# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

DWAYNE FURLOW,          )
                                )
        Plaintiff,     )     Cause Number: 4:16 cv 00254 JAR
                                )

v.                         )
                                )

JON BELMAR, et. al.,     )
                                )
        Defendants.    )

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS

**Preliminary Statement**

       Plaintiffs filed a two count lawsuit pursuant to 42 U.S.C. §1983 against multiple defendants. Defendants Christopher Partin, Kevin Walsh and Laura Clements are being sued in their personal capacities for actual damages and punitive damages. Jon Belmar is being sued in his official capacity as Chief of Police of the St. Louis County police department. The County of St. Louis, Missouri is alleged to be "culpable pursuant to *Monell v. N.Y. Dep't of Soc. Svs*, 436 U.S.658 (1978)." (See Doc 14, par. 164). No other defendant has been named or served. There was no underlying constitutional violation with any of the individual plaintiffs. Jon Belmar, The County of St. Louis, Missouri, Christopher Partin, Kevin Walsh, and Laura Clements have filed their motion for summary judgment seeking dismissal of the entire lawsuit.

       As presented by plaintiffs in Doc 57, par. 4, "The use of Wanteds by Defendants is at the core of Platinfffs' claims in this action." Christopher Partin, Kevin Walsh, and Laura Clements issued wanteds, and so they are being sued. As shown in the Statement of Material Facts, there was probable cause to believe that plaintiffs committed crimes before wanteds were issued.

Both Dwayne Furlow and Ralph Torres spoke on the telephone with a police officer who asked that they appear in person to talk. They did not. Howard Liner did not speak on the phone with an officer but his pleading indicates that he had been alerted that a "wanted" was issued. (Doc 14, par. 124). So each of the plaintiffs had knowledge that the police wanted to talk to them.

Numerous depositions of St. Louis County police officers have been taken including a former lieutenant who recently retired from the force after 30 years. Without exception the testimony has been that the policy and practice is that anytime a person is taken into custody, whether by a Wanted or otherwise, there must be probable cause to believe that this person committed a crime.

This Memorandum of Law is in support of Defendants' Motion for Summary Judgment.

**Statement of Facts**

Defendants incorporate as though fully set out herein the Statement of Undisputed Material Facts and the exhibits that are being filed with this memorandum of law and motion for summary judgment. All the facts will not be repeated because the uncontroverted facts with citations are 44 pages long, but a shortened version without citations to the record is as follows.

*Dwayne Furlow underlying claims against Officers Partin and Walsh*

Dwayne Furlow was on probation for a burglary conviction. He had had problems with both the mother of his children and with his wife LaToya who had both threatened to tell his probation officer that he had hit them. The Department of Family Services had come to his home at two different addresses, and Furlow admitted that he "maybe" had phone conversations that the DFS woman had asked police to go with her for protection. During his probation he had what he called a "dirty urine drop." In addition he believed that committing an assault while on

probation was "jail time" for him. With that backdrop, his next door neighbor who was a skinny woman wearing glasses called 911 on November 11, 2015 and reported Mr. Furlow had knocked her down and had taken her cell phone. Soon after the call to the dispatcher was made, Mr. Furlow fled the scene. His story at his deposition was that he had been in bed, heard rowdiness, he kept hearing noises, he, looked out, then he walked out, saw this adult woman smacking his kids in the face with a belt, so he walked his kids back to the house and left them there to wait for the taxi to be taken to school, and then he left to take his wife's daughter to daycare, but he could not remember the name of the daycare. Officer Christopher Partin arrived along with field training officer Slusser at 9.a.m., just three minutes after the 911 call was received from the dispatcher at 8:57 a.m.. Mr. Furlow was already gone upon the officers' arrival. Officer Partin and his training officer tried to sort things out and tried to talk to as many people as possible and also canvassed the neighborhood. The neighbor woman said that there had been ongoing issues with the Furlow family, and so when she saw the fight involving kids she started recording it on her cell phone and then Furlow came up, took her phone, hit her in the head, and broke her glasses. One eyewitness told the officer that he did not see who among the kids had started the fight, but he did see Furlow assault the woman and take her phone. While this investigation on t was taking place, Furlow's son walked up to Officer Partin and said my dad wants to talk to you, and then handed Partin a cell phone. Officer Partin asked the voice on the phone, presumably Furlow, to return to the scene to speak with him in person. Furlow told the officer that he would try and touch base with him later on. Furlow immediately called his attorneys. Officer Partin returned to Furlow's house several times that day. Furlow admitted that he was aware that officers came by, and his attorneys even mentioned in a letter that police officers returned to the house multiple occasions that day. Later, close to the end of the shift, a wanted was issued.

