# Exhibit 4

CHRISTOPHER PARTIN  2/8/2017

## Page 1

```
 1          UNITED STATES DISTRICT COURT
 2     EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION
 3                    --oOo--
 4   DWAYNE FURLOW, et al.,      )
                                 )
 5       Plaintiff              )
                                 )
 6       vs.              ) No. 4:16-CV-00254-CEJ
                                 )
 7   JON BELMAR, et al.,         )
                                 )
 8       Defendants.            )
     _____)
 9
10        VIDEO-RECORDED DEPOSITION OF
11            CHRISTOPHER PARTIN
     _____
12          February 8, 2017
13
14
15        (Beginning at 9:30 a.m.)
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   Exhibit 7   November 11th, 2015, email from   151
 2       Blake Strode which attaches a
 3       letter from ArchCity Defenders
 4   Exhibit 8   Summons issued to Mr. Furlow      155
 5       dated DEFRRFP100000001
 6   (The original exhibits were retained by the court
 7   reporter and will be copied and attached to copies
 8   of the transcript.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1                 INDEX
 2                         PAGE
 3
 4   EXAMINATION BY MR. HOLLAND .....................9
 5   EXAMINATION BY MR. HUGHES ....................160
 6   FURTHER EXAMINATION BY MR. HOLLAND ...........210
 7   FURTHER EXAMINATION BY MR. HUGHES ............214
 8   FURTHER EXAMINATION BY MR. HOLLAND ...........215
 9              EXHIBITS
10   Exhibit 1   General order dated July 15,      29
11       2015, Bates stamped
12       DEF-RFP23400000017
13   Exhibit 2   General order dated September 14,  29
14       2016, Bates numbered
15       DEF-RFP23400000022
16   Exhibit 3   General Order 11-26 dated          31
17       September 13th, 2011, Bates
18       numbered DEFRRFP23400000013
19   Exhibit 4   General Order 10-37  Bates         76
20       numbered DEF-RFP23400000028
21   Exhibit 5   General Order 16-37 dated March    77
22       16th, 2016, Bates numbered
23       DEFRRFP23400000078
24   Exhibit 6   Police report Bates numbered      119
25       DEFRRFP 100000004
```

## Page 4

```
 1          UNITED STATES DISTRICT COURT
 2     EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION
 3                    --oOo--
 4   DWAYNE FURLOW, et al.,      )
                                 )
 5       Plaintiff              )
                                 )
 6       vs.              ) No. 4:16CV00254CEJ
                                 )
 7   JON BELMAR, et al.,         )
                                 )
 8       Defendants.            )
     _____)
 9
10                    --oOo--
11        VIDEO-RECORDED DEPOSITION OF CHRISTOPHER
12   PARTIN, produced, sworn, and examined on Wednesday,
13   February 8, 2017, taken on behalf of the Plaintiffs,
14   at the offices of Midwest Litigation Services, 711
15   North 11th Street, in the City of St. Louis, State
16   of Missouri, before RENÉE COMBS QUINBY, a Certified
17   Court Reporter (MO), Certified Shorthand Reporter
18   (CA), Registered Merit Reporter, Certified Realtime
19   Reporter, and a Notary Public within and for the
20   State of Missouri.
21
22
23
24
25
```

1 (Pages 1 to 4)

**CHRISTOPHER PARTIN  2/8/2017**

Page 5

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
4        Blake Strode, Esq.
         Edward Hall, Esq.
5        ArchCity Defenders, Inc.
         1210 Locust Street
6        St. Louis, MO  63103
         (855)724-2489
7        bstrode@archcitydefenders.org
         ehall@archcitydefenders.org
8
9        Timothy Holland, Esq.
         Elizabeth Grossman, Esq.
10       Jonathan Wall, Esq.
         Charles Hamilton, Esq.
11       Paul, Weiss, Rifkind, Wharton & Garrison LLP
         1285 Avenue of the Americas
12       New York, NY  10019-6064
         (212)373-3373
13       tholland@paulweiss.com
         egrossman@paulweiss.com
14       jwall@paulweiss.com
         chamilton@paulweiss.com
15
16       Britney Wilson, Esq.
         Center For Constitutional Rights
17       666 Broadway, 7th Floor
         New York, NY  10012
18       (212)614-6464
         bwilson@ccrjustice.org
19
20
21
22
23
24
25
```

Page 6

```
1    FOR THE DEFENDANTS:
2        Michael E. Hughes, Esq.
         St. Louis County Counselor's Office
3        41 S. Central Avenue,
         Clayton, MO  63105
4        (314)615-7042
         mhughes2@stlouisco.com
5
6
7    THE VIDEOGRAPHER:
8        David Doell
         Midwest Litigation Services
9        711 North 11th Street
         St. Louis, MO  63101
10       (314)644-2191
11
12   COURT REPORTER:
13       RENÉE COMBS QUINBY, RMR, CRR
         CSR (CA) #11867
14       CCR (MO) #1291
         Midwest Litigation Services
15       711 North 11th Street
         St. Louis, MO  63101
16       (314)644-2191
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                    --oOo--
2         IT IS HEREBY STIPULATED AND AGREED by and
3    between counsel for the Plaintiffs and counsel for
4    the Defendants, that this deposition may be taken in
5    machine shorthand by RENÉE COMBS QUINBY, a Certified
6    Court Reporter and Notary Public, and afterwards
7    transcribed into typewriting, and the signature
8    waived by agreement of Counsel and consent of the
9    Witness.
10                   --oOo--
11       P R O C E E D I N G S  9:30 a.m.
12                   --oOo--
13        THE VIDEOGRAPHER:  We are now on the
14   record.  Today's date is February the 8th, 2017.
15   The time is approximately 9:31 a.m.  This is the
16   video-recorded deposition of Officer Christopher
17   Partin in the matter of Furlow, et al. versus
18   Belmar, et al., case number 4:16CV00245CEJ, in the
19   United States District Court for the Eastern
20   District of Missouri.
21        This deposition is being held at
22   Midwest Litigation Center in St. Louis, Missouri.
23   The reporter's name is Renée Quinby.  My name is
24   David Doell, and I'm the legal videographer.  We're
25   here with Midwest Litigation Services.
```

Page 8

```
1         Will the attorneys present please
2    introduce yourselves.
3         MR. HOLLAND:  My name is Timothy
4    Holland from the firm of Paul Weiss.  I am here on
5    behalf of plaintiffs, along with my colleagues,
6    Elizabeth Grossman, Charles Hamilton, and Jonathan
7    Wall.  And I have some colleagues from a couple
8    other places who will introduce themselves.
9         MR. STRODE:  My name is Blake Strode
10   from ArchCity Defenders with Ed Hall.
11        MS. WILSON:  My name is Britney Wilson
12   here on behalf of the Center for Constitutional
13   Rights.
14        MR. HOLLAND:  Go ahead.
15        MR. WALL:  Jonathan Wall.  He
16   introduced me.
17        MR. HUGHES:  Oh, yeah.  You're
18   Jonathan, okay.  I'm Mike Hughes.  I represent Chris
19   Partin and also Laura Clements, and also Kevin Walsh
20   and Chief Jon Belmar in his official capacity, and
21   St. Louis County.
22        THE VIDEOGRAPHER:  If the court
23   reporter would please swear in the witness and we
24   may proceed.
25        CHRISTOPHER PARTIN,
```

2 (Pages 5 to 8)

CHRISTOPHER PARTIN   2/8/2017

Page 9

1  of lawful age, having been first duly sworn to
2  testify to the, the whole truth, the nothing
3  but the truth in the case aforesaid, deposes and
4  says in reply to oral interrogatories propounded as
5  follows, to-wit:
6              --o0o--
7          EXAMINATION
8  BY MR. HOLLAND:
9      Q.  Good morning, Officer Partin.  Just for
10  the record's sake, can you just state your name,
11  please.
12      A.  Officer Christopher Partin.
13      Q.  And spell the last name.
14      A.  P-a-r-t-i-n.
15      Q.  Good morning, Officer Partin.  Thank
16  you for coming today.  I'll be asking you some
17  questions today.  If at any point my question is
18  vague or confusing to you, just please let me know
19  and I'll try my best to rephrase it just so we can
20  make sure we're on the same page.
21          Is there any reason, medically or due
22  to a substance, that you don't think you'll be able
23  to give truthful or full answers today?
24      A.  No.
25      Q.  If that changes at any point today,

Page 10

1  will you let me know?
2      A.  Yes.
3      Q.  Okay.  Just to try to get you out of
4  here as quickly as we can today, let's go over some
5  ground rules up front.  As you can see, we have a
6  court reporter here trying to take down every word
7  that we say.  As she is only one person, she can
8  only take down what one of us is saying at each
9  time, so let's just do our best to try not to talk
10  over each other.  I think it's bound to happen, but
11  the less it happens, the more smoothly this will go
12  today.
13          Second, as you were just told by the
14  court reporter, you're on the record under oath, so
15  it's important that you give truthful, complete
16  answers, but it also means that at any point later
17  in the deposition you realize something you said
18  was -- you know, you want to correct it or wasn't as
19  complete as you wish you would have made it, just
20  please let me know that and I'll give you that
21  opportunity.
22      A.  Okay.
23      Q.  And I'm not sure that we'll be here all
24  day today.  But if at any point you want to take a
25  break, it's at your leisure.  Just the only thing I

Page 11

1  ask is that you don't take a break while a question
2  of mine is pending.  Is that fair?
3      A.  Yes.
4      Q.  And lastly, are you represented by
5  counsel today?
6      A.  Yes.
7      Q.  Your counsel, Mr. Hughes, may object to
8  a question that I ask.  Once he puts the objection
9  on the record, unless he instructs you not to, you
10  can continue to answer my question.
11      A.  Okay.
12      Q.  Do you understand that you're here
13  today in connection with a -- a legal case?
14      A.  Yes.
15      Q.  Do you understand that you're a
16  defendant in that legal case?
17      A.  Yes.
18      Q.  What is your understanding of the case?
19      A.  My understanding of the case is that
20  it's in regards to the use of wanteds.
21      Q.  Anything else?
22      A.  That's about it.
23      Q.  Okay.  Have you read the complaint in
24  this action?
25      A.  Yes.

Page 12

1      Q.  And you understand the claims against
2  you and your codefendants?
3      A.  Yes.
4      Q.  Okay.  Have you ever been deposed
5  before?  Have you ever sat for a deposition as we're
6  doing today?
7      A.  No.
8      Q.  What did you do to prepare for the
9  deposition today?
10      A.  I had two meetings with Mr. Hughes, and
11  then again this morning prior to sitting in front of
12  you guys today.
13      Q.  When were your two meetings aside from
14  this morning with Mr. Hughes?
15      A.  One was approximately a week ago, and
16  then the other one was probably two weeks prior to
17  that.
18      Q.  And about how long did you meet with
19  him each of those times?
20      A.  I think approximately three hours
21  apiece.
22      Q.  Apiece?  Okay.  Did you review any
23  documents during those meetings?
24      A.  I reviewed the complaint, our answer to
25  the complaint, the police report pertaining to me,

3 (Pages 9 to 12)

CHRISTOPHER PARTIN   2/8/2017

Page 13

1    and the summons that I issued Mr. Furlow, and the
2    County Counselor's notes on the -- from the night of
3    the court -- night court.
4          Q.   From the night that Mr. Furlow -- was
5    in connection with the summons that you issued?
6          A.   Correct.
7          Q.   Aside from your meetings with
8    Mr. Hughes, did you review any documents on your own
9    to prepare for today?
10          A.   Just the documents that I mentioned,
11    those were the only documents that I had read.
12          Q.   When did you learn that you would be
13    testifying today?
14          A.   Approximately three weeks ago.
15          Q.   Do you have a work email address?
16          A.   Yes.
17          Q.   Is that how you communicate with other
18    officers or other employees of St. Louis County?
19          A.   Yes.
20          Q.   Did there come a time when someone
21    asked you to collect documents of your own in
22    connection with this litigation?
23          A.   No.
24          Q.   You were never asked to collect,
25    whether it be emails or notes in regard to this

Page 14

1    litigation?
2          A.   No.
3          Q.   Okay.  Are you -- do you -- strike
4    that.
5          Do you recall using email to discuss
6    Mr. Furlow or anything with regard to this
7    litigation?
8          MR. HUGHES:  Do you mean email
9    communication with me or email communication with
10    other -- others?
11          BY MR. HOLLAND:
12          Q.   Let's break that down.  I'll reask the
13    question.  Do you recall using email to communicate
14    regarding Mr. Furlow with any other officers?
15          A.   No.
16          Q.   With anyone other than Mr. Hughes?
17          A.   No.
18          Q.   Do you recall sending any hard copy
19    correspondence or notes to anyone regarding this
20    case?
21          A.   No.
22          Q.   Are you familiar with Detective Laura
23    Clements?
24          A.   I know she's a detective on our
25    department.  I have not worked with her.

Page 15

1          Q.   How about Officer Walsh?
2          A.   Again, I know he's an officer on
3    St. Louis County, but I have not worked with him.
4          Q.   Do you understand that they are named
5    defendants as you are in this litigation?
6          A.   Yes.
7          Q.   Have you spoken with them at all
8    regarding this litigation since you were named a
9    defendant?
10          A.   No.
11          Q.   Have you spoken with Chief Jon Belmar
12    about this case at all?
13          A.   No.
14          Q.   Are you familiar with Dwayne Furlow?
15          A.   From my case, yes.
16          Q.   Have you had any interactions with
17    Mr. Furlow since you were named a defendant in this
18    action?
19          A.   No.
20          Q.   Okay.  I'd like to get into some of --
21    some background about you.  So going back to when
22    you graduated high school, can you tell us what
23    education you have?
24          A.   I have -- after high school, instead of
25    going to -- directly to college, I deployed to Iraq

Page 16

1    within a year of graduating high school.  I was
2    there for a year, came home, did a little bit of
3    college.  I have 37 credit hours.  And then just
4    army training, classes, and then The Police Academy
5    and my continuing education with them.
6          Q.   Thank you for your service.
7          A.   Sure.
8          Q.   Okay.  So you took some college
9    courses, some army training, and then you entered
10    The Police Academy.  About when was that?
11          A.   March of 2015.
12          Q.   And how long were you at The Police
13    Academy?
14          A.   Six months.
15          Q.   So about September 2015, what happened
16    then?
17          A.   I graduated from The Police Academy and
18    was given my duty assignment to the Affton southwest
19    precinct.
20          Q.   And that is when you joined the
21    St. Louis County Police Department?
22          A.   I --
23          Q.   Became -- excuse me, became a St. Louis
24    County police officer?
25          A.   I was a hired employee going through

4 (Pages 13 to 16)

CHRISTOPHER PARTIN  2/8/2017

Page 17

1  the academy, so I actually was a hired employee
2  beginning in March.
3       Q.  What is the difference between a hired
4  employee and your current role?
5       MR. HUGHES:  I'm sorry?
6       MR. HOLLAND:  Yes.
7       MR. HUGHES:  I heard what is the
8  difference between hired employee and then I -- for
9  some reason I --
10      MR. HOLLAND:  Sorry.
11      MR. HUGHES:  I guess my hearing isn't
12  what it once was.
13      MR. HOLLAND:  I think I spoke softly,
14  and I'll try not to do that today.
15      Q.  Okay.  So what is your current
16  position?
17      A.  I'm a hired patrol officer.
18      Q.  And you said in March 2015 you were a
19  hired employee, correct?
20      A.  I was a hired police recruit.
21      Q.  A hired police recruit.  What does a
22  hired police recruit do?
23      A.  Basically, we do the same thing as a
24  police recruit.  In the academy, there's multiple
25  ways you can go through.  You can be a hired county

Page 18

1  employee going through the academy, which is where
2  you're paid.  You can be going with a connection to
3  a college, or you can be open enrollment where you
4  try to get a job while you're going through with
5  either St. Louis County or one of the
6  municipalities.
7       Q.  And which of those were you?
8       A.  I was a hired county employee.
9       Q.  And you hold that role for the six
10  months while you were in the academy?
11      A.  Yes.
12      Q.  And then in September 2015, you became
13  a hired officer?
14      A.  Police officer.
15      Q.  Hired police officer.  And how did your
16  role change?
17      A.  I no longer had to go the academy, and
18  then I was on field training.
19      Q.  So let's talk about what you would do
20  while you were at the academy.  So March 2015
21  through September -- through early September 2015,
22  you were a hired recruit and also going to the
23  academy, and then in September 2015, you became a
24  hired police officer no longer having -- no longer
25  having to go to the academy.

Page 19

1       So why don't you tell me a typical day
2  while you're a hired recruit.
3       A.  You would show up on the parking lot at
4  7:10 a.m.  You would enter the building as a group.
5  You would store your lunchbox in the cafeteria.  You
6  would put your gear away in the locker room, and
7  then you would prepare for first inspection.  So the
8  supervisors would come around and make sure that you
9  looked squared away for the day and that you shaved,
10  and you'd go and sit in classes for about an hour,
11  and then take a break and you had lunch, and then
12  depending on the day, you may have class the rest of
13  the afternoon or you may have physical training, PT,
14  at the end of the day.
15      Q.  I think I'm going to come back and ask
16  you about some of those -- the training courses that
17  you took at the academy.  So then -- so you did that
18  for about six months, and then in September 2015,
19  you became a hired police officer.  What was --
20  what's a typical day for you as a hired police
21  officer since then?
22      A.  Then it was, I would -- I was on
23  afternoon, so my shift started at 11:00 a.m. and was
24  over at 9:00 p.m.  It could be anything.  I mean,
25  you could respond to any call doing investigation.

Page 20

1  Just you were at the mercy of whatever calls came
2  out or whatever self-initiated things you happened
3  to do that day.
4       Q.  So after the six months' Police
5  Academy, did you have any -- any further training
6  responsibilities or obligations?
7       A.  On field training it was basically
8  another learning environment.  They teach you more.
9  The Police Academy is kind of basic for P.O.S.T.
10  certification, and then when you get to field
11  training they teach you a more -- more about
12  St. Louis County procedure and policy and prepare
13  you to be on the road by yourself.
14      Q.  You said they teach you.  Who is they?
15      A.  Field trainers.
16      Q.  Is there a team field trainers or does
17  each -- sorry.  Strike that.
18      Does each police officer have an
19  individual field trainer?
20      A.  Field training is four phases.  Your
21  first -- you're assigned a field trainer when you
22  graduate the academy.  Your first field trainer is
23  considered your primary field trainer, so you're
24  with him for phase one and phase four.  And I
25  believe phase one is four or five weeks, and then

5 (Pages 17 to 20)

**CHRISTOPHER PARTIN   2/8/2017**

Page 21

1  you go to an alternate field trainer in the same
2  precinct, possibly on a different shift.  Usually on
3  a different shift.
4           You're with them for three to four
5  weeks, and then you go to an alternate field trainer
6  at a different precinct and you're with them for, I
7  believe, four weeks, and then you go back to your
8  home precinct and you're there for another four
9  weeks.
10      Q.   So this field training was broken up
11  into phases.  Other than being with a different
12  field trainer or field officer, are there any
13  differences between the phases?
14      A.   Your first phase, they kind of show you
15  the ropes of the area that you're working.  They
16  teach you a lot of procedure.  They ask you
17  questions.  They -- they kind of walk you through
18  how to investigate things, how to look at them.
19           Phase two is a little bit -- you're not
20  new but you're not senior, so you -- they're still
21  teaching you, but they expect more from you.  And
22  then phase three, it's basically they're there with
23  you and then you talk to them, and then phase four
24  is you're basically running everything.  You're
25  working the radio, driving the car.  Basically, when

Page 22

1  you go on the call, you're the primary officer.  You
2  know you're writing the report; you're supposed to
3  gather as much information as you can.
4      Q.   And you said during phase one -- and
5  this may happen in other phases -- they're kind of
6  showing you the ropes and teaching you about
7  St. Louis County policy and procedure.  Do they have
8  materials with them that they're showing you or are
9  they just -- well, strike that.
10           Let me ask it this way:  When you're
11  on -- in phase one and they're showing you policy
12  and procedure of St. Louis County, are they showing
13  you any materials?
14      A.   They do go over the general orders in a
15  pretty lengthy manner.
16      Q.   We'll get into those a little later.
17           So just as a background question, it
18  sounds like you started phase one in September 2015;
19  is that right?
20      A.   Correct.
21      Q.   And you said each phase is around four
22  to five weeks; is that right?
23      A.   Yes.
24      Q.   So just thinking about the subject
25  matter of your relevance to this or your -- strike

Page 23

1  that.
2           Considering the facts underlying the
3  complaint relating to your involvement with
4  Mr. Furlow, I believe that happened in
5  November 2015; is that correct?
6      A.   Yes.
7      Q.   What phase would you have been in at
8  that --
9      A.   Phase three.
10      Q.   Okay.  And who was your phase one field
11  trainer?
12      A.   Joseph Curcuru.
13      Q.   Can you spell that last name?
14      A.   C-u-r-c-u-r-u.
15      Q.   And who was your phase two field
16  trainer?
17      A.   Christopher Rickard.
18      Q.   Spell the last name for the record.
19      A.   R-i-c-k-a-r-d.
20      Q.   And who was your field three officer?
21      A.   Christopher Slusser.
22      Q.   Excuse me.  Let me just ask that again
23  for the record.  Who was your phase three field
24  trainer.  I believe I said field three.
25      A.   Christopher Slusser.  That's

Page 24

1  S-l-u-s-s-e-r.
2      Q.   Christopher Slusser would have been
3  your field trainer in November of 2015?
4      A.   Correct.
5      Q.   And your field four -- phase four field
6  trainer would have been Officer Curcuru?
7      A.   Yes.
8      Q.   And when did you end phase four field
9  training?
10      A.   Approximately a week or two before
11  Christmas.
12      Q.   2015?
13      A.   Yes.
14      Q.   So March 2015 through, give or take,
15  Christmas 2015, you had six months of Police Academy
16  and three months of field training?
17      A.   Correct.
18      Q.   Aside from those two areas, what other
19  training has the police -- has the St. Louis County
20  Police Department provided to you?
21      A.   Since December of '15 to now?
22      Q.   Yes.
23      A.   I've had a couple in-service dates
24  where you sit in a classroom and you're taught
25  more -- more things.  I also went to crisis

CHRISTOPHER PARTIN  2/8/2017

Page 25

1  intervention training, which was a week-long class.
2  I went to a three-day patrol rifleman's class, and
3  then I had a range day there.
4      Q.  When you -- sorry.  Were you done?
5      A.  Yes.
6      Q.  And when you say you sit in a classroom
7  and they teach you more things, are they teaching
8  you things that were already in place and you
9  reached a level where they felt you needed to learn
10 it, or are they teaching you things because policies
11 have changed, or both?
12     A.  They teach you about policy changes,
13 but they also teach you about, like, the law
14 changes.  January 1st the changes with domestic
15 violence and assaults and how they added and changed
16 what used to be a domestic assault third changed,
17 and just how -- how the law has changed and how they
18 were being implemented among the department, and if
19 you get this case, this is basically what it's
20 considered.
21     Q.  Okay.  And so at The Police Academy,
22 are the people who train you and teach the courses
23 there the same people who would provide this
24 continuing education once you're an officer?
25     A.  For certain classes, yes.  My

Page 26

1  constitutional law professor retired, so there was a
2  different person teaching that, but certain classes
3  are still taught by the same instructors.
4      Q.  So just to be clear, when you're taking
5  these in-classroom courses after you finish your
6  field training, it's kind of going back to the
7  academy to refresh or learn something new?
8      A.  Correct.
9      Q.  So that brings us into 2016.  Are you
10 in the same rank now that you were when you finished
11 your field training?
12     A.  I'm no longer a probationary police
13 officer.  I passed my probation year.
14     Q.  And that started around Christmas of
15 2015?
16     A.  I came off probation in September of
17 '16.
18     Q.  And your probation year starts when?
19     A.  The year you graduate from The Police
20 Academy.
21     Q.  While you were a probation officer, who
22 did you report in to?
23     A.  While I was on field training, I
24 reported to the field trainers, and then after that
25 it was you reported for your shift and basically

Page 27

1  reported to whichever supervisor was in charge for
2  that day.
3      Q.  So you didn't have the same supervisor
4  at all times?
5      A.  We had the -- on the platoon there is
6  three supervisors assigned, two sergeants and a
7  lieutenant.  And as far as the days, it just
8  depended on who was working that day.
9      Q.  Did you have sergeants and lieutenants
10 who were your supervisor more often than others?
11     A.  I think it was pretty spread out.  I
12 had the same sergeants at least two days a week.
13     Q.  Who were those sergeants?
14     A.  After I got off field training, I was
15 only on afternoons until January 1st, and then I
16 switched to days for the year, so my supervisors
17 were Sergeant Quentin, Sergeant Koeller, Lieutenant
18 McWilliams, who left the precinct, and then it was
19 Lieutenant Gomez.
20     Q.  About when did Lieutenant Gomez become
21 your -- or excuse me.  Strike that.
22         About when did Lieutenant Gomez become
23 one of the supervisors for you?
24     A.  I do not know.
25     Q.  Okay.

Page 28

1      A.  I know it was closer towards the end of
2  the year.
3      Q.  End of 2016?
4      A.  Yes, approximately.  Approximately
5  three months from the end of the year.
6      Q.  Give or take September or October?
7      A.  Yes.
8      Q.  Have you ever been the subject of a
9  civil complaint since you've been an officer?
10     A.  No.
11     Q.  Have you ever -- aside from the filing
12 of this litigation, have you ever been -- has your
13 police work ever been the subject of an
14 investigation?
15     A.  No.
16     Q.  Have you -- strike that.
17         Since you've been an officer, have you
18 been evaluated?
19     A.  Yes.
20     Q.  Have you ever received a negative
21 evaluation?
22     A.  No.
23     Q.  So you mentioned obviously some
24 training during The Police Academy, and field
25 training and some -- some continuing training or

7 (Pages 25 to 28)

CHRISTOPHER PARTIN   2/8/2017

Page 29

1  what I'll call continuing training since you
2  finished field training.  Did any of that training
3  include background on wanteds?
4       A.  When the policy changed, it was
5  included in the continuing education.
6       Q.  And by policy, what do you mean?  What
7  document are you referring to?
8       A.  The general order for wanteds.
9       Q.  Let's take a look at that.  This will
10 be -- make sure we're on the same page.  I'm going
11 to hand you what I'm marking as Exhibits 1 and 2.
12           (Exhibits 1-2 were marked for
13           identification.)
14 BY MR. HOLLAND:
15      Q.  I'd ask you to take a look at those
16 documents and let me know if you've -- if you
17 recognize them.  And here's a copy for Mr. Hughes.
18           MR. HUGHES:  Thank you.  Officer, can
19 you tell me which -- which one is Exhibit 1?  Just
20 give me the -- the Department General Order 15-26?
21           THE WITNESS:  15-26 is Exhibit 2.
22           MR. HOLLAND:  I'll just clear the
23 record.  Exhibit 1 is dated July 15, 2015, and it
24 contains Bates numbers in the lower right corner
25 DEF-RFP234, five zeros -- or six zeros, excuse me,

Page 30

1  and one seven.  Exhibit 2 is dated September 14,
2  2016, as Bates numbers in the lower right corner
3  DEF-RFP234, six zeros, 22.
4       Q.  Do you recognize these documents?
5       A.  Yes.
6       Q.  Are these the policy general orders
7  that you were referring to?
8       A.  Yes.
9       Q.  Okay.  So the July -- excuse me,
10 Exhibit 1 is dated July 15, 2015, so that -- and if
11 you look in the somewhat upper right corner, you can
12 see that it says, "Cancels General Order 11-26,"
13 correct?
14      A.  Yes.
15      Q.  So this document is dated July 15,
16 2015, which would have been when you were in the
17 academy; is that correct?
18      A.  Yes.
19      Q.  Do you recall this order coming into
20 effect?
21      A.  Yes.
22      Q.  You started at the academy four months
23 prior to this order coming into effect?
24      A.  Yes.
25      Q.  Are you -- were you -- have you ever

Page 31

1  seen the General Order 11-26 that it canceled or
2  replaced?
3       A.  No.
4       Q.  Why don't I -- why don't I show it to
5  you and you can let me know if you've seen it
6  before.
7           I'm marking as Exhibit 3, General Order
8  11-26 dated -- dated September 13th, 2011, with
9  Bates DEFRFP234, six zeros, 13.
10           (Exhibit 3 was marked for
11           identification.)
12           MR. HOLLAND:  Copy for Mr. Hughes.
13      Q.  So as you -- have you had a chance to
14 look at the document?
15      A.  Yes.
16      Q.  Have you ever seen this document
17 before?
18           MR. HUGHES:  My objection is
19 repetitive.  Asked and answered.  You can answer.
20           THE WITNESS:  No.
21 BY MR. HOLLAND:
22      Q.  Is it correct that this general order
23 is the order that was canceled by the -- by
24 Exhibit 1?
25      A.  Yes.

Page 32

1       Q.  Okay.  And this order dated
2  September 13th, 2011, Exhibit 3, would have been in
3  effect up and until July 14th, 2015?
4       A.  Yes.
5       Q.  So during your four months of training
6  leading up to July 15th, 2015, you were never shown
7  this General Order 11-26?
8       A.  No.  In the academy they don't cover
9  general orders until much later, if they cover them.
10 Because not everyone in your class is a department
11 that works for St. Louis County, and these are only
12 pertinent to St. Louis County police officers, not
13 the municipalities.
14      Q.  Do you know about what time during a
15 typical academy they start telling officers about
16 the general orders in that -- that are the policies
17 and procedures of the police department?
18      A.  I do not.
19      Q.  Is it your testimony that the standard
20 time is more than four months after the training has
21 begun -- excuse me, the academy has begun?
22      A.  Yes.
23      Q.  Okay.  Let's -- let's take a look at
24 Exhibits 1 and 2, which you said you have seen
25 before.  And I believe you mentioned that you

CHRISTOPHER PARTIN  2/8/2017

Page 33

1  received some training on these policies; is that
2  correct?
3      A.  Yes.
4      Q.  Can you tell me about the training
5  focused on, I believe you said, wanteds related to
6  these policies?
7      A.  In regards to the wanteds, you have to
8  have probable cause before you can place anyone out
9  wanted.  That was the policy that was in effect
10  until July 14th, 2015.  And then the policy for
11  that -- that went into effect September 14th of '16,
12  that policy was basically amended to where you had
13  to run it by your supervisor and have a supervisor's
14  approval for the wanted.
15      Q.  Okay.  And I think right now I'm
16  focused on the trainings you received on these, but
17  I believe you also just mentioned that you were
18  trained or informed of the policy up until
19  July 14th, 2015, that was in effect.  Is that what
20  you said?
21      MR. HUGHES:  I think you're misstating
22  his testimony, but you can answer.
23      MR. HOLLAND:  Well, let me just read
24  back.
25      Q.  It says, in regards to the wanteds, you

Page 34

1  have probable cause before you can place anyone out
2  wanted.  That was the policy that was in effect
3  until July 14th, 2015.  Is that your testimony?
4      A.  It's the same policy.  Both the general
5  orders you had to have probable cause to use a
6  wanted.  The only difference between the new policy
7  and the old policy in regards to the wanteds, is
8  that you had a supervisor's approval.  But before
9  you still had a supervisor's approval because they
10  would read your reports, and if they had an issue
11  with something, they would speak to you very quickly
12  about if they had an issue with it.
13      Q.  And I guess I'm focused for now on --
14  you said you received training on these.  So what
15  did that training involve?  And we can start with
16  Exhibit 1.  July 15th, 2015, when were you trained
17  on this policy?
18      A.  In the academy, the training on the
19  policy was basically you read the policy, and that's
20  your training in the academy on the policy.  You --
21  there's a lot that, in The Police Academy, you are
22  expected to do at home.  And one of those things is
23  reading, especially when you're a county hire, you
24  read a lot of the general orders on your own time.
25      And then when you get to field

Page 35

1  training, then they -- they constant -- field
2  trainers constantly ask you questions about general
3  orders and they expect you to know.
4      Q.  So there wasn't an in-class training on
5  these policies?
6      A.  No.
7      Q.  Were you provided any materials and
8  guidelines outside of what's in these documents?
9      A.  No.
10      Q.  So you were in the academy in
11  July 2015.  How did you come to know that the policy
12  had changed?
13      A.  Some of our instructors in the academy
14  were St. Louis County police officers, and they
15  would tell you about changes that would affect the
16  way that you do your job once you're out of the
17  academy.  They would tell you and then they would
18  tell you the general order changed.  You should read
19  the new general order on it.
20      Q.  Do you recall the officers who told you
21  this?
22      A.  I do not.
23      Q.  What did you, at that point, understand
24  the policy to have been prior to this change?
25      A.  Prior --

Page 36

1      MR. HUGHES:  If you know.  That's all
2  right.
3      BY MR. HOLLAND:
4      Q.  Well, strike that.
5      MR. HUGHES:  Well, he said he hadn't
6  read it, so ...
7      MR. HOLLAND:  Understood.
8      Q.  You just said -- or is it true that
9  sometime around July 2015, officers told you that
10  you should read the general order because the policy
11  was changing?
12      A.  Correct.
13      Q.  Did they tell you -- what was your
14  understanding of what the policy change was?
15      A.  For the policy change in 2015?
16      Q.  So maybe I can make this a little
17  simpler.  If we look at Exhibit 1, page 2, there is
18  some bolded language, correct?
19      A.  Yes.
20      Q.  Did you understand that to be -- to
21  represent the additions, the changes in policy?
22      A.  Yes.
23      Q.  Did you understand that to have not
24  been within the policy prior to July 15, 2015?
25      MR. HUGHES:  Just object to the form of

9 (Pages 33 to 36)

CHRISTOPHER PARTIN   2/8/2017

Page 37

1   the question as vague.  Calls for speculation and
2   conjecture as to what you mean.
3        BY MR. HOLLAND:
4        Q.  I'll go ahead and reask my question.
5   You were reviewing this as you were instructed to
6   do.  You noticed that there was bolded language in
7   this -- on page 2 of this policy.  You understood
8   that to be the changes to the policy.  Do you agree
9   that that means you also understood those -- the
10  bolded language to not have been in the prior
11  policy?
12       A.  I didn't know the prior policy.  This
13  is the only -- the one of the policy -- the policy
14  of Exhibit 1 is the first policy I knew of St. Louis
15  County Police Department in regards to, this is the
16  way St. Louis County does things.
17            Prior to that, I did not have any law
18  enforcement experience with St. Louis County.  This
19  is the only policy that I knew, and then now this is
20  the policy I follow.
21       Q.  I totally understand that.  My
22  question -- I guess my simple question is, what did
23  you understand the bolded language to mean?  Why is
24  that language in bold?
25       A.  The bold lettering is the change to the

Page 38

1   policy.
2        Q.  And the bold language -- the change to
3   the policy in July 2015 was once the case officer
4   has determined probable cause exists that a person
5   has committed a crime, only the case officer shall
6   request wanted person entries.  The case officer
7   will contact CARE or DCI ward -- excuse me, DCI word
8   processing and requesting a wanted entry on that
9   person.  Did I read that correctly?
10       A.  Yes.
11       Q.  And in section B(1)(b), subset --
12  subsection one, there is also an addition of the
13  language "probable cause" that the officer has to
14  have; is that correct?
15       A.  Yes.
16       Q.  So other than reading this policy, was
17  anybody -- did you have any communication with
18  anybody about how your job as a police officer would
19  change because of these changes to the policy -- or
20  strike that.
21            You were still in the academy at the
22  time, so your job as a police officer was just
23  beginning.  Did any police officer talk to you about
24  how the job of a police officer out in the field
25  would change because of these changes?

Page 39

1        A.  No.
2        Q.  Aside from reading the policy, how did
3   you become comfortable with the requirements within
4   the policy in terms of being able to issue a wanted
5   once you're out in the field?
6        A.  After speaking with the field -- after
7   speaking with my field trainers, they -- field
8   trainers are essentially teachers, and they teach
9   you policy, how -- officer safety.  They teach you
10  all these things that the academy teaches you, but
11  the field trainers fine-tune it and basically break
12  it down so that you can understand everything.
13       Q.  What do you mean by field trainers
14  fine-tuning it?
15            MR. HUGHES:  I think it's obvious, but
16  go ahead and answer.
17            MR. HOLLAND:  I was just looking for
18  something more specific.
19            MR. HUGHES:  All right.
20            THE WITNESS:  They -- they go over it
21  more in depth.  They -- instead of you sitting there
22  and reading it, you can ask them questions.  If
23  you're not sure of something, they are the ones that
24  you are supposed to ask.  You can -- you can ask
25  supervisors and you can ask lieutenants.  You can

Page 40

1   ask pretty much anyone on the department, and they
2   can -- if you're not comfortable with something, you
3   can ask them and they can help you work it out.  You
4   talk back and forth with them, and if you're seeing
5   something and you're wrong, they'll tell you and
6   they'll explain it so you know where you should be
7   with it.
8        BY MR. HOLLAND:
9        Q.  Okay.  Let's turn to the subject of
10  wanteds.  So you were -- as the July 2015 policy was
11  issued, you were in the academy and then in
12  September you started in the field.  At that point
13  what was your understanding of a wanted?
14       A.  My understanding of a wanted was --
15       Q.  And sorry to interrupt.  I'm asking at
16  that point.  So September 2015, not as you sit here
17  today.  At that point what was your understanding of
18  a wanted?
19       A.  My --
20            MR. HUGHES:  Just so -- you can answer,
21  but my objection is to form of the question as just
22  vague.  Calls for speculation.  But you can answer.
23            THE WITNESS:  Can you ask your
24  question?
25            MR. HUGHES:  She can read it.  He can

10 (Pages 37 to 40)

CHRISTOPHER PARTIN   2/8/2017

Page 41

1  rephrase it if you want, or you can ask the court
2  reporter to just read it back.
3           THE WITNESS:  Can you --
4           MR. HUGHES:  But if you want him to
5  rephrase it.
6       BY MR. HOLLAND:
7       Q.  I'll just rephrase it.
8       MR. HUGHES:  Okay.  I mean, I think --
9  I think -- and I don't know.  Maybe I'm putting
10  words in his mouth -- that my objection distracted
11  him.  So that's why I said you could ask the court
12  reporter to reread it.
13       BY MR. HOLLAND:
14       Q.  Let me ask this:  Has your
15  understanding of a wanted changed from
16  September 2015 until the point we sit here today?
17       A.  No.
18       Q.  What is your understanding of a wanted?
19       A.  My understanding of a wanted is that
20  you have to have probable cause before you can put
21  anyone out as wanted.
22       Q.  Probable cause for what?
23       A.  Probable cause to believe that they
24  were the one that committed the crime.
25       Q.  What is the purpose of entering a

Page 42

1  wanted?
2       A.  The purpose of entering a wanted is to
3  be able to speak with the person that was involved
4  in the case to see -- to give -- to give them their
5  opportunity to say what happened.
6       Q.  And by the person involved in the case,
7  you mean the suspect?
8       A.  Correct.
9       Q.  Is there a purpose for a wanted once
10  you've spoken to a person who is the wanted?
11       MR. HUGHES:  I'd just object to the
12  form.  I think it's a little confusing and
13  ambiguous.
14       MR. HOLLAND:  I'll rephrase.
15       Q.  So you've said that the purpose of a
16  wanted is to speak to the person involved in this
17  case who you have said is the wanted.  Once you have
18  spoken to the person, is there a need for the wanted
19  to remain?
20       MR. HUGHES:  Once he has spoken to the
21  person -- to the suspect in person?  Is that what
22  you mean?
23       MR. HOLLAND:  Mike, I asked a simple
24  question.
25       MR. HUGHES:  Okay.

Page 43

1       MR. HOLLAND:  There's no reason to
2  interject.  I'll reask the question.
3       MR. HUGHES:  Okay.
4       BY MR. HOLLAND:
5       Q.  Once you have issued a wanted and
6  you've spoken -- once you have spoken to the
7  person -- strike that.
8       Once you have spoken to the person who
9  is the subject for the wanted, is there a reason to
10  keep the wanted in place or issue the wanted at all?
11       A.  Once you've spoke to them?
12       Q.  Yes.
13       A.  Once you've spoke to them, it's
14  canceled immediately.
15       Q.  How is it canceled?
16       A.  You call CARE and they type up a new
17  teletype that cancels the wanted on them so that if
18  they're ran through any police system, the wanted no
19  longer shows.
20       Q.  Why do you issue a wanted instead of
21  going to get a warrant for -- well, strike that.
22       You issue a wanted to speak to a person
23  and how do you go about -- strike that.
24       You said that the purpose of showing a
25  wanted is to speak to the person who is wanted.  The

Page 44

1  way that the -- that is -- that that occurs is that
2  the person -- the hope of the wanted is that the
3  person will be arrested and brought in so that you
4  can have that opportunity.  Is that accurate?
5       A.  It's to afford them the opportunity to
6  either speak on what had happened or to not speak.
7  That way you can issue them a summons or let them
8  know I will be applying through the County Counselor
9  or the State Prosecuting Attorney's Office.
10       Q.  At the point that you issue a wanted,
11  do you believe that the person should be arrested
12  for the offense?
13       MR. HUGHES:  My only objection it's
14  been answered already, but go ahead.
15       THE WITNESS:  Could you read that back?
16       BY MR. HOLLAND:
17       Q.  I'll rephrase.  When you issue a wanted
18  or enter it into the system, have you reached the
19  point in your investigation where you believe the
20  person should be arrested for the offense?
21       A.  Repeat that back one more time.
22       Q.  Sure.  No problem.  So you -- you have
23  reached the point in your investigation where you
24  want to enter a wanted into the system for John Doe.
25  At that point do you believe John Doe should be

11 (Pages 41 to 44)

CHRISTOPHER PARTIN  2/8/2017

Page 45

1    arrested for the offense, taken into custody?
2        A.   Yes.
3        Q.   Why issue the wanted instead of going
4    to the prosecutor's office and obtaining an arrest
5    warrant?
6        A.   Because the County Counselor's Office
7    or the PA's Office usually won't even -- on the
8    smaller cases, won't look at them unless the person
9    has been afforded the opportunity to voice their
10   side of the allegation.
11       Q.   Just for clarification, what do you
12   mean by PA's Office?
13       A.   Prosecuting Attorney's Office.
14       Q.   Who -- strike that.
15            Have you ever gone to the prosecutor's
16   office and had them -- or the PA's Office and had
17   them tell you that you need to first make -- speak
18   with the suspect before they would issue a -- an
19   arrest warrant?
20       A.   Repeat that.  Could you repeat that?
21       Q.   Yes, of course.  Have you -- so you
22   just said that one of the reasons why you would
23   issue a wanted instead of going to seek an arrest
24   warrant at the prosecutor or PA's Office is because
25   the prosecutor's office would tell you, especially

Page 46

1    in smaller cases, that they will not even entertain
2    or provide a warrant without giving the suspect an
3    opportunity to communicate their side of the story?
4        A.   Correct.
5        Q.   Have you ever done that and been told
6    go talk to the person first before I'm going to give
7    you an arrest warrant personally?
8        A.   No, because most of the time you have
9    to get approval from a supervisor to talk to them
10   about -- I mean, most supervisors won't let you go
11   down to the County Counselor's Prosecuting
12   Attorney's Office because it will take you -- you
13   could spend three hours there for an answer that
14   basically you already knew was going to happen.
15       Q.   So have you had supervisors told you to
16   go talk to a suspect first rather than going to the
17   prosecutor's office?
18       A.   Most of the time it's -- if you haven't
19   talked to them, they're not going to allow you to
20   send it off to the County Counselor or the state's
21   prosecuting attorney without having once talked to
22   them.
23       Q.   I'm just trying to understand how you
24   personally know that the prosecutor's office won't
25   entertain your application for an arrest warrant

Page 47

1    without talking to the suspect.  You said that you
2    haven't personally been told that by the prosecutor
3    or PA's Office.  Have you personally been told that
4    by a supervisor?
5        A.   No.
6        Q.   Have you been told that by other
7    officers?
8        A.   Could you repeat that one more time?
9        Q.   Yes.  You -- so what we're talking
10   about is how you came to know that instead of
11   issuing, entering a wanted than subject the
12   person to a custodial arrest to -- for communication
13   purposes, you -- it is not worth going down to the
14   prosecutor or PA's Office to obtain a warrant
15   because you would be -- they would not issue one
16   without you first communicating with the suspect and
17   we're -- we're trying to find out -- or I'm trying
18   to find out how you came to understand that to be
19   the case.  And you said the PA's, prosecutor's
20   office, did not tell you that, a supervisor has not
21   told you that, so I'm just -- who told you that?
22       A.   Other officers.
23       Q.   Do you know who it was?
24       A.   No.
25       Q.   So you said earlier that the purpose of

Page 48

1    entering a wanted is to give the suspect an
2    opportunity to communicate with the officer before
3    you pursue a warrant.  Who told you that that is the
4    purpose of entering a wanted?
5        A.   I'm not sure.
6        Q.   Maybe it will help if -- if you could
7    walk me through your understanding of the wanted
8    process.  So you receive a -- a dispatch and there
9    is an allegation made against John Doe.  From that
10   point, what needs to happen before you enter a
11   wanted into the system for John Doe?
12       A.   What's the allegation against him?
13       Q.   The allegation is that he assaulted his
14   neighbor.
15       A.   The victim statement and a third -- a
16   third party's account of the incident.
17       Q.   Third party's account of the incident,
18   what does that involve?
19       A.   Someone who witnessed it who is not --
20   someone who witnessed the incident who is not taking
21   a side of this person over this person.  Basically,
22   to them it doesn't matter -- it doesn't matter who
23   assaulted who.  It's this is what I saw.  This is
24   what happened.
25       Q.   They're --

12 (Pages 45 to 48)

CHRISTOPHER PARTIN  2/8/2017

Page 49

1    A.  They're an independent witness.
2  They're not for this person; they're not for this
3  person.  They're just middle and had observed it.
4    Q.  An eyewitness account?
5    A.  Yeah.
6    Q.  And at that point you would believe you
7  have probable cause to issue a wanted?
8    A.  Based on the evidence and a third
9  party's eyewitness.
10    Q.  Would you do anything else before
11  entering the wanted?
12    A.  I would -- now, before I would enter a
13  wanted, I would speak with a supervisor and verify
14  that I have enough and -- to make sure that I'm --
15  I'm good with my probable cause.
16    Q.  And prior to September 2016, what would
17  you do?
18    A.  Prior to September of 2016?  Most of
19  the time I still -- if I questioned something, I
20  would run it by my supervisor first.
21    Q.  If you thought you didn't have any
22  reason to question something, you would not speak to
23  your supervisor?
24    A.  When I was with a field trainer, I
25  would speak with the field trainer about it.  After

Page 50

1  I got off field training, it was told to me by quite
2  a few supervisors and lieutenants, if you have a
3  question, ask.  You're still new, you're still
4  learning, and you'll be learning for the first few
5  years, so don't be afraid to ask a question.
6    Q.  Okay.  So you're at the point where you
7  determined that you have probable cause and would
8  like to enter a wanted for John Doe.  I've never
9  been on that scenario.  What do you do to make that
10  happen?
11    A.  To enter a wanted?
12    Q.  Yeah.
13    A.  Typically, the way I do it is I usually
14  go -- respond to wherever my supervisor -- after I
15  clear from the call, I respond to wherever my
16  supervisor is and I talk to him face-to-face, give
17  him -- tell him what happened with the case, how --
18  how the suspect was identified, and --
19    Q.  Can I stop you for a second?  I'm
20  sorry.  This is my fault.  I guess what I'm more
21  interested in is, prior to September 2016, what
22  would you have done in our scenario, our
23  hypothetical where you've determined John Doe is --
24  you believe you have probable cause that John Doe
25  committed assault, and you wanted to enter a wanted

Page 51

1  for John Doe prior to Exhibit 2 coming into effect?
2  What did you do at that point to get the wanted into
3  the system?
4    A.  Well, while I was on field training, I
5  would ask the field -- I would talk it over with the
6  field trainer, and if he said you have enough
7  probable cause, you can enter a wanted.  I would
8  enter a wanted.  From -- and then so basically
9  Christmas of '15 to September of '16, if I had
10  questions on something, I still talked to a
11  supervisor about it.
12    Q.  And my question -- my next question is
13  about the technical details.  What do you do?
14  You're on the scene -- what do you do to get the
15  wanted into the system?
16    A.  You would call CARE.
17    Q.  And what is CARE?
18    A.  Computer Automated Report Entry, and
19  you would call them and then you would go through
20  the beginning parts of the report, where you were,
21  what time you got there, who was involved, your
22  suspect, your victim, your witnesses, and then you
23  would tell her, I need to put John Doe out as wanted
24  for this charge, and they would send a teletype and
25  that would show in the system, and then it would be,

Page 52

1  contact Officer Partin upon arrest.
2    Q.  And as you're on the phone or the radio
3  with CARE, are you providing this information from
4  your head or have you been taking notes and --
5    A.  From notes.
6    Q.  Do you typically keep those notes?
7    A.  No.
8    Q.  Do you typically keep those notes for
9  the life of an investigation?
10    A.  No.
11    Q.  Do you typically discard those notes
12  the same day?
13    A.  No.
14    Q.  How -- how long do you maintain notes
15  from a call that leads to a wanted?
16    A.  From a call that leads to a wanted?
17    Q.  Or excuse me -- strike that.
18        How long do you keep notes from your
19  investigation of an incident that leads to a wanted?
20    A.  Until the case is cleared.  By cleared,
21  I mean he's either issued a -- he's either issued a
22  summons or the report is forwarded to the County
23  Counselor, or I mean, when the report is approved,
24  if it's going to be like a warrant application.
25    Q.  Okay.  So you have entered the wanted

13 (Pages 49 to 52)

CHRISTOPHER PARTIN  2/8/2017

Page 53

1 into the system.  What do you do next?
2     A.  If --
3         MR. HUGHES:  I just object to the form
4 of the question.  I mean, maybe it's being too
5 technical, but I think he testified the CARE clerk
6 enters it and --
7         MR. HOLLAND:  You're right, Mike.
8 You're right.  I'll rephrase to be accurate.
9     Q.  So you have the CARE person send out
10 the teletype that John Doe is wanted.  Let me ask
11 you, if you are familiar with John Doe, would you do
12 any of your own attempts to contact John Doe prior
13 to entering the wanted?
14     A.  Yes.
15     Q.  What would you do?
16     A.  If his -- so if it happened at like a
17 business and, you know, I would -- and we knew who
18 he was and where he lived, I would swing by the
19 house and try and talk to him there.  I would look
20 up phone numbers to see if I could get ahold of him,
21 but ...
22     Q.  So in our scenario, John Doe assaulted
23 his neighbor.  You arrive on the scene, you gather
24 as much information as you can about the victim,
25 about the suspect.  You learn that the suspect lives

Page 54

1 next door.  Prior to entering the wanted, you might
2 try to talk to the person first, right?
3     A.  Yes.
4     Q.  And when do you deem that unsuccessful
5 in terms of, okay, I've tried to contact this
6 person; I now need to enter the wanted?
7     A.  Usually it's before the end of the
8 shift.
9     Q.  Okay.  So back to the question which I
10 did not ask too well a moment ago.  You have CARE
11 enter the wanted.  It is in the system.  It is sent
12 out to other St. Louis County police officers?  What
13 do you do next?
14     A.  You can conduct follow-ups.  You can --
15 I mean, if his home is in the area where you work,
16 you can swing by, see if the car that he's known to
17 drive is there.  If it's not there, you can get out
18 and knock on the door.  Just basically conduct
19 follow-ups.
20     Q.  And during this time period, you are
21 not pursuing an arrest warrant or trying to obtain
22 one from the prosecutors or PA's Office because of
23 the policy that you first needed to give the suspect
24 an opportunity to communicate, correct?
25     A.  That, and the PA's Office, the

Page 55

1 Prosecuting Attorney's Office, you have summonses
2 for a reason.  The Prosecuting Attorney's Office is
3 dealing with other cases.  Simple stuff, you don't
4 want to send off to the PA's Office because it will
5 sit there because they've got other more pressing
6 issues.
7         The County Counselor, they have other
8 pressing issues.  The simpler stuff, they prefer
9 that you issue summons and let them go to night
10 court and deal with it there as opposed to tying up
11 the already overworked County Counselors and PA's
12 Office.
13         MR. HOLLAND:  Do you want to take a
14 quick break?
15         MR. HUGHES:  Sure.
16         MR. HOLLAND:  It's been about an hour.
17         THE VIDEOGRAPHER:  The time is 10:37.
18 We are off the record.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  The time is 10:55.
21 We are back on the record.
22         BY MR. HOLLAND:
23     Q.  Officer Partin, I just want to revisit
24 a few things we discussed prior to taking a break,
25 focusing in on interactions or things you understand

Page 56

1 to be the case involving the prosecutor's -- the
2 PA's Office, as you called it.  You also mentioned
3 the counselor's office being involved; is that
4 correct?
5     A.  In what aspect?
6     Q.  I believe you said that the County
7 Counselor Office plays a role or kind of directs you
8 not to take small stuff to the prosecutor's office;
9 is that correct?
10     A.  No, it's not the counselor's office
11 that directs it.
12     Q.  Who is it?
13     A.  It's not them that directs it.  It's
14 kind of told among officers.
15     Q.  Told among officers what?
16     A.  Just you're better off to give the
17 suspect an opportunity to speak in regards to the
18 incident before you proceed so that the County
19 Counselor can -- or State Prosecuting Attorney's
20 Office can make the best decision.
21     Q.  And just the involvement there of the
22 County Counselor, when would they be involved?  When
23 would you go to the County Counselor's Office
24 instead of the PA's Office?
25     A.  Usually all felonies go straight to the

14 (Pages 53 to 56)

CHRISTOPHER PARTIN   2/8/2017

Page 57

1  PA's Office.  The lesser crimes go to the County
2  Counselor's Office.
3        Q.  Can you be more specific with the --
4  with the separation there, lesser crimes versus
5  higher crimes?
6        A.  Murder, domestic assault first,
7  robbery, that type of stuff would go to the PA's
8  Office.  County Counselor, endangering the welfare
9  of a child, drug charges.
10        Q.  And your understanding is, whether you
11  have lesser crimes or higher crimes -- whether you
12  have to go to the PA's Office or the County
13  Counselor's Office, your understanding is that the
14  practice that you should undertake is to first speak
15  with the suspect prior to going to either of those
16  offices?
17        A.  Yes.
18        Q.  And you said earlier that other
19  officers told you that this was the practice?
20        A.  Yeah.
21        Q.  What exactly did they tell you?
22        A.  That you're better off to talk to the
23  suspect before you pass it along because it just
24  gives them an idea of what, you know -- most things
25  are he said/she said.  Not everything is clearcut

Page 58

1  and dry like that, so you want to give everyone
2  their opportunity to speak before you pass it along
3  because that could be the difference between, you
4  know, actually being something to not being
5  something.
6        Q.  So what they told you was to -- you
7  know, in order to further your investigation and
8  make sure you have enough to take to the County
9  Counselor or PA, you should issue the
10  wanted and speak with the person?
11        A.  If you have enough information to -- if
12  you have enough probable cause to put someone out
13  wanted, put them out wanted.  If you don't, continue
14  with your investigation until either you have enough
15  evidence of probable cause -- and probable cause to
16  do so or you just have to inactivate the case.
17        Q.  Sorry.  Maybe you didn't understand my
18  question, and that could be my fault.  So you said
19  that what these other officers told you was before
20  going to the PA's Office or the County Counselor's
21  Office, you want to give the other person an
22  opportunity to talk to them because maybe there's
23  nothing there; is that accurate?
24        A.  There's always two sides to every
25  story.  And if I'm talking to you, you're -- and

Page 59

1  you're the victim, I'm getting one side of the
2  story.  Now you could be -- you could be telling the
3  whole truth and there could be -- there could be
4  some truth, so some of what you're saying could be
5  true; some of what you're saying may not be.
6        But until I talk to the other party
7  involved and get their side of what's going on,
8  it's, you know -- you take what they say, and then
9  you talk to the suspect, and then you put into what
10  they say, and then you look at the differences.  You
11  know, if you're saying that the pen is blue --
12  blue-green and he's saying, well, maybe it's more
13  blue than it is green, you've got to give everyone
14  their opportunity to give their argument of the side
15  before you go any further.
16        Q.  And the way to get the suspect's side
17  of the story is to enter the wanted?
18        A.  To speak to him.
19        Q.  The way to get the suspect's story is
20  to enter the wanted?
21        MR. HUGHES:  Objection.  Asked and
22  answered.  Repetitive.
23        MR. HOLLAND:  I don't think he answered
24  the question.
25        MR. HUGHES:  I think he did, but I made

Page 60

1  my objection.  Go ahead.
2        BY MR. HOLLAND:
3        Q.  The way to -- so what you're saying
4  here is you speak to the victim in this
5  hypothetical.  Get their side of the story.  Before
6  going to the PA's Office or the County Counselor's
7  Office, your understanding, based on what officers
8  have told you, is that the practice is to hear the
9  other side of the story from the suspect.  The way
10  you do that is by issuing a wanted; is that
11  accurate?
12        A.  You don't have to -- could you repeat
13  that one more time?
14        MR. HOLLAND:  Can you read back the
15  question, please.
16        (Record read by the reporter.)
17        THE WITNESS:  It's one way.
18        BY MR. HOLLAND:
19        Q.  What is your definition of "probable
20  cause"?  Better way to ask that is, how would you
21  define "probable cause"?
22        A.  Have enough reason to believe that they
23  were the one that committed the crime.
24        Q.  How did you learn that?  How did you
25  come to have that understanding that that's the

15 (Pages 57 to 60)

CHRISTOPHER PARTIN   2/8/2017

Page 61

1  definition of probable cause?
2      A.  Through the academy.  Through field
3  training.
4      Q.  Did someone tell you that or was it in
5  a document that you read?
6      A.  It's with what you read in the academy,
7  constitutional law.
8      Q.  Were you told anything else about
9  probable cause other than that definition?
10     A.  There's a lot about probable cause.  If
11  you reasonably believe and have knowledge from --
12  you know, in regards to this instance, if you have
13  the victim, what she's saying matches what you have,
14  plus you have an independent third-party witness
15  that says this is what happened, you can put two and
16  two together and you can see here's my probable
17  cause.  I can clearly see this happened to this
18  extent.
19     Q.  And the -- so related to that, you
20  believe you have probable cause and you said earlier
21  that instead of going to the County Counselor's
22  Office or PA's Office, you enter the wanted.  So I
23  guess what I want to ask you about is what is your
24  understanding of the requirements of the PA's Office
25  or the County Counselor's Office in issuing a -- an

Page 62

1  arrest warrant?  What is needed for them to do that?
2      A.  Probable cause.
3      Q.  Anything else?
4      A.  Enough evidence to support that
5  probable cause.
6      Q.  And you said it's your understanding
7  that they also have this policy of requiring you to
8  communicate with the suspect?
9      A.  I don't know if they have a policy for
10  that.  This is -- this is officers talking.  This
11  isn't a directive from the PA's Office or the County
12  Counselor's Office.
13     Q.  So is it your understanding that
14  there's no difference between the requirements of
15  getting a warrant and entering a wanted?
16     A.  Except the practice and department
17  policy says that you'll -- if you have enough
18  probable cause, you'll enter someone as wanted,
19  speak with them before you proceed.
20     Q.  If you didn't have this understanding
21  from other officers that you should first try to
22  communicate with the suspect before pursuing a
23  warrant, would you ever issue a wanted?
24     A.  If I have enough probable cause, yes.
25     Q.  If there wasn't this understanding on

Page 63

1  your part that you need to speak with the suspect
2  before obtaining an arrest warrant from the
3  prosecutor's office or the County Counselor's
4  Office, why would you issue a wanted?
5      A.  Because I want to know the whole -- I
6  want to know the whole story before I present the
7  case to them.  It does me no good if I present them
8  half the case before trying to get a warrant.
9      Q.  So you -- sorry.
10     A.  You don't -- there's no point in taking
11  a case to them if you don't have the whole story.
12  If I give you half the story, something could be
13  missed, something could be overlooked, something
14  could get thrown out.  I try to present the best
15  case I can to them and let them make their decision,
16  and by presenting the best case I can to them, I
17  need to know what the victim says, what the suspect
18  says, and then let them figure out who's right and
19  who's wrong.  That's ...
20     Q.  So you entered wanteds knowing half the
21  story?
22         MR. HUGHES:  Objection.  It's
23  argumentative.  Object to the form of the question.
24  And it misstates his testimony and only states half
25  of what he said, not even half.  A word of what he

Page 64

1  said in his full answer.
2         MR. HOLLAND:  Objection to form is
3  fine.
4      Q.  But he -- so you said that one of the
5  reasons why you would continue to issue wanteds even
6  if this understanding of yours that you -- that
7  that's what the PA and County Counselor's Office
8  prefer is because you want to complete your
9  investigation, and you said that you don't want to
10  present them with half the story; is that accurate?
11     A.  Yes.
12     Q.  So in those instances, you would enter
13  a wanted?
14     A.  If I had enough probable cause.
15     Q.  So you mentioned earlier that -- excuse
16  me -- once you enter the wanted, your practice is to
17  thereafter conduct follow-up?
18     A.  Yes.
19     Q.  Can you describe that in more detail?
20     A.  If I know where they live, I -- and I
21  know, you know, what they drive, swing by their
22  house.  If their car is there, knock on the door.
23  If the car is not there, but, you know, still knock
24  on the door, try to talk to them.  That way the
25  wanted doesn't have to sit out there longer than

16 (Pages 61 to 64)

CHRISTOPHER PARTIN   2/8/2017

Page 65

1  necessary.
2      **Q.  And at what point during this follow-up**
3  **would you cancel the wanted?**
4      A.  When I know the whole entire story.
5  When I -- I would cancel the wanted once either, you
6  know, I can't go any further with it.  I've tried
7  finding it.  I've, you know -- in this instance, he
8  presents himself to me, says, I'm not going to talk.
9  Okay.  Well, but I want to see it face-to-face.
10  That way, when I hand you the paperwork or a summons
11  or to let you know what's going on, that's how I
12  know, okay, this is -- this is what I'm sending off
13  to the County Counselor.  This is what's going to
14  night court.
15      If you don't want to talk, you don't
16  have to talk.  You have that right.  But I wanted to
17  afford you that right to speak with me.  That way
18  they can have your side, his side, and then we can
19  be done with it.
20      **Q.  And if you, either prior to entering**
21  **the wanted or during your follow-up, you speak to**
22  **the suspect and they tell you they will not speak to**
23  **you, they have no interest in talking to you about**
24  **this subject matter, would you issue a wanted at**
25  **that point?**

Page 66

1      MR. HUGHES:  Well, excuse me.  I'd just
2  object to the form of the question.  I object to the
3  form of the question.  It's vague as to facts and
4  calls for speculation and conjecture as to whether
5  or not you're asking if he's speaking to someone in
6  person face-to-face.
7      BY MR. HOLLAND:
8      **Q.  I'm just asking a simple question about**
9  **speaking with the witness.  We can --**
10      MR. HUGHES:  Speaking to a witness on
11  the phone?  Speaking to the witness in person?
12      BY MR. HOLLAND:
13      **Q.  Prior to issuing a wanted, if you spoke**
14  **to the suspect and they told you that they have no**
15  **interest in talking to you, that they will not speak to**
16  **you, whether themselves or with an attorney present,**
17  **would you still enter a wanted?**
18      MR. HUGHES:  Same objection as before.
19      THE WITNESS:  Can you read that back?
20      (Record read by the reporter.)
21      THE WITNESS:  If I had enough probable
22  cause, yes.
23      BY MR. HOLLAND:
24      **Q.  Your testimony today has been that the**
25  **purpose of the wanted is to allow the suspect to**

Page 67

1  **communicate their side of the story; is that**
2  **accurate?**
3      A.  Yes.
4      **Q.  If that suspect tells you they will not**
5  **talk to you about this case, what is the purpose for**
6  **entering that wanted?**
7      A.  If I spoke to you over the phone, just
8  because you say you're John Smith, does not mean you
9  are John Smith.  Until I have you in front of me and
10  I can see, okay, yeah, you are John Smith, that --
11  that is how I know, okay, you are -- you are John
12  Smith and you are saying I'm not going to talk to
13  you.
14      Your friend could say, yeah, I'm John
15  Smith and I'm not going to talk to you, I have --
16  over the phone I have no way of verifying that you
17  are John Smith and that I am actually talking to
18  John Smith until you are in front of me.  That's --
19      **Q.  Is that your personal policy or did**
20  **somebody tell you that that's how you should**
21  **practice your police work?**
22      A.  That's me.
23      **Q.  So in that scenario, if you have no**
24  **doubt that the person you're speaking to is who**
25  **you're speaking to, would there then be any need to**

Page 68

1  **show a wanted?**
2      A.  There's always doubt, because if I've
3  never dealt with you before and I don't know your
4  voice, and I'm not a professional on voices, I can't
5  tell you from my uncle.  I mean, there's no --
6  there's no way to distinguish that I'm actually
7  speaking to who I want to speak to.
8      **Q.  So until you -- your personal practice**
9  **is that until you meet with this person**
10  **face-to-face, the wanted -- the wanted needs to**
11  **remain in place?**
12      A.  As long as I have probable cause, yes.
13      **Q.  And during your follow-up, if you**
14  **encounter this person at their house, would you**
15  **arrest them pursuant to the warrant -- wanted?**
16      A.  If I -- if I -- if I pull up to your
17  house, knock on the door, you answer and you talk to
18  me, it -- I mean, if you don't have warrants, I
19  don't have -- I don't need to take you in on the
20  wanted.  I can -- basically, right there I can do
21  everything I need to do without taking you in, and I
22  can get rid of the wanted just the same as if you go
23  to intake.
24      **Q.  So today your testimony has kind of**
25  **framed wanteds as -- the purpose of wanteds as**

17 (Pages 65 to 68)

CHRISTOPHER PARTIN  2/8/2017

Page 69

1  providing a suspect with an opportunity to tell
2  their side of the story; is that accurate?
3      A.  Yes.
4      Q.  So does that seem -- to you is that
5  something that that person should be arrested for?
6      MR. HUGHES:  You know, he's given you
7  that answer multiple times, so I'd just object.
8  Asked and answered.
9  BY MR. HOLLAND:
10     Q.  I'll reask it.  I believe earlier I
11 asked you whether a person on a wanted you felt --
12 you feel they should be arrested.  What I'm asking
13 you is whether you think providing the suspect with
14 an opportunity to tell their side of the story is
15 a -- an appropriate basis for arrest.
16     A.  If they're not in front of me and it's
17 someone else arresting them, then, yes.  If I'm not
18 speaking to them, if I have not spoken to them and
19 it's a different officer arresting them, then, yes,
20 it would be reason to arrest them.
21     But as far as if the person that has
22 the wanted is standing in front of me, there's no
23 need to -- I mean, I can talk to you in a -- in an
24 open room or I can talk -- you know, there's no
25 point in causing more work and headache for your --

Page 70

1  for both of us.  I mean, by the time you go through
2  the booking process, I mean, it could be a few
3  hours.
4      Q.  So if you were following up on a
5  suspect at their home, you said that you don't have
6  to arrest them, but would you arrest them pursuant
7  to a wanted?
8      MR. HUGHES:  Just -- just object.  It's
9  just overbroad and vague and ambiguous.  Object to
10 form.  Okay.  Go ahead.
11     THE WITNESS:  If it's my wanted, I
12 wouldn't have to arrest them.  If they had warrants,
13 I would be bound to arrest them.  But if it's my
14 wanted, no.  If it's another officer's wanted, yes.
15 If it's my case, my wanted, then, no.
16 BY MR. HOLLAND:
17     Q.  Have you ever arrested a -- well,
18 strike that.
19     How many wanteds have you entered in
20 your police career?
21     A.  I do not know.
22     Q.  More than ten?
23     A.  I do not know.
24     Q.  Have you ever, upon following up on a
25 wanted, encountered a suspect at their home?

Page 71

1      A.  After I've issued?
2      Q.  Correct.
3      A.  After I've issued a wanted?
4      Q.  Correct.
5      A.  At their home, no.  On the street, yes.
6      Q.  Can you describe what happened in that
7  situation?
8      A.  I had a road rage incident that had
9  happened on Lindbergh.  I had a perfect description
10 of the vehicle and a license plate.  I went by the
11 house numerous times.  I sent other officers by the
12 house numerous times, and the guy claimed that it
13 was his brother who had possession of the truck.
14 And the house that we had gone to, the brother did
15 not live at and the person at the house was very
16 uncooperative.
17     One day I just so happened to see a
18 vehicle matching my case description that had no
19 license plates on it, and I stopped it and he
20 identified himself, and it just so happened to be
21 the vehicle that I had out wanted.  He was not
22 arrested and that teletype was canceled immediately.
23     Q.  What happened during the interaction?
24     A.  I spoke with him.  I was like, you
25 know, he never went -- he did not go in handcuffs.

Page 72

1  I just -- talking to him.  He talked to me about it
2  and was like, Okay.  Well, now I have your side of
3  it.  I had her side.  Now I have your side.
4      She said she's willing to go to court.
5  You guys can both go to court on this date and talk
6  about -- and the judge will decide if -- if the case
7  warrants further or if it doesn't, but he was not --
8  he was not arrested.  He was on the side of the road
9  with me for maybe 15 minutes at most, and then he
10 was on his way.
11     Q.  Have you ever issued a wanted and then
12 thereafter sought a warrant, arrest warrant?
13     A.  No.
14     Q.  Why not?
15     A.  Most of what -- most of the cases that
16 I've had I've usually arrested the person on --
17 arrested them, and in certain instances I've
18 arrested them on the scene of the incident and
19 conducted warrant application while they were in
20 custody, or usually it's -- actually, I would like
21 to retract that.  There is one where I issued a
22 wanted and then applied on a warrant.
23     Q.  Can you tell me about that?
24     A.  I was patrolling in an area where I saw
25 a vehicle that had -- so every year on your plate,

18 (Pages 69 to 72)

CHRISTOPHER PARTIN   2/8/2017

Page 73

1  the year corresponds with the color.  '16 is black,
2  '17 is red.  I saw a vehicle that had a black '17
3  sticker which -- well, they don't even make black
4  '17 stickers, so I initiated a traffic stop.  And
5  there's two occupants.
6          The driver identified -- there was
7  warrants attached to the plates.  The driver
8  identified himself and I knew he was the driver that
9  had the warrants.  The female passenger
10  identified -- falsely identified herself, and as I
11  returned to my vehicle, I found that the driver had
12  felony warrants.  Not wanteds, warrants.
13          And as I was -- it's our practice that
14  you don't just go and try and arrest a person with
15  felony warrants, especially when they have caution
16  codes for being violent.  You wait for another
17  officer to get there to assist you.  You never know
18  what's going to happen.
19          On this traffic stop from where my
20  position was, they actually had to go a roundabout
21  way to get there and the female exited the
22  vehicle -- I still had not been able to identify the
23  female, and she exited the vehicle and fled from the
24  scene.
25          Other officers arrived 15 seconds after

Page 74

1  she made it to the tree line, and I stayed with the
2  driver because I had him identified, and I knew who
3  he was, and I knew he had felony warrants.  They
4  went after her.  The driver falsely identified her,
5  but we were able to ascertain who she was and
6  realized that the reason she lied is because she had
7  $50,000 worth of cash-only bonds for dangerous
8  things.
9          So based on all of this and positive
10  identification, we issued a wanted, and she was
11  picked up approximately, like, a month later by
12  Jefferson County.  And since she had $50,000
13  cash-onlys -- and I mean, this lady did not have
14  very much money to her name and knowing that she did
15  not appear in court numerous times, I knew she
16  wasn't getting out any time soon.
17          I responded to Jefferson County.  I
18  interviewed her, and then I came back, canceled the
19  wanted immediately, wrote up my report, and then
20  forwarded it off to the Prosecuting Attorney's
21  Office.
22      Q.  So what would cause you to -- after
23  entering a wanted talking to the suspect, what would
24  cause you to apply for a warrant as opposed to
25  issuing a summons?

Page 75

1      A.  The amount of -- there are certain --
2  there are certain things that you can issue a
3  summons for.  There are certain things you can't
4  issue a summons for.  And if -- and in this
5  instance, since she had felony -- she had numerous
6  felony charges, active warrants, I went to the state
7  PA's Office, because in that instance, since she had
8  felony warrants, she fled from me, that means it's
9  felony resisting, so that's why I went with the
10  Prosecuting Attorney's Office.
11      Q.  What can you issue a summons for?
12      A.  Gas drive-off, drug paraphernalia,
13  marijuana, trespassing, peace disturbance.
14  There's -- there's probably about 15 to 20 charges
15  written on there that -- and then you have your
16  ordinance book where you can do additional other
17  charges that aren't written on the form.
18      Q.  And everything else you have to go
19  apply for a warrant for?
20      A.  You forward it to the County
21  Counselor's Office and see if -- or the State
22  Prosecuting Attorney's Office.
23      Q.  Is this four?
24      A.  Yes.
25      Q.  Excuse me.  Sorry.  I'll just mark the

Page 76

1  whole document.  I'm marking as Exhibit 4 Department
2  General Order 10-37, but it also contains later
3  iterations of this -- of this document.  Bates
4  number DEF-RFP234, six zeros, 28.
5          (Exhibit 4 was marked for
6          identification.)
7      MS. GROSSMAN:  Here you go, Mike.
8      MR. HUGHES:  Thank you.
9  BY MR. HOLLAND:
10      Q.  And I understand that the cover page
11  you're looking at and the iteration -- the first
12  couple iterations predated your time as a -- as an
13  officer.  What I'm interested in starts on page 1 of
14  21.  It's lower right-hand corner ending in 57.
15  It's Department General Order 13-37 dated
16  September 25, 2013.
17      A.  You said it's which page?
18      Q.  It's --
19      MR. HUGHES:  I think this is --
20      MR. HOLLAND:  On the bottom middle it
21  says 11 of 21.
22      MR. HUGHES:  Sort of in the middle.
23      MR. HOLLAND:  Excuse me, 1 of 21.
24      MR. HUGHES:  Yeah, that exhibit.  I
25  think I found it.

19 (Pages 73 to 76)

CHRISTOPHER PARTIN  2/8/2017

Page 77

1    MR. HOLLAND:  Okay.
2    MR. HUGHES:  So I showed it to him, so
3  he's looking for it, so ...
4    THE WITNESS:  You said 1 of 21?
5    MR. HUGHES:  Yeah, this is -- Tim, are
6  you saying Department General Order 13-37?
7    MR. HOLLAND:  That's correct.
8    MR. HUGHES:  Effective September 25th,
9  2013?  Okay.
10    MR. HOLLAND:  That's correct.
11    MR. HUGHES:  Yeah, 1 of 21.
12    MR. HOLLAND:  I'm going to hand you one
13  more document just to get us up to date.
14    (Exhibit 5 was marked for
15    identification.)
16    MR. HOLLAND:  Marking as Exhibit 5,
17  Departmental General Order 16-37 dated March 16th,
18  2016, Bates DEFRFP234, six zeros, and 78.
19    Q.  Do you recognize these two documents?
20    A.  Yes.
21    Q.  What are they?
22    A.  Department policy on case management.
23    Q.  And these are the two versions of this
24  document that were in effect during your time as a
25  police officer?

Page 78

1    A.  Yes.
2    Q.  Okay.  If we turn -- if you start with
3  13-37 and turn to page 11 of 21, section 8 is
4  Warrant Summons Application Procedures; is that
5  accurate?  Sorry.  I'm looking at Exhibit 4.
6    A.  Okay.
7    Q.  Page 11 of 21?
8    A.  Okay.
9    Q.  Do you see exhibit -- or section 8
10  there?
11    MR. HUGHES:  Roman numeral eight?
12    MR. HOLLAND:  Roman numeral eight.
13    MR. HUGHES:  VII -- VIII.
14    THE WITNESS:  Mine.
15    MR. HUGHES:  Is it -- are you on
16  Exhibit 4?
17    THE WITNESS:  Yeah, Exhibit 4.
18    MR. HUGHES:  Allow me to see if I can
19  help him find it.
20    MR. HOLLAND:  Of course.  Thank you.
21    MR. HUGHES:  This is Roman numeral
22  eight.
23    THE WITNESS:  Oh.
24    MR. HUGHES:  And then --
25    MR. HOLLAND:  Thanks, Mike.

Page 79

1    Q.  So section -- Roman numeral eight,
2  subsection A reads, "When confronted with a
3  situation where a suspect exists but there is no
4  potential danger to the public or loss of evidence
5  would not occur by delaying the arrest, officers are
6  permitted and encouraged to apply for an arrest
7  warrant or summons prior to effecting a full custody
8  arrest."  Did I read that correctly?
9    A.  Yes.
10    Q.  Was this your practice?
11    A.  Yes.
12    Q.  Would you agree that entering a wanted,
13  your goal is to have the result be a full custody
14  arrest?
15    A.  Can you repeat that one more time?
16    Q.  Would you agree that when you enter a
17  wanted, a goal is to have the suspect -- strike
18  that.
19    Would you agree that when you enter a
20  wanted, your goal is to effect a full custody
21  arrest, whether by you or an officer who reads the
22  teletype that you directed to be sent out?
23    MR. HUGHES:  My only objection is it's
24  been asked and answered in a different form when he
25  previously stated what his goal was.

Page 80

1    THE WITNESS:  If there's enough
2  probable cause and it's warranted if he -- in an
3  instance where someone has assaulted and has
4  warrants, then, yeah, they need a full custody
5  arrest.
6    BY MR. HOLLAND:
7    Q.  My question is if you enter a wanted,
8  is the goal of that wanted to have the suspect
9  arrested?
10    A.  For the ability to give them an
11  opportunity to speak their side, yes.
12    Q.  Officer Partin, I'm just asking a
13  yes-or-no question.  If you enter a wanted, is your
14  goal to have the suspect be arrested?
15    MR. HUGHES:  My objection is asked and
16  answered, so he's just repeating the question.
17    THE WITNESS:  Yes, if it's warranted.
18    BY MR. HOLLAND:
19    Q.  And you told me a few minutes ago that
20  you have entered wanteds and also thereafter applied
21  for a warrant on only one instance.
22    A.  On one instance that I can remember.
23  One that sticks out in my head.
24    Q.  Have you ever arrested somebody
25  pursuant to another officer's wanted?

20 (Pages 77 to 80)

CHRISTOPHER PARTIN   2/8/2017

Page 81

1    A.   Yes.
2    Q.   How many times?
3    A.   I do not know.
4    Q.   More than ten?
5    A.   I do not know.
6    Q.   When you arrested that person, what was
7    your basis for the arrest?
8    A.   Wanted and/or warrants.
9    Q.   I'm focused specifically on wanteds.
10   So your basis for arresting a person, as you said
11   you have done, you look and -- you type in their
12   name, it says they have a wanted, and you effected
13   the arrest?
14   A.   Well, just because it's in the computer
15   doesn't mean it's necessarily an active wanted.  I
16   mean, we always call and verify to make sure that
17   they are active.
18   Q.   Are you aware of wanteds regularly
19   being in the system that are not active?
20   A.   Not to my knowledge.  But I still
21   verify everything, warrants and wanteds.
22   Q.   So why don't you walk me through that
23   process.  You enter the name into the system, it
24   says wanted, what do you do to verify that it's
25   still active?

Page 82

1    A.   Is it a St. Louis County wanted or is
2    it a different department's wanted?
3    Q.   Why don't we start with St. Louis
4    County.
5    A.   I call the St. Louis County records
6    room.
7    Q.   What do they tell you?
8    A.   They'll -- if it's a wanted, well,
9    they'll either confirm, yes, it's active or, no, and
10   then we arrest based on that.
11   Q.   So in that instance, whether it is
12   warranted is based solely on whether the wanted is
13   in the system and active, in your judgment, where
14   you're not the case officer?
15   A.   Yeah.  If they say yes, active,
16   then ...
17   Q.   You mentioned earlier that when you
18   were walking me through one -- one of the
19   experiences you had that you -- that a vehicle that
20   had been spotted was wanted.  Are wanteds just for
21   suspects or are they for vehicles as well?
22   A.   You're referring to the traffic stop
23   for the road rage incident?
24   Q.   Correct.
25   A.   At that -- I -- upon stopping that

Page 83

1    vehicle, I did not know that was my wanted.  I knew
2    I was looking for a vehicle like that, but without
3    it having license plates on it, I had no idea that
4    that was the wanted vehicle I was looking for.
5    Q.   What do you mean when you say "wanted
6    vehicle"?
7    A.   Typically, whenever I put a vehicle
8    out -- a vehicle that was involved in a crime, it's
9    a stop infer.  I just want to know who's in the
10   vehicle.  That way I can get an opportunity to talk
11   to them, find out who they are.  That way I can see
12   if they remotely come close to the description that
13   I was given.
14   Q.   How do you put that vehicle out as
15   being involved in a crime?
16   A.   For the stop infer?  Same -- same as a
17   wanted for a person except instead of -- I mean,
18   it's not -- it's not -- the wanted is just for,
19   like, stops, not for a tow.  You don't have to tow
20   them.  You don't have to arrest them.  Just stop
21   them, find out who's in it, get the vehicle
22   information, and they pass it along to me for me to
23   conduct a follow-up later.
24   Q.   Going back to your -- the discussion
25   about you potentially responding to wanted in the

Page 84

1    system, when you -- when you do go and check -- when
2    you have gone to check whether that -- whether
3    wanteds are active, have you ever been told that
4    they're not active?
5    A.   No.
6    Q.   Why did you suggest that as a
7    possibility?
8    A.   Well, for -- in regards to other
9    agencies, some agencies when they put out wanteds
10   that aren't warrants, they put extradition limits,
11   so if Franklin County has a wanted and they say
12   they're only going to pick up adjoining agencies,
13   still afford them that opportunity to, hey, this is
14   who we have.  If you want them, let us know.
15   It's -- it's to afford the originating agency the
16   opportunity if they -- the person is wanted if they
17   want to spend the extra time to come and get them.
18       MR. HOLLAND:  Why don't we take a quick
19   bathroom break, if that's okay.
20       THE VIDEOGRAPHER:  The time is 11:42.
21   We are off the record.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  The time is 11:54.
24   We are back on the record.
25       BY MR. HOLLAND:

21 (Pages 81 to 84)

CHRISTOPHER PARTIN  2/8/2017

Page 85

1    Q.   Officer Partin, before we took a break,
2    we were talking about instances in which you have
3    happened upon a person who happens to have a wanted
4    out for them; is that correct?
5    A.   Yes.
6    Q.   Each time you have done so, has that
7    resulted in you arresting the individual?
8    A.   There have been instances where I see
9    the officer's name and know that they are working,
10   and I will give them a call and tell them, hey,
11   someone, you have a wanted out.  I have him here.
12   If you want to come talk to them and most -- more
13   than likely they always do.
14   Q.   What happens when the officer is
15   unavailable or you don't recognize the name?
16   A.   Well, if they're unavailable or don't
17   recognize the name, then I arrest them and take them
18   to Clayton.
19   Q.   By Clayton, what do you mean?
20   A.   Justice Services.
21   Q.   And what happens to them at that point?
22   A.   The -- they're booked and then the
23   officer responds there to talk to them.
24   Q.   And what if the officer is unavailable?
25   A.   Define unavailable.

Page 86

1    Q.   On vacation.
2    A.   If they're on vacation and they're not
3    going to be able to respond, then usually another
4    officer will go talk to them and take over the case.
5    Q.   What if they're not coming on duty for
6    another eight hours?
7    A.   I can't speak for other officers, but I
8    know what I would do.
9    Q.   What would you do?
10   A.   If I wasn't coming on for another eight
11   hours, I would probably get in my uniform and go
12   respond before my shift.
13   Q.   Have you ever done that?
14   A.   Yes.
15   Q.   If a person is in custody pursuant to
16   being arrested from a wanted, what circumstances
17   would exist where the case officer would not speak
18   to that person?
19   A.   I don't know what -- in what instances
20   that they wouldn't come and talk to someone that
21   they had an active case against.
22   Q.   Are there any limitations or
23   requirements related to the -- the wanted who was
24   arrested in terms of how long they can be kept?
25   A.   Not a moment longer than necessary.

Page 87

1    Q.   Is there a maximum -- prior to the
2    point where you would pursue a warrant or summons,
3    maximum amount of time?
4    A.   For --
5    Q.   Is there a 24-hour rule?
6    A.   There is a 24-hour rule.
7    Q.   What is your understanding of the
8    24-hour rule?
9    A.   There's that you have -- you should get
10   there to talk to them as soon as you possibly can.
11   They understand that things happen.  It's short.  If
12   can't get down there during your shift, you go after
13   your shift.  It's -- if you can't make it, then
14   that's on you, and they will be released after 24
15   hours.  They can't be -- they shouldn't be picked up
16   again on that same wanted.
17   Q.   Are you aware of instances where a
18   person has been arrested on a wanted held for 24
19   hours and not questioned during that time period?
20   A.   No.
21   Q.   Are you aware of individuals being
22   arrested pursuant to a wanted and held for longer
23   than the moment necessary out of punishment for that
24   person?
25   A.   No.

Page 88

1    Q.   Once the officer -- case officer
2    questions the individual arrested pursuant to a
3    wanted, what should happen at that point?
4    A.   They're immediately processed for
5    release if they don't have other warrants or other
6    officers that need to speak with them.
7    Q.   So those are the situations where you
8    arrested the person pursuant to a wanted.  You also
9    mentioned instances that you've experienced where
10   you recognize the officer on the report and you
11   contact that officer to let them know you have their
12   suspect in custody, correct?
13   A.   Usually -- with that -- that is only if
14   they work in my precinct and they are on the next
15   shift, the shift that's on.  So when I was on days,
16   if afternoons was on, since I would be off at 4:00,
17   if afternoons was on and it was in that time span,
18   they would -- I would give them a call and say, hey,
19   here's your wanted.
20       If it's midnights, I would say -- I
21   would arrest them because, unfortunately, not
22   everyone can make it in as soon as you call them.
23   People have lives, kids.  It's not that simple to
24   drop everything and go.
25       Usually on midnights, we're told as

22 (Pages 85 to 88)

CHRISTOPHER PARTIN   2/8/2017

Page 89

1  soon as roll call is over at 8:00, go take care of
2  that.  So I mean, if they're on -- if they're on and
3  working, I'll call them and be like, hey, come take
4  care of this.  Come take care of your wanted.
5        If they're not on -- and me calling
6  them right then and there and having them respond to
7  the scene is only if they're in my precinct.  Other
8  than that, I can't -- I can't sit around in Affton
9  and wait for an officer from North County to come
10 down.  It's a lot of time consuming.
11       Q.  You're speaking in a bit of
12 hypotheticals and I appreciate that, but you said it
13 has happened where you have encountered an
14 individual who you determined is wanted, and you
15 recognize the officer's name, and you contact that
16 officer to come see the suspect; is that correct?
17       A.  Yes.
18       Q.  And during that time period between the
19 point where you contact the officer and he arrives,
20 you have detained that individual, correct?
21       A.  Actually, no, because the few
22 instances, the person didn't know that I knew who
23 they were.
24       Q.  What do you mean?
25       A.  One instance I was -- I responded

Page 90

1  earlier in the day for a 1050 leaving.  They knew it
2  was the neighbor, and she said she would be back
3  with her grandson, told the victim, and then it just
4  so happened that I knew from -- I mean, as officers
5  we talk about our cases.  You know, we help each
6  other.  And it just so happened that I remembered
7  the name of another case that he was working, and I
8  knew exactly who the guy was.
9        While I was investigating and leaving
10 the scene, he didn't know that I knew he was wanted.
11 So I didn't even contact him about it and just knew
12 where he was.  He was hanging out in someone's
13 basement, and we were allowed to go onto the
14 gentleman's property to get him, and the officer
15 took custody, so he was actually never detained by
16 me.
17       Q.  How about in the other instances where
18 this has happened?  Have you detained the individual
19 while waiting for the officer?
20       A.  Yes.
21       Q.  So you just mentioned that you talk to
22 officers about your cases, so you let each other
23 know who is wanted on your cases?
24       A.  Not like the little cases, but the ones
25 that are affecting, like, our area, like people that

Page 91

1  are constantly causing issues, we all know those
2  cases.  We're made aware of what's happening in our
3  precinct, the larger stuff, not the small gas
4  drive-off or anything like that.
5        Q.  And the purpose of that would be so
6  that the wanteds in those larger cases could be
7  arrested while walking the street because the
8  officers know who they are as opposed to the more
9  random encounters, correct?
10       A.  So that we can -- can you repeat that
11 one more time?
12       Q.  You said that the officers talk,
13 especially with regarding the larger cases and who
14 was wanted in connections with them, and my question
15 to you is, the purpose of that is so that the
16 officers can know who is wanted so that if they
17 recognize them in the street at a diner, anywhere,
18 they can arrest them in those situations as opposed
19 to having to wait for a chance encounter at a
20 traffic stop; is that correct?
21       A.  Depending on who the -- in the bigger
22 cases, it's more people that are known to be
23 violent, people that are known to carry weapons.
24 It's -- it's more of an officer safety thing if --
25 if I know that John Smith is out wanted for assault,

Page 92

1  and he's known to fight, he's known to resist, I
2  don't want to send one of my friends into an
3  instance where they could get hurt or something bad
4  could happen to them.  So it's more to let them know
5  officer safety.  Hey, this guy, every time I've
6  arrested him, he's had an actual syringe in his
7  pocket.  I don't want to get stuck by a dirty
8  needle.  I don't want my friends stuck by a dirty
9  needle, so we talk about things that most people
10 don't want to hear, but, unfortunately, it's an
11 everyday thing for our job.
12       Q.  I understand.  Based on your experience
13 with the 24-hour hold, would it be improper for an
14 officer to elect to leave someone on a 24-hour hold
15 without attempting to question them or apply for a
16 warrant?
17       A.  Yes.
18       Q.  Just circling back, you mentioned
19 earlier that your practice is, upon encountering
20 somebody who you determined is wanted, aside from
21 your cases, wanted by another officer, you check if
22 it's -- the wanted is active or inactive, correct?
23       A.  Yes.
24       Q.  What would cause a wanted to be
25 inactive?

23 (Pages 89 to 92)

CHRISTOPHER PARTIN   2/8/2017

Page 93

1      A.  I don't know.
2      Q.  The -- presumably the officer in
3  response to that wanted had reason to cancel it?
4      A.  Possibly.
5      Q.  At his own discretion, his or her own
6  discretion?
7      A.  If that's where the case led, then,
8  yes.
9      Q.  When you -- you started at the academy
10  in March 2015, correct?
11      A.  Yes.
12      Q.  Around that time were you made aware of
13  a -- a report issued by the Department of Justice in
14  connection with Ferguson County?
15      A.  We had heard of it, but we had not read
16  it.
17      Q.  What had you heard about it?
18      A.  That it was going to change the way
19  police departments operate, and there was going to
20  be big changes coming, basically.
21      Q.  Who told you that?
22      A.  Instructors.
23      Q.  Do you remember any names?
24      A.  No.
25      Q.  Do you remember what courses you were

Page 94

1  in when you heard that?
2      A.  No, I do not.
3      Q.  Do you -- what did they tell you about
4  these big changes?
5      A.  That it's not just changes that's going
6  to affect our department.  It's going to be changed
7  that affect law enforcement -- the law enforcement
8  community across the US.
9      Q.  Did any of these changes relate to
10  wanteds?
11      A.  I can't remember.
12      Q.  Do you remember the report having any
13  connection to wanteds, the use of wanteds by police
14  officers?
15      A.  Which report?
16      Q.  The DOJ report.
17      MR. HUGHES:  The DOJ report about the
18  Ferguson Police Department?
19      MR. HOLLAND:  Correct.  That's what I'm
20  asking you about.
21      THE WITNESS:  I never read the report.
22      BY MR. HOLLAND:
23      Q.  These instructors who told you about
24  the big changes, did they tell you anything about
25  this report?

Page 95

1      A.  No.  Just that it was going to affect
2  law enforcement as a whole and not just Ferguson
3  Police Department, but even police departments
4  thousands of miles away will change everyone's way
5  of doing things.
6      Q.  And earlier we spoke about the changes
7  to the wanteds policy in July 2015 and then
8  subsequent changes in September 2016; is that
9  correct?
10      A.  Yes.
11      Q.  Did you -- and July 2015 would have
12  been four months after this March 2015 DOJ report;
13  is that correct?
14      A.  Yes.
15      Q.  Did anyone tell you that the changes
16  made to those policies were in connection with or
17  impacted at all by that report?
18      A.  No.
19      Q.  Did you have an understanding that --
20  or did you have a belief that the changes that came
21  to be in that July 2015 policy were part of the big
22  changes that you were told about by these
23  instructors?
24      MR. HUGHES:  Object to the relevance.
25  Go ahead.

Page 96

1      THE WITNESS:  Can you repeat that one
2  more time?
3      BY MR. HOLLAND:
4      Q.  You said these instructors told you
5  that, you know, following this report, there were
6  going to be big changes in the way police practices
7  nationwide and in St. Louis County were conducted,
8  and then these changes to the policy happened in
9  July 2015.  Did you believe that those changes were
10  related to what you were told about?
11      MR. HUGHES:  My objection, it calls for
12  speculation and conjecture on his part, so I object
13  to the form on that basis.
14      MR. HOLLAND:  I'm only asking for his
15  belief.
16      THE WITNESS:  Can you read that back
17  one more time?
18      (Record read by the reporter.)
19      MR. HUGHES:  Also object to the form.
20  It's vague and it assumes facts not in evidence.  Go
21  ahead.
22      THE WITNESS:  In my opinion, the
23  general orders changed so frequently that, I mean,
24  they even tell you keep up on your general orders
25  because they change constantly.  They're -- there's

24 (Pages 93 to 96)

CHRISTOPHER PARTIN   2/8/2017

Page 97

1  always ways to better improve and do things, and
2  when they hear them, they change them, so staying up
3  to date on them is crucial.
4       BY MR. HOLLAND:
5       Q.  How did you go about staying up to date
6  on them?
7       A.  Whenever they -- whenever they told me
8  that a new general order was in the past system, I
9  would go read the general order and then sign off on
10  it.
11      Q.  How did you sign off on it?
12      A.  Digital signature with a user name and
13  password.
14      Q.  I think you said earlier that
15  Exhibit 1, which is the July 15th, came about in --
16  while you were at the academy, and your training on
17  it consisted of reading it at home.
18          How about -- can you remind me about
19  Exhibit 2, which was issued September 2016, the
20  updates there?  Was there any training in connection
21  with that while you were in the field?
22          MR. HUGHES:  Objection.  Repetitive.
23  Asked and answered.
24          THE WITNESS:  I believe there was
25  actually training at in-service on the changes to

Page 98

1  the teletypes and wanteds.
2       BY MR. HOLLAND:
3       Q.  Sorry.  When did that happen?
4       A.  I can't remember a specific date.  But
5  we do in-service once or twice a year.  Twice a
6  year, I know, I think.
7       Q.  Is that about the same time each year?
8       A.  It varies.
9       Q.  So this -- this update came out
10  September 2016.  Do you remember if that in-service
11  training was prior to this or after that?
12      A.  I don't remember.
13      Q.  Do you remember if there were any
14  materials other than the policy that you were
15  provided to train you on these updates?
16      A.  I don't remember.
17      Q.  What can you tell me about that
18  in-service training?
19      A.  They went over changes to the laws,
20  teletypes.  It was -- I think there was six classes,
21  so not exactly easy to remember.
22      Q.  What changes to the law did they tell
23  you about?
24      A.  The changes of domestic -- with
25  domestic violence and how the addition of E felonies

Page 99

1  and all that, all those changes.  How they pertain
2  to the department.
3       Q.  So if we look at Exhibit 2, the second
4  page, section B, there's some language in bold
5  there.  Section B(1)(a) at this -- as of
6  September 14th, 2016, and is this current?
7       A.  Yes.
8       Q.  It reads, once the case -- "Once the
9  case officer has determined probable cause exists
10  that a person has committed a crime, they must have
11  a review of the facts supporting the case by their
12  immediate supervisor or his or her designee and
13  receive approval before requesting wanted person
14  entries.  Once approved, the case officer will
15  contact CARE or DCI word processing and request a
16  wanted entry on the person.  The name and DSN of the
17  approving supervisor must be in the narrative of the
18  CARE report."  Did I read that correctly?
19      A.  Yes.
20      Q.  Did you receive any training during
21  that in-service training session on this section of
22  the teletype policy?
23      A.  I'm not sure.
24      Q.  You could have but you just don't
25  recall?

Page 100

1       A.  Correct.
2       Q.  How did your -- strike that.
3          How did your handling of a wanted
4  change once this policy went into effect?
5       A.  Once this policy went into effect, it
6  was -- you know, if I had a suspect, I ran
7  everything by my supervisor.
8       Q.  Prior to issuing the wanted?
9       A.  Uh-huh.  Yes.
10      Q.  Did anybody tell you why that change
11  was made?
12      A.  They did say that it was according to
13  something that was published about the Ferguson
14  Police Department.
15      Q.  Who said that to you?
16      A.  It was just everyone talking.
17      Q.  By everyone talking --
18      A.  Police officers talking.
19      Q.  Which officers do you talk to most
20  frequently?
21      A.  It's a small precinct and we're not
22  co-workers.  We're kind of like a family, so I talk
23  to pretty much everyone every time I see them.
24      Q.  Within the Affton -- Affton police
25  precinct?

25 (Pages 97 to 100)

**CHRISTOPHER PARTIN  2/8/2017**

Page 101

1    A.  Yes.
2    Q.  Did any -- were there other officers
3 who told you that or did a supervisor tell your
4 group of officers that the reason that this was
5 being changed was related to a publication on the
6 Ferguson police report?
7    A.  It was just brought up.  It was now we
8 have to add the supervisor's name and DSN and some
9 people said, well, now we've got to talk to them
10 about every case.  Well, doesn't extend your report,
11 and it's simple.  It's to make sure that everyone is
12 in the right.
13    Q.  So prior to September 14th, 2016, I
14 think you said earlier you still got supervisor
15 approval, but maybe it happened after the wanted had
16 been entered; is that accurate?
17    A.  Say that again.
18    Q.  Prior to this policy being in place,
19 did you receive supervisory review and approval of
20 the wanteds you entered?
21    A.  For the most part, yeah, because I was
22 new, still learning, and the last thing I wanted to
23 do was something that I shouldn't and, you know, get
24 written up for it.
25    Q.  But it was permitted to happen after

Page 102

1 the wanted was entered under the policy, correct,
2 the approval?
3    A.  Can you rephrase that?
4    Q.  Strike that.
5    I'll move on.  So you -- have you ever
6 been refused -- strike that.
7    Has there ever been an instance where
8 you wanted to enter a wanted, but you -- your
9 supervisor refused or thought it was inappropriate?
10    A.  Since this policy went into effect?
11    Q.  Let's start with before the policy went
12 into effect.  Was there ever an instance where
13 you -- before entering the wanted, you sought your
14 supervisor's guidance saying you wanted to enter a
15 wanted and they said it would not be appropriate to
16 enter the wanted?
17    A.  I remember speaking with them and
18 telling them, I don't think I have enough for a
19 wanted, but I want to run this past you.  Most
20 supervisors have, you know, ten to 15 years on, so
21 quite a bit more experience than myself.  So if I'm
22 not -- if I'm not connecting the dots on my case,
23 maybe someone else who knows my case can help me out
24 and determine if I have enough or don't have enough
25 and if I need to continue my investigation.

Page 103

1    Q.  I guess my question is, did that ever
2 happen?  Did you ever say you wanted to enter a
3 wanted and a supervisor said, you don't have enough?
4    A.  No.
5    Q.  Did you -- was there ever a case where
6 you entered a wanted and then the -- your supervisor
7 thereafter, whether a day, a week later, reviewed it
8 and told you that they disagreed with the level of
9 probable cause?
10    A.  No.
11    Q.  Prior to 2000 -- prior to
12 September 2016, what was your understanding
13 of -- strike that.
14    I'll come back to that.
15    After September 2016, when this policy
16 went into effect and you've been meeting with your
17 supervisor before entering the wanted, have you ever
18 been refused by the supervisor in an instance where
19 you wanted to enter a wanted?
20    MR. HUGHES:  Objection.  Asked and
21 answered.  Oh, after September 17th.  I think it's
22 been asked and answered.  But anyway, go ahead.
23    THE WITNESS:  Can you repeat that one
24 more time?
25    BY MR. HOLLAND:

Page 104

1    Q.  After September 2016, when this policy
2 came into effect and you'd have to meet with your
3 supervisor before issuing the wanted, has there ever
4 been an instance where you wanted to enter a wanted
5 but your supervisor said no?
6    A.  No.
7    MR. HOLLAND:  Okay.  Mike, I think the
8 next stuff I want to get into is the case-specific
9 stuff, so I think this is a good point to break for
10 half an hour for lunch.
11    MR. HUGHES:  Okay.  Finally
12 case-specific, huh?
13    MR. HOLLAND:  Finally, yeah.
14    THE VIDEOGRAPHER:  The time is 12:22.
15 We are off the record.
16    (Discussion off the record.)
17    THE VIDEOGRAPHER:  The time is 12:22.
18 We are back on the record.
19    BY MR. HOLLAND:
20    Q.  Officer Partin, I have -- was just
21 asking you about whether there was ever any
22 instances where you wanted to enter a wanted and
23 your supervisor told you no.  Let's talk about the
24 opposite where you brought your case to a supervisor
25 and you were unsure whether you had probable cause

26 (Pages 101 to 104)

CHRISTOPHER PARTIN  2/8/2017

Page 105

1  or didn't think you had probable cause. Was there
2  ever an instance where a supervisor in that scenario
3  said go ahead and enter the wanted?
4      MR. HUGHES: Wait. Could you repeat
5  the question?
6      MR. HOLLAND: Yes.
7      MR. HUGHES: Or rephrase it because I
8  think I heard it --
9      MR. HOLLAND: Let me just ask it
10  directly.
11      MR. HUGHES: -- in a strange way.
12      BY MR. HOLLAND:
13      Q. Has there ever been a scenario where
14  you're discussing with your supervisor a suspect who
15  you don't think you have probable cause on to enter
16  a wanted, and they tell you to go ahead and enter
17  the wanted.
18      A. No, they haven't. If I don't feel I
19  have enough probable cause and the supervisor, they
20  wouldn't just tell me to enter the wanted because
21  for whatever reason, unless they're seeing probable
22  cause that I'm not seeing, but they've never told me
23  to do that without explaining, like, connecting the
24  dots that I'm not seeing.
25      Q. But has that ever happened where maybe

Page 106

1  they saw something you didn't see?
2      A. No.
3      Q. Okay. Okay.
4      THE VIDEOGRAPHER: The time is 12:24.
5  We are off the record.
6      (Recess taken.)
7      THE VIDEOGRAPHER: The time is 1:00 p.m.
8  We are back on the record.
9      BY MR. HOLLAND:
10      Q. Officer Partin, before lunch you had
11  mentioned that you talked to officers in your
12  precinct, and it's a relatively small precinct; is
13  that correct?
14      A. Yes.
15      Q. Earlier you mentioned that there are
16  two sergeants and a lieutenant who, at various
17  times, are your supervisors; is that correct?
18      A. Yes.
19      Q. What are the names of the other
20  officers in your precinct?
21      A. Just patrol officers?
22      Q. Patrol officers, the officers who you
23  would have spoken to on a daily basis.
24      MR. HUGHES: Should he include the --
25  also who was recently killed in that -- oh, maybe

Page 107

1  you didn't know that, okay.
2      MR. HOLLAND: I was unaware.
3      THE WITNESS: Officers that I spoke to
4  on a pretty regular basis would have been Vineyard,
5  Bement, Berardi, Hake, Graf, Costa, Behlmann, again
6  Rickard, Thompson, May, Curcuru, Kanteres, Norberg,
7  Wilschusen, Brannan, Fosdick, Boenever, Killian,
8  Arras, Blake.
9      BY MR. HOLLAND:
10      Q. And it would have been these officers
11  that you spoke to about the practice of trying to
12  talk to the suspect before going to the prosecutor's
13  office or the County Counselor?
14      A. We didn't always talk about work. We
15  talked about personal stuff. We talked about --
16  we're friends. We all talked about just about
17  everything.
18      Q. Right. And I understand that. I'm
19  just focused on your earlier testimony about talking
20  to other officers or hearing from other officers
21  about the practice within the police department of
22  issuing wanteds to communicate with the suspect
23  prior to pursuing a warrant or issuing a summons.
24      A. I can't remember those specific names.
25      Q. But it would have been somebody among

Page 108

1  the names you just entered or just said?
2      A. Could be.
3      Q. And same group of people that you could
4  have or would have spoken to about the impact that
5  the DOJ report would have had on police practices?
6      A. It's possible -- it's possible.
7      Q. Okay. Are you familiar with the REJIS
8  system?
9      A. Yes.
10      Q. What is REJIS?
11      A. Regional information system.
12      Q. How do you use it?
13      A. For checking to make sure that people
14  don't have warrants or do have warrants and --
15      Q. Wanteds as well?
16      A. Yeah, if they're -- if they -- we have
17  all these systems, and it doesn't seem like they all
18  talk to each other, so sometimes you'll see stuff in
19  this one -- or this system will show you nothing and
20  then this system will show you everything. And
21  sometimes this will have some of it and this doesn't
22  and ...
23      Q. And by -- you're talking about multiple
24  systems here. Is one of them REJIS?
25      A. Yes.

27 (Pages 105 to 108)

CHRISTOPHER PARTIN  2/8/2017

Page 109

1   Q.   What are the other ones?
2   A.   DOR.
3   Q.   What is DOR?
4   A.   Department of Revenue; CrimeMATRIX,
5   which is a St. Louis County website that we use or
6   application we use.
7   Q.   What do you use DOR for?
8   A.   Plates, driver's license, it populates
9   warrants, wanteds.
10   Q.   What do you use CrimeMATRIX for?
11   A.   It will show you -- it will show you
12   history and it will show wanteds also.
13   Q.   What does CrimeMATRIX show you in
14   connection with wanteds?
15   A.   It's limited -- it's very limited
16   information.  It doesn't show -- it doesn't show you
17   a whole lot, but it can show you more than -- it can
18   show you something that isn't in, like, one of the
19   other systems.
20   Q.   For example?
21   A.   If they're on probation or parole and
22   past addresses that they've used, phone numbers.
23   Q.   Does it show that -- in the CrimeMATRIX
24   database, is there an entry next to the person that
25   says they are wanted?

Page 110

1   A.   If you have the right information, it
2   could be.
3   Q.   Explain that to me.
4   A.   If you put in -- if you put in a name
5   and you're not sure on the date of birth, you could
6   put in the name and then like a range of two years
7   of what you think their birthday could be, and it
8   will show you all the similar people, and then you
9   have to look through.
10   Q.   Let me make sure I'm understanding
11   this.  Are you saying you have somebody who is
12   wanted and you're searching CrimeMATRIX for them, or
13   does the CrimeMATRIX database itself denote that
14   that person is wanted?
15   A.   So if it's John Smith, white male, 1/12
16   of '88, but then there's five of '87, six of '82,
17   but they're all the same name, same race, and it
18   shows -- if you just put the name, it will show all
19   those, and then it will -- and it will say if
20   they're wanted.
21   Q.   Okay.
22   A.   But it won't -- until you actually
23   click on it and start reading, you won't know if --
24   you won't know what they're wanted for until you
25   look at what the wanted information is.

Page 111

1   Q.   And that wanted information will be in
2   their entry within CrimeMATRIX?
3   A.   Yes.
4   Q.   And who has access to CrimeMATRIX?
5   A.   St. Louis County employees.
6   Q.   Who maintains the data within
7   CrimeMATRIX, if you know?
8   A.   I don't know.
9   Q.   Does the DOR database contain
10   information relating to wanteds?
11   A.   It does.
12   Q.   Does it -- does it state whether that
13   individual is wanted?
14   A.   It will show like the person's name and
15   like the case and all that information, and what
16   they're wanted for and if -- it will show like the
17   teletype number and the officer with case
18   responsibility.
19   Q.   Have you ever identified somebody
20   within CrimeMATRIX as wanted and then arrested them
21   because of that?
22   A.   Through CrimeMATRIX?
23   Q.   Right.
24   A.   No.
25   Q.   Do you -- can you access that while in

Page 112

1   your patrol car?
2   A.   Yes.
3   Q.   Same as REJIS?
4   A.   Yes.
5   Q.   Do you know the reason why both systems
6   exist independently?  Do they contain separate
7   information?
8   Let me ask it this way:  Why would you
9   use CrimeMATRIX instead of REJIS?
10   A.   Because sometimes -- CrimeMATRIX, if
11   it's a person who frequents St. Louis County's jail,
12   you have current mug shot photos.  It's -- if you've
13   been arrested in the last six months with, you
14   know -- if I'm looking for a person with -- who's
15   bald and has a goatee and now this guy has, you
16   know, hair that's, you know, past their shoulder, it
17   will help you determine is this a possibility of a
18   suspect, not.
19   Q.   So REJIS contains kind of statistics
20   about the person, height, weight; whereas,
21   CrimeMATRIX contains a mug shot?  More current?
22   A.   More current information.
23   Q.   Is there a reason you might use REJIS
24   instead of CrimeMATRIX?
25   A.   I use -- I pretty much use every

28 (Pages 109 to 112)

CHRISTOPHER PARTIN  2/8/2017

Page 113

1  system, I mean, quite independently.  I mean,
2  sometimes I -- if I'm working on a -- each program
3  does different things, so certain programs, if
4  you're looking for certain information, you're going
5  to want to use this program.  If you're looking for
6  certain other information, you want to use this
7  program, so ...
8      Q.  Do you know how long a wanted can
9  remain in REJIS's system?
10     A.  Not exactly sure.
11     Q.  Do you know how long a wanted can
12  remain in CrimeMATRIX?
13     A.  Until it's removed.
14     Q.  Possibly indefinitely?
15     A.  If you're arrested and you cancel the
16  teletype, it will be removed.
17     Q.  Is that the same for REJIS?
18     A.  Yes.
19     Q.  Have you ever -- I think earlier you
20  said that you encounter a person, you can enter
21  their name into either of these systems and
22  determine if they are wanted, correct?
23     A.  Correct.  Well, yes and no.  A name
24  alone, unless it's a significant name, like, very
25  few people have this name, but a more common name, I

Page 114

1  mean, you have to maybe know their exact birthdate
2  or roughly how old they are, or where the last place
3  is that they called home.
4      I mean, if you've never lived -- if I'm
5  looking for John Smith, and I know he lived in
6  Jefferson County was the place on his driver's
7  license, then probably the people that don't live in
8  Jefferson County can be excluded, but I mean,
9  still ...
10     Q.  I understand that.  I didn't want to
11  cut you off.  That was -- that was -- I wasn't as --
12  I didn't ask that as well as I could have.
13     Do you have the appropriate information
14  to enter into REJIS when you encounter a person on,
15  say, a traffic stop, you'll be able to determine if
16  they are wanted, correct?
17     A.  Hypothetically, yes, but people don't
18  always identify themselves correctly.
19     Q.  Understood.  And if you are not on a
20  traffic stop but, say, just on your daily patrol,
21  are you able to identify people who are wanted in
22  your general vicinity at that time?  You know, not
23  looking for any specific person, but, okay, who
24  within a five-mile radius is wanted?  Are you able
25  to do that through REJIS or CrimeMATRIX?

Page 115

1      A.  That will only show -- it will only
2  show warrants.
3      Q.  So if you typed your current ZIP code
4  or GPS into the -- into the REJIS or CrimeMATRIX or
5  other systems within your patrol car, it wouldn't
6  let you know who is wanted in the area?
7      A.  Usually -- I mean, if you're -- if
8  you're looking for wanted, you could -- you can find
9  them.  But the computer systems are -- I mean, the
10 systems are so wishy-washy at times that if you type
11 in information, you might -- I mean, I'd check to
12 see who had felony warrants one night and it said
13 there was one.  Well, 63128 is a big area and only
14 one felony warrant popped up, so I mean, I don't
15 know how accurate some of the times that can be.
16     Q.  So by 63128, is that a ZIP code?
17     A.  Yes.
18     Q.  So you can enter a ZIP code in and it
19 will tell you in that ZIP code who's wanted, who's
20 out for a warrant; is that correct?
21     A.  If they're -- if the address that they
22 lived at used that ZIP code, it should, if they
23 entered that address in there.
24     Q.  Have you ever done that and found that
25 someone in your vicinity is wanted or out on a

Page 116

1  wanted?
2      A.  Out on a wanted, no.
3      Q.  Are you familiar with MULES?
4      A.  Yes.
5      Q.  What is MULES?
6      A.  Another one of those systems where you
7  can get all that information.
8      Q.  Is it -- do you know of any differences
9  between MULES and REJIS?
10     A.  It's one of those that I -- yeah,
11 I've -- we have all these programs that we can use,
12 and there are some that are a lot more
13 user-friendly, and then there are some that are just
14 downright confusing, so sometimes I try to avoid
15 using them because you just get confused, and
16 there's much simpler ones you can use.
17     Q.  Which ones are the more confusing ones?
18     A.  REJIS, the -- typically, I --
19 typically, I can run them through Mobile Ticketing,
20 which is uses DOR inlets, and you can -- that
21 usually holds as much information as MULES or REJIS,
22 and it's usually -- usually pretty accurate.
23     I mean, I haven't -- haven't come
24 across too many people that if I ran them in that
25 program, what I see is exactly what they're wanted

29 (Pages 113 to 116)

CHRISTOPHER PARTIN  2/8/2017

Page 117

1    for.  There's usually not any hidden information.
2         Q.  Is there any information that is in
3    REJIS that is not in MULES?
4         A.  I'm not sure.
5         MR. HUGHES:  I guess before lunch you
6    said you would get some specifics on this case.
7         MR. HOLLAND:  Mike, I'm going to get
8    there.  I'm almost there.
9         Q.  Have you ever issued a temporary
10   wanted?
11        A.  A temporary wanted?
12        Q.  Do you know what that is?
13        A.  (Shakes head.)
14        Q.  Okay.  Do you know how long wanteds
15   remain in MULES or NCIC?
16        A.  No.
17        Q.  All right.  Let's -- let's turn to the
18   circumstances relating to Mr. Furlow.  Just before
19   we do that, earlier you said that around the police
20   precinct you -- you and the other officers talk
21   about larger cases, especially if, you know, it's a
22   suspect who causes trouble in the community; is that
23   accurate?
24        A.  Yeah.
25        Q.  Was -- does Mr. Furlow fall within that

Page 118

1    group?
2         A.  Prior to my interaction with him on
3    November 11th, I'd never heard that name.
4         Q.  Got it.
5         A.  That was also when I was up in North
6    County and --
7         MR. HUGHES:  You answered the question.
8         MR. HOLLAND:  You did.
9         Q.  So why don't you walk me through the
10   morning of November 11th, 2015.  What do you
11   remember about that morning?
12        A.  We were on patrol, and then we got
13   dispatched for a fight in progress.  We responded --
14   I think the call was dispatched at 8:58 and we
15   arrived at 9:00 o'clock.
16        Q.  So you were in the area?
17        A.  We -- we worked Glasgow Village, which
18   Glasgow is very small so doesn't take long to get
19   from one side of there to the other.
20        Q.  And by "we," who were you with that
21   morning?
22        A.  Officer Slusser.
23        Q.  What rank is Officer Slusser?
24        A.  He's a field trainer.
25        Q.  And as you said earlier, he was your

Page 119

1    field trainer.  You were in phrase three at that
2    point?
3         A.  Correct.
4         Q.  What time did your shift start that
5    day?
6         A.  6:00 a.m.
7         Q.  So you get this call for an ongoing
8    fight.  Were you familiar with the location where it
9    was taking place?
10        A.  Not really.
11        Q.  Have you responded to that street
12   previously?
13        A.  I can't remember.
14        MR. HOLLAND:  Okay.  Let's take a look
15   at the -- what I believe is the police report in
16   connection with that incident.  Marking as Partin
17   Exhibit 6, Bates numbers DEFRFP 100000004.  And you
18   can take a couple minutes to review that.
19        (Exhibit 6 was marked for
20        identification.)
21   BY MR. HOLLAND:
22        Q.  Do you recognize this document?
23        A.  Yes.
24        Q.  Is -- why don't you tell me what it is?
25        A.  It's the police report I completed the

Page 120

1    day of the incident.
2         Q.  And did you draft this document or
3    create this document?
4         A.  I -- some of it is computer-automated
5    from dispatch but some of it we have to add in.
6         Q.  What parts did you add in?
7         A.  Some of the -- the first -- above the
8    first line below "Investigative information," some
9    of the radio and my DSN, the -- some of the
10   information about times and then when it occurred,
11   the officers that responded.
12        Q.  So just stopping you, the times that it
13   occurred, I think as you just said a little bit
14   earlier, it looks like the date and time received
15   was at 8:57 that morning.  What does that indicate
16   to you?
17        A.  That's the time that it was called in
18   to the police department.
19        Q.  And then date/time dispatch, 8:58 a.m.
20   that day?
21        A.  That's the time that the call was sent
22   to us.
23        Q.  And then you arrived on the scene at
24   9:00 a.m.?
25        A.  Yes.

30 (Pages 117 to 120)

CHRISTOPHER PARTIN   2/8/2017



Page 121

1    Q.   And the scene is listed under respond
2  location 116 Glen Garry Road?
3    A.   Yes.
4    Q.   Have you responded to any incidents
5  previously on that street?
6    A.   No, at least not at that address.
7    Q.   Any other addresses?
8    A.   Not to my knowledge, but we respond for
9  sick cases pretty much just about everywhere, so
10 there's a good chance that I may have responded to a
11 sick case on that street.
12   Q.   And you said you add in, did you say,
13 the responding officers to the report here as well?
14   A.   Yes.
15   Q.   Where would those be listed?
16   A.   Where it says, "Agency personnel," and
17 then you see 3DSN and name lines.
18   Q.   So you previously said that Slusser was
19 there with you?
20   A.   Yes.
21   Q.   What role did Officers Robertson and
22 Spraggins play?
23   A.   Robinson was another field trainer and
24 Spraggins was also on field training at that time.
25 He was one of the guys I went to the academy with.

Page 122

1    Q.   And what was their role that day?
2    A.   Spraggins was there assisting me in the
3  investigation, and then Robertson was there in the
4  same capacity that Slusser was, for us to tell him
5  what we got --
6    Q.   So you had each been in your patrol
7  cars, you and Slusser, Robertson, and Spraggins,
8  when the dispatch went out and both patrol cars
9  responded to the scene?
10   A.   Yes.
11   Q.   What led -- what led to the decision
12 where you became the reporting officer among that
13 group?
14   A.   It was our beat, so we work beats.  So
15 since it happened in our area, it's automatically
16 mine.
17   Q.   So you respond to the scene that day.
18 You arrive at 9:00 a.m.  What happened next?
19   A.   Next we started talking to everyone
20 that was involved, the -- ███.
21   Q.   Why don't I stop you there and ask you
22 who was involved.
23   A.   It was --
24   Q.   Do you remember by your recollection or
25 do you have to look at the report?

Page 123

1    A.   There's quite a few names, and I want
2  to make sure I have them correct.
3    Q.   Okay.
4    A.   There's Janet Virgin, Dwayne Furlow,
5  Latoya Furlow, ██████, ██████, █████
6  ██.
7    Q.   Were all of those individuals on the
8  scene when you arrived?
9    A.   No.
10   Q.   Who was not?
11   A.   Dwayne Furlow and Latoya Furlow were
12 not on scene.
13   Q.   Did you speak to the other individuals?
14   A.   Yes.
15   Q.   What did they tell you?  What did Janet
16 Virgin tell you?
17   A.   Janet Virgin told me that there's been
18 ongoing issues with the neighbors, Dwayne Furlow and
19 Latoya Furlow, and that Dwayne Furlow's son came out
20 and started verbally harassing her kids and then
21 started fighting with them.
22   Q.   What did -- did you speak to ██████
23 ██?
24   A.   I did.
25   Q.   What did he tell you?

Page 124

1    A.   He didn't really disclose much about
2  what had gone on.  The more I tried talking to him,
3  the less he would talk to me.  And then I went back
4  to talk to Janet about what actually -- like what's
5  the ongoing issue was, and she couldn't elaborate what
6  the ongoing issue was.  It's just that there's
7  ongoing issues.
8         She wouldn't say if it was the kids
9  bickering and then the parents just started
10 bickering, or if it's just someone is being a bad
11 neighbor.  She wouldn't elaborate on what the
12 ongoing issue was.
13   Q.   So all she told you was there's an
14 ongoing issue?
15   A.   Pretty much.
16   Q.   Did you speak to ███████ there?
17   A.   Yes.
18   Q.   What did she tell you?
19   A.   She basically said that they started
20 messing with her brother and that she stepped in to
21 defend him.
22   Q.   And her brother is ████████?
23   A.   No, her -- her brother is ████
24 ██.
25   Q.   Did you speak to ████████?

31 (Pages 121 to 124)

**CHRISTOPHER PARTIN   2/8/2017**

Page 125

1   A.  I did.
2   Q.  **What did he tell you?**
3   A.  He said that ▮▮▮▮ came out and
4   started talking at him and then started fighting
5   with him.
6   Q.  **What happened next?**
7   A.  I was talking to Janet, and then she
8   told me that when the kids started fighting, that
9   she started recording on her phone because she
10  wanted to have evidence of the type of stuff that
11  was going on, and then she said while they were
12  fighting, Mr. Furlow came at her and took her phone
13  in an aggressive manner and then fled the scene.
14  Q.  **Did she tell you anything else?**
15  A.  She said that she was hit in the head
16  and he broke her glasses.
17  Q.  **What did you do next?**
18  A.  Next I walked back to my car, and then
19  ▮▮▮▮ came up to me and handed me his dad's
20  cell or his cell phone and said, "My dad wants to
21  talk to you."
22      He identified himself as Dwayne Furlow,
23  and then I started talking to him about what had
24  happened.  At first he said he was inside sleeping
25  and heard the altercation, and then he reversed

Page 126

1   himself and said he was outside and saw it, and then
2   he was gone.  So we were there and he wanted to
3   press charges for the person that had assaulted his
4   kid, but he wouldn't -- I mean, he wasn't exactly
5   doing anything to help me out in that investigation.
6      I mean, if -- if I saw my child be
7   assaulted and I had such an issue with it, I think I
8   would have remained on scene to further that
9   investigation.  If I want that person brought to
10  justice for assaulting my kid, this is what I would
11  do.  I would be there to talk to the police about
12  it.
13  Q.  **But different people have different**
14  **perspectives, fears of law enforcement; do you agree**
15  **with that?**
16  A.  I completely agree with that.  But an
17  ultimate -- I mean --
18  MR. HUGHES:  You can wait for the next
19  question.
20  MR. HOLLAND:  Okay.
21  MR. HUGHES:  Unless you want him to
22  finish it, but I thought he answered the question.
23  MR. HOLLAND:  Just want him to -- as
24  complete as he feels; it's not up to me.
25  MR. HUGHES:  If you want to -- if you

Page 127

1   don't think it was complete, I won't stop you.
2   BY MR. HOLLAND:
3   Q.  **So now you've spoken to everybody on**
4   **the scene.  I just -- looking at the report, is**
5   **there a reason why your communications with ▮▮▮▮,**
6   **▮▮▮▮, and ▮▮▮▮ are not described in the**
7   **narrative?**
8   A.  Well, none of them had marks on them,
9   so it didn't sound like an actual fight.  It sounded
10  more like siblings wrestling and it -- it just -- I
11  mean, with what we had in regards to it, it
12  didn't -- we really didn't have much in regards to
13  it.  I've got what one parent is saying and then the
14  other one is not there and not telling me what's
15  going on.  Just telling me to do my F'ing job.
16  Q.  **So is it your understanding at that**
17  **point based on what Janet had said and your viewing**
18  **the scene, it's kind of a neighborly dispute?**
19  A.  The kids, neighborly dispute.  The --
20  the assault and the larceny, not exactly neighborly.
21  Q.  **The allegations of it?**
22  A.  Yes.
23  Q.  **What -- so at this point, after ▮▮▮▮**
24  **comes over to you, you speak to Dwayne.  You have**
25  **heard Janet's allegations and Dwayne's side of the**

Page 128

1   story.  What do you do next?
2   A.  We then canvass the area to see who may
3   have witnessed it that wasn't from either family,
4   and we locate a neighbor who had seen the incident.
5   Q.  **And that is ▮▮▮▮; is that**
6   **correct?**
7   A.  Yes.
8   Q.  **Where was he located?**
9   A.  He was standing outside of his house
10  at -- I think he lived at --
11  Q.  **▮▮▮▮, I think, is right.**
12  A.  Yeah.
13  Q.  **Where is ▮▮▮▮ in relation to 116 Glen**
14  **Garry Road?**
15  A.  So if you imagine this wall as the
16  street (indicating) in the -- and the center house
17  is Janet Virgin's, to the right was Dwayne Furlow's,
18  to the left was ▮▮▮▮.
19  Q.  **What did -- what did ▮▮▮▮ tell you?**
20  A.  He said -- he said he didn't see who
21  started the fight amongst the kids; however, he did
22  say he saw Mr. Furlow assault Ms. Virgin and take
23  her phone.
24  Q.  **Did he -- if we look at your report, it**
25  **says, "▮▮▮▮ stated" -- ▮▮▮▮ is ▮▮▮▮ --**

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

CHRISTOPHER PARTIN  2/8/2017

Page 129

1  "stated he observed the altercation between Virgin
2  and D. Furlow.  He's not certain who started the
3  altercation.  He explained he observed Furlow take a
4  phone from Virgin."
5       Did I read that correctly?
6    A.  Yes.
7    Q.  Is that different from what you just
8  said?
9    A.  Can you repeat what I said?
10   Q.  I can read it.  It says -- I asked you
11 what I told you, and you said -- you said, "He
12 didn't see who started the fight amongst the kids;
13 however, he did say he saw Mr. Furlow assault
14 Ms. Virgin and take her phone."
15   A.  And he did not see who started the
16 altercation, but he did see Mr. Furlow take the
17 phone from Virgin.
18   Q.  Saw her -- saw Mr. Furlow take a phone
19 from --
20   A.  Yes.
21   Q.  So that point, Mr. Furlow could have
22 been taking the phone -- his phone back from
23 Ms. Virgin for all you knew, right?
24      MR. HUGHES:  Objection to the form.
25 It's argumentative.

Page 130

1      BY MR. HOLLAND:
2    Q.  Did you know if the phone that
3  Mr. Furlow took from Ms. Virgin -- or excuse me,
4  strike that.
5       Do you know if Mr. -- the phone that
6  ████████ told you he saw Mr. Furlow take from
7  Ms. Virgin was her phone or Mr. Furlow's phone?
8    A.  He was not able -- he did not elaborate
9  if it was Mr. Furlow's phone that Ms. Virgin was in
10 possession or if it was her phone.
11   Q.  You said you were canvassing the area.
12 Did you -- why don't you tell me what else you did
13 to canvass the area?
14   A.  We knocked on other doors for the
15 surrounding houses and no one answered.
16   Q.  What did you do next?
17   A.  Well, multiple times -- so ████████
18 ██, he didn't just hand me the phone once.  He
19 handed me it multiple times, and when I asked
20 Mr. Furlow about the phone, he didn't answer and
21 then just "Do your F'ing job."
22   Q.  Who said that to you?
23   A.  Mr. Furlow.  Presumably, Mr. Furlow.
24   Q.  When you -- when ████████ handed you the
25 phone the first time, other times, what did you say

Page 131

1  to ████████ about who you were going to be speaking
2  to?
3    A.  He identified him as his dad.
4    Q.  Did you look at the screen of the phone
5  to see what the number was?
6    A.  It was an older phone; it was a flip
7  phone with a cracked screen.
8    Q.  It didn't have any identifying
9  information on the phone in terms of who the caller
10 was?
11   A.  I couldn't -- I don't remember.
12   Q.  So as I was just reading to you the
13 report, it doesn't contain any reference to
14 Ms. Virgin's glasses being broken or -- or the
15 assault having been witnessed by ████████; is that
16 correct?  And by ████████, I mean
17 that we've referred to him as both.
18   A.  Yes, it doesn't say.
19   Q.  In fact, if you turn to the page ending
20 in Bates number 5, which is two of seven of the
21 report, look in the middle of the page, "Injury
22 class," it says, "Probable, not apparent."
23      Does that mean that the injury, if
24 there was one to you, was not apparent?
25   A.  Well, Ms. Virgin is an African

Page 132

1  female -- African-American female, and she had
2  darker-colored skin and the mark on her head was a
3  little bit darker, but I mean, I didn't see blood or
4  anything like that, so ...
5    Q.  Okay.  So after knocking on doors and
6  coming up unsuccessful and aside from ████████ --
7  and I'm referring to him as ████████, but can you
8  tell me more about -- how old was he?
9    A.  16, I believe.
10   Q.  Were his parents at home?  Did you
11 speak to them at all?
12   A.  I did not.  I don't think -- I don't
13 think they were home.
14   Q.  Did you learn anything about
15 ████████ relationship with anyone involved in the
16 incident?
17   A.  The only thing that he said was that
18 they were neighbors.
19   Q.  So at this point, what did you do next?
20 And before we get there, I just want to bring you
21 back to the narrative because you said you spoke to
22 Mr. -- who you presume to be Mr. Furlow.  Did he
23 tell you anything about whether he committed these
24 offenses or not?
25   A.  When I tried talking to him about it,

33 (Pages 129 to 132)

CHRISTOPHER PARTIN   2/8/2017

Page 133

1   he -- he was -- he was talkative, and then when I
2   started talking about the phone, he just quit
3   talking.  He -- and then the only thing I could get
4   out of him was "Do your F'ing job."
5        Q.  Did he tell you whether he took the
6   phone or not?
7        A.  Every time I asked him, he said, "Do
8   your F'ing job."
9        Q.  If you look at page four of seven of
10  the report -- is that right?  Yeah, four of seven,
11  which is the narrative.  The second to last sentence
12  above the straight line across there, does it say,
13  "D. Furlow denied taking Virgin's property"?
14       To read the full sentence, does it say,
15  "When questioned about taking Virgin's cell phone,
16  D. Furlow denied taking Virgin's property"?
17       Did I read that correctly?
18       A.  Yeah.
19       Q.  Do you recall that happening?
20       A.  If I remember, his denying was, "Do
21  your F'ing job."  And by not completely answering
22  the question.
23       Q.  When somebody says that to you, do you
24  usually put that in a report as a denial?
25       A.  I've -- my report writing has grown

Page 134

1   since writing this report.
2        Q.  Okay.  So now you are finished
3   canvassing and you canvassed the street.  Did you
4   try to find Mr. Furlow?
5        A.  We did.
6        Q.  Is this before or after you entered the
7   wanted?
8        A.  The wanted wasn't entered until later
9   in that day.  We drove past the house a couple
10  times.
11       Q.  So let's try to put a time on where we
12  are now.  You canvassed the street after responding
13  at 9:00 a.m.  What time do you think you were done
14  with that?
15       A.  Probably by 10:00.
16       Q.  And then what did you do?
17       A.  I mean, we -- we cleared from the
18  scene, and then we were still -- I mean, Glasgow is
19  small, so we were patrolling.
20       Q.  Trying to find Mr. Furlow?
21       A.  Just because we get one call doesn't
22  mean we focus all of our attention.  There's still
23  plenty of things that need to be done.
24       Q.  And at what point did you enter the
25  wanted?

Page 135

1        A.  Later that day.
2        Q.  How did you make that happen?
3        A.  I had talked -- I had written the
4   report.  I showed it to Officer Slusser.  He said I
5   was -- putting him out as wanted, he didn't seem to
6   have an issue with, because of -- on field training,
7   you can't do anything without the field trainer's
8   okay.  No matter what phase you're in, the field
9   trainer looks over everything, so if he -- if he
10  would have had an issue with it, then it wouldn't
11  have been in there.
12       Q.  So Officer Slusser reviewed this report
13  and okayed or approved or okayed the wanted being
14  sent out for Mr. Furlow?
15       A.  (Nods head.)
16       Q.  Is that noted anywhere in the report
17  Officer Slusser's role here?  And by role, I mean
18  having spoken to you and said it was appropriate to
19  issue a wanted.
20       A.  No, because that wasn't part of
21  department policy then.
22       Q.  It would be now, though, right?
23       A.  Yes.
24       Q.  If you turn back to the first page,
25  just going to the bottom of the data it says,

Page 136

1   "Approval records."  Can you tell me what those
2   indicated?
3        A.  Supervisor approval would be the person
4   that reviewed the report.  Final approval would be
5   someone in CARE that would approve the report after
6   a supervisor has approved it.
7        Q.  So let's start with the supervisor
8   review.  It says it was dated November 15th, 2015,
9   at 10:49, on a Sunday.  So give or take four full
10  days after the incident?
11       A.  Yeah.
12       Q.  What would -- what is -- I know you
13  mentioned this individual when -- when I had you
14  name your fellow precinct members.  Gilyon, who is
15  that?
16       A.  She's an afternoon supervisor.
17       Q.  First name is?
18       A.  Emily.
19       Q.  Emily Gilyon.  Is she an officer or a
20  lieutenant, sergeant?
21       A.  Sergeant Gilyon.
22       Q.  Sergeant Gilyon.  What would she have
23  done here to review this from a supervisor's
24  perspective, or what did she do that you know?
25       A.  I don't know what supervisors do when

34 (Pages 133 to 136)

CHRISTOPHER PARTIN  2/8/2017

Page 137

1  they review reports.
2      Q.  You're not involved in the supervisor's
3  review --
4      A.  If --
5      Q.  -- for cases where you're the case
6  officer?
7      A.  If they have an issue with it, they
8  bring it up to us before they approve it.
9      Q.  Is it your understanding that she would
10  have reviewed the report, and if she had a problem
11  with it, you would have heard about it?
12      A.  Yes.
13      Q.  So is it your understanding that on
14  November 15th, she thought that was appropriate to
15  approve this wanted?  And I'm not asking you to
16  speak for her.  Your understanding, having not heard
17  from her, is that --
18      A.  Having not heard from her, then I would
19  assume she didn't have an issue with it.
20      Q.  I think you said earlier that you never
21  had a supervisor contact you about a wanted that you
22  had issued?
23      A.  Not to my knowledge.
24      Q.  Do you know why she reviewed this four
25  days later, or is that -- is that --

Page 138

1      A.  I don't know.
2      Q.  And then the CARE review, is that more
3  of a, you know, just make sure that the I's are
4  dotted, the T's are crossed, the information there
5  is accurate?
6      A.  I would assume so.
7      Q.  Do you know what they use to confirm
8  that?  Do they compare --
9      A.  I do not.
10      Q.  All right.  So the wanted has been
11  entered for Mr. Furlow.  Does that mean officers
12  statewide are given license to arrest him upon
13  encountering him?
14      A.  I don't remember what the exact wanted
15  said in regards to extradition.
16      Q.  Certainly within St. Louis County?
17      A.  Yes.
18      Q.  What did you do to try to find
19  Mr. Furlow?
20      A.  We worked -- we worked four tens, and
21  we were always in the same area, so we attempted to
22  stop by there a couple times.
23      Q.  By "there," you mean his residence?
24      A.  The residence at 116 Glen Garry.
25      Q.  And going back to some of your earlier

Page 139

1  testimony, you said that in some instances -- in an
2  instance where you were familiar with the suspect or
3  knew where they lived prior to entering the wanted,
4  you might visit their home, knock on the door, see
5  if the car is there.  Is that accurate?
6      A.  Yes, we did that that day.
7      Q.  Prior to entering the wanted?
8      A.  Correct.
9      Q.  What happened upon those visits?
10      A.  No -- no one answered.
11      Q.  The wanted was entered that afternoon.
12  Did you try to visit him again later that day?
13      A.  Prior to the wanted being entered
14  or ...
15      Q.  Now I'm after the wanted.
16      A.  After the wanted, no.  The wanted was
17  entered probably pretty close to end of shift.
18      Q.  Well, let's look at the report to see
19  if we can figure out exactly when it was entered.
20  Does date/time entered under the management
21  column -- row on the first page, does that give a
22  pretty good estimate of when it went in the system,
23  1:24 p.m.?
24      A.  That's probably when the face sheets
25  were entered, but the narrative, I don't think

Page 140

1  that's the same time that the narrative would have
2  been entered.
3      Q.  And if we look in REJIS, the actual
4  teletype, would we be able to know when it was
5  entered?
6      A.  I don't know.
7      Q.  Okay.  So whenever it was entered that
8  day and the teletype went out, what did you do
9  thereafter?
10      A.  After the teletype was entered?
11      Q.  Yes.
12      A.  We -- we did as much as we could.  We
13  drove past.
14      Q.  His home?
15      A.  Yes.
16      Q.  Knock on the door?
17      A.  Yes.
18      Q.  Did you encounter him?
19      A.  No.
20      Q.  When you had spoken to him on the phone
21  earlier and spoken to his son, had you obtained his
22  telephone number?
23      A.  I did not.
24      Q.  Would you normally try to take the
25  telephone number in a scenario like that so you

35 (Pages 137 to 140)

CHRISTOPHER PARTIN  2/8/2017

Page 141

1  could contact the person?
2      Q.  Yeah, but whenever we try and call
3  people, no one ever answers the private number.
4      Q.  Did there come a time when Mr. Furlow
5  or his attorney tried to contact you?
6      A.  Yes.  It was never -- Mr. -- after
7  November 11th, Mr. Furlow never tried to contact me.
8  It was all Blake Strode.
9      Q.  Can you tell me about your interactions
10 with Mr. Strode?
11     A.  First -- the first time that I got a
12 message to call Mr. Strode, all it said was he was a
13 lawyer for Dwayne Furlow.  And spoke to him and he
14 was trying to find out what was going on, but then
15 he made promises to turn his client in, and he -- I
16 felt like he called me just about every day I was
17 working.
18     Q.  When you had spoken to Mr. Furlow on
19 the phone earlier that day, did you tell him -- did
20 you do anything to try to get him to come back and
21 talk to you?
22     A.  I had -- I advised him that I had
23 enough information and probable cause to believe
24 that he had done the larceny and assault, and he was
25 going to be put out wanted.

Page 142

1      Q.  And what was your basis for probable
2  cause at that point when you spoke to him?
3      A.  My -- my victim and my independent
4  witness.
5      Q.  So the statements of Ms. Virgin and
6  ▇▇▇▇▇▇▇?
7      A.  Yes.
8      Q.  So after November 11th, on
9  November 11th, after the wanted is entered, did
10 you -- what did you do in response to the
11 interactions you had with Mr. Strode to try to talk
12 to Mr. Furlow?
13     A.  Mr. Strode kept saying that he was
14 unwilling to talk to me and would invoke Fifth
15 Amendment right, and Mr. Strode kept saying that he
16 was going to turn himself in.  He's going to turn
17 himself in.  And then a month and a day later, he
18 told me late in the afternoon that he was going to
19 turn himself in that evening, but I had heard that
20 so many times that I didn't believe it.
21     Q.  So a couple things.  Earlier today you
22 said that the purpose of a wanted is to allow the
23 suspect the opportunity to tell their side of the
24 story, right?
25     A.  Uh-huh, yes.

Page 143

1      Q.  And on this day after the incident, you
2  had a phone conversation with somebody who said that
3  they're Mr. Furlow, told you their side of the
4  story, and told you to do your job, and then you had
5  conversations with somebody who said they were
6  Mr. Furlow's attorney and that he does not wish to
7  talk to you, correct?
8      A.  Correct.
9      Q.  So at that point, what is the purpose
10 of the wanted that you entered other than to have
11 Mr. Furlow arrested?
12     A.  It was like I said before, although he
13 identified -- stated he was Dwayne Furlow on the
14 phone, if he's not in front of me, I can't confirm
15 who he is.  So he could say that -- I mean, he could
16 say it through his lawyer, but it's kind of one of
17 those things where it's a preferred face-to-face
18 interaction.
19     Q.  Are you familiar with the Fifth
20 Amendment?
21     A.  Yes.
22     Q.  Does Mr. Furlow have a right not to
23 talk to you?
24     A.  Yes.
25     Q.  Did he exercise that right?

Page 144

1      A.  He did.
2      Q.  So what is the purpose of the wanted at
3  that point?
4      MR. HUGHES:  Are you saying did he
5  exercise his Fifth Amendment right not to talk to
6  him when he's at the Justice Center, or are you
7  saying on the telephone, his voice on the telephone?
8      MR. HOLLAND:  Through his attorney.
9      MR. HUGHES:  Okay.  My objection is
10 asked and answered.  Repetitive.  You can ask him to
11 repeat it or rephrase it.
12     THE WITNESS:  Repeat.
13     MR. HUGHES:  I forgot what it was.
14 BY MR. HOLLAND:
15     Q.  So earlier in the day you said that the
16 purpose of issuing a wanted is to allow the other
17 party -- or the suspect, excuse me, an opportunity
18 to communicate their side of the story, correct?
19     A.  Yes.
20     Q.  In this instance, Mr. Furlow said that
21 he would not talk to you and through his attorney
22 exercised his Fifth Amendment right to not talk to
23 you; is that right?
24     A.  Yes.
25     Q.  Why keep the wanted in place at that

36 (Pages 141 to 144)

CHRISTOPHER PARTIN   2/8/2017

Page 145

1  point?
2      A.  Because we -- leaving it active was so
3  that I could verify -- if and when he was picked up,
4  I could get to him, allow him to say it to me.  I'm
5  not talking to you and issue him the summons.  That
6  way we could have receipt that he received it and
7  that way he had a receipt that, hey, he knows that
8  he has to go to court.  That way when a bench
9  warrant for a failure to appear shows up, it's not
10  by anyone's fault except for --
11      Q.  But Mr. Strode, who is Mr. Furlow's
12  counsel, offered to bring Mr. Furlow in for that
13  purpose if you had the probable cause to get a
14  warrant, and those kinds of things, or issue a
15  summons.  He offered to do that, correct?
16          MR. HUGHES:  Objection.  Assumes facts
17  not in evidence.  And it's argumentative.
18  BY MR. HOLLAND:
19      Q.  Did Mr. Strode -- actually, excuse me.
20      I believe Officer Partin testified a
21  few minutes ago that Mr. Strode repeatedly said that
22  he would bring Mr. Furlow in and -- to bring himself
23  in.  Is that correct?
24      A.  He didn't --
25      Q.  You can look back at the transcript,

Page 146

1  but I believe you testified to that.
2      A.  He did on multiple occasions --
3      Q.  Right.
4      A.  -- but on those occasions, when he did
5  say he was going to bring him in, he did not bring
6  him in.
7      Q.  Understood.  But you just said that the
8  purpose of keeping the warrant -- the wanted out
9  there is to see Mr. Furlow in person to give him the
10  notice for the summons and make sure that he
11  received it.  And my question is, Mr. Strode was
12  offering to bring him in, correct?
13          MR. HUGHES:  Objection.  Asked and
14  answered.  Go ahead.
15          THE WITNESS:  Yes.
16  BY MR. HOLLAND:
17      Q.  Did you tell Mr. Strode anything about
18  what might need to happen once Mr. Furlow was
19  brought in?
20      A.  I explained the way that things happen,
21  whether it be -- if he did it on a day I was
22  working, he could come to the station, and if he --
23  he could be issued the summons there.  He could be
24  transported to intake if he has warrants, I mean,
25  and then if he does it on a day he's not working,

Page 147

1  he'll be transported to intake until I can get
2  there.
3      Q.  So by transported to intake means he
4  would be booked, processed, those sorts of things?
5      A.  Yes.
6      Q.  Earlier -- and that would happen
7  whether you were on duty or not, correct?
8      A.  No.
9      Q.  If you weren't on duty, he would be
10  processed.  If you were on duty, what would happen?
11      A.  If I was on duty and he came to the
12  station and I was at the station, then I could --
13  it's like I explained on the traffic stop for my
14  road rage, I could have -- I could have -- hey, he's
15  going to invoke his Fifth?  All right.  Here's your
16  summons.
17      Q.  And what -- what station were you
18  working at at this time?
19      A.  On which day?
20      Q.  November 11th, 2015, through
21  December 12th, 2015.
22      A.  Up until December 1st, I was in North
23  County, and then after I was back in Affton.
24      Q.  And if you were off duty, he would have
25  had to have been processed in intake?

Page 148

1      A.  Yes.
2      Q.  Or it was at a precinct where you
3  weren't at, or let's say you were out in the field
4  and he came in, you would have to be processed?
5      A.  If I was where?
6      Q.  If you weren't at the precinct at the
7  time.
8      A.  At the first or the third?
9      Q.  Either one.
10      A.  Since I -- I wasn't at the -- if he
11  would have turned himself into the third precinct, I
12  could have came there and tooken -- taken care of it
13  there, but if he would have turned himself in into
14  the first precinct when I was in the third, he would
15  have had to go to intake.
16      Q.  Did Mr. Strode tell you anything about
17  the individuals involved?
18      A.  He told me that there's ongoing issues
19  between neighbors and that there's a restraining
20  order, but he didn't show me that paperwork.
21      Q.  Did you ever go back and ask Ms. Virgin
22  if that was the case?
23      A.  I did not.
24      Q.  Do you recall Mr. Strode requesting on
25  multiple occasions to meet you at the Justice Center

37 (Pages 145 to 148)

Page 149

1  instead of the precinct station so Mr. Furlow would
2  not be arrested, processed, and transferred over to
3  the Justice Center?
4       A.  No.
5       Q.  You're saying that did not happen?
6       A.  He did not ask me to meet him at the
7  Justice Center.  He said that his client did not
8  want to be in the custody of St. Louis County police
9  officers because he's had issues with them in the
10 past.
11      Q.  And during this time, you left --
12 despite this communication with Mr. Furlow's
13 attorney, you left the wanted outstanding subjecting
14 Mr. Furlow to custodial arrest at any point?
15          MR. HUGHES:  Object to form of the
16 question.  It's obviously argumentative.
17          BY MR. HOLLAND:
18      Q.  Did the wanted remain outstanding
19 during this time?
20      A.  Between November 11th and
21 December 12th?
22      Q.  Correct.
23      A.  Yes.
24      Q.  Do you recall insisting that Mr. Furlow
25 appear at the precinct station at any point, as

Page 150

1  opposed to the Justice Center?  You wanted him to
2  come to the precinct center first; is that accurate?
3       A.  There were so many communications with
4  him, I'm sure it's a possibility.
5       Q.  And then he would have had to have been
6  transferred to the Justice Center?
7       A.  If I was at the first precinct, he
8  would not have had to have been transferred.
9       Q.  When you encounter people on the
10 street, do you ask them for identification?
11      A.  Yes.
12      Q.  For what purposes?
13      A.  Depends on what instances you're
14 meaning.
15      Q.  Do you encounter people on the street
16 and ask them for ID to check them to see if they're
17 wanted?
18      A.  In what aspect?  Just someone
19 walking -- someone at a gas station?  At a store?
20      Q.  Someone you're familiar with.
21      A.  Familiar how?
22      Q.  In -- so you said you and your officers
23 discuss larger cases, and if any individuals are
24 wanted in connection with those larger cases, people
25 you suspect to be those individuals on the street,

Page 151

1  do you ever ask them for identification to confirm
2  one way or the other?
3       A.  Usually the ones that we're looking for
4  that are involved in the larger cases we know fairly
5  well.
6       Q.  Okay.  Do you know who Captain Guy
7  Means is?
8       A.  The name is the captain of the first
9  precinct when I was up there.
10      Q.  Did you ever discuss Mr. Furlow with
11 Mr. Means?
12      A.  I did not.
13      Q.  Are you aware of a letter that
14 Mr. Furlow's counsel sent to Captain Means on
15 November 11th, 2015?
16      A.  Not until I was made aware of this
17 lawsuit.
18          MR. HOLLAND:  Let's take a look at that
19 letter.  Entering as Exhibit 7, this is a
20 November 11th, 2015, email from Blake Strode which
21 attaches a letter from ArchCity Defenders with the
22 same date.
23          (Discussion off the record.)
24          (Exhibit 7 was marked for
25          identification.)

Page 152

1          MR. HOLLAND:  Is that the right one?
2  Here.
3          MR. HUGHES:  For the record, I object
4  to this exhibit.  It's Exhibit 7.  He already
5  testified he did not see this until the lawsuit was
6  filed, and it's nothing but self-serving hearsay
7  letter prepared by the ArchCity Defenders, Blake
8  Strode.
9          MR. HOLLAND:  Objection noted.
10      Q.  So I'm looking at this letter.  Can
11 you -- so Captain Guy Means was a captain within the
12 first precinct; is that accurate?
13      A.  Yes.
14      Q.  Does this letter -- it was addressed to
15 Captain Means on November 11th, 2015?
16          MR. HUGHES:  You're asking him to what?
17 To --
18          MR. HOLLAND:  Strike that.
19      Q.  Have you had a chance to look through
20 the letter?  I understand that you haven't --
21          MR. HUGHES:  Have you ever seen this
22 letter yourself?
23          THE WITNESS:  I've never seen it until
24 I was notified of this lawsuit.
25          MR. HUGHES:  I mean -- I mean, it was

38 (Pages 149 to 152)

CHRISTOPHER PARTIN  2/8/2017

Page 153

1 an allegation in the lawsuit that there was a letter
2 sent, but the question is, have you ever seen that
3 letter before now?
4         THE WITNESS:  When I was notified -- it
5 may have been in the original lawsuit, but I --
6     BY MR. HOLLAND:
7     Q.  Would you dispute that this letter was
8 sent to Captain Guy Means of the first precinct on
9 November 11th, 2015?
10     A.  I have no idea if it was sent to
11 Captain Means.
12     Q.  And I understand you haven't -- you
13 haven't seen this letter previously, but I just
14 wanted to ask you about some of the things in the
15 letter and, you know, given that you were involved
16 in the incident underlying the letter -- strike
17 that.
18         I guess my one question is, if you had
19 seen this letter on November 11th, 2015, or any time
20 thereafter until December 12th, what would your
21 reaction have been in terms of the need for the
22 wanted?
23         MR. HUGHES:  Objection not only to
24 relevance but to the form of the question.  It calls
25 for speculation and conjecture and it's

Page 154

1 argumentative.
2     BY MR. HOLLAND:
3     Q.  Officer Partin, if you had read this
4 letter on November 11th, 2015, would you have
5 canceled the wanted?
6     A.  I would have looked to my superior for
7 guidance.
8     Q.  Why don't you tell me what happened on
9 December 12th, 2015.
10     A.  We were contacted earlier in the day
11 that Mr. Strode was going to be bringing Mr. Furlow
12 to turn himself in.  He did not give a time frame.
13 We responded to Clayton when we found out that he
14 was here, but we were coming from, basically,
15 Jefferson County.  That was the area we were working
16 way down south that day.  And we got there as quick
17 as we could, considering traffic and finding a spot
18 to park.
19         We came in, we contacted Mr. Strode and
20 Mr. Furlow.  Mr. Strode said that Mr. Furlow didn't
21 want to talk to us, and we didn't do a warning and
22 waiver because he wasn't willing to speak with us.
23 We gave him a summons and told him to go to North
24 Division night court to appear on those charges and
25 that we told him that the wanted would be removed

Page 155

1 immediately.
2     Q.  Did you learn anything new from
3 Mr. Strode or Mr. Furlow on that day that you didn't
4 know on November 11th or any day thereafter?
5     A.  No.
6         MR. HUGHES:  Object to the form of the
7 question.  It's argumentative.  I objected to the
8 form of the question.
9         MR. HOLLAND:  I asked a simple
10 question.
11         MR. HUGHES:  Well, it is argumentative.
12         MR. HOLLAND:  I asked him a question.
13         MR. HUGHES:  I made my objection to the
14 form.
15     BY MR. HOLLAND:
16     Q.  Let's take a look at the summons that
17 you issued to Mr. Furlow on that day.
18         (Exhibit 8 was marked for
18         identification.)
20     BY MR. HOLLAND:
21     Q.  Entering as Exhibit 8, Bates numbers
22 DEFRFP1, a lot of zeros and then one.  Do you
23 recognize this document?
24     A.  Yes.
25     Q.  Is this the summons that you issued to

Page 156

1 Mr. -- Mr. Furlow following your meeting at the
2 precinct on December 12th?
3     A.  Yes.
4     Q.  What was your purpose when you drafted
5 this document?
6     A.  To cover the events of that night.
7     Q.  Would Mr. Furlow be going to court
8 based on the events of that night or based on the
9 events of November 11th?
10     A.  The events of November 11th.
11     Q.  Are those events described in this
12 document?
13     A.  At the very end, if you see where it
14 says, "See report for further," that would have --
15 you're only given so many lines, but "see report for
16 further" would be a good indication to read the
17 police report since you have to write -- you're only
18 given so much room.
19     Q.  Who's reading this document?
20     A.  The County Counselor at night court.
21     Q.  And it's your testimony that they would
22 understand what "see report for further" would mean?
23     A.  I would assume so.
24     Q.  What is the purpose of the "by reason
25 of," in your experience?  What's that section

39 (Pages 153 to 156)

CHRISTOPHER PARTIN   2/8/2017

Page 157

1   supposed to indicate?
2       A.   The incident.
3       Q.   And you just said there's only a
4   limited amount of space here, but you didn't include
5   anything about the incident; is that correct?
6           MR. HUGHES:  Well, objection.
7   Argumentative.  He did answer differently already,
8   but go ahead.  You can answer.
9       BY MR. HOLLAND:
10      Q.   In this section what you just said is
11  supposed to be about the incident.  Is there
12  anything other than the "see report for further"
13  relating to the November 11th, 2015, incident?
14      A.   No.
15      Q.   Going up a little bit, the document
16  says, "Defendant committed the following offense in
17  the unincorporated portion of St. Louis, to wit,"
18  then it says, "On or about 12/12/2015."  Do you see
19  that?
20      A.   Yes.
21      Q.   What incident -- what offense did
22  Mr. Furlow commit on 12/12/2015?
23      A.   None.
24      Q.   What offense did Mr. Furlow commit at
25  or near 100 South Central?

Page 158

1       A.   None.
2       Q.   Did you issue this summons because
3   Mr. Furlow would not speak with you?
4       A.   No.
5       Q.   When you met with Mr. Furlow and his
6   attorney at the Justice Center, do you recall
7   yourself or Sergeant Curcuru -- excuse my --
8           MR. HUGHES:  Excuse me.  Are you
9   calling -- it says, "PO Curcuru."  Are you saying
10  Sergeant Curcuru?
11      BY MR. HOLLAND:
12      Q.   Is Curcuru a police officer or a
13  sergeant?
14      A.   Police officer.
15      Q.   My mistake.  When you met Mr. Furlow
16  and his attorney at the Justice Center on
17  December 12th, 2015, do you recall yourself or
18  Police Officer Curcuru stating that you would never
19  rely on statements by a minor to issue a summons in
20  a case like Mr. Furlow's?
21      A.   I do not remember that comment.
22      Q.   Is it possible that you said something
23  like that?
24      A.   I do not remember that comment.
25      Q.   Are you saying you did not say that

Page 159

1   comment?
2       A.   I'm saying I do not remember that
3   comment.
4       Q.   And on the topics of ranks of certain
5   people, where does Captain Guy Means fall within the
6   chain of command?
7       A.   We have probationary police officer,
8   police officer, and then you have like -- I would
9   assume that you would put field trainers above
10  normal police officers, and then you'd have
11  sergeants, lieutenants, captains.
12      Q.   At the time of November -- I know you
13  said earlier you had some varying supervisors.  Who
14  was your supervisor on November 11th, 2015?
15      A.   I don't remember his name.
16      Q.   Other than Officer Slusser, who was
17  your field trainer?
18      A.   I don't remember the sergeant's name.
19      Q.   Have you had any interactions with
20  Mr. Furlow since December 12th, 2015?
21      A.   No.
22          MR. HOLLAND:  I don't have any further
23  questions at this time.  I will defer to my
24  colleagues.
25          MR. HUGHES:  Well, I have some

Page 160

1   questions.
2           MR. HOLLAND:  Do you want to take --
3   can we take a short break?  It's been about an hour
4   and ten minutes.  Take a quick break.
5           THE VIDEOGRAPHER:  The time is 2:18.
6   We are off the record.
7           (Recess taken.)
8           THE VIDEOGRAPHER:  The time is 2:24.
9   We are back on the record.
10          MR. HOLLAND:  I will pass the witness.
11              EXAMINATION
12      BY MR. HUGHES:
13      Q.   Thank you.  Officer Partin, I have a
14  few questions.  Oh, by the way, do you have Gomez
15  Exhibit 4?
16          MR. HOLLAND:  Do you have a Bates
17  number for that?
18          MR. HUGHES:  Excuse me.  I'm going to
19  hand the first amended complaint, which was -- I
20  don't have the original Gomez Exhibit 4, but I've
21  got a copy here for you.  This is -- this was Gomez
22  Exhibit 4.
23      Q.   And I don't believe in duplicating
24  exhibits, so we'll -- what was -- you see Gomez
25  Exhibit 4, which is the first amended complaint

40 (Pages 157 to 160)

CHRISTOPHER PARTIN  2/8/2017

Page 161

1 filed in this lawsuit. Do you see that, Officer
2 Partin?
3     A. Yes.
4     Q. Okay. And, you know, could we go
5 through this a little bit? And I guess I'm going to
6 mostly concentrate on the allegations concerning
7 you. Paragraph 32, that's on page 9 of Gomez
8 Exhibit 4; do you see that?
9     A. Yes.
10     Q. So -- so you see in the first amended
11 complaint, paragraph 32, it is alleged that shortly
12 after Mr. Furlow's departure from home on the
13 morning of November 11th, 2015, Mr. Furlow's minor
14 son was attacked by his adult female neighbor; do
15 you see that?
16     A. Yes.
17     Q. Did I read that allegation accurately?
18     A. Yes.
19     Q. And just so we understand, Mr. Furlow's
20 minor son, was that ███████?
21     A. Yes.
22     Q. Okay. And you talked to ██████; is
23 that correct?
24     A. Yes.
25     Q. Did ███████ ever once tell you that he

Page 162

1 was attacked by his adult female neighbor?
2     A. No.
3     Q. Now, you indicated that you did try to
4 speak with people on the scene; is that correct?
5     A. Yes.
6     Q. And you spoke to at least one person on
7 the scene; is that correct?
8     A. Yes.
9     Q. Were you told by that person for
10 anyone -- by anyone that the son, ████████, was
11 attacked by the adult female neighbor?
12     A. No.
13     Q. Okay. And when you spoke to Dwayne
14 Furlow on his son's cell phone, did he ever say to
15 you that this adult female attacked my son?
16     A. He didn't explicitly say an adult
17 female attacked his son.
18     Q. And now, paragraph 33, it says,
19 "When police arrived, the adult female neighbor
20 alleged as a basis for the conflict that Mr. Furlow
21 had stolen her cell phone earlier that morning." Is
22 that correct?
23     A. Yes.
24     Q. Okay. So is it basically correct that
25 the adult female neighbor had alleged that

Page 163

1 Mr. Furlow had stolen her cell phone?
2     A. Yes.
3     Q. So just so we understand, you didn't
4 arrive on the scene making accusations against
5 Mr. Furlow; would that be correct?
6     A. Correct.
7     Q. Other people were -- or some other
8 person was making an allegation?
9     A. Yes.
10     Q. Well, let's put it this way: When you
11 arrived on the scene, did you have any idea what was
12 going on?
13     A. No.
14     Q. Were you trying to sort things out?
15     A. Yes.
16     Q. And how do you try to sort things out?
17     A. Talking to people.
18     Q. And did you try to talk to people?
19     A. Yes.
20     Q. And you talked to more than one person;
21 is that correct?
22     A. Yes.
23     Q. And, you know, you talked to this Janet
24 Virgin; is that correct?
25     A. Yes.

Page 164

1     Q. And you talked to some kids; is that
2 correct?
3     A. Yes.
4     Q. And you gave their names to -- by the
5 way, did any of those other kids you talked to say
6 that an adult female had attacked ███████?
7     A. No.
8     Q. Okay. And -- but anyway, you're there
9 sorting something out; is that correct?
10     A. Yes.
11     Q. Was there a cab driver on the scene?
12     A. Yes.
13     Q. Did -- did -- did that cab driver, by
14 any chance, say that the adult female had attacked a
15 child?
16     A. No.
17     Q. Okay. And -- so anyway, what they
18 allege, you know, in paragraph 33, certainly has
19 some element of truth that the adult female did say
20 that Mr. Furlow had stolen her cell phone; is that
21 correct?
22     A. Yes.
23     Q. Now, if someone tells you that they had
24 stolen their cell phone, are you supposed to just
25 say, well, that's just a neighborly dispute and get

41 (Pages 161 to 164)

CHRISTOPHER PARTIN  2/8/2017

Page 165

1  up and leave?
2      MR. HOLLAND:  Objection.  Form.
3  BY MR. HUGHES:
4      Q.  Are you, Officer?
5      A.  No.
6      Q.  No.  Are you -- what are you obligated
7  to do?
8      A.  Investigate.
9      Q.  And did you?
10     A.  Yes.
11     Q.  Okay.  So -- and again, this goes
12  without saying, but you indicated that you responded
13  to the 911 call; is that correct?
14     A.  Yes.
15     Q.  And you arrived two minutes after it
16  was dispatched to you; is that correct?
17     A.  Correct.
18     Q.  And that was three minutes after the
19  911 call had come in; is that correct?
20     A.  Correct.
21     Q.  So from looking at the records, the
22  police report, you were there three minutes after
23  the event; is that correct?
24     A.  Yes.
25     Q.  Whatever it was.  And then you had to

Page 166

1  try to sort it out; is that correct?
2      A.  Yes.
3      Q.  And paragraph 34 has this allegation,
4  "Responding to this allegation, Officer Partin of
5  the St. Louis County Police Department called
6  Mr. Furlow on Mr. Furlow's cell phone."  Do you see
7  that?
8      A.  Yes.
9      Q.  Did I read that accurately?
10     A.  Yes.
11     Q.  Did you know Mr. Furlow's cell phone
12  number?
13     A.  No.
14     Q.  So if you did not know his cell phone
15  number, how could you possibly call Mr. Furlow?
16     A.  I didn't.
17     Q.  Did you -- I don't even know if you had
18  a land line number, but let's ask you that.  Did you
19  call a land line number --
20     A.  No.
21     Q.  -- of Mr. Furlow?
22         And so, in fact, this allegation that
23  you called Mr. Furlow or Mr. Furlow's cell phone is
24  inaccurate; is that correct?
25     A.  Correct.

Page 167

1      Q.  And by the way, you mentioned earlier
2  that ▓▓▓▓ handed you his cell phone -- is that
3  correct -- at some point?
4      A.  Yes.
5      Q.  Did you know -- so you know ▓▓▓▓ did
6  not call you on his cell phone.  He handed you his
7  cell phone; is that correct?
8      A.  Yes.
9      Q.  So you would not have the cell phone
10  number of ▓▓▓▓ unless it's written -- was the
11  cell phone number written on the cell phone?
12     A.  I didn't see it.
13     Q.  So you would not know his cell phone
14  number; is that a fair statement?
15     A.  Correct.
16     Q.  Now, you testified earlier that you did
17  talk to Mr. Furlow on the telephone; is that
18  correct?
19     A.  Yes.
20     Q.  Or at least you spoke to someone -- you
21  spoke to a voice; is that correct?
22     A.  Yes.
23     Q.  And that voice was identified by
24  ▓▓▓▓ as his dad?
25     A.  Yes.

Page 168

1      Q.  And so you -- but you did not see him
2  in person; is that correct?
3      A.  Correct.
4      Q.  But this voice you were talking to, if
5  it was Mr. Furlow, you -- you had responded just
6  minutes after the event happened; is that correct?
7      A.  Correct.
8      MR. HOLLAND:  Objection.
9  BY MR. HUGHES:
10     Q.  And either -- and if he was on the
11  scene at the time of the incident happened and he
12  was not on the scene when you talked to him on the
13  phone, could you conclude that he fled the scene?
14     A.  Yes.
15     Q.  Would that be a reasonable conclusion
16  by a reasonable officer?
17     MR. HOLLAND:  Objection.
18     THE WITNESS:  Yes.
19  BY MR. HUGHES:
20     Q.  Okay.  And let me ask you this.  Well,
21  I think you testified earlier that initially he was
22  talkative; is that correct?
23     A.  Yes.
24     Q.  At some point -- okay.  When he was
25  talkative, did you listen to what he said?

42 (Pages 165 to 168)

CHRISTOPHER PARTIN   2/8/2017

Page 169

1    A.  Yes.
2    Q.  Now, at this point you had already
3  gotten the story from Janet Virgin; is that correct?
4    A.  Yes.
5    Q.  But initially had you talked to the
6  other independent -- the independent witness yet the
7  first time the cell phone was given to you?
8    A.  I don't think so.
9    Q.  But now -- but anyway, at some point
10  did Mr. -- did this voice, who was identified by
11  ██████████ as his dad, did this voice become
12  non-talkative?
13    A.  Yes.
14    MR. HOLLAND:  Objection.
15    BY MR. HUGHES:
16    Q.  Could you explain how that was or what
17  you said or what caused him to become non-talkative?
18    MR. HOLLAND:  Objection.
19    THE WITNESS:  When I started -- he
20  started getting quiet after I asked him questions in
21  regardings to the allegation of the cell phone
22  theft.
23    BY MR. HUGHES:
24    Q.  According to after you asked him
25  allegations regarding the cell phone theft; is that

Page 170

1  correct?
2    A.  Yes.
3    Q.  And that's when he became
4  non-talkative; is that correct?
5    MR. HOLLAND:  Objection.
6    THE WITNESS:  Yes.
7    BY MR. HUGHES:
8    Q.  Okay.  Now -- and then after that, you
9  testified earlier, I believe, that you did -- you
10  knocked on doors or you looked for other witnesses;
11  is that correct?
12    A.  Yes.
13    Q.  Is that because, once again, the theft
14  of a phone is not considered a neighborly thing but
15  is considered something a police officer must
16  investigate; is that correct?
17    MR. HOLLAND:  Objection to form.
18    THE WITNESS:  Yes.
19    BY MR. HUGHES:
20    Q.  Okay.  And as a reasonable police
21  officer on the scene, you thought it was your
22  obligation to investigate the allegation of theft of
23  that phone; is that correct?
24    A.  Yes.
25    Q.  Okay.  And -- okay.  Now, after you --

Page 171

1  you were knocking on doors, tell us again what
2  the -- well, I'll tell you what.  Let's -- let's
3  look at the police report.  Let's look at what's
4  been marked as Partin Exhibit 6; do you see that?
5    A.  Yes.
6    Q.  And let's just go through -- let's go
7  down the line.  It says, "Call received:  Radio."
8  Now, is that generated by you or is that generated
9  by someone else?
10    MR. HOLLAND:  Objection.  Asked and
11  answered.
12    THE WITNESS:  It's generated by the CAD
13  system.
14    BY MR. HUGHES:
15    Q.  Okay.  Generated by the CAD system.
16  All right.  And then where it says what time the
17  call came in, is that generated by the CAD system?
18    A.  Yes.
19    Q.  And, you know, it says there -- and
20  that's the 911 call; is that correct?
21    A.  Received as the 911 call and dispatch
22  is when patrol officers received it.
23    Q.  Yeah.  So what was received, just to
24  have this in good chronological order, was at 0857;
25  is that correct?

Page 172

1    MR. HOLLAND:  Asked and answered.
2    THE WITNESS:  Yes.
3    BY MR. HUGHES:
4    Q.  And then it indicates "Nature:
5  Assault."  Do you see that?
6    A.  Yes.
7    Q.  Is that CAD-generated, that term there?
8    A.  It -- that's what the call comes out
9  as.  It can be adjusted.  In this sentence it was
10  not.
11    Q.  Okay.  So in other words, this written
12  down as an assault was generated by the CAD; in
13  other words, I think that's computer-aided dispatch
14  or something like that; is that correct?
15    A.  Yeah.
16    Q.  So that's the -- you know, what the
17  dispatcher called it out as, as an assault; is that
18  correct?
19    A.  Yes.
20    Q.  Initially?  Okay.  And then it
21  indicates that you -- a dispatch went out at 0858;
22  is that correct?
23    A.  Yes.
24    Q.  And then you arrive at 0900; is that
25  correct?

43 (Pages 169 to 172)

CHRISTOPHER PARTIN  2/8/2017

Page 173

1    A.  Yes.
2    Q.  At 116 Glen Garry Road, St. Louis
3  County, Missouri; is that correct?
4    A.  Yes.
5    Q.  And -- and then it lists various
6  officers, and one of them was Slusser; is that
7  correct?
8    A.  Yes.
9    Q.  And that was your field training
10  officer; is that correct?
11    A.  Yes.
12    Q.  And it turned out there are some --
13  another field training officer had arrived on the
14  scene and another -- with another officer who was in
15  field training; is that correct?
16    A.  Yes.
17    Q.  Okay.  So on page 2, there is the -- it
18  says, "Victim information"; is that correct, at the
19  top of page 2, a black line and white lettering,
20  "Victim information"?
21    A.  Yes.
22    Q.  Okay.  And then it has "medical
23  assistance" with a checkmark.  What does that mean;
24  do you know?
25    A.  I think we -- I think we did have

Page 174

1  paramedics come out and she refused treatment.
2    Q.  Okay.  And then to the right it has
3  "will prosecute" and a checkmark; do you see that?
4    A.  Yes.
5    Q.  Okay.  And just to your knowledge of
6  court procedures, you know, if someone will
7  prosecute, that would mean the victim would
8  prosecute; is that correct?
9    A.  Yes.
10    Q.  So the victim here is listed as who?
11    A.  Janet Virgin.
12    Q.  Okay.  And it gives her address; is
13  that correct?
14    A.  Yes.
15    Q.  And her address then was ▆▆▆▆▆▆
16  ▆▆▆; is that correct?
17    A.  Yes.
18    Q.  Now, you -- as was pointed out by
19  Mr. Holland under "injury class," it says, "Probable
20  not apparent"; is that correct?
21    A.  Yes.
22    Q.  And tell us why you put probable.
23    A.  If you were really looking at it, you
24  could see it, but if you weren't really looking --
25  if you didn't know that something like this had

Page 175

1  happened, you would never have been able to tell.
2    Q.  Okay.  But -- and there wasn't any
3  blood, as you mentioned earlier?
4    A.  Correct.
5    Q.  But you did believe there was some sort
6  of mark; is that correct?
7    A.  Yes.
8    Q.  And you mentioned paramedics.  Just so
9  I understand, you did not call paramedics; is that
10  correct?
11    A.  I think we did.  We did call them.
12    Q.  Do you know that or was that just from
13  the initial 911 -- 911 call that the 911 operator
14  notified paramedics to go to the scene?
15    A.  I don't think they dispatched them for
16  the fight.  I think we called for them.
17    Q.  Okay.  So after -- as part of your
18  investigation after talking to the victim, you
19  believe you called for paramedics; is that correct?
20    A.  Yes.
21    Q.  All right.  And then "injury
22  description," you know, again, where Mr. Holland
23  pointed out "probable not apparent," but as I -- I
24  don't recall he pointed out "injury description" and
25  what's written there is "punched in the head"; is

Page 176

1  that correct?
2    A.  Yes.
3    Q.  Okay.  So would you agree that a punch
4  in the head would be considered -- if that happened,
5  would you agree that would be considered an assault?
6    A.  Yes.
7    Q.  You know, maybe not, you know, assault
8  in the first degree, but at least an assault to be
9  sent, if nothing else, an ordinance violation; is
10  that correct?
11    A.  Yes.
12    Q.  Okay.  And -- and then you did list the
13  name -- oh, under "treatment disposition," it is
14  written "refused treatment"; is that correct?
15    A.  Yes.
16    Q.  So that would indicate that, you know,
17  paramedics did talk to the victim and the victim
18  said, no, I don't need to go to the hospital, or
19  something to that effect; would that be a fair
20  statement?
21    A.  Yes.
22    Q.  Okay.  And then it has the witness and
23  you list ▆▆▆▆▆▆▆; isn't that correct?
24    A.  Yes.
25    Q.  Okay.  And it lists his address; is

44 (Pages 173 to 176)

CHRISTOPHER PARTIN   2/8/2017

Page 177

1  that correct?
2       A.  Yes.
3       Q.  And that's nearby; is that correct?
4       A.  Yes.
5       Q.  Okay.  And is that the independent
6  person that you talked to --
7       A.  Yes.
8       Q.  -- that did talk to you; is that
9  correct?
10      A.  Yes.
11      Q.  And other people you did knock on the
12  door, but they would not answer the door for you; is
13  that correct?
14      A.  Correct.
15      Q.  And then we go to the next page, and it
16  says, "Charges:  Assault third, stealing under
17  $500."  Do you see that?
18      A.  Yes.
19      Q.  And it indicates the name Furlow
20  Dwayne; is that correct?
21      A.  Yes.
22      Q.  And it gives some information about
23  him, such as his height and his weight.  Do you see
24  that?
25      A.  Yes.

Page 178

1       Q.  Where did you get that information
2  from?
3       A.  One of the computer systems.
4       Q.  Okay.  So you could check, like, for
5  example, the driver's license information?  I guess
6  DOR, you mentioned that; is that correct?
7       A.  Yeah.
8       Q.  Does that generally have people's
9  height and weight?
10      A.  Yeah.
11      Q.  If it's true that he's 5 foot 11,
12  190 pounds, that he's -- would you agree is pretty
13  big size?
14      MR. HOLLAND:  Objection to form.
15      MR. HUGHES:  190 pounder?
16      THE WITNESS:  Yeah.
17      BY MR. HUGHES:
18      Q.  If it's true a 190 pounder punched a
19  female in the head, you would not consider that a --
20  as Mr. Holland referred to it as a, quote,
21  neighborly thing, unquote?
22      MR. HOLLAND:  Objection to form.
23      THE WITNESS:  No.
24      BY MR. HUGHES:
25      Q.  Okay.  And it has a street address,

Page 179

1  which I don't recognize.  Can you explain that to
2  me?
3       A.  If I remember correctly, that was the
4  actual address of his last known.
5       Q.  Okay.  Would you have gotten that off
6  the DOR records, for example?
7       A.  Yeah.
8       Q.  Okay.  And Department of Revenue, DOR,
9  okay.  And then "property information," the owner of
10 the property was listed as Janet Virgin.  Did I read
11 that correctly?
12      A.  Yes.
13      Q.  And property says, "Stolen"; is that
14 correct?
15      A.  Yes.
16      Q.  "Item:  Cell phone"; is that correct?
17      A.  Yes.
18      Q.  "Manufacturer:  Cricket.  Property
19 value $175."
20      A.  Yes.
21      Q.  Did you get that information -- did you
22 get that information from Ms. Virgin?
23      A.  Yes.
24      Q.  Okay.  And it says, "Procedure
25 information."  It says, "Neighborhood canvass," and

Page 180

1  there's a checkmark; is that correct?
2       A.  Yes.
3       Q.  So you did canvass the neighborhood,
4  looking for more witnesses, and you put that in your
5  report; is that correct?
6       MR. HOLLAND:  Objection.  Asked and
7  answered.
8       THE WITNESS:  Yes.
9       BY MR. HUGHES:
10      Q.  Is that something that your field
11 training officer, you know, suggested that you do?
12      A.  He didn't suggest that we do it.  We
13 just did it.
14      Q.  So he did it also?
15      A.  Me and -- I did it.
16      Q.  Okay.  But anyway, you just did it?
17      A.  Yeah.
18      Q.  Okay.  By this point in your field
19 training you knew enough to do it; is that correct?
20      A.  Yes.
21      Q.  And you're supposed to try to impress
22 your field training instructor; is that correct?
23      MR. HOLLAND:  Objection.
24      THE WITNESS:  Yes.
25      MR. HUGHES:  That you know what to do?

45 (Pages 177 to 180)

**CHRISTOPHER PARTIN  2/8/2017**

Page 181

1     Q.  Okay.  And then let's get into your
2 narrative.  "On 11/11/2015, at approximately
3 8:50 a.m., Police Officer Slusser and I responded to
4 116 Glen Garry in reference to an assault"; is that
5 correct?
6     A.  Yes.
7     Q.  Again, in reference to an assault, that
8 would have been how the 911 call was -- or strike
9 that.
10     In reference to an assault, that's how
11 the dispatch would have come into you; is that
12 correct?
13     A.  Yes.
14     MR. HOLLAND:  Objection.
15     BY MR. HUGHES:
16     Q.  And it says, "Upon arrival, I made
17 contact with the reporting party identified as Janet
18 Virgin who resides at ▮▮▮▮▮▮▮▮."  Do you see
19 that?
20     A.  Yes.
21     Q.  Did I read that correctly?
22     A.  Yes.
23     Q.  "Virgin explained that there have been
24 ongoing issues with Dwayne Furlow, Latoya Furlow,
25 and ▮▮▮▮▮▮▮, who reside at 116 Glen Garry."

Page 182

1 Did I read that correctly?
2     A.  Yes.
3     Q.  "Virgin stated her children, ▮▮▮▮▮
4 and ▮▮▮▮▮▮▮, were verbally harassed by
5 ▮▮▮▮▮▮▮▮ and an unknown juvenile.  Virgin
6 stated ▮▮▮▮▮ began fighting with ▮▮▮▮
7 and ▮▮.  D. Furlow and Latoya Furlow stood by and
8 watched the altercation and did not break it up."
9     Let me ask you a question about that.
10 Are you just reporting what she told you --
11     MR. HOLLAND:  Objection to form.
12     BY MR. HUGHES:
13     Q.  -- with regard to Dwayne Furlow and
14 Latoya Furlow being present and standing by and
15 watching the altercation?
16     A.  Yes.
17     MR. HOLLAND:  Objection to form.
18     THE WITNESS:  That's what Virgin had
19 stated on the scene.
20     BY MR. HUGHES:
21     Q.  Okay.  And so then after that, it
22 stated, "Virgin stated she began recording the
23 incident on her Android ZTE smartphone.  Virgin
24 explained after recording started, D. Furlow" -- I
25 guess that's Dwayne Furlow; is that correct?

Page 183

1     A.  Yes.
2     Q.  -- "came after her and took the phone
3 from her with some force but Virgin could not recall
4 exactly what" -- you put he -- "exactly what he
5 did"; is that correct?
6     A.  Yeah.
7     Q.  Was she a little bit excitable that
8 day?
9     A.  Yes.
10     Q.  Let me ask you this.  Maybe she was
11 excitable.  I mean, if she was, that would be
12 understandable.  Did she appear to you that day that
13 she had, you know, any mental health issues that
14 were apparent to you?
15     MR. HOLLAND:  Objection --
16     THE WITNESS:  No.
17     MR. HOLLAND:  -- to the colloquy.
18 Objection to form.
19     MR. HUGHES:  I'm sorry, what?
20     MR. HOLLAND:  Objection to form and the
21 preceding colloquy.
22     BY MR. HUGHES:
23     Q.  Okay.  She did not appear to you to
24 have any -- you know, nothing that was apparent to
25 you --

Page 184

1     A.  No.
2     Q.  -- that she had mental health issues?
3     So -- okay.  And you didn't know her
4 before?
5     A.  No.
6     Q.  And you didn't know Dwayne Furlow
7 before; is that a fair statement?
8     A.  Correct.
9     Q.  And then it says, "I've made contact
10 with D. Furlow and Latoya Furlow via ▮▮▮▮▮'s cell
11 phone, who stated at first he heard an altercation
12 out on the front lawn and did not see anyone
13 fighting.  After continuing to speak with D.
14 Furlow," Dwayne Furlow, "he then changed his account
15 of the incident and stated he saw and heard the
16 fight.  Dwayne Furlow advised he tried to break up
17 the altercation."
18     Let me ask you this:  You alluded to
19 something earlier in your testimony when Mr. Holland
20 was asking you questions.  You alluded to something
21 about there was at least a second time that ▮▮▮▮▮
22 handed you his cell phone?
23     A.  Yes.
24     Q.  Okay.  I don't get it.  Can you explain
25 that to me?

46 (Pages 181 to 184)

CHRISTOPHER PARTIN  2/8/2017

Page 185

1　A.　Well, I can't -- I had talked to him,
2　and I tried to talk to him about the assault and
3　then tried to get him to come back to the property
4　to talk to me about the allegations of the assault
5　and that -- and so I could figure out what was
6　actually going on with the fight.  And after --
7　after being told for, I think, the second or third
8　time to do my F'ing job, I got tired of being
9　berated when I was trying to do my job and figure
10　out what was going on, so I handed him back the
11　phone, and then I continued to try and investigate
12　what was going on, but then he handed me the phone
13　again and --
14　**Q.　Okay.  My -- here's my question:  When**
15　**he handed you the phone again, did you -- did**
16　**████████ just say, Here, my dad wants to talk to you**
17　**again, or did you say to ████████, Can I talk to your**
18　**dad again?  I don't get that.**
19　A.　It was ████████ saying he wanted to talk
20　to me again.
21　**Q.　Oh, okay.  Did he -- did -- after**
22　**████████ said his dad wants to talk to you again, did**
23　**you bring up the subject about the cell phone or did**
24　**you make some statements to him or -- to Dwayne or**
25　**what, or to -- to the voice who you -- who probably**

Page 186

1　was or at least you thought was Dwayne?
2　　　MR. HOLLAND:  Objection.
3　　　THE WITNESS:  I -- I told him what I
4　had, and I told him I had more than enough probable
5　cause to place him out as wanted for the assault and
6　theft of the phone, and he was like, "Man, do your
7　F'ing job."  He kept -- he said it numerous times.
8　　　BY MR. HUGHES:
9　**Q.　Anyway, your report says, "When**
10　**questioned about taking Virgin's cell phone, D.**
11　**Furlow denied taking Virgin's property.  D. Furlow**
12　**refused to return to the scene and speak with me."**
13　**Is that correct?**
14　A.　It was trying to get him to return to
15　the scene and speak with me.  It wasn't just about
16　the phone or the assault.  It was about his kids
17　fighting and those issues.
18　**Q.　All right.  You're still trying to sort**
19　**everything out; is that correct?**
20　A.　Yes.
21　**Q.　But anyway -- and but at this point,**
22　**you did have a statement from Ms. Virgin; is that**
23　**correct?**
24　A.　Yes.
25　**Q.　And you had a statement from another**

Page 187

1　eyewitness; is that correct?
2　A.　Yes.
3　**Q.　And did you believe then you had**
4　**probable cause to either arrest Mr. Furlow or give**
5　**him a summons for the night court?**
6　A.　Yes.
7　**Q.　Okay.  So you believe, in good faith as**
8　**an officer on the scene trying to do your job, that**
9　**you had probable cause and you asked him to go and**
10　**talk to you in person; is that correct?**
11　A.　Yes.
12　**Q.　And if he came and talked to you in**
13　**person, would you have talked to him in person?**
14　　　MR. HOLLAND:  Objection.
15　　　THE WITNESS:  If he was willing to talk
16　to me, yes.  If not --
17　　　BY MR. HUGHES:
18　**Q.　And then would you have made a judgment**
19　**call at that point to either, you know -- if it**
20　**seemed to be a dangerous situation to take him for**
21　**booking or get him away from the danger, or if it**
22　**wasn't dangerous, to just issue him a summons to**
23　**appear in night court?**
24　　　MR. HOLLAND:  Objection.
25　　　THE WITNESS:  Yes.

Page 188

1　　　BY MR. HUGHES:
2　**Q.　Okay.  Can I see this?**
3　**In paragraph 21 of the first amended**
4　**complaint, Gomez Exhibit 4, just so we understand,**
5　**it just alleges generally "Subjects of wanted often**
6　**do not know they have been designated for arrest by**
7　**defendants pursuant to a wanted."  In this**
8　**particular case, did you come right out and tell**
9　**Mr. Furlow -- strike that.**
10　**In this particular case, after you had**
11　**already determined you had probable cause for**
12　**arrest, did you actually tell Mr. Furlow that you**
13　**would issue a wanted; is that correct?**
14　A.　Yes.
15　**Q.　So he knew about it; is that correct?**
16　A.　Yes.
17　**Q.　And as was brought up by Mr. Holland,**
18　**you had numerous telephone calls with Blake Strode;**
19　**is that correct?**
20　A.　Yes.
21　**Q.　So would it be a fair statement that**
22　**it's obvious to you that Mr. Furlow knew that there**
23　**was a wanted out for him; is that correct?**
24　A.　Yes.
25　**Q.　And as it turned out, when he**

47 (Pages 185 to 188)

CHRISTOPHER PARTIN   2/8/2017

Page 189

1   ultimately appeared a month and a day after this
2   happened and you issued a summons, the wanted was
3   canceled by you that very day; is that correct?
4       A.   Yes.
5       Q.   And if he had appeared with Mr. Strode,
6   you know, the next day or the day after or three
7   days after and you issued a summons, you would have
8   canceled the wanted then too; is that correct?
9       A.   Correct.
10          MR. HOLLAND:  Objection.  Form.
11      BY MR. HUGHES:
12      Q.   In paragraph 23, it's alleged that
13   wanteds are issued to punish people.  Did you issue
14   a wanted on Dwayne Furlow for the purpose of
15   punishing him?
16      A.   No.
17          MR. HOLLAND:  Objection to form.
18      BY MR. HUGHES:
19      Q.   Did you issue a wanted because you had
20   probable cause to believe he committed some offense
21   and he -- is that correct?
22      A.   Yes.
23      Q.   Okay.  And in paragraph 24, it's
24   alleged that police officers issue wanteds to
25   demonstrate the authority over an individual.  Did

Page 190

1   you ask for a wanted on Dwayne Furlow for the
2   purpose of exercising your authority over him?
3          MR. HOLLAND:  Objection to form.
4          THE WITNESS:  No.
5      BY MR. HUGHES:
6      Q.   Did you exercise -- ask for a wanted in
7   order -- because -- did you ask for a wanted because
8   you believed there was probable cause to believe
9   that he committed some sort of an assault and some
10   sort of theft of property?
11      A.   Yes.
12          MR. HOLLAND:  Objection.  Asked and
13   answered.
14      BY MR. HUGHES:
15      Q.   Okay.  Did -- paragraph 22, it
16   mentions, you know, quantity -- you know, this
17   scheme is at the whim of police officers.  Did you
18   ask for a wanted on Dwayne Furlow on a mere whim?
19      A.   No.
20          MR. HOLLAND:  Objection.
21      BY MR. HUGHES:
22      Q.   Again, you had probable cause?
23      A.   Yes.
24      Q.   And again, you had your field training
25   officer with you?

Page 191

1      A.   Yes.
2      Q.   And this field training officer, you
3   and he go back and forth in discussing these things;
4   is that correct?
5      A.   Yes.
6      Q.   Was your field training officer fully
7   aware that the wanted was being issued?
8      A.   Yes.
9      Q.   Okay.  And paragraph 41 alleges that
10   counsel for plaintiffs spoke with Officer Partin.
11   Now, who was that counsel?
12      A.   Blake Strode.
13      Q.   And you're aware that in this Gomez
14   Exhibit 4, Blake Strode is listed as the lead
15   counsel with the first signature on page 35, first
16   electronic signature?
17      A.   Yes.
18      Q.   Okay.  And paragraph 45 alleges that
19   counsel for Furlow contacted you several times by
20   telephone to arrange a time to deliver Mr. Furlow to
21   Officer Partin's station or precinct; do you see
22   that?
23      A.   Yes.
24      Q.   You know, again, this is alleged in
25   paragraph 45 that Counsel contacted you several

Page 192

1   times by telephone to attempt to arrange a time to
2   deliver Mr. Furlow to Officer Partin's station or
3   precinct.  Did you ever refuse to say no, I'm not
4   going to allow you to deliver him to -- you know, to
5   me at my station or precinct?
6      A.   No.
7      Q.   In fact, I think you alluded to this
8   earlier, you even told him what days you would be
9   working; is that correct?
10      A.   Yes.
11      Q.   And the reason you told him what days
12   you would be working would be -- and correct me if
13   I'm wrong -- to make it easier on them so that he
14   could be released on a summons; is that correct?
15          MR. HOLLAND:  Objection to form.
16          THE WITNESS:  Yes.
17      BY MR. HUGHES:
18      Q.   If I'm not correct, will you explain
19   it?  I mean, well, since there is an objection as to
20   form, he didn't state what was wrong with the form.
21   But assuming he says it was leading, why don't you
22   tell us why you told him the dates that you were
23   working.
24      A.   So that I wouldn't be inconvenienced on
25   my day off.

48 (Pages 189 to 192)

CHRISTOPHER PARTIN   2/8/2017

Page 193

1    Q.  Okay.  So you wouldn't be
2  inconvenienced, okay.  So he -- but would it be true
3  he -- they also would not be inconvenienced?
4    A.  Yeah.
5    Q.  Okay.
6    A.  Because if he would have turned himself
7  into the station and they would have known I was
8  off, they would have arrested him, transported him
9  to Clayton, and then called me to come back to work.
10    Q.  Okay.  Now, on page 48 -- excuse me, on
11  paragraph 48, which is page 11 of the first amended
12  complaint, it indicates that Mr. Furlow, accompanied
13  by Counsel, turned himself in to St. Louis County's
14  jail on the evening of December 12th, 2015; do you
15  see that?
16    A.  Yes.
17    Q.  And let's just see, though, if we have
18  the full story.  You were working that day; is that
19  correct?
20    A.  Yes.
21    Q.  But at this time you were working the
22  Affton precinct; is that correct?
23    A.  Yes.
24    Q.  And I think you said something like you
25  were practically in Jefferson County.  What you mean

Page 194

1  by that is, where you had been patrolling that day
2  was so far south you were closer to Jefferson
3  County; would that be a fair statement?
4    A.  I was closer to Jefferson County than I
5  was my precinct station.
6    Q.  Oh, okay.  And so -- and the call came
7  in.  Did it come in and say they were there now or
8  did the call came in saying I'm going to turn him in
9  later on?
10    A.  I think it was --
11    Q.  As best you remember.
12    A.  It was a call -- earlier in the day, I
13  got a call to call Mr. Strode.  And I called him and
14  he said that he was going to turn himself in that
15  night, which I honestly didn't think it was going to
16  happen since I had --
17    Q.  I didn't ask you what you think.
18    MR. HOLLAND:  Let him finish the
19  answer, Mr. Hughes.
20    BY MR. HUGHES:
21    Q.  Okay.  Go ahead.
22    A.  I didn't think it was going to happen
23  because for almost an entire month I had been
24  hearing this same thing and --
25    Q.  Are you saying almost an entire

Page 195

1  month --
2    MR. HOLLAND:  Please don't interrupt
3  the witness.
4    BY MR. HUGHES:
5    Q.  I'll let you finish.  Are you saying he
6  was breaking promises when he was going to turn
7  himself in?
8    MR. HOLLAND:  Why don't you let him
9  finish his first answer, and then you can ask him
10  the follow-up question.
11    THE WITNESS:  So the --
12    BY MR. HUGHES:
13    Q.  Just answer the question any way you
14  want.  Go ahead and answer -- maybe I shouldn't have
15  interrupted.  Just answer the question.
16    A.  So for the entire month, I mean, that
17  night I didn't believe that he was going to turn
18  himself in.  For -- for the whole month of November,
19  from the time the incident happened to
20  December 12th, he said he was going to turn him
21  in -- he was going to respond and turn him in and so
22  we could be done with this matter.  I had heard this
23  numerous times and it never happened, so when he
24  said that he was going to turn himself in that
25  night, I didn't get my hopes up.

Page 196

1    Q.  Okay.  But then did you receive a call
2  that day that he had turned himself in?
3    A.  I believe it came through dispatch.  I
4  can't remember if it was to call Mr. Strode or just
5  to respond to 100 South Central for Mr. Furlow.
6    Q.  Once you received that call that
7  Mr. Strode -- Mr. Furlow was turning himself in with
8  his counsel, did you make any attempts to get down
9  to 100 South Central as quickly as possible?
10    A.  We -- as soon as I notified my field
11  trainer, we got there as quickly as we could.  I
12  mean, we were coming from a distance, and I don't --
13  we may have had to clear from a call first before we
14  could head that way, but as soon as we were able, we
15  headed that way.
16    Q.  Okay.  And then paragraph 50 alleges
17  that Mr. Furlow's counsel reiterated to you that
18  Mr. Furlow did not intend to answer any questions.
19  Is that another way of saying that Mr. Furlow was
20  exercising his Fifth Amendment right not to
21  incriminate himself?
22    A.  Yes.
23    MR. HOLLAND:  Objection.
24    BY MR. HUGHES:
25    Q.  When he exercises his Fifth Amendment

49 (Pages 193 to 196)

CHRISTOPHER PARTIN  2/8/2017

Page 197

1  right not to incriminate himself, did you honor that
2  right?
3      A.  Yes.
4      Q.  Okay.  And then did you prepare a
5  summons?
6      A.  Yes.
7      Q.  Objection.  And paragraph --
8  paragraph 50, you know, the rest of the sentence
9  indicates that "Officer Partin and the supervising
10  officer," I assume they're referring to the field
11  trainer that was with you that day, but you were
12  with a field training officer at that time; is that
13  correct?
14      A.  Yes, Officer Curcuru.
15      Q.  And so "Officer Partin and the
16  supervising officer informed Counsel" -- I guess
17  that means Mr. Strode -- "that there would be no
18  need to take Mr. Furlow into custody.  And then
19  paragraph 51 said, "Officer Partin issued a summons
20  for Mr. Furlow to appear in court," so that's
21  correct; is that correct?
22      A.  Yes.
23      Q.  So -- so just as -- what was alleged in
24  paragraphs 50 and 51, he was not jailed but he was
25  released on a summons; is that correct?

Page 198

1      A.  Correct.
2      Q.  And then paragraph 52 alleges that
3  after issuing the summons, you stated that the
4  wanted would be quashed.  Did you use the word
5  "quashed"?  I'm just curious.
6      A.  No, I had to ask what that meant.
7      Q.  Who did you ask?
8      A.  You.
9      Q.  Okay.  So what word would you have
10  used?
11      A.  "Removed," "canceled."
12      Q.  Okay.  And so you did remove the wanted
13  or canceled the wanted that day; is that correct?
14      A.  If I -- I canceled it that day and
15  actually I canceled it as we were leaving Justice
16  Services heading back to Affton.
17      Q.  Okay.  Now, let's -- you were asked if
18  you had ever -- if you had ever seen Mr. Furlow or
19  heard of him before this incident of November 11th,
20  2015, and you said no; is that correct?
21      A.  Yes.
22      Q.  And you were asked if you had any
23  interaction with him after December 12th, 2015, and
24  you answered no; is that correct?
25      A.  Yes.

Page 199

1      Q.  So your interaction with him was, you
2  know, doing your investigation and trying to get him
3  to come in to, you know, be given an opportunity to
4  give his side of the story, and then you issued a
5  summons; is that correct?
6      A.  Correct.
7      Q.  And at any time did you -- did you have
8  any malice towards Mr. Furlow?
9      A.  No.
10      Q.  At any time were you trying to be
11  punitive to Mr. Furlow?
12      A.  No.
13      Q.  Okay.  Did you have any ill will
14  towards Mr. Furlow?
15      A.  No.
16      Q.  Did -- at any time were you trying to
17  be deliberately indifferent to his rights?
18      A.  No.
19      Q.  In fact, you were -- you warned him --
20  you asked him to come in to give his side of the
21  story; is that correct?
22      A.  Yes.
23      Q.  And when he didn't, you -- and you told
24  him you had probable cause -- you had probable cause
25  or you had enough to arrest him if he -- is that

Page 200

1  correct?
2          MR. HOLLAND:  Objection --
3          THE WITNESS:  Yeah.
4  BY MR. HUGHES:
5      Q.  And --
6          MR. HOLLAND:  -- to form.
7  BY MR. HUGHES:
8      Q.  And you told him that you could issue a
9  wanted; is that correct?
10          MR. HOLLAND:  Objection to form.
11          THE WITNESS:  Yes.
12  BY MR. HUGHES:
13      Q.  So you warned him of that; is that
14  correct?
15      A.  Yes.
16      Q.  And then you discussed with his
17  attorney numerous times; is that correct?
18      A.  Yes.
19          MR. HOLLAND:  Objection to form.
20  BY MR. HUGHES:
21      Q.  And then you -- when he finally did
22  come in and he finally did exercise his right not to
23  incriminate himself, you honored that and you issued
24  him a summons; is that correct?
25          MR. HOLLAND:  Objection to form.

50 (Pages 197 to 200)

CHRISTOPHER PARTIN  2/8/2017

Page 201

1    THE WITNESS:  Yes.
2    BY MR. HUGHES:
3    Q.  And that summons was for -- to appear
4  in night court; is that correct?
5    A.  Yes.
6    Q.  And --
7    MR. HOLLAND:  Objection to form.
8    BY MR. HUGHES:
9    Q.  And you were asked about Partin Exhibit
10  Number 8, which is the complaint information
11  summons -- whatever it's called; do you see that?
12    A.  Yes.
13    Q.  Do you see about a third of the way
14  down it has a report number?  It has, you know,
15  preprinted report number and under that it has some
16  numbers indicating a report; do you see that?
17    A.  Yes.
18    Q.  Okay.  And what numbers did you put in
19  there?
20    A.  15-61723.
21    Q.  Okay.  Now, do you have Partin
22  Exhibit 6 with you?
23    A.  Yes.
24    Q.  And Partin Exhibit 6, is that 15-61723?
25    A.  Yes.

Page 202

1    Q.  Okay.  And does that report describe
2  the event that was called in as an assault but also
3  discussed a theft?
4    A.  Yes.
5    Q.  Okay.  And then what you -- what this
6  arrest notification, this complaint information
7  summons was for was an assault and it says,
8  "Larceny"; is that correct?
9    A.  Yes.
10    Q.  And then it says, "See report for
11  further"; is that correct?
12    A.  Yes.
13    Q.  And when you put "see report for
14  further," you're referring to that report, 15-61723,
15  which is Partin 6; is that correct?
16    A.  Yes.
17    Q.  And do you see the signature B. Joyce
18  Kelly?
19    A.  Yes.
20    Q.  So is that the -- a prosecutor or --
21    MR. HOLLAND:  Objection to form.
22    THE WITNESS:  County Counselor, I
23  believe.
24    BY MR. HUGHES:
25    Q.  So -- right.  Okay.  So the charges

Page 203

1  "see report for further" were -- were signed off by
2  the County Counselor, whoever B. Joyce Kelly is; is
3  that correct?
4    A.  Yes.
5    MR. HOLLAND:  Objection to form.
6    BY MR. HUGHES:
7    Q.  Okay.  So the charges were issued; is
8  that correct?
9    MR. HOLLAND:  Objection to form.
10    MR. HUGHES:  It was signed off by the
11  prosecutor, let's put it that way.
12    Q.  It was signed off by B. Joyce Kelly; is
13  that correct?
14    A.  Yes.
15    MR. HOLLAND:  Objection to form.
16    BY MR. HUGHES:
17    Q.  Okay.  So now let me ask you this:
18  Paragraph 53 alleges that on February 17th, 2016,
19  Mr. Furlow's counsel appeared on Mr. Furlow's behalf
20  in St. Louis County Municipal Court, North Division.
21  Did you see that?
22    A.  Yes.
23    Q.  Now, would it be a true statement that
24  on the first court date, the attorneys can appear
25  without their client and enter a plea of not guilty,

Page 204

1  and then if they enter a plea of not guilty or ask
2  for a trial date, then, you know, the victim would
3  be notified to appear in court?
4    A.  Yes.
5    Q.  So if there was a plea of not guilty on
6  that date, the victim, Janet Virgin, would be --
7  and, you know, would be notified to appear on
8  whenever the trial date is; is that correct?
9    A.  Yes.
10    Q.  Were you ever notified that a plea of
11  not guilty was entered, by any chance?
12    A.  No.
13    Q.  Were you ever notified that this case
14  was set for trial?
15    A.  No.
16    Q.  Were you ever notified that the victim
17  was notified of a trial setting?
18    A.  No.
19    Q.  So as far as you know, there's no plea
20  of not guilty from what anyone has told you?
21    A.  Correct.
22    Q.  And paragraph 54 alleges "While
23  discussing Mr. Furlow's case, a municipal prosecutor
24  read the charging document written by Officer
25  Partin, apparently for the first time."  Now, were

51 (Pages 201 to 204)

CHRISTOPHER PARTIN  2/8/2017

Page 205

1  you involved or were you even present when I guess
2  the counsel for Mr. Furlow and the municipal
3  prosecutor were having this discussion?
4      A.  No.
5      Q.  Okay.  The -- it indicates -- and
6  Mr. Holland was bringing out that, you know, you
7  wrote "by reason of," and where it's preprinted,
8  where it says, "By reason of," what you ended up
9  writing in addition to "see report for further," you
10  wrote about the circumstances involved when
11  Mr. Strode and Mr. Furlow appeared and he indicated
12  he did not wish to speak to us; is that correct?
13      A.  Yes.
14      Q.  Okay.  Now, assuming the point made by
15  Mr. Holland was correct, that there's some sort of
16  defect in the way this complaint information summons
17  was written, even though it was signed by B. Joyce
18  Kelly, but let's just assume it's correct that
19  there's some sort of defect in the way this is
20  written, and let's assume that see report -- "see
21  report for further" does not give the -- you know,
22  the man accused enough notice of what he's -- you
23  know, what the allegations are, do you know enough
24  about court procedures to know that a prosecutor can
25  amend defects in the information prior --

Page 206

1      A.  Yes.
2      Q.  -- to the trial date?
3      A.  Yes.
4      Q.  And would you assume that an attorney
5  who does municipal court work would know that also?
6      A.  Yes.
7      Q.  Okay.
8      MR. HOLLAND:  Objection to form.
9  BY MR. HUGHES:
10      Q.  You testified earlier that you had
11  become -- well, you were asked what documents you
12  were shown in preparation for your deposition, and
13  one of the things you mentioned was an exhibit that
14  was produced to plaintiff's counsel that was made in
15  the ordinary course of business of the prosecutor
16  that indicated that the reason for dismissal was
17  that "Attorney appeared in court says it's a
18  neighbor dispute and the neighbor is not mentally
19  well and says they have since moved."  So you were
20  aware -- you were shown that document; is that
21  correct?
22      A.  Yes.
23      Q.  You testified to that.
24      MR. HOLLAND:  Objection.
25  BY MR. HUGHES:

Page 207

1      Q.  Again, did any witness --
2      MR. HOLLAND:  Mike, I'm not sure that
3  he was shown that document, so can you -- are you
4  pointing to a specific exhibit?
5      MR. HUGHES:  No, you asked him what
6  documents he was shown in preparation for his
7  deposition and --
8      MR. HOLLAND:  Got you.
9      MR. HUGHES:  -- he testified he saw
10  that.
11      MR. HOLLAND:  Understood.
12      MR. HUGHES:  So that's why I brought
13  that up.
14      Q.  So just my question to you, and I can
15  see it's repetitive.  Mr. Holland wants to make an
16  objection.
17      MR. HOLLAND:  I just didn't know what
18  document you were looking at.
19  BY MR. HUGHES:
20      Q.  Yeah.  But did any witness that day on
21  November 11th, again, tell you that this lady had
22  mental issues?
23      A.  No.
24      Q.  And just from what you know about
25  ordinary life, was any mental issues apparent to you

Page 208

1  in talking to the victim?
2      A.  No.
3      MR. HOLLAND:  Objection.
4  BY MR. HUGHES:
5      Q.  Okay.  And -- again, as a police
6  officer on the street, would you consider if it's
7  true that she was -- what's in the report "punched
8  in the head," and if it's true that the cell phone
9  was taken, would you just consider that a neighborly
10  dispute?
11      MR. HOLLAND:  Objection to form.  Asked
12  and answered.
13      THE WITNESS:  No.
14  BY MR. HUGHES:
15      Q.  Okay.  And do you have any knowledge
16  one way or the other on whether -- I don't know who
17  had moved, but do you have any knowledge one way or
18  the other if this lady had already moved by this
19  first court date?
20      MR. HOLLAND:  Objection to form.
21      THE WITNESS:  Not to my knowledge.
22  BY MR. HUGHES:
23      Q.  You wouldn't know yourself; is that
24  correct?
25      A.  No.

52 (Pages 205 to 208)

CHRISTOPHER PARTIN   2/8/2017

Page 209

1    Q.  So -- oh, you had made a comment
2  earlier in Mr. Holland saying my -- he seemed to be
3  critical of the way you wrote the report, and you
4  made the comment that my report writing has grown
5  since this report.  Do you remember making that
6  statement?
7        MR. HOLLAND:  Objection to form.  I was
8  not critical.
9        MR. HUGHES:  It was not critical?
10        THE WITNESS:  Yes, I remember.
11     BY MR. HUGHES:
12     Q.  Okay.  And -- okay.  And so at the time
13  you wrote the report you were -- strike that.  I'll
14  move on.
15        And regarding the wanted that was
16  issued, that -- you would have requested the wanted
17  be issued with the CARE clerk; is that correct?
18     A.  Yes.
19     Q.  And that would have been issued in
20  REJIS, the regional system?
21     A.  Yes.
22     Q.  And you had no reason to think, for
23  example, that Mr. Furlow might be going to -- moving
24  to Illinois or going to Kansas City or Rolla or
25  Columbia, you had no reason to think it had to be

Page 210

1  put a statewide wanted?
2     A.  Correct.
3     Q.  Okay.  So what was entered against him
4  was just in the regional system; is that correct?
5     A.  Should have been.
6     Q.  And -- Officer Partin, thank you very
7  much.  I have no other questions.
8        FURTHER EXAMINATION
9     BY MR. HOLLAND:
10     Q.  I have a few follow-ups just to what
11  Mr. Hughes was talking to you about.  So prior to
12  November 11th, 2015, had you ever met Janet Virgin
13  before?
14     A.  No.
15     Q.  So when you happened upon her that
16  morning, you had no -- you couldn't tell whether the
17  mark you described for us today had been on her head
18  a week or two before, correct?
19     A.  Correct.
20     Q.  Do you know who placed the 911 call
21  that morning?
22     A.  I do not.
23     Q.  What were you informed when the
24  dispatch came out to you?  What was the -- what was
25  the call?

Page 211

1     A.  It was either it came out as either a
2  fight or an assault.
3     Q.  And I believe Mr. Hughes pointed you on
4  page 1 of Exhibit 6 to the nature of the -- I guess
5  the call, and it says, "Assault."
6     A.  Fights are assaults.
7     Q.  That's where I'm going, sir.
8        MR. HUGHES:  The question he asked you,
9  what does it say?
10        THE WITNESS:  It says "assault" but a
11  fight is an assault.
12     BY MR. HOLLAND:
13     Q.  So if the call had been for children
14  fighting, would that have been classified under
15  nature as assault?
16     A.  It would have -- yeah, it's a generic.
17  It's -- it doesn't -- the only way it would have
18  been different, if it was boyfriend and girlfriend,
19  then it would have been domestic violence.
20     Q.  And, in fact, if you look at your
21  narrative from this report, neither your report of
22  Ms. Virgin's statement nor your report of ███████
23  ███████'s statement refers to Mr. Furlow punching
24  Ms. Virgin; is that correct?
25     A.  Ms. Virgin could not recall exactly

Page 212

1  what he did, and ██████ stated he observed the
2  altercation, was not certain who started that
3  altercation, and he just observed D. Furlow take a
4  phone from Virgin.
5     Q.  And we earlier talked about how you
6  couldn't be sure based on his account whether that
7  was Ms. Virgin's cell phone or Mr. Furlow taking his
8  phone back from her; is that correct?
9     A.  Correct.
10     Q.  Now, when Mr. Hughes was talking to
11  you, he brought up a cab driver.
12     A.  Yes.
13     Q.  I didn't see anything about a cab
14  driver in your report.  Can you tell me anything
15  about that?
16     A.  Because the cab -- the cab driver
17  was -- the language barrier was so difficult, we
18  couldn't understand anything he was saying other
19  than he called.  He called someone.  But usually if
20  there's a language barrier with a call taker and a
21  reporting party, they let us know, like, significant
22  language barrier or something to that effect, so he
23  says he called someone, but that never came across
24  to us that him -- as him as the call taker or
25  reporting party.

CHRISTOPHER PARTIN  2/8/2017

Page 213

1    Q.   So he says he called someone.  Was he
2  saying he made the 911 call?
3    A.   He says he called someone, but like I
4  said, when trying to speak with him, the language
5  barrier was so great that you really couldn't
6  understand anything he was saying and the simple --
7  and I mean -- yeah.  Whoever he called, it was not
8  911 because we didn't get more than one call and
9  they didn't advise language barrier, which they are
10  very good about advising language barriers.
11    Q.   Did anyone else on the scene say that
12  they had made the 911 call?
13    A.   Other than Virgin, no.
14    Q.   Virgin told you she placed the 911
15  call?
16    A.   She called.
17    Q.   Do you -- just looking at exhibit --
18  the summons, do you know who D. Joyce Kelly is?
19    A.   No.
20    Q.   Do you know whether that signature or
21  stamp, whatever it is on the middle of the page,
22  indicates that she read the report?
23    A.   No, I don't know.
24    Q.   Do you know whether that indicates
25  anything more than that she signed this report --

Page 214

1  piece of paper?
2    A.   I do not.
3    MR. HOLLAND:  I think that's all I
4  have.
5    FURTHER EXAMINATION
6  BY MR. HUGHES:
7    Q.   I have a question.  This was
8  interesting.  He -- Mr. Holland just asked you words
9  to this effect:  You could not tell if Mr. Furlow
10  was taking back his own cell phone or taking
11  Ms. Virgin's cell phone; do you recall that?
12    MR. HOLLAND:  Objection based on the
13  account given by the eyewitness.
14  BY MR. HUGHES:
15    Q.   Do you recall that question as being
16  asked of you?
17    A.   Yes.
18    Q.   Did -- did the eye -- did Ms. Virgin
19  ever tell you that when Mr. Furlow grabbed the cell
20  phone out of her hand that she was using to
21  videotape the fight, to film the fight, that this --
22  that the telephone that was taken out of her hand
23  belonged to Mr. Furlow?
24    A.   No.
25    Q.   Okay.  And you talked to ▓▓▓▓; is

Page 215

1  that correct?
2    A.   Correct.
3    Q.   Did ▓▓▓▓ ever tell you that the
4  phone that his dad removed from Ms. Virgin was his
5  dad's phone?
6    A.   No.
7    Q.   Did anyone on the scene tell you or
8  suggest to you the possibility that when
9  Mr. Phone -- Mr. Furlow was taking the phone from
10  Ms. Virgin, that he was taking his own phone from
11  her?
12    A.   No.
13    MR. HUGHES:  Thank you.  I have no
14  other questions.
15    FURTHER EXAMINATION
16  BY MR. HOLLAND:
17    Q.   I would only ask one question:  Was
18  your determination of probable cause based on
19  anything beyond the eyewitness and Ms. Virgin's
20  statement?
21    A.   Say that again.
22    Q.   Was your determination that you had
23  probable cause based on anything beyond the
24  statement by the eyewitness, ▓▓▓▓, and
25  Ms. Virgin's statement?

Page 216

1    A.   It was based on that.
2    MR. HOLLAND:  That's all I have.
3    MR. HUGHES:  Okay.  Here's the drill:
4  You have the right to read the deposition once it's
5  typed up and make changes to your testimony or make
6  corrections that she makes.  But most -- I advise
7  you to waive that right because it's being videoed
8  anyway, so I doubt she'll make a mistake.
9    But even if she does, it will be
10  videoed, but if you don't waive that -- your
11  signature, you'll have to, within a -- you know,
12  fill out all the corrections to be made.  So would
13  you like to waive your signature?  You'll get the
14  deposition either way.
15    THE WITNESS:  Yeah.
16    MR. HUGHES:  Okay.  Thank you.
17    THE VIDEOGRAPHER:  The time is 3:30.
18  We are off the record.  This concludes the
19  deposition of Officer Christopher Partin.
20    (Whereupon, signature was
21    waived and the witness was
22    excused at 3:29 p.m.)
23    --oOo--
24
25

54 (Pages 213 to 216)

**CHRISTOPHER PARTIN  2/8/2017**

Page 217

```
1          CERTIFICATE OF REPORTER
2
3        I, RENÉE COMBS QUINBY, a Registered Merit
4   Reporter, Certified Realtime Reporter, Certified
5   Shorthand Reporter (CA), Certified Court Reporter
6   (MO), Realtime Systems Administrator, and Notary
7   Public within and for the State of Missouri, do
8   hereby certify that the witness whose testimony
9   appears in the foregoing deposition was duly sworn
10  by me to testify to the truth and nothing but the
11  truth; that the testimony of said witness was taken
12  by stenographic means by me to the best of my
13  ability and thereafter reduced to print under my
14  direction.
15       I further certify that I am neither
16  attorney nor counsel nor related nor employed by any
17  of the parties to the action in which this
18  deposition was taken; further, that I am not a
19  relative or employee of any attorney or counsel
20  employed by the parties hereto or financially
21  interested in this action.
22
23
24       -------------------------------------
25       Renée Combs Quinby, RMR, CRR, CCR #1291
```

55 (Page 217)

CHRISTOPHER PARTIN  2/8/2017

**A**

[REDACTED] 123:5
124:16 127:6
182:3
**ability** 80:10
217:13
**able** 9:22 39:4
42:3 73:22 74:5
86:3 114:15,21
114:24 130:8
140:4 175:1
196:14
**academy** 16:4,10
16:13,17 17:1
17:24 18:1,10
18:17,20,23,25
19:17 20:5,9,22
24:15 25:21
26:7,20 28:24
30:17,22 32:8
32:15,21 34:18
34:20,21 35:10
35:13,17 38:21
39:10 40:11
61:2,6 93:9
97:16 121:25
**access** 111:4,25
**accompanied**
193:12
**account** 48:16,17
49:4 184:14
212:6 214:13
**accurate** 44:4
53:8 58:23
60:11 64:10
67:2 69:2 78:5
101:16 115:15
116:22 117:23
138:5 139:5
150:2 152:12
**accurately**
161:17 166:9
**accusations**
163:4
**accused** 205:22
**action** 11:24
15:18 217:17

217:21
**active** 75:6 81:15
81:17,19,25
82:9,13,15 84:3
84:4 86:21
92:22 145:2
**actual** 127:9
140:3 179:4
**add** 101:8 120:5
120:6 121:12
**added** 25:15
**addition** 38:12
98:25 205:9
**additional** 75:16
**additions** 36:21
**address** 13:15
115:21,23
121:6 174:12
174:15 176:25
178:25 179:4
**addressed**
152:14
**addresses** 109:22
121:7
**adjoining** 84:12
**adjusted** 172:9
**Administrator**
217:6
**adult** 161:14
162:1,11,15,16
162:19,25
164:6,14,19
**advise** 213:9
216:6
**advised** 141:22
184:16
**advising** 213:10
**affect** 35:15 94:6
94:7 95:1
**afford** 44:5 65:17
84:13,15
**afforded** 45:9
**Affton** 16:18
89:8 100:24,24
147:23 193:22
198:16
**aforesaid** 9:3

**afraid** 50:5
**African** 131:25
**African-Ameri...**
132:1
**afternoon** 19:13
19:23 136:16
139:11 142:18
**afternoons** 27:15
88:16,17
**age** 9:1
**agencies** 84:9,9
84:12
**agency** 84:15
121:16
**aggressive**
125:13
**ago** 12:15 13:14
54:10 80:19
145:21
**agree** 37:8 79:12
79:16,19
126:14,16
176:3,5 178:12
**AGREED** 7:2
**agreement** 7:8
**ahead** 8:14 37:4
39:16 44:14
60:1 70:10
95:25 96:21
103:22 105:3
105:16 146:14
157:8 194:21
195:14
**ahold** 53:20
**al** 1:4,7 4:4,7
7:17,18
**allegation** 45:10
48:9,12,13
153:1 161:17
163:8 166:3,4
166:22 169:21
170:22
**allegations**
127:21,25
161:6 169:25
185:4 205:23
**allege** 164:18

**alleged** 161:11
162:20,25
189:12,24
191:24 197:23
**alleges** 188:5
191:9,18
196:16 198:2
203:18 204:22
[REDACTED] 123:5
124:16 182:4,7
**allow** 46:19
66:25 78:18
142:22 144:16
145:4 192:4
**allowed** 90:13
**alluded** 184:18
184:20 192:7
**altercation**
125:25 129:1,3
129:16 182:8
182:15 184:11
184:17 212:2,3
**alternate** 21:1,5
**ambiguous** 42:13
70:9
**amend** 205:25
**amended** 33:12
160:19,25
161:10 188:3
193:11
**Amendment**
142:15 143:20
144:5,22
196:20,25
**Americas** 5:11
**amount** 75:1
87:3 157:4
**Android** 182:23
**and/or** 81:8
**answer** 11:10
12:24 31:19
33:22 39:16
40:20,22 46:13
64:1 68:17 69:7
130:20 157:7,8
177:12 194:19
195:9,13,14,15

196:18
**answered** 31:19
44:14 59:22,23
69:8 79:24
80:16 97:23
103:21,22
118:7 126:22
130:15 139:10
144:10 146:14
171:11 172:1
180:7 190:13
198:24 208:12
**answering**
133:21
**answers** 9:23
10:16 141:3
**anybody** 38:17
38:18 100:10
**anyone's** 145:10
**anyway** 103:22
164:8,17 169:9
180:16 186:9
186:21 216:8
**apiece** 12:21,22
**apparent** 131:22
131:24 174:20
175:23 183:14
183:24 207:25
**apparently**
204:25
**appear** 74:15
145:9 149:25
154:24 183:12
183:23 187:23
197:20 201:3
203:24 204:3,7
**appeared** 189:1,5
203:19 205:11
206:17
**appears** 217:9
**application**
46:25 52:24
72:19 78:4
109:6
**applied** 72:22
80:20
**apply** 74:24

CHRISTOPHER PARTIN   2/8/2017

75:19 79:6
92:15
**applying** 44:8
**appreciate** 89:12
**appropriate**
69:15 102:15
114:13 135:18
137:14
**approval** 33:14
34:8,9 46:9
99:13 101:15
101:19 102:2
136:1,3,4
**approve** 136:5
137:8,15
**approved** 52:23
99:14 135:13
136:6
**approving** 99:17
**approximately**
7:15 12:15,20
13:14 24:10
28:4,4 74:11
181:2
**ArchCity** 3:3 5:5
8:10 151:21
152:7
**area** 21:15 54:15
72:24 90:25
115:6,13
118:16 122:15
128:2 130:11
130:13 138:21
154:15
**areas** 24:18
**argument** 59:14
**argumentative**
63:23 129:25
145:17 149:16
154:1 155:7,11
157:7
**army** 16:4,9
**arrange** 191:20
192:1
**Arras** 107:8
**arrest** 45:4,19,23
46:7,25 47:12

52:1 54:21 62:1
63:2 68:15
69:15,20 70:6,6
70:12,13 72:12
73:14 79:5,6,8
79:14,21 80:5
81:7,13 82:10
83:20 85:17
88:21 91:18
138:12 149:14
187:4 188:6,12
199:25 202:6
**arrested** 44:3,11
44:20 45:1 69:5
69:12 70:17
71:22 72:8,16
72:17,18 80:9
80:14,24 81:6
86:16,24 87:18
87:22 88:2,8
91:7 92:6
111:20 112:13
113:15 143:11
149:2 193:8
**arresting** 69:17
69:19 81:10
85:7
**arrival** 181:16
**arrive** 53:23
122:18 163:4
172:24
**arrived** 73:25
118:15 120:23
123:8 162:19
163:11 165:15
173:13
**arrives** 89:19
**ascertain** 74:5
**aside** 12:13 13:7
24:18 28:11
39:2 92:20
132:6
**asked** 13:21,24
31:19 42:23
59:21 69:8,11
79:24 80:15
97:23 103:20

103:22 129:10
130:19 133:7
144:10 146:13
155:9,12
169:20,24
171:10 172:1
180:6 187:9
190:12 198:17
198:22 199:20
201:9 206:11
207:5 208:11
211:8 214:8,16
**asking** 9:16
40:15 66:5,8
69:12 80:12
94:20 96:14
104:21 137:15
152:16 184:20
**aspect** 56:5
150:18
**assault** 25:16
50:25 57:6
91:25 127:20
128:22 129:13
131:15 141:24
172:5,12,17
176:5,7,8
177:16 181:4,7
181:10 185:2,4
186:5,16 190:9
202:2,7 211:2,5
211:10,11,15
**assaulted** 48:13
48:23 53:22
80:3 126:3,7
**assaulting**
126:10
**assaults** 25:15
211:6
**assigned** 20:21
27:6
**assignment**
16:18
**assist** 73:17
**assistance** 173:23
**assisting** 122:2
**assume** 137:19

138:6 156:23
159:9 197:10
205:18,20
206:4
**assumes** 96:20
145:16
**assuming** 192:21
205:14
**attached** 3:7 73:7
**attaches** 3:2
151:21
**attacked** 161:14
162:1,11,15,17
164:6,14
**attempt** 192:1
**attempted**
138:21
**attempting** 92:15
**attempts** 53:12
196:8
**attention** 134:22
**attorney** 46:21
66:16 141:5
143:6 144:8,21
149:13 158:6
158:16 200:17
206:4,17
217:16,19
**attorneys** 8:1
203:24
**Attorney's** 44:9
45:13 46:12
55:1,2 56:19
74:20 75:10,22
**authority** 189:25
190:2
**Automated**
51:18
**automatically**
122:15
**Avenue** 5:11 6:3
**avoid** 116:14
**aware** 81:18
87:17,21 91:2
93:12 151:13
151:16 191:7
191:13 206:20

138:6 156:23
**a.m** 1:15 7:11,15
19:4,23 119:6
120:19,24
122:18 134:13
181:3

**B**

**B** 99:4 202:17
203:2,12
205:17
**back** 15:21 19:15
21:7 26:6 33:24
40:4 41:2 44:15
44:21 54:9
55:21 60:14
66:19 74:18
83:24 84:24
90:2 92:18
96:16 103:14
104:18 106:8
124:3 125:18
129:22 132:21
135:24 138:25
141:20 145:25
147:23 148:21
160:9 185:3,10
191:3 193:9
198:16 212:8
214:10
**background**
15:21 22:17
29:3
**bad** 92:3 124:10
**bald** 112:15
**barrier** 212:17
212:20,22
213:5,9
**barriers** 213:10
**based** 49:8 60:7
74:9 82:10,12
92:12 127:17
156:8,8 212:6
214:12 215:18
215:23 216:1
**basement** 90:13
**basic** 20:9
**basically** 17:23

CHRISTOPHER PARTIN  2/8/2017

20:7 21:22,24
21:25 25:19
26:25 33:12
34:19 39:11
46:14 48:21
51:8 54:18
68:20 93:20
124:19 154:14
162:24
**basis** 69:15 81:7
81:10 96:13
106:23 107:4
142:1 162:20
**Bates** 2:11,14,17
2:19,22,24
29:24 30:2 31:9
76:3 77:18
119:17 131:20
155:21 160:16
**bathroom** 84:19
**beat** 122:14
**beats** 122:14
**began** 182:6,22
**beginning** 1:15
17:2 38:23
51:20
**begun** 32:21,21
**behalf** 4:13 8:5
8:12 203:19
**Behlmann** 107:5
**belief** 95:20
96:15
**believe** 20:25
21:7 23:4,24
32:25 33:5,17
41:23 44:11,19
44:25 49:6
50:24 56:6
60:22 61:11,20
69:10 96:9
97:24 119:15
132:9 141:23
142:20 145:20
146:1 160:23
170:9 175:5,19
187:3,7 189:20
190:8 195:17

196:3 202:23
211:3
**believed** 190:8
**Belmar** 1:7 4:7
7:18 8:20 15:11
**belonged** 214:23
**Bement** 107:5
**bench** 145:8
**Berardi** 107:5
**berated** 185:9
**best** 9:19 10:9
56:20 63:14,16
**better** 56:16
57:22 60:20
97:1
**beyond** 215:19
215:23
**bickering** 124:9
124:10
**big** 93:20 94:4,24
95:21 96:6
115:13 178:13
**bigger** 91:21
**birth** 110:5
**birthdate** 114:1
**birthday** 110:7
**bit** 16:2 21:19
89:11 102:21
120:13 132:3
157:15 161:5
183:7
**black** 73:1,2,3
173:19
**Blake** 3:2 5:4 8:9
107:8 141:8
151:20 152:7
188:18 191:12
191:14
**blood** 132:3
175:3
**blue** 59:11,13
**blue-green** 59:12
**Boenever** 107:7
**bold** 37:24,25
38:2 99:4
**bolded** 36:18

37:6,10,23
**bonds** 74:7
**book** 75:16
**booked** 85:22
147:4
**booking** 70:2
187:21
**bottom** 76:20
135:25
**bound** 10:10
70:13
**boyfriend** 211:18
**Brannan** 107:7
**break** 10:25 11:1
14:12 19:11
39:11 55:14,24
84:19 85:1
104:9 160:3,4
182:8 184:16
**breaking** 195:6
**bring** 132:20
137:8 145:12
145:22,22
146:5,5,12
185:23
**bringing** 154:11
205:6
**brings** 26:9
**Britney** 5:16 8:11
**Broadway** 5:17
**broke** 125:16
**broken** 21:10
131:14
**brother** 71:13,14
124:20,22,23
**brought** 44:3
101:7 104:24
126:9 146:19
188:17 207:12
212:11
**bstrode@arch...**
**building** 19:4
**business** 53:17
206:15
**bwilson@ccrju...**
5:18

**B(1)(a)** 99:5
**B(1)(b)** 38:11
_____
**C**
**C** 5:1 7:11
**CA** 4:18 6:13
217:5
**cab** 164:11,13
212:11,13,16
212:16
**CAD** 171:12,15
171:17 172:12
**CAD-generated**
172:7
**cafeteria** 19:5
**call** 19:25 22:1
29:1 43:16
50:15 51:16,19
52:15,16 81:16
82:5 85:10
88:18,22 89:1,3
118:14 119:7
120:21 134:21
141:2,12
165:13,19
166:15,19
167:6 171:7,17
171:20,21
172:8 175:9,11
175:13 181:8
187:19 194:6,8
194:12,13,13
196:1,4,6,13
210:20,25
211:5,13
212:20,24
213:2,8,12,15
**called** 56:2 114:3
120:17 141:16
166:5,23
172:17 175:16
175:19 193:9
194:13 201:11
202:2 212:19
212:19,23
213:1,3,7,16
**caller** 131:9

**calling** 89:5
158:9
**calls** 20:1 37:1
40:22 66:4
96:11 153:24
188:18
**cancel** 65:3,5
93:3 113:15
**canceled** 31:1,23
43:14,15 71:22
74:18 154:5
189:3,8 198:11
198:13,14,15
**cancels** 30:12
43:17
**canvass** 128:2
130:13 179:25
180:3
**canvassed** 134:3
134:12
**canvassing**
130:11 134:3
**capacity** 8:20
122:4
**captain** 151:6,8
151:14 152:11
152:11,15
153:8,11 159:5
**captains** 159:11
**car** 21:25 54:16
64:22,23 112:1
115:5 125:18
139:5
**care** 38:7 43:16
51:16,17 52:3
53:5,9 54:10
89:1,4,4 99:15
99:18 136:5
138:2 148:12
209:17
**career** 70:20
**carry** 91:23
**cars** 122:7,8
**case** 7:18 9:3
11:13,16,18,19
14:20 15:12,15
25:19 38:3,5,6

**CHRISTOPHER PARTIN   2/8/2017**

42:4,6,17 47:19
50:17 52:20
56:1 58:16 63:7
63:8,11,15,16
67:5 70:15
71:18 72:6
77:22 82:14
86:4,17,21 88:1
90:7 93:7 99:8
99:9,11,14
101:10 102:22
102:23 103:5
104:24 111:15
111:17 117:6
121:11 137:5
148:22 158:20
188:8,10
204:13,23
**cases** 45:8 46:1
55:3 72:15 90:5
90:22,23,24
91:2,6,13,22
92:21 117:21
121:9 137:5
150:23,24
151:4
**case-specific**
104:8,12
**cash-only** 74:7
**cash-onlys** 74:13
**cause** 33:8 34:1,5
38:4,13 41:20
41:22,23 49:7
49:15 50:7,24
51:7 58:12,15
58:15 60:20,21
61:1,9,10,17,20
62:2,5,18,24
64:14 66:22
68:12 74:22,24
80:2 92:24 99:9
103:9 104:25
105:1,15,19,22
141:23 142:2
145:13 186:5
187:4,9 188:11
189:20 190:8

190:22 199:24
199:24 215:18
215:23
**caused** 169:17
**causes** 117:22
**causing** 69:25
91:1
**caution** 73:15
**CCR** 6:14 217:25
**cell** 125:20,20
133:15 162:14
162:21 163:1
164:20,24
166:6,11,14,23
167:2,6,7,9,11
167:11,13
169:7,21,25
179:16 184:10
184:22 185:23
186:10 208:8
212:7 214:10
214:11,19
**center** 5:16 7:22
8:12 128:16
144:6 148:25
149:3,7 150:1,2
150:6 158:6,16
**Central** 6:3
157:25 196:5,9
**certain** 25:25
26:2 72:17 75:1
75:2,3 113:3,4
113:6 129:2
159:4 212:2
**certainly** 138:16
164:18
**CERTIFICATE**
217:1
**certification**
20:10
**Certified** 4:16,17
4:18 7:5 217:4
217:4,5
**certify** 217:8,15
**chain** 159:6
**chamilton@pa...**
5:14

**chance** 31:13
91:19 121:10
152:19 164:14
204:11
**change** 18:16
35:24 36:14,15
37:25 38:2,19
38:25 93:18
95:4 96:25 97:2
100:4,10
**changed** 25:11
25:15,16,17
29:4 35:12,18
41:15 94:6
96:23 101:5
184:14
**changes** 9:25
25:12,14,14
35:15 36:21
37:8 38:19,25
93:20 94:4,5,9
94:24 95:6,8,15
95:20,22 96:6,8
96:9 97:25
98:19,22,24
99:1 216:5
**changing** 36:11
**charge** 27:1
51:24
**charges** 57:9
75:6,14,17
126:3 154:24
177:16 202:25
203:7
**charging** 204:24
**Charles** 5:10 8:6
**check** 84:1,2
92:21 115:11
150:16 178:4
**checking** 108:13
**checkmark**
173:23 174:3
180:1
**Chief** 8:20 15:11
**child** 57:9 126:6
164:15
**children** 182:3

211:13
**Chris** 8:18
**Christmas** 24:11
24:15 26:14
51:9
**Christopher** 1:11
4:11 7:16 8:25
9:12 23:17,21
23:25 24:2
216:19
**chronological**
171:24
**circling** 92:18
**circumstances**
86:16 117:18
205:10
**City** 4:15 209:24
**civil** 28:9
**claimed** 71:12
**claims** 12:1
**clarification**
45:11
**class** 19:12 25:1
25:2 32:10
131:22 174:19
**classes** 16:4
19:10 25:25
26:2 98:20
**classified** 211:14
**classroom** 24:24
25:6
**Clayton** 6:3
85:18,19
154:13 193:9
**clear** 26:4 29:22
50:15 196:13
**clearcut** 57:25
**cleared** 52:20,20
134:17
**clearly** 61:17
**Clements** 8:19
14:23
**clerk** 53:5 209:17
**click** 110:23
**client** 141:15
149:7 203:25
**close** 83:12

139:17
**closer** 28:1 194:2
194:4
**code** 115:3,16,18
115:19,22
**codefendants**
12:2
**codes** 73:16
**colleagues** 8:5,7
159:24
**collect** 13:21,24
**college** 15:25
16:3,8 18:3
**colloquy** 183:17
183:21
**color** 73:1
**Columbia** 209:25
**column** 139:21
**Combs** 4:16 6:13
7:5 217:3,25
**come** 13:20 19:8
19:15 35:11
60:25 83:12
84:17 85:12
86:20 89:3,4,9
89:16 103:14
116:23 141:4
141:20 146:22
150:2 165:19
174:1 181:11
185:3 188:8
193:9 194:7
199:3,20
200:22
**comes** 127:24
172:8
**comfortable** 39:3
40:2
**coming** 9:16
30:19,23 51:1
86:5,10 93:20
132:6 154:14
196:12
**command** 159:6
**comment** 158:21
158:24 159:1,3
209:1,4

**CHRISTOPHER PARTIN  2/8/2017**

**commit** 157:22 157:24
**committed** 38:5 41:24 50:25 60:23 99:10 132:23 157:16 189:20 190:9
**common** 113:25
**communicate** 13:17 14:13 46:3 48:2 54:24 62:8,22 67:1 107:22 144:18
**communicating** 47:16
**communication** 14:9,9 38:17 47:12 149:12
**communications** 127:5 150:3
**community** 94:8 117:22
**compare** 138:8
**complaint** 11:23 12:24,25 23:3 28:9 160:19,25 161:11 188:4 193:12 201:10 202:6 205:16
**complete** 10:15 10:19 64:8 126:24 127:1
**completed** 119:25
**completely** 126:16 133:21
**computer** 51:18 81:14 115:9 178:3
**computer-aided** 172:13
**computer-auto...** 120:4
**concentrate** 161:6
**concerning** 161:6
**conclude** 168:13

**concludes** 216:18
**conclusion** 168:15
**conduct** 54:14,18 64:17 83:23
**conducted** 72:19 96:7
**confirm** 82:9 138:7 143:14 151:1
**conflict** 162:20
**confronted** 79:2
**confused** 116:15
**confusing** 9:18 42:12 116:14 116:17
**conjecture** 37:2 66:4 96:12 153:25
**connecting** 102:22 105:23
**connection** 11:13 13:5,22 18:2 93:14 94:13 95:16 97:20 109:14 119:16 150:24
**connections** 91:14
**consent** 7:8
**consider** 178:19 208:6,9
**considered** 20:23 25:20 170:14 170:15 176:4,5
**considering** 23:2 154:17
**consisted** 97:17
**constant** 35:1
**constantly** 35:2 91:1 96:25
**constitutional** 5:16 8:12 26:1 61:7
**consuming** 89:10
**contact** 38:7 52:1 53:12 54:5

88:11 89:15,19 90:11 99:15 137:21 141:1,5 141:7 181:17 184:9
**contacted** 154:10 154:19 191:19 191:25
**contain** 111:9 112:6 131:13
**contains** 29:24 76:2 112:19,21
**continue** 11:10 58:13 64:5 102:25
**continued** 185:11
**continuing** 16:5 25:24 28:25 29:1,5 184:13
**conversation** 143:2
**conversations** 143:5
**copied** 3:7
**copies** 3:7
**copy** 14:18 29:17 31:12 160:21
**corner** 29:24 30:2,11 76:14
**correct** 10:18 13:6 17:19 22:20 23:5 24:4 24:17 26:8 30:13,17 31:22 33:2 36:12,18 38:14 42:8 46:4 54:24 56:4,9 71:2,4 77:7,10 82:24 85:4 88:12 89:16,20 91:9,20 92:22 93:10 94:19 95:9,13 100:1 102:1 106:13 106:17 113:22 113:23 114:16 115:20 119:3

123:2 128:6 131:16 139:8 143:7,8 144:18 145:15,23 146:12 147:7 149:22 157:5 161:23 162:4,7 162:22,24 163:5,6,21,24 164:2,9,21 165:13,16,17 165:19,20,23 166:1,24,25 167:3,7,15,18 167:21 168:2,3 168:6,7,22 169:3 170:1,4 170:11,16,23 171:20,25 172:14,18,22 172:25 173:3,7 173:10,15,18 174:8,13,16,20 175:4,6,10,19 176:1,10,14,23 177:1,3,9,13,14 177:20 178:6 179:14,16 180:1,5,19,22 181:5,12 182:25 183:5 184:8 186:13 186:19,23 187:1,10 188:13,15,19 188:23 189:3,8 189:9,21 191:4 192:9,12,14,18 193:19,22 197:13,21,21 197:25 198:1 198:13,20,24 199:5,6,21 200:1,9,14,17 200:24 201:4 202:8,11,15 203:3,8,13

204:8,21 205:12,15,18 206:21 208:24 209:17 210:2,4 210:18,19 211:24 212:8,9 215:1,2
**corrections** 216:6,12
**correctly** 38:9 79:8 99:18 114:18 129:5 133:17 179:3 179:11 181:21 182:1
**correspondence** 14:19
**corresponds** 73:1
**Costa** 107:5
**counsel** 7:3,3,8 11:5,7 145:12 151:14 191:10 191:11,15,19 191:25 193:13 196:8,17 197:16 203:19 205:2 206:14 217:16,19
**Counselor** 44:8 46:20 52:23 55:7 56:7,19,22 57:8 58:9 65:13 107:13 156:20 202:22 203:2
**Counselors** 55:11
**counselor's** 6:2 13:2 45:6 46:11 56:3,10,23 57:2 57:13 58:20 60:6 61:21,25 62:12 63:3 64:7 75:21
**county** 6:2 8:21 13:2,18 15:3 16:21,24 17:25 18:5,8 20:12

CHRISTOPHER PARTIN  2/8/2017

22:7,12 24:19 32:11,12 34:23 35:14 37:15,16 37:18 44:8 45:6 46:11,20 52:22 54:12 55:7,11 56:6,18,22,23 57:1,8,12 58:8 58:20 60:6 61:21,25 62:11 63:3 64:7 65:13 74:12,17 75:20 82:1,4,5 84:11 89:9 93:14 96:7 107:13 109:5 111:5 114:6,8 118:6 138:16 147:23 149:8 154:15 156:20 166:5 173:3 193:25 194:3,4 202:22 203:2 203:20

**County's** 112:11 193:13

**couple** 8:7 24:23 76:12 119:18 134:9 138:22 142:21

**course** 45:21 78:20 206:15

**courses** 16:9 19:16 25:22 26:5 93:25

**court** 1:1 3:6 4:1 4:17 6:12 7:6 7:19 8:22 10:6 10:14 13:3,3 41:1,11 55:10 65:14 72:4,5 74:15 145:8 154:24 156:7 156:20 174:6 187:5,23 197:20 201:4 203:20,24 204:3 205:24

206:5,17 208:19 217:5

**cover** 32:8,9 76:10 156:6

**co-workers** 100:22

**cracked** 131:7

**create** 120:3

**credit** 16:3

**Cricket** 179:18

**crime** 38:5 41:24 60:23 83:8,15 99:10

**CrimeMATRIX** 109:4,10,13,23 110:12,13 111:2,4,7,20,22 112:9,10,21,24 113:12 114:25 115:4

**crimes** 57:1,4,5 57:11,11

**crisis** 24:25

**critical** 209:3,8,9

**crossed** 138:4

**CRR** 6:13 217:25

**crucial** 97:3

**CSR** 6:13

**Curcuru** 23:12 24:6 107:6 158:7,9,10,12 158:18 197:14

**curious** 198:5

**current** 17:4,15 99:6 112:12,21 112:22 115:3

**custodial** 47:12 149:14

**custody** 45:1 72:20 79:7,13 79:20 80:4 86:15 88:12 90:15 149:8 197:18

**cut** 114:11

**C-u-r-c-u-r-u** 23:14

**D**

**D** 7:11 129:2 133:13,16 182:7,24 184:10,13 186:10,11 212:3 213:18

**dad** 125:20 131:3 167:24 169:11 185:16,18,22 215:4

**dad's** 125:19 215:5

**daily** 106:23 114:20

**danger** 79:4 187:21

**dangerous** 74:7 187:20,22

**darker** 132:3

**darker-colored** 132:2

**data** 111:6 135:25

**database** 109:24 110:13 111:9

**date** 7:14 72:5 77:13 97:3,5 98:4 110:5 120:14 151:22 203:24 204:2,6 204:8 206:2 208:19

**dated** 2:10,13,16 2:21 3:5 29:23 30:1,10,15 31:8 31:8 32:1 76:15 77:17 136:8

**dates** 24:23 192:22

**date/time** 120:19 139:20

**David** 6:8 7:24

**day** 10:24 19:1,9 19:12,14,20 20:3 25:3 27:2 27:8 52:12

71:17 90:1 103:7 119:5 120:1,20 122:1 122:17 134:9 135:1 139:6,12 140:8 141:16 141:19 142:17 143:1 144:15 146:21,25 147:19 154:10 154:16 155:3,4 155:17 183:8 183:12 189:1,3 189:6,6 192:25 193:18 194:1 194:12 196:2 197:11 198:13 198:14 207:20

**days** 27:7,12,16 88:15 136:10 137:25 189:7 192:8,11

**DCI** 38:7,7 99:15

**deal** 55:10

**dealing** 55:5

**dealt** 68:3

**December** 24:21 147:21,22 149:21 153:20 154:9 156:2 158:17 159:20 193:14 195:20 198:23

**decide** 72:6

**decision** 56:20 63:15 122:11

**deem** 54:4

**defect** 205:16,19

**defects** 205:25

**defend** 124:21

**defendant** 11:16 15:9,17 157:16

**defendants** 1:8 4:8 6:1 7:4 15:5 188:7

**Defenders** 3:3 5:5 8:10 151:21

152:7

**defer** 159:23

**define** 60:21 85:25

**definition** 60:19 61:1,9

**DEFRFP2** 2:25 119:17

**DEFRFP1** 155:22

**DEFRFP10000...** 3:5

**DEFRFP234** 31:9 77:18

**DEFRFP23400...** 2:18

**DEFRFP23400...** 2:23

**DEF-RFP234** 29:25 30:3 76:4

**DEF-RFP2340...** 2:12

**DEF-RFP2340...** 2:15

**DEF-RFP2340...** 2:20

**degree** 176:8

**delaying** 79:5

**deliberately** 199:17

**deliver** 191:20 192:2,4

**demonstrate** 189:25

**denial** 133:24

**denied** 133:13,16 186:11

**denote** 110:13

**denying** 133:20

**department** 14:25 16:21 24:20 25:18 29:20 32:10,17 37:15 40:1 62:16 76:1,15 77:6,22 93:13 94:6,18 95:3

CHRISTOPHER PARTIN  2/8/2017

99:2 100:14
107:21 109:4
120:18 135:21
166:5 179:8
**Departmental**
77:17
**departments**
93:19 95:3
**department's**
82:2
**departure**
161:12
**depended** 27:8
**depending** 19:12
91:21
**Depends** 150:13
**deployed** 15:25
**deposed** 12:4
**deposes** 9:3
**deposition** 1:10
4:11 7:4,16,21
10:17 12:5,9
206:12 207:7
216:4,14,19
217:9,18
**depth** 39:21
**describe** 64:19
71:6 202:1
**described** 127:6
156:11 210:17
**description** 71:9
71:18 83:12
175:22,24
**designated** 188:6
**designee** 99:12
**despite** 149:12
**detail** 64:19
**details** 51:13
**detained** 89:20
90:15,18
**detective** 14:22
14:24
**determination**
215:18,22
**determine**
102:24 112:17
113:22 114:15

**determined** 38:4
50:7,23 89:14
92:20 99:9
188:11
**difference** 17:3,8
34:6 58:3 62:14
**differences** 21:13
59:10 116:8
**different** 21:2,3,6
21:11 26:2
69:19 79:24
82:2 113:3
126:13,13
129:7 211:18
**differently** 157:7
**difficult** 212:17
**Digital** 97:12
**diner** 91:17
**directed** 79:22
**direction** 217:14
**directive** 62:11
**directly** 15:25
105:10
**directs** 56:7,11
56:13
**dirty** 92:7,8
**disagreed** 103:8
**discard** 52:11
**disclose** 124:1
**discretion** 93:5,6
**discuss** 14:5
150:23 151:10
**discussed** 55:24
200:16 202:3
**discussing**
105:14 191:3
204:23
**discussion** 83:24
104:16 151:23
205:3
**dismissal** 206:16
**dispatch** 48:8
120:5,19 122:8
171:21 172:13
172:21 181:11
196:3 210:24
**dispatched**

118:13,14
165:16 175:15
**dispatcher**
172:17
**disposition**
176:13
**dispute** 127:18
127:19 153:7
164:25 206:18
208:10
**distance** 196:12
**distinguish** 68:6
**distracted** 41:10
**District** 1:1,2 4:1
4:2 7:19,20
**disturbance**
75:13
**Division** 1:2 4:2
154:24 203:20
**document** 29:7
30:15 31:14,16
61:5 76:1,3
77:13,24
119:22 120:2,3
155:23 156:5
156:12,19
157:15 204:24
206:20 207:3
207:18
**documents** 12:23
13:8,10,11,21
29:16 30:4 35:8
77:19 206:11
207:6
**Doe** 44:24,25
48:9,11 50:8,23
50:24 51:1,23
53:10,11,12,22
**Doell** 6:8 7:24
**doing** 12:6 19:25
95:5 126:5
199:2
**DOJ** 94:16,17
95:12 108:5
**domestic** 25:14
25:16 57:6
98:24,25

211:19
**door** 54:1,18
64:22,24 68:17
139:4 140:16
177:12,12
**doors** 130:14
132:5 170:10
171:1
**DOR** 109:2,3,7
111:9 116:20
178:6 179:6,8
**dots** 102:22
105:24
**dotted** 138:4
**doubt** 67:24 68:2
216:8
**downright**
116:14
**draft** 120:2
**drafted** 156:4
**drill** 216:3
**drive** 54:17 64:21
**driver** 73:6,7,8
73:11 74:2,4
164:11,13
212:11,14,16
**driver's** 109:8
114:6 178:5
**drive-off** 75:12
91:4
**driving** 21:25
**drop** 88:24
**drove** 134:9
140:13
**drug** 57:9 75:12
**dry** 58:1
**DSN** 99:16 101:8
120:9
**due** 9:21
**duly** 9:1 217:9
**duplicating**
160:23
**duty** 16:18 86:5
147:7,9,10,11
147:24
**Dwayne** 1:4 4:4
15:14 123:4,11

123:18,19
125:22 127:24
128:17 141:13
143:13 162:13
177:20 181:24
182:13,25
184:6,14,16
185:24 186:1
189:14 190:1
190:18
**Dwayne's** 127:25

_____
**E**
**E** 5:1,1 6:2 7:11
7:11 98:25
**earlier** 47:25
57:18 61:20
64:15 69:10
82:17 90:1
92:19 95:6
97:14 101:14
106:15 107:19
113:19 117:19
118:25 120:14
137:20 138:25
140:21 141:19
142:21 144:15
147:6 154:10
159:13 162:21
167:1,16
168:21 170:9
175:3 184:19
192:8 194:12
206:10 209:2
212:5
**early** 18:21
**easier** 192:13
**Eastern** 1:2,2 4:2
4:2 7:19
**easy** 98:21
**Ed** 8:10
**education** 15:23
16:5 25:24 29:5
**Edward** 5:4
**effect** 30:20,23
32:3 33:9,11,19
34:2 51:1 77:24

CHRISTOPHER PARTIN  2/8/2017

79:20 100:4,5 102:10,12 103:16 104:2 176:19 212:22 214:9
**effected** 81:12
**effecting** 79:7
**Effective** 77:8
**egrossman@p...** 5:13
**ehall@archcit...** 5:7
**eight** 78:11,12,22 79:1 86:6,10
**either** 18:5 44:6 52:21,21 57:15 58:14 65:5,20 82:9 113:21 128:3 148:9 168:10 187:4 187:19 211:1,1 216:14
**elaborate** 124:5 124:11 130:8
**elect** 92:14
**electronic** 191:16
**element** 164:19
**Elizabeth** 5:9 8:6
**email** 3:1 13:15 14:5,8,9,13 151:20
**emails** 13:25
**Emily** 136:18,19
**employed** 217:16 217:20
**employee** 16:25 17:1,4,8,19 18:1,8 217:19
**employees** 13:18 111:5
**encounter** 68:14 91:19 113:20 114:14 140:18 150:9,15
**encountered** 70:25 89:13
**encountering**

92:19 138:13
**encounters** 91:9
**encouraged** 79:6
**endangering** 57:8
**ended** 205:8
**enforcement** 37:18 94:7,7 95:2 126:14
**enrollment** 18:3
**enter** 19:4 44:18 44:24 48:10 49:12 50:8,11 50:25 51:7,8 54:6,11 59:17 59:20 61:22 62:18 64:12,16 66:17 79:16,19 80:7,13 81:23 102:8,14,16 103:2,19 104:4 104:22 105:3 105:15,16,20 113:20 114:14 115:18 134:24 203:25 204:1
**entered** 16:9 52:25 63:20 70:19 80:20 101:16,20 102:1 103:6 108:1 115:23 134:6,8 138:11 139:11,13,17 139:19,20,25 140:2,5,7,10 142:9 143:10 204:11 210:3
**entering** 41:25 42:2 47:11 48:1 48:4 49:11 53:13 54:1 62:15 65:20 67:6 74:23 79:12 102:13 103:17 139:3,7 151:19 155:21

**enters** 53:6
**entertain** 46:1,25
**entire** 65:4 194:23,25 195:16
**entries** 38:6 99:14
**entry** 38:8 51:18 99:16 109:24 111:2
**environment** 20:8
**especially** 34:23 45:25 73:15 91:13 117:21
**Esq** 5:4,4,9,9,10 5:10,16 6:2
**essentially** 39:8
**estimate** 139:22
**et** 1:4,7 4:4,7 7:17,18
**evaluated** 28:18
**evaluation** 28:21
**evening** 142:19 193:14
**event** 165:23 168:6 202:2
**events** 156:6,8,9 156:10,11
**everybody** 127:3
**everyday** 92:11
**everyone's** 95:4
**evidence** 49:8 58:15 62:4 79:4 96:20 125:10 145:17
**exact** 114:1 138:14
**exactly** 57:21 90:8 98:21 113:10 116:25 126:4 127:20 139:19 183:4,4 211:25
**EXAMINATI...** 2:4,5,6,7,8 9:7 160:11 210:8

214:5 215:15
**examined** 4:12
**example** 109:20 178:5 179:6 209:23
**excitable** 183:7 183:11
**excluded** 114:8
**excuse** 16:23 23:22 27:21 29:25 30:9 32:21 38:7 52:17 64:15 66:1 75:25 76:23 130:3 144:17 145:19 158:7,8 160:18 193:10
**excused** 216:22
**exercise** 143:25 144:5 190:6 200:22
**exercised** 144:22
**exercises** 196:25
**exercising** 190:2 196:20
**exhibit** 2:10,13 2:16,19,21,24 3:1,4 29:19,21 29:23 30:1,10 31:7,10,24 32:2 34:16 36:17 37:14 51:1 76:1 76:5,24 77:14 77:16 78:5,9,16 78:17 97:15,19 99:3 119:17,19 151:19,24 152:4,4 155:18 155:21 160:15 160:20,22,25 161:8 171:4 188:4 191:14 201:9,22,24 206:13 207:4 211:4 213:17
**exhibits** 2:9 3:6

29:11,12 32:24 160:24
**exist** 86:17 112:6
**exists** 38:4 79:3 99:9
**exited** 73:21,23
**expect** 21:21 35:3
**expected** 34:22
**experience** 37:18 92:12 102:21 156:25
**experienced** 88:9
**experiences** 82:19
**explain** 40:6 110:3 169:16 179:1 184:24 192:18
**explained** 129:3 146:20 147:13 181:23 182:24
**explaining** 105:23
**explicitly** 162:16
**extend** 101:10
**extent** 61:18
**extra** 84:17
**extradition** 84:10 138:15
**eye** 214:18
**eyewitness** 49:4,9 187:1 214:13 215:19,24

---

**F**
**face** 139:24
**face-to-face** 50:16 65:9 66:6 68:10 143:17
**fact** 131:19 166:22 192:7 199:19 211:20
**facts** 23:2 66:3 96:20 99:11 145:16
**failure** 145:9
**fair** 11:2 167:14

**CHRISTOPHER PARTIN   2/8/2017**

176:19 184:7
188:21 194:3
**fairly** 151:4
**faith** 187:7
**fall** 117:25 159:5
**falsely** 73:10
74:4
**familiar** 14:22
15:14 53:11
108:7 116:3
119:8 139:2
143:19 150:20
150:21
**family** 100:22
128:3
**far** 27:7 69:21
194:2 204:19
**faults** 22:17
**fault** 50:20 58:18
145:10
**fears** 126:14
**February** 1:12
4:13 7:14
203:18
**feel** 69:12 105:18
**feels** 126:24
**fellow** 136:14
**felonies** 56:25
98:25
**felony** 73:12,15
74:3 75:5,6,8,9
115:12,14
**felt** 25:9 69:11
141:16
**female** 73:9,21
73:23 132:1,1
161:14 162:1
162:11,15,17
162:19,25
164:6,14,19
178:19
**Ferguson** 93:14
94:18 95:2
100:13 101:6
**field** 18:18 20:7
20:10,15,16,19
20:20,21,22,23
21:1,5,10,12,12

23:10,15,20,23
23:24 24:3,5,5
24:8,16 26:6,11
26:23,24 27:14
28:24 29:2
34:25 35:1
38:24 39:5,6,7
39:7,11,13
40:12 49:24,25
50:1 51:4,5,6
61:2 97:21
118:24 119:1
121:23,24
135:6,7,8 148:3
159:9,17 173:9
173:13,15
180:10,18,22
190:24 191:2,6
196:10 197:10
197:12
**Fifth** 142:14
143:19 144:5
144:22 147:15
196:20,25
**fight** 92:1 118:13
119:8 127:9
128:21 129:12
175:16 184:16
185:6 211:2,11
214:21,21
**fighting** 123:21
125:4,8,12
182:6 184:13
186:17 211:14
**Fights** 211:6
**figure** 63:18
139:19 185:5,9
**filed** 152:6 161:1
**filing** 28:11
**fill** 216:12
**film** 214:21
**Final** 136:4
**finally** 104:11,13
200:21,22
**financially**
217:20
**find** 47:17,18

78:19 83:11,21
115:8 134:4,20
138:18 141:14
**finding** 65:7
154:17
**fine** 64:3
**fine-tune** 39:11
**fine-tuning** 39:14
**finish** 26:5
126:22 194:18
195:5,9
**finished** 26:10
29:2 134:2
**firm** 8:4
**first** 9:1 19:7
20:21,22 21:14
37:14 45:17
46:6,16 47:16
49:20 50:4 54:2
54:23 57:6,14
62:21 76:11
120:7,8 125:24
130:25 135:24
136:17 139:21
141:11,11
148:8,14 150:2
150:7 151:8
152:12 153:8
160:19,25
161:10 169:7
176:8 184:11
188:3 191:15
191:15 193:11
195:9 196:13
203:24 204:25
208:19
**five** 20:25 22:22
29:25 110:16
**five-mile** 114:24
**fled** 73:23 75:8
125:13 168:13
**flip** 131:6
**Floor** 5:17
**focus** 134:22
**focused** 33:5,16
34:13 81:9
107:19

**focusing** 55:25
**follow** 37:20
**following** 70:4,24
96:5 156:1
157:16
**follows** 9:5
**follow-up** 64:17
65:2,21 68:13
83:23 195:10
**follow-ups** 54:14
54:19 210:10
**foot** 178:11
**force** 183:3
**foregoing** 217:9
**forgot** 144:13
**form** 36:25 40:21
42:12 53:3
63:23 64:2 66:2
66:3 70:10
75:17 79:24
96:13,19
129:24 149:15
153:24 155:6,8
155:14 165:2
170:17 178:14
178:22 182:11
182:17 183:18
183:20 189:10
189:17 190:3
192:15,20,20
200:6,10,19,25
201:7 202:21
203:5,9,15
206:8 208:11
208:20 209:7
**forth** 40:4 191:3
**forward** 75:20
**forwarded** 52:22
74:20
**Fosdick** 107:7
**found** 73:11
76:25 115:24
154:13
**four** 20:20,24,25
21:4,7,8,23
22:21 24:5,5,8
30:22 32:5,20

75:23 95:12
133:9,10 136:9
137:24 138:20
**frame** 154:12
**framed** 68:25
**Franklin** 84:11
**frequently** 96:23
100:20
**frequents** 112:11
**friend** 67:14
**friends** 92:2,8
107:16
**front** 10:5 12:11
67:9,18 69:16
69:22 143:14
184:12
**full** 9:23 64:1
79:7,13,20 80:4
133:14 136:9
193:18
**fully** 191:6
**Furlow** 1:4 3:4
4:4 7:17 13:1,4
14:6,14 15:14
15:17 23:4
117:18,25
123:4,5,5,11,11
123:18,19,23
124:22 125:12
125:19,22
128:22 129:2,3
129:13,16,18
129:21 130:3,6
130:18,20,23
130:23 132:22
133:13,16
134:4,20
135:14 138:11
138:19 141:4,7
141:13,18
142:12 143:3
143:11,13,22
144:20 145:12
145:22 146:9
146:18 149:1
149:14,24
151:10 154:11

**CHRISTOPHER PARTIN  2/8/2017**

154:20,20
155:3,17 156:1
156:7 157:22
157:24 158:3,5
158:15 159:20
162:14,20
163:1,5 164:20
166:6,15,21,23
167:17 168:5
177:19 181:24
181:24,25
182:5,6,7,7,13
182:14,24,25
184:6,10,10,14
184:14,16
186:11,11
187:4 188:9,12
188:22 189:14
190:1,18
191:19,20
192:2 193:12
196:5,7,18,19
197:18,20
198:18 199:8
199:11,14
205:2,11
209:23 211:23
212:3,7 214:9
214:19,23
215:9
**Furlow's** 123:19
128:17 130:7,9
143:6 145:11
149:12 151:14
158:20 161:12
161:13,19
166:6,11,23
196:17 203:19
203:19 204:23
**further** 2:6,7,8
20:5 58:7 59:15
65:6 72:7 126:8
156:14,16,22
157:12 159:22
202:11,14
203:1 205:9,21
210:8 214:5

215:15 217:15
217:18
**F'ing** 127:15
130:21 133:4,8
133:21 185:8
186:7

――――――
**G**

**G** 7:11
**Garrison** 5:11
**Garry** 121:2
128:14 138:24
173:2 174:15
181:4,18,25
**gas** 75:12 91:3
150:19
**gather** 22:3
53:23
**gear** 19:6
**general** 2:10,13
2:16,19,21
22:14 29:8,20
30:6,12 31:1,7
31:22 32:7,9,16
34:4,24 35:2,18
35:19 36:10
76:2,15 77:6,17
96:23,24 97:8,9
114:22
**generally** 178:8
188:5
**generated** 171:8
171:8,12,15,17
172:12
**generic** 211:16
**gentleman's**
90:14
**getting** 59:1
62:15 74:16
169:20
**Gilyon** 136:14,19
136:21,22
**girlfriend** 211:18
**give** 9:23 10:15
10:20 24:14
28:6 29:20 42:4
42:4 46:6 48:1

50:16 54:23
56:16 58:1,21
59:13,14 63:12
80:10 85:10
88:18 136:9
139:21 146:9
154:12 187:4
199:4,20
205:21
**given** 16:18 69:6
83:13 138:12
153:15 156:15
156:18 169:7
199:3 214:13
**gives** 57:24
174:12 177:22
**giving** 46:2
**Glasgow** 118:17
118:18 134:18
**glasses** 125:16
131:14
**Glen** 121:2
128:13 138:24
173:2 174:15
181:4,18,25
**go** 8:14 10:4,11
17:25 18:17,25
19:10 21:1,5,7
22:1,14 37:4
39:16,20 43:23
44:14 46:6,10
46:16 50:14
51:19 55:9
56:23,25 57:1,7
57:12 59:15
60:1 65:6 68:22
70:1,10 71:25
72:4,5 73:14,20
75:18 76:7 84:1
86:4,11 87:12
88:24 89:1
90:13 95:25
96:20 97:5,9
103:22 105:3
105:16 145:8
146:14 148:15
148:21 154:23

157:8 161:4
171:6,6 175:14
176:18 177:15
187:9 191:3
194:21 195:14
**goal** 79:13,17,20
79:25 80:8,14
**goatee** 112:15
**goes** 165:11
**going** 15:21,25
16:25 18:1,2,4
18:22 19:15
26:6 29:10
43:21 45:3,23
46:6,14,16,19
47:13 52:24
57:15 58:20
59:7 60:6 61:21
65:8,11,13
67:12,15 73:18
77:12 83:24
84:12 86:3
93:18,19 94:5,6
95:1 96:6
107:12 113:4
117:7 125:11
127:15 131:1
135:25 138:25
141:14,25
142:16,16,18
146:5 147:15
154:11 156:7
157:15 160:18
161:5 163:12
185:6,10,12
192:4 194:8,14
194:15,22
195:6,17,20,21
195:24 209:23
209:24 211:7
**Gomez** 27:19,20
27:22 160:14
160:20,21,24
161:7 188:4
191:13
**good** 9:9,15
49:15 63:7

104:9 121:10
139:22 156:16
171:24 187:7
213:10
**gotten** 169:3
179:5
**GPS** 115:4
**grabbed** 214:19
**graduate** 20:22
26:19
**graduated** 15:22
16:17
**graduating** 16:1
**Graf** 107:5
**grandson** 90:3
**great** 213:5
**green** 59:13
**Grossman** 5:9
8:6 76:7
**ground** 10:5
**group** 19:4 101:4
108:3 118:1
122:13
**grown** 133:25
209:4
**guess** 17:11
34:13 37:22
50:20 61:23
103:1 117:5
153:18 161:5
178:5 182:25
197:16 205:1
211:4
**guidance** 102:14
154:7
**guidelines** 35:8
**guilty** 203:25
204:1,5,11,20
**guy** 71:12 90:8
92:5 112:15
151:6 152:11
153:8 159:5
**guys** 12:12 72:5
121:25

――――――
**H**

**hair** 112:16

CHRISTOPHER PARTIN  2/8/2017

Hake 107:5
half 63:8,12,20
  63:24,25 64:10
  104:10
Hall 5:4 8:10
Hamilton 5:10
  8:6
hand 29:11 65:10
  77:12 130:18
  160:19 214:20
  214:22
handcuffs 71:25
handed 125:19
  130:19,24
  167:2,6 184:22
  185:10,12,15
handling 100:3
hanging 90:12
happen 10:10
  22:5 46:14
  48:10 50:10
  73:18 87:11
  88:3 92:4 98:3
  101:25 103:2
  135:2 146:18
  146:20 147:6
  147:10 149:5
  194:16,22
happened 16:15
  20:2 23:4 42:5
  44:6 48:24
  50:17 53:16
  61:15,17 71:6,9
  71:17,20,23
  85:3 89:13 90:4
  90:6,18 96:8
  101:15 105:25
  122:15,18
  125:6,24 139:9
  154:8 168:6,11
  175:1 176:4
  189:2 195:19
  195:23 210:15
happening 91:2
  133:19
happens 10:11
  85:3,14,21

harassed 182:4
harassing 123:20
hard 14:18
  ■■■■ 123:6
  124:24,25
  182:4,6
head 52:4 80:23
  117:13 125:15
  132:2 135:15
  175:25 176:4
  178:19 196:14
  208:8 210:17
headache 69:25
headed 196:15
heading 198:16
health 183:13
  184:2
hear 60:8 92:10
  97:2
heard 17:7 93:15
  93:17 94:1
  105:8 118:3
  125:25 127:25
  137:11,16,18
  142:19 184:11
  184:15 195:22
  198:19
hearing 17:11
  107:20 194:24
hearsay 152:6
height 112:20
  177:23 178:9
held 7:21 87:18
  87:22
help 40:3 48:6
  78:19 90:5
  102:23 112:17
  126:5
hereto 217:20
hey 84:13 85:10
  88:18 89:3 92:5
  145:7 147:14
he'll 147:1
hidden 117:1
high 15:22,24
  16:1
higher 57:5,11

hire 34:23
hired 16:25 17:1
  17:3,8,17,19,20
  17:21,22,25
  18:8,13,15,22
  18:24 19:2,19
  19:20
history 109:12
hit 125:15
hold 18:9 92:13
  92:14
holds 116:21
Holland 2:4,6,8
  5:9 8:3,4,14 9:8
  14:11 17:6,10
  17:13 29:14,22
  31:12,21 33:23
  36:3,7 37:3
  39:17 40:8 41:6
  41:13 42:14,23
  43:1,4 44:16
  53:7 55:13,16
  55:22 59:23
  60:2,14,18 64:2
  66:7,12,23 69:9
  70:16 76:9,20
  76:23 77:1,7,10
  77:12,16 78:12
  78:20,25 80:6
  80:18 84:18,25
  94:19,22 96:3
  96:14 97:4 98:2
  103:25 104:7
  104:13,19
  105:6,9,12
  106:9 107:2,9
  117:7 118:8
  119:14,21
  126:20,23
  127:2 130:1
  144:8,14
  145:18 146:16
  149:17 151:18
  152:1,9,18
  153:6 154:2
  155:9,12,15,20
  157:9 158:11

159:22 160:2
160:10,16
165:2 168:8,17
169:14,18
170:5,17
171:10 172:1
174:19 175:22
178:14,20,22
180:6,23
181:14 182:11
182:17 183:15
183:17,20
184:19 186:2
187:14,24
188:17 189:10
189:17 190:3
190:12,20
192:15 194:18
195:2,8 196:23
200:2,6,10,19
200:25 201:7
202:21 203:5,9
203:15 205:6
205:15 206:8
206:24 207:2,8
207:11,15,17
208:3,11,20
209:2,7 210:9
211:12 214:3,8
214:12 215:16
216:2
home 16:2 21:8
  34:22 54:15
  70:5,25 71:5
  97:17 114:3
  132:10,13
  139:4 140:14
  161:12
honestly 194:15
honor 197:1
honored 200:23
hope 44:2
hopes 195:25
hospital 176:18
hour 19:10 55:16
  104:10 160:3
hours 12:20 16:3

46:13 70:3 86:6
86:11 87:15,19
house 53:19
  64:22 68:14,17
  71:11,12,14,15
  128:9,16 134:9
houses 130:15
Hughes 2:5,7 6:2
  8:17,18 11:7
  12:10,14 13:8
  14:8,16 17:5,7
  17:11 29:17,18
  31:12,18 33:21
  36:1,5,25 39:15
  39:19 40:20,25
  41:4,8 42:11,20
  42:25 43:3
  44:13 53:3
  55:15 59:21,25
  63:22 66:1,10
  66:18 69:6 70:8
  76:8,19,22,24
  77:2,5,8,11
  78:11,13,15,18
  78:21,24 79:23
  80:15 94:17
  95:24 96:11,19
  97:22 103:20
  104:11 105:4,7
  105:11 106:24
  117:5 118:7
  126:18,21,25
  129:24 144:4,9
  144:13 145:16
  146:13 149:15
  152:3,16,21,25
  153:23 155:6
  155:11,13
  157:6 158:8
  159:25 160:12
  160:18 165:3
  168:9,19
  169:15,23
  170:7,19
  171:14 172:3
  178:15,17,24
  180:9,25

CHRISTOPHER PARTIN  2/8/2017

181:15 182:12
182:20 183:19
183:22 186:8
187:17 188:1
189:11,18
190:5,14,21
192:17 194:19
194:20 195:4
195:12 196:24
200:4,7,12,20
201:2,8 202:24
203:6,10,16
206:9,25 207:5
207:9,12,19
208:4,14,22
209:9,11
210:11 211:3,8
212:10 214:6
214:14 215:13
216:3,16
**huh** 104:12
**hurt** 92:3
**hypothetical**
50:23 60:5
**Hypothetically**
114:17
**hypotheticals**
89:12

**I**
**ID** 150:16
**idea** 57:24 83:3
153:10 163:11
**identification**
29:13 31:11
74:10 76:6
77:15 119:20
150:10 151:1
151:25 155:19
**identified** 50:18
71:20 73:6,8,10
73:10 74:2,4
111:19 125:22
131:3 143:13
167:23 169:10
181:17
**identify** 73:22

114:18,21
**identifying** 131:8
**ill** 199:13
**Illinois** 209:24
**imagine** 128:15
**immediate** 99:12
**immediately**
43:14 71:22
74:19 88:4
155:1
**impact** 108:4
**impacted** 95:17
**implemented**
25:18
**important** 10:15
**impress** 180:21
**improper** 92:13
**improve** 97:1
**inaccurate**
166:24
**inactivate** 58:16
**inactive** 92:22,25
**inappropriate**
102:9
**incident** 48:16,17
48:20 52:19
56:18 71:8
72:18 82:23
119:16 120:1
128:4 132:16
136:10 143:1
153:16 157:2,5
157:11,13,21
168:11 182:23
184:15 195:19
198:19
**incidents** 121:4
**include** 29:3
106:24 157:4
**included** 29:5
**inconvenienced**
192:24 193:2,3
**incriminate**
196:21 197:1
200:23
**indefinitely**
113:14

**independent**
49:1 61:14
142:3 169:6,6
177:5
**independently**
112:6 113:1
**INDEX** 2:1
**indicate** 120:15
157:1 176:16
**indicated** 136:2
162:3 165:12
205:11 206:16
**indicates** 172:4
172:21 177:19
193:12 197:9
205:5 213:22
213:24
**indicating**
128:16 201:16
**indication**
156:16
**indifferent**
199:17
**individual** 20:19
85:7 88:2 89:14
89:20 90:18
111:13 136:13
189:25
**individuals** 87:21
123:7,13
148:17 150:23
150:25
**infer** 83:9,16
**information** 22:3
52:3 53:24
58:11 83:22
108:11 109:16
110:1,25 111:1
111:10,15
112:7,22 113:4
113:6 114:13
115:11 116:7
116:21 117:1,2
120:8,10 131:9
138:4 141:23
173:18,20
177:22 178:1,5

179:9,21,22,25
201:10 202:6
205:16,25
**informed** 33:18
197:16 210:23
**initial** 175:13
**initially** 168:21
169:5 172:20
**initiated** 73:4
**injury** 131:21,23
174:19 175:21
175:24
**inlets** 116:20
**inside** 125:24
**insisting** 149:24
**inspection** 19:7
**instance** 61:12
65:7 75:5,7
80:3,21,22
82:11 89:25
92:3 102:7,12
103:18 104:4
105:2 139:2
144:20
**instances** 64:12
72:17 85:2,8
86:19 87:17
88:9 89:22
90:17 104:22
139:1 150:13
**instructed** 37:5
**instructor**
180:22
**instructors** 26:3
35:13 93:22
94:23 95:23
96:4
**instructs** 11:9
**intake** 68:23
146:24 147:1,3
147:25 148:15
**intend** 196:18
**interaction** 71:23
118:2 143:18
198:23 199:1
**interactions**
15:16 55:25

141:9 142:11
159:19
**interest** 65:23
66:15
**interested** 50:21
76:13 217:21
**interesting** 214:8
**interject** 43:2
**interrogatories**
9:4
**interrupt** 40:15
195:2
**interrupted**
195:15
**intervention** 25:1
**interviewed**
74:18
**introduce** 8:2,8
**introduced** 8:16
**investigate** 21:18
165:8 170:16
170:22 185:11
**investigating**
90:9
**investigation**
19:25 28:14
44:19,23 52:9
52:19 58:7,14
64:9 102:25
122:3 126:5,9
175:18 199:2
**Investigative**
120:8
**invoke** 142:14
147:15
**involve** 34:15
48:18
**involved** 42:3,6
42:16 51:21
56:3,22 59:7
83:8,15 122:20
122:22 132:15
137:2 148:17
151:4 153:15
205:1,10
**involvement** 23:3
56:21

CHRISTOPHER PARTIN   2/8/2017

involving 56:1
in-class 35:4
in-classroom 26:5
in-service 24:23
   97:25 98:5,10
   98:18 99:21
Iraq 15:25
issue 34:10,12
   39:4 43:10,20
   43:22 44:7,10
   44:17 45:3,18
   45:23 47:15
   49:7 55:9 58:9
   62:23 63:4 64:5
   65:24 75:2,4,11
   124:5,6,12,14
   126:7 135:6,10
   135:19 137:7
   137:19 145:5
   145:14 158:2
   158:19 187:22
   188:13 189:13
   189:19,24
   200:8
issued 3:4 13:1,5
   40:11 43:5
   52:21,21 71:1,3
   72:11,21 74:10
   93:13 97:19
   117:9 137:22
   146:23 155:17
   155:25 189:2,7
   189:13 191:7
   197:19 199:4
   200:23 203:7
   209:16,17,19
issues 55:6,8 91:1
   123:18 124:7
   148:18 149:9
   181:24 183:13
   184:2 186:17
   207:22,25
issuing 47:11
   60:10 61:25
   66:13 74:25
   100:8 104:3

107:22,23
   144:16 198:3
Item 179:16
iteration 76:11
iterations 76:3
   76:12
I's 138:3

—— J ——
jail 112:11
   193:14
jailed 197:24
Janet 123:4,15
   123:17 124:4
   125:7 127:17
   128:17 163:23
   169:3 174:11
   179:10 181:17
   204:6 210:12
Janet's 127:25
January 25:14
   27:15
██████ 123:5
   124:23,25
   127:6 182:4
Jefferson 74:12
   74:17 114:6,8
   154:15 193:25
   194:2,4
job 18:4 35:16
   38:18,22,24
   92:11 127:15
   130:21 133:4,8
   133:21 143:4
   185:8,9 186:7
   187:8
John 44:24,25
   48:9,11 50:8,23
   50:24 51:1,23
   53:10,11,12,22
   67:8,9,10,11,14
   67:17,18 91:25
   110:15 114:5
joined 16:20
Jon 1:7 4:7 8:20
   15:11
Jonathan 5:10

8:6,15,18
Joseph 23:12
Joyce 202:17
   203:2,12
   205:17 213:18
judge 72:6
judgment 82:13
   187:18
July 2:10 29:23
   30:9,10,15 32:3
   32:6 33:10,19
   34:3,16 35:11
   36:9,24 38:3
   40:10 95:7,11
   95:21 96:9
   97:15
justice 85:20
   93:13 126:10
   144:6 148:25
   149:3,7 150:1,6
   158:6,16
   198:15
juvenile 182:5
jwall@paulwei...
   5:14

—— K ——
Kansas 209:24
Kanteres 107:6
keep 43:10 52:6
   52:8,18 96:24
   144:25
keeping 146:8
Kelly 202:18
   203:2,12
   205:18 213:18
kept 86:24
   142:13,15
   186:7
Kevin 8:19
kid 126:4,10
kids 88:23
   123:20 124:8
   125:8 127:19
   128:21 129:12
   164:1,5 186:16
killed 106:25

Killian 107:7
kind 20:9 21:14
   21:17 22:5 26:6
   56:7,14 68:24
   100:22 112:19
   127:18 143:16
kinds 145:14
knew 37:14,19
   46:14 53:17
   73:8 74:2,3,15
   83:1 89:22 90:1
   90:4,8,10,11
   129:23 139:3
   180:19 188:15
   188:22
knock 54:18
   64:22,23 68:17
   139:4 140:16
   177:11
knocked 130:14
   170:10
knocking 132:5
   171:1
know 9:18 10:1
   10:18,20 14:24
   15:2 22:2 27:24
   28:1 29:16 31:5
   32:14 35:3,11
   36:1 37:12 40:6
   41:9 44:8 46:24
   47:10,23 53:17
   57:24 58:4,7
   59:8,11 61:12
   62:9 63:5,6,17
   64:20,21,21,23
   65:4,6,7,11,12
   67:11 68:3 69:6
   69:24 70:21,23
   71:25 73:17
   81:3,5 83:1,9
   84:14 85:9 86:8
   86:19 88:11
   89:22 90:5,10
   90:23 91:1,8,16
   91:25 92:4 93:1
   96:5 100:6
   101:23 102:20

107:1 110:23
   110:24 111:7,8
   112:5,14,16,16
   113:8,11 114:1
   114:5,22 115:6
   115:15 116:8
   117:12,14,21
   130:2,5 136:12
   136:24,25
   137:24 138:1,3
   138:7 140:4,6
   151:4,6 153:15
   155:4 159:12
   161:4 163:23
   164:18 166:11
   166:14,17
   167:5,5,13
   171:19 172:16
   173:24 174:6
   174:25 175:12
   175:22 176:7,7
   176:16 180:11
   180:25 183:13
   183:24 184:3,6
   187:19 188:6
   189:6 190:16
   190:16 191:24
   192:4 197:8
   199:2,3 201:14
   204:2,7,19
   205:6,21,23,23
   205:24 206:5
   207:17,24
   208:16,23
   210:20 212:21
   213:18,20,23
   213:24 216:11
knowing 63:20
   74:14
knowledge 61:11
   81:20 121:8
   137:23 174:5
   208:15,17,21
known 54:16
   91:22,23 92:1,1
   179:4 193:7
knows 102:23

**CHRISTOPHER PARTIN   2/8/2017**

145:7
Koeller 27:17

**L**

lady 74:13
  207:21 208:18
  ████████ 122:20
  123:5,22
  124:22 125:3
  125:19 127:5
  127:23 130:17
  130:24 131:1
  161:20,22,25
  162:10 164:6
  167:2,5,10,24
  169:11 181:25
  182:5,6 184:21
  185:16,17,19
  185:22 214:25
  215:3
  ████████ 184:10
land 166:18,19
language 36:18
  37:6,10,23,24
  38:2,13 99:4
  212:17,20,22
  213:4,9,10
larceny 127:20
  141:24 202:8
larger 91:3,6,13
  117:21 150:23
  150:24 151:4
lastly 11:4
late 142:18
Latoya 123:5,11
  123:19 181:24
  182:7,14
  184:10
Laura 8:19 14:22
law 25:13,17
  26:1 37:17 61:7
  94:7,7 95:2
  98:22 126:14
lawful 9:1
lawn 184:12
laws 98:19

lawsuit 151:17
  152:5,24 153:1
  153:5 161:1
lawyer 141:13
  143:16
lead 191:14
leading 32:6
  192:21
leads 52:15,16,19
learn 13:12 25:9
  26:7 53:25
  60:24 132:14
  155:2
learning 20:8
  50:4,4 101:22
leave 92:14 165:1
leaving 90:1,9
  145:2 198:15
led 93:7 122:11
  122:11
left 27:18 128:18
  149:11,13
legal 7:24 11:13
  11:16
leisure 10:25
lengthy 22:15
lesser 57:1,4,11
letter 3:3 151:13
  151:19,21
  152:7,10,14,20
  152:22 153:1,3
  153:7,13,15,16
  153:19 154:4
lettering 37:25
  173:19
let's 10:4,9 14:12
  18:19 29:9
  32:23,23 40:9
  102:11 104:23
  117:17,17
  119:14 134:11
  136:7 139:18
  148:3 151:18
  155:16 163:10
  166:18 171:2,2
  171:3,6,6 181:1
  193:17 198:17

203:11 205:18
  205:20
level 25:9 103:8
license 71:10,19
  83:3 109:8
  114:7 138:12
  178:5
lied 74:6
lieutenant 27:7
  27:17,19,20,22
  106:16 136:20
lieutenants 27:9
  39:25 50:2
  159:11
life 52:9 207:25
limitations 86:22
limited 109:15,15
  157:4
limits 84:10
Lindbergh 71:9
line 74:1 120:8
  133:12 166:18
  166:19 171:7
  173:19
lines 121:17
  156:15
list 176:12,23
listed 121:1,15
  174:10 179:10
  191:14
listen 168:25
lists 173:5 176:25
litigation 4:14
  6:8,14 7:22,25
  13:22 14:1,7
  15:5,8 28:12
little 16:2 21:19
  22:16 36:16
  42:12 90:24
  120:13 132:3
  157:15 161:5
  183:7
live 64:20 71:5
  114:7
lived 53:18 114:4
  114:5 115:22
  128:10 139:3

lives 53:25 88:23
LLP 5:11
locate 128:4
located 128:8
location 119:8
  121:2
locker 19:6
Locust 5:5
long 12:18 16:12
  52:14,18 68:12
  86:24 113:8,11
  117:14 118:18
longer 18:17,24
  18:24 26:12
  43:19 64:25
  86:25 87:22
look 21:18 29:9
  29:15 30:11
  31:14 32:23
  36:17 45:8
  53:19 59:10
  81:11 99:3
  110:9,25
  119:14 122:25
  128:24 131:4
  131:21 133:9
  139:18 140:3
  145:25 151:18
  152:19 155:16
  171:3,3 211:20
looked 19:9
  154:6 170:10
looking 39:17
  76:11 77:3 78:5
  83:2,4 112:14
  113:4,5 114:5
  114:23 115:8
  127:4 151:3
  152:10 165:21
  174:23,24
  180:4 207:18
  213:17
looks 120:14
  135:9
loss 79:4
lot 19:3 21:16
  34:21,24 61:10

89:10 109:17
  116:12 155:22
Louis 4:15 5:6
  6:2,9,15 7:22
  8:21 13:18 15:3
  16:21,23 18:5
  20:12 22:7,12
  24:19 32:11,12
  35:14 37:14,16
  37:18 54:12
  82:1,3,5 96:7
  109:5 111:5
  112:11 138:16
  149:8 157:17
  166:5 173:2
  193:13 203:20
lower 29:24 30:2
  76:14
lunch 19:11
  104:10 106:10
  117:5
lunchbox 19:5

**M**

machine 7:5
maintain 52:14
maintains 111:6
making 163:4,8
  209:5
male 110:15
malice 199:8
man 186:6
  205:22
management
  77:22 139:20
manner 22:15
  125:13
Manufacturer
  179:18
March 2:21
  16:11 17:2,18
  18:20 24:14
  77:17 93:10
  95:12
marijuana 75:13
mark 75:25
  132:2 175:6

**CHRISTOPHER PARTIN   2/8/2017**

210:17
**marked** 29:12
   31:10 76:5
   77:14 119:19
   151:24 155:18
   171:4
**marking** 29:11
   31:7 76:1 77:16
   119:16
**marks** 127:8
**matches** 61:13
**matching** 71:18
**materials** 22:8,13
   35:7 98:14
**matter** 7:17
   22:25 48:22,22
   65:24 135:8
   195:22
**maximum** 87:1,3
**McWilliams**
   27:18
**mean** 14:8 19:24
   29:6 37:2,23
   39:13 41:8 42:7
   42:22 45:12
   46:10 52:21,23
   53:4 54:15 67:8
   68:5,18 69:23
   70:1,2 74:13
   81:15,16 83:5
   83:17 85:19
   89:2,24 90:4
   96:23 113:1,1
   114:1,4,8 115:7
   115:9,11,14
   116:23 126:4,6
   126:17 127:11
   131:16,23
   132:3 134:17
   134:18,22
   135:17 138:11
   138:23 143:15
   146:24 152:25
   152:25 156:22
   173:23 174:7
   183:11 192:19
   193:25 195:16

196:12 213:7
**meaning** 150:14
**means** 10:16 37:9
   75:8 147:3
   151:7,11,14
   152:11,15
   153:8,11 159:5
   197:17 217:12
**meant** 198:6
**medical** 173:22
**medically** 9:21
**meet** 12:18 68:9
   104:2 148:25
   149:6
**meeting** 103:16
   156:1
**meetings** 12:10
   12:13,23 13:7
**members** 136:14
**mental** 183:13
   184:2 207:22
   207:25
**mentally** 206:18
**mentioned** 13:10
   28:23 32:25
   33:17 56:2
   64:15 82:17
   88:9 90:21
   92:18 106:11
   106:15 136:13
   167:1 175:3,8
   178:6 206:13
**mentions** 190:16
**mercy** 20:1
**mere** 190:18
**Merit** 4:18 217:3
**message** 141:12
**messing** 124:20
**met** 158:5,15
   210:12
**mhughes2@stl...**
   6:4
**Michael** 6:2
**middle** 49:3
   76:20,22
   131:21 213:21
**midnights** 88:20

88:25
**Midwest** 4:14 6:8
   6:14 7:22,25
**Mike** 8:18 42:23
   53:7 76:7 78:25
   104:7 117:7
   207:2
**miles** 95:4
**mine** 11:2 78:14
   122:16
**minor** 158:19
   161:13,20
**minutes** 72:9
   80:19 119:18
   145:21 160:4
   165:15,18,22
   168:6
**missed** 63:13
**Missouri** 1:2 4:2
   4:16,20 7:20,22
   173:3 217:7
**misstates** 63:24
**misstating** 33:21
**mistake** 158:15
   216:8
**MO** 4:17 5:6 6:3
   6:9,14,15 217:6
**Mobile** 116:19
**moment** 54:10
   86:25 87:23
**money** 74:14
**month** 74:11
   142:17 189:1
   194:23 195:1
   195:16,18
**months** 16:14
   18:10 19:18
   20:4 24:15,16
   28:5 30:22 32:5
   32:20 95:12
   112:13
**morning** 9:9,15
   12:11,14
   118:10,11,21
   120:15 161:13
   162:21 210:16
   210:21

**mouth** 41:10
**move** 102:5
   209:14
**moved** 206:19
   208:17,18
**moving** 209:23
**mug** 112:12,21
**MULES** 116:3,5
   116:9,21 117:3
   117:15
**multiple** 17:24
   69:7 108:23
   130:17,19
   146:2 148:25
**municipal**
   203:20 204:23
   205:2 206:5
**municipalities**
   18:6 32:13
**Murder** 57:6

_____

**N**

**N** 5:1 7:11
**name** 7:23,23 8:3
   8:9,11 9:10,13
   23:13,18 74:14
   81:12,23 85:9
   85:15,17 89:15
   90:7 97:12
   99:16 101:8
   110:4,6,17,18
   111:14 113:21
   113:23,24,25
   113:25 118:3
   121:17 136:14
   136:17 151:8
   159:15,18
   176:13 177:19
**named** 15:4,8,17
**names** 93:23
   106:19 107:24
   108:1 123:1
   164:4
**narrative** 99:17
   127:7 132:21
   133:11 139:25
   140:1 181:2

211:21
**nationwide** 96:7
**nature** 172:4
   211:4,15
**NCIC** 117:15
**near** 157:25
**nearby** 177:3
**necessarily** 81:15
**necessary** 65:1
   86:25 87:23
**need** 42:18 45:17
   51:23 54:6 63:1
   63:17 67:25
   68:19,21 69:23
   80:4 88:6
   102:25 134:23
   146:18 153:21
   176:18 197:18
**needed** 25:9
   54:23 62:1
**needle** 92:8,9
**needs** 48:10
   68:10
**negative** 28:20
**neighbor** 48:14
   53:23 90:2
   124:11 128:4
   161:14 162:1
   162:11,19,25
   206:18,18
**neighborhood**
   179:25 180:3
**neighborly**
   127:18,19,20
   164:25 170:14
   178:21 208:9
**neighbors** 123:18
   132:18 148:19
**neither** 211:21
   217:15
**never** 13:24 32:6
   50:8 68:3 71:25
   73:17 90:15
   94:21 105:22
   114:4 118:3
   137:20 141:6,7
   152:23 158:18

**CHRISTOPHER PARTIN   2/8/2017**

175:1 195:23
212:23
**new** 5:12,17
21:20 26:7 34:6
35:19 43:16
50:3 97:8
101:22 155:2
**night** 13:2,3,4
55:9 65:14
115:12 154:24
156:6,8,20
187:5,23
194:15 195:17
195:25 201:4
**Nods** 135:15
**non-talkative**
169:12,17
170:4
**Norberg** 107:6
**normal** 159:10
**normally** 140:24
**North** 4:15 6:9
6:15 89:9 118:5
147:22 154:23
203:20
**Notary** 4:19 7:6
217:6
**noted** 135:16
152:9
**notes** 13:2,25
14:19 52:4,5,6
52:8,11,14,18
**notice** 146:10
205:22
**noticed** 37:6
**notification**
202:6
**notified** 152:24
153:4 175:14
196:10 204:3,7
204:10,13,16
204:17
**November** 3:1
23:5 24:3 118:3
118:10 136:8
137:14 141:7
142:8,9 147:20

149:20 151:15
151:20 152:15
153:9,19 154:4
155:4 156:9,10
157:13 159:12
159:14 161:13
195:18 198:19
207:21 210:12
**number** 7:18
76:4 111:17
131:5,20
140:22,25
141:3 160:17
166:12,15,18
166:19 167:10
167:11,14
201:10,14,15
**numbered** 2:14
2:18,20,22,24
**numbers** 29:24
30:2 53:20
109:22 119:17
155:21 201:16
201:18
**numeral** 78:11
78:12,21 79:1
**numerous** 71:11
71:12 74:15
75:5 186:7
188:18 195:23
200:17
**NY** 5:12,17

_____
**O**

**O** 7:11
**oath** 10:14
**object** 11:7 36:25
42:11 53:3
63:23 66:2,2
69:7 70:8,9
95:24 96:12,19
149:15 152:3
155:6
**objected** 155:7
**objection** 11:8
31:18 40:21
41:10 44:13

59:21 60:1
63:22 64:2
66:18 79:23
80:15 96:11
97:22 103:20
129:24 144:9
145:16 146:13
152:9 153:23
155:13 157:6
165:2 168:8,17
169:14,18
170:5,17
171:10 178:14
178:22 180:6
180:23 181:14
182:11,17
183:15,18,20
186:2 187:14
187:24 189:10
189:17 190:3
190:12,20
192:15,19
196:23 197:7
200:2,10,19,25
201:7 202:21
203:5,9,15
206:8,24
207:16 208:3
208:11,20
209:7 214:12
**obligated** 165:6
**obligation**
170:22
**obligations** 20:6
**observed** 49:3
129:1,3 212:1,3
**obtain** 47:14
54:21
**obtained** 140:21
**obtaining** 45:4
63:2
**obvious** 39:15
188:22
**obviously** 28:23
149:16
**occasions** 146:2,4
148:25

**occupants** 73:5
**occur** 79:5
**occurred** 120:10
120:13
**occurs** 44:1
**October** 28:6
**offense** 44:12,20
45:1 157:16,21
157:24 189:20
**offenses** 132:24
**offered** 145:12
145:15
**offering** 146:12
**office** 6:2 44:9
45:4,6,7,12,13
45:16,16,24,25
46:12,17,24
47:3,14,20
54:22,25 55:1,2
55:4,12 56:2,3
56:7,8,10,20,23
56:24 57:1,2,8
57:12,13 58:20
58:21 60:6,7
61:22,22,24,25
62:11,12 63:3,4
64:7 74:21 75:7
75:10,21,22
107:13
**officer** 7:16 9:9
9:12,15 15:1,2
16:24 17:17
18:13,14,15,24
19:19,21 20:18
21:12 22:1
23:20 24:6
25:24 26:13,21
28:9,17 29:18
38:3,5,6,13,18
38:22,23,24
39:9 48:2 52:1
55:23 69:19
73:17 76:13
77:25 79:21
80:12 82:14
85:1,14,23,24
86:4,17 88:1,1

88:10,11 89:9
89:16,19 90:14
90:19 91:24
92:5,14,21 93:2
99:9,14 104:20
106:10 111:17
118:22,23
122:12 135:4
135:12,17
136:19 137:6
145:20 154:3
158:12,14,18
159:7,8,16
160:13 161:1
165:4 166:4
168:16 170:15
170:21 173:10
173:13,14
180:11 181:3
187:8 190:25
191:2,6,10,21
192:2 197:9,10
197:12,14,15
197:16,19
204:24 208:6
210:6 216:19
**officers** 13:18
14:14 32:12,15
35:14,20 36:9
47:7,22 54:12
56:14,15 57:19
58:19 60:7
62:10,21 71:11
73:25 79:5 86:7
88:6 90:4,22
91:8,12,16
94:14 100:18
100:19 101:2,4
106:11,20,21
106:22,22
107:3,10,20,20
117:20 120:11
121:13,21
138:11 149:9
150:22 159:10
171:22 173:6
189:24 190:17

**CHRISTOPHER PARTIN    2/8/2017**

officer's 70:14
80:25 85:9
89:15
offices 4:14
57:16
official 8:20
oh 8:17 78:23
103:21 106:25
160:14 176:13
185:21 194:6
209:1
okay 8:18 10:3
10:22 11:11,23
12:4,22 14:3
15:20 16:8
17:15 23:10
25:21 27:25
30:9 32:1,23
33:15 40:9 41:8
42:25 43:3 50:6
52:25 54:5,9
65:9,12 67:10
67:11 70:10
72:2 77:1,9
78:2,6,8 84:19
104:7,11 106:3
106:3 107:1
108:7 110:21
114:23 117:14
119:14 123:3
126:20 132:5
134:2 135:8
140:7 144:9
151:6 161:4,22
162:13,18,24
164:8,17
165:11 168:20
168:24 170:8
170:20,25,25
171:15 172:11
172:20 173:17
173:22 174:2,5
174:12 175:2
175:17 176:3
176:12,22,25
177:5 178:4,25
179:5,8,9,24

180:16,18
181:1 182:21
183:23 184:3
184:24 185:14
185:21 187:7
188:2 189:23
190:15 191:9
191:18 193:1,2
193:5,10 194:6
194:21 196:1
196:16 197:4
198:9,12,17
199:13 201:18
201:21 202:1,5
202:25 203:7
203:17 205:5
205:14 206:7
208:5,15
209:12,12
210:3 214:25
216:3,16
okayed 135:13
135:13
old 34:7 114:2
132:8
older 131:6
once 11:8 17:12
25:24 35:16
38:3 39:5 42:9
42:17,20 43:5,6
43:8,11,13
46:21 64:16
65:5 88:1 98:5
99:8,8,14 100:4
100:5 130:18
146:18 161:25
170:13 196:6
216:4
ones 39:23 90:24
109:1 116:16
116:17,17
151:3
ongoing 119:7
123:18 124:5,6
124:7,12,14
148:18 181:24
oOo 4:10 7:1,10

216:23
open 18:3 69:24
operate 93:19
operator 175:13
opinion 96:22
opportunity
10:21 42:5 44:4
44:5 45:9 46:3
48:2 54:24
56:17 58:2,22
59:14 69:1,14
80:11 83:10
84:13,16
142:23 144:17
199:3
opposed 55:10
74:24 91:8,18
150:1
opposite 104:24
oral 9:4
order 2:10,13,16
2:19,21 29:8,20
30:12,19,23
31:1,7,22,23
32:1,7 35:18,19
36:10 58:7 76:2
76:15 77:6,17
97:8,9 148:20
171:24 190:7
orders 22:14
30:6 32:9,16
34:5,24 35:3
96:23,24
ordinance 75:16
176:9
ordinary 206:15
207:25
original 3:6
153:5 160:20
originating 84:15
outside 35:8
126:1 128:9
outstanding
149:13,18
overbroad 70:9
overlooked 63:13
overworked

55:11
owner 179:9
o'clock 118:15
o0o 1:3 4:3 7:12
9:6

**P**

P 5:1,1 7:11
PA 58:9 64:7
page 2:2 9:20
29:10 36:17
37:7 76:10,13
76:17 78:3,7
99:4 131:19,21
133:9 135:24
139:21 161:7
173:17,19
177:15 191:15
193:10,11
211:4 213:21
paid 18:2
paper 214:1
paperwork 65:10
148:20
paragraph 161:7
161:11 162:18
164:18 166:3
188:3 189:12
189:23 190:15
191:9,18,25
193:11 196:16
197:7,8,19
198:2 203:18
204:22
paragraphs
197:24
paramedics
174:1 175:8,9
175:14,19
176:17
paraphernalia
75:12
parent 127:13
parents 124:9
132:10
park 154:18
parking 19:3

parole 109:21
part 63:1 95:21
96:12 101:21
135:20 175:17
particular 188:8
188:10
parties 217:17,20
Partin 1:11 4:12
7:17 8:19,25
9:9,12,15 52:1
55:23 80:12
85:1 104:20
106:10 119:16
145:20 154:3
160:13 161:2
166:4 171:4
191:10 197:9
197:15,19
201:9,21,24
202:15 204:25
210:6 216:19
Partin's 191:21
192:2
parts 51:20 120:6
party 59:6
144:17 181:17
212:21,25
party's 48:16,17
49:9
pass 57:23 58:2
83:22 160:10
passed 26:13
passenger 73:9
password 97:13
patrol 17:17 25:2
106:21,22
112:1 114:20
115:5 118:12
122:6,8 171:22
patrolling 72:24
134:19 194:1
Paul 5:11 8:4
PA's 45:7,12,16
45:24 47:3,14
47:19 54:22,25
55:4,11 56:2,24
57:1,7,12 58:20

**CHRISTOPHER PARTIN   2/8/2017**

60:6 61:22,24
62:11 75:7
**peace** 75:13
**pen** 59:11
**pending** 11:2
**people** 25:22,23
88:23 90:25
91:22,23 92:9
101:9 108:3,13
110:8 113:25
114:7,17,21
116:24 126:13
141:3 150:9,15
150:24 159:5
162:4 163:7,17
163:18 177:11
189:13
**people's** 178:8
**perfect** 71:9
**period** 54:20
87:19 89:18
**permitted** 79:6
101:25
**person** 10:7 26:2
38:4,6,9 42:3,6
42:10,16,18,21
42:21 43:7,8,22
43:25 44:2,3,11
44:20 45:8 46:6
47:12 48:21,21
49:2,3 53:9
54:2,6 58:10,21
66:6,11 67:24
68:9,14 69:5,11
69:21 71:15
72:16 73:14
81:6,10 83:17
84:16 85:3
86:15,18 87:18
87:24 88:8
89:22 99:10,13
99:16 109:24
110:14 112:11
112:14,20
113:20 114:14
114:23 126:3,9
136:3 141:1

146:9 162:6,9
163:8,20 168:2
177:6 187:10
187:13,13
**personal** 67:19
68:8 107:15
**personally** 46:7
46:24 47:2,3
**personnel** 121:16
**person's** 111:14
**perspective**
136:24
**perspectives**
126:14
**pertain** 99:1
**pertaining** 12:25
**pertinent** 32:12
**phase** 20:24,24
20:25 21:14,19
21:22,23 22:4
22:11,18,21
23:7,9,10,15,23
24:5,8 135:8
**phases** 20:20
21:11,13 22:5
**phone** 52:2 53:20
66:11 67:7,16
109:22 125:9
125:12,20
128:23 129:4
129:14,17,18
129:22,22
130:2,5,7,7,9
130:10,18,20
130:25 131:4,6
131:7,9 133:2,6
133:15 140:20
141:19 143:2
143:14 162:14
162:21 163:1
164:20,24
166:6,11,14,23
167:2,6,7,9,11
167:11,13
168:13 169:7
169:21,25
170:14,23

179:16 183:2
184:11,22
185:11,12,15
185:23 186:6
186:10,16
208:8 212:4,7,8
214:10,11,20
215:4,5,9,9,10
**photos** 112:12
**phrase** 119:1
**physical** 19:13
**pick** 84:12
**picked** 74:11
87:15 145:3
**piece** 214:1
**place** 25:8 33:8
34:1 43:10
68:11 101:18
114:2,6 119:9
144:25 186:5
**placed** 210:20
213:14
**places** 8:8
**Plaintiff** 1:5 4:5
**plaintiffs** 4:13
5:3 7:3 8:5
191:10
**plaintiff's** 206:14
**plate** 71:10 72:25
**plates** 71:19 73:7
83:3 109:8
**platoon** 27:5
**play** 121:22
**plays** 56:7
**plea** 203:25
204:1,5,10,19
**please** 8:1,23
9:11,18 10:20
60:15 195:2
**plenty** 134:23
**plus** 61:14
**PO** 158:9
**pocket** 92:7
**point** 9:17,25
10:16,24 35:23
40:12,16,17
41:16 44:10,19

44:23,25 48:10
49:6 50:6 51:2
63:10 65:2,25
69:25 85:21
87:2 88:3 89:19
104:9 119:2
127:17,23
129:21 132:19
134:24 142:2
143:9 144:3
145:1 149:14
149:25 167:3
168:24 169:2,9
180:18 186:21
187:19 205:14
**pointed** 174:18
175:23,24
211:3
**pointing** 207:4
**police** 2:24 12:25
16:4,10,12,17
16:21,24 17:20
17:21,22,24
18:14,15,24
19:19,20 20:4,9
20:18 24:15,19
24:20 25:21
26:12,19 28:13
28:24 32:12,17
34:21 35:14
37:15 38:18,22
38:23,24 43:18
54:12 67:21
70:20 77:25
93:19 94:13,18
95:3,3 96:6
100:14,18,24
101:6 107:21
108:5 117:19
119:15,25
120:18 126:11
149:8 156:17
158:12,14,18
159:7,8,10
162:19 165:22
166:5 170:15
170:20 171:3

181:3 189:24
190:17 208:5
**policies** 25:10
32:16 33:1,6
35:5 95:16
**policy** 20:12 22:7
22:11 25:12
29:4,6 30:6
33:9,10,12,18
34:2,4,6,7,17
34:19,19,20
35:11,24 36:10
36:14,15,21,24
37:7,8,11,12,13
37:13,14,19,20
38:1,3,16,19
39:2,4,9 40:10
54:23 62:7,9,17
67:19 77:22
95:7,21 96:8
98:14 99:22
100:4,5 101:18
102:1,10,11
103:15 104:1
135:21
**popped** 115:14
**populates** 109:8
**portion** 157:17
**position** 17:16
73:20
**positive** 74:9
**possession** 71:13
130:10
**possibility** 84:7
112:17 150:4
215:8
**possible** 108:6,6
158:22 196:9
**possibly** 21:2
87:10 93:4
113:14 166:15
**potential** 79:4
**potentially** 83:25
**pounder** 178:15
178:18
**pounds** 178:12
**practically**

CHRISTOPHER PARTIN   2/8/2017

193:25
**practice** 57:14,19
  60:8 62:16
  64:16 67:21
  68:8 73:13
  79:10 92:19
  107:11,21
**practices** 96:6
  108:5
**preceding** 183:21
**precinct** 16:19
  21:2,6,8 27:18
  88:14 89:7 91:3
  100:21,25
  106:12,12,20
  117:20 136:14
  148:2,6,11,14
  149:1,25 150:2
  150:7 151:9
  152:12 153:8
  156:2 191:21
  192:3,5 193:22
  194:5
**predated** 76:12
**prefer** 55:8 64:8
**preferred** 143:17
**preparation**
  206:12 207:6
**prepare** 12:8
  13:9 19:7 20:12
  197:4
**prepared** 152:7
**preprinted**
  201:15 205:7
**present** 8:1 63:6
  63:7,14 64:10
  66:16 182:14
  205:1
**presenting** 63:16
**presents** 65:8
**press** 126:3
**pressing** 55:5,8
**presumably** 93:2
  130:23
**presume** 132:22
**pretty** 22:15
  27:11 40:1

100:23 107:4
  112:25 116:22
  121:9 124:15
  139:17,22
  178:12
**previously** 79:25
  119:12 121:5
  121:18 153:13
**primary** 20:23
  22:1
**print** 217:13
**prior** 12:11,16
  30:23 35:24,25
  36:24 37:10,12
  37:17 49:16,18
  50:21 51:1
  53:12 54:1
  55:24 57:15
  65:20 66:13
  79:7 87:1 98:11
  100:8 101:13
  101:18 103:11
  103:11 107:23
  118:2 139:3,7
  139:13 205:25
  210:11
**private** 141:3
**probable** 33:8
  34:1,5 38:4,13
  41:20,22,23
  49:7,15 50:7,24
  51:7 58:12,15
  58:15 60:19,21
  61:1,9,10,16,20
  62:2,5,18,24
  64:14 66:21
  68:12 80:2 99:9
  103:9 104:25
  105:1,15,19,21
  131:22 141:23
  142:1 145:13
  174:19,22
  175:23 186:4
  187:4,9 188:11
  189:20 190:8
  190:22 199:24
  199:24 215:18

215:23
**probably** 12:16
  75:14 86:11
  114:7 134:15
  139:17,24
  185:25
**probation** 26:13
  26:16,18,21
  109:21
**probationary**
  26:12 159:7
**problem** 44:22
  137:10
**procedure** 20:12
  21:16 22:7,12
  179:24
**procedures**
  32:17 78:4
  174:6 205:24
**proceed** 8:24
  56:18 62:19
**process** 48:8 70:2
  81:23
**processed** 88:4
  147:4,10,25
  148:4 149:2
**processing** 38:8
  99:15
**produced** 4:12
  206:14
**professional** 68:4
**professor** 26:1
**program** 113:2,5
  113:7 116:25
**programs** 113:3
  116:11
**progress** 118:13
**promises** 141:15
  195:6
**property** 90:14
  133:13,16
  179:9,10,13,18
  185:3 186:11
  190:10
**propounded** 9:4
**prosecute** 174:3
  174:7,8

**prosecuting** 44:9
  45:13 46:11,21
  55:1,2 56:19
  74:20 75:10,22
**prosecutor** 45:24
  47:2,14 202:20
  203:11 204:23
  205:3,24
  206:15
**prosecutors**
  54:22
**prosecutor's**
  45:4,15,25
  46:17,24 47:19
  56:1,8 63:3
  107:12
**provide** 25:23
  46:2
**provided** 24:20
  35:7 98:15
**providing** 52:3
  69:1,13
**PT** 19:13
**public** 4:19 7:6
  79:4 217:7
**publication**
  101:5
**published** 100:13
**pull** 68:16
**punch** 176:3
**punched** 175:25
  178:18 208:7
**punching** 211:23
**punish** 189:13
**punishing** 189:15
**punishment**
  87:23
**punitive** 199:11
**purpose** 41:25
  42:2,9,15 43:24
  47:25 48:4
  66:25 67:5
  68:25 91:5,15
  142:22 143:9
  144:2,16
  145:13 146:8
  156:4,24

189:14 190:2
**purposes** 47:13
  150:12
**pursuant** 68:15
  70:6 80:25
  86:15 87:22
  88:2,8 188:7
**pursue** 48:3 87:2
**pursuing** 54:21
  62:22 107:23
**put** 19:6 41:20
  51:23 58:12,13
  59:9 61:15 83:7
  83:14 84:9,10
  110:4,4,6,18
  133:24 134:11
  141:25 159:9
  163:10 174:22
  180:4 183:4
  201:18 202:13
  203:11 210:1
**puts** 11:8
**putting** 41:9
  135:5
**P-a-r-t-i-n** 9:14
**p.m** 19:24 106:7
  139:23 216:22
**P.O.S.T** 20:9

_____

**Q**

**quantity** 190:16
**quashed** 198:4,5
**Quentin** 27:17
**question** 9:17
  11:1,8,10 14:13
  22:17 37:1,4,22
  37:22 40:21,24
  42:24 43:2
  49:22 50:3,5
  51:12,12 53:4
  54:9 58:18
  59:24 60:15
  63:23 66:2,3,8
  80:7,13,16
  91:14 92:15
  103:1 105:5
  118:7 126:19

CHRISTOPHER PARTIN   2/8/2017

126:22 133:22
146:11 149:16
153:2,18,24
155:7,8,10,12
182:9 185:14
195:10,13,15
207:14 211:8
214:7,15
215:17
**questioned** 49:19
87:19 133:15
186:10
**questions** 9:17
21:17 35:2
39:22 51:10
88:2 159:23
160:1,14
169:20 184:20
196:18 210:7
215:14
**quick** 55:14
84:18 154:16
160:4
**quickly** 10:4
34:11 196:9,11
**quiet** 169:20
**Quinby** 4:16
6:13 7:5,23
217:3,25
**quit** 133:2
**quite** 50:1 102:21
113:1 123:1
**quote** 178:20

**R**

**R** 5:1 7:11
**race** 110:17
**radio** 21:25 52:2
120:9 171:7
**radius** 114:24
**rage** 71:8 82:23
147:14
**ran** 43:18 100:6
116:24
**random** 91:9
**range** 25:3 110:6
**rank** 26:10

118:23
**ranks** 159:4
**reached** 25:9
44:18,23
**reaction** 153:21
**read** 11:23 13:11
33:23 34:10,19
34:24 35:18
36:6,10 38:19
40:25 41:2
44:15 60:14,16
61:5,6 66:19,20
79:8 93:15
94:21 96:16,18
97:9 99:18
129:5,10
133:14,17
154:3 156:16
161:17 166:9
179:10 181:21
182:1 204:24
213:22 216:4
**reading** 34:23
38:16 39:2,22
97:17 110:23
131:12 156:19
**reads** 79:2,21
99:8
**realize** 10:17
**realized** 74:6
**really** 119:10
124:1 127:12
174:23,24
213:5
**Realtime** 4:18
217:4,6
**reask** 14:12 37:4
43:2 69:10
**reason** 9:21 17:9
43:1,9 49:22
55:2 60:22
69:20 74:6 93:3
101:4 105:21
112:5,23 127:5
156:24 192:11
205:7,8 206:16
209:22,25

**reasonable**
168:15,16
170:20
**reasonably** 61:11
**reasons** 45:22
64:5
**recall** 14:5,13,18
30:19 35:20
99:25 133:19
148:24 149:24
158:6,17
175:24 183:3
211:25 214:11
214:15
**receipt** 145:6,7
**receive** 48:8
99:13,20
101:19 196:1
**received** 28:20
33:1,16 34:14
120:14 145:6
146:11 171:7
171:21,22,23
196:6
**Recess** 55:19
84:22 106:6
160:7
**recognize** 29:17
30:4 77:19
85:15,17 88:10
89:15 91:17
119:22 155:23
179:1
**recollection**
122:24
**record** 7:14
10:14 11:9
23:18,23 29:23
55:18,21 60:16
66:20 84:21,24
96:18 104:15
104:16,18
106:5,8 151:23
152:3 160:6,9
216:18
**recording** 125:9
182:22,24

**records** 82:5
136:1 165:21
179:6
**record's** 9:10
**recruit** 17:20,21
17:22,24 18:22
19:2
**red** 73:2
**reduced** 217:13
**reference** 131:13
181:4,7,10
**referred** 131:17
178:20
**referring** 29:7
30:7 82:22
132:7 197:10
202:14
**refers** 211:23
**refresh** 26:7
**refuse** 192:3
**refused** 102:6,9
103:18 174:1
176:14 186:12
**regard** 13:25
14:6 182:13
**regarding** 14:14
14:19 15:8
91:13 169:25
209:15
**regardings**
169:21
**regards** 11:20
33:7,25 34:7
37:15 56:17
61:12 84:8
127:11,12
138:15
**regional** 108:11
209:20 210:4
**Registered** 4:18
217:3
**regular** 107:4
**regularly** 81:18
**reiterated** 196:17
**REJIS** 108:7,10
108:24 112:3,9
112:19,23

113:17 114:14
114:25 115:4
116:9,18,21
117:3 140:3
209:20
**REJIS's** 113:9
**relate** 94:9
**related** 33:5
61:19 86:23
96:10 101:5
217:16
**relating** 23:3
111:10 117:18
157:13
**relation** 128:13
**relationship**
132:15
**relative** 217:19
**relatively** 106:12
**release** 88:5
**released** 87:14
192:14 197:25
**relevance** 22:25
95:24 153:24
**rely** 158:19
**remain** 42:19
68:11 113:9,12
117:15 149:18
**remained** 126:8
**remember** 80:22
93:23,25 94:11
94:12 98:4,10
98:12,13,16,21
102:17 107:24
118:11 119:13
122:24 131:11
133:20 138:14
158:21,24
159:2,15,18
179:3 194:11
196:4 209:5,10
**remembered**
90:6
**remind** 97:18
**remotely** 83:12
**remove** 198:12
**removed** 113:13

**CHRISTOPHER PARTIN   2/8/2017**

113:16 154:25 198:11 215:4
**RENÉE** 4:16 6:13 7:5 217:3
**Renée** 7:23 217:25
**repeat** 44:21 45:20,20 47:8 60:12 79:15 91:10 96:1 103:23 105:4 129:9 144:11 144:12
**repeatedly** 145:21
**repeating** 80:16
**repetitive** 31:19 59:22 97:22 144:10 207:15
**rephrase** 9:19 41:1,5,7 42:14 44:17 53:8 102:3 105:7 144:11
**replaced** 31:2
**reply** 9:4
**report** 2:24 12:25 22:2 26:22 51:18,20 52:22 52:23 74:19 88:10 93:13 94:12,15,16,17 94:21,25 95:12 95:17 96:5 99:18 101:6,10 108:5 119:15 119:25 121:13 122:25 127:4 128:24 131:13 131:21 133:10 133:24,25 134:1 135:4,12 135:16 136:4,5 137:10 139:18 156:14,15,17 156:22 157:12 165:22 171:3

180:5 186:9 201:14,15,16 202:1,10,13,14 203:1 205:9,20 205:21 208:7 209:3,4,5,13 211:21,21,22 212:14 213:22 213:25
**reported** 26:24 26:25 27:1
**reporter** 3:7 4:17 4:17,18,19 6:12 7:6 8:23 10:6 10:14 41:2,12 60:16 66:20 96:18 217:1,4,4 217:5,5
**reporter's** 7:23
**reporting** 122:12 181:17 182:10 212:21,25
**reports** 34:10 137:1
**represent** 8:18 36:21
**represented** 11:4
**request** 38:6 99:15
**requested** 209:16
**requesting** 38:8 99:13 148:24
**requirements** 39:3 61:24 62:14 86:23
**requiring** 62:7
**reread** 41:12
**reside** 181:25
**residence** 138:23 138:24
**resides** 181:18
**resist** 92:1
**resisting** 75:9
**respond** 19:25 50:14,15 86:3 86:12 89:6 121:1,8 122:17

195:21 196:5
**responded** 74:17 89:25 118:13 119:11 120:11 121:4,10 122:9 154:13 165:12 168:5 181:3
**responding** 83:25 121:13 134:12 166:4
**responds** 85:23
**response** 93:3 142:10
**responsibilities** 20:6
**responsibility** 111:18
**rest** 19:12 197:8
**restraining** 148:19
**result** 79:13
**resulted** 85:7
**retained** 3:6
**retired** 26:1
**retract** 72:21
**return** 186:12,14
**returned** 73:11
**Revenue** 109:4 179:8
**reversed** 125:25
**review** 12:22 13:8 99:11 101:19 119:18 136:8,23 137:1 137:3 138:2
**reviewed** 12:24 103:7 135:12 136:4 137:10 137:24
**reviewing** 37:5
**revisit** 55:23
**Rickard** 23:17 107:6
**rid** 68:22
**Rifkind** 5:11
**rifleman's** 25:2
**right** 22:19,22

29:24 30:2,11 33:15 36:2 39:19 53:7,8 54:2 63:18 65:16,17 68:20 89:6 101:12 107:18 110:1 111:23 117:17 128:11,17 129:23 133:10 135:22 138:10 142:15,24 143:22,25 144:5,22,23 146:3 147:15 152:1 171:16 174:2 175:21 186:18 188:8 196:20 197:1,2 200:22 202:25 216:4,7
**rights** 5:16 8:13 199:17
**right-hand** 76:14
**RMR** 6:13 217:25
**road** 20:13 71:8 72:8 82:23 121:2 128:14 147:14 173:2 174:16
**robbery** 57:7
**Robertson** 121:21 122:3,7
**Robinson** 121:23
**role** 17:4 18:9,16 56:7 121:21 122:1 135:17 135:17
**roll** 89:1
**Rolla** 209:24
**Roman** 78:11,12 78:21 79:1
**room** 19:6 69:24 82:6 156:18
**ropes** 21:15 22:6
**roughly** 114:2

**roundabout** 73:20
**row** 139:21
**rule** 87:5,6,8
**rules** 10:5
**run** 33:13 49:20 102:19 116:19
**running** 21:24
**R-i-c-k-a-r-d** 23:19

---

**S**

**S** 5:1 6:3 7:11
**safety** 39:9 91:24 92:5
**said/she** 57:25
**sake** 9:10
**sat** 12:5
**saw** 48:23 72:24 73:2 106:1 126:1,6 128:22 129:13,18,18 130:6 184:15 207:9
**saying** 10:8 59:4 59:5,11,12 60:3 61:13 67:12 77:6 102:14 110:11 127:13 142:13,15 144:4,7 149:5 158:9,25 159:2 165:12 185:19 194:8,25 195:5 196:19 209:2 212:18 213:2,6
**says** 9:4 30:12 33:25 61:15 62:17 63:17,18 65:8 76:21 81:12,24 109:25 121:16 128:25 129:10 131:22 133:23 135:25 136:8 156:14 157:16 157:18 158:9

**CHRISTOPHER PARTIN  2/8/2017**

162:18 171:7
171:16,19
173:18 174:19
177:16 179:13
179:24,25
181:16 184:9
186:9 192:21
202:7,10 205:8
206:17,19
211:5,10
212:23 213:1,3
**scenario** 50:9,22
53:22 67:23
105:2,13
140:25
**scene** 51:14
53:23 72:18
73:24 89:7
90:10 120:23
121:1 122:9,17
123:8,12
125:13 126:8
127:4,18
134:18 162:4,7
163:4,11
164:11 168:11
168:12,13
170:21 173:14
175:14 182:19
186:12,15
187:8 213:11
215:7
**scheme** 190:17
**school** 15:22,24
16:1
**screen** 131:4,7
**searching** 110:12
**second** 10:13
50:19 99:3
133:11 184:21
185:7
**seconds** 73:25
**section** 38:11
78:3,9 79:1
99:4,5,21
156:25 157:10
**see** 10:5 30:12

42:4 53:20
54:16 61:16,17
65:9 67:10
71:17 75:21
78:9,18 83:11
85:8 89:16
100:23 106:1
108:18 115:12
116:25 121:17
128:2,20
129:12,15,16
131:5 132:3
139:4,18 146:9
150:16 152:5
156:13,14,15
156:22 157:12
157:18 160:24
161:1,8,10,15
166:6 167:12
168:1 171:4
172:5 174:3,24
177:17,23
181:18 184:12
188:2 191:21
193:15,17
201:11,13,16
202:10,13,17
203:1,21 205:9
205:20,20
207:15 212:13
**seeing** 40:4
105:21,22,24
**seek** 45:23
**seen** 31:1,5,16
32:14 128:4
152:21,23
153:2,13,19
198:18
**self-initiated** 20:2
**self-serving** 152:6
**send** 46:20 51:24
53:9 55:4 92:2
**sending** 14:18
65:12
**senior** 21:20

**sent** 54:11 71:11
79:22 120:21
135:14 151:14
153:2,8,10
176:9
**sentence** 133:11
133:14 172:9
197:8
**separate** 112:6
**separation** 57:4
**September** 2:13
2:17 16:15
18:12,21,21,23
19:18 22:18
26:16 28:6 30:1
31:8 32:2 33:11
40:12,16 41:16
49:16,18 50:21
51:9 76:16 77:8
95:8 97:19
98:10 99:6
101:13 103:12
103:15,21
104:1
**sergeant** 27:17
27:17 136:20
136:21,22
158:7,10,13
**sergeants** 27:6,9
27:12,13
106:16 159:11
**sergeant's** 159:18
**service** 16:6
**Services** 4:14 6:8
6:14 7:25 85:20
198:16
**session** 99:21
**set** 204:14
**setting** 204:17
**seven** 30:1
131:20 133:9
133:10
**Shakes** 117:13
**shaved** 19:9
**sheets** 139:24
**she'll** 216:8

**shift** 19:23 21:2,3
26:25 54:8
86:12 87:12,13
88:15,15 119:4
139:17
**short** 87:11 160:3
**shorthand** 4:17
7:5 217:5
**shortly** 161:11
**shot** 112:12,21
**shoulder** 112:16
**show** 19:3 21:14
31:4 51:25 68:1
108:19,20
109:11,11,12
109:13,16,16
109:17,18,23
110:8,18
111:14,16
115:1,2 148:20
**showed** 77:2
135:4
**showing** 22:6,8
22:11,12 43:24
**shown** 32:6
206:12,20
207:3,6
**shows** 43:19
110:18 145:9
**siblings** 127:10
**sick** 121:9,11
**side** 45:10 46:3
48:21 59:1,7,14
59:16 60:5,9
65:18,18 67:1
69:2,14 72:2,3
72:3,8 80:11
118:19 127:25
142:23 143:3
144:18 199:4
199:20
**sides** 58:24
**sign** 97:9,11
**signature** 7:7
97:12 191:15
191:16 202:17
213:20 216:11

216:13,20
**signed** 203:1,10
203:12 205:17
213:25
**significant**
113:24 212:21
**similar** 110:8
**simple** 37:22
42:23 55:3 66:8
88:23 101:11
155:9 213:6
**simpler** 36:17
55:8 116:16
**sir** 211:7
**sit** 19:10 24:24
25:6 40:16
41:16 55:5
64:25 89:8
**sitting** 12:11
39:21
**situation** 71:7
79:3 187:20
**situations** 88:7
91:18
**six** 16:14 18:9
19:18 20:4
24:15 29:25
30:3 31:9 76:4
77:18 98:20
110:16 112:13
**size** 178:13
**skin** 132:2
**sleeping** 125:24
**Slusser** 23:21,25
24:2 118:22,23
121:18 122:4,7
135:4,12
159:16 173:6
181:3
**Slusser's** 135:17
**small** 56:8 91:3
100:21 106:12
118:18 134:19
**smaller** 45:8 46:1
**smartphone**
182:23
**Smith** 67:8,9,10

CHRISTOPHER PARTIN   2/8/2017

67:12,15,17,18
91:25 110:15
114:5
**smoothly** 10:11
**softly** 17:13
**solely** 82:12
**somebody** 67:20
80:24 92:20
107:25 110:11
111:19 133:23
143:2,5
**someone's** 90:12
**somewhat** 30:11
**son** 123:19
140:21 161:14
161:20 162:10
162:15,17
**son's** 162:14
**soon** 74:16 87:10
88:22 89:1
196:10,14
**sorry** 17:5,10
20:17 25:4
40:15 50:20
58:17 63:9
75:25 78:5 98:3
183:19
**sort** 76:22 163:14
163:16 166:1
175:5 186:18
190:9,10
205:15,19
**sorting** 164:9
**sorts** 147:4
**sought** 72:12
102:13
**sound** 127:9
**sounded** 127:9
**sounds** 22:18
**south** 154:16
157:25 194:2
196:5,9
**southwest** 16:18
**space** 157:4
**span** 88:17
**speak** 34:11 42:3
42:16 43:22,25

44:6,6 45:17
49:13,22,25
56:17 57:14
58:2,10 59:18
60:4 62:19 63:1
65:17,21,22
66:15 68:7
80:11 86:7,17
88:6 123:13,22
124:16,25
127:24 132:11
137:16 154:22
158:3 162:4
184:13 186:12
186:15 205:12
213:4
**speaking** 39:6,7
66:5,9,10,11
67:24,25 68:7
69:18 89:11
102:17 131:1
**specific** 39:18
57:3 98:4
107:24 114:23
207:4
**specifically** 81:9
**specifics** 117:6
**speculation** 37:1
40:22 66:4
96:12 153:25
**spell** 9:13 23:13
23:18
**spend** 46:13
84:17
**spoke** 17:13
43:11,13 66:13
67:7 71:24 95:6
107:3,11
132:21 141:13
142:2 162:6,13
167:20,21
191:10
**spoken** 15:7,11
42:10,18,20
43:6,6,8 69:18
106:23 108:4
127:3 135:18

140:20,21
141:18
**spot** 154:17
**spotted** 82:20
**Spraggins**
121:22,24
122:2,7
**spread** 27:11
**squared** 19:9
**St** 4:15 5:6 6:2,9
6:15 7:22 8:21
13:18 15:3
16:21,23 18:5
20:12 22:7,12
24:19 32:11,12
35:14 37:14,16
37:18 54:12
82:1,3,5 96:7
109:5 111:5
112:11 138:16
149:8 157:17
166:5 173:2
193:13 203:20
**stamp** 213:21
**stamped** 2:11
**standard** 32:19
**standing** 69:22
128:9 182:14
**start** 32:15 34:15
78:2 82:3
102:11 110:23
119:4 136:7
**started** 19:23
22:18 26:14
30:22 40:12
93:9 122:19
123:20,21
124:9,19 125:4
125:4,8,9,23
128:21 129:2
129:12,15
133:2 169:19
169:20 182:24
212:2
**starts** 26:18
76:13
**state** 4:15,20

9:10 44:9 56:19
75:6,21 111:12
192:20 217:7
**stated** 79:25
128:25 129:1
143:13 182:3,6
182:19,22,22
184:11,15
198:3 212:1
**statement** 48:15
167:14 176:20
184:7 186:22
186:25 188:21
194:3 203:23
209:6 211:22
211:23 215:20
215:24,25
**statements** 142:5
158:19 185:24
**states** 1:1 4:1
7:19 63:24
**statewide** 138:12
210:1
**state's** 46:20
**stating** 158:18
**station** 146:22
147:12,12,17
149:1,25
150:19 191:21
192:2,5 193:7
194:5
**statistics** 112:19
**stayed** 74:1
**staying** 97:2,5
**stealing** 177:16
**stenographic**
217:12
**stepped** 124:20
**sticker** 73:3
**stickers** 73:4
**sticks** 80:23
**STIPULATED**
7:2
**stolen** 162:21
163:1 164:20
164:24 179:13
**stood** 182:7

**stop** 50:19 73:4
73:19 82:22
83:9,16,20
91:20 114:15
114:20 122:21
127:1 138:22
147:13
**stopped** 71:19
**stopping** 82:25
120:12
**stops** 83:19
**store** 19:5 150:19
**story** 46:3 58:25
59:2,17,19 60:5
60:9 63:6,11,12
63:21 64:10
65:4 67:1 69:2
69:14 128:1
142:24 143:4
144:18 169:3
193:18 199:4
199:21
**straight** 56:25
133:12
**strange** 105:11
**street** 4:15 5:5
6:9,15 71:5
91:7,17 119:11
121:5,11
128:16 134:3
134:12 150:10
150:15,25
178:25 208:6
**strike** 14:3 20:17
22:9,25 27:21
28:16 36:4
38:20 43:7,21
43:23 45:14
52:17 70:18
79:17 100:2
102:4,6 103:13
130:4 152:18
153:16 181:8
188:9 209:13
**Strode** 3:2 5:4
8:9,9 141:8,10
141:12 142:11

CHRISTOPHER PARTIN   2/8/2017

142:13,15
145:11,19,21
146:11,17
148:16,24
151:20 152:8
154:11,19,20
155:3 188:18
189:5 191:12
191:14 194:13
196:4,7 197:17
205:11
**stuck** 92:7,8
**stuff** 55:3,8 56:8
57:7 91:3 104:8
104:9 107:15
108:18 125:10
**subject** 22:24
28:8,13 40:9
43:9 47:11
65:24 185:23
**subjecting**
149:13
**Subjects** 188:5
**subsection** 38:12
79:2
**subsequent** 95:8
**subset** 38:11
**substance** 9:22
**suggest** 84:6
180:12 215:8
**suggested** 180:11
**summons** 3:4
13:1,5 44:7
52:22 55:9
65:10 74:25
75:3,4,11 78:4
79:7 87:2
107:23 145:5
145:15 146:10
146:23 147:16
154:23 155:16
155:25 158:2
158:19 187:5
187:22 189:2,7
192:14 197:5
197:19,25
198:3 199:5

200:24 201:3
201:11 202:7
205:16 213:18
**summonses** 55:1
**Sunday** 136:9
**superior** 154:6
**supervising**
197:9,16
**supervisor** 27:1,3
27:10 33:13
46:9 47:4,20
49:13,20,23
50:14,16 51:11
99:12,17 100:7
101:3,14 102:9
103:3,6,17,18
104:3,5,23,24
105:2,14,19
136:3,6,7,16
137:21 159:14
**supervisors** 19:8
27:6,16,23
39:25 46:10,15
50:2 102:20
106:17 136:25
159:13
**supervisory**
101:19
**supervisor's**
33:13 34:8,9
101:8 102:14
136:23 137:2
**support** 62:4
**supporting** 99:11
**supposed** 22:2
39:24 157:1,11
164:24 180:21
**sure** 9:20 10:23
16:7 19:8 29:10
39:23 44:22
48:5 49:14
55:15 58:8
81:16 99:23
101:11 108:13
110:5,10
113:10 117:4
123:2 138:3

146:10 150:4
207:2 212:6
**surrounding**
130:15
**suspect** 42:7,21
45:18 46:2,16
47:1,16 48:1
50:18 51:22
53:25,25 54:23
56:17 57:15,23
59:9 60:9 62:8
62:22 63:1,17
65:22 66:14,25
67:4 69:1,13
70:5,25 74:23
79:3,17 80:8,14
88:12 89:16
100:6 105:14
107:12,22
112:18 117:22
139:2 142:23
144:17 150:25
**suspects** 82:21
**suspect's** 59:16
59:19
**swear** 8:23
**swing** 53:18
54:16 64:21
**switched** 27:16
**sworn** 4:12 9:1
217:9
**syringe** 92:6
**system** 43:18
44:18,24 48:11
51:3,15,25 53:1
54:11 81:19,23
82:13 84:1 97:8
108:8,11,19,20
113:1,9 139:22
171:13,15,17
209:20 210:4
**systems** 108:17
108:24 109:19
112:5 113:21
115:5,9,10
116:6 178:3
217:6

S-l-u-s-s-e-r 24:1

_____

**T**

**take** 10:6,8,24
11:1 19:11
24:14 28:6 29:9
29:15 32:23
46:12 55:13
56:8 58:8 59:8
68:19 84:18
85:17 86:4 89:1
89:3,4 118:18
119:14,18
128:22 129:3
129:14,16,18
130:6 136:9
140:24 151:18
155:16 160:2,3
160:4 187:20
197:18 212:3
**taken** 4:13 7:4
45:1 55:19
84:22 106:6
148:12 160:7
208:9 214:22
217:11,18
**taker** 212:20,24
**talk** 10:9 18:19
21:23 38:23
40:4 46:6,9,16
50:16 51:5
53:19 54:2
57:22 58:22
59:6,9 64:24
65:8,15,16 67:5
67:12,15 68:17
69:23,24 72:5
83:10 85:12,23
86:4,20 87:10
90:5,21 91:12
92:9 100:19,22
101:9 104:23
107:12,14
108:18 117:20
124:3,4 125:21
126:11 141:21
142:11,14

143:7,23 144:5
144:21,22
154:21 163:18
167:17 176:17
177:8 185:2,4
185:16,17,19
185:22 187:10
187:15
**talkative** 133:1
168:22,25
**talked** 46:19,21
51:10 72:1
106:11 107:15
107:15,16
135:3 161:22
163:20,23
164:1,5 168:12
169:5 177:6
185:1 187:12
187:13 212:5
212:25
**talking** 47:1,9
58:25 62:10
65:23 66:15
67:17 72:1
74:23 85:2
100:16,17,18
107:19 108:23
122:19 124:2
125:4,7,23
132:25 133:2,3
145:5 163:17
168:4 175:18
208:1 210:11
212:10
**taught** 24:24
26:3
**teach** 20:8,11,14
21:16 25:7,12
25:13,22 39:8,9
**teachers** 39:8
**teaches** 39:10
**teaching** 21:21
22:6 25:7,10
26:2
**team** 20:16
**technical** 51:13

**CHRISTOPHER PARTIN   2/8/2017**

| | | | |
|---|---|---|---|
| 53:5 | 127:15 | 75:3 87:11 92:9 | 137:14 170:21 |
| **telephone** 140:22 | **tells** 67:4 164:23 | 95:5 97:1 113:3 | 186:1 |
| 140:25 144:7,7 | **temporary** 117:9 | 134:23 142:21 | **thousands** 95:4 |
| 167:17 188:18 | 117:11 | 143:17 145:14 | **three** 12:20 13:14 |
| 191:20 192:1 | **ten** 70:22 81:4 | 146:20 147:4 | 21:4,22 23:9,20 |
| 214:22 | 102:20 160:4 | 153:14 163:14 | 23:23,24 24:16 |
| **teletype** 43:17 | **tens** 138:20 | 163:16 191:3 | 27:6 28:5 46:13 |
| 51:24 53:10 | **term** 172:7 | 206:13 | 119:1 165:18 |
| 71:22 79:22 | **terms** 39:4 54:5 | **think** 9:22 10:10 | 165:22 189:6 |
| 99:22 111:17 | 86:24 131:9 | 12:20 17:13 | **three-day** 25:2 |
| 113:16 140:4,8 | 153:21 | 19:15 27:11 | **thrown** 63:14 |
| 140:10 | **testified** 53:5 | 33:15,21 39:15 | **Ticketing** 116:19 |
| **teletypes** 98:1,20 | 145:20 146:1 | 41:8,9 42:12 | **Tim** 77:5 |
| **tell** 15:22 19:1 | 152:5 167:16 | 53:5 59:23,25 | **time** 7:15 10:9 |
| 29:19 33:4 | 168:21 170:9 | 69:13 76:19,25 | 13:20 32:14,20 |
| 35:15,17,18 | 206:10,23 | 97:14 98:6,20 | 34:24 38:22 |
| 36:13 40:5 | 207:9 | 101:14 102:18 | 44:21 46:8,18 |
| 45:17,25 47:20 | **testify** 9:2 217:10 | 103:21 104:7,9 | 47:8 49:19 |
| 50:17 51:23 | **testifying** 13:13 | 105:1,8,15 | 51:21 54:20 |
| 57:21 61:4 | **testimony** 32:19 | 110:7 113:19 | 55:17,20 60:13 |
| 65:22 67:20 | 33:22 34:3 | 118:14 120:13 | 70:1 74:16 |
| 68:5 69:1,14 | 63:24 66:24 | 126:7 127:1 | 76:12 77:24 |
| 72:23 82:7 | 68:24 107:19 | 128:10,11 | 79:15 84:17,20 |
| 85:10 94:3,24 | 139:1 156:21 | 132:12,13 | 84:23 85:6 87:3 |
| 95:15 96:24 | 184:19 216:5 | 134:13 137:20 | 87:19 88:17 |
| 98:17,22 | 217:8,11 | 139:25 168:21 | 89:10,18 91:11 |
| 100:10 101:3 | **thank** 9:15 16:6 | 169:8 172:13 | 92:5 93:12 96:2 |
| 105:16,20 | 29:18 76:8 | 173:25,25 | 96:17 98:7 |
| 115:19 119:24 | 78:20 160:13 | 175:11,15,16 | 100:23 103:24 |
| 122:4 123:15 | 210:6 215:13 | 185:7 192:7 | 104:14,17 |
| 123:16,25 | 216:16 | 193:24 194:10 | 106:4,7 114:22 |
| 124:18 125:2 | **Thanks** 78:25 | 194:15,17,22 | 119:4 120:14 |
| 125:14 128:19 | **theft** 169:22,25 | 209:22,25 | 120:17,21 |
| 130:12 132:8 | 170:13,22 | 214:3 | 121:24 130:25 |
| 132:23 133:5 | 186:6 190:10 | **thinking** 22:24 | 133:7 134:11 |
| 136:1 141:9,19 | 202:3 | **third** 25:16 48:15 | 134:13 140:1 |
| 142:23 146:17 | **thing** 10:25 | 48:16,17 49:8 | 141:4,11 |
| 148:16 154:8 | 17:23 91:24 | 148:8,11,14 | 147:18 148:7 |
| 161:25 171:1,2 | 92:11 101:22 | 177:16 185:7 | 149:11,19 |
| 174:22 175:1 | 132:17 133:3 | 201:13 | 153:19 154:12 |
| 188:8,12 | 170:14 178:21 | **third-party** | 159:12,23 |
| 192:22 207:21 | 194:24 | 61:14 | 160:5,8 168:11 |
| 210:16 212:14 | **things** 20:2 21:18 | **tholland@paul...** | 169:7 171:16 |
| 214:9,19 215:3 | 24:25 25:7,8,10 | 5:13 | 184:21 185:8 |
| 215:7 | 34:22 37:16 | **Thompson** 107:6 | 191:20 192:1 |
| **telling** 32:15 59:2 | 39:10 55:24,25 | **thought** 49:21 | 193:21 195:19 |
| 102:18 127:14 | 57:24 74:8 75:2 | 102:9 126:22 | 197:12 199:7 |
| | | | 199:10,16 |
| | | | 204:25 209:12 |
| | | | 216:17 |
| | | | **times** 12:19 27:4 |
| | | | 69:7 71:11,12 |
| | | | 74:15 81:2 |
| | | | 106:17 115:10 |
| | | | 115:15 120:10 |
| | | | 120:12 130:17 |
| | | | 130:19,25 |
| | | | 134:10 138:22 |
| | | | 142:20 186:7 |
| | | | 191:19 192:1 |
| | | | 195:23 200:17 |
| | | | **Timothy** 5:9 8:3 |
| | | | **tired** 185:8 |
| | | | **today** 9:16,17,23 |
| | | | 9:25 10:4,12,24 |
| | | | 11:5,13 12:6,9 |
| | | | 12:12 13:9,13 |
| | | | 17:14 40:17 |
| | | | 41:16 66:24 |
| | | | 68:24 142:21 |
| | | | 210:17 |
| | | | **Today's** 7:14 |
| | | | **told** 10:13 35:20 |
| | | | 36:9 46:5,15 |
| | | | 47:2,3,6,21,21 |
| | | | 48:3 50:1 56:14 |
| | | | 56:15 57:19 |
| | | | 58:6,19 60:8 |
| | | | 61:8 66:14 |
| | | | 80:19 84:3 |
| | | | 88:25 90:3 |
| | | | 93:21 94:23 |
| | | | 95:22 96:4,10 |
| | | | 97:7 101:3 |
| | | | 103:8 104:23 |
| | | | 105:22 123:17 |
| | | | 124:13 125:8 |
| | | | 129:11 130:6 |
| | | | 142:18 143:3,4 |
| | | | 148:18 154:23 |
| | | | 154:25 162:9 |
| | | | 182:10 185:7 |
| | | | 186:3,4 192:8 |
| | | | 192:11,22 |

**CHRISTOPHER PARTIN   2/8/2017**

199:23 200:8
204:20 213:14
**tooken** 148:12
**top** 173:19
**topics** 159:4
**totally** 37:21
**tow** 83:19,19
**to-wit** 9:5
**traffic** 73:4,19
82:22 91:20
114:15,20
147:13 154:17
**train** 25:22 98:15
**trained** 33:18
34:16
**trainer** 20:19,21
20:22,23 21:1,5
21:12 23:11,16
23:24 24:3,6
49:24,25 51:6
118:24 119:1
121:23 135:9
159:17 196:11
197:11
**trainers** 20:15,16
26:24 35:2 39:7
39:8,11,13
159:9
**trainer's** 135:7
**training** 16:4,9
18:18 19:13,16
20:5,7,11,20
21:10 24:9,16
24:19 25:1 26:6
26:11,23 27:14
28:24,25,25
29:1,2,2 32:5
32:20 33:1,4
34:14,15,18,20
35:1,4 50:1
51:4 61:3 97:16
97:20,25 98:11
98:18 99:20,21
121:24 135:6
173:9,13,15
180:11,19,22
190:24 191:2,6

197:12
**trainings** 33:16
**transcribed** 7:7
**transcript** 3:8
145:25
**transferred**
149:2 150:6,8
**transported**
146:24 147:1,3
193:8
**treatment** 174:1
176:13,14
**tree** 74:1
**trespassing**
75:13
▇▇▇▇▇ 128:5
128:19,25
130:6 131:16
142:6 176:23
211:22
▇▇▇▇▇
128:18
**trial** 204:2,8,14
204:17 206:2
**tried** 54:5 65:6
124:2 132:25
141:5,7 184:16
185:2,3
**trouble** 117:22
**truck** 71:13
**true** 36:8 59:5
178:11,18
193:2 203:23
208:7,8
**truth** 9:2,2,3 59:3
59:4 164:19
217:10,11
**truthful** 9:23
10:15
**try** 9:19 10:3,9
17:14 18:4
53:19 54:2
62:21 63:14
64:24 73:14
116:14 134:4
134:11 138:18
139:12 140:24

141:2,20
142:11 162:3
163:16,18
166:1 180:21
185:11
**trying** 10:6 46:23
47:17,17 54:21
63:8 107:11
134:20 141:14
163:14 185:9
186:14,18
187:8 199:2,10
199:16 213:4
**turn** 40:9 78:2,3
117:17 131:19
135:24 141:15
142:16,16,19
154:12 194:8
194:14 195:6
195:17,20,21
195:24
**turned** 148:11,13
173:12 188:25
193:6,13 196:2
**turning** 196:7
**twice** 98:5,5
**two** 12:10,13,16
21:19 23:15
24:10,18 27:6
27:12 58:24
61:15,16 73:5
77:19,23
106:16 110:6
131:20 165:15
210:18
**tying** 55:10
**type** 43:16 57:7
81:11 115:10
125:10
**typed** 115:3
216:5
**typewriting** 7:7
**typical** 19:1,20
32:15
**typically** 50:13
52:6,8,11 83:7
116:18,19

**T's** 138:4
_____
**U**
**Uh-huh** 100:9
142:25
**ultimate** 126:17
**ultimately** 189:1
**unavailable**
85:15,16,24,25
**unaware** 107:2
**uncapped** 92:6
**uncle** 68:5
**uncooperative**
71:16
**underlying** 23:2
153:16
**understand**
11:12,15 12:1
15:4 35:23
36:20,23 37:21
37:23 39:12
46:23 47:18
55:25 58:17
76:10 87:11
92:12 107:18
114:10 152:20
153:12 156:22
161:19 163:3
175:9 188:4
212:18 213:6
**understandable**
183:12
**understanding**
11:18,19 36:14
40:13,14,17
41:15,18,19
48:7 57:10,13
60:7,25 61:24
62:6,13,20,25
64:6 87:7 95:19
103:12 110:10
127:16 137:9
137:13,16
**understood** 36:7
37:7,9 114:19
146:7 207:11
**undertake** 57:14

**unfortunately**
88:21 92:10
**uniform** 86:11
**unincorporated**
157:17
**United** 1:1 4:1
7:19
**unknown** 182:5
**unquote** 178:21
**unsuccessful**
54:4 132:6
**unsure** 104:25
**unwilling** 142:14
**update** 98:9
**updates** 97:20
98:15
**upper** 30:11
**use** 11:20 34:5
94:13 108:12
109:5,6,7,10
112:9,23,25,25
113:5,6 116:11
116:16 138:7
198:4
**user** 97:12
**user-friendly**
116:13
**uses** 116:20
**usually** 21:2 45:7
50:13 54:7
56:25 72:16,20
86:3 88:13,25
115:7 116:21
116:22,22
117:1 133:24
151:3 212:19
_____
**V**
**vacation** 86:1,2
**vague** 9:18 37:1
40:22 66:3 70:9
96:20
**value** 179:19
▇▇▇▇▇ 128:25,25
128:25 130:6
131:15,16,16
132:6,7 142:6

**CHRISTOPHER PARTIN  2/8/2017**

176:23 212:1
215:24
███████ 132:15
211:23
**varies** 98:8
**various** 106:16
173:5
**varying** 159:13
**vehicle** 71:10,18
71:21 72:25
73:2,11,22,23
82:19 83:1,2,4
83:6,7,8,10,14
83:21
**vehicles** 82:21
**verbally** 123:20
182:4
**verify** 49:13
81:16,21,24
145:3
**verifying** 67:16
**versions** 77:23
**versus** 7:17 57:4
**vicinity** 114:22
115:25
**victim** 48:15
51:22 53:24
59:1 60:4 61:13
63:17 90:3
142:3 173:18
173:20 174:7
174:10 175:18
176:17,17
204:2,6,16
208:1
**videoed** 216:7,10
**videographer** 6:7
7:13,24 8:22
55:17,20 84:20
84:23 104:14
104:17 106:4,7
160:5,8 216:17
**videotape** 214:21
**video-recorded**
1:10 4:11 7:16
**viewing** 127:17
**VII** 78:13

**VIII** 78:13
**Village** 118:17
**Vineyard** 107:4
**violation** 116:9
**violence** 25:15
98:25 211:19
**violent** 73:16
91:23
**Virgin** 123:4,16
123:17 128:22
129:1,4,14,17
129:23 130:3,7
130:9 131:25
142:5 148:21
163:24 169:3
174:11 179:10
179:22 181:18
181:23 182:3,5
182:18,22,23
183:3 186:22
204:6 210:12
211:24,25
212:4 213:13
213:14 214:18
215:4,10
**Virgin's** 128:17
131:14 133:13
133:15,16
186:10,11
211:22 212:7
214:11 215:19
215:25
**visit** 139:4,12
**visits** 139:9
**voice** 45:9 68:4
144:7 167:21
167:23 168:4
169:10,11
185:25
**voices** 68:4
**vs** 1:6 4:6

---

**W**

**wait** 73:16 89:9
91:19 105:4
126:18
**waiting** 90:19

**waive** 216:7,10
216:13
**waived** 7:8
216:21
**waiver** 154:22
**walk** 21:17 48:7
81:22 118:9
**walked** 125:18
**walking** 82:18
91:7 150:19
**wall** 5:10 8:7,15
8:15 128:15
**Walsh** 8:19 15:1
**want** 10:18,24
41:1,4 44:24
55:4,13,23 58:1
58:21 61:23
63:5,6 64:8,9
65:9,15 68:7
83:9 84:14,17
85:12 92:2,7,8
92:10 102:19
104:8 113:5,6
114:10 123:1
126:9,21,23,25
132:20 149:8
154:21 160:2
195:14
**wanted** 33:9,14
34:2,6 38:6,8
39:4 40:13,14
40:18 41:15,18
41:19,21 42:1,2
42:9,10,16,17
42:18 43:5,9,10
43:10,17,18,20
43:22,25,25
44:2,10,17,24
45:3,23 47:11
48:1,4,7,11
49:7,11,13 50:8
50:11,25,25
51:2,7,8,15,23
52:15,16,19,25
53:10,13 54:1,6
54:11 58:10,13
58:13 59:17,20

60:10 61:22
62:15,18,23
63:4 64:13,16
64:25 65:3,5,16
66:17,25 67:6
68:1,10,10,15
68:20,22 69:11
69:22 70:7,11
70:14,14,15,25
71:3,21 72:11
72:22 74:10,19
74:23 79:12,17
79:20 80:7,8,13
80:25 81:8,12
81:15,24 82:1,2
82:8,12,20 83:1
83:4,5,17,18,25
84:11,16 85:3
85:11 86:16,23
87:16,18,22
88:3,8,19 89:4
89:14 90:10,23
91:14,16,25
92:20,21,22,24
93:3 99:13,16
100:3,8 101:15
101:22 102:1,8
102:8,13,14,15
102:16,19
103:2,3,6,17,19
103:19 104:3,4
104:4,22,22
105:3,16,17,20
109:25 110:12
110:14,20,24
110:25 111:1
111:13,16,20
113:8,11,22
114:16,21,24
115:6,8,19,25
116:1,2,25
117:10,11
125:10 126:2
134:7,8,25
135:5,13,19
137:15,21

138:10,14
139:3,7,11,13
139:15,16,16
141:25 142:9
142:22 143:10
144:2,16,25
146:8 149:13
149:18 150:1
150:17,24
153:14,22
154:5,25
185:19 186:5
188:5,7,13,23
189:2,8,14,19
190:1,6,7,18
191:7 198:4,12
198:13 200:9
209:15,16
210:1
**wanteds** 11:20
29:3,8 33:5,7
33:25 34:7
40:10 63:20
64:5 68:25,25
70:19 73:12
80:20 81:9,18
81:21 82:20
84:3,9 91:6
94:10,13,13
95:7 98:1
101:20 107:22
108:15 109:9
109:12,14
111:10 117:14
189:13,24
**wants** 125:20
185:16,22
207:15
**ward** 38:7
**warned** 199:19
200:13
**warning** 154:21
**warrant** 43:21
45:5,19,24 46:2
46:7,25 47:14
48:3 52:24
54:21 62:1,15

---

**CHRISTOPHER PARTIN   2/8/2017**

62:23 63:2,8
68:15 72:12,12
72:19,22 74:24
75:19 78:4 79:7
80:21 87:2
92:16 107:23
115:14,20
145:9,14 146:8
**warranted** 80:2
80:17 82:12
**warrants** 68:18
70:12 72:7 73:7
73:9,12,12,15
74:3 75:6,8
80:4 81:8,21
84:10 88:5
108:14,14
109:9 115:2,12
146:24
**wasn't** 10:18
35:4 62:25
74:16 86:10
114:11 126:4
128:3 134:8
135:20 148:10
154:22 175:2
186:15 187:22
**watched** 182:8
**watching** 182:15
**way** 22:10 35:16
37:16 44:1,7
50:13 59:16,19
60:3,9,17,20
64:24 65:10,17
67:16 68:6
72:10 73:21
83:10,11 93:18
95:4 96:6
105:11 112:8
145:6,7,8
146:20 151:2
154:16 160:14
163:10 164:5
167:1 195:13
196:14,15,19
201:13 203:11
205:16,19

208:16,17
209:3 211:17
216:14
**ways** 17:25 97:1
**weapons** 91:23
**website** 109:5
**Wednesday** 4:12
**week** 12:15 24:10
27:12 103:7
210:18
**weeks** 12:16
13:14 20:25
21:5,7,9 22:22
**week-long** 25:1
**weight** 112:20
177:23 178:9
**Weiss** 5:11 8:4
**welfare** 57:8
**went** 24:25 25:2
33:11 71:10,25
74:4 75:6,9
98:19 100:4,5
102:10,11
103:16 121:25
122:8 124:3
139:22 140:8
172:21
**weren't** 147:9
148:3,6 174:24
**we'll** 10:23 22:16
160:24
**we're** 7:24 9:20
12:5 29:10 47:9
47:17,17 88:25
91:2 100:21,22
107:16 151:3
**we've** 101:9
131:17
**Wharton** 5:11
**whichever** 27:1
**whim** 190:17,18
**white** 110:15
173:19
**willing** 72:4
154:22 187:15
**Wilschusen**
107:7

**Wilson** 5:16 8:11
8:11
**wish** 10:19 143:6
205:12
**wishy-washy**
115:10
**wit** 157:17
**witness** 7:9 8:23
29:21 31:20
39:20 40:23
41:3 44:15 49:1
60:17 61:14
66:9,10,11,19
66:21 70:11
77:4 78:14,17
78:23 80:1,17
94:21 96:1,16
96:22 97:24
103:23 107:3
142:4 144:12
146:15 152:23
153:4 160:10
168:18 169:6
169:19 170:6
170:18 171:12
172:2 176:22
178:16,23
180:8,24
182:18 183:16
186:3 187:15
187:25 190:4
192:16 195:3
195:11 200:3
200:11 201:1
202:22 207:1
207:20 208:13
208:21 209:10
211:10 216:15
216:21 217:8
217:11
**witnessed** 48:19
48:20 128:3
131:15
**witnesses** 51:22
170:10 180:4
**word** 10:6 38:7
63:25 99:15

198:4,9
**words** 41:10
172:11,13
214:8
**work** 13:15
28:13 40:3
54:15 67:21
69:25 88:14
107:14 122:14
193:9 206:5
**worked** 14:25
15:3 118:17
138:20,20
**working** 21:15
21:25 27:8 85:9
89:3 90:7 113:2
141:17 146:22
146:25 147:18
154:15 192:9
192:12,23
193:18,21
**works** 32:11
**worth** 47:13 74:7
**wouldn't** 70:12
86:20 105:20
115:5 124:8,11
126:4 135:10
192:24 193:1
208:23
**wrestling** 127:10
**write** 156:17
**writing** 22:2
133:25 134:1
205:9 209:4
**written** 75:15,17
101:24 135:3
167:10,11
172:11 175:25
176:14 204:24
205:17,20
**wrong** 40:5
63:19 192:13
192:20
**wrote** 74:19
205:7,10 209:3
209:13

**Y**

**yeah** 8:17 49:5
50:12 57:20
67:10,14 76:24
77:5,11 78:17
80:4 82:15
101:21 104:13
108:16 116:10
117:24 128:12
133:10,18
136:11 141:2
171:23 172:15
178:7,10,16
179:7,20
180:17 183:6
193:4 200:3
207:20 211:16
213:7 216:15
**year** 16:1,2 26:13
26:18,19 27:16
28:2,5 72:25
73:1 98:5,6,7
**years** 50:5
102:20 110:6
**yes-or-no** 80:13
**York** 5:12,17

**Z**

**zeros** 29:25,25
30:3 31:9 76:4
77:18 155:22
**ZIP** 115:3,16,18
115:19,22
**ZTE** 182:23

**$**

**$175** 179:19
**$50,000** 74:7,12
**$500** 177:17

**#**

**#11867** 6:13
**#1291** 6:14
217:25

**0**

**0857** 171:24

**CHRISTOPHER PARTIN   2/8/2017**

**0858** 172:21
**0900** 172:24

_____
**1**
**1** 2:10 29:11,19
    29:23 30:10
    31:24 32:24
    34:16 36:17
    37:14 76:13,23
    77:4,11 97:15
    211:4
**1st** 25:14 27:15
    147:22
**1-2** 29:12
**1/12** 110:15
**1:00** 106:7
**1:24** 139:23
**10-37** 2:19 76:2
**10:00** 134:15
**10:37** 55:17
**10:49** 136:9
**10:55** 55:20
**100** 157:25 196:5
    196:9
**100000004** 2:25
    119:17
**10012** 5:17
**10019-6064** 5:12
**1050** 90:1
**108** 128:11,13
**11** 76:21 78:3,7
    178:11 193:11
**11th** 3:1 4:15 6:9
    6:15 118:3,10
    141:7 142:8,9
    147:20 149:20
    151:15,20
    152:15 153:9
    153:19 154:4
    154:5 156:9,10
    157:13 159:14
    161:13 198:19
    207:21 210:12
**11-26** 2:16 30:12
    31:1,8 32:7
**11/11/2015** 181:2
**11:00** 19:23

**11:42** 84:20
**11:54** 84:23
**112** 174:15
    181:18
**116** 121:2 128:13
    138:24 173:2
    181:4,25
**119** 2:24
**12th** 147:21
    149:21 153:20
    154:9 156:2
    158:17 159:20
    193:14 195:20
    198:23
**12/12/2015**
    157:18,22
**12:22** 104:14,17
**12:24** 106:4
**1210** 5:5
**1285** 5:11
**13** 31:9
**13th** 2:17 31:8
    32:2
**13-37** 76:15 77:6
    78:3
**14** 2:13 30:1
**14th** 32:3 33:10
    33:11,19 34:3
    99:6 101:13
**15** 2:10 24:21
    29:23 30:10,15
    36:24 51:9 72:9
    73:25 75:14
    102:20
**15th** 32:6 34:16
    97:15 136:8
    137:14
**15-26** 29:20,21
**15-61723** 201:20
    201:24 202:14
**151** 3:1
**155** 3:4
**16** 26:17 33:11
    51:9 73:1 132:9
**16th** 2:22 77:17
**16-37** 2:21 77:17
**160** 2:5

**17** 73:2,2,4
**17th** 103:21
    203:18
**190** 178:12,15,18

_____
**2**
**2** 2:13 29:11,21
    30:1 32:24
    36:17 37:7 51:1
    97:19 99:3
    173:17,19
**2:18** 160:5
**2:24** 160:8
**20** 75:14
**2000** 103:11
**2011** 2:17 31:8
    32:2
**2013** 76:16 77:9
**2015** 2:11 3:1
    16:11,15 17:18
    18:12,20,21,23
    19:18 22:18
    23:5 24:3,12,14
    24:15 26:15
    29:23 30:10,16
    32:3,6 33:10,19
    34:3,16 35:11
    36:9,15,24 38:3
    40:10,16 41:16
    93:10 95:7,11
    95:12,21 96:9
    118:10 136:8
    147:20,21
    151:15,20
    152:15 153:9
    153:19 154:4,9
    157:13 158:17
    159:14,20
    161:13 193:14
    198:20,23
    210:12
**2016** 2:14,22
    26:9 28:3 30:2
    49:16,18 50:21
    77:18 95:8
    97:19 98:10
    99:6 101:13

**103**:12,15
    104:1 203:18
**2017** 1:12 4:13
    7:14
**21** 76:14,21,23
    77:4,11 78:3,7
    188:3
**210** 2:6
**212)373-3373**
    5:12
**212)614-6464**
    5:18
**214** 2:7
**215** 2:8
**22** 30:3 190:15
**23** 189:12
**24** 87:14,18
    189:23
**24-hour** 87:5,6,8
    92:13,14
**25** 76:16
**25th** 77:8
**28** 76:4
**29** 2:10,13

_____
**3**
**3** 2:16 31:7,10
    32:2
**3DSN** 121:17
**3:29** 216:22
**3:30** 216:17
**31** 2:16
**314)615-7042** 6:4
**314)644-2191**
    6:10,16
**32** 161:7,11
**33** 162:18 164:18
**34** 166:3
**35** 191:15
**37** 16:3

_____
**4**
**4** 2:19 76:1,5
    78:5,16,17
    160:15,20,22
    160:25 161:8
    188:4 191:14

**4:00** 88:16
**4:16CV00245...**
    7:18
**4:16CV00254...**
    4:6
**4:16-CV-00254...**
    1:6
**41** 6:3 191:9
**45** 191:18,25
**48** 193:10,11

_____
**5**
**5** 2:21 77:14,16
    131:20 178:11
**50** 196:16 197:8
    197:24
**51** 197:19,24
**52** 198:2
**53** 203:18
**54** 204:22
**57** 76:14

_____
**6**
**6** 2:24 119:17,19
    171:4 201:22
    201:24 202:15
    211:4
**6:00** 119:6
**63101** 6:9,15
**63103** 5:6
**63105** 6:3
**63128** 115:13,16
**666** 5:17

_____
**7**
**7** 3:1 151:19,24
    152:4
**7th** 5:17
**7:10** 19:4
**711** 4:14 6:9,15
**76** 2:19
**77** 2:21
**78** 77:18

_____
**8**
**8** 1:12 3:4 4:13
    78:3,9 155:18
    155:21 201:10

**CHRISTOPHER PARTIN  2/8/2017**

**8th** 7:14
**8:00** 89:1
**8:50** 181:3
**8:57** 120:15
**8:58** 118:14
  120:19
**82** 110:16
**855)724-2489** 5:6
**87** 110:16
**88** 110:16

**9**

**9** 2:4 161:7
**9:00** 19:24
  118:15 120:24
  122:18 134:13
**9:30** 1:15 7:11
**9:31** 7:15
**911** 165:13,19
  171:20,21
  175:13,13,13
  181:8 210:20
  213:2,8,12,14