Officer Partin believes he had probable cause that Furlow had committed a crime. Before issuing the wanted, he discussed it with his field trainer. There is supervisor approval of all reports, and so in addition to discussing this with his field trainer, Officer Partin knew that his sergeant would review his report which contained the wanted.

Following this, Furlow's attorney spoke to Officer Partin numerous times. Partin told the attorney what his schedule was so that Mr. Furlow could turn himself in at a convenient time. On December 12th Furlow and his attorney appeared; it was communicated that Furlow would not answer any questions, Officer Partin respected Furlow's right to remain silent, issued Furlow a summons, and then cancelled the wanted. Furlow believes that he was in the presence of Officer Partin (and the field trainer) for probably 10 minutes. Furlow does not remember what Partin looks like and could not pick him out if he saw him. Furlow alleges that what Partin did was a constitutional violation and so he is suing Partin for both actual and punitive damages in his individual capacity.

On January 25, 2015, approximately 2 ½ months after Furlow was accused of assaulting a skinny female neighbor, another 911 call was made. This time a different neighbor called 911 saying that Latoya Furlow came running over to their house saying that her husband had beat her up. Minutes after the call was made, Furlow fled the scene in a vehicle with tinted windows. When Mrs. Furlow spoke to the 911 operator she was still crying. Officer Walsh responded to the scene 8 minutes later. Mrs. Furlow was still crying profusely when he arrived and was crying when telling Officer Walsh that Furlow had accused her of being unfaithful, knocked her down, stomped on her legs, and dragged her out of the house by the hair. She was nervous about being in the house even though her husband left the scene. Officer Walsh offered to perform a protective sweep to make sure Furlow had not returned through the back door, which she agreed

to. While walking through the house to see if Furlow was there, an AR 15 rifle was observed with one live round in the chamber and 29 rounds in the magazine. Officer Walsh then learned from Latoya that Furlow had a felony conviction for which he was on probation, and that the rifle had been purchased in Latoya's name, and kept at the home "for protection."

Latoya's cell phone rang; Latoya indicated it was her husband, and handed the phone to Officer Walsh. Officer Walsh asked Furlow to come to the scene and talk to him. Interestingly, even though it is alleged in the First Amended Complaint that Furlow told Officer Walsh that he had no interest in answering questions, at his deposition Furlow did not remember talking to Officer Walsh, until he was shown during the deposition that he had alleged in his Complaint that he had talked to Officer Walsh. Then Furlow testified that he may have been smoking marijuana back then. Even after he acknowledged that he talked with Officer Walsh, he testified that he did not recall saying that he had no interest in speaking with the police or answering questions (despite the Count II allegations that he was retaliated against for not answering questions).

Latoya indicated that she could move to a home in the City. Officer Walsh assisted Latoya in carrying plastic bins and other itmes to her car, including the AR 15 rifle, which he unloaded. Officer Walsh gave Latoya advice on getting a protective order. Latoya was still crying as she got into her car. That night Officer Walsh went by the house at least three times looking for Furlow, believing there existed a dangerous situation. Officer Walsh issued a wanted for Dwayne Furlow.

Officer Walsh had determined that this was dangerous not only because it involved domestic violence, but also because there was a loaded AR 15 rifle; purchased by means of a

straw purchase. On advice of counsel Furlow refused to answer questions regarding the AR 15 rifle being present in his house.

What would have confirmed that Officer Walsh's suspicions that this was a very dangerous situation were completely valid was that less than 4 months later a rifle was shot in the air numerous times in front of or near the Furlow house, at a time that children were playing in the street, and when at least one neighbor woman was outside in the area. Again, Furlow's counsel advised Furlow not to answer numerous questions regarding this incident.

The day after Latoya ran crying to a neighbor's house, Latoya called Officer Walsh to recant that her husband had beat her up. For various reasons including Latoya's emotion the day the emergency 911 call was made, and now her fast paced anxious and agitated voice during the recantation, and the reasonable belief that what domestic abuse victims say initially is usually the truth, Officer Walsh asked if she was being coerced, and asked her to come into the station to make a statement in writing. She said no. At his deposition Furlow was asked if he was with Latoya when she made the recantation. He indicated he did not recall, but admitted that he had *"just let her know like I don't feel like going through this police shit over here."*

Two days later, Furlow was driving an automobile without a license plate on the rear of the vehicle he was driving, in the city of St. Louis, on Goodfellow Blvd. near the Job Corps Center. He was pulled over by police. As it turned out, he did not have a driver's license either. He told the officer he believed there was either a wanted or a warrant out for him. He was taken into custody. He called his attorney. His attorney called police demanding that Furlow be released. It is alleged. In paragraph 80 of the First Amended Complaint that a police sergeant told Furlow's counsel that Officer Walsh had followed department procedures in issuing a wanted. Officer Walsh testified he believes he followed department procedure with everything

that he did. Furlow acknowledge that he alleged that police refused to release him pursuant to police department policy. Nonetheless, Furlow has sued Officer Walsh in his individual capacity for actual and punitive damages, despite that there is no dispute that he followed policy.

*Ralph Torres' underlying claim against Det. Laura Clements*

Mr. Torres acknowledged in his deposition that protective orders had been issued involving him and his ex-wife, and also there had been several calls that the police responded to at his house.

On November 13, 2014 the St. Charles County Children's Division received what they labeled as an "emergency" investigation alleging sexual abuse of a minor girl by Ralph Torres.

Mr. Torres owns property in various locations including the City of Saint Peters in St. Charles County. One of his ex-wives lives in St. Charles County. In late 2014 and early 2015 Mr. Torres lived in a house in St. Louis County. He became aware that sexual misconduct allegations were made against him. Andrea Kroninger of the St. Charles County Department of Social Services left a voice mail message that she wanted to speak to him. In addition she sent Torres a letter. Mr. Torres chose not to cooperate with or even talk to the St. Charles County Department of Social Services. So whatever was being alleged to the St. Charles County Department of Social Services was not denied by Mr. Torres to the Department of Social Services. He testified that he had access to reports from St. Charles County through his attorney.

On November 26, 2014 Ms. Amy Robins of the Child Center conducted a forensic interview with the child in St. Charles County. A forensic interview is conducted by someone who has been especially trained in talking to young children. No leading questions are asked. Questions are age appropriate. The interview is conducted in a neutral environment. Just one person is in the room with the child, but other people are able to observe from another room.

During the interview the young girl, who at the time of the interview had turned 5 years old shortly before the interview, said that Ralph Torres begged her to touch his private parts but she did not want to. The girl said sometimes Torres made her touch his "front" and sometimes his "back." She said that she had touched his penis when she was 4 years old. He made her touch it with a tissue and she had to "clean down there." She also had to touch his butt with a washcloth.

At some point the interviewer, Ms. Robins, left the room for a break, and while the girl was in the room by herself, she drew pictures of Torres' penis with pee coming out.

When Ms. Robins returned to the interview room she asked the child what Torres says when he asks her to touch his penis and the child answered, "Yes, because he likes it." The child indicated she was told by Torres not to tell her mother about this.

The St. Charles County Department of Social Services later requested Sgt. Redmond of the St. Louis County Detective Bureau crimes against persons to conduct an investigation, and sent Sgt. Redmond a disc of the forensic interview. Sgt. Redmond assigned the investigation to Detective Laura Clements, and gave her the disc of the forensic interview, which she watched. Det. Clements also spoke with Melissa Snyder, an ex-wife of Ralph Torres, who told her that the minor child said that Torres touches her bottom, and the child asked Ms. Snyder to do the same. Ms. Snyder contacted the Missouri Department of Social Services Children's Division, St. Charles Office.

After viewing the disc and speaking to Ms. Snyder, Det. Clements thought that she had probable cause that Mr. Torres committed statutory sodomy. But Det. Clements wanted a complete investigation and so she called Torres; he did not answer, she left a voice mail message for him to call her. He did not return the call. Det. Clements called a 2nd time and left a 2nd

voice mail message. Torres returned the 2nd call. Det. Clements made the request that Torres

come in to talk to her. His response was that she would have to go through his attorney. Torres

gave his attorney's name but not the attorney's telephone number. Detective Clement

nonetheless tried to call the attorney. In fact the attorney even said to. Torres, that they were

playing "phone tag" It was the hope and preference of Det. Clements that Torres and the

attorney would come to her office and make a statement, or not, but she had to complete the

investigation of the crime which she had probable cause to believe that Mr. Torres committed.

But Mr. Torres and his attorney did not come in to her office. Finally on February 23, 2015 Det.

Clements issued a wanted. It is always her practice to tell her sergeant that she is going to issue

a wanted before she does. The wanted was issued. On or about April 2nd, 2015 a police officer

came to Torres' house. After the officer arrived and found Torres, the officer called Detective

Clements to tell her that Ralph Torres was being picked up on the wanted. Clements was then

off duty and was not scheduled to come on duty until later that afternoon at 4:30 p.m. Because of

the late time to start her shift, the warrant office would not be open after the interview until the

next morning. Before he left his house, Torres was allowed to make telephone calls to his

attorney, to his friend, and to relatives. After Det. Clements came on duty, she interviewed Mr.

Torres that night. Detective Clements and Torres are in agreement generally on what was said.

Torres testified he simply said "Call my attorney I don't have anything to tell you." Det.

Clements testified that Torres said that he had already contacted his attorney and he didn't have

anything else to say. Torres did not say that he and his ex-wife were in a custody dispute, and

he did not say that he would be agreeable to talk with her if his attorney was present (as alleged).

He just said, call my attorney, I don't have anything to tell you.

Detective Clements believed her investigation was now complete. She was aware when the 24 hours would expire, so she went to the prosecuting attorney's office at 10 a.m. the next day, which was 5 ½ hours before her shift began. The prosecutor bumps up on the list the applications when the 24 hours is approaching, Clements knew Mr. Torres would be released if a warrant was not issued within 24 hours, and she knew that the 24 hours begins when someone is picked up.

Charges were not issued just as the 24 hours were up, and so Det. Clements knew that Torres would be released. Subsequently the ex-wife learned that charges were not issued and was very upset. Det. Clements listened to Ms. Snyder, and allowed her to vent, but took no other action against Mr. Torres.

*Det. Clements is being sued in her individual capacity* for actual and punitive damages. Mr. Torres testified that he believes only St. Louis County is being sued and that he is not suing anyone else. So he did not know that he was suing Det. Clements, at least until there was a break during his deposition.

*Howard Liner's underlying claim (but no police officer has been named and served)*

Page 17 of the First Amended Complaint lists allegations addressed as "November, 2013," stemming from a "domestic dispute." These allegations were abandoned during the deposition of Mr. Liner, when a series of questions were just getting started, and Liner's attorney indicated on the record that there were errors in the Complaint and they will not be relying on those allegations.

Pages 17-18 of the First Amended Complaint lists allegations addressed as "June 2015." These allegations involving domestic violence were abandoned when Mr. Liner's attorney

advised Liner not to answer questions and indicated on the record that they will not be relying on those allegations.

Pages 18-19 of the First Amended Complaint lists allegations addressed as "July-August 2015."

Paragraphs 124 and 125 of the Amended Complaint allege that Mr. Liner had been alerted that a Wanted had been issued, and then sometime later Mr. Liner was arrested by the City of St. Louis Police Department. Mr. Liner could not recall during the deposition any details regarding when, why, and where Mr. Liner was arrested by the City of St. Louis police department. But sometime after the City of St. Louis police released Mr. Liner from its custody, he was transferred to St. Louis County because a wanted had been issued by a St. Louis County police officer, which, as alleged in the Amended Complaint, Mr. Liner had been aware of. After being transferred to the County, Mr. Liner was interviewed by Officer Ed Schlueter regarding felony theft of rims-tires. Officer Schlueter told Mr. Liner of his right to remain silent, Mr. Liner waived his right, gave his side of the story, which caused Officer Schlueter to believe him, or at least question himself on whether he still had probable cause. So Officer Schlueter ordered that Mr. Liner be released. Officer Schlueter counseled Mr. Liner saying whatever you do, don't retaliate against the person who made the accusation because Officer Schlueter said he did not want Mr. Liner arrested. Since this encounter, the paths of Officer Schlueter and Mr. Liner have crossed and they have been cordial and respectful to each other.

Officer Schlueter is the officer who issued the Wanted for Mr. Liner. Mr. Liner does have several felony convictions. On August 25th 2015 Officer Schlueter received a dispatch of a theft that had just occurred at a residence. He went there, went inside, people were loud and screaming; yelling and commotion was going on. Officer Schlueter was told by the mother of

the alleged victim that Howard Liner had stolen tires-rims from her son, and her son had now left for work. Howard Liner was specifically identified by name by the mother. The mother called the son on the telephone who said to Officer Schlueter that he knows Liner really well, that he had been attempting to sell stereo equipment in his front yard to Liner, that he also had the tires-rims outside in the yard, and then after talking things over with Liner, the alleged victim went into the house, came out, and discovered the tires-rims were gone, and he observed the silver BMW belonging to Howard Liner driving off, and then the alleged victim said he talked to a neighbor who said that he witnessed Liner removing the rims-tires, and putting them in his car. The mother also said that she had seen the BMW driving off. The police officer also talked to others in the house. Schlueter knocked on the door of the alleged eyewitness but he did not answer. Officer Schlueter believed that he had probable cause to believe that Liner committed a crime. He went to Liner's house, knocked on the door and walked around. As it turned out, Liner later told Officer Schlueter that he spotted Schlueter on his cameras walking around his house.

## St. Louis County and Chief Belmar in his official capacity as chief

CALEA is the premier accrediting agency in the United States. The St. Louis County police department is CALEA accredited and has been since 1998. The most recent reaccreditation occurred December 2012 and December 2015, where St. Louis County met all standards in law enforcement, and in fact was accredited with excellence in Law Enforcement, a large component of which involves policies, and excellence in Communication, and missed the excellence in training by one standard. Training both at the academy and ongoing teaches that there must be probable cause for all arrests. The hiring process of St. Louis County police officers is thorough and exhaustive. Discipline rules and discipline procedures are in place and

they meet all CALEA standards. Supervisors go through a probationary period and must be evaluated and must meet CALEA standards. All training is POST certified, and police officers are POST certified, and the Academy, instructors, and curricula are POST approved. Because of the hiring process, the policies in place, the training, the supervision in place, the discipline in place, and the CALEA certification, Chief Belmar is confident there is not a pattern of unconstitutional conduct.

Plaintiffs took the deposition of Patrick Monahan, a licensed attorney, and employee of the Prosecuting Attorney's office since 1997, and the supervisor of the warrant office since 2013. He indicated that police officers who come into the warrant office, beginning when young officers are with their training officer, learn the process that when the officers come in, the prosecutor wants a complete investigation, including a police report, evidence receipts, multimedia and/ or cell phone analysis; and further they learn an investigation is not considered complete if the subject of the investigation has not been spoken to. The PA wants both sides of the story. Phone conversations are not helpful and are not admissible. This licensed attorney and experienced prosecutor said warrantless arrests are permitted by the U. S. Supreme Court where there is probable cause that the suspect committed the crime. This licensed attorney and experienced prosecutor also testified that a "wanted" is when an officer has probable cause to think a suspect has committed a crime but the officer cannot find this person or talk to him, and so a wanted is entered into the teletype in order to have the in-person conversation, in order to complete the investigation. Mr. Monahan is not aware of any instances where a St. Louis County police officer misused a wanted.

This licensed attorney and experienced prosecutor also testified that in the state of Missouri an arrested person can be detained 24 hours. Officers will tell the PA when the 24

hours began and then when the 24 hours are approaching the reviews by the PA office are expedited. If warrants are refused or taken under advisement the arrested person is released. Mr. Monahan has no knowledge of individuals being detained longer than 24 hours.

Numerous depositions of St. Louis County police officers, and supervisors, and even a recently retired lieutenant were taken. Most have college degrees, those who have not completed a degree served in the military; all were trained in a police academy followed by continuing education and training. (Lt. Burk attended two different police academies, and Officer Schlueter attended three different police academies).

The county police officers were asked about wanteds. Without exception each officer said that wanteds are issued only with probable cause that a suspect has committed a crime and that is how it has always been with the St. Louis County police department. That sentiment was echoed by the former lieutenant who had a 30 year career with St. Louis County. Probable cause for wanteds was always required even before the words "probable cause" were added to a general order. The officers testified that a purpose of wanteds is to give suspects an opportunity to say what happened, to give their side of the story. Wanteds are discussed during field training, including the correct steps needed to be taken, probable cause, notifying a CARE operator. During field training wanteds are not issued without discussing with the field trainer; the supervisors review all reports and so sergeants have always known when wanteds are issued at least by reading the report, if not discussed before then, and some officers such as Det. Clements, as a practice, have always let their sergeants know before wanteds were issued. Now a sergeant has to approve the wanted beforehand, and the name of the sergeant or other supervisor is now documented in the report. People are not arrested on a wanted for questioning unless there is probable cause that the suspect committed the crime. Probable cause has to exist before the

wanted is issued. It is not permitted to take someone into custody and then try to come up with probable cause. Wanteds are a last resort to make contact with persons where probable cause exists. Officers first try to make contact with the suspects. They often go to their houses; they call them, and invite them to come to the office or station to speak with them for a face to face meeting, which meetings do not necessarily result in immediate arrest. Testimony included that investigations had to be complete; there are times when a suspect's side of the story will be enough not to arrest the suspect, or may lead to having to talk to other people. There was testimony that there are plenty of cases where a suspect is talked to, not arrested, and a warrant is not applied for until later. The testimony often included opinions of officers that giving the suspect an opportunity to tell their side of the story was fair to the suspect, rather than applying for a warrant when the suspect may be innocent.

Normally only users of the REJIS system can view wanteds. There are occasions when the state MULES system and/or national NCIC system are used for a temporary 48 hour wanted, but only if it is believed that an individual may seek refuge across jurisdictional boundaries and only if the case officer is prepared to immediately respond to the extradition limits. It is very rare for County police to use the MULES temporary wanteds.

When an officer discovers someone has a wanted from another jurisdiction, the officer must contact the other jurisdiction to make sure that the wanted is still active.

In order to have access to the REIS system someone has to attend a REJIS taught class, be certified and then pass a test every year.

After wanteds are issued, they are removed when a suspect is found. If not found the wanted must be validated 90 days after issuance to determine if the wanted should remain, and then validation occurs annually after that. Wanteds are removed when the statute of limitations

expire, so they are removed in 6 months for some violations, one year for misdemeanors, and 3 years for most felonies. Some crimes, such as murder, have no statute of limitations but even those major crimes still have to be validated annually. If a wanted is issued for a minor offense such as shoplifting, an interview can occur wherever, such as the side of the road, and the suspect can be given a summons rather than taken in for interview at the station.

The officers in their depositions were often asked about the statute requiring release within 24 hours if no warrant has been issued. Various officers indicated they speak to the person as soon as reasonably possible. When an investigation is complete the officers apply for a warrant, whether this is 5, 10 or 15 hours, it does not matter. If a warrant is refused early the suspect is then released early.

The policy is different when there is probable cause for domestic abuse. The suspected domestic abuser can be held for 24 hours to allow the victim time to obtain an order of protection, to get medical help, to move to a safe house, to give physical and emotional protection to the victim during the 24 hour period, and generally to protect the victim. Also the domestic abuser may realize the consequence of the abuse and not do it again. So this exception is not meant to punish the abuser, but to protect the victim.

No officer or supervisor deposed was aware of individuals ever being held longer than 24 hours without a warrant.

After graduation from the academy, St. Louis County police officers have a one year probationary period which begins with 4 phases of field training. Field training instructors take a class on field training. During field training, policies and procedures, including general orders, are reviewed and fine-tuned. The officers are encouraged to ask questions of their field

trainers and also to supervisors and even to lieutenants. Officers are coached through the calls that are made, and guided to further investigation.

Training for all officers includes the reading of general orders. When general orders are updated, supervisors are the first to learn about the updates. Then the supervisors discuss the update at roll call. The updated general orders are sent to each officer by computer. The officers must read the order and at the end of it they sign their log in information indicating that they have reviewed it and understand it.

## Statement of Law

*Summary Judgment standard:*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," F.R.C.P. 56(a); Hill *v. Walker*, 737 F. 3d 1209, 1216 (8th Cir. 2013). On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Ricci v. DeStefano*, 557 U. S. 557, 129 S. Ct. 2658, 2677 (2009) (quoting *Scott v. Harris, 550 U.S. 372, 380 (2007)* (internal quotations omitted). Also see *AgriStor Leasing v. Farrow*, 826 F. 2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*, 477 U. S. 242 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Summary judgment procedure is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the federal rules as a whole, which are designed to secure the just,

speedy and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U. S. 317, 323 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.* at 247-48 (1986). A plaintiff cannot create sham issues of fact to defeat summary judgment, *Wilson v. Westinghouse Elec. Corp.*, 838 F. 2d 286, 289 (8th Cir. 1988).

*Arrest with probable cause but without a warrant:*

Section 544.216. R. S. Mo allows officers to arrest without a warrant when an officer has reasonable grounds to believe someone has violated any ordinance, or any law of this state over which such officer has jurisdiction.

Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to obtain a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest. *United States v. Webster,* 625 F. 3d 439, 442 (8th Cir. 2010). Instead, the mere "probability or substantial chance of criminal activity, rather than an actual showing of criminal activity," is all that is required. *United States v. Mendoza*, 421 F. 3d 663, 667 (8th Cir. 2005). In making a probable cause determination, law enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances. *United States v. Henderson*, 613 F. 3d 1117, 111 (8th Cir. 2010).

Florida once allowed persons to be arrested and remain in police custody for 30 days or more without a judicial determination of probable cause. This was challenged. *Gerstein v. Pugh*, 420 U.S. 103, 104-10 (1975) established that the Fourth Amendment requires a neutral judicial determination of probable cause as a prerequisite to extended restraint of liberty. *Id* at 114. Under *Gerstein*, warrantless arrests are permitted, but persons arrested without a warrant

must "promptly" be brought before a neutral magistrate for a judicial determination of probable cause. *Id* at 114. "A policeman's on the scene assessment of probable cause provides legal justification for arresting person suspected of crime, and for a brief period of detention, to take the administrative steps incident to arrest. *Id*.

In *County of Riverside v. McLaughlin*, 500 U. S.44, 47 (1991) the Court addressed what is "prompt" within the meaning of the Fourth Amendment. The court noted the distinction that *Gerstein* provides for , but not immediate probable cause determination. *Id* at 55. The Court declared "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id* at 56. Examples of *unreasonable* delays are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the individual, or delay for delay's sake. *Id* at 56. If the hearing is held within 48 hours, the burden is on the arrested individual to show that his or her probable cause determination was delayed unreasonably. *Id* at 57. After 48 hours, it is the government's burden to show that the probable cause determination was delayed for good reason. *Id*.

*Section 544.170*.1 requires that all persons arrested and confined in any jail by any peace officer without a warrant for any alleged breach of the peace or other criminal offense or suspicion thereof, shall be discharged from said custody within twenty four hours from the time of such arrest, unless they shall be charged with a criminal offense.

The facts of this case have shown that St. Louis County police officers issue wanteds only on probable cause, and then there is no unreasonable delay, and arrested persons are not held 48 hours, as generally approved in *County of Riverside v. McLaughlin*, but rather no longer than 24 hours, and shorter than that if a warrant is refused or taken under advisement. There is

no testimony and no reason to believe that detention without a warrant is unjustifiably prolonged. The only time someone may be held the full 24 hours without actively seeking a warrant involves domestic violence cases but that is not done out of ill, but rather to protect the victim. The Missouri Supreme Court has recognized the validity of this. To quote *In re Conard*, 944 S. W. 2d 191, 201 (1997) "In many instances there are valid reasons for keeping an individual in jail for (the 20 hours that was then allowed by section 544.170). This is especially in instances of domestic abuse when continued violence is a threat."

*Gerstein* only requires a judicial determination of probable cause for *extended* restraint (emphasis added) of liberty following arrest. *Gerstein*, 420 U. S. at 114. A delay is unreasonable if it is motivated by a desire to uncover additional evidence to support the initial arrest or to use the suspect's presences solely to investigate the suspect's involvement in other crimes. *Id;* Also see *United States v. Davis*, 174 F. 3d 941, 944 (8th Cir. 1999).

*Individual defendants:*

With regard to Officers, Partin, Walsh, and Det. Clements, "Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed. *Smith v. City of Minneapolis*, 754 F. 3d 541, 547 (8th Cir. 2014).

For a plaintiff to succeed on a claim of false arrest there must be confinement without legal justification. *Rustici v. Weidemeyer*, 673, S. W. 2d 762, 767 (Mo. banc. 1984). Probable cause for arrest exits when the totality of the circumstances at the time of the arrest is sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. *Borgman v. Kedley*, 646 F. 3d 518, 522, 523 (8th Cir. 2011). Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable. *Id*, quoting *Linn v. Garcia*, 531 F. 2d 855, 861 (8th Cir.

1976). The law does not require law enforcement officers to conduct a perfect investigation to avoid a suit for false arrest. See *Stepnes v. Ritschel*, 663 F. 3d 952, 961 (8ᵗʰ Cir. 2011).

*Qualified Immunity:*

Qualified Immunity protects government official from liability for civil damages if they have not violated clearly established statutory or constitutional rights of which a reasonable person would have known. *DeBoise v. Taser Int'l. Inc.,* 760 F. 3d 892, 896 (8h Cir. 2014); *Akins v. Epperly*, 588 F. 3d 1178, 1183 (8ᵗʰ Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U. S. 800, 818 (1982). A government official is shielded from damages if a reasonable official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official. *Olson v. Bloomberg*, 339 F. 3d 730, 735 (8ᵗʰ Cir. 2003). This immunity permits government officers to make reasonable errors. *Habiger v. City of Fargo et al*, 80 F. 3d 289, 295 (8ᵗʰ Cir. 1996) and provides ample room for mistaken judgments. *Malley v. Briggs*, 475 U. S. 335, 343 (1986); *Borgman v. Kedley*, 646 F. 3d 518, 522 (8ᵗʰ Cir. 2011). The qualified immunity defense protects public officials unless they are plainly incompetent or knowingly violate the law. *Id.*, (Quoting *Hunter v. Bryant*, 502 U. S. 224, 229 (1991). Also see *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (citations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines (citation omitted)." *Luckert v. Dodge County*, 684 F. 3d 808, 817 (8ᵗʰ Cir. 2012).

Qualified Immunity is immunity from suit rather than merely a defense to liability. *Mitchell v. Forsyth*, 472 U. S. 511, 526 (1985). A defendant is entitled to a thorough determination of a claim of qualified immunity if that immunity is to mean anything at all. *O'Neill v. City of Iowa City*, 496 F. 3d 915, 918 (8ᵗʰ Cir. 2007).

*Supervisory Liability:*

A supervisor cannot be held liable where there is no underlying constitutional violation. *Abbott v. City of* Crocker, 30 F. 3d 994, 998 (8th Cir. 1994)   Without personal involvement in the claimed constitutional torts, supervisors are not liable under §1983. *Johnson v.* Blaukat, 453 F. 3d 1108, 1113 (8th Cir. 2006); *Jane Doe "A" v. Special School Dist.*, 901 F. 2d 642, 645 (8th Cir. 1990). Plaintiff must demonstrate that the supervisory defendant had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation. *Tlamka v. Serrell*, 244 F. 3d 1069, 1078 (8th Cir. 1996).  Under this theory of liability, plaintiff must show that the supervisory defendants were "deliberately indifferent to or tacitly authorized the offending acts." *Vaughn v. Greene County, Arkansas*, 438 F. 3d 845, 851 (8th Cir. 2006), quoting *Wever v. Lincoln County, Nebraska*, 388 F. 3d 601, 606 (8th Cir. 2004).  Supervisors cannot be vicariously liable under §1983 for the actions of a subordinate. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009).

St. Louis Count has been CALEA accredited.  Accreditation is prima facie evidence that standards and practices of an agency meet constitutional due process requirements. *Woe by Woe v. Cuomo,* 729 F.2d 96, 106 (2nd Cir. 1984).

*Punitive Damages:*

With regard to punitive damages, the defendant's conduct must be motivated by evil motive or intent or involve a reckless or callous indifference to the federally protected rights of others. *Hollins v. Powell*, 773 F. 2d 191, 197 (8th Cir. 1985).  In this case the deposition pages of the parties clearly have no hint of evil motive or intent or reckless indifference.  In fact the First Amended Complaint even alleges that the actions of the officers were pursuant to the policy, practice and custom of the St. Louis County police department.

The Plaintiffs cannot recover punitive damages against St. Louis County, Missouri. Kline v. City of Kansas City, 175 F.3d 660, 670 (8th Cir. 1999) (citing Chappel v. City of Springfield, 432 S.W.2d 810, 814-15 (Mo. 1968); *See* City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762 (1981) (municipality not liable for punitive damages under 42 U.S.C. § 1983).

Official capacity suits are, in all respects other than name, to be treated as suits against the entity. *Kentucky v. Graham*, 473 U.S. 159, 163 (1985). Therefore, since plaintiffs cannot recover punitive damages against the County, plaintiffs should not be able to recover punitive damages against Jon Belmar, sued in his official capacity.

*Furlow taking the 5th amendment on questions involving the claim and defenses"*

There is a separate issue that applies to Dwayne Furlow's claim where he repeatedly refused to answer questions regarding his having a rifle in the house when he is a convicted felon, his inducing his wife to purchase an AR15 rifle in her name, and his shooting an assault rifle into the air multiple times. Dwayne Furlow sued Officer Walsh who observed the AR 15 rifle in Furlow's home, and learned that Furlow was a felon on probation, and learned that the purchase of the rife was a straw purchase and was kept at the home "for protection; and so he justifiably believed this was a very dangerous situation, and he was skeptical of the alleged recanting on the telephone the next day. In *General Dynamics Corp* v. *Selb Mfg. Co.*, 481 F. 2d 1204, 1209, 1218 (8th Cir. 1973) the court noted the right against self-incrimination does not free a claimant of the responsibility to respond to discovery when the information bears upon the claim or defenses. In *McKeller v. Rubel*, 2009 WL 913908,1 (E.D. Mo. 2009) the Court granted summary judgment to the defendant when the plaintiff relied on the 5th Amendment not to answer questions concerning a disputed issue. In *Brutcher v. Jefferson County*, 2009

WL1749373, 5 (E. D. Mo. 2009) the court granted summary judgment on the emotional damages claim noting that plaintiff's invocation of the 5th Amendment during depositions prevented full exploration of this claim.

*No constitutional violation for wanteds, so should be no class,*

Regarding the class allegations, Dwayne Furlow, Ralph Torres, and Howard Liner allege that their constitutional rights were violated, and so they are bringing this action on behalf of others similarly situated. But the facts show that plaintiffs' constitutional rights have not been violated, and further the facts show that wanteds are not issued for improper purposes that were alleged, such as just to interrogate individuals, or to punish individuals or to demonstrate police authority over individuals. Further, plaintiffs made allegations that the use of wanteds creates a police state where poor and black people are afraid to leave their homes, drive cars, visit friends and otherwise conduct their daily lives. The allegations are baseless, nothing like that was disclosed by ; and all of the countless depositions have only proven that there was probable cause or arguable probable cause to believe each of the plaintiffs had committed a crime, and all of the police officers deposed and the prosecuting attorney deposed are educated, well trained and dedicated public servants. Plaintiffs have made unsupported allegations and wish only to cause a huge amount of discovery hoping to find something somewhere.

**Conclusion**

There are no material facts in dispute. Officers Christopher Partin, Kevin Walsh and Laura Clements are entitled to judgment as a matter of law. In addition they are entitled to qualified immunity. The training and policies and customs and practices of St. Louis County have not violated the constitutional rights of these plaintiffs. Issuing wanteds on the basis of probable cause, and then holding those arrested for a reasonable length of time not to exceed 24

hours without a warrant does not violate the constitution   Summary Judgment should be granted

in favor of all defendants on all claims.

Respectfully Submitted,

PETER J. KRANE
COUNTY COUNSELOR

/s/ Michael E. Hughes
Michael E. Hughes    #23360MO
Associate County Counselor
Mhughes2@stlouisco.com
41 So. Central Avenue, 9th Floor
Clayton, MO. 63105
314-615-7009; Fax 314-615-3732
Attorneys for Defendants

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served electronically to all counsel of
record via this Court's Electronic Filing System this 25th day of August, 2017

/s/   Michael E. Hughes