# Exhibit 5

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MISSOURI
 3                    EASTERN DIVISION
 4                        --oOo--
 5    DWAYNE FURLOW, et al.,       )
                                   )
 6       Plaintiff                 )
                                   )
 7       vs.          )Case No.
                      )4:16-cv-00254-CEJ
 8    JON BELMAR, et al.,          )
                                   )
 9       Defendants.               )
      _____)
10
11         VIDEO-RECORDED DEPOSITION OF
12                  KEVIN WALSH
      _____
13              February 9, 2017
14
15
16          (Beginning at 9:31 a.m.)
17
18
19
20
21
22
23
24
25
```

## Page 2

```
 1
 2                    INDEX
 3                                      PAGE
 4
 5    EXAMINATION BY MR. HAMILTON ...............8
 6    EXAMINATION BY MR. HUGHES .................143
 7    FURTHER EXAMINATION BY MR. HAMILTON ..........173
 8
 9
10                  EXHIBITS
11    Exhibit 1  Document on REJIS letterhead     62
12         entitled "Wanted Entry" Bates
13         stamped DEFRFP40000001
14    Exhibit 2  Document on REJIS letterhead     62
15         entitled "Law Enforcement Wanted
16         Entry" Bates stamped
17         DEF-SUPP0000022
18    Exhibit 3  Department General Order 11-26   101
19         Bates stamped DEFRFP2340000013
20    Exhibit 4  Department General Order 15-26   104
21         Bates stamped DEFRFP234000017
22    Exhibit 5  Department General Order 16-26   110
23         Bates DEFRFP234000022
24    Exhibit 6  Police report Bates stamped      115
25         DEFRFP1000014
```

## Page 3

```
 1    Exhibit A   Document entitled "St. Louis     148
 2         County CAD Call Search
 3         Application"
 4    (The original exhibits were retained by the court
 5    reporter and will be copied and attached to copies
 6    of the transcript.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MISSOURI
 3                    EASTERN DIVISION
 4                        --oOo--
 5    DWAYNE FURLOW, et al ,       )
 6                                 )
 7                                 )
                                   )
 8       Plaintiff                 )
                                   )
 9       vs           )Case No
                      )4:16-cv-00254-CEJ
10    JON BELMAR, et al ,          )
                                   )
11       Defendants                )
      _____)
12
13                       --oOo--
14         VIDEO-RECORDED DEPOSITION OF KEVIN WALSH,
15    produced, sworn, and examined on Thursday, February
16    9, 2017, taken on behalf of the Plaintiffs, at the
17    offices of Midwest Litigation Services, 711 North
18    11th Street, in the City of St Louis, State of
19    Missouri, before RENÉE COMBS QUINBY, a Certified
20    Court Reporter (MO), Certified Shorthand Reporter
21    (CA), Registered Merit Reporter, Certified Realtime
22    Reporter, and a Notary Public within and for the
23    State of Missouri
24
25
```

1 (Pages 1 to 4)

**KEVIN WALSH  2/9/2017**

Page 5

1
2
3　　　A P P E A R A N C E S
4
5　FOR THE PLAINTIFFS:
6　　Blake Strode, Esq.
　　　ArchCity Defenders, Inc.
7　　1210 Locust Street
　　　St. Louis, MO  63103
8　　(855)724-2489
　　　bstrode@archcitydefenders.org
9
10　Timothy Holland, Esq.
　　　Elizabeth Grossman, Esq.
11　Jonathan Wall, Esq.
　　　Charles Hamilton, Esq.
12　Paul, Weiss, Rifkind, Wharton & Garrison LLP
　　　1285 Avenue of the Americas
13　New York, NY  10019-6064
　　　(212)373-3373
14　tholland@paulweiss.com
　　　egrossman@paulweiss.com
15　jwall@paulweiss.com
　　　chamilton@paulweiss.com
16
17
18
19
20
21
22
23
24
25

Page 6

1　FOR THE DEFENDANTS:
2　　Michael E. Hughes, Esq.
3　　St. Louis County Counselor's Office
4　　41 S. Central Avenue, 9th Floor
5　　Clayton, MO  63105
6　　(314)615-7042
　　　mhughes2@stlouisco.com
7
8
9　THE VIDEOGRAPHER:
10　David Doell
　　　Midwest Litigation Services
11　711 North 11th Street
　　　St. Louis, MO  63101
12　(314)644-2191
13
14　COURT REPORTER:
15　RENÉE COMBS QUINBY, RMR, CRR
　　　CSR (CA) #11867
16　CCR (MO) #1291
　　　Midwest Litigation Services
17　711 North 11th Street
　　　St. Louis, MO  63101
18　(314)644-2191
19
20
21
22
23
24
25

Page 7

1　　　　　　　--oOo--
2　　　　IT IS HEREBY STIPULATED AND AGREED by and
3　between counsel for the Plaintiffs and counsel for
4　the Defendants, that this deposition may be taken in
5　machine shorthand by RENÉE COMBS QUINBY, a Certified
6　Court Reporter and Notary Public, and afterwards
7　transcribed into typewriting, and the signature
8　waived by agreement of Counsel and consent of the
9　Witness.
10　　　　　　　--oOo--
11　P R O C E E D I N G S  9:31 a.m.
12　　　　　　　--oOo--
13　　　　THE VIDEOGRAPHER:  We are now on the
14　record.  Today's date is February the 9th, 2017.
15　The time is approximately 9:32 a.m.
16　　　　This is the video-recorded deposition
17　of Kevin Walsh, in the matter of Furlow, et al.
18　versus Belmar, et al., Case Number 4:16CV00245CEJ in
19　the United States District Court for the Eastern
20　District of Missouri.
21　　　　This deposition is being held at
22　Midwest Litigation Services in St. Louis, Missouri.
23　The reporter's name is Renée Quinby.  My name is
24　David Doell, and I'm the legal videographer.  We're
25　here with Midwest Litigation Services.

Page 8

1　　　　Will the attorneys present please
2　introduce yourselves.
3　　　　MR. HAMILTON:  My name is Charles
4　Hamilton from Paul, Weiss.  I'm joined with my
5　colleague Jonathan Wall, Elizabeth Grossman and Tim
6　Holland.  I'm also joined by cocounsel who I'll have
7　introduce himself.
8　　　　MR. STRODE:  Blake Strode with ArchCity
9　Defenders, also for the plaintiffs.
10　　　　MR. HUGHES:  Oh, I'm Michael Hughes,
11　sorry.  I represent Kevin Walsh.  I also represent
12　Laura Clements and Chris Partin and Chief Belmar in
13　his official capacity, and St. Louis County,
14　Missouri.
15　　　　THE VIDEOGRAPHER:  If the court
16　reporter would please swear in the witness, we may
17　proceed.
18　　　　KEVIN WALSH,
19　of lawful age, having been first duly sworn to
20　testify to the truth, the whole truth, and nothing
21　but the truth in the case aforesaid, deposes and
22　says in reply to oral interrogatories propounded as
23　follows, to-wit:
24　　　　　　　--oOo--
25　　　　EXAMINATION

2 (Pages 5 to 8)

Page 9

1    BY MR. HAMILTON:
2        Q.  Good morning, Officer Walsh.
3        A.  Good morning.
4        Q.  My name is Charles Hamilton, and I'll
5    be asking you some questions today.  I'm one of the
6    attorneys representing the plaintiffs in this
7    action, including Dwayne Furlow, Howard Liner, and
8    Ralph Torres.
9            When I ask you questions today, if for
10   any reason you think that my question is vague or
11   confusing, please tell me and I'll rephrase it.  And
12   otherwise, I'll assume you've heard and understood
13   the question.  Is that all right?
14       A.  Yes.
15       Q.  Is there any reason such as a medical
16   condition or the influence of any substance that it
17   would affect your ability to testify fully and
18   truthfully today?
19       A.  No.
20       Q.  Will you tell me if that changes at all
21   over the course of our deposition?
22       A.  Yes.
23       Q.  For the sake of efficiency and to get
24   you out of here and get all of us out of here as
25   quickly as possible, there are a couple of ground

Page 10

1    rules that I'm going to cover, and I apologize if
2    they're duplicative.  You've been deposed before.
3    I'm just going to run through them pretty quickly.
4            First, as you can see, we do have a
5    court reporter here with us today trying to take
6    down everything that we say.  She's only one person.
7    We are a couple.  And if you include Mr. Hughes,
8    that's three of us.  If all of us are talking at the
9    same time, basically makes it impossible for her to
10   capture and attribute the correct statements to the
11   correct people.  So it's going to be a little bit
12   weird, but I'm going to do my best to not talk over
13   you, if you'll do the same for me.  Is that all
14   right?
15       A.  Yes.
16       Q.  Second, as you were just told by the
17   court reporter, you are on the record and under
18   oath.  So it's important that you provide accurate
19   and truthful testimony and in as complete a manner
20   as you possibly can.
21            If at any point in time over the course
22   of the deposition, even if a line of questioning has
23   passed, you realize that there's something you
24   forgot or something that you wanted to complete, you
25   can always feel free to alert me of that and we can

Page 11

1    go back to that and you can complete your testimony;
2    is that all right?
3        A.  Yes.
4        Q.  Third, we can take a break at your
5    leisure.  Hopefully this room won't get too hot.
6    But if at any point you need to use the restroom or
7    just need a break, please let me know.  The only
8    question I ask -- or the only request I have is that
9    if we're in the middle of a question, if you'll just
10   let us complete that question before you request a
11   break; is that all right?
12       A.  Yes.
13       Q.  Lastly, are you represented by
14   Mr. Hughes today?
15       A.  Yes.
16       Q.  At particular times he may object to a
17   line of questioning that I ask.  If he does, unless
18   he instructs you not to answer, you may proceed to
19   answer the question.  The objection is for the
20   purposes of the record.  Do you understand?
21       A.  Yes.
22       Q.  Do you understand that I'm going to ask
23   you questions today in connection with a legal case?
24       A.  Yes.
25       Q.  And do you understand that you are

Page 12

1    defendant -- a defendant in that legal case?
2        A.  Yes.
3        Q.  What is your understanding of the legal
4    case?
5        A.  Challenging the wanted system.
6        Q.  And have you read the complaint or any
7    of the materials that have been filed in court?
8        A.  Yes.
9        Q.  What materials have you read?
10       A.  The complaint.
11       Q.  Anything else?
12       A.  I believe the interrogatory.
13       Q.  Okay.  Anything else?
14       A.  (Shakes head.)
15       Q.  Have you ever been deposed before?
16       A.  No.
17       Q.  Okay.  Officer Walsh -- and just to
18   confirm, is it all right if I refer to you as
19   Officer Walsh?  Is there --
20       A.  Yes.
21       Q.  -- a better designation?
22            Thank you.
23            How did you learn that you were being
24   asked to testify in this matter?
25       A.  I was contacted by Mr. Hughes.

**KEVIN WALSH  2/9/2017**

Page 13

1      Q.  And how did -- what did you do, if
2  anything, to prepare for today's deposition?
3      A.  Read the reports that -- my contact
4  with Mr. Furlow and the complaint.
5      Q.  Okay.  Did you meet with your attorney?
6      A.  I did.
7      Q.  About how many times did you meet with
8  Mr. Hughes?
9      A.  Roughly three.
10      Q.  About when?
11      MR. HUGHES:  In -- in preparation for
12  the deposition is what he asked.
13      THE WITNESS:  Just one then.
14      BY MR. HAMILTON:
15      Q.  Just one.
16      About when was that time that you met
17  with Mr. Hughes to discuss this case?
18      A.  Last week.
19      Q.  And in addition to the documents that
20  we've already mentioned, did you review any
21  documents during these -- during this meeting?
22      A.  Could you -- could you re- --
23      Q.  I apologize.
24      A.  -- clarify?
25      Q.  Did you review any documents outside of

Page 14

1  the complaint, the interrogatories, and the
2  underlying reports?
3      A.  Just our CAD system.  Calls for
4  service.
5      Q.  Is -- what does CAD stand for?
6      A.  Computer-automated, I believe,
7  dispatching.
8      Q.  And just briefly, could you describe
9  what a -- what a CAD report is?
10      A.  It shows calls for service to a -- a
11  residence.
12      Q.  Okay.  Do you have a work-related email
13  address, Officer Walsh?
14      A.  Yes.
15      Q.  Have you communicated with others
16  within your police department about this case over
17  that email address?
18      A.  No.
19      Q.  Have you communicated with others in
20  your department about this case in general?
21      A.  No.
22      Q.  And what other means of communication
23  do you typically use to communicate work-related
24  matters?
25      A.  Word of mouth.

Page 15

1      Q.  So is it fair to say it's word of mouth
2  over email?  Is there anything else?
3      A.  No.
4      Q.  Okay.  Did someone collect documents or
5  files from you related to this litigation?
6      A.  No.
7      Q.  So just to be clear, the records that
8  you reviewed with Mr. Hughes and the CAD report,
9  these were documents that -- that you did not
10  provide.  They were housed on some other system; is
11  that correct?
12      A.  Could you clarify?
13      Q.  Sure.
14      That the documents that you referred to
15  in terms of what you reviewed for today's
16  deposition, none of those were ones that you
17  personally collected from your email or any other
18  database?
19      A.  No.
20      Q.  Okay.  Are you familiar with Detective
21  Laura Clements?
22      A.  No.
23      Q.  Are you familiar with Officer
24  Christopher Partin?
25      A.  No.

Page 16

1      Q.  Are you familiar with Chief Jon Belmar?
2      A.  Yes.
3      Q.  How do you know Chief Jon Belmar?
4      A.  He's the Chief of Police of the
5  department that I work for.
6      Q.  Have you worked at all with him
7  directly?
8      A.  No.
9      Q.  Have you spoken with him outside
10  of -- strike that.
11      Have you ever spoken directly to him
12  face-to-face, one-on-one?
13      A.  Yes.
14      Q.  What were the occasions for you to have
15  those one-on-one conversations?
16      A.  It was the end of probation period,
17  meeting with the chief to discuss my year, and I
18  think just other random events that St. Louis County
19  puts on.
20      Q.  What types of events were those?
21      A.  Christmas party or things of that
22  nature.
23      Q.  Are these type -- the types of
24  conversations that Chief Belmar has with other sort
25  of probationary officers?

KEVIN WALSH  2/9/2017

Page 17

1    A.  Yes.
2    Q.  Okay.  Would you describe it as like a
3  check-in?
4    A.  Yes.
5    Q.  Is this the type of conversation that
6  happens annually?
7    A.  No.
8    Q.  And during that conversation, did you
9  discuss your performance at all?
10    A.  Yes.
11    Q.  What aspects of your performance did
12  you two discuss?
13    A.  My demeanor in the -- in the police
14  department, how he believed that I was perceived by
15  other officers, supervisors, and then just general
16  things that maybe the department could do to -- to
17  grow.
18    Q.  Was this -- was this conversation --
19  did you perceive this conversation to be an
20  evaluation of any sort?
21    A.  Yes.
22    Q.  Do you know if it was recorded in any
23  file or documentation?
24    A.  I'm unaware.
25    Q.  Do you recall whether Chief Belmar was

Page 18

1  taking notes during that conversation?
2    A.  I don't believe he was.
3    Q.  Where did you have that conversation?
4    A.  His office.
5    Q.  And have you had occasion to meet or
6  talk with Chief Jon Belmar outside of the St. Louis
7  County Police Department offices?
8    A.  Yes.
9    Q.  What occasions have those been?
10    A.  The functions of Christmas parties or a
11  BackStopper event, things of that nature.
12    Q.  What is a BackStopper event?
13    A.  It's a local charity organization that
14  supports law enforcement and first responders.
15    Q.  And what type of activities or events
16  do they hold?
17    A.  Boxing matches, car shows, other
18  assortment of -- of charity functions that -- I
19  could probably go on and on.
20    Q.  And how did you get -- or strike that.
21    Are all officers involved in these
22  types of events?
23    A.  They can be if they want.  It's up to
24  their discretion if they choose to -- to
25  participate.

Page 19

1    Q.  And so you chose to participate?
2    A.  Yes.
3    Q.  Officer Walsh, do you know Dwayne
4  Furlow?
5    A.  I do.
6    Q.  How do you know Mr. Furlow?
7    A.  Calls for service to his residence.
8    Q.  About how many times have you received
9  calls for service to his residence?
10    A.  Roughly five, six.
11    Q.  Have you had any communications with
12  Mr. Furlow since this case was filed in February,
13  2016?
14    A.  Yes.
15    Q.  What would have been the nature of
16  those encounters?
17    A.  It was calls for service to his
18  residence for destruction of properties, I believe
19  disturbances, and keep the peace with Division of
20  Family Services.
21    Q.  Do you know either of the other named
22  defendants in this matter, Ralph Torres or Harold
23  Liner?
24    A.  No.
25    Q.  What was your reaction --

Page 20

1    MR. HUGHES:  Excuse me.  Maybe I heard
2  you wrong, but I thought you said, Do you know the
3  other defendants, Mr. Liner, but you meant the
4  plaintiffs; is that right?
5    MR. HAMILTON:  I apologize.
6    MR. HUGHES:  If I heard it wrong --
7    MR. HAMILTON:  No.  You've got --
8  you've got that correct.
9    MR. HUGHES:  -- but maybe I did.
10    MR. HAMILTON:  Thank you.  Thank you,
11  Mr. Hughes.  That's correct.
12    Q.  The other plaintiffs, Ralph Torres or
13  Harold Liner, do you know either of them?
14    A.  No.
15    Q.  Thank you.
16    Officer Walsh, what was your reaction
17  upon learning that you were named as a defendant in
18  this matter?
19    A.  Confused.
20    Q.  Why?
21    A.  Never been sued before.
22    Q.  That's fair.
23    Okay.  So let's walk through some of
24  your professional background, starting with
25  education.

5 (Pages 17 to 20)

**KEVIN WALSH  2/9/2017**

---

Page 21

1    Officer Walsh, have you ever been known
2  by another name?
3    A.  No.
4    Q.  Okay.  Could you state your educational
5  background going in reverse from -- not in reverse
6  but let's start at the end of high school and coming
7  up to the most recent education that you've
8  received.
9    A.  High school diploma, bachelor's degree,
10  and then a graduate of the St. Louis County Police
11  Academy.
12    Q.  Can you go back through each of those
13  and -- and tell me -- tell us where you received
14  each of those educational experiences?
15    A.  In 2005 it was Christian Brothers
16  College High School.
17    And in 2010, it was Harris-Stowe State
18  University.
19    Q.  What was your major?
20    A.  Criminal justice.
21    Q.  Did you know at that point that you
22  wanted to be a police officer?
23    A.  No.
24    Q.  What did you do after graduating from
25  college?

---

Page 22

1    A.  I became a probation parole officer for
2  the State of Missouri.
3    Q.  Tell me about that experience.  How did
4  you come to apply for that job?
5    A.  It was something that I was interested
6  in.  I met the requirements, took their exam,
7  passed, and graduated the Missouri Department of
8  Corrections along the lines of a -- of Academy.  I
9  don't know the correct term for it.
10    Q.  When you say you "met the
11  requirements," what were those requirements?
12    A.  They were looking for college --
13  college degrees.  Off the top of my head, I -- I
14  wouldn't be able to give you much more than that.
15  I'm sorry.
16    Q.  Sure.
17    And what did your -- what did that job
18  entail?
19    A.  It was to monitor, investigate
20  felony -- offenders that were on Missouri probation
21  and/or parole for felony crimes, to investigate
22  their family as a suitable home for this person to
23  live.  It was to institute drug treatment if need --
24  if needed, and it was also to investigate possible
25  employment and any other violations that the

---

Page 23

1  offender may have occurred while on probation or
2  parole.
3    Q.  And where were you based during this
4  time?
5    A.  Downtown St. Louis.
6    Q.  And what was your -- do you have a
7  jurisdiction in that job, like a --
8    A.  Yes.  It was primarily everything from
9  the Wainwright Building north up until the 63147 ZIP
10  code which is right about the county/city line.
11    Q.  Okay.  So I'm not from here, so give me
12  a sense of how long would it take to drive from the
13  farthest two points of that jurisdiction, just to
14  get a sense of how big that is.
15    A.  Roughly 20 minutes.
16    Q.  Okay.  Okay.
17    MR. HUGHES:  Just so you know, in
18  St. Louis, everything is about 20 minutes away.
19  Sometimes 30.
20    MR. HAMILTON:  Starting to gather that.
21  Of course with no traffic.
22    Q.  And how long did you hold this
23  position?
24    A.  I was an intern for six months, and
25  then I worked there, I believe, about a year and a

---

Page 24

1  half.
2    Q.  Okay.  Were there significant changes
3  in responsibilities as an intern and as a full-time
4  probation officer?
5    A.  No.
6    Q.  Okay.  And at some point that
7  employment ended.  What did you do after that?
8    A.  I enrolled into the St. Louis County
9  Police Academy.
10    Q.  And so was it during your time as a
11  probationary officer -- or a probation officer,
12  excuse me, that you realized you wanted to join the
13  police force?
14    A.  Yes.
15    Q.  And so help me chronologically.  About
16  what year was it that you decided to -- to join the
17  St. Louis County police force?
18    A.  It would have been 2012.
19    Q.  Okay.  And so what -- what was that
20  process like?  You -- presumably you applied?
21    A.  Yes.
22    Q.  And how long -- what was the
23  application process?
24    A.  It was a written application.  After
25  that there were written tests, verbal tests, a

---

6 (Pages 21 to 24)

**KEVIN WALSH  2/9/2017**

Page 25

1  physical fitness test, background investigation,
2  polygraph test, and ultimately a board panel
3  interview with the higher ranking St. Louis County
4  police officers.
5       Q.  How did that compare to the -- to the
6  application process for serving as a probation
7  officer?
8       A.  Night and day.
9       Q.  Night and day?
10      A.  Yes.
11      Q.  Much more comprehensive?
12      A.  Yes.
13      Q.  And then so how long did it take from
14  applying to become a police officer to learning that
15  you'd been accepted to the Academy?
16      A.  I'd say roughly six months.
17      Q.  Okay.  At which point you began -- did
18  you immediately start the St. Louis -- strike that.
19          At that point did you immediately begin
20  enrollment in the Police Academy?
21      A.  Yes.
22      Q.  And so now what year was that?
23      A.  2013.
24      Q.  Okay.  Do you remember the month?
25      A.  It would have been June.

Page 27

1       A.  Yes.
2       Q.  So at that point, what was your -- what
3  was your position or title with the St. Louis County
4  police force?
5       A.  Probationary police officer.
6       Q.  And how long were you a probationary
7  police officer?
8       A.  One year.
9       Q.  Is that standard?
10      A.  Yes.
11      Q.  And what does it mean to be a
12  probationary police officer?
13      A.  It pretty much means you don't have the
14  protections outside of the police department with
15  the Police Officers's Association necessarily, and
16  that you have to meet a certain criteria to get off
17  probation that the police department sets up.
18      Q.  Do you know what that -- what that
19  criteria is?
20      A.  Successful completion of field
21  training.
22      Q.  Okay.  So what is field training?
23      A.  Field training is when you're with a
24  senior officer.  That senior officer is responsible
25  for maintaining not only your -- your -- your case

Page 26

1       Q.  June, 2013 you started the St. Louis
2  County Police Academy?
3       A.  Yes.
4       Q.  And how long did that -- did your time
5  at the Academy last?
6       A.  Six months.
7       Q.  Were you on a campus?  Did you commute
8  from where you lived?
9       A.  Yes.
10      Q.  Which one of those?  Excuse me.
11      A.  I commuted.
12      Q.  And what did -- talk to us about
13  what -- what sort of Academy training entailed over
14  the course of that six months.
15      A.  It was very comprehensive.  Not only
16  was it academic but it was physical.  "Academic"
17  being from -- everything from how to write a
18  accident report up to a homicide investigation.
19      Q.  Okay.  I want to come back to the
20  Academy a little bit because that's -- that's going
21  to be an interesting conversation, but I want to get
22  through -- so you -- you spent six months at the
23  Academy.  So that takes us to the end of 2013 when
24  you completed your time at the Academy; is that
25  correct?

Page 28

1  file, personal case file, of meeting the standards
2  that St. Louis County has set up being that certain
3  reports have to be written, certain guidelines have
4  to be met of -- sorry.  I'm trying to find the
5  best -- best phrasing.
6       Q.  Yeah.
7       A.  But just like any -- any other line of
8  work, pretty much going back to school and learning
9  the trade.
10      Q.  Yeah.  Are you aware of what -- did you
11  ever become aware of what the requirements are to
12  serve as a -- as a field instructor?  Did I get that
13  term right?
14      A.  Yes.
15      Q.  Do you know -- did you ever learn what
16  those requirements are?  How much more senior you
17  have to be?  Is there certain training involved
18  there?
19      A.  Yes.  It's a one-week completion of a
20  field training school, and it is picked upon by your
21  immediate supervisors of who is designated a field
22  trainer.
23      Q.  And is there -- do you have to reach a
24  certain level of seniority in terms of years in the
25  force until you can be sort of nominated to be a

7 (Pages 25 to 28)

KEVIN WALSH  2/9/2017

Page 29

1  field instructor?
2      A.  No.
3      Q.  You just can't be a probationary
4  officer?
5      A.  Correct.
6      Q.  And is it -- is it the case that your
7  field instructor sort of goes on every call with you
8  and assists in sort of all facets of the job during
9  your probationary period?
10      A.  Yes.
11      Q.  And is there a -- is there an
12  evaluation or a review process from the field
13  instructor to you, the probationary officer?
14      A.  Yes.
15      Q.  How often does that happen?
16      A.  At the end of every phase, and there
17  are four phases.
18      Q.  And so are all phases equal in terms of
19  duration?
20      A.  No.
21      Q.  So how long is each phase?
22      A.  The first phase is five weeks.  The
23  second phase is three.  The third phase is four.
24  And I believe the fourth phase is three as well.
25      Q.  Three week -- and those latter ones

Page 30

1  you're talking about, when you're stating three,
2  you're talking about months?
3      A.  Three weeks.
4      Q.  Weeks?
5      A.  Yes, sir.
6      Q.  Oh, excuse me.  So I apologize.
7  Let's -- let's do this again.
8          So the phases -- how long are all four
9  phases all together?
10      A.  I believe -- 17 weeks I believe.
11      Q.  Okay.  So is it -- is it correct that
12  you're a probationary officer, and immediately once
13  you start your time as a probationary officer, you
14  start in Phase One, and you go through those four
15  phases in a manner of 17 weeks.  So after you
16  finished those four phases, you're a probationary
17  officer still, but you're no longer assisted as
18  comprehensively by your field instructor; is that
19  correct?
20      A.  Yes.
21      Q.  And so what does your relationship
22  become with your field instructor after those 17
23  weeks?
24      A.  Pretty much what you want to make of
25  it.  Some field trainers are still out there, not

Page 31

1  necessarily looking over you but checking in with
2  you to make sure that there's nothing that they can
3  help you with or investigations that they could help
4  further with you.  There are some field trainers
5  that kind of just let you go.  My three field
6  trainers were pretty hands-on.
7      Q.  Who were your three field trainers?
8      A.  Officer Mumford.
9      Q.  How do you spell that?
10      A.  M-u-m-f-o-r-d.
11      Q.  Okay.
12      A.  Officer Wojchiuh -- W-o -- I'm not even
13  going to spell it right, but W-o-j-c-h-i-u-h, I
14  believe.
15      Q.  Okay.
16      A.  And Officer King.
17      Q.  Officer King?
18      A.  King.
19      Q.  So once you're finished with your 17
20  weeks -- well, how -- how do those three field
21  training officers divide between your 17 weeks?
22      A.  The first five weeks were with Officer
23  Mumford.
24      Q.  Uh-huh.
25      A.  And then three weeks were with Officer

Page 32

1  King, four weeks were with Officer Wojchiuh, and
2  then I returned to Officer Mumford for the fourth
3  phase.  And I believe it was the additional three.
4      Q.  And so after you finished those 17
5  weeks, which field instructor do you go to when
6  you -- or who are you assisted by of those three?
7      A.  It's all verbal so I'm not
8  necessarily -- nobody physically checks in.
9      Q.  Uh-huh.
10      A.  But Officer Mumford and Officer King
11  worked in my precinct.  Officer Wojchiuh did not
12  work in my precinct.
13      Q.  And did they -- did they continue to
14  have check-in conversations or evaluations of you
15  during your probationary period?
16      A.  Not evaluations but check-in.
17      Q.  And were those more ad hoc sort, of at
18  your discretion or their discretion?
19      A.  Yes.
20      Q.  So if I've got my math right, in about
21  2015 you've -- the beginning of 2015, you've
22  completed your probationary period?
23      A.  Yes.
24      Q.  And what is your title then?
25      A.  Police officer.

8 (Pages 29 to 32)

**KEVIN WALSH  2/9/2017**

Page 33

1  Q.  And has that been your title -- is that
2  your title today?
3  A.  No.
4  Q.  What is your title today?
5  A.  Detective.
6  Q.  So when did you achieve the rank of
7  detective?
8  A.  It was July of '16.
9  Q.  So tell me a little bit about your
10  day-to-day as a -- as a police officer I guess for
11  the -- for the year and a half that you were a
12  police officer, starting in early 2015 to the middle
13  of July of 2016.  And I guess just give me a sense
14  of what does your typical day look like?
15  A.  There's nothing necessarily typical.
16  But answering radio calls that are dispatched by
17  St. Louis County Police communications, calls for
18  services for accidents, calls for service for
19  shopliftings, robberies, domestics, rape, homicides,
20  and then also self-initiated assignments that I use
21  my discretion on of making traffic stops or
22  pedestrian checks or business contacts, business
23  checks, things of that nature.
24  Q.  The self-initiated work that you just
25  described, how did you determine when you were going

Page 34

1  to do those or when you were going to dedicate time
2  for that?
3  A.  It all depended on the precinct.  So on
4  some days, we're pretty busy, and you don't have
5  time to do anything self-initiated.  There's other
6  times where there is no assist car close to you, so
7  it puts officers at a disadvantage.  Pretty
8  dangerous being on your own.  So a little more
9  reluctant to do self-initiated assignments if
10  there's no other officers in service around you.
11  Q.  During this time, did you have a
12  partner?
13  A.  No.
14  Q.  And so when you went -- when you
15  responded to calls for service, you tended to
16  respond to them just yourself?
17  A.  Depending on the nature of the call,
18  but, yes.
19  Q.  So what is the -- what factors would --
20  would sort of militate in favor of going alone
21  versus going with someone else?
22  A.  Disturbances, fights, domestics,
23  shootings, things of that nature require two cars.
24  Q.  When you say "require two cars," is
25  that in some sort of guidance that you received?

Page 35

1  A.  Yes.
2  Q.  Is it verbal or written guidance?
3  A.  It is written.
4  Q.  Do you know where it's written?
5  A.  In our general order.
6  Q.  Okay.  Do you know which general order?
7  A.  I do not.
8  Q.  During your time as a police officer,
9  who did you -- who did you immediately report to?
10  A.  The sergeants and then to the
11  lieutenant.
12  Q.  Who is your -- during your year and a
13  half, who was your sergeant?  Did you have just one?
14  A.  No.  There are three per platoon.  In
15  that year and a half I had switched platoons, so
16  there are at least six, probably more.
17  Q.  Okay.  And when you report to these
18  sergeants, is there any one in particular that you
19  are closer to hierarchically, or as a practical
20  matter did you -- well -- strike that.
21  Were you divided amongst the sergeants
22  in any type of way?
23  A.  No.
24  Q.  As a practical matter, did you work
25  more closely with one of the particular sergeants

Page 36

1  over the others?
2  A.  No.  Sergeants kind of fluctuate so ...
3  Q.  During your time as a police officer,
4  did anyone report to you?
5  A.  No.
6  Q.  During your time as a police officer,
7  did you ever serve as a field instructor?
8  A.  Yes.
9  Q.  At what point did you serve as a field
10  instructor?
11  A.  I believe it was after my second year,
12  my second full year as a police officer.
13  Q.  So that would have been the beginning
14  of '16?
15  A.  Yes.
16  Q.  And is this how you know about the
17  one-week training for field instructors?
18  A.  Yes.
19  Q.  And what did that training entail?
20  A.  It entailed management of people,
21  personalities, how to overcome obstacles that a
22  young police officer or a supervisor might entail.
23  Q.  Uh-huh.
24  A.  Or might encounter.
25  Q.  Were there any materials that you

**KEVIN WALSH  2/9/2017**

Page 37

1  received during this instruction?
2     A.  Yes.
3     Q.  Do you have any of those materials
4  still?
5     A.  I believe I do.
6        MR. HAMILTON:  Okay.  Mr. Hughes, if
7  you don't mind, at some point we'd like to see those
8  materials, if possible.
9        MR. HUGHES:  We'll talk about it.  But
10  I mean, I don't care but ...
11  BY MR. HAMILTON:
12     Q.  And did you take any notes during this
13  instruction?
14     A.  I believe I did.
15     Q.  Okay.  What's the process of becoming a
16  detective like?
17     A.  A lot of hard work.
18     Q.  Yeah?
19        Is there an application process?
20     A.  There was a memo.
21     Q.  A memo that you had to write?
22     A.  Yes.
23     Q.  What's the subject of the memo?
24     A.  Your qualifications.
25     Q.  And what was the -- were there any

Page 38

1  other aspects of the application process?
2     A.  There was an interview.
3     Q.  And how long was the process from the
4  time you applied to the time that you learned that
5  you were accepted or promoted to -- to be a
6  detective?
7     A.  I'd say weeks.
8     Q.  And when you became a detective, did
9  you -- did your jurisdiction change at all?
10     A.  No.
11     Q.  You remained in the same office?
12     A.  Yes.
13     Q.  How did your responsibilities change as
14  a detective?
15     A.  Noncall responsive versus as a
16  patrolman being call responsive.
17     Q.  So is it fair to say that as a
18  detective -- and I apologize.  This comes from just
19  not knowing.  Are -- is all of your work
20  self-initiated?
21     A.  No.
22     Q.  How do you receive your work if you're
23  not responding to calls?
24     A.  Road officers will ask for assistance
25  or guidance on a particular case.  Supervisors

Page 39

1  determine that the precinct intelligence detectives
2  will take certain cases that the road officer either
3  wishes not to handle or doesn't necessarily have the
4  time or ability to further that investigation.
5     Q.  As a detective, does anybody report to
6  you?
7     A.  No.
8     Q.  Who do you report to as a detective?
9     A.  The sergeant.
10     Q.  Is it the same group of sergeants that
11  you reported to as a -- as a police officer?
12     A.  No.
13     Q.  Are these -- how are they different?
14     A.  It is just one sergeant in this manner.
15     Q.  Once you became a detective, which
16  sergeant did you begin reporting to?
17     A.  Sergeant Roediger.
18     Q.  Can you spell that name?
19     A.  R-o-e-d-i-g-e-r.
20     Q.  Is this the same sergeant that you
21  report to today?
22     A.  Yes.
23     Q.  And do you have a particular specialty
24  or division that you -- you're responsible for as a
25  detective?

Page 40

1     A.  St. Louis County North County gangs.
2     Q.  Did you select this?
3     A.  No.
4     Q.  How many people are in that -- is it
5  fair to call it a unit?
6     A.  Uh-huh.  Two.
7     Q.  Who else is in that unit?
8     A.  Detective Rob Brannan.
9     Q.  Brannan?
10     A.  Brannan.  B-r-a-n-n-a-n.
11     Q.  Have you ever received a demotion or
12  reprimand?
13     A.  No.
14     Q.  Aside from this case, are you aware of
15  any instance in which your conduct was investigated?
16     A.  Yes.
17     Q.  What was that instance or those
18  instances?
19     A.  It was just one.  I was informed by
20  Bureau of Professional Standards that a complaint
21  was filed that I did not show up to a call.  It was
22  determined that that was not sustained, as my car --
23  my car and a witness determined that I was on-scene,
24  and my car GPS proved that I was on-scene.
25     Q.  When did this happen?

10 (Pages 37 to 40)

KEVIN WALSH  2/9/2017

Page 41

1    A.  Probably two years ago.
2    Q.  During your probationary period?
3    A.  Right around there.
4    Q.  And who -- did you find out who -- how
5  did it come to light in the first place?
6    A.  I believe I received an email and then
7  a phone call from Bureau of Professional Standards.
8    Q.  And outside of this instance, no other
9  instance in which you're aware of that your conduct
10  was under investigation?
11    A.  No.
12    Q.  Thank you.
13        So as I get to that, let's talk a
14  little bit about the training because that's -- can
15  you describe in a little bit of detail the -- the
16  type of training that you received during The Police
17  Academy?
18    A.  It was academic classroom material,
19  different instructors from The Police Academy,
20  different guest speakers required several tests,
21  quizzes, presentations and -- then also the
22  physical manner, same thing.
23    Q.  So let's talk about the -- and remind
24  me.  I apologize.  I know I asked this.  About how
25  long did the actual Academy last?

Page 42

1    A.  Six months.
2    Q.  Six months is what I thought.
3        Was it classroom instruction for all of
4  those six months?
5    A.  Yes.
6    Q.  How frequently did that classroom
7  instruction occur?
8    A.  Every day.
9    Q.  For how many hours?
10    A.  Roughly it was an eight-hour day.  Give
11  or take an hour or two, three times a week for
12  physical fitness, half hour for lunch.  So I'd say
13  six to eight.
14    Q.  So is it fair to say that most of the
15  Academy training was classroom training?
16    A.  Yes.
17    Q.  And what subjects did this classroom
18  training cover?
19    A.  It -- it covered ethics, criminal law,
20  Constitutional law, criminal investigation,
21  domestic, accident investigation.  That's all I'm
22  coming up with right now.
23    Q.  And just -- how big was your class?
24    A.  I believe it was 19.
25    Q.  Did your class have a number?

Page 43

1    A.  Yes.
2    Q.  What number was your class?
3    A.  180.
4    Q.  Did everybody in your class go on to
5  become a -- a police officer?
6    A.  Yes.
7    Q.  So let's go back to the -- to the
8  classroom training.  You mentioned that some of that
9  instruction was in law.  Can you tell me a little
10  bit about what you remember about sort of the legal
11  instruction that you received?
12    A.  It was a state statute specific to
13  Missouri and then Constitutional law.
14    Q.  And who provided that instruction?
15    A.  It was -- Ron Grames was Constitutional
16  law.
17    Q.  How do you spell that name?
18    A.  I believe it is G-r-a-m-e-s.
19    Q.  So that was Constitutional law?
20    A.  Uh-huh.
21    Q.  And what about the statutes?
22    A.  That was Officer Keith Emerson of the
23  Maryland Heights Police Department.
24    Q.  Is Officer Emerson a lawyer?
25    A.  No.

Page 44

1    Q.  And you mentioned that there were
2  evaluations.  About how frequently did these
3  evaluations on sort of the Constitutional law and
4  statutory law occur?
5    A.  There are weekly quizzes.  Tests
6  occurred at the end of -- of certain blocks.
7    Q.  Was all of this instruction given
8  in-person?
9    A.  Yes.
10    Q.  Is any of it online?
11    A.  No.
12    Q.  Was there homework?
13    A.  Yes.
14    Q.  Based on your recollection, did any of
15  this training cover wanteds?
16    A.  Yes.
17    Q.  What do you remember about the training
18  on wanteds from the Academy?
19    A.  I believe it was -- you know, it was
20  distinguishing between a wanted and a warrant and
21  how a wanted worked, how a warrant worked.
22    Q.  Do you recall any -- receiving any
23  materials along these lines?
24    A.  No.
25    Q.  So this -- based on your recollection,

11 (Pages 41 to 44)

10

Page 45

1  the instruction on -- on wanteds and warrants was
2  verbal instruction?
3      A.  Yes.
4      Q.  Was there any electronic materials,
5  PowerPoints, anything like that?
6      A.  I don't know.
7      Q.  Do you recall, given the context of --
8  of the -- the time that you spent on the legal
9  instruction, how many hours or how many classes
10  you-all spent on wanteds?
11      A.  I don't know.
12      Q.  You mentioned that some of the
13  instruction was on the distinction between wanteds
14  and warrants.  What is that distinction?
15      A.  A warrant is signed by a judge versus a
16  wanted is determine -- determined by the officer
17  that probable cause exists to arrest a subject.
18      Q.  Was -- based on your recollection, was
19  this definition of a wanted the one that was given
20  during your Police Academy instruction?
21      A.  Yes.
22      Q.  And how is probable cause defined or
23  explained during your instruction?
24      A.  It's reasonable -- a reason to believe
25  that a crime has been committed by a subject.

Page 46

1      Q.  And was this -- was this definition
2  applicable to both wanteds and warrants?
3      A.  Yes.
4      Q.  And so based on your understanding from
5  The Police Academy that -- the only difference
6  between a wanted and a warrant was the fact that a
7  warrant required the signature of a judge; is that
8  correct?
9      A.  Yes.
10      Q.  What do you recall from the -- your
11  Academy training -- strike that.
12          Did you receive any training once you
13  completed the Police Academy?
14      A.  Yes.
15      Q.  What type of training did you receive
16  following the Police Academy?
17      A.  Field training.
18      Q.  What does field training consist of?  I
19  know you answered it a little bit, but I'd like to
20  sort of get it in the context of what the Academy
21  training was, so I'll ask the question again.
22          What did field training consist of?
23      A.  It consisted of a senior officer
24  responding to calls with you, coaching you through
25  certain calls, and guiding you to further

Page 47

1  investigations.
2      Q.  Were there ever -- did it ever include
3  any more formal instruction, like in a classroom?
4      A.  There is quarterly in-service that
5  St. Louis County mandates.
6      Q.  Is this part of field instruction, or
7  is this separate and part?
8      A.  This is separate.
9      Q.  Okay.  Let's -- let's go back to that.
10          But as far as field instruction, were
11  there ever -- was there ever an occasion when your
12  field instructor said, you know, now we're going to
13  sit in a classroom and -- and read some books on the
14  law or policy?
15      A.  Not in the classroom.
16      Q.  Okay.
17      A.  More of a patrol vehicle.  But reading
18  general orders.
19      Q.  Reading general orders?
20      A.  Uh-huh.
21      Q.  So you would read general orders with
22  your field instructor?
23      A.  Yes.
24      Q.  Was this -- was this formalized in any
25  way, or was this more of a conversation?

Page 48

1      A.  More of a conversation.
2      Q.  And in the course of the field
3  instruction, do you recall any occasion in which the
4  topic of wanteds was discussed?
5      A.  Not a specific one, no.
6      Q.  So is that a "yes" but not
7  specifically?
8      A.  Yes.
9      Q.  So just to -- just to ask it a
10  different way, did you discuss wanteds with your
11  field instruction officer --
12      A.  Yes.
13      Q.  -- or trainer?
14          What do you recall those conversations
15  consisted of?
16      A.  How to properly go about issuing a
17  wanted, the steps that needed to be taken for a
18  wanted to actually come to light.
19      Q.  Talk to me a little bit about what you
20  recall about the steps, the correct steps that
21  needed to be taken in order to take in order for a
22  wanted to come to light.
23      A.  Probable cause had to be determined.
24  Once probable cause was determined on a subject or
25  subjects, depending on the case, a supervisor was

12 (Pages 45 to 48)

**KEVIN WALSH  2/9/2017**

Page 49

1   notified, and then the CARE operator was notified.
2       Q.  What steps did -- would an officer take
3   in order to make a probable cause determination?
4       A.  Based on facts that were given at the
5   scene.
6       Q.  Can you say a little bit more about
7   that?  Facts given on the scene by whom?
8       A.  By significant others, family members,
9   friends, sometimes store owners that determined that
10  a crime has been committed and notify the police.
11  And the facts are given to the police officer, and
12  the police officer determines if probable cause does
13  exist that a crime had been committed by that said
14  subject.
15      Q.  Did -- in the course of a Police
16  Academy or in your field instruction, did anybody
17  ever talk about a threshold or a certain set of
18  factors and components that meant that you'd
19  achieved or reached probable cause?
20      A.  No.
21      Q.  But as you said, it was really based on
22  talking to the people at the scene and gathering the
23  facts?
24      A.  Yes.
25      Q.  So let's talk a little bit about you

Page 50

1   mentioned that one final -- not final but that next
2   category, in-service training, quarterly in-service
3   training.  Do I understand it correctly that that
4   means it happened every four months?
5       A.  Yes.
6       Q.  And where would that in-service
7   training take place?
8       A.  St. Louis County Police Academy.
9       Q.  And how long would that in-service
10  training be?
11      A.  It's a full workday.
12      Q.  And who has to attend those in-service
13  trainings?
14      A.  Everybody employed by St. Louis County
15  Police Department.
16      Q.  And what do those in-service trainings
17  entail?
18      A.  They entail academics, legal updates,
19  firearms training.
20      Q.  Do you recall any of those in-service
21  trainings relating to wanteds?
22      A.  No.
23      Q.  So you don't recall any in-service
24  training ever covering the topic of wanteds?
25      A.  No.

Page 51

1       Q.  Do you recall any of those in-service
2   trainings covering the topics of -- or the topic of
3   probable cause determinations?
4       A.  Not to my knowledge.
5       Q.  What about when and whether to pursue
6   or issue a warrant?
7       A.  No.
8       Q.  Now, as far as training in general,
9   what were you taught about when you should take
10  steps to issue a wanted versus pursuing a warrant?
11      A.  Could you rephrase, please?
12      Q.  Sure.
13          Did -- in the course of your training,
14  what did you learn about when it was appropriate to
15  issue a wanted and when it was appropriate to pursue
16  a warrant?
17      A.  One would be the subject is not
18  on-scene.  So therefore, even though probable cause
19  was determined, the subject isn't on-scene so the
20  subject could not be taken into custody at that
21  time.  And through numerous investigations,
22  Prosecuting Attorney's Office has determined that
23  they wished to have the suspect interviewed before a
24  warrant would be issued.
25      Q.  Talk to me about that second part.  You

Page 52

1   said -- and I'm just reading it from the transcript
2   here -- through numerous investigations,
3   prosecuting -- the Prosecuting Attorney's Office has
4   determined that they wished to have the suspect
5   interviewed before a warrant would be issued.
6          Is -- is what -- is that statement
7   instruction that you've received from the
8   Prosecuting Attorney's Office about the requirements
9   for issuing a warrant?
10      A.  Just verbal.
11      Q.  Verbal from whom?
12      A.  Prosecuting Attorney's Office.
13      Q.  Have you had conversations with members
14  of the Prosecuting Attorney's Office about sort of
15  what they need before they will issue or approve of
16  or pursue, I guess, a -- a warrant?
17      A.  Yes.
18      Q.  And have they said anything in addition
19  to the fact that they want numerous investigations?
20      A.  No.
21      Q.  So how do you interpret -- how do you
22  interpret that requirement of numerous
23  investigations?  Does it mean that in order to
24  pursue a wanted, you need to conduct more than one
25  investigation of the particular subject for whom you

13 (Pages 49 to 52)

**KEVIN WALSH  2/9/2017**

Page 53

1    want to get a warrant?
2         MR. HUGHES:  Maybe I object.  Maybe I
3    missed something, but I'm not quite sure where this
4    "numerous investigations" came in.  Maybe he said
5    that.  I just don't remember, so I'm just --
6         MR. HAMILTON:  It is --
7         MR. HUGHES:  -- not quite clear on
8    where this question came from, but it might be my
9    fault.
10        MR. HAMILTON:  So I'll ask the question
11   again.
12        Q.  Did you ever receive any instruction,
13   particular instruction from the Prosecuting
14   Attorney's Office, that they needed numerous --
15   numerous investigations, as in more than one
16   investigation, in order to issue a warrant or to
17   pursue a warrant?
18        A.  No.  I -- I was stating that over the
19   course of numerous investigations that I've worked,
20   that is what they have -- have asked, not they don't
21   want numerous investigations.  I was stating --
22        Q.  Okay.  So let me clarify.  Over the
23   course of numerous investigations that you've
24   participated in, you have learned that the
25   Prosecuting Attorney's Office wants what in order to

Page 54

1    pursue a warrant?
2         A.  An interview of the subject.
3         Q.  And have they specified what an
4    interview of the subject actually means?
5         A.  No.
6         Q.  How do you interpret that interview
7    requirement of the subject?
8         A.  Subject is taken into custody, subject
9    is Mirandized, and a formal interview is conducted
10   by officer or officers.
11        Q.  What is a formal interview?
12        A.  I would say subject is -- like I said,
13   Mirandized, talked about the facts that were given
14   in a particular case and offered the ability to give
15   their side of the story.
16        Q.  Is it possible to have an official --
17   sorry, a formal interview at the scene?
18        A.  Potentially.
19        Q.  Is it possible to have a formal
20   interview over the phone?
21        A.  No.
22        Q.  Why not?
23        A.  I can't determine who that person is.
24        Q.  So you're saying in order for -- and
25   please correct me if I'm wrong.  I'm not trying to

Page 55

1    misstate anything.  In order for you to pursue a
2    warrant, you need to conduct a formal investigation
3    of an individual, and that formal investigation
4    entails speaking with them face-to-face?
5         Mike, he can clarify if --
6         MR. HUGHES:  No, no.  I think he said
7    for a warrant.  Maybe he might have said for --
8    might have wanted to say for a warrant --
9         MR. HAMILTON:  No, I meant -- I meant
10   warrant.
11        MR. HUGHES:  I'm sorry.
12        MR. HAMILTON:  That's okay.
13        Yeah, I'll repeat the question.
14        MR. HUGHES:  I apologize for the
15   interruption then.
16        MR. HAMILTON:  Not a problem.
17        Q.  So if I'm understanding you correctly,
18   based on the several investigations that you've
19   participated in, and conversations with the
20   Prosecuting Attorney's Office, before they will
21   pursue a warrant, they want the officer to have a
22   formal interview with the suspect, and that formal
23   interview entails a face-to-face meeting?
24        A.  Yes.
25        Q.  So do you understand the purpose of a

Page 56

1    wanted to allow an officer to formally interview the
2    suspect in a crime?
3         A.  Yes.
4         Q.  Does a -- does a wanted serve any other
5    purpose?
6         A.  No.
7         Q.  So to be clear -- strike that.
8         You mentioned that through several
9    investigations and conversations with the
10   Prosecuting Attorney's Office, you've developed this
11   understanding.  Is there a particular person at the
12   Prosecuting Attorney's Office who you've had
13   these -- that you recall who you've had these
14   specific conversations with?
15        A.  No.
16        Q.  Various folks in that office over time?
17        A.  (Nods head.)
18        Q.  Is the understanding that we just
19   discussed, is that written down anywhere?
20        A.  No.  Not to my knowledge.
21        Q.  So the understanding that you explained
22   is something that -- that you've developed and is
23   a -- is the practice that you follow; is that
24   correct?
25        A.  Yes.

14 (Pages 53 to 56)

**KEVIN WALSH  2/9/2017**

Page 57

```
 1          Q.  Is that the practice, to your
 2   knowledge, that other officers follow?
 3       A.  Yes.
 4          Q.  And is there any other type of
 5   guidance, unwritten, that you're aware of kind of
 6   captures this purpose of a wanted and the
 7   requirements for a warrant?
 8       A.  No.
 9          Q.  Does the Prosecuting Attorney's Office
10   ever specifically request or ask that an officer or
11   that you issue a wanted?
12       A.  No.
13          Q.  How many wanteds have you issued --
14   created?
15       A.  No idea.
16       Q.  Is it more than ten?
17       A.  Yes.
18       Q.  More than 50?
19       A.  I can't say for certain.
20          Q.  And how many warrants -- how many
21   warrant applications have you pursued or completed?
22       A.  Lots.
23       Q.  More than ten?
24       A.  Yes.
25       Q.  More than 50?
```

Page 58

```
 1       A.  Likely.
 2          Q.  And on any of those occasions -- let's
 3   talk about the warrants.  On any of those occasions,
 4   have you been told -- had that warrant application
 5   been rejected or denied?
 6       A.  Yes.
 7          Q.  What have been the reasons for those
 8   denials?
 9       A.  Taken under -- taken under advisement
10   or lack of -- lack of victim cooperation.
11          Q.  And so taken under advisement is a --
12   is a denial?
13       A.  Potentially.
14          Q.  What happens?  Does it just sit there
15   and nothing happens to it?
16       A.  I can't speak on -- on behalf of the
17   prosecutors.
18          Q.  How have you determined that it was --
19   you -- you placed that in the category of warrant
20   applications that have been denied.  So how did
21   you -- why did you place it in the category of
22   denials?
23          MR. HUGHES:  Well, I'm not sure if he
24   placed them in the category of denials.  I think he
25   did, but -- but I think he said sometimes they're
```

Page 59

```
 1   taken under advisement.
 2          MR. HAMILTON:  I can rephrase.
 3          MR. HUGHES:  Okay.
 4   BY MR. HAMILTON:
 5          Q.  What have been the reasons that you've
 6   received from the Prosecuting Attorney's Office that
 7   warrants that you've applied for have been denied?
 8       A.  The lack of victim cooperation,
 9   sometimes outside of the statute of limitations, off
10   the top of my head.
11          MR. HAMILTON:  So let's do this:  We've
12   been going for about an hour.  Let's take a short
13   break and come back.  I understand we've got a
14   packed day, so I'm fine with it being five
15   minutes --
16          MR. HUGHES:  Fine with me.
17          MR. HAMILTON:  -- so people can stretch
18   their legs.
19          THE VIDEOGRAPHER:  The time is 10:37.
20   We are off the record.
21          (Recess taken.)
22          THE VIDEOGRAPHER:  The time is 10:45.
23   We are back on the record.
24          BY MR. HAMILTON:
25          Q.  Thanks so much, Officer Walsh.
```

Page 60

```
 1          Now, just to close the loop here,
 2   we've -- we've been talking about the trainings that
 3   you've received, and we were talking about wanteds
 4   and warrants.
 5          Just to give you a little bit of a
 6   roadmap, I want to keep going with trainings for a
 7   little bit, and I want to talk a little bit more
 8   about wanteds as you might suspect and some of the
 9   general orders, and then we can get to some of what
10   this case is about.  Just so you have a sense of
11   where I'm going.
12          Are you familiar with REJIS?
13       A.  Yes.
14       Q.  What is REJIS?
15       A.  It's a regional system -- law
16   enforcement system.
17          Q.  And what relationship do you have with
18   REJIS?
19       A.  That is the system that St. Louis
20   County contracts with that we utilize.
21       Q.  Is it the only system?
22       A.  No.
23       Q.  What are the other systems?
24       A.  MULES, NCIC.
25       Q.  Are those all of the systems that you
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

Page 61

1    use?
2        A.  Uh-huh.
3        Q.  Are there any others?
4        A.  No.
5        Q.  Did you ever receive any training from
6    REJIS?
7        A.  Yes.
8        Q.  What type of training did you receive?
9        A.  I believe it's called operator --
10   operator training, how to navigate through --
11   through the system.
12       Q.  Can you give a little bit of a
13   description?  Doesn't have to be technical in terms
14   of what that entails.
15       A.  As simple as pretty much what button
16   does what, what -- what button will give you certain
17   information versus others.
18       Q.  Did any of the trainings or any of
19   the -- the guides relate to wanteds or warrants?
20       A.  Potentially.
21       Q.  I'm going to show you a document.  This
22   is a document that is marked DEFRFP40000001.  And
23   we'll hand it over to you momentarily.
24           I'm going to mark this as Walsh
25   Exhibit 1.

Page 62

1            (Exhibit 1 was marked for
2            identification.)
3        BY MR. HAMILTON:
4        Q.  I'm going to pass that to you.
5            Mr. Hughes, a copy for you.
6            And just for efficiency purposes, I'm
7    also going to provide you with another document.
8    This is marked DEF-SUPP0000022.
9            And we're going to mark this as Walsh
10   Exhibit 2.
11           (Exhibit 2 was marked for
12           identification.)
13       MR. HAMILTON:  Here's a copy for you
14   and a copy for you, Mr. Hughes.
15       Q.  If you have enough space to put these
16   side by side, do you agree, Officer -- or excuse
17   me -- Detective Walsh -- is that the correct
18   designation?
19       A.  Yes.
20       Q.  Detective Walsh, that they both say on
21   the front cover "Wanted Entry"?
22       A.  Yes.
23       Q.  And if you turn the first page of
24   each -- it's a coordinated process, I know -- would
25   you agree that if you take a look down at the bottom

Page 63

1    of what is page 3 of both documents, there is a date
2    that says "Updated" followed by a date; do you see
3    that?
4        A.  Yes.
5        Q.  Do you see that on what has been marked
6    as Exhibit 1, the updated date is January 2016; is
7    that correct?
8        A.  Yes.
9        Q.  And on the document marked Exhibit 2,
10   it is updated July 2014; is that correct?
11       A.  Yes.
12       Q.  Would you -- if you indulge me and turn
13   each page one more time and look to your left,
14   you'll see each page has a stick figure scratching
15   their head; do you see that?
16       A.  Yes.
17       Q.  And to the left of that stick figure,
18   it says "Record Types" underneath "Wanted versus
19   Warrant."  Do you see that?
20       A.  Yes.
21       Q.  And I'm going to read from Exhibit 2
22   first for "Wanted" right underneath "Record Types."
23   It reads, "Wanted, the police are interested in
24   questioning a subject prior to asking for a judge's
25   order.  Wanted records are maintained in REJIS but

Page 64

1    not MULES and NCIC."
2            Did I read that accurately?
3        A.  Yes.
4        Q.  Now, I'm going to read from Exhibit 1,
5    in the same section, and I'm going to read the
6    language as follows:
7            "Wanted, subject is wanted for
8    questioning.  There is no warrant associated with
9    the record.  The law enforcement officer entering
10   the wanted information must have probable cause to
11   believe that the person committed the crime prior to
12   entering a REJIS wanted on that person."
13           Did I read that accurately?
14       A.  Yes.
15       Q.  Detective Walsh, would you agree with
16   me that the language in Exhibit 2 for the definition
17   of a wanted does not include the words "probable
18   cause"?
19       A.  Yes.
20       Q.  And would you agree that the language
21   in Exhibit 1 for the definition of a wanted does
22   contain probable cause?
23       A.  Yes.
24       Q.  Do you happen to know why probable
25   cause was not included in the definition in

16 (Pages 61 to 64)

**KEVIN WALSH  2/9/2017**

Page 65

1  Exhibit 2, the document of Jane -- of July, 2014?
2      A.  No.
3      Q.  Was probable cause part of a
4  determination of a wanted in July, 2014?
5      A.  Could you rephrase, please?
6      Q.  As a police officer who served in the
7  St. Louis County Police Department in July of 2014,
8  was probable cause a requirement for issuing a
9  wanted?
10     A.  Yes.
11         MR. HUGHES:  Okay.  I was just going to
12  object because he had answered it before but he
13  answered it again.  That's okay.
14     BY MR. HAMILTON:
15     Q.  Why do you think that the language in
16  these two definitions of a wanted is different?
17         MR. HUGHES:  My objection, it was asked
18  and answered about 60 seconds ago.  So repetitive.
19     BY MR. HAMILTON:
20     Q.  You may answer the question.
21     A.  I don't know.
22     Q.  Are you aware of any events in between
23  the publication of these two exhibits that may have
24  caused for the inclusion -- strike that.
25         Are you aware of any events in between

Page 66

1  the publication of these two reports that resulted
2  in a different definition for a wanted in these
3  manuals?
4      A.  No.
5      Q.  Do you recall any conversations outside
6  of trainings about the requirements for
7  wanteds -- strike that.
8         Have you spoken with fellow officers
9  about the requirements for wanteds since July 2014?
10     A.  Yes.
11     Q.  What have these conversations consisted
12  of?
13     A.  That supervisor approval based on
14  probable cause facts in particular cases is now
15  required.
16     Q.  You said that supervisor approval based
17  on probable cause facts in particular cases is now
18  required.  Does that mean that it was not required
19  beforehand?
20     A.  No.  It was required.  But supervisors
21  who authorize the wanted now goes into the narrative
22  of the CARE report for St. Louis County.
23     Q.  Are you aware of why that change was
24  made?
25     A.  No.

Page 67

1      Q.  Is it accurate that the supervisor
2  authorization was not a part of wanteds previous
3  to -- strike that.
4         You previously said the supervisor
5  approval based on probable cause is now required.
6  When you said "now required," were you referring to
7  a particular time period as to when that changed?
8      A.  No.  I was just stating that a
9  supervisor now has to be named in the report saying
10  that the wanted, based on your probable cause, is
11  authorized.
12     Q.  And what I'm asking is about your use
13  of the word "now."  Prior to the "now," such
14  designation of the supervisor's approval was not
15  required?
16         That's poorly phrased.  I apologize.
17         What time -- during what time period
18  was an officer's -- the designation of the
19  supervising officer's authorization not required in
20  the narrative of the report, of the wanted report?
21         MR. HUGHES:  Maybe it's clear to him,
22  but I'm just objecting because the question just
23  does not seem clear to me.  It's ambiguous.  So I
24  object to the form.
25     BY MR. HAMILTON:

Page 68

1      Q.  Would you like me to rephrase, or did
2  you understand my question?
3      A.  Could you please rephrase?
4      Q.  Sure.
5         Based on your recollection, was there a
6  time in which a supervisor's -- the inclusion of a
7  supervisor's authorization needed to be included in
8  a wanted report?
9      A.  No.
10     Q.  So it's always been the case that
11  you've needed to designate the supervisor's approval
12  in the narrative of the report?
13     A.  No.
14     Q.  When did that change?  When did that
15  become required?
16     A.  I don't know the exact date, but the
17  update to our last general order.
18     Q.  Okay, thank you.
19         Thank you for bearing with me on that
20  question.  Okay.  I think we can put this to the
21  side.
22         So just to -- to close this off, we
23  talked about your Academy training.  We talked about
24  in-service training.  We talked about field
25  training.  We talked about training or manuals from

17 (Pages 65 to 68)

**KEVIN WALSH  2/9/2017**

---

Page 69

1   REJIS. Is there any training that comes to mind for
2   you on the topic of wanteds and warrants that I
3   didn't cover?
4        A.   No.
5        Q.   So that -- that captures the universe?
6        A.   Yes.
7        Q.   Have you participated as an instructor
8   in any trainings on wanteds and warrants?
9        A.   No.
10       Q.   Let's dig into wanteds a little bit.
11   Am I correct that your -- in your prior
12   testimony 15, 20 minutes ago is that you said the
13   purpose of a wanted is to give an officer an
14   opportunity to conduct a formal investigation of a
15   suspect -- formal interview of a suspect?
16       A.   After probable cause was determined,
17   yes.
18       Q.   And to be clear, is this -- based on
19   your conversations and interactions with other
20   officers and detectives in the St. Louis County
21   Police Department, is this understanding of the
22   purpose of a wanted shared amongst your colleagues?
23       A.   Yes.
24       Q.   And is that definition of purpose
25   written anywhere that you're aware of?

---

Page 70

1        A.   Not that I'm aware of.
2        Q.   Are you aware of other jurisdictions
3   that use wanteds?
4        A.   No.
5        Q.   Why do you think wanteds are used in
6   St. Louis County?
7        A.   Based off of the testimony that I just
8   gave, that it's -- before probable cause is
9   determined, the wanted is placed out for the suspect
10   to conduct a formal interview if the suspect is not
11   on scene.
12       Q.   Are you aware of any distinguishing
13   factors that make St. Louis County different from
14   other jurisdictions in Missouri or other parts of
15   the country?
16       A.   I know everybody does something a
17   little different.
18       Q.   So let's walk through the process of --
19   of actually creating a wanted. You -- you started
20   doing that -- and I appreciate you indulging me to
21   come back and revisit this topic.
22            So you receive a call -- this is as a
23   police officer -- you receive a call to come to --
24   come to a scene where -- from which the call
25   originated. What type of investigation do you do

---

Page 71

1   upon arriving on the scene?
2        A.   Contact the reporting party.
3        Q.   And what does that contact consist of?
4        A.   Asking them to -- as simple as why --
5   why were we called to the scene.
6        Q.   And after determining why you were
7   called to the scene, what in general happens next?
8        A.   Gather the reporting party's pedigree
9   information, their statement, and then I contact
10   witnesses.
11       Q.   And so you've done all of this contact
12   in the factual investigation. At what point in time
13   do you make a determination that perhaps a wanted is
14   justified?
15       A.   Every case is different. But if the
16   suspect isn't on scene and attempts to contact them,
17   we met with negative results.
18       Q.   What does attempts -- what does
19   "negative results" mean?
20       A.   Attempts to contact them at their
21   residence or place of work or via telephone.
22       Q.   And if you're able to contact that
23   person via telephone, what is the next step?
24       A.   I -- I first try and get them to
25   identify themselves to verify that -- who I am

---

Page 72

1   potentially talking to and then try and set up a
2   meeting spot, whether it be at the police station,
3   on-scene, or another, you know, undisclosed
4   location.
5        Q.   And so if a person identifies
6   themselves over the phone, but they're not
7   interested in -- in meeting you, what's the next
8   step?
9        A.   Since probable cause was already
10   determined, the wanted would be placed out.
11       Q.   Okay. Or presumably if you're unable
12   to make contact with that person but you still have
13   made a probable cause determination; is that right?
14       A.   Yes.
15       Q.   So you're now ready to issue the
16   wanted. And I apologize for making this so basic,
17   but literally, what is the next thing that you do in
18   the wanted creation process?
19       A.   I contact the CARE operator and advise
20   them of my report number, the suspect's pedigree
21   information, and charges that would -- would be
22   issued.
23       Q.   And so you are -- I'm placing you --
24   you're at the scene. You're investigating. You
25   pick up your phone or your radio and you call in to

---

18 (Pages 69 to 72)

**KEVIN WALSH  2/9/2017**

Page 73

1    the CARE provider.  Where is the CARE provider
2    sitting, or the CARE officer?
3        A.  They're sitting at their office which
4    was -- was now Clayton and is now unincorporated
5    West -- West County.
6        Q.  And you say, I am here to -- I'm
7    calling to initiate a wanted on John Doe.  Here is
8    the pedigree information, here's -- here's the
9    facts.  Is there anything else that goes -- that
10    happens in that conversation?
11        A.  No.
12        Q.  So you -- how long does that
13    conversation typically take?
14        A.  Five minutes.
15        Q.  Five minutes.
16            So you have a five-minute conversation
17    and after you hang up the phone or sort of close off
18    the -- the radio call, is -- does that mean that the
19    wanted has been created?
20        A.  To my knowledge, yes.
21        Q.  And so it goes into the system?
22        A.  (Nods head.)
23        Q.  And so if -- and now we're going to get
24    a little technical, so I apologize but -- so it's --
25    it's gone into the system.  Let's say five minutes

Page 74

1    later an officer encounters John Doe at some other
2    location.  Will that officer be able to learn that
3    this person has a wanted out against them?
4        A.  Yes.
5        Q.  Within -- so -- so it happens like
6    that?  (Snaps fingers.)
7        A.  I believe so.
8        Q.  What role then does a -- does a
9    supervisor play in the wanted creation process?
10        A.  Once they review the report and
11    determine that probable cause is in existence, then
12    they approve the report.
13        Q.  So is there -- I'm trying to wrap my
14    head around this.  If -- is -- is there any lag time
15    between when you hung up the phone with the CARE
16    officer and when the supervisor approves the wanted
17    where the wanted is not active, or is it immediately
18    active?
19        A.  I can't speak for -- for CARE, but I
20    believe it's immediately active.
21        Q.  So is it possible -- have you
22    encountered instances where a supervisor will --
23    will not approve the creation of a wanted?
24        A.  No.
25        Q.  You've never heard of an instance in

Page 75

1    which a supervisor has not approved a wanted?
2        MR. HUGHES:  Well, I think your first
3    question was has that ever happened to him?  Now --
4        MR. HAMILTON:  Well, now I'm asking --
5    I'm asking a second question, Mr. Hughes.
6        MR. HUGHES:  Okay.  Okay.
7        THE WITNESS:  No.
8    BY MR. HAMILTON:
9        Q.  You're not aware of it?
10            And is it -- how many levels of
11    approval are there in the wanted creation process?
12        A.  That I don't know.
13        Q.  So -- and do you know how long about --
14    just in your experience, how long the creation -- or
15    the approval process for a wanted will take?
16        A.  No.
17        Q.  Do you know what the -- have you
18    yourself ever served as a -- as a supervisor for
19    wanted authorization purposes?
20        A.  No.
21        Q.  Do you know what goes into the process
22    of reviewing a wanted from the supervisor's
23    perspective?
24        A.  No.
25        Q.  In instances where you have initiated

Page 76

1    or issued a wanted, what interaction or what contact
2    do you have with the -- the supervisor who's
3    approving the wanted?  Is there a conversation?
4        A.  Not on every -- on every case but some,
5    yes.
6        Q.  And so in some cases, you might find
7    out that the supervisors approved it just by looking
8    at the entry, the teletype in -- in REJIS, I
9    suppose?
10        A.  Based on the facts that were laid out
11    in the report.
12        Q.  Based on the facts that were laid out
13    in the report because it indicates that a supervisor
14    has approved it?
15        A.  Could you rephrase that?
16        Q.  Sure.
17            So I was asking how -- how you know
18    that a supervisor has approved your -- the creation
19    of the wanted that you initiated.  And you said
20    sometimes -- sometimes there's a conversation that
21    you have with that supervising officer, but
22    sometimes not.
23            And in the instances where you don't
24    have a conversation with the supervising officer,
25    how do you ultimately find out that it has been

19 (Pages 73 to 76)

**KEVIN WALSH  2/9/2017**

Page 77

1  approved?  And you said it -- I think you said, but
2  correct me if I'm wrong, it would appear in the
3  report?
4        A.  When you access CARE, the computer
5  report system, it would show that a supervisor has
6  approved it.  It would be stamped.
7        Q.  And so -- and -- and just to be clear,
8  and I may -- I may have already covered this and I
9  apologize.  But do you know when in -- sort of how
10  quickly a supervisor will review the wanted that
11  you've created or initiated?
12       A.  No.  It's up to their -- their
13  discretion.
14       Q.  What are the requirements for serving
15  as a supervisor for approving a wanted?
16       A.  I don't know.
17       Q.  In the instances -- so let's take --
18  think about one of the officers who's approved
19  wanteds that you've initiated.  Are they -- are they
20  your same seniority year?
21       A.  No.
22       Q.  How much -- are they your same rank?
23       A.  No.
24       Q.  What rank are they, typically?
25       A.  Sergeant and above.

Page 78

1        Q.  Sergeant and above can serve as an
2  approver for a wanted?
3        A.  Yes.
4        Q.  Are you aware of lieutenants approving
5  wanteds?
6        A.  I suppose.
7        Q.  Let's walk through -- you said that
8  sometimes you had a conversation with -- with the --
9  with the supervising officer about a wanted that
10  you've created.  If you think about one of those
11  instances, how long after you initiated that wanted
12  did that conversation happen?
13       MR. HUGHES:  Are you assuming that it's
14  always after, or are you excluding "before" in your
15  question?
16       Well, anyway, I object to the form of
17  the question.  It's vague --
18  BY MR. HAMILTON:
19       Q.  Is it -- is it true that the
20  conversations that you've had -- strike that.
21       In your experience, does supervisor
22  approval necessarily come after you've created the
23  wanted?
24       A.  No.  Sometimes it's on-scene.
25       Q.  So there are instances in which the

Page 79

1  supervising officer is there with you and it's
2  through -- after conversation with them that you go
3  ahead and issue the warrant --
4        A.  Yes.
5        Q.  -- the wanted?  Excuse me.
6        Okay.  So let's talk about one of the
7  instances in which the supervisor approval has come
8  after you've created the wanted.  How long did that
9  conversation happen after you created the wanted?
10       A.  Some instances are the next day.  Some
11  are hours.
12       Q.  And thinking about one of those
13  conversations, what was the -- the content of that
14  conversation?
15       A.  Furthering the investigation of where I
16  may -- may be able to contact certain witnesses
17  again, or victims, just to help further the
18  investigation.
19       Q.  And are these -- and so am I
20  understanding correctly that they will approve the
21  wanted and say you should also do these things to
22  further your investigation?
23       A.  Sometimes.
24       Q.  Do they tell you to further your
25  investigation in order to achieve probable cause?

Page 80

1        A.  No.
2        Q.  Why do they tell you to further your
3  investigation, or why have they told you to further
4  your investigation?
5        A.  Sometimes there's more charges that can
6  be sought and making sure that, you know, in some
7  instances that maybe certain businesses have video
8  surveillance that we would maybe be able to access
9  to show these events unfolding, things that would
10  help with the prosecution.
11       Q.  So if I'm understanding you correctly,
12  these conversations that have happened after you
13  have initiated the wanted are essentially an
14  approval of the wanted, and then further steps you
15  can take as far as additional information you can
16  gather or other charges you can bring?
17       A.  Yes.
18       Q.  And are you aware of any type of
19  approval that's required after the supervisor's
20  approval?
21       A.  No, I'm not.
22       Q.  Are you aware of any training that
23  supervising officers receive in when and whether to
24  approve of a wanted that's been created?
25       A.  No, I'm not.

Page 81

1    Q.  In the course of your conversations
2  with a supervising officer, have they ever said you
3  should go ahead and apply for a warrant?
4        A.  No.  I'm sorry.  Can you -- could you
5  kind of clarify?
6        Q.  Sure.
7            You have a conversation with the
8  supervising officer after you've initiated the
9  wanted and it becomes live.  In the course of that
10  conversation, have you ever had an instance in which
11  the supervising officer says you should apply for a
12  warrant?
13        Instead of the wanted?
14        Q.  Instead -- instead of the wanted or in
15  addition to the wanted?
16        A.  No.
17        Q.  Do you ever receive any guidance from a
18  supervising officer or anyone else about when and
19  whether to apply for a warrant?
20        A.  Could you repeat it, please?  I'm
21  sorry.
22        Q.  Sure.
23            Do you ever receive any guidance from a
24  supervising officer or anyone else as to when you
25  should apply for a warrant?

Page 82

1        A.  Yes.
2        Q.  Can you describe when those instances
3  occur?
4        A.  If somebody is in custody, and based on
5  certain facts on the actual crime that had been
6  committed.  Sometimes immediate warrant application
7  is to be conducted through the prosecuting attorneys
8  and sometimes it -- supervisors, based on certain
9  facts, can be released pending application of
10  warrant.
11        Q.  What types of facts would -- strike
12  that.
13            In what types of instances would
14  somebody be released pending the application of a
15  warrant?
16        A.  Drug arrest.
17        Q.  Can you say a little bit more about
18  the -- the analysis that goes into that
19  determination like with the drug arrest?
20        A.  Somebody that is not necessarily a
21  threat to themselves or the community immediately.
22        Q.  That's helpful.  So talk to me about
23  the -- the factors.  You said that you've applied
24  for numerous warrants.  What type of analysis goes
25  through your head as a detective when you're making

Page 83

1  a determination as to when a warrant is justified?
2        A.  In every case where probable cause
3  exists that a crime has been committed, a warrant
4  is -- is justified of seeking.
5        Q.  But in many of those instances you --
6  you issue a wanted as opposed to a warrant; is that
7  correct?
8        A.  Well, if somebody is in custody, then I
9  would seek a warrant.  If somebody is not in
10  custody, I would seek a wanted.
11        Q.  Because a wanted is -- the purpose of
12  the wanted is for that formal interview?
13        A.  Correct.
14        Q.  Is it the case in your experience that
15  a warrant is always preceded by a wanted?
16        A.  Yes.
17        Q.  So we were walking -- we were walking
18  down the --
19        MR. HUGHES:  Nevermind.  Just object to
20  the form of the last question.  The fact that you
21  made it "always."  So -- it's just overbroad.
22        MR. HAMILTON:  Okay.
23        MR. HUGHES:  Okay.
24        BY MR. HAMILTON:
25        Q.  So we've -- I just -- so I want to go

Page 84

1  back to -- to our timeline.  The wanted has been --
2  the wanted has been created basically on-scene
3  through your conversation with the CARE officer.
4  The approval process happens either on-scene or
5  sometime thereafter.  And what happens to -- to the
6  individual who has a -- has a wanted out on them?
7  And let me ask a question that you can actually
8  answer.
9            A police officer encounters this
10  individual who has a wanted out for them.  What is
11  the next step if you are that police officer and
12  you've encountered a person who has a wanted out?
13        A.  If -- if knowing based on such as
14  myself being familiar with the case, I would take
15  that -- that suspect into custody.  Somebody not
16  necessarily knowing the particulars of the case, a
17  system check of the individual being -- or providing
18  his -- his or her pedigree, the officer would
19  conduct that record check to verify that, in fact,
20  there is a wanted out for his or her arrest.  And
21  then they would take that person into custody if
22  there is.
23        Q.  And if you are -- and just to be clear,
24  you said this is an officer who was not familiar
25  with the case; is that correct?

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

Page 85

1  A.  Yes.
2  Q.  So if you are an officer who's familiar
3  with the case and you encounter this person with a
4  wanted, what happens then?
5  A.  I would take them into custody based --
6  knowing that there is probable cause.
7  Q.  Even if you're -- if you -- you know
8  the person and you're aware of their involvement in
9  the case, you would still take them into custody?
10  A.  Yes.  Based on if there's probable
11  cause.
12  Q.  Is it possible to conduct a -- formal
13  interview without taking somebody into custody?
14  A.  Potentially, yes.
15  Q.  In your experience, is it -- is it
16  possible to conduct such a formal interview and
17  clear the wanted without taking a person into
18  custody?
19  A.  Yes.
20  Q.  Have you ever done that?
21  A.  Could you --
22  Q.  Yeah.
23  A.  -- rephrase, please?
24  Q.  Yeah.
25      So has there ever come a time when you

Page 86

1  have encountered somebody who has a wanted out
2  against them, you're familiar with their case, and
3  you've been able to conduct a formal interview
4  without taking them into custody, and clear the
5  wanted?
6  A.  Yes.  I believe like a shoplifting case
7  or something along those lines where somebody has
8  been identified, probable cause was established, the
9  person was put out wanted, and I encountered them,
10  arrested them, conducted an interview, and released
11  on-scene, whether it be on summons or warrant
12  application being made.
13  Q.  So we talked about instances in which
14  you could conduct a formal investigation without
15  taking somebody into custody.  Can you describe
16  instances in which it wouldn't be possible to
17  conduct such a formal investigation and thus you'd
18  be required to actually take them into custody?
19  A.  Domestic cases, anything violent,
20  felonies, specifically gun cases.
21  Q.  So is it -- is it then -- is it the
22  policy that -- just going back to the purpose of a
23  wanted is to be able to conduct a formal interview
24  of somebody, is there kind of a carve-out or a
25  caveat for certain types of offenses or certain

Page 87

1  types of crimes where the purpose is actually to
2  bring somebody into custody where you then conduct
3  the formal interview?
4  A.  Yes.
5  Q.  Is that written anywhere?
6  A.  Yes.
7  Q.  Do you recall where that's written --
8  where that's written, where that guidance exists?
9  A.  The general order on domestics
10  discusses not exact terminology.
11  Q.  Sure.
12  A.  But where a 24-hour hold would be
13  placed on all domestic violence cases, whether it be
14  misdemeanor, felony.
15  Q.  That's helpful.  Thank you.
16      Have you ever -- have you ever sort of
17  encountered an instance in which you were able to
18  conduct a formal interview of somebody who was
19  wanted without arresting them?
20  A.  Yes, the scenario that -- that I gave
21  previous.
22  Q.  So I guess even taking a step -- a step
23  further back, without -- without handcuffing them
24  and just conducting a formal interview, just without
25  the person in any form of -- of custody?

Page 88

1  A.  I suppose, but nothing --
2  Q.  Not in your experience?
3  A.  No, sir.
4  Q.  Okay.  So let's go back to the instance
5  in which you are -- you're an officer who is not
6  familiar with the case, but you encounter the
7  person.  You run their name and information.  You
8  find out there's a wanted.  As the reporting
9  officer, what do you do?  You -- you take them into
10  custody, but who do you -- do you contact anybody?
11  A.  The officer that made the arrest or the
12  officer that has --
13  Q.  The officer who made the arrest.
14  Right.  So you're the officer who made the arrest.
15  You're not familiar with the person, but you know
16  there's a wanted.  What are the steps that you take?
17  A.  I would contact the St. Louis County
18  Records Department to verify that it is still an
19  active wanted.
20  Q.  Okay.
21  A.  And then after verification is made, I
22  would contact St. Louis County CARE to cancel the
23  wanted.
24  Q.  Okay.  Now, you said to ensure that the
25  wanted is active.  What does that mean?

22 (Pages 85 to 88)

**KEVIN WALSH  2/9/2017**

Page 89

1     A.  It's just checking with our record
2  department to make sure that it is -- is, in fact,
3  an active wanted.
4     Q.  Are there inactive wanteds?
5     A.  That I can't speak of.  I've never
6  encountered one but ...
7     Q.  Is that -- that's -- that's the
8  protocol?
9     A.  Yes.
10     Q.  Have you heard of any inactive wanteds?
11     A.  I'm sure there -- there have been.
12     Q.  Is -- in any sort of training or
13  guidance, have you -- has -- has an inactive wanted
14  been described, like what it would look like?
15     A.  It wouldn't look like anything
16  different to us, no.
17     Q.  But based on your understanding, the
18  CARE operator might say this is inactive because --
19  fill in the blank?  Is there -- is there any sense
20  of why it would be inactive?
21     A.  I mean, certain municipalities have
22  said you can release them on a court date.
23     Q.  And that would be the basis -- I'm not
24  sure I follow.  So that would be the basis for
25  making a determination that the wanted is not

Page 90

1  active?
2     A.  Based upon County records, that -- that
3  would be, I guess, their determination.  But I don't
4  see anything different when -- when I'm conducting a
5  record check.
6     Q.  Got it.
7     And how do you conduct a record check?
8     A.  Via computer.
9     Q.  And where is that computer?
10     A.  Either in your car or in my case,
11  office.
12     Q.  Okay.  So you encounter somebody.
13  You -- you run their name through your computer,
14  which may be in your car, you find out that there's
15  a wanted out.  You're not familiar with this person.
16  You call the Records Department.  You determine that
17  the wanted is active.  Did I describe the sequence
18  correctly?
19     A.  Yes.
20     Q.  Okay.  So you've now determined that
21  it's active and you're going to take the person.
22  And what happens next?
23     A.  Then I contact the watch commander over
24  the radio and ask for a location, whether it be the
25  precinct or Clayton.

Page 91

1     Q.  And the location to --
2     A.  To take the prisoner.
3     Q.  And how is that location determined?
4     A.  It's based upon a number of factors, a
5  supervisor has to determine.
6     Q.  Okay.  And once you take them to
7  wherever they're going, what happens next?
8     A.  Then I would contact CARE and inform
9  CARE that I had the person in custody.  The officer
10  that has the wanted, I would contact them, and then
11  the CARE operator would cancel the wanted.
12     Q.  So -- so the wanted, based upon now
13  that you've got this person in custody, based on
14  your understanding, the wanted is then immediately
15  canceled?
16     A.  Yes.
17     Q.  And so now what happens when you
18  contact the officer who initiated the wanted?  How
19  does that conversation go?
20     A.  I just let him or her know that their
21  suspect, based on whatever particular case it is, I
22  have them in custody and I let them know the
23  location that I'm going to, and I let them know what
24  time I picked them up.
25     Q.  Great.

Page 92

1     And why do you let them know what time
2  you picked them up?
3     A.  Because they have 24 hours to conduct
4  their interview.
5     Q.  And as the arresting officer, you --
6  does -- what happens once you have delivered the
7  person to wherever they're going?  Does your
8  responsibility continue any further?
9     A.  You write either an original report or
10  a supplement to that officer's original report on
11  the probable cause.
12     Q.  And after that, is there anything
13  further that you, as the arresting officer, do?
14     A.  No.
15     Q.  Now, I want to put you into the shoes
16  of -- of the officer who initiated the wanted.  You
17  just received the call.  What do you do?
18     A.  I guess it depends on when, where,
19  where I'm at.  So if I'm contacted while on duty, I
20  would respond to whichever location, whether it be
21  Clayton or the precinct, and conduct my interview.
22     Q.  And if you're not on duty?
23     A.  If I'm not on duty, if it's in the
24  middle of the night, I don't answer my phone.
25     Q.  Okay.

23 (Pages 89 to 92)

**KEVIN WALSH  2/9/2017**

Page 93

1      A.  So I guess it would -- it would start
2   when my day started in the morning.
3      Q.  Got it.
4         Are there guidelines for how an officer
5   is expected to respond to a call that their wanted
6   has been -- or the individual for whom a wanted is
7   out has been arrested?
8      A.  Within 24 hours.
9      Q.  Are there -- is there any further
10  guidance published by the St. Louis County Police
11  Department?
12     A.  Not to my knowledge, no.
13     Q.  Is there any guidance on when within
14  those 24 hours an officer is expected to try and
15  conduct the formal interview with the wanted
16  individual?
17     A.  No.
18     Q.  But it just has to be within 24 hours?
19     A.  Yes.
20     Q.  And so you now -- let's just -- let's
21  close the loop.  So you -- you've arrived and you
22  are face-to-face with the subject of your wanted.
23  You try and speak to them.  Once you speak to them,
24  does that end the -- end the custody?
25     A.  Not always.

Page 94

1      Q.  Why wouldn't it?
2      A.  Whether I'm applying for warrants on
3   the person in custody --
4      Q.  Uh-huh.
5      A.  -- or on domestic cases.
6      Q.  Okay.  Let's break those down.  Well,
7   let me ask a separate question.  Are those the only
8   two instances in which a person wouldn't be
9   immediately released following your formal interview
10  of them?
11     A.  No.  It's not the only one.
12     Q.  Are there others that you -- that come
13  to mind?
14     A.  Yes.
15     Q.  What are those other instances?
16     A.  If they have other warrants.
17     Q.  Just to be clear, if a person is -- is
18  arrested and they have -- there's both a warrant and
19  a wanted out, first of all, is that possible?
20     A.  Yes.
21     Q.  Would they be separate matters?
22     A.  Yes.
23     Q.  Does -- is there any sort of priority
24  in terms of the warrant and the wanted?
25     A.  The -- the officer with the wanted, if

Page 95

1   it is in St. Louis County and it is a St. Louis
2   County wanted, would be given priority.  But as
3   far as other jurisdictions, I can't speak for that.
4      Q.  So if it's a St. Louis County wanted
5   and a St. Louis County warrant, what's the priority
6   there?
7      A.  The officer with the 20 -- with the
8   24-hour hold on the wanted would go first.
9      Q.  Got it.
10        So it sounds to me like three instances
11  that you've described where an individual who is in
12  custody pursuant to a wanted wouldn't be immediately
13  released following a formal interview.  Are there
14  others that you can think of?
15     A.  No.
16     Q.  Okay.  So in those instances, even
17  after you've spoken to somebody and gotten now the
18  information you can get out, they would still remain
19  in custody for 24 hours -- for the remainder of the
20  24 hours; is that correct?
21        MR. HUGHES:  Wait, wait.  I'm not sure
22  I understand the question.  So I object --
23        MR. HAMILTON:  Sure.
24        MR. HUGHES:  -- to the form.
25        BY MR. HAMILTON:

Page 96

1      Q.  In those three instances that you
2   described, domestic violence -- and I guess it's two
3   categories because you've got outstanding warrants.
4   I apologize.  It is three categories because you
5   might be applying for a warrant, it might be
6   domestic violence, and there might be an outstanding
7   warrant.
8         Outside of those three instances, a
9   person should be released from custody once they've
10  participated in the formal interview with the
11  officer who initiated the wanted; is that correct?
12     A.  Yes.
13     Q.  What if a person is in custody and
14  they've said that they're not interested in being
15  interviewed or talking to the police officer?  What
16  happens next?
17     A.  And it's outside of those three
18  instances?
19     Q.  Yes.
20     A.  Two officers' discretion based upon the
21  case, whether warrants will be applied for in
22  custody or release pending application of warrant.
23     Q.  So the only reason -- and I just want
24  to make sure I'm characterizing this right, and
25  please let me know if I'm wrong.  The only reason

24 (Pages 93 to 96)

**KEVIN WALSH  2/9/2017**

Page 97

1  that a person who says that they're not interested
2  in being interviewed would continue to be held in
3  custody would be because a warrant is being applied
4  for?
5       A.  Not the only instance, no.
6       Q.  What are the other instances?
7       A.  Warrants or --
8       Q.  And domestic violence?
9       A.  -- domestic violence.
10      Q.  Got it.
11           But that's -- that captures the
12  universe?
13      A.  Yes.
14      Q.  Okay.  And is it -- is it your
15  understanding that as soon as -- strike that.  We
16  can move on.
17           Have you ever become aware of an
18  investigation by the Department of Justice into the
19  Ferguson Police Department?
20      A.  Partly, yes.
21      Q.  When you say "partly," what does that
22  mean?
23      A.  I didn't read the whole report but I'm
24  aware.
25      Q.  You're aware of it?

Page 98

1       A.  Yes.
2       Q.  What -- what -- can you describe your
3  awareness of it?
4       A.  Just their practices of law enforcement
5  in courts.
6       Q.  What parts of the report did you read?
7       A.  Just pretty much what the St. Louis
8  Post Dispatch put out there, short version.
9       Q.  Okay.  Did anybody -- do you recall any
10  conversations within your department once this
11  report was released?
12      A.  Yes.
13      Q.  Did any of those conversations entail
14  the use of wanteds?
15      A.  Not to my knowledge, no.
16      Q.  Do you recall anything changes --
17  excuse me.  Strike that.
18           Do you recall anything changing in the
19  St. Louis County policies or practices following
20  that Department of Justice report?
21      A.  I'm sure.  I mean, I've had a couple
22  specifics, but a lot has changed in a couple years.
23      Q.  Do you recall any in-service trainings
24  or any -- any other trainings or sort of group
25  meetings among -- within your department discussing

Page 99

1  any changes to St. Louis County based on the
2  Department of Justice report?
3       A.  No.
4       Q.  Do you -- do you recall any new
5  training that you received in light of this report
6  or in light of the events of Ferguson?
7       A.  Yes.
8       Q.  What trainings were those?
9       A.  Civil -- civil disturbance.
10      Q.  And what did that entail?
11      A.  Went over Constitutional rights, giving
12  verbal warning, and then tactics to keep officers
13  safe, communities safe, and those -- those doing the
14  civil disturbance.
15      Q.  Yeah.  Yeah.  Did you ever participate
16  in any conversations or events outside of the topics
17  related to those topics that you just described?
18      A.  Could you repeat -- rephrase, please.
19      Q.  Sure.
20           Did you ever participate in any -- any
21  conversations outside of -- I asked you about
22  conversations you had with your colleagues.  Did you
23  ever participate in any events or conversations with
24  folks outside of the St. Louis County Police
25  Department on some of the issues related to the

Page 100

1  Ferguson sort of instances or the report that
2  followed?
3       A.  Yes.
4       Q.  What were those?
5       A.  Everybody wants to ask a police officer
6  their opinion.
7       Q.  Okay.
8       A.  I tend not to share my opinion with
9  anybody but, you know, close family.
10      Q.  Okay.
11      A.  But, you know, just what changes I see
12  in not only St. Louis County but in law enforcement
13  in general.  And then community relations.
14      Q.  Conversations you've had around
15  community relations?  Are these -- are these all
16  conversations that you're discussing that you've had
17  with your close family and friends?
18      A.  Yes.
19      Q.  Anything outside of that?
20      A.  No.  People, you know, if they see
21  coming to or from work, I've had people stop me on
22  the street and say, Hey, what's going on?  I don't
23  even know the person.
24      Q.  Got it, okay.
25      A.  And so different conversations with

25 (Pages 97 to 100)

Page 101

1  different types of people.
2      Q.  Great.  Thank you.
3          So I want to ask you a little bit --
4  we've talked a little bit about the general orders
5  and procedures of the St. Louis County Police
6  Department.  So let's dive into those a little bit.
7          So can you grab 13?
8      I'm going to show you a document.
9          So this is a document with Bates
10  identifier DEFRFP2340000013.  I'm marking it as
11  Walsh Exhibit 3.
12          (Exhibit 3 was marked for
13          identification.)
14  BY MR. HAMILTON:
15      Q.  Handing it to you.
16      And Mr. Hughes, a copy for you.
17          Detective Walsh, do you recognize this
18  document?
19      A.  Yes.
20      Q.  Can you read for me what the -- the
21  title of the document is at the top center of the
22  page?
23      A.  "Teletype and REJIS Terminal Policy."
24      Q.  Yeah.  And above that at the very top
25  of the page?

Page 102

1      A.  "Departmental General Order 11-26."
2      Q.  Great.
3          Was this a general order that was in
4  effect during your time as a police officer?
5      A.  Yes.
6      Q.  I want to direct your attention to --
7  to the second page.  You'll see Section B.  It's
8  titled "Wanted Warrants."  Do you see that?
9      A.  Yes.
10      Q.  Subsection A states that "Only case
11  officers shall request wanted person entries."
12          What is a case officer?
13      A.  The officer that has -- that controls
14  the scene.  So depending on beat responsibility,
15  each precinct is broken down into beats.
16      Q.  Uh-huh.
17      A.  And if the call occurs in your beat,
18  you are therefore deemed case officer.
19      Q.  Okay.  And so it's -- I mean, why do
20  you think only a case officer can request a wanted
21  entry?
22      A.  Because they're the most familiar with
23  the case.
24      Q.  Makes sense to me.
25          I guess if you look down a little bit

Page 103

1  to subsection C, it reads as follows, and I guess
2  just confirm that I've read this correctly.
3          "The case officer must inform the
4  CARE/Records Clerk of the desired extradition limits
5  for any wanted person entries.  When the suspect is
6  detained by a law enforcement agency based on the
7  wanted entry, the case officer will be notified and
8  is responsible for the suspect being picked up
9  and/or interviewed.  The Prisoner Conveyance Unit
10  will only respond to adjoining Missouri counties,
11  and a suspect cannot be extradited across state
12  lines without a warrant."
13      Did I read that correctly?
14      A.  Yes.
15      Q.  Why do you think all of these
16  requirements are reserved for the case officer?
17      A.  Their familiarity.
18      Q.  And would you agree that it's also
19  based on the case officer's familiarity that they're
20  designated as the person responsible for the suspect
21  being picked up and/or interviewed?
22          MR. HUGHES:  Well, object to the form
23  of the question.  It's -- it's vague and calls for
24  speculation and conjecture as to what you mean by
25  that.

Page 104

1  BY MR. HAMILTON:
2      Q.  I can rephrase if that's unclear.
3      A.  Please.
4      Q.  In the middle of that -- of section C,
5  there's language that says "The case officer will be
6  notified and is responsible for the suspect being
7  picked up and/or interviewed."
8          Why do you think it is the case
9  officer's responsibility to be responsible for
10  pickup and the interview of the suspect?
11      A.  Familiarity and delegating
12  responsibilities.
13      Q.  Why wouldn't another officer conduct an
14  interview?
15      A.  Not always the case, but like I said,
16  familiarity with -- with the facts that are going
17  on.
18      Q.  Got it.  Okay.
19          So I am now going to show you a
20  document that is marked with Bates -- it's just the
21  next one -- with Bates DEFRFP234000017.  We're going
22  to mark this as Walsh Exhibit 4.
23          (Exhibit 4 was marked for
24          identification.)
25  BY MR. HAMILTON:

26 (Pages 101 to 104)

**KEVIN WALSH  2/9/2017**

Page 105

1    Q.  Here you go.
2        And you'll see at the top -- well,
3  first of all, are you familiar with this document?
4    A.  Yes.
5    Q.  You'll see at the top it reads
6  "Department" -- "Departmental General Order 1526."
7        Would you agree with me that this is
8  the order that followed Exhibit 3 that we just
9  discussed?
10   A.  Yes.
11   Q.  If you'll turn to the next page, you'll
12  see once more that there's section B.  And this is
13  closer to the middle of the page.  Do you see that?
14   A.  Yes.
15   Q.  The title now reads "Wanted, warrants,
16  stop orders."  What is a stop order?
17   A.  Based off of probable cause, the case
18  officer has reason to believe that the person --
19  person or persons could potentially flee to whether
20  it be adjoining counties or across state lines.
21  That officer contacts supervisor and the supervisor
22  determines as well that all of the facts presented
23  to him or her, that a stop order should be issued
24  based on that person potentially fleeing.
25   Q.  So is it fair to say that a stop order

Page 106

1  is a type of wanted?
2    A.  Type, yes.
3    Q.  Now, subsection A contains bold
4  language.  Would you -- if you don't mind -- if you
5  don't mind opening up Exhibit 3 just for comparison.
6  Would you agree with me that the language in
7  subsection A of Exhibit 4 is not contained in
8  Exhibit 3?
9    A.  Yes.
10   Q.  And so I'm going to read that new
11  language, and just let me know if it's correct.
12       It says, "Once the case officer has
13  determined probable cause exists that a person has
14  committed a crime, only the case officer shall
15  request wanted person entries.  The case officer
16  will contact CARE or DCI word processing in
17  requesting a wanted entry on the person."
18       Did I read that correctly?
19   A.  Yes.
20   Q.  Do you recall why this language was
21  added to the general order?
22   A.  No.
23   Q.  Is it your recollection that when new
24  general orders come out, the -- the new additional
25  language is -- is discussed explicitly?

Page 107

1    A.  Yes.
2    Q.  Let me rephrase.
3        But I'll -- I'll just rephrase just for
4  the benefit -- when a new general -- in your
5  experience as a police officer, when you have new
6  general orders that cancel older orders, is there
7  some sort of discussion about the amendments that
8  are made?
9    A.  No.
10   Q.  And how -- how does the department
11  ensure that police officers have read the new
12  general orders that come out?
13   A.  Officers go into the past system and
14  reading the general order at the bottom, they put in
15  their user name and password specific to them
16  showing that they have read the general order.
17   Q.  Is this -- this is a little technical,
18  but is it one of those things where you can scroll
19  down to the bottom and just put your password in, or
20  are there certain checkpoints that you have to --
21  to -- to pass to show that you've read it?
22   A.  There -- there are tests on some.  Not
23  all but some.
24   Q.  When are those tests administered?
25   A.  I don't know the -- the rhyme or

Page 108

1  reason.
2    Q.  But are you aware of any schedule that
3  says, you know, we're conducting a test on General
4  Order 15-26?
5    A.  No.
6    Q.  Is -- what happens if you don't pass
7  that test?
8    A.  You take it again.
9    Q.  Okay.  Are there any other consequences
10  that you're aware of?
11   A.  Not that I'm aware of.
12   Q.  Are you -- have you ever not passed one
13  of those tests?
14   A.  Not to my knowledge.
15   Q.  Do you know if officers are informed if
16  they haven't passed the test?
17   A.  I don't know.
18   Q.  Do you know that you have passed all of
19  these tests?
20   A.  I do.
21   Q.  Okay.  How were you informed that you
22  passed the test?
23   A.  It's -- it's just a test at the bottom.
24  It might be five questions, might be 50 questions.
25  And I've never been denied.

27 (Pages 105 to 108)

**KEVIN WALSH  2/9/2017**

Page 109

1          Q.   Okay.  So there's some sort of screen
2    or some sort of indication that you remember that
3    says --
4          A.   It's -- it's on the specific general
5    order.  There's nothing that goes out that says you
6    need to log on and take this test.  It is specific
7    to that general order at the very bottom.
8          Q.   Uh-huh.
9          A.   Not all of them have it.  Some of them
10   do.
11         Q.   Got it.  Got it.  Okay.
12              Why was this -- why do you think that
13   the language of probable cause existing appears in
14   this General Order 15-26 but did not appear in
15   11-26?
16              MR. HUGHES:  Just object to the form of
17   the question.  You're asking him to speculate.  So
18   it calls for speculation and conjecture on his part.
19   And it could also be interpreted as being
20   argumentative.
21              You can still answer if he --
22              THE WITNESS:  I don't know.
23         BY MR. HAMILTON:
24         Q.   Okay.  But it's your understanding that
25   probable cause has always been a part of the

Page 110

1    requirement for issuing a wanted; is that correct?
2          A.   Yes.
3          Q.   Okay.  You can close that.
4              One more on this, if you'll indulge me.
5    This is the last one.
6              So I'm now referring to a document with
7    Bates DEFRFP234000022.  And it's going to be marked
8    as Walsh Exhibit 5.
9              (Exhibit 5 was marked for
10             identification.)
11         BY MR. HAMILTON:
12         Q.   And Detective Walsh, will you agree
13   with me that this is Department General Order 16-26?
14         A.   Yes.
15         Q.   And that this replaces what was marked
16   as Exhibit 4 which was Department General Order
17   15-26?
18         A.   Yes.
19         Q.   And to your knowledge, is this a
20   department general order that is currently in
21   effect?
22         A.   Yes.
23         Q.   Great.
24             Let's turn to the next page, to
25   section B.  And I'll give you an opportunity to

Page 111

1    check, but will you agree with me that the bold
2    language that appears under section B, subsection
3    little A, is the new language that's been included?
4          A.   Yes.
5          Q.   So I'm going to read that bold
6    language.  I'll read the entire thing, actually,
7    just -- and please confirm if I've read it
8    correctly.  It says, "Once the case officer has
9    determined probable cause exists that a person has
10   committed a crime, they must have a review of the
11   facts supporting the case by their immediate
12   supervisor of his or her designee and receive
13   approval before questioning wanted person" --
14              MR. HUGHES:  Before "requesting."  I
15   think you used the word "question" instead of -- I
16   think you said "questioning" instead of -- I think
17   you said "questioning" instead of "requesting."
18              MR. HAMILTON:  Thank you.  Thank you.
19              MR. HUGHES:  I think you misread it.
20              MR. HAMILTON:  I think you're --
21              MR. HUGHES:  I think it was honest --
22              MR. HAMILTON:  You're absolutely right,
23   Mike.  Let me start over.
24         Q.   "Once the case officer has determined
25   probable cause exists that a person has committed a

Page 112

1    crime, they must have a review of the facts
2    supporting the case by their immediate supervisor or
3    his/her designee and receive approval before
4    requesting wanted person entries.  Once approved,
5    the case officer will contact CARE or DCI word
6    processing and request a wanted entry on the person.
7    The name and the DSN of the approving supervisor
8    must be in the narrative of the CARE report."
9              Did I read that accurately?
10         A.   Yes.
11         Q.   Thank you.
12             Now, looking at this bold language, it
13   says, and correct me if I'm wrong, that the case
14   officer must receive approval before requesting a
15   wanted person entry --
16         A.   Yes.
17         Q.   -- is that correct?
18             Did that conflict at all with the
19   practice that you're aware of of commencing
20   initiating a wanted and then having a conversation
21   with a supervising officer?
22         A.   Could you clarify, please?
23         Q.   Sure.
24             Do you understand this paragraph to
25   mean that before an officer can request a wanted

28 (Pages 109 to 112)

**KEVIN WALSH  2/9/2017**

Page 113

1    person entry, they must receive approval?
2        A.  Yes.
3        Q.  And am I correct that in our discussion
4    previously, you talked about being on the scene and
5    the decision to issue a wanted.  You described two
6    scenarios.  One scenario was that you have a
7    supervising officer with you.  You talk through the
8    case, and then you commence the wanted.
9            In another scenario, you make a
10   probable cause determination, you put it into -- you
11   contact CARE, and then after that, you speak with a
12   supervising officer; is that correct?
13       A.  Yes.
14       Q.  Based on your understanding and your
15   reading of this paragraph, is that following the
16   protocol as laid out here?
17       A.  Not the new, no.
18       Q.  Not the new --
19       A.  The new wording.
20       Q.  Not the new wording?
21       A.  No.
22       Q.  So it's correct that before -- based on
23   your reading, based on this current language, an
24   officer must receive approval from the supervising
25   officer before they create the wanted?

Page 114

1        A.  Yes.
2        Q.  Okay.  Let's close this.  Just give me
3    one second.
4            If you-all don't mind, let's do this
5    because I know we've got -- we've got a -- got a
6    time crunch here.  I -- I see about --
7            MR. HOLLAND:  Let's go off the record
8    for a minute.
9            THE VIDEOGRAPHER:  The time is 11:59.
10   We are off the record.
11           (Recess taken.)
12           THE VIDEOGRAPHER:  The time is 12:09.
13   We are back on the record.
14           BY MR. HAMILTON:
15       Q.  Thank you very much.
16           So we had just been talking about
17   various general orders in the St. Louis County
18   Police Department.  And let's move on, actually,
19   to the events that gave rise to this complaint.
20           So I'm going to ask you to walk through
21   the events that led up to the issuance of the wanted
22   for Mr. Furlow in January of 2016.  Are you familiar
23   with those events?
24       A.  Yes.
25       Q.  Okay.  I'm actually going to, just for

Page 115

1    the sake of everybody being on the same page, direct
2    your attention to documents that have been marked
3    DEFRFP1000014 which I am now marking as Exhibit 6.
4            (Exhibit 6 was marked for
5            identification.)
6    BY MR. HAMILTON:
7        Q.  Walsh Exhibit 6.  This is for you.
8            Mr. Hughes, this copy is for you.
9            Detective Walsh, do you recognize this
10   document?
11       A.  I do.
12       Q.  What is it?
13       A.  It's an official St. Louis County
14   police report.
15       Q.  Great.
16           Because I don't operate in this system
17   that you guys work in, I'm going to ask that you
18   walk through this document in a little bit of
19   detail.  But let's start with the morning of
20   January 25th, 2016 if you can remember.
21           So if I'm going back -- going back to
22   our timeline, you have just -- you have somewhat
23   recently graduated from your probationary period; is
24   that correct?
25       A.  Full year ago so this is two years.

Page 116

1        Q.  Oh, two years, right.  Because you did
2    the Academy -- I'm sorry.  I'm just doing this for
3    myself.  You did the Academy second half of 2013,
4    and then 2014 to 2015 you were a probationary
5    officer, right?
6        A.  Uh-huh.
7        Q.  So is it correct that the beginning of
8    2016 you've now been -- I see what you're saying.
9    You've been an officer for a full year, but you are
10   now no longer a probationary officer; is that
11   correct?
12       A.  Correct.
13       Q.  Okay.  Tell me what -- based on your
14   recollection, what does your sort of day look like
15   around this time?
16       A.  I was on afternoon shift, so I started
17   my day at 10:30.
18       Q.  Okay.  And in what precinct were you
19   based at this time?
20       A.  North County First Precinct.
21       Q.  And you received a call about an
22   alleged assault?
23       A.  Yes.
24       Q.  Okay.  Talk to me about what you recall
25   of that call.

**KEVIN WALSH 2/9/2017**

Page 117

1    A.  I was -- I had just cleared from
2  another call.  I don't know what call that was.  But
3  Officer Ziegler responded there.  He arrived before
4  me because I was coming from -- a ways from my last
5  call.  And St. Louis County Dispatch advised that a
6  female -- it was a domestic violence call, and a
7  female neighbor had made a call saying that her
8  neighbor was just assaulted by her husband and that
9  the victim was on-scene and was very flustered,
10  nervous, upset.
11    Q.  Who is Officer Ziegler?
12    A.  He's another patrol officer in the
13  North County precinct.
14    Q.  Is he -- in terms of years on the
15  force, is he senior to you?  Junior to you?
16    A.  Junior.
17    Q.  Junior.
18    And as you indicated, he was closer and
19  he was the first officer to report on the scene?
20    A.  Yes.
21    Q.  About how far away were you coming
22  from?
23    A.  I know it was a ways.  I don't remember
24  specifically where I was.
25    Q.  Why did the call come in to you?

Page 118

1    A.  It was my beat.
2    Q.  It was your beat?
3    A.  Uh-huh.
4    Q.  Okay.  And so about -- it looks like --
5  and I'm just going to start walking through the
6  document.  If you look sort of on the left-hand side
7  towards the top where it says "CAD details"?
8    A.  Yes.
9    Q.  It says "Date/time received," it looks
10  like that's 12:25 on Monday; is that right?
11    A.  Uh-huh.
12    Q.  So is that shortly after the beginning
13  of your shift?
14    MR. HUGHES:  1/25 on Monday, just so
15  we --
16    MR. HOLLAND:  The time, not the date.
17    MR. HUGHES:  Oh, I'm sorry, I'm sorry.
18  I apologize.
19    THE WITNESS:  Roughly two hours after.
20    BY MR. HAMILTON:
21    Q.  Okay.  And so -- and the address that
22  is listed here right under "Respond Location" is
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮; is that correct?
24    A.  Yes.
25    Q.  Were you familiar at this -- with this

Page 119

1  address before the call came in?
2    A.  No.
3    Q.  Okay.  So did you know any of the
4  individuals involved before arriving on the scene?
5    A.  No.
6    Q.  Okay.  So talk to me about sort of what
7  happened when you arrived on the scene.
8    A.  I arrived on-scene and responded to
9  ▮▮▮▮▮▮▮ where I was approached by the victim,
10  Mrs. Furlow.  And Mrs. Furlow walked me through what
11  had just taken place.
12    Q.  If you don't mind, let's -- let's turn
13  two pages to what looks to be the narrative.  Is
14  this the -- does this narrative capture what you --
15  what you saw when you arrived on the scene?
16    A.  Yes.
17    Q.  Okay.  So you can -- you can keep
18  going.  So you spoke to the victim.  And what did
19  she say?
20    A.  She said that her husband, Dwayne, came
21  home, accused her of being unfaithful in their
22  marriage.  He smacked her, knocked her to the
23  ground, stomped on her leg several times, tried
24  dragging her out of the house by her hair.  And when
25  she got to the doorway, she was able to get up

Page 120

1  and -- and flee the area.
2    Q.  And -- and so -- and she recounted
3  that -- that to you.  What -- what happened next?
4    A.  While we were on-scene, she said that
5  he did leave, but was nervous about being in her
6  house alone.  I said that while we were on-scene, I
7  said, "I'm not going to leave you in the house
8  alone."
9    I said, "I'm going to take a protective
10  sweep around the outside and the inside to make sure
11  that he didn't double back and come in the back
12  door," to which she agreed and said that it was a
13  good idea to make sure that he wasn't in there
14  waiting for her.
15    Q.  Right.
16    A.  And while I did a protective sweep of
17  the residence, I observed a loaded AR15 in the
18  basement.  I asked her about that, being that it was
19  a domestic violence issue.  She had told me that
20  Dwayne was on probation for burglary and that she
21  had purchased the gun for their protection because
22  he was on probation.
23    Q.  Uh-huh.
24    A.  After rendering that the firearm
25  records check showed that the firearm was not

**KEVIN WALSH  2/9/2017**

Page 121

1  stolen, she stated that that firearm belonged to
2  her.
3          I rendered it safe, placed it in her
4  vehicle as she told me that she was going to a
5  family member in St. Louis City.  When she began
6  sort of packing her items, she had several large
7  clothing tubs, plastic tubs that she was trying to
8  move. I moved probably, I don't know, two, three of
9  them --
10      Q.  Uh-huh.
11      A.  -- to the back of her car.  And she
12  said that she was pressing charges and she was done
13  with -- with Mr. Furlow.
14      Q.  Okay.  And at any point in time during
15  the point in which you were interviewing Ms. Furlow
16  or at the residence, did you speak to Mr. Furlow?
17      A.  I did.
18      Q.  How did that come to pass?
19      A.  Her phone rang multiple times, and she
20  seemed to be -- originally I didn't know who was on
21  the other end.  She just kept ignoring them.  And
22  finally she showed me her phone and said, "It's
23  him."
24          And I said, "Well, let me talk to him."
25          I picked up the phone.  The subject on

Page 122

1  the other end identified himself as Dwayne Furlow.
2  And I advised the subject on the other end that if
3  he was, in fact, Mr. Furlow, that he needed to
4  respond back to the scene.
5          The subject on the other end told me
6  that he's already contacted his lawyers, that I was
7  going to lock him up, and that he was not going to
8  turn himself in.
9          I informed Mr. Furlow that yes, he
10  would be under arrest and that if he did not respond
11  to the scene that a wanted would be placed out for
12  his arrest based on the probable cause that I've
13  determined, and that he would be picked up probably
14  at an inconvenient time in his life rather than
15  handling it right then and there.
16      Q.  So at what point in time sort of in --
17  well, so that conversation ended and what happened
18  next?
19      A.  Mr. Furlow said he would not turn
20  himself in, shouted some expletives on the phone and
21  hung up.
22      Q.  And was it at this point in time that
23  you made a determination that a wanted was -- that
24  you would issue a wanted?
25      A.  Yes.

Page 123

1      Q.  What steps did you take to do that?
2      A.  After securing Mrs. Furlow in her
3  vehicle and making sure that the residence was
4  secure, I responded back to my patrol car, and I
5  believe at that time I contacted CARE.
6      Q.  And did you contact CARE in the way
7  that -- that we had discussed previously?  You
8  called them up, and you described the individual for
9  whom you wanted a wanted placed?
10      A.  Yes.
11      Q.  Okay.  Did you consult with anybody
12  before placing that call?
13      A.  No.
14      Q.  Did you consult with anybody after
15  placing that call?
16      A.  Not to my knowledge, no.
17      Q.  What is the standard practice in your
18  experience when someone speaks to you over the
19  phone -- strike that.
20          What is the standard practice when
21  somebody who you suspect may be involved in a crime
22  speaks to you over the phone and informs you that
23  they have legal counsel?
24      A.  I'm not sure of your question.  I'm
25  sorry, could you rephrase?

Page 124

1      Q.  Sure.
2          No, it's probably terribly phrased.
3          What -- what steps do you take -- did
4  you have any reason to believe that the person on
5  the other end of the phone that you were speaking to
6  was not Mr. Furlow?
7      A.  No.
8      Q.  What -- what -- what context clues or
9  factors did you take into account in making a
10  determination that you were actually talking to
11  Mr. Furlow over the phone?
12      A.  The -- the phone call came in to
13  Mrs. Furlow's phone.  She recognized it as being --
14  I'm not sure what she had him saved in her phone as.
15  She originally picked up.  There was shouting back
16  and forth real quick.  She acknowledged that it was
17  him, at which time I took -- took possession of the
18  phone and -- and talked to Mr. Furlow.
19      Q.  And so based on -- based on what you
20  described, did you have any reason to believe that
21  you were speaking to somebody who was not
22  Mr. Furlow?
23      A.  No.
24      Q.  So why, then, did you end up issuing a
25  wanted if you knew that the person that you were

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334

Page 125

1  speaking to over the phone was Mr. Furlow and he
2  explained that he would not -- he would not speak to
3  you?
4      A.  Because there was probable cause for
5  the arrest for domestic violence and domestic peace
6  disturbance.
7      Q.  Why wouldn't you then apply for a
8  warrant?
9      A.  The -- I -- I would say it's more of --
10  sorry, I'm having a little bit of a brain cramp.
11     Q.  No worries.
12     A.  That is following the general procedure
13  of -- of domestics and what is laid out through the
14  Prosecuting Attorney's Office, the formal
15  interview would be -- should be attempted.  I
16  followed those guidelines.
17     Q.  So even though, as -- as you've said,
18  that the purpose of issuing a wanted is to be able
19  to conduct a formal interview where you speak to
20  somebody, you issued a warrant -- excuse me -- you
21  issued a wanted?
22     A.  Yes.
23     Q.  Did you believe that in issuing a
24  wanted, you would be able to obtain any additional
25  information in talking to Mr. Furlow?

Page 126

1      A.  I always try and present it, you know,
2  to a suspect that, you know, this is their time to
3  give me their side of the story.  Whether they
4  choose to or not, that's up to them.  But I'm at
5  least going to give them the opportunity to give
6  their side.
7      Q.  If Mr. Furlow had -- had come in and
8  spoken to you, what would that result -- what would
9  the result have been?
10     A.  His -- his statement, whatever he had
11  to say or not say, would have been entered into the
12  police report, and he would have been taken into
13  custody based off of the facts that I was given
14  on-scene by Mrs. Furlow.
15     Q.  So either way, Mr. Furlow was going to
16  be arrested; is that correct?
17     A.  Yes.
18     Q.  Is this -- is sort of this process that
19  you described that he would have been arrested
20  either way, is this particular to domestic violence
21  cases, or is this just the protocol that, you know,
22  if -- if there's probable -- strike that.
23         Is this -- is what -- is the process
24  that you've described specific to domestic violence
25  cases?

Page 127

1      A.  Not necessarily, no.
2      Q.  Okay.  Is it common practice that even
3  if a person comes -- comes back to the scene to give
4  their side of the story that they're going to be
5  arrested?
6      A.  No.
7      Q.  So there are instances in which perhaps
8  a different type of crime or incident where you
9  would speak to somebody on the phone and say, you
10  know, come back to the scene and talk to me and they
11  might not be -- end up being arrested?
12     A.  Correct.
13     Q.  So I started on this question before
14  and I'm going to return to it.  It's -- and I
15  apologize if you answer it again.  I just don't
16  recall.
17         What is the standard practice when
18  somebody informs you over the phone that they've got
19  legal counsel and that they are not interested in
20  speaking to you?
21     A.  I -- I wouldn't necessarily say there
22  is a standard of practice.  Mr. Furlow just said,
23  "I'm not returning to the scene.  I contacted my
24  lawyer and he told me not to turn myself in."
25     Q.  Did you make any attempt to determine

Page 128

1  who Mr. Furlow's lawyer was at the time?
2      A.  No.
3      Q.  Did you have any reason to question
4  Ms. -- Ms. Furlow's account of what happened at the
5  time?
6      A.  Question?  I'm sorry?
7      Q.  Her account of the events that she
8  described that appear in your narrative.
9      A.  Could you elaborate, please?
10     Q.  Sure, yeah.
11         Did you -- yeah, as the reporting
12  officer, did you have any reason to think that the
13  account that Ms. Furlow was giving was not sort of a
14  complete or truthful account?
15     A.  No.  I had no indication of that.
16     Q.  Okay.  You have in your report that
17  you -- let me be a little bit more specific here.
18  So on -- if you look at your narrative, the second
19  page, toward the top it is written, "I observed no
20  bruises, swelling, or lacerations to Latoya F.'s
21  person.  Latoya F. refused medical attention on the
22  scene."
23         So do I understand correctly that in --
24  in looking at Ms. Furlow, you didn't see any sort
25  of -- any indication of -- any sign of injury?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

Page 129

1  A.  No sign of injury.
2      Q.  On what was your probable cause based
3  on?
4      A.  It was based on all of her statements
5  that she provided.
6      Q.  So probable cause determination can be
7  made by someone stating that I've -- I've been the
8  victim of a crime and this is the person who did it.
9  Is that sufficient for probable cause?
10     A.  Based on her statements, her
11  interaction with me, her state of -- her demeanor
12  on-scene, based on all of those, yes.
13     Q.  Did you make any determination that
14  Ms. Furlow was of sound mind?
15     A.  Just by our interaction.  I had no
16  indication that she would not be.
17     Q.  So just to be clear, the -- the
18  entirety of your probable cause determination was in
19  speaking to Ms. Furlow and sort of observing her
20  general state of being?
21     A.  Yes.
22     Q.  But you did not observe any sort of
23  physical signs of sort of the incident that she
24  recounted to you; is that right?
25     A.  Nothing physical injury-wise.  Hair was

Page 130

1  disheveled.  Clothes were kind of ruffled.
2      Q.  Okay.
3      A.  But nothing physical on her person,
4  per se.
5      Q.  Okay.  Just to be clear, did you
6  attempt to find out who Mr. Furlow's lawyer was that
7  he referenced in your phone call?
8      A.  No.
9      Q.  Are you aware of any other teletypes
10  that you can use to get in touch with a person that
11  you are seeking?
12     A.  No.
13     Q.  So is it your understanding that the
14  only way that you could have followed up to have a
15  formal interview with Mr. Furlow was through the
16  issuance of a wanted?
17     A.  Yes.
18     Q.  And that you -- but you didn't have the
19  information sufficient for the application of a
20  warrant at that time; is that correct?
21     A.  No, it's not.
22     Q.  So you could have applied for a warrant
23  at that time; is that correct?
24     A.  I could.  But based off of no formal
25  interview, I likely wouldn't be entertained.

Page 131

1      Q.  So -- so even though -- and I'm just --
2  correct me if I'm wrong.  Even though both a warrant
3  and a wanted have the same requirements of probable
4  cause, the probable cause that you had established
5  was sufficient for a wanted but was not sufficient
6  for a warrant in your determination?
7      A.  No.  I would say they're both --
8  they're both -- in my determination they're both
9  sufficient.  But it's -- it's the powers above me
10  that I have nothing to do with that would
11  necessarily, I guess, entertain.
12     Q.  Your experience told you that you
13  didn't have enough information based on your
14  interview of Ms. Furlow and your conversation with
15  Mr. Furlow for a successful warrant application; is
16  that correct?
17        MR. HUGHES:  Just object to the form of
18  the question.  It misstates his testimony, I
19  believe.  But go ahead.
20        BY MR. HAMILTON:
21     Q.  Please correct me if I'm wrong.  I can
22  restate it or I can say it again if that's helpful.
23     A.  No.  Based -- based on experience, I --
24  I -- I have enough for both.  But like I said,
25  that's above me.  I -- I have enough.  I would -- I

Page 132

1  would feel comfortable going and applying for a
2  warrant with what I had.
3      Q.  But you didn't because --
4      A.  Because the prosecutor wants a formal
5  interview or an attempt at a formal interview.
6      Q.  Okay.  Did you believe that Mr. Furlow
7  would return home eventually?
8      A.  Likelihood, yes.
9      Q.  Did you attempt to follow up with
10  Mr. Furlow sort of at his home?
11     A.  I did.
12     Q.  And with what result?
13     A.  Negative results.
14     Q.  At what point in time did you attempt
15  such follow up?
16     A.  Later that night, the next day, and I'm
17  not sure if it was three days in a row --
18     Q.  Sure.
19     A.  -- but I know it was several times.
20     Q.  Did you believe that Mr. Furlow
21  presented a -- a threat to Ms. Furlow?
22     A.  From her account and her demeanor
23  on-scene, yes, I did.
24     Q.  But despite this, it's your experience
25  that those factors and circumstances would not be --

33 (Pages 129 to 132)

**KEVIN WALSH  2/9/2017**

Page 133

1    would probably result in a warrant application being
2    denied; is that correct?
3        A.  Well, I mean, the wanted was placed out
4    for his arrest.
5        Q.  Right.
6        A.  Which the warrant would have done the
7    same --
8        Q.  Right.
9        A.  -- for his arrest.
10       Q.  Right.
11       A.  So could you kind of rephrase the
12   question, please?
13       Q.  Sure.
14           I -- yeah, I guess I'm -- what I'm
15   trying to figure out, and -- and this may be ground
16   that we've already covered, is -- is your
17   determination if -- if he still presented a danger
18   to Ms. Furlow and you thought he was going to come
19   back when, why you ultimately didn't -- with the
20   information that you had, ultimately didn't apply
21   for a warrant.  That's what I'm trying to figure
22   out.
23       A.  The wanted was -- I was following my --
24   my standard of practice as well, that I would try
25   and get his side of the story of what's going on,

Page 134

1    whether he wants to tell me his side or not, but get
2    everything together so I can present it to the
3    prosecutor and say, this is what we have.
4        Q.  Got it.
5        A.  So there would be no more question of,
6    well, Did you interview him?  You didn't interview
7    him?  What did he have to say?
8        Q.  Got it, okay.
9            You made a reference to the powers that
10   be.  And just to be clear, is it your understanding
11   that they -- do you think they use a different
12   standard for probable cause?
13       A.  No.
14       Q.  They just want to see an interview, a
15   formal interview of the suspect?
16       A.  Yes.
17       Q.  Okay.  So the wanted's in the system.
18   This -- this has happened on -- on the 25th of
19   January.  To go back to -- to the front page, if you
20   don't mind, under "Management" toward the bottom, it
21   says "date/time entered," it looks like you entered
22   it on -- at 1:26.
23           And then if you take a look below, it
24   says "Approval records."  Supervisor review
25   happened, it looks like, the next day, almost

Page 135

1    exactly 24 hours later.  Do you recall having a
2    conversation with -- would it be Sergeant Rose?
3        A.  Yes.  I did not have a --
4        Q.  A conversation?
5        A.  -- a conversation, no, not to my
6    recollection.
7        Q.  Okay.  So that was -- that was approved
8    the next day.
9            And then there's a final approval that
10   happened a few days later by -- is that Sergeant
11   Eilermann?
12       A.  No.  She's a civilian employee.
13       Q.  Okay.  What -- can you just explain
14   that process?
15       A.  She's a CARE operator.
16       Q.  I see.
17       A.  She's a supervisor in the CARE
18   department.
19       Q.  And so CARE gives the final approval?
20       A.  On the report itself.  Yes.
21       Q.  Got it.
22           Are -- have there ever been instances
23   in which the CARE provider has not provided final
24   approval?
25       A.  Not to my knowledge, no.

Page 136

1        Q.  Okay.  So that was approved on
2    January 29th, that final approval was achieved on --
3    on the 29th.  So let's flip a couple more pages
4    to -- now, this is page 5 of 7 if you look in the
5    bottom right-hand corner.  So this is the instance
6    in which Mr. Furlow was ultimately arrested.  Do you
7    recall receiving a -- a call from the officer who
8    arrested Mr. Furlow?
9        A.  Yes.
10       Q.  Tell me about that call.
11       A.  The officer -- actually, the supervisor
12   contacted me.  I was working as the desk officer
13   that night in the First Precinct.  The supervisor
14   said that, Hey, we picked up a wanted.  Gave me
15   Mr. Furlow's information and then said, you know,
16   he's saying he wants a lawyer.  He's invoked his
17   right, and he's shouting expletives at us, and
18   that's about it.
19       Q.  Yeah.  And what did you say?
20       A.  I said, Okay.
21           And he said, He's already invoked his
22   right.  Do you just want us to cancel the teletype
23   and -- and supplement it?
24           And I said, Yes.
25       Q.  So I'm just reading from the narrative

34 (Pages 133 to 136)

**KEVIN WALSH  2/9/2017**

Page 137

1  portion here, if you take a look at sort of the
2  paragraph that starts "on the above date."  The
3  second sentence reads, "I contacted the
4  investigating Officer Walsh, DSN4068, and he asked
5  this officer to do the interview."
6       Did -- is -- it sounds a little bit
7  different from what you described.  Is there, based
8  on Mr. Furlow's invocation of his right not to -- to
9  speak, is an interview conducted in your experience,
10  or is the teletype just canceled?
11       A.  Could you --
12       Q.  Yeah, sure.
13       A.  Please.
14       Q.  That is -- that was muddled.
15       Did you ask the officer to conduct an
16  interview?
17       A.  When I was told that he was screaming
18  and yelling and saying he wants, you know, wants a
19  lawyer, I said, you know, Conduct the interview,
20  give him -- read him his rights, that he wants his
21  -- if he wants his attorney, then I'll take care of
22  the warrant application.
23       But beings that I was on the desk, he
24  was there and he was already yelling to begin with.
25  The officer that made the arrest, I -- I told him

Page 138

1  to -- to conduct the formal interview.
2       Q.  Okay.  Did you learn anything about
3  sort of what that formal interview entailed?
4       A.  Mirandizing and -- and telling him he
5  wants his lawyer and yelling at the officers.
6       Q.  Okay.  And based on your sort of
7  understanding and recollection of things, what
8  happened next?
9       A.  That was it.  The wanted was canceled.
10  And then --
11       MR. HUGHES:  Okay.  Is that what
12  happened next?
13       THE WITNESS:  Yeah.
14       MR. HUGHES:  Okay.
15       BY MR. HAMILTON:
16       Q.  Now, it says on the final page here at
17  the very top of the page, it says "Case
18  responsibility will be with PO Walsh."
19       What does that mean?
20       A.  That means that the -- the actual case
21  will be my responsibility to do any follow-ups, to
22  conduct warrant application, things of that nature.
23       Q.  And did you -- did you apply for a
24  warrant?
25       A.  Not right then and there, no.

Page 139

1       Q.  Did you apply for a warrant thereafter?
2       A.  Uh-huh.
3       Q.  And was -- what was the result of that
4  warrant?
5       A.  I'm not sure.
6       Q.  Okay.
7       A.  After I applied, this came about and I
8  kind of stayed out of it then.
9       Q.  Did you hear anything from the
10  prosecutor's office --
11       A.  No.
12       Q.  -- about your application?
13       A.  No.
14       Q.  And so following your conversation with
15  the officer who arrested Mr. Furlow, was
16  Mr. Furlow -- based on your understanding, was he --
17  was he released?
18       A.  He was held 24 hours.
19       Q.  And he was held 24 hours because?
20       A.  Department policy.
21       Q.  Based on -- based on --
22       A.  Domestic violence.
23       Q.  It was based on it being a domestic
24  violence instance.  So he was just held for a
25  straight 24 hours.

Page 140

1       Were you aware of any other questioning
2  that occurred?
3       A.  No.
4       Q.  Have you ever had -- did you ever
5  encounter Mr. Furlow after -- after this instance?
6       A.  Yes.
7       Q.  What were those encounters?
8       A.  The first one was -- I don't know the
9  exact date.  It was a couple days after he was
10  arrested and released.  I had received a call from
11  Mrs. Furlow wishing to recant her statement.  After
12  that, I advised her that she needed to come in
13  person to give a written statement --
14       Q.  Uh-huh.
15       A.  -- of her account of events both days,
16  why she was recanting, and I also asked her if she
17  was being forced into making this statement, in
18  which she said, no.  Mrs. Furlow never responded, to
19  my knowledge, to the First Precinct.
20       Q.  Uh-huh.
21       A.  So therefore after Mr. Furlow was
22  released, I responded back to their residence to try
23  and get ahold of Mrs. Furlow to see if I could kind
24  of get a one-on-one with her to see why she recanted
25  her statement, make sure she's all right.  And that

35 (Pages 137 to 140)

**KEVIN WALSH  2/9/2017**

Page 141

1  was our first encounter with Mr. Furlow.
2      Q.  Okay.  And there were others?
3      A.  Yes.
4      Q.  What were the nature of those other --
5  other encounters?
6      A.  It was calls for service to and around
7  their residence.  Neighbors had called to complain
8  that their -- the Furlows' children, one was cutting
9  through the backyard of this gentleman's residence
10  and damaged their fence.
11      Another was a -- a property owner of a
12  residence on their property, neighbor called saying
13  that his shed of his -- next to his house, the
14  shingles were being ripped off by Mr. Furlow's son.
15      And I believe another one was for a
16  loose dog that came from the Furlow's residence that
17  was apparently chasing and attacking small children
18  in the neighborhood.
19      Q.  And on what basis did you apply for a
20  warrant for Mr. Furlow?
21      MR. HUGHES:  Well, are you talking
22  about the domestic violence case?  Or are you
23  talking about --
24      MR. HAMILTON:  Well, I'm -- I'm just
25  going back to Detective Walsh's prior testimony.

Page 142

1      MR. HUGHES:  Okay.
2      MR. HAMILTON:  You said you applied for
3  a warrant.
4      THE WITNESS:  Right.
5  BY MR. HUGHES:
6      Q.  And what was the basis for that
7  application?
8      A.  The domestic violence.
9      Q.  Domestic violence, okay.
10      A.  Yes.
11      Q.  I just want to go back quickly to -- to
12  the policy.  What is the purpose of the 24-hour hold
13  policy for domestic violence?
14      A.  A number of things.  One, the victim is
15  able to seek an order of protection against the
16  suspect.  Could seek medical attention --
17      Q.  Uh-huh.
18      A.  -- that that person maybe was in fear
19  of -- of doing while the suspect was near or around
20  them.  And it's also -- can be used for that
21  person -- it becomes real when a suspect is
22  arrested.
23      Q.  Uh-huh.
24      A.  So it kind of gives the ability for the
25  victim to feel a little bit, I guess, empowered to

Page 143

1  accomplish all of those things, move out.
2      Q.  Uh-huh.  Is this something that would
3  be employed if somebody were picked up on a wanted
4  days, weeks, or months after the initial incident?
5      A.  Uh-huh, yes.
6      Q.  So even -- even if the exigency, let's
7  call it, is -- or the -- the time close to the
8  incident has now grown, that 24-hour sort of
9  mandatory hold for domestic violence suspects is
10  still enforced?
11      A.  Yes.
12      MR. HAMILTON:  Okay.  Mr. Hughes, I'll
13  pass the witness to you.
14      MR. HUGHES:  Oh, thank you.
15      EXAMINATION
16  BY MR. HUGHES:
17      Q.  First, a few matters just to see if I
18  understood your -- some of your testimony correctly
19  or not.  Maybe I did, maybe I didn't.
20      You gave some testimony that, to my
21  ears, and my hearing is getting not as good as it
22  used to be, sounded a little bit conflicting.  You
23  made a statement, and I'm looking at my notes, which
24  it's hard to read my notes.  Certain municipalities
25  have said you can release to a court date.  And then

Page 144

1  another point you said something, other
2  jurisdictions -- I can't read my writing, but you
3  talk about -- this was in connection with wanteds.
4  So -- and my question is -- is St. Louis County --
5  is St. Louis County Police Department the only
6  jurisdiction that employs wanteds, to your
7  knowledge?
8      A.  No.
9      Q.  Okay.  So -- and these attorneys who
10  came from out-of-state may not realize, for example,
11  that the City of St. Louis is sort of a county
12  within a county -- a county within -- is sort of its
13  own county; is that correct?
14      A.  Correct.
15      Q.  So there's St. Louis County where
16  we're at -- you know, and then there's the County of
17  the City of St. Louis; is that correct?
18      A.  Yes.
19      Q.  Okay.  Does the County of the City of
20  St. Louis employ wanteds?
21      A.  Yes.
22      Q.  Yeah.  So -- so in your experience, for
23  example, driving a patrol car if you happen to pull
24  someone over, there could be a wanted for the City
25  of St. Louis; is that correct?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

Page 145

1      A.  Yes.
2      Q.  And then there are -- in St. Louis
3   County there are multiple, multiple municipalities;
4   is that correct?
5      A.  Yes.
6      Q.  Do those multiple municipalities use
7   systems of wanteds too?
8      A.  Yes.
9      Q.  Now, I think there's been testimony
10  in -- in some other deposition about REJIS being a
11  regional system; is that correct?
12     A.  Yes.
13     Q.  And is it your -- do you know, is
14  St. Charles County part of REJIS too?
15     A.  Yes, I believe so.
16     Q.  Okay.  So -- so anyway, would it be
17  fair statement that all these, you know,
18  municipalities or counties who are part of the REJIS
19  system, they use the system of wanteds; is that
20  correct?
21     A.  Yes.
22     Q.  And so St. Louis County does not stand
23  alone; is that correct?
24     A.  Yes.
25     Q.  And correct me if I'm wrong.  Kansas --

Page 146

1   would it be correct, that the Kansas City area, if
2   you know this, has a system of wanteds except they
3   have a different name like stop orders or persons of
4   interest, but it's the same thing; is that correct?
5         MR. HAMILTON:  Objection to form.
6      BY MR. HUGHES:
7      Q.  As far as you know or not?
8      A.  I'm unaware of Kansas City.
9      Q.  Okay.  But as far as -- okay.  And I
10  think you might have asked -- might have answered a
11  question this way.  I know you're asked a lot of
12  questions, but it seemed like you were asked, is a
13  warrant always preceded by a wanted?  And according
14  to my notes, you said, yes.  And I think I might
15  have objected to the form of the question as being
16  overbroad, but -- so I want to follow up on that,
17  but I just wanted to, you know --
18         MR. HAMILTON:  Objection to form.
19     BY MR. HUGHES:
20     Q.  -- leading up.  If, for example, you
21  speak to someone on -- right on the scene and you,
22  know, you asked them to give you a statement, and
23  they give you their statement and then you decide to
24  bring them into custody or not to bring them into
25  custody or to just move on or to -- to release them

Page 147

1   on a -- summons; is that -- is that a fair
2   statement?
3      A.  Uh-huh.
4         MR. HAMILTON:  Objection to form.
5      BY MR. HUGHES:
6      Q.  So in those statements you -- and then
7   if you apply for a warrant, you would apply for a
8   warrant without having issued a wanted; is that
9   correct?
10     A.  Yes.
11     Q.  Okay.  And you made some statement that
12  they have 24 hours to conduct an interview.  Or
13  maybe you just said yes to that question.
14         And are you familiar with the 24-hour
15  statute?
16     A.  Yes.
17     Q.  Now, are officers trained to do what
18  they can to -- other than let's say domestic
19  violence cases, to -- to do what they can to apply
20  before the expiration of the 24 hours?
21     A.  Yes.
22     Q.  Okay.  So -- if all of a sudden they
23  have information in five hours or ten hours or 16
24  hours, they -- they do so; is that correct?
25     A.  Yes.

Page 148

1      Q.  Okay.  They don't -- it's not the
2   practice to wait til the 23 -- 23 and a half hours
3   go by, is it?
4      A.  No.
5      Q.  Okay.  Let me -- why don't we mark this
6   as Defendant's Exhibit A.
7         (Exhibit A was marked for
8          identification.)
9      BY MR. HUGHES:
10     Q.  Now, looking at Defendant's Exhibit A,
11  what -- what is that?
12     A.  This is a calls for service via CAD.
13     Q.  Okay.  And -- and those are -- I think
14  you alluded to this earlier -- has, you know, kind
15  of like a dispatcher summary of things or --
16     A.  Yes.
17     Q.  -- entries made by the dispatcher; is
18  that correct?
19     A.  Yes.
20     Q.  They're -- they're not entries made by
21  you; is that correct?
22     A.  Yes.
23     Q.  Okay.  And so it indicates that there
24  was a caller; is that correct?
25     A.  Yes.

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com      Phone: 1.800.280.3376      Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

Page 149

1    Q. And what is the name of the caller?
2    A. That says Steve Arnold.
3    Q. Okay. So this caller was not Latoya
4  Furlow; is that correct?
5    A. Correct.
6    Q. And then it also has an address of the
7  caller; is that correct?
8    A. Yes.
9    Q. What is that?
10   A. ████████████.
11   Q. So that is -- you've learned that's not
12  the Furlow's address; is that correct?
13   A. Yes.
14   Q. Okay. And also it indicates the call
15  was received at what time?
16   A. 12:25.
17   Q. Okay. And then did the dispatcher --
18  does it appear that the dispatcher notified any
19  other entity other than the police department first
20  or at any time?
21   A. Spanish Lake Fire and Christian
22  Hospital EMS.
23   Q. So -- so the dispatcher, you gather
24  from that the dispatcher here -- upon hearing the
25  call notified EMS? Is that correct? And even the

Page 150

1  fire department?
2    A. Yes.
3    Q. Is that correct?
4      Now, when EMS in -- in a violent
5  situation and fire department are notified, do they
6  go right to the scene, or do they stage nearby until
7  it's safe?
8    A. They stage.
9    Q. Okay. And -- and then at 12:26, is
10  there an entry there by the dispatcher?
11   A. Yes.
12   Q. And what does it say?
13   A. "Neighbor came over stating her husband
14  beat her up."
15   Q. Okay. So initially that's not the --
16  Latoya Furlow calling to say, my husband beat me up.
17  It's a neighbor came over stating her husband beat
18  her up; is that correct?
19   A. Yes.
20   Q. Okay. And then it has something about
21  at 12:27 there's a couple entries that I can't quite
22  make out. What are they?
23   A. First one, "He is at 1230."
24   Q. Do you know what that means?
25   A. 1230 Maple is their residence.

Page 151

1    Q. Oh, I see. Okay. And then -- and then
2  after that, what does it say?
3    A. "Dwayne, black male, Cadillac DTS,
4  tinted windows."
5    Q. Which means what?
6    A. He is potentially driving a Cadillac
7  DTS.
8    Q. Oh, okay, with tinted windows. Okay.
9  And -- and then -- and then -- after that what does
10  it say?
11   A. "Direction of travel, right towards
12  Larimore." It says "Latimore" but it should be
13  "Larimore Road."
14   Q. Okay. And -- and then 12:38, what does
15  it say?
16   A. "Ambulance is 76" -- which means
17  en route -- "and advise when scene is secure."
18   Q. So that would suggest to you they're
19  going to stage someplace when it's secure; is that
20  correct?
21   A. Yes.
22   Q. Okay. And -- and then at -- after that
23  12:28, what does it state?
24   A. "He departed in vehicle with daughter."
25   Q. Okay. And then -- and then after that,

Page 152

1  what does it state at 12:28?
2    A. "Caller distraught and crying on
3  phone."
4    Q. Okay. So initially the -- a neighbor
5  called at 12:25, it looks like, and then three
6  minutes later it's no longer the neighbor. It's --
7  it's Mrs. Furlow, "Caller distraught and crying on
8  the phone." Is that correct?
9    A. Yes.
10   Q. Okay. Then what time did you arrive?
11   A. I arrived at 12:36.
12   Q. Okay. So you arrived -- let's see.
13  That would be eight minutes later after the
14  dispatcher hears a caller distraught and crying on
15  the phone; is that correct?
16   A. Yes.
17   Q. Will you describe in detail, or at
18  least give us, you know, some sort of description of
19  whether or not when you arrived eight minutes later,
20  whether or not she was crying and distraught?
21   A. She was crying profusely.
22   Q. Okay. And what about distraught?
23  Would you still describe it as distraught?
24   A. Yes.
25   Q. Okay. How long did that crying

38 (Pages 149 to 152)

**KEVIN WALSH  2/9/2017**

---

Page 153

1  continue while you were there?
2      A.  Until I left the scene and she was
3  driving away in her vehicle.
4      Q.  Okay.  And she was driving away and --
5  so she was crying -- so she was crying -- driving
6  away in her vehicle?
7      A.  Yes.
8      Q.  So you talked before about a protective
9  sweep.  Was she crying while you were doing the
10 protective sweep?
11     A.  Yes.
12     Q.  Was she still distraught while you were
13 doing the protective sweep?
14     A.  Yes.
15     Q.  Okay.  And did -- did -- did you have
16 any reason to believe that her life could be in
17 danger or that this was a very, very dangerous
18 situation?
19     A.  Yes.
20     Q.  Tell us why.
21     A.  I treat every domestic as such.  Just
22 because there's a lot of emotion that goes into
23 them.  When I got into the basement and saw the
24 loaded AR15 and Mrs. Furlow in her state of mind,
25 stating that she was in fear that, you know, Dwayne

---

Page 154

1  was going to come back or Dwayne was -- being that
2  he was on -- on probation and a convicted felon, he
3  had a little bit more, I guess, to worry about that
4  he's dealing with a probation status as well.
5      Q.  Okay.  So he had -- he had -- he had to
6  worry not only about this domestic violence charge.
7  He had to worry about his probation status; is that
8  correct?
9          MR. HAMILTON:  Objection to form.
10 BY MR. HUGHES:
11     Q.  Is that what you just said?
12     A.  Yes.
13     Q.  Okay.  So you still -- did you -- while
14 she was doing all this -- while she was being
15 distraught and while she was crying, did you have
16 any reason to think that she was making all this up?
17     A.  No.
18     Q.  Do you have any reason to think she was
19 putting on an act?
20     A.  No.
21     Q.  Did you think she was very believable?
22     A.  Yes.
23     Q.  Did -- did you believe she was truly in
24 distress?
25     A.  Yes.

---

Page 155

1      Q.  Did you do anything to try to show
2  concern and compassion towards her?
3      A.  Counseled her on how to obtain a
4  protection order for her and her children.  I
5  secured several items into her vehicle, and I stayed
6  with her until she gathered up a good portion of her
7  belongings and placed them into her vehicle.
8      Q.  Now, tell us about that AR15 rifle.
9  Was it empty?
10     A.  No.
11     Q.  Tell us about it.
12     A.  There was one live round in the
13 chamber, and there were 29 rounds in the magazine.
14     Q.  Okay.  So I notice that there's an
15 alderman in the City of St. Louis -- I realize
16 that's a different jurisdiction than St. Louis
17 County -- has said she wants -- wants to file some
18 sort of bill to make AR15s completely illegal in the
19 City of St. Louis?
20         MR. HAMILTON:  Objection to form.
21 BY MR. HUGHES:
22     Q.  Were you aware of that?
23     A.  Yes.
24     Q.  Would you agree they're highly
25 dangerous?

---

Page 156

1      A.  Yes.
2          MR. HAMILTON:  Objection to form.
3  BY MR. HUGHES:
4      Q.  Now -- now, why -- why is it -- did
5  she -- did -- did Mrs. Furlow explain to you why
6  they had the AR15 rifle in the house?
7      A.  Yes.
8      Q.  What was that?
9      A.  For their protection.
10     Q.  They needed an AR15 rifle in their
11 house --
12         MR. HAMILTON:  Objection to form.
13 BY MR. HUGHES:
14     Q.  -- for their protection, is that what
15 you're saying?
16     A.  Yes.
17     Q.  Okay.  Did -- did that alert you that
18 this is -- did -- did that alert you that that would
19 also be dangerous?
20         MR. HAMILTON:  Objection to form.
21 BY MR. HUGHES:
22     Q.  Is that correct?
23     A.  Yes.
24     Q.  Do you have -- did she volunteer what
25 could be going on in the house that -- where they

---

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

**KEVIN WALSH  2/9/2017**

|  | Page 157 |
|---|---|
| 1 | would need an AR15 rifle for protection? |
| 2 | MR. HAMILTON:  Objection to form. |
| 3 | THE WITNESS:  No. |
| 4 | BY MR. HUGHES: |
| 5 | Q.  Okay.  Now, you alluded to something a |
| 6 | little while ago that she had mentioned that she had |
| 7 | purchased that AR15 rifle herself? |
| 8 | A.  Yes. |
| 9 | MR. HAMILTON:  Objection. |
| 10 | BY MR. HUGHES: |
| 11 | Q.  Now, what did you say about that? |
| 12 | A.  She said she -- she purchased the AR15 |
| 13 | because Dwayne was on probation, couldn't purchase |
| 14 | it himself. |
| 15 | Q.  Now -- okay.  So why -- why couldn't he |
| 16 | purchase it himself? |
| 17 | MR. HAMILTON:  Objection. |
| 18 | THE WITNESS:  Because he's a convicted |
| 19 | felon. |
| 20 | BY MR. HUGHES: |
| 21 | Q.  Oh, so you're saying in the State of |
| 22 | Missouri, convicted felons aren't supposed to have |
| 23 | AR15 rifles? |
| 24 | MR. HAMILTON:  Objection. |
| 25 | THE WITNESS:  Yes, in the country as |

|  | Page 158 |
|---|---|
| 1 | well. |
| 2 | BY MR. HUGHES: |
| 3 | Q.  Okay.  And -- and what about this -- |
| 4 | this fact that -- well, let me ask you this:  How |
| 5 | would you describe the purchase by a spouse of -- |
| 6 | MR. HAMILTON:  Objection. |
| 7 | MR. HUGHES:  -- of a AR15 rifle, you |
| 8 | know, for -- her spouse who's a convicted felon? |
| 9 | MR. HAMILTON:  Objection. |
| 10 | THE WITNESS:  So per federal |
| 11 | guidelines, it's a straw purchase. |
| 12 | BY MR. HUGHES: |
| 13 | Q.  So this is a federal offense; is that |
| 14 | correct? |
| 15 | MR. HAMILTON:  Objection. |
| 16 | BY MR. HUGHES: |
| 17 | Q.  You said -- did you say per federal -- |
| 18 | A.  Yes. |
| 19 | Q.  -- laws?  Okay. |
| 20 | And -- and the fact that she may have |
| 21 | violated a federal law by making a straw purchase -- |
| 22 | MR. HAMILTON:  Objection. |
| 23 | BY MR. HUGHES: |
| 24 | Q.  -- would that suggest to you that this |
| 25 | man could be manipulative? |

|  | Page 159 |
|---|---|
| 1 | MR. HAMILTON:  Objection. |
| 2 | THE WITNESS:  Yes. |
| 3 | BY MR. HUGHES: |
| 4 | Q.  Okay.  Now, you indicated you helped |
| 5 | carry some boxes of clothing to the car; is that |
| 6 | correct? |
| 7 | A.  Yes. |
| 8 | Q.  What about that rifle? |
| 9 | A.  Yes. |
| 10 | Q.  Yes, what? |
| 11 | A.  I carried it to the vehicle. |
| 12 | Q.  Did you keep it loaded? |
| 13 | A.  No. |
| 14 | Q.  What did you do? |
| 15 | A.  I rendered it safe by unloading it. |
| 16 | Q.  Okay.  And did she specifically tell |
| 17 | you that she would prosecute her husband? |
| 18 | A.  Yes. |
| 19 | Q.  Okay.  You indicated that assault B -- |
| 20 | you were charging her with assault third and |
| 21 | domestic peace -- you're going to charge Mr. Furlow |
| 22 | with assault third and domestic peace disturbance; |
| 23 | is that correct? |
| 24 | A.  Yes. |
| 25 | Q.  If this happened today instead of a |

|  | Page 160 |
|---|---|
| 1 | year ago when it happened -- are the domestic |
| 2 | violence statutes different?  Could you have charged |
| 3 | them with something different today? |
| 4 | MR. HAMILTON:  Objection. |
| 5 | THE WITNESS:  Yes. |
| 6 | BY MR. HUGHES: |
| 7 | Q.  What? |
| 8 | A.  A Class E felony. |
| 9 | Q.  Okay.  So if the same thing happened |
| 10 | today, Mr. Furlow could be charged with a Class E |
| 11 | felony; is that correct? |
| 12 | MR. HAMILTON:  Objection. |
| 13 | THE WITNESS:  Yes. |
| 14 | BY MR. HUGHES: |
| 15 | Q.  Okay.  Now, you mentioned earlier that |
| 16 | the next day you spoke to her on the telephone and |
| 17 | she recanted; is that correct? |
| 18 | A.  Yes. |
| 19 | Q.  Tell us your thoughts about that -- |
| 20 | MR. HAMILTON:  Objection. |
| 21 | BY MR. HUGHES: |
| 22 | Q.  -- when she recanted. |
| 23 | A.  She stated that she wished to recant |
| 24 | her statement and that she made everything up.  I |
| 25 | asked her if she would -- if anybody was coercing |

40 (Pages 157 to 160)

**KEVIN WALSH  2/9/2017**

Page 161

1  her into making that statement, and she said, no.
2      I asked her to respond to the First
3  Precinct in person and make a written statement.
4  She wanted to know what was going to happen, and I
5  told her that per State of Missouri, all domestics
6  are still investigated and victimless crimes are
7  prosecuted.  So that her statement would be taken
8  into account, but ultimately the prosecuting
9  attorney would determine.
10      Q.  That's -- that's nice.  But let me ask
11  you this:  Did -- did the recanting the next day --
12          MR. HAMILTON:  Objection.
13      BY MR. HUGHES:
14      Q.  -- did it ring true to you?
15      A.  No.  It seemed a little odd.
16      Q.  Tell us why.
17      A.  It seemed odd by her statement on-scene
18  and then her demeanor.
19      Q.  On-scene?
20      A.  Yes.
21      Q.  Okay.  And -- and how was she talking
22  to you when she was on the telephone and she wanted
23  to recant?  Was her voice patterns different?
24      A.  She was very fast-paced.  She seemed a
25  little agitated, anxious.

Page 162

1      Q.  And -- and tell us again why you wanted
2  her to come in.  I mean, did you have any concern
3  about her?
4      A.  Yes.  I did.
5      Q.  What?  Tell us.
6      A.  I had concern for her.  She said she
7  had multiple children that were living in the house
8  as well.  And in my dealing with domestics, usually
9  recanting can -- can occur, but more times than not,
10  the first statement that is made by the victim is
11  usually the most truthful one.
12      Q.  Okay.  Now, you were asked what the
13  probable cause was to -- to arrest Mr. Furlow.
14  First of all, you saw Mrs. Furlow yourself; is that
15  correct?
16      A.  Yes.
17          MR. HAMILTON:  Objection.
18      BY MR. HUGHES:
19      Q.  And -- and -- and she made a statement
20  to you that she had been assaulted; is that correct?
21      A.  Yes.
22      Q.  And also you mentioned before she was
23  crying and she was distraught; is that correct?
24          MR. HAMILTON:  Objection.
25          THE WITNESS:  Yes.

Page 163

1      BY MR. HUGHES:
2      Q.  She was still crying long after the
3  call -- the initial call was made by the neighbor;
4  is that correct?
5          MR. HAMILTON:  Objection.
6          THE WITNESS:  Yes.
7      BY MR. HUGHES:
8      Q.  Okay.  Now, you testified earlier that
9  you did speak with Mr. Furlow on the telephone; is
10  that correct?  That you spoke with a man that you
11  were pretty sure was Mr. Furlow and you explained
12  why; is that correct?
13      A.  Yes.
14      Q.  Okay.  When -- and you mentioned
15  earlier that he said -- and including the words he
16  said was, If I turn myself in, I will be locked up;
17  is that correct?
18      A.  Yes.
19      Q.  Did he ever deny that he did not strike
20  his wife?
21      A.  No.
22          MR. HAMILTON:  Objection.
23      BY MR. HUGHES:
24      Q.  He never once did?
25      A.  No.

Page 164

1      Q.  Okay.  So just add all these things up.
2  You -- you -- you saw what you saw.  You saw
3  Mrs. Furlow crying and being distressed -- being
4  distraught and saying she wants to prosecute; is
5  that correct?
6      A.  Yes.
7      Q.  And then when you spoke to Mr. Furlow
8  on the phone, he did not deny that he struck her; is
9  that correct?
10          MR. HAMILTON:  Objection.
11          THE WITNESS:  Yes.
12      BY MR. HUGHES:
13      Q.  And -- and then regarding the 24-hour
14  hold in domestic violence cases, I know there is
15  something alleged in the first amended complaint
16  which was -- I'll read it to you -- which was Gomez
17  Exhibit 4, where it's alleged that an attorney,
18  presumably an attorney for Mr. Furlow, spoke to a
19  Sergeant James Grace about Mr. Furlow being in
20  custody.  And I don't know if he spoke -- I don't
21  know who this attorney was.  He wasn't identified.
22  But it says that Sergeant James Grace made the
23  statement to counsel that Walsh followed department
24  procedures?
25          MR. HAMILTON:  Objection.

41 (Pages 161 to 164)

**KEVIN WALSH  2/9/2017**

Page 165

1    BY MR. HUGHES:
2        Q.  So my question to you is:  Is it true
3    you followed department procedures in everything you
4    did?
5        A.  Yes.
6        Q.  Okay.  And even -- even this 24-hour
7    domestic violence hold, was there anything in the
8    report where you said, I -- I -- I want him held for
9    24 hours?
10       A.  No.
11       Q.  Okay.  But it is a policy of the police
12   department; is that correct?
13       A.  Yes.
14       Q.  You're not some sort of rogue cop, and
15   I apologize for using that term --
16           MR. HAMILTON:  Objection.
17       BY MR. HUGHES:
18       Q.  -- going outside the policy; is that
19   correct?
20       A.  Yes.
21       Q.  Okay.  So you're just doing your job;
22   is that correct?
23       A.  Yes.
24       Q.  Did you have any malice towards
25   Mr. Furlow?

Page 166

1        A.  No.
2        Q.  Did you know him before?
3        A.  No.
4        Q.  Did you have any ill will towards
5    Mr. Furlow?
6        A.  No.
7        Q.  Okay.  Were you just attempting to
8    punish Mr. Furlow for any reason?
9        A.  No.
10           MR. HAMILTON:  Objection.
11       BY MR. HUGHES:
12       Q.  Okay.  Now, you sort of addressed
13   various reasons why, you know, you think that a
14   24-hour old for domestic violence cases exist.  But
15   was that there before you started, by the way?
16       A.  Yes.
17       Q.  Okay.  But you mentioned it gives the
18   victim time to engage -- to get -- for an order of
19   protection; is that correct?
20       A.  Yes.
21       Q.  And it also gives the victim time to
22   seek medical help; is that correct?
23       A.  Yes.
24       Q.  And would it be true it also gives the
25   victim time to find and move into a safe house?

Page 167

1        A.  Yes.
2        Q.  And would you agree that, you know --
3    would you agree that the -- it gives the victim, you
4    know, some physical emotional protection during this
5    24 hours?
6        A.  Yes.
7        Q.  And you mentioned it -- it makes it
8    real, when you said that, it makes it real for the
9    domestic abuser; is that correct?
10       A.  Yes.
11           MR. HAMILTON:  Objection.
12       BY MR. HUGHES:
13       Q.  And would be -- so the hope is he won't
14   do it again; is that correct?
15           MR. HAMILTON:  Objection.
16           THE WITNESS:  Yes.
17       BY MR. HUGHES:
18       Q.  Would you agree it's not intended for
19   you to do an investigation?
20       A.  Yes.
21       Q.  Would you agree it's only intended to
22   protect the victim?
23       A.  Yes.
24       Q.  Let's -- let's go to -- let's make sure
25   we've covered everything in the police report that's

Page 168

1    been marked as an exhibit, Exhibit 6, Walsh 6.
2        So on the front page it says, "Call
3    received radio."
4        And then it says, "Reporting Officer
5    Walsh."  Is that correct?
6        A.  Yes.
7        Q.  So just -- just so we understand, and I
8    guess it goes without saying, but let's say it.  You
9    did not arrive making accusations to Mr. Furlow.
10   There was a call on the radio where someone else was
11   making accusations; is that a fair statement?
12           MR. HAMILTON:  Objection.
13           THE WITNESS:  Yes.
14       BY MR. HUGHES:
15       Q.  Okay.  And -- and the initial caller,
16   we dealt with this in the CAD report, was someone
17   named Steve Arnold; is that correct?
18           MR. HAMILTON:  Objection.
19           THE WITNESS:  Yes.
20       BY MR. HUGHES:
21       Q.  That's listed there?  Okay.
22       And -- and it says "Final Approval."
23   And it has a supervisor review that was the next
24   day.  And then you mention there's a CARE final
25   approval.  That CARE clerk doesn't approve it for

42 (Pages 165 to 168)

**KEVIN WALSH  2/9/2017**

Page 169

1  probable cause.  Would it be a fair statement she
2  approves it for whatever the procedures for CARE is
3  involved?
4       A.  Yes.
5          MR. HAMILTON:  Objection.
6       BY MR. HUGHES:
7       Q.  Okay.  And it listed the -- the
8  victim's name?  Latoya Furlow; is that correct?
9       A.  Yes.
10      Q.  And -- oh, here's something that wasn't
11 addressed on earlier questioning.  It says,
12 "Physical state/emotions."  And what are -- what
13 are -- what did you put there?
14      A.  Angry, crying, fearful, afraid,
15 nervous.
16      Q.  Okay.  And I -- by the way, I want you
17 to assume it's true, that there was a deposition
18 yesterday where Mr. Furlow, with his attorney,
19 turned himself in --
20         MR. HAMILTON:  Objection.
21      BY MR. HUGHES:
22      Q.  -- to the police station.  I just want
23 you to assume it's true, and then he was released on
24 a summons.
25         Let me ask you this:  You were asked --

Page 170

1  did -- did any attorney ever call you up and say,
2  Now we'll turn him in --
3          THE WITNESS:  No.
4       BY MR. HUGHES:
5       Q.  -- voluntarily?  Okay.
6          And -- oh, speaking of that, you did
7  mention before when you were asked what you reviewed
8  in preparation for the deposition, you did mention
9  that you read this complaint; is that correct?
10      A.  Yes.
11      Q.  And --
12         MR. HAMILTON:  Objection.
13      BY MR. HUGHES:
14      Q.  -- and so that's one of the things you
15 reviewed; is that correct?
16      A.  Yes.
17      Q.  And did you read that at another time
18 before this -- this case of violence involving --
19         MR. HAMILTON:  Objection.
20      BY MR. HUGHES:
21      Q.  -- Mr. Furlow, you know, involving, you
22 know, when you responded, that another police
23 officer responded to claim of assault against a
24 female, and the accuser was Mr. -- that the person
25 who was being accused of committing the assault

Page 171

1  against another female was Mr. Furlow?
2          MR. HAMILTON:  Objection.
3          THE WITNESS:  Yes.
4       BY MR. HUGHES:
5       Q.  Okay.  So now you -- so now you know
6  that at least two times he's been accused of
7  violence to a female; is that correct?
8          MR. HAMILTON:  Objection.
9          THE WITNESS:  Yes.
10      BY MR. HUGHES:
11      Q.  Okay.  And you -- you mentioned that
12 you issued a wanted but you still -- you didn't stop
13 there.  You actually went by the house; is that
14 correct?
15      A.  Yes.
16      Q.  And you -- did you have a -- one of the
17 reasons you went by the house is to make sure
18 Mrs. Furlow was okay; is that correct?
19      A.  I was making sure that if she did
20 return back to her residence that she was okay and
21 see if Mr. Furlow did, in fact, return to the
22 residence.
23      Q.  And also you went back -- you were
24 looking for Mr. Furlow; is that correct?
25      A.  Yes.

Page 172

1          MR. HAMILTON:  Objection.
2       BY MR. HUGHES:
3       Q.  And you went back how many times, do
4  you believe?
5       A.  I believe at least three.
6       Q.  Okay.  So you went back to the house
7  three times so -- and then in addition to that, no
8  attorney ever called you up to say will turn himself
9  in; is that correct?
10      A.  Yes.
11      Q.  But according to the allegations in the
12 complaint, there is an attorney who apparently was
13 aware that Mr. Furlow was wanted on a -- what --
14 that there was a wanted issued on Mr. Furlow; is
15 that correct?
16         MR. HAMILTON:  Objection.
17         THE WITNESS:  Yes.
18         MR. HUGHES:  Okay.  Thank you, Officer
19 Walsh.  I have no other questions.
20         MR. HAMILTON:  I have -- we requested a
21 very, very brief break.  I just want to confer with
22 my team.  If anything, I have just a handful of
23 questions.  Really nothing.  Two minutes, literally.
24         THE VIDEOGRAPHER:  Time is 1:24.  We
25 are off the record.

43 (Pages 169 to 172)

KEVIN WALSH  2/9/2017

Page 173

1  (Discussion off the record.)
2  THE VIDEOGRAPHER:  The time is 1:27.
3  We are back on the record.
4  FURTHER EXAMINATION
5  BY MR. HAMILTON:
6  Q.  Thank you, Detective Walsh.  Just a few
7  clean-up questions, if you don't mind.
8  I want to go back to -- to your
9  responding to -- to the incident involving
10  Ms. Furlow.
11  You mentioned the presence of the AR15;
12  is that correct?
13  A.  Yes.
14  Q.  And this was -- you said you made the
15  gun safe and you put it into the car that Ms. Furlow
16  was driving away with, right?
17  A.  Yes.
18  Q.  Did you inquire any further about the
19  ownership of that car?
20  A.  The ownership of the car?  No.
21  Q.  Okay.  Did you inquire about what was
22  going to happen to that rifle specifically?
23  A.  She said she was taking it to her
24  family's house in the city.
25  Q.  Okay.  You also -- you also learned

Page 174

1  that Mr. Furlow left with one of their children in
2  the car; is that right?
3  A.  Yes.
4  Q.  Did you -- were you concerned about the
5  safety of that child?
6  A.  Always concerned about a child in a
7  domestic situation.  But Mrs. Furlow didn't really
8  make any -- any mention of concern over it.
9  Q.  But in your experience and
10  observation and based on the concern you just
11  mentioned, did you take any steps to ensure that
12  that child was okay?
13  A.  Attempted to -- when I talked to
14  Mr. Furlow, I talked to him.  And he didn't want to
15  answer anything.
16  Q.  And I -- I believe you -- did you take
17  any independent steps to make sure that the child
18  with Mr. Furlow was okay?
19  A.  No.
20  Q.  Did you put out an Amber alert?
21  A.  No.
22  Q.  And did you ever inquire when you --
23  well, you had occasion to speak to Ms. Furlow the
24  following day; is that correct?
25  A.  Yes.

Page 175

1  Q.  Did you inquire about the whereabouts
2  of that -- that high-powered rifle?
3  A.  Yes.
4  Q.  And what did she say?
5  A.  She said it was at her family's
6  house.
7  Q.  And did she say anything about whether
8  Dwayne had access to it?
9  A.  She said that he was not around.
10  Q.  Okay.  Did you inquire about her child
11  who was with Mr. Furlow?
12  A.  I don't know.
13  Q.  But taking all of this together, you
14  did not feel like you had enough information for a
15  warrant for Mr. Furlow's arrest; is that correct?
16  A.  No.
17  Q.  That's not correct?
18  A.  No.
19  Q.  Did you immediately take steps to try
20  and see -- apply for a warrant?
21  A.  No, not until he was in custody.
22  Q.  Okay.  Even though, as you described,
23  Ms. Furlow was distraught upon your arrival at the
24  scene the day before, correct?
25  A.  Yes.

Page 176

1  Q.  And despite the presence of the
2  high-powered rifle; is that correct?
3  A.  Yes.
4  Q.  And despite knowing that one of the
5  children was with Mr. Furlow; is that correct?
6  A.  Yes.
7  MR. HAMILTON:  No further questions.
8  MR. HUGHES:  I have no questions.
9  You have the right to read the
10  deposition and make changes if -- if the court
11  reporter made any mistakes, but this is being
12  televised anyway, and you have the right to change
13  your testimony but that's, you know --
14  MR. HAMILTON:  It's --
15  MR. HUGHES:  So -- so -- but you have a
16  right to waive that.
17  MR. HAMILTON:  Objection.
18  Mike, do you want to say this off the
19  record?  I don't know if this is --
20  MR. HUGHES:  No.  Let's keep -- I
21  recommend you waive signature.
22  Would you like to waive signature?
23  THE WITNESS:  Yes.
24  MR. HUGHES:  Yes, okay.
25  THE VIDEOGRAPHER:  The time is 2:31.

44 (Pages 173 to 176)

Page 177

1  We are off the record.  This concludes our
2  deposition of Kevin Walsh.
3              (Whereupon, signature was
4              waived and the witness was
5              excused at 1:30 p.m.)
6                  --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 178

1            CERTIFICATE OF REPORTER
2
3        I, RENÉE COMBS QUINBY, a Registered Merit
4  Reporter, Certified Realtime Reporter, Certified
5  Shorthand Reporter (CA), Certified Court Reporter
6  (MO), Realtime Systems Administrator, and Notary
7  Public within and for the State of Missouri, do
8  hereby certify that the witness whose testimony
9  appears in the foregoing deposition was duly sworn
10  by me to testify to the truth and nothing but the
11  truth; that the testimony of said witness was taken
12  by stenographic means by me to the best of my
13  ability and thereafter reduced to print under my
14  direction.
15        I further certify that I am neither
16  attorney nor counsel nor related nor employed by any
17  of the parties to the action in which this
18  deposition was taken; further, that I am not a
19  relative or employee of any attorney or counsel
20  employed by the parties hereto or financially
21  interested in this action.
22        My Commission expires April 9, 2017
23
24      ------------------------------------
25      Renée Combs Quinby, RMR, CRR, CCR #1291

45 (Pages 177 to 178)

**KEVIN WALSH  2/9/2017**

| A | | | | |
|---|---|---|---|---|

**A**

**a.m** 1:16 7:11,15
**ability** 9:17 39:4
  54:14 142:24
  178:13
**able** 22:14 71:22
  74:2 79:16
  80:8 86:3,23
  87:17 119:25
  125:18,24
  142:15
**absolutely**
  111:22
**abuser** 167:9
**academic** 26:16
  26:16 41:18
**academics** 50:18
**Academy** 21:11
  22:8 24:9
  25:15,20 26:2
  26:5,13,20,23
  26:24 41:17,19
  41:25 42:15
  44:18 45:20
  46:5,11,13,16
  46:20 49:16
  50:8 68:23
  116:2,3
**accepted** 25:15
  38:5
**access** 77:4 80:8
  175:8
**accident** 26:18
  42:21
**accidents** 33:18
**accomplish**
  143:1
**account** 124:9
  128:4,7,13,14
  132:22 140:15
  161:8
**accurate** 10:18
  67:1
**accurately** 64:2
  64:13 112:9
**accusations**
  168:9,11

**accused** 119:21
  170:25 171:6
**accuser** 170:24
**achieve** 33:6
  79:25
**achieved** 49:19
  136:2
**acknowledged**
  124:16
**act** 154:19
**action** 9:7
  178:17,21
**active** 74:17,18
  74:20 88:19,25
  89:3 90:1,17
  90:21
**activities** 18:15
**actual** 41:25
  82:5 138:20
**ad** 32:17
**add** 164:1
**added** 106:21
**addition** 13:19
  52:18 81:15
  172:7
**additional** 32:3
  80:15 106:24
  125:24
**address** 14:13
  14:17 118:21
  119:1 149:6,12
**addressed**
  166:12 169:11
**adjoining**
  103:10 105:20
**administered**
  107:24
**Administrator**
  178:6
**advise** 72:19
  151:17
**advised** 117:5
  122:2 140:12
**advisement** 58:9
  58:11 59:1
**affect** 9:17
**aforesaid** 8:21

**afraid** 169:14
**afternoon**
  116:16
**age** 8:19
**agency** 103:6
**agitated** 161:25
**ago** 41:1 65:18
  69:12 115:25
  157:6 160:1
**agree** 62:16,25
  64:15,20
  103:18 105:7
  106:6 110:12
  111:1 155:24
  167:2,3,18,21
**agreed** 7:2
  120:12
**agreement** 7:8
**ahead** 79:3 81:3
  131:19
**ahold** 140:23
**al** 1:5,8 4:5,10
  7:17,18
**alderman**
  155:15
**alert** 10:25
  156:17,18
  174:20
**allegations**
  172:11
**alleged** 116:22
  164:15,17
**allow** 56:1
**alluded** 148:14
  157:5
**Amber** 174:20
**ambiguous**
  67:23
**Ambulance**
  151:16
**amended** 164:15
**amendments**
  107:7
**Americas** 5:12
**analysis** 82:18
  82:24
**and/or** 22:21

103:9,21 104:7
**Angry** 169:14
**annually** 17:6
**answer** 11:18,19
  65:20 84:8
  92:24 109:21
  127:15 174:15
**answered** 46:19
  65:12,13,18
  146:10
**answering** 33:16
**anxious** 161:25
**anybody** 39:5
  49:16 88:10
  98:9 100:9
  123:11,14
  160:25
**anyway** 78:16
  145:16 176:12
**apologize** 10:1
  13:23 20:5
  30:6 38:18
  41:24 55:14
  67:16 72:16
  73:24 77:9
  96:4 118:18
  127:15 165:15
**apparently**
  141:17 172:12
**appear** 77:2
  109:14 128:8
  149:18
**appears** 109:13
  111:2 178:9
**applicable** 46:2
**application** 3:3
  24:23,24 25:6
  37:19 38:1
  58:4 82:6,9,14
  86:12 96:22
  130:19 131:15
  133:1 137:22
  138:22 139:12
  142:7
**applications**
  57:21 58:20
**applied** 24:20

38:4 59:7
  82:23 96:21
  97:3 130:22
  139:7 142:2
**apply** 22:4 81:3
  81:11,19,25
  125:7 133:20
  138:23 139:1
  141:19 147:7,7
  147:19 175:20
**applying** 25:14
  94:2 96:5
  132:1
**appreciate**
  70:20
**approached**
  119:9
**appropriate**
  51:14,15
**approval** 66:13
  66:16 67:5,14
  68:11 75:11,15
  78:22 79:7
  80:14,19,20
  84:4 111:13
  112:3,14 113:1
  113:24 134:24
  135:9,19,24
  136:2 168:22
  168:25
**approve** 52:15
  74:12,23 79:20
  80:24 168:25
**approved** 75:1
  76:7,14,18
  77:1,6,18
  112:4 135:7
  136:1
**approver** 78:2
**approves** 74:16
  169:2
**approving** 76:3
  77:15 78:4
  112:7
**approximately**
  7:15
**April** 178:22

KEVIN WALSH  2/9/2017

**AR15** 120:17
153:24 155:8
156:6,10 157:1
157:7,12,23
158:7 173:11
**AR15s** 155:18
**ArchCity** 5:6
8:8
**area** 120:1 146:1
**argumentative**
109:20
**Arnold** 149:2
168:17
**arrest** 45:17
82:16,19 84:20
88:11,13,14
122:10,12
125:5 133:4,9
137:25 162:13
175:15
**arrested** 86:10
93:7 94:18
126:16,19
127:5,11 136:6
136:8 139:15
140:10 142:22
**arresting** 87:19
92:5,13
**arrival** 175:23
**arrive** 152:10
168:9
**arrived** 93:21
117:3 119:7,8
119:15 152:11
152:12,19
**arriving** 71:1
119:4
**Aside** 40:14
**asked** 12:24
13:12 41:24
53:20 65:17
99:21 120:18
137:4 140:16
146:10,11,12
146:22 160:25
161:2 162:12
169:25 170:7

**asking** 9:5 63:24
67:12 71:4
75:4,5 76:17
109:17
**aspects** 17:11
38:1
**assault** 116:22
159:19,20,22
170:23,25
**assaulted** 117:8
162:20
**assignments**
33:20 34:9
**assist** 34:6
**assistance** 38:24
**assisted** 30:17
32:6
**assists** 29:8
**associated** 64:8
**Association**
27:15
**assortment**
18:18
**assume** 9:12
169:17,23
**assuming** 78:13
**attached** 3:5
**attacking**
141:17
**attempt** 127:25
130:6 132:5,9
132:14
**attempted**
125:15 174:13
**attempting**
166:7
**attempts** 71:16
71:18,20
**attend** 50:12
**attention** 102:6
115:2 128:21
142:16
**attorney** 13:5
137:21 161:9
164:17,18,21
169:18 170:1
172:8,12

178:16,19
**Attorney's**
51:22 52:3,8
52:12,14 53:14
53:25 55:20
56:10,12 57:9
59:6 125:14
**attorneys** 8:1
9:6 82:7 144:9
**attribute** 10:10
**authorization**
67:2,19 68:7
75:19
**authorize** 66:21
**authorized**
67:11
**Avenue** 5:12 6:4
118:23 149:10
**aware** 28:10,11
40:14 41:9
57:5 65:22,25
66:23 69:25
70:1,2,12 75:9
78:4 80:18,22
85:8 97:17,24
97:25 108:2,10
108:11 112:19
130:9 140:1
155:22 172:13
**awareness** 98:3

---

**B**

**B** 102:7 105:12
110:25 111:2
159:19
**B-r-a-n-n-a-n**
40:10
**bachelor's** 21:9
**back** 11:1 21:12
26:19 28:8
43:7 47:9
59:13,23 70:21
84:1 86:22
87:23 88:4
114:13 115:21
115:21 120:11
120:11 121:11

122:4 123:4
124:15 127:3
127:10 133:19
134:19 140:22
141:25 142:11
154:1 171:20
171:23 172:3,6
173:3,8
**background**
20:24 21:5
25:1
**BackStopper**
18:11,12
**backyard** 141:9
**based** 23:3
44:14,25 45:18
46:4 49:4,21
55:18 66:13,16
67:5,10 68:5
69:18 70:7
76:10,12 82:4
82:8 84:13
85:5,10 89:17
90:2 91:4,12
91:13,21 96:20
99:1 103:6,19
105:17,24
113:14,22,23
116:13,19
122:12 124:19
124:19 126:13
129:2,4,10,12
130:24 131:13
131:23,23
137:7 138:6
139:16,21,21
139:23 174:10
**basement**
120:18 153:23
**basic** 72:16
**basically** 10:9
84:2
**basis** 89:23,24
141:19 142:6
**Bates** 12:16,19
2:21,23,24
101:9 104:20

104:21 110:7
**bearing** 68:19
**beat** 102:14,17
118:1,2 150:14
150:16,17
**beats** 102:15
**becoming** 37:15
**began** 25:17
121:5
**beginning** 1:16
32:21 36:13
116:7 118:12
**behalf** 4:16
58:16
**beings** 137:23
**believable**
154:21
**believe** 12:12
14:6 18:2
19:18 23:25
29:24 30:10,10
31:14 32:3
36:11 37:5,14
41:6 42:24
43:18 44:19
45:24 61:9
64:11 74:7,20
86:6 105:18
123:5 124:4,20
125:23 131:19
132:6,20
141:15 145:15
153:16 154:23
172:4,5 174:16
**believed** 17:14
**Belmar** 1:8 4:10
7:18 8:12 16:1
16:3,24 17:25
18:6
**belonged** 121:1
**belongings**
155:7
**benefit** 107:4
**best** 10:12 28:5
28:5 178:12
**better** 12:21
**big** 23:14 42:23

KEVIN WALSH  2/9/2017

**bill** 155:18
**bit** 10:11 26:20
  33:9 41:14,15
  43:10 46:19
  48:19 49:6,25
  60:5,7,7 61:12
  69:10 82:17
  101:3,4,6
  102:25 115:18
  125:10 128:17
  137:6 142:25
  143:22 154:3
**black** 151:3
**Blake** 5:6 8:8
**blank** 89:19
**blocks** 44:6
**board** 25:2
**bold** 106:3 111:1
  111:5 112:12
**books** 47:13
**bottom** 62:25
  107:14,19
  108:23 109:7
  134:20 136:5
**boxes** 159:5
**Boxing** 18:17
**brain** 125:10
**Brannan** 40:8,9
  40:10
**break** 11:4,7,11
  59:13 94:6
  172:21
**brief** 172:21
**briefly** 14:8
**bring** 80:16 87:2
  146:24,24
**broken** 102:15
**Brothers** 21:15
**bruises** 128:20
**bstrode@arch...**
  5:8
**Building** 23:9
**Bureau** 40:20
  41:7
**burglary** 120:20
**business** 33:22
  33:22

**businesses** 80:7
**busy** 34:4
**button** 61:15,16

**C**

**C** 5:3 7:11 103:1
  104:4
**CA** 4:21 6:15
  178:5
**CAD** 3:2 14:3,5
  14:9 15:8
  118:7 148:12
  168:16
**Cadillac** 151:3,6
**call** 3:2 29:7
  34:17 38:16
  40:5,21 41:7
  70:22,23,24
  72:25 73:18
  90:16 92:17
  93:5 102:17
  116:21,25
  117:2,2,5,6,7
  117:25 119:1
  123:12,15
  124:12 130:7
  136:7,10
  140:10 143:7
  149:14,25
  163:3,3 168:2
  168:10 170:1
**called** 61:9 71:5
  71:7 123:8
  141:7,12 152:5
  172:8
**caller** 148:24
  149:1,3,7
  152:2,7,14
  168:15
**calling** 73:7
  150:16
**calls** 14:3,10
  19:7,9,17
  33:16,17,18
  34:15 38:23
  46:24,25
  103:23 109:18

**141:6 148:12
**campus** 26:7
**cancel** 88:22
  91:11 107:6
  136:22
**canceled** 91:15
  137:10 138:9
**capacity** 8:13
**capture** 10:10
  119:14
**captures** 57:6
  69:5 97:11
**car** 18:17 34:6
  40:22,23,24
  90:10,14
  121:11 123:4
  144:23 159:5
  173:15,19,20
  174:2
**care** 37:10 49:1
  66:22 72:19
  73:1,1,2 74:15
  74:19 77:4
  84:3 88:22
  89:18 91:8,9
  91:11 106:16
  112:5,8 113:11
  123:5,6 135:15
  135:17,19,23
  137:21 168:24
  168:25 169:2
**CARE/Records**
  103:4
**carried** 159:11
**carry** 159:5
**cars** 34:23,24
**carve-out** 86:24
**case** 1:7 4:9 7:18
  8:21 11:23
  12:1,4 13:17
  14:16,20 19:12
  27:25 28:1
  29:6 38:25
  40:14 48:25
  54:14 60:10
  68:10 71:15
  76:4 83:2,14

**84:14,16,25
  85:3,9 86:2,6
  88:6 90:10
  91:21 96:21
  102:10,12,18
  102:20,23
  103:3,7,16,19
  104:5,8,15
  105:17 106:12
  106:14,15
  111:8,11,24
  112:2,5,13
  113:8 138:17
  138:20 141:22
  170:18
**cases** 39:2 66:14
  66:17 76:6
  86:19,20 87:13
  94:5 126:21,25
  147:19 164:14
  166:14
**categories** 96:3
  96:4
**category** 50:2
  58:19,21,24
**cause** 45:17,22
  48:23,24 49:3
  49:12,19 51:3
  51:18 64:10,18
  64:22,25 65:3
  65:8 66:14,17
  67:5,10 69:16
  70:8 72:9,13
  74:11 79:25
  83:2 85:6,11
  86:8 92:11
  105:17 106:13
  109:13,25
  111:9,25
  113:10 122:12
  125:4 129:2,6
  129:9,18 131:4
  131:4 134:12
  162:13 169:1
**caused** 65:24
**caveat** 86:25
**CCR** 6:16

178:25
**center** 101:21
**Central** 6:4
**certain** 27:16
  28:2,3,17,24
  39:2 44:6
  46:25 49:17
  57:19 61:16
  79:16 80:7
  82:5,8 86:25
  86:25 89:21
  107:20 143:24
**CERTIFICA...**
  178:1
**Certified** 4:19
  4:20,21 7:5
  178:4,4,5
**certify** 178:8,15
**Challenging**
  12:5
**chamber** 155:13
**chamilton@p...**
  5:15
**change** 38:9,13
  66:23 68:14
  176:12
**changed** 67:7
  98:22
**changes** 9:20
  24:2 98:16
  99:1 100:11
  176:10
**changing** 98:18
**characterizing**
  96:24
**charge** 154:6
  159:21
**charged** 160:2
  160:10
**charges** 72:21
  80:5,16 121:12
**charging** 159:20
**charity** 18:13,18
**Charles** 5:11 8:3
  9:4 145:14
**chasing** 141:17
**check** 84:17,19

**KEVIN WALSH  2/9/2017**

90:5,7 111:1
120:25
**check-in** 17:3
32:14,16
**checking** 31:1
89:1
**checkpoints**
107:20
**checks** 32:8
33:22,23
**chief** 8:12 16:1,3
16:4,17,24
17:25 18:6
**child** 174:5,6,12
174:17 175:10
**children** 141:8
141:17 155:4
162:7 174:1
176:5
**choose** 18:24
126:4
**chose** 19:1
**Chris** 8:12
**Christian** 21:15
149:21
**Christmas**
16:21 18:10
**Christopher**
15:24
**chronologically**
24:15
**circumstances**
132:25
**city** 4:18 121:5
144:11,17,19
144:24 146:1,8
155:15,19
173:24
**civil** 99:9,9,14
**civilian** 135:12
**claim** 170:23
**clarify** 13:24
15:12 53:22
55:5 81:5
112:22
**class** 42:23,25
43:2,4 160:8

160:10
**classes** 45:9
**classroom** 41:18
42:3,6,15,17
43:8 47:3,13
47:15
**Clayton** 6:5 73:4
90:25 92:21
**clean-up** 173:7
**clear** 15:7 53:7
56:7 67:21,23
69:18 77:7
84:23 85:17
86:4 94:17
129:17 130:5
134:10
**cleared** 117:1
**Clements** 8:12
15:21
**clerk** 103:4
168:25
**close** 34:6 60:1
68:22 73:17
93:21 100:9,17
110:3 114:2
143:7
**closely** 35:25
**closer** 35:19
105:13 117:18
**Clothes** 130:1
**clothing** 121:7
159:5
**clues** 124:8
**coaching** 46:24
**cocounsel** 8:6
**code** 23:10
**coercing** 160:25
**colleague** 8:5
**colleagues** 69:22
99:22
**collect** 15:4
**collected** 15:17
**college** 21:16,25
22:12,13
**Combs** 4:19
6:15 7:5 178:3
178:25

**come** 22:4 26:19
41:5 48:18,22
59:13 70:21,23
70:24 78:22
79:7 85:25
94:12 106:24
107:12 117:25
120:11 121:18
126:7 127:10
133:18 140:12
154:1 162:2
**comes** 38:18
69:1 127:3,3
**comfortable**
132:1
**coming** 21:6
42:22 100:21
117:4,21
**commander**
90:23
**commence**
113:8
**commencing**
112:19
**Commission**
178:22
**committed**
45:25 49:10,13
64:11 82:6
83:3 106:14
111:10,25
**committing**
170:25
**common** 127:2
**communicate**
14:23
**communicated**
14:15,19
**communication**
14:22
**communicatio...**
19:11 33:17
**communities**
99:13
**community**
82:21 100:13
100:15

**commute** 26:7
**commuted**
26:11
**compare** 25:5
**comparison**
106:5
**compassion**
155:2
**complain** 141:7
**complaint** 12:6
12:10 13:4
14:1 40:20
114:19 164:15
170:9 172:12
**complete** 10:19
10:24 11:1,10
128:14
**completed** 26:24
32:22 46:13
57:21
**completely**
155:18
**completion**
27:20 28:19
**components**
49:18
**comprehensive**
25:11 26:15
**comprehensiv...**
30:18
**computer** 77:4
90:8,9,13
**Computer-aut...**
14:6
**concern** 155:2
162:2,6 174:8
174:10
**concerned** 174:4
174:6
**concludes** 177:1
**condition** 9:16
**conduct** 40:15
41:9 52:24
55:2 69:14
70:10 84:19
85:12,16 86:3
86:14,17,23

87:2,18 90:7
92:3,21 93:15
104:13 125:19
137:15,19
138:1,22
147:12
**conducted** 54:9
82:7 86:10
137:9
**conducting**
87:24 90:4
108:3
**confer** 172:21
**confirm** 12:18
103:2 111:7
**conflict** 112:18
**conflicting**
143:22
**Confused** 20:19
**confusing** 9:11
**conjecture**
103:24 109:18
**connection**
11:23 144:3
**consent** 7:8
**consequences**
108:9
**consist** 46:18,22
71:3
**consisted** 46:23
48:15 66:11
**Constitutional**
42:20 43:13,15
43:19 44:3
99:11
**consult** 123:11
123:14
**contact** 13:3
71:2,3,9,11,16
71:20,22 72:12
72:19 76:1
79:16 88:10,17
88:22 90:23
91:8,10,18
106:16 112:5
113:11 123:6
**contacted** 12:25

KEVIN WALSH  2/9/2017

92:19 122:6
123:5 127:23
136:12 137:3
**contacts** 33:22
105:21
**contain** 64:22
**contained** 106:7
**contains** 106:3
**content** 79:13
**context** 45:7
46:20 124:8
**continue** 32:13
92:8 97:2
153:1
**contracts** 60:20
**controls** 102:13
**conversation**
17:5,8,18,19
18:1,3 26:21
47:25 48:1
73:10,13,16
76:3,20,24
78:8,12 79:2,9
79:14 81:7,10
84:3 91:19
112:20 122:17
131:14 135:2,4
135:5 139:14
**conversations**
16:15,24 32:14
48:14 52:13
55:19 56:9,14
66:5,11 69:19
78:20 79:13
80:12 81:1
98:10,13 99:16
99:21,22,23
100:14,16,25
**Conveyance**
103:9
**convicted** 154:2
157:18,22
158:8
**cooperation**
58:10 59:8
**coordinated**
62:24

**cop** 165:14
**copied** 3:5
**copies** 3:5
**copy** 62:5,13,14
101:16 115:8
**corner** 136:5
**correct** 10:10,11
15:11 20:8,11
22:9 26:25
29:5 30:11,19
46:8 48:20
54:25 56:24
62:17 63:7,10
69:11 77:2
83:7,13 84:25
95:20 96:11
106:11 110:1
112:13,17
113:3,12,22
115:24 116:7
116:11,12
118:23 126:16
127:12 130:20
130:23 131:2
131:16,21
133:2 144:13
144:14,17,25
145:4,11,20,23
145:25 146:1,4
147:9,24
148:18,21,24
149:4,5,7,12
149:25 150:3
150:18 151:20
152:8,15 154:8
156:22 158:14
159:6,23
160:11,17
162:15,20,23
163:4,10,12,17
164:5,9 165:12
165:19,22
166:19,22
167:9,14 168:5
168:17 169:8
170:9,15 171:7
171:14,18,24

172:9,15
173:12 174:24
175:15,17,24
176:2,5
**Corrections**
22:8
**correctly** 50:3
55:17 79:20
80:11 90:18
103:2,13
106:18 111:8
128:23 143:18
**counsel** 7:3,3,8
123:23 127:19
164:23 178:16
178:19
**Counseled**
155:3
**Counselor's** 6:3
**counties** 103:10
105:20 145:18
**country** 70:15
157:25
**county** 3:2 6:3
8:13 16:18
18:7 21:10
24:8,17 25:3
26:2 27:3 28:2
33:17 40:1,1
47:5 50:8,14
60:20 65:7
66:22 69:20
70:6,13 73:5
88:17,22 90:2
93:10 95:1,2,4
95:5 98:19
99:1,24 100:12
101:5 114:17
115:13 116:20
117:5,13 144:4
144:5,11,12,12
144:13,15,16
144:19 145:3
145:14,22
155:17
**county/city**
23:10

**couple** 9:25 10:7
98:22 136:3
140:9 150:21
**course** 9:21
10:21 23:21
26:14 48:2
49:15 51:13
53:19,23 81:1
81:9
**court** 1:1 3:4 4:1
4:20 6:14 7:6
7:19 8:15 10:5
10:17 12:7
89:22 143:25
176:10 178:5
**courts** 98:5
**cover** 10:1 42:18
44:15 62:21
69:3
**covered** 42:19
77:8 133:16
167:25
**covering** 50:24
51:2
**cramp** 125:10
**create** 113:25
**created** 57:14
73:19 77:11
78:10,22 79:8
79:9 80:24
84:2
**creating** 70:19
**creation** 72:18
74:9,23 75:11
75:14 76:18
**crime** 45:25
49:10,13 56:2
64:11 82:5
83:3 106:14
111:10 112:1
123:21 127:8
129:8
**crimes** 22:21
87:1 161:6
**criminal** 21:20
42:19,20
**criteria** 27:16,19

**CRR** 6:15
178:25
**crunch** 114:6
**crying** 152:2,7
152:14,20,21
152:25 153:5,5
153:9 154:15
162:23 163:2
164:3 169:14
**CSR** 6:15
**current** 113:23
**currently**
110:20
**custody** 51:20
54:8 82:4 83:8
83:10 84:15,21
85:5,9,13,18
86:4,15,18
87:2,25 88:10
91:9,13,22
93:24 94:3
95:12,19 96:9
96:13,22 97:3
126:13 146:24
146:25 164:20
175:21
**cutting** 141:8

---

**D**

**D** 7:11
**damaged** 141:10
**danger** 133:17
153:17
**dangerous** 34:8
153:17 155:25
156:19
**database** 15:18
**date** 7:14 63:1,2
63:6 68:16
89:22 118:16
137:2 140:9
143:25
**date/time** 118:9
134:21
**daughter** 151:24
**David** 6:10 7:24
**day** 25:8,9 33:14

KEVIN WALSH 2/9/2017

42:8,10 59:14
79:10 93:2
116:14,17
132:16 134:25
135:8 160:16
161:11 168:24
174:24 175:24
**day-to-day**
33:10
**days** 34:4
132:17 135:10
140:9,15 143:4
**DCI** 106:16
112:5
**dealing** 154:4
162:8
**dealt** 168:16
**decide** 146:23
**decided** 24:16
**decision** 113:5
**dedicate** 34:1
**deemed** 102:18
**DEF-SUPP00...**
2:17 62:8
**defendant** 12:1
12:1 20:17
**Defendant's**
148:6,10
**defendants** 1:9
4:11 6:1 7:4
19:22 20:3
**Defenders** 5:6
8:9
**defined** 45:22
**definition** 45:19
46:1 64:16,21
64:25 66:2
69:24
**definitions**
65:16
**DEFRFP1000...**
2:25 115:3
**DEFRFP2340...**
2:19 101:10
**DEFRFP2340...**
2:21 104:21
**DEFRFP2340...**

2:23 110:7
**DEFRFP4000...**
2:13 61:22
**degree** 21:9
**degrees** 22:13
**delegating**
104:11
**delivered** 92:6
**demeanor** 17:13
129:11 132:22
161:18
**demotion** 40:11
**denial** 58:12
**denials** 58:8,22
58:24
**denied** 58:5,20
59:7 108:25
133:2
**deny** 163:19
164:8
**departed** 151:24
**department**
2:18,20,22
14:16,20 16:5
17:14,16 18:7
22:7 27:14,17
43:23 50:15
65:7 69:21
88:18 89:2
90:16 93:11
97:18,19 98:10
98:20,25 99:2
99:25 101:6
105:6 107:10
110:13,16,20
114:18 135:18
139:20 144:5
149:19 150:1,5
164:23 165:3
165:12
**Departmental**
102:1 105:6
**depended** 34:3
**depending**
34:17 48:25
102:14
**depends** 92:18

**deposed** 10:2
12:15
**deposes** 8:21
**deposition** 1:11
4:14 7:4,16,21
9:21 10:22
13:2,12 15:16
145:10 169:17
170:8 176:10
177:2 178:9,18
**describe** 14:8
17:2 41:15
82:2 86:15
90:17 98:2
152:17,23
158:5
**described** 33:25
89:14 95:11
96:2 99:17
113:5 123:8
124:20 126:19
126:24 128:8
137:7 175:22
**description**
61:13 152:18
**designate** 68:11
**designated**
28:21 103:20
**designation**
12:21 62:18
67:14,18
**designee** 111:12
112:3
**desired** 103:4
**desk** 136:12
137:23
**despite** 132:24
176:1,4
**destruction**
19:18
**detail** 41:15
115:19 152:17
**details** 118:7
**detained** 103:6
**detective** 15:20
33:5,7 37:16
38:6,8,14,18

39:5,8,15,25
40:8 62:17,20
64:15 82:25
101:17 110:12
115:9 141:25
173:6
**detectives** 39:1
69:20
**determination**
49:3 65:4
71:13 72:13
82:19 83:1
89:25 90:3
113:10 122:23
124:10 129:6
129:13,18
131:6,8 133:17
**determinations**
51:3
**determine** 33:25
39:1 45:16
54:23 74:11
90:16 91:5
127:25 161:9
**determined**
40:22,23 45:16
48:23,24 49:9
51:19,22 52:4
58:18 69:16
70:9 72:10
90:20 91:3
106:13 111:9
111:24 122:13
**determines**
49:12 105:22
**determining**
71:6
**developed** 56:10
56:22
**difference** 46:5
**different** 39:13
41:19,20 48:10
65:16 66:2
70:13,17 71:15
89:16 90:4
100:25 101:1
127:8 134:11

137:7 146:3
155:16 160:2,3
161:23
**dig** 69:10
**diploma** 21:9
**direct** 102:6
115:1
**direction** 151:11
178:14
**directly** 16:7,11
**disadvantage**
34:7
**discretion** 18:24
32:18,18 33:21
77:13 96:20
**discuss** 13:17
16:17 17:9,12
48:10
**discussed** 48:4
56:19 105:9
106:25 123:7
**discusses** 87:10
**discussing** 98:25
100:16
**discussion** 107:7
113:3 173:1
**disheveled**
130:1
**Dispatch** 98:8
117:5
**dispatched**
33:16
**dispatcher**
148:15,17
149:17,18,23
149:24 150:10
152:14
**dispatching**
14:7
**distinction**
45:13,14
**distinguishing**
44:20 70:12
**distraught**
152:2,7,14,20
152:22,23
153:12 154:15

KEVIN WALSH  2/9/2017

162:23 164:4 175:23
**distress** 154:24
**distressed** 164:3
**District** 1:1,2 4:1,2 7:19,20
**disturbance** 99:9,14 125:6 159:22
**disturbances** 19:19 34:22
**dive** 101:6
**divide** 31:21
**divided** 35:21
**division** 1:3 4:3 19:19 39:24
**document** 2:11 2:14 3:1 61:21 61:22 62:7 63:9 65:1 101:8,9,18,21 104:20 105:3 110:6 115:10 115:18 118:6
**documentation** 17:23
**documents** 13:19,21,25 15:4,9,14 63:1 115:2
**Doe** 73:7 74:1
**Doell** 6:10 7:24
**dog** 141:16
**doing** 70:20 99:13 116:2 142:19 153:9 153:13 154:14 165:21
**domestic** 42:21 86:19 87:13 94:5 96:2,6 97:8,9 117:6 120:19 125:5,5 126:20,24 139:22,23 141:22 142:8,9 142:13 143:9

147:18 153:21 154:6 159:21 159:22 160:1 164:14 165:7 166:14 167:9 174:7
**domestics** 33:19 34:22 87:9 125:13 161:5 162:8
**door** 120:12
**doorway** 119:25
**double** 120:11
**Downtown** 23:5
**dragging** 119:24
**drive** 23:12
**driving** 144:23 151:6 153:3,4 153:5 173:16
**drug** 22:23 82:16,19
**DSN** 112:7
**DSN4068** 137:4
**DTS** 151:3,7
**duly** 8:19 178:9
**duplicative** 10:2
**duration** 29:19
**duty** 92:19,22 92:23
**Dwayne** 1:5 4:5 9:7 19:3 119:20 120:20 122:1 151:3 153:25 154:1 157:13 175:8

---
**E**

**E** 5:3,3 6:2 7:11 7:11 160:8,10
**earlier** 148:14 160:15 163:8 163:15 169:11
**early** 33:12
**ears** 143:21
**Eastern** 1:2,3 4:2,3 7:19
**education** 20:25

21:7
**educational** 21:4,14
**effect** 102:4 110:21
**efficiency** 9:23 62:6
**egrossman@p...** 5:14
**eight** 42:13 152:13,19
**eight-hour** 42:10
**Eilermann** 135:11
**either** 19:21 20:13 39:2 84:4 90:10 92:9 126:15,20
**elaborate** 128:9
**electronic** 45:4
**Elizabeth** 5:10 8:5
**email** 14:12,17 15:2,17 41:6
**Emerson** 43:22 43:24
**emotion** 153:22
**emotional** 167:4
**employ** 144:20
**employed** 50:14 143:3 178:16 178:20
**employee** 135:12 178:19
**employment** 22:25 24:7
**employs** 144:6
**empowered** 142:25
**empty** 155:9
**EMS** 149:22,25 150:4
**en** 151:17
**encounter** 36:24 85:3 88:6 90:12 140:5

141:1
**encountered** 74:22 84:12 86:1,9 87:17 89:6
**encounters** 19:16 74:1 84:9 140:7 141:5
**ended** 24:7 122:17
**enforced** 143:10
**enforcement** 2:15 18:14 60:16 64:9 98:4 100:12 103:6
**engage** 166:18
**enrolled** 24:8
**enrollment** 25:20
**ensure** 88:24 107:11 174:11
**entail** 22:18 36:19,22 50:17 50:18 98:13 99:10
**entailed** 26:13 36:20 138:3
**entails** 55:4,23 61:14
**entered** 126:11 134:21,21
**entering** 64:9,12
**entertain** 131:11
**entertained** 130:25
**entire** 111:6
**entirety** 129:18
**entitled** 2:12,15 3:1
**entity** 149:19
**entries** 102:11 103:5 106:15 112:4 148:17 148:20 150:21
**entry** 2:12,16

62:21 76:8 102:21 103:7 106:17 112:6 112:15 113:1 150:10
**equal** 29:18
**Esq** 5:6,10,10,11 5:11 6:2
**essentially** 80:13
**established** 86:8 131:4
**et** 1:5,8 4:5,10 7:17,18
**ethics** 42:19
**evaluation** 17:20 29:12
**evaluations** 32:14,16 44:2 44:3
**event** 18:11,12
**events** 18:15,22 65:22 65:25 80:9 99:6,16,23 114:19,21,23 128:7 140:15
**eventually** 132:7
**everybody** 43:4 50:14 70:16 100:5 115:1
**exact** 68:16 87:10 140:9
**exactly** 135:1
**exam** 22:6
**EXAMINATI...** 2:5,6,7 8:25 143:15 173:4
**examined** 4:15
**example** 144:10 144:23 146:20
**excluding** 78:14
**excuse** 20:1 24:12 26:10 30:6 62:16 79:5 98:17 125:20
**excused** 177:5

KEVIN WALSH  2/9/2017

**exhibit** 2:11,14
2:18,20,22,24
3:1 61:25 62:1
62:10,11 63:6
63:9,21 64:4
64:16,21 65:1
101:11,12
104:22,23
105:8 106:5,7
106:8 110:8,9
110:16 115:3,4
115:7 148:6,7
148:10 164:17
168:1,1
**exhibits** 2:10 3:4
65:23
**exigency** 143:6
**exist** 49:13
166:14
**existence** 74:11
**existing** 109:13
**exists** 45:17 83:3
87:8 106:13
111:9,25
**expected** 93:5
93:14
**experience** 22:3
75:14 78:21
83:14 85:15
88:2 107:5
123:18 131:12
131:23 132:24
137:9 144:22
174:9
**experiences**
21:14
**expiration**
147:20
**expires** 178:22
**explain** 135:13
156:5
**explained** 45:23
56:21 125:2
163:11
**expletives**
122:20 136:17
**explicitly** 106:25

**extradited**
103:11
**extradition**
103:4

**F**
**F** 128:21
**F.'s** 128:20
**face-to-face**
16:12 55:4,23
93:22
**facets** 29:8
**fact** 46:6 52:19
83:20 84:19
89:2 122:3
158:4,20
171:21
**factors** 34:19
49:18 70:13
82:23 91:4
124:9 132:25
**facts** 49:4,7,11
49:23 54:13
66:14,17 73:9
76:10,12 82:5
82:9,11 104:16
105:22 111:11
112:1 126:13
**factual** 71:12
**fair** 15:1 20:22
38:17 40:5
42:14 105:25
145:17 147:1
168:11 169:1
**familiar** 15:20
15:23 16:1
60:12 84:14,24
85:2 86:2 88:6
88:15 90:15
102:22 105:3
114:22 118:25
147:14
**familiarity**
103:17,19
104:11,16
**family** 19:20
22:22 49:8

100:9,17 121:5
**family's** 173:24
175:5
**far** 47:10 51:8
80:15 95:3
117:21 146:7,9
**farthest** 23:13
**fast-paced**
161:24
**fault** 53:9
**favor** 34:20
**fear** 142:18
153:25
**fearful** 169:14
**February** 1:13
4:15 7:14
19:12
**federal** 158:10
158:13,17,21
**feel** 10:25 132:1
142:25 175:14
**fellow** 66:8
**felon** 154:2
157:19 158:8
**felonies** 86:20
**felons** 157:22
**felony** 22:20,21
87:14 160:8,11
**female** 117:6,7
170:24 171:1,7
**fence** 141:10
**Ferguson** 97:19
99:6 100:1
**field** 27:20,22,23
28:12,20,21
29:1,7,12
30:18,22,25
31:4,5,7,20
32:5 36:7,9,17
46:17,18,22
47:6,10,12,22
48:2,11 49:16
68:24
**fights** 34:22
**figure** 63:14,17
133:15,21
**file** 17:23 28:1,1

155:17
**filed** 12:7 19:12
40:21
**files** 15:5
**fill** 89:19
**final** 50:1,1
135:9,19,23
136:2 138:16
168:22,24
**finally** 121:22
**financially**
178:20
**find** 28:4 41:4
76:6,25 88:8
90:14 130:6
166:25
**fine** 59:14,16
**fingers** 74:6
**finished** 30:16
31:19 32:4
**fire** 149:21
150:1,5
**firearm** 120:24
120:25 121:1
**firearms** 50:19
**first** 8:19 10:4
18:14 29:22
31:22 41:5
62:23 63:22
71:24 75:2
94:19 95:8
105:3 116:20
117:19 136:13
140:8,19 141:1
143:17 149:19
150:23 161:2
162:10,14
164:15
**fitness** 25:1
42:12
**five** 19:10 29:22
31:22 59:14
73:14,15,25
108:24 147:23
**five-minute**
73:16
**flee** 105:19

120:1
**fleeing** 105:24
**flip** 136:3
**Floor** 6:4
**fluctuate** 36:2
**flustered** 117:9
**folks** 56:16
99:24
**follow** 56:23
57:2 89:24
132:9,15
146:16
**follow-ups**
138:21
**followed** 63:2
100:2 105:8
125:16 130:14
164:23 165:3
**following** 46:16
94:9 95:13
98:19 113:15
125:12 133:23
139:14 174:24
**follows** 8:23
64:6 103:1
**force** 24:13,17
27:4 28:25
117:15
**forced** 140:17
**foregoing** 178:9
**forgot** 10:24
**form** 67:24
78:16 83:20
87:25 95:24
103:22 109:16
131:17 146:5
146:15,18
147:4 154:9
155:20 156:2
156:12,20
157:2
**formal** 47:3 54:9
54:11,17,19
55:2,3,22,22
69:14,15 70:10
83:12 85:12,16
86:3,14,17,23

**KEVIN WALSH  2/9/2017**

87:3,18,24
93:15 94:9
95:13 96:10
125:14,19
130:15,24
132:4,5 134:15
138:1,3
**formalized**
47:24
**formally** 56:1
**forth** 124:16
**four** 29:17,23
30:8,14,16
32:1 50:4
**fourth** 29:24
32:2
**free** 10:25
**frequently** 42:6
44:2
**friends** 49:9
100:17
**front** 62:21
134:19 168:2
**full** 36:12 50:11
115:25 116:9
**full-time** 24:3
**fully** 9:17
**functions** 18:10
18:18
**Furlow** 1:5 4:5
7:17 9:7 13:4
19:4,6,12
114:22 119:10
119:10 121:13
121:15,16
122:1,3,9,19
123:2 124:6,11
124:18,22
125:1,25 126:7
126:14,15
127:22 128:13
128:24 129:14
129:19 130:15
131:14,15
132:6,10,20,21
133:18 136:6,8
139:15,16

140:5,11,18,21
140:23 141:1
141:20 149:4
150:16 152:7
153:24 156:5
159:21 160:10
162:13,14
163:9,11 164:3
164:7,18,19
165:25 166:5,8
168:9 169:8,18
170:21 171:1
171:18,21,24
172:13,14
173:10,15
174:1,7,14,18
174:23 175:11
175:23 176:5
**Furlow's** 124:13
128:1,4 130:6
136:15 137:8
141:14,16
149:12 175:15
**Furlows'** 141:8
**further** 2:7 31:4
39:4 46:25
79:17,22,24
80:2,3,14
87:23 92:8,13
93:9 173:4,18
176:7 178:15
178:18
**Furthering**
79:15

——————
**G**
——————
**G** 7:11
**G-r-a-m-e-s**
43:18
**gangs** 40:1
**Garrison** 5:12
**gather** 23:20
71:8 80:16
149:23
**gathered** 155:6
**gathering** 49:22
**general** 2:18,20

2:22 14:20
17:15 35:5,6
47:18,19,21
51:8 60:9
68:17 71:7
87:9 100:13
101:4 102:1,3
105:6 106:21
106:24 107:4,6
107:12,14,16
108:3 109:4,7
109:14 110:13
110:16,20
114:17 125:12
129:20
**gentleman's**
141:9
**getting** 143:21
**give** 22:14 23:11
33:13 42:10
54:14 60:5
61:12,16 69:13
110:25 114:2
126:3,5,5
127:3 137:20
140:13 146:22
146:23 152:18
**given** 44:7 45:7
45:19 49:4,7
49:11 54:13
95:2 126:13
**gives** 135:19
142:24 166:17
166:21,24
167:3
**giving** 99:11
128:13
**go** 11:1 18:19
21:12 30:14
31:5 32:5 43:4
43:7 47:9
48:16 79:2
81:3 83:25
88:4 91:19
95:8 105:1
107:13 114:7
131:19 134:19

142:11 148:3
150:6 167:24
173:8
**goes** 29:7 66:21
73:9,21 75:21
82:18,24 109:5
153:22 168:8
**going** 10:1,3,11
10:12 11:22
21:5 26:20
28:8 31:13
33:25 34:1,20
34:21 47:12
59:12 60:6,11
61:21,24 62:4
62:7,9 63:21
64:4,5 65:11
73:23 86:22
90:21 91:7,23
92:7 100:22
101:8 104:16
104:19,21
106:10 110:7
111:5 114:20
114:25 115:17
115:21,21
118:5 119:18
120:7,9 121:4
122:7,7 126:5
126:15 127:4
127:14 132:1
133:18,25
141:25 151:19
154:1 156:25
159:21 161:4
165:18 173:22
**Gomez** 164:16
**good** 9:2,3
120:13 143:21
155:6
**gotten** 95:17
**GPS** 40:24
**grab** 101:7
**Grace** 164:19,22
**graduate** 21:10
**graduated** 22:7
115:23

**graduating**
21:24
**Grames** 43:15
**Great** 91:25
101:2 102:2
110:23 115:15
**Grossman** 5:10
8:5
**ground** 9:25
119:23 133:15
**group** 39:10
98:24
**grow** 17:17
**grown** 143:8
**guess** 33:10,13
52:16 87:22
90:3 92:18
93:1 96:2
102:25 103:1
131:11 133:14
142:25 154:3
168:8
**guest** 41:20
**guidance** 34:25
35:2 38:25
57:5 81:17,23
87:8 89:13
93:10,13
**guidelines** 28:3
93:4 125:16
158:11
**guides** 61:19
**guiding** 46:25
**gun** 86:20
120:21 173:15
**guys** 115:17

——————
**H**
——————
**hair** 119:24
129:25
**half** 24:1 33:11
35:13,15 42:12
116:3 148:2
**Hamilton** 2:5,7
5:11 8:3,4 9:1
9:4 13:14 20:5
20:7,10 23:20

KEVIN WALSH 2/9/2017

37:6,11 53:6
53:10 55:9,12
55:16 59:2,4
59:11,17,24
62:3,13 65:14
65:19 67:25
75:4,8 78:18
83:22,24 95:23
95:25 101:14
104:1,25
109:23 110:11
111:18,20,22
114:14 115:6
118:20 131:20
138:15 141:24
142:2,5 143:12
146:5,18 147:4
154:9 155:20
156:2,12,20
157:2,9,17,24
158:6,9,15,22
159:1 160:4,12
160:20 161:12
162:17,24
163:5,22
164:10,25
165:16 166:10
167:11,15
168:12,18
169:5,20
170:12,19
171:2,8 172:1
172:16,20
173:5 176:7,14
176:17
**hand** 61:23
**handcuffing**
87:23
**handful** 172:22
**Handing** 101:15
**handle** 39:3
**handling** 122:15
**hands-on** 31:6
**hang** 73:17
**happen** 29:15
40:25 64:24
78:12 79:9

144:23 161:4
173:22
**happened** 50:4
75:3 80:12
119:7 120:3
122:17 128:4
134:18,25
135:10 138:8
138:12 159:25
160:1,9
**happens** 17:6
58:14,15 71:7
73:10 74:5
84:4,5 85:4
90:22 91:7,17
92:6 96:16
108:6
**hard** 37:17
143:24
**Harold** 19:22
20:13
**Harris-Stowe**
21:17
**head** 12:14
22:13 56:17
59:10 63:15
73:22 74:14
82:25
**hear** 139:9
**heard** 9:12 20:1
20:6 74:25
89:10
**hearing** 143:21
149:24
**hears** 152:14
**Heights** 43:23
**held** 7:21 97:2
139:18,19,24
165:8
**help** 24:15 31:3
31:3 79:17
80:10 166:22
**helped** 159:4
**helpful** 82:22
87:15 131:22
**hereto** 178:20
**Hey** 100:22

136:14
**hierarchically**
35:19
**high** 21:6,9,16
**high-powered**
175:2 176:2
**higher** 25:3
**highly** 155:24
**his/her** 112:3
**hoc** 32:17
**hold** 18:16 23:22
87:12 95:8
142:12 143:9
164:14 165:7
**Holland** 5:10
8:6 114:7
118:16
**home** 22:22
119:21 132:7
132:10 133:19
**homework**
44:12
**homicide** 26:18
**homicides** 33:19
**honest** 111:21
**hope** 167:13
**Hopefully** 11:5
**Hospital** 149:22
**hot** 11:5
**hour** 42:11,12
59:12
**hours** 42:9 45:9
79:11 92:3
93:8,14,18
95:19,20
118:19 135:1
139:18,19,25
147:12,20,23
147:23,24
148:2 165:9
167:5
**house** 119:24
120:6,7 141:13
156:6,11,25
162:7 166:25
171:13,17
172:6 173:24

175:6
**housed** 15:10
**Howard** 9:7
**Hughes** 2:6 6:2
8:10,10 10:7
11:14 12:25
13:8,11,17
15:8 20:1,6,9
20:11 23:17
37:6,9 53:2,7
55:6,11,14
58:23 59:3,16
62:5,14 65:11
65:17 67:21
75:2,5,6 78:13
83:19,23 95:21
95:24 101:16
103:22 109:16
111:14,19,21
115:8 118:14
118:17 131:17
138:11,14
141:21 142:1
143:12,14,16
146:6,19 147:5
148:9 154:10
155:21 156:3
156:13,21
157:4,10,20
158:2,7,12,16
158:23 159:3
160:6,14,21
161:13 162:18
163:1,7,23
164:12 165:1
165:17 166:11
167:12,17
168:14,20
169:6,21 170:4
170:13,20
171:4,10 172:2
172:18 176:8
176:15,20,24
**hung** 74:15
122:21
**husband** 117:8
119:20 150:13

150:16,17
159:17

---

**I**

**idea** 57:15
120:13
**identification**
62:2,12 101:13
104:24 110:10
115:5 148:8
**identified** 86:8
122:1 164:21
**identifier**
101:10
**identifies** 72:5
**identify** 71:25
**ignoring** 121:21
**ill** 166:4
**illegal** 155:18
**immediate**
28:21 82:6
111:11 112:2
**immediately**
25:18,19 30:12
35:9 74:17,20
82:21 91:14
94:9 95:12
175:19
**important** 10:18
**impossible** 10:9
**in-person** 44:8
**in-service** 47:4
50:2,2,6,9,12
50:16,20,23
51:1 68:24
98:23
**inactive** 89:4,10
89:13,18,20
**incident** 127:8
129:23 143:4,8
173:9
**include** 10:7
47:2 64:17
**included** 64:25
68:7 111:3
**including** 9:7
163:15

**KEVIN WALSH  2/9/2017**

inclusion 65:24 68:6
inconvenient 122:14
independent 174:17
INDEX 2:2
indicated 117:18 159:4 159:19
indicates 76:13 148:23 149:14
indication 109:2 128:15,25 129:16
individual 55:3 84:6,10,17 93:6,16 95:11 123:8
individuals 119:4
indulge 63:12 110:4
indulging 70:20
influence 9:16
inform 91:8 103:3
information 61:17 64:10 71:9 72:21 73:8 80:15 88:7 95:18 125:25 130:19 131:13 133:20 136:15 147:23 175:14
informed 40:19 108:15,21 122:9
informs 123:22 127:18
initial 143:4 163:3 168:15
initially 150:15 152:4
initiate 73:7
initiated 75:25

76:19 77:11,19 78:11 80:13 81:8 91:18 92:16 96:11
initiating 112:20
injury 128:25 129:1
injury-wise 129:25
inquire 173:18 173:21 174:22 175:1,10
inside 120:10
instance 40:15 40:17 41:8,9 74:25 81:10 87:17 88:4 97:5 136:5 139:24 140:5
instances 40:18 74:22 75:25 76:23 77:17 78:11,25 79:7 79:10 80:7 82:2,13 83:5 86:13,16 94:8 94:15 95:10,16 96:1,8,18 97:6 100:1 127:7 135:22
institute 22:23
instruction 37:1 37:13 42:3,7 43:9,11,14 44:7 45:1,2,9 45:13,20,23 47:3,6,10 48:3 48:11 49:16 52:7 53:12,13
instructor 28:12 29:1,7,13 30:18,22 32:5 36:7,10 47:12 47:22 69:7
instructors 36:17 41:19
instructs 11:18

intelligence 39:1
intended 167:18 167:21
interaction 76:1 129:11,15
interactions 69:19
interest 146:4
interested 22:5 63:23 72:7 96:14 97:1 127:19 178:21
interesting 26:21
intern 23:24 24:3
interpret 52:21 52:22 54:6
interpreted 109:19
interrogatories 8:22 14:1
interrogatory 12:12
interruption 55:15
interview 25:3 38:2 54:2,4,6,9 54:11,17,20 55:22,23 56:1 69:15 70:10 83:12 85:13,16 86:3,10,23 87:3,18,24 92:4,21 93:15 94:9 95:13 96:10 104:10 104:14 125:15 125:19 130:15 130:25 131:14 132:5,5 134:6 134:6,14,15 137:5,9,16,19 138:1,3 147:12
interviewed 51:23 52:5 96:15 97:2

103:9,21 104:7
interviewing 121:15
introduce 8:2,7
investigate 22:19,21,24
investigated 40:15 161:6
investigating 72:24 137:4
investigation 25:1 26:18 39:4 41:10 42:20,21 52:25 53:16 55:2,3 69:14 70:25 71:12 79:15,18 79:22,25 80:3 80:4 86:14,17 97:18 167:19
investigations 31:3 47:1 51:21 52:2,19 52:23 53:4,15 53:19,21,23 55:18 56:9
invocation 137:8
invoked 136:16 136:21
involved 18:21 28:17 119:4 123:21 169:3
involvement 85:8
involving 170:18,21 173:9
issuance 114:21 130:16
issue 51:6,10,15 52:15 53:16 57:11 72:15 79:3 83:6 113:5 120:19 122:24
issued 51:24

52:5 57:13 72:22 76:1 105:23 125:20 125:21 147:8 171:12 172:14
issues 99:25
issuing 48:16 52:9 65:8 110:1 124:24 125:18,23
items 121:6 155:5

**J**

James 164:19,22
Jane 65:1
January 63:6 114:22 115:20 134:19 136:2
job 22:4,17 23:7 29:8 165:21
John 73:7 74:1
join 24:12,16
joined 8:4,6
Jon 1:8 4:10 16:1,3 18:6
Jonathan 5:11 8:5
judge 45:15 46:7
judge's 63:24
July 33:8,13 63:10 65:1,4,7 66:9
June 25:25 26:1
Junior 117:15 117:16,17
jurisdiction 23:7,13 38:9 144:6 155:16
jurisdictions 70:2,14 95:3 144:2
justice 21:20 97:18 98:20 99:2
justified 71:14 83:1,4

KEVIN WALSH  2/9/2017

| | | | | |
|---|---|---|---|---|
| jwall@paulwe... 5:15 | 121:8,20 126:1 126:2,21 127:10 132:19 136:15 137:18 137:19 140:8 144:16 145:13 145:17 146:2,7 146:11,17,22 148:14 150:24 152:18 153:25 158:8 161:4 164:14,20,21 166:2,13 167:2 167:4 170:21 170:22 171:5 175:12 176:13 176:19 | 151:12,13 **Lastly** 11:13 **Latimore** 151:12 **Latoya** 128:20 128:21 149:3 150:16 169:8 **Laura** 8:12 15:21 **law** 2:15 18:14 42:19,20 43:9 43:13,16,19 44:3,4 47:14 60:15 64:9 98:4 100:12 103:6 158:21 **lawful** 8:19 **laws** 158:19 **lawyer** 43:24 | 47:9,9 49:25 58:2 59:11,12 69:10 70:18 73:25 77:17 78:7 79:6 88:4 93:20,20 94:6 101:6 110:24 114:2,4,7,18 115:19 119:12 119:12 136:3 143:6 147:18 152:12 167:24 167:24,24 168:8 176:20 **letterhead** 2:11 2:14 **level** 28:24 **levels** 75:10 **lieutenant** 35:11 **lieutenants** 78:4 | 60:5,7,7 61:12 69:10 70:17 73:24 82:17 101:3,4,6 102:25 107:17 111:3 115:18 125:10 128:17 137:6 142:25 143:22 154:3 157:6 161:15 161:25 **live** 22:23 81:9 155:12 **lived** 26:8 **living** 162:7 **LLP** 5:12 **loaded** 120:17 153:24 159:12 **local** 18:13 **location** 72:4 74:2 90:24 |
| **K** | | | | |
| **Kansas** 145:25 146:1,8 **keep** 19:19 60:6 99:12 119:17 159:12 176:20 **Keith** 43:22 **kept** 121:21 **Kevin** 1:12 4:14 7:17 8:11,18 177:2 **kind** 31:5 36:2 57:5 81:5 86:24 130:1 133:11 139:8 140:23 142:24 148:14 **King** 31:16,17 31:18 32:1,10 **knew** 124:25 **knocked** 119:22 **know** 11:7 16:3 17:22 19:3,6 19:21 20:2,13 21:21 22:9 23:17 27:18 28:15 35:4,6 36:16 41:24 44:19 45:6,11 46:19 47:12 62:24 64:24 65:21 68:16 70:16 72:3 75:12,13,17,21 76:17 77:9,16 80:6 85:7 88:15 91:20,22 91:23 92:11 96:25 98:21 100:9,11,20,23 106:11 107:25 108:3,15,17,18 109:22 114:5 117:2,23 119:3 | **knowing** 38:19 84:13,16 85:6 176:4 **knowledge** 51:4 56:20 57:2 73:20 93:12 98:15 108:14 110:19 123:16 135:25 140:19 144:7 **known** 21:1 | 127:24 128:1 130:6 136:16 137:19 138:5 **lawyers** 122:6 **leading** 146:20 **learn** 12:23 28:15 51:14 74:2 138:2 **learned** 38:4 53:24 149:11 173:25 **learning** 20:17 25:14 28:8 **leave** 120:5,7 **led** 114:21 **left** 63:13,17 153:2 174:1 **left-hand** 118:6 **leg** 119:23 **legal** 7:24 11:23 12:1,3 43:10 45:8 50:18 123:23 127:19 **legs** 59:18 **leisure** 11:5 **let's** 20:23 21:6 30:7,7 41:13 41:23 43:7 | **life** 122:14 153:16 **light** 41:5 48:18 48:22 99:5,6 **Likelihood** 132:8 **limitations** 59:9 **limits** 103:4 **line** 10:22 11:17 23:10 28:7 **Liner** 9:7 19:23 20:3,13 **lines** 22:8 44:23 86:7 103:12 105:20 **listed** 118:22 168:21 169:7 **literally** 72:17 172:23 **litigation** 4:17 6:10,16 7:22 7:25 15:5 **little** 10:11 26:20 33:9 34:8 41:14,15 43:9 46:19 48:19 49:6,25 | 91:1,3,23 92:20 118:22 **lock** 122:7 **locked** 163:16 **Locust** 5:7 **log** 109:6 **long** 23:12,22 24:22 25:13 26:4 27:6 29:21 30:8 38:3 41:25 50:9 73:12 75:13,14 78:11 79:8 152:25 163:2 **longer** 30:17 116:10 152:6 **look** 33:14 62:25 63:13 89:14,15 102:25 116:14 118:6 128:18 134:23 136:4 137:1 **looking** 22:12 31:1 76:7 112:12 128:24 |
| | **L** | | | |
| | **lacerations** 128:20 **lack** 58:10,10 59:8 **lag** 74:14 **laid** 76:10,12 113:16 125:13 **Lake** 149:21 **language** 64:6 64:16,20 65:15 104:5 106:4,6 106:11,20,25 109:13 111:2,3 111:6 112:12 113:23 **large** 121:6 **Larimore** | | | |

**KEVIN WALSH  2/9/2017**

143:23 148:10
171:24
**looks** 118:4,9
119:13 134:21
134:25 152:5
**loop** 60:1 93:21
**loose** 141:16
**lot** 37:17 98:22
146:11 153:22
**Lots** 57:22
**Louis** 3:1 4:18
5:7 6:3,11,17
7:22 8:13
16:18 18:6
21:10 23:5,18
24:8,17 25:3
25:18 26:1
27:3 28:2
33:17 40:1
47:5 50:8,14
60:19 65:7
66:22 69:20
70:6,13 88:17
88:22 93:10
95:1,1,4,5 98:7
98:19 99:1,24
100:12 101:5
114:17 115:13
117:5 121:5
144:4,5,11,15
144:17,20,25
145:2,22
155:15,16,19
**lunch** 42:12

**M**
**M-u-m-f-o-r-d**
31:10
**machine** 7:5
**magazine**
155:13
**maintained**
63:25
**maintaining**
27:25
**major** 21:19
**making** 33:21

72:16 80:6
82:25 89:25
123:3 124:9
140:17 154:16
158:21 161:1
168:9,11
171:19
**male** 151:3
**malice** 165:24
**man** 158:25
163:10
**management**
36:20 134:20
**mandates** 47:5
**mandatory**
143:9
**manipulative**
158:25
**manner** 10:19
30:15 39:14
41:22
**manuals** 66:3
68:25
**Maple** 118:23
119:9 149:10
150:25
**mark** 61:24 62:9
104:22 148:5
**marked** 61:22
62:1,8,11 63:5
63:9 101:12
104:20,23
110:7,9,15
115:2,4 148:7
168:1
**marking** 101:10
115:3
**marriage**
119:22
**Maryland** 43:23
**matches** 18:17
**material** 41:18
**materials** 12:7,9
36:25 37:3,8
44:23 45:4
**math** 32:20
**matter** 7:17

12:24 19:22
20:18 35:20,24
**matters** 14:24
94:21 143:17
**mean** 27:11
37:10 52:23
66:18 71:19
73:18 88:25
89:21 97:22
98:21 102:19
103:24 112:25
133:3 138:19
162:2
**means** 14:22
27:13 50:4
54:4 138:20
150:24 151:5
151:16 178:12
**meant** 20:3
49:18 55:9,9
**medical** 9:15
128:21 142:16
166:22
**meet** 13:5,7 18:5
27:16
**meeting** 13:21
16:17 28:1
55:23 72:2,7
**meetings** 98:25
**member** 121:5
**members** 49:8
52:13
**memo** 37:20,21
37:23
**mention** 168:24
170:7,8 174:8
**mentioned**
13:20 43:8
44:1 45:12
50:1 56:8
157:6 160:15
162:22 163:14
166:17 167:7
171:11 173:11
174:11
**Merit** 4:21
178:3

**met** 13:16 22:6
22:10 28:4
71:17
**mhughes2@st...**
6:6
**Michael** 6:2
8:10
**middle** 11:9
33:12 92:24
104:4 105:13
**Midwest** 4:17
6:10,16 7:22
7:25
**Mike** 55:5
111:23 176:18
**militate** 34:20
**mind** 37:7 69:1
94:13 106:4,5
114:4 119:12
129:14 134:20
153:24 173:7
**minute** 114:8
**minutes** 23:15
23:18 59:15
69:12 73:14,15
73:25 152:6,13
152:19 172:23
**Mirandized**
54:9,13
**Mirandizing**
138:4
**misdemeanor**
87:14
**misread** 111:19
**missed** 53:3
**Missouri** 1:2 4:2
4:19,23 7:20
7:22 8:14 22:2
22:7,20 43:13
70:14 103:10
157:22 161:5
178:7
**misstate** 55:1
**misstates** 131:18
**mistakes** 176:11
**MO** 4:20 5:7 6:5
6:11,16,17

178:6
**momentarily**
61:23
**Monday** 118:10
118:14
**monitor** 22:19
**month** 25:24
**months** 23:24
25:16 26:6,14
26:22 30:2
42:1,2,4 50:4
143:4
**morning** 9:2,3
93:2 115:19
**mouth** 14:25
15:1
**move** 97:16
114:18 121:8
143:1 146:25
166:25
**moved** 121:8
**muddled** 137:14
**MULES** 60:24
64:1
**multiple** 121:19
145:3,3,6
162:7
**Mumford** 31:8
31:23 32:2,10
**municipalities**
89:21 143:24
145:3,6,18

**N**
**N** 5:3 7:11
**name** 7:23,23
8:3 9:4 21:2
39:18 43:17
88:7 90:13
107:15 112:7
146:3 149:1
169:8
**named** 19:21
20:17 67:9
168:17
**narrative** 66:21
67:20 68:12

**KEVIN WALSH  2/9/2017**

112:8 119:13
119:14 128:8
128:18 136:25
**nature** 16:22
18:11 19:15
33:23 34:17,23
138:22 141:4
**navigate** 61:10
**NCIC** 60:24
64:1
**near** 142:19
**nearby** 150:6
**necessarily**
27:15 31:1
32:8 33:15
39:3 78:22
82:20 84:16
127:1,21
131:11
**need** 11:6,7
22:23 52:15,24
55:2 109:6
157:1
**needed** 22:24
48:17,21 53:14
68:7,11 122:3
140:12 156:10
**negative** 71:17
71:19 132:13
**neighbor** 117:7
117:8 141:12
150:13,17
152:4,6 163:3
**neighborhood**
141:18
**Neighbors** 141:7
**neither** 178:15
**nervous** 117:10
120:5 169:15
**never** 20:21
74:25 89:5
108:25 140:18
163:24
**Nevermind**
83:19
**new** 5:13 99:4
106:10,23,24

107:4,5,11
111:3 113:17
113:18,19,20
**nice** 161:10
**night** 25:8,9
92:24 132:16
136:13
**Nods** 56:17
73:22
**nominated**
28:25
**Noncall** 38:15
**north** 4:17 6:11
6:17 23:9 40:1
116:20 117:13
**Notary** 4:22 7:6
178:6
**notes** 18:1 37:12
143:23,24
146:14
**notice** 155:14
**notified** 49:1,1
103:7 104:6
149:18,25
150:5
**notify** 49:10
**number** 7:18
42:25 43:2
72:20 91:4
142:14
**numerous** 51:21
52:2,19,22
53:4,14,15,19
53:21,23 82:24
**NY** 5:13

─────────
**O**

**O** 7:11
**o0o--** 1:4 4:4
7:12 8:24
**oath** 10:18
**object** 11:16
53:2 65:12
67:24 78:16
83:19 95:22
103:22 109:16
131:17

**objected** 146:15
**objecting** 67:22
**objection** 11:19
65:17 146:5,18
147:4 154:9
155:20 156:2
156:12,20
157:2,9,17,24
158:6,9,15,22
159:1 160:4,12
160:20 161:12
162:17,24
163:5,22
164:10,25
165:16 166:10
167:11,15
168:12,18
169:5,20
170:12,19
171:2,8 172:1
172:16 176:17
**observation**
174:10
**observe** 129:22
**observed** 120:17
128:19
**observing**
129:19
**obstacles** 36:21
**obtain** 125:24
155:3
**occasion** 18:5
47:11 48:3
174:23
**occasions** 16:14
18:9 58:2,3
**occur** 42:7 44:4
82:3 162:9
**occurred** 23:1
44:6 140:2
**occurs** 102:17
**odd** 161:15,17
**offender** 23:1
**offenders** 22:20
**offense** 158:13
**offenses** 86:25
**offered** 54:14

**office** 6:3 18:4
38:11 51:22
52:3,8,12,14
53:14,25 55:20
56:10,12,16
57:9 59:6 73:3
90:11 99:16
125:14 139:10
**officer** 9:2 12:17
12:19 14:13
15:23 19:3
20:16 21:1,22
22:1 24:4,11
24:11 25:7,14
27:5,7,12,24
27:24 29:4,13
30:12,13,17
31:8,12,16,17
31:22,25 32:1
32:2,10,10,11
32:25 33:10,12
35:8 36:3,6,12
36:22 39:2,11
43:5,22,24
45:16 46:23
48:11 49:2,11
49:12 54:10
55:21 56:1
57:10 59:25
62:16 64:9
65:6 69:13
70:23 73:2
74:1,2,16
76:21,24 78:9
79:1 81:2,8,11
81:18,24 84:3
84:9,11,18,24
85:2 88:5,9,11
88:12,13,14
91:9,18 92:5
92:13,16 93:4
93:14 94:25
95:7 96:11,15
100:5 102:4,12
102:13,18,20
103:3,7,16
104:5,13

105:18,21
106:12,14,15
107:5 111:8,24
112:5,14,21,25
113:7,12,24,25
116:5,9,10
117:3,11,12,19
128:12 136:7
136:11,12
137:4,5,15,25
139:15 168:4
170:23 172:18
**officer's** 67:18
67:19 92:10
103:19 104:9
**officers** 16:25
17:15 18:21
25:4 31:21
34:7,10 38:24
54:10 57:2
66:8 69:20
77:18 80:23
99:12 102:11
107:11,13
108:15 138:5
147:17
**officers'** 96:20
**Officers's** 27:15
**offices** 4:17 18:7
**official** 8:13
54:16 115:13
**oh** 8:10 30:6
116:1 118:17
143:14 151:1,8
157:21 169:10
170:6
**okay** 12:13,17
13:5 14:12
15:4,20 17:2
20:23 21:4
23:11,16,16
24:2,6,19
25:17,24 26:19
27:22 30:11
31:11,15 35:6
35:17 37:6,15
47:9,16 53:22

KEVIN WALSH  2/9/2017

| | | | | |
|---|---|---|---|---|
| 55:12 59:3 | 166:7,12,17 | opposed 83:6 | 173:19,20 | partly 97:20,21 |
| 65:11,13 68:18 | 168:15,21 | oral 8:22 | | partner 34:12 |
| 68:20 72:11 | 169:7,16 170:5 | order 2:18,20,22 | **P** | parts 70:14 98:6 |
| 75:6,6 79:6 | 171:5,11,18,20 | 35:5,6 48:21 | P 5:3,3 7:11 | party 16:21 71:2 |
| 83:22,23 88:4 | 172:6,18 | 48:21 49:3 | p.m 177:5 | party's 71:8 |
| 88:20,24 90:12 | 173:21,25 | 52:23 53:16,25 | packed 59:14 | pass 62:4 107:21 |
| 90:20 91:6 | 174:12,18 | 54:24 55:1 | packing 121:6 | 108:6 121:18 |
| 92:25 94:6 | 175:10,22 | 63:25 68:17 | page 2:3 62:23 | 143:13 |
| 95:16 97:14 | 176:24 | 79:25 87:9 | 63:1,13,14 | passed 10:23 |
| 98:9 100:7,10 | old 166:14 | 102:1,3 105:6 | 101:22,25 | 22:7 108:12,16 |
| 100:24 102:19 | older 107:6 | 105:8,16,23,25 | 102:7 105:11 | 108:18,22 |
| 104:18 108:9 | on-scene 40:23 | 106:21 107:14 | 105:13 110:24 | password |
| 108:21 109:1 | 40:24 51:18,19 | 107:16 108:4 | 115:1 128:19 | 107:15,19 |
| 109:11,24 | 72:3 78:24 | 109:5,7,14 | 134:19 136:4 | patrol 47:17 |
| 110:3 114:2,25 | 84:2,4 86:11 | 110:13,16,20 | 138:16,17 | 117:12 123:4 |
| 116:13,18,24 | 117:9 119:8 | 142:15 155:4 | 168:2 | 144:23 |
| 118:4,21 119:3 | 120:4,6 126:14 | 166:18 | pages 119:13 | patrolman |
| 119:6,17 | 129:12 132:23 | orders 47:18,19 | 136:3 | 38:16 |
| 121:14 123:11 | 161:17,19 | 47:21 60:9 | panel 25:2 | patterns 161:23 |
| 127:2 128:16 | once 30:12 | 101:4 105:16 | paragraph | Paul 5:12 8:4 |
| 130:2,5 132:6 | 31:19 39:15 | 106:24 107:6,6 | 112:24 113:15 | peace 19:19 |
| 134:8,17 135:7 | 46:12 48:24 | 107:12 114:17 | 137:2 | 125:5 159:21 |
| 135:13 136:1 | 74:10 91:6 | 146:3 | parole 22:1,21 | 159:22 |
| 136:20 138:2,6 | 92:6 93:23 | organization | 23:2 | pedestrian |
| 138:11,14 | 96:9 98:10 | 18:13 | panel 25:2 | 33:22 |
| 139:6 141:2 | 105:12 106:12 | original 3:4 92:9 | part 47:6,7 | pedigree 71:8 |
| 142:1,9 143:12 | 111:8,24 112:4 | 92:10 | 51:25 65:3 | 72:20 73:8 |
| 144:9,19 | 163:24 | originally | 67:2 109:18,25 | 84:18 |
| 145:16 146:9,9 | one-on-one | 121:20 124:15 | 145:14,18 | pending 82:9,14 |
| 147:11,22 | 16:12,15 | originated 70:25 | participate | 96:22 |
| 148:1,5,13,23 | 140:24 | out-of-state | 18:25 19:1 | people 10:11 |
| 149:3,14,17 | one-week 28:19 | 144:10 | 99:15,20,23 | 36:20 40:4 |
| 150:9,15,20 | 36:17 | outside 13:25 | participated | 49:22 59:17 |
| 151:1,8,8,14 | ones 15:16 29:25 | 16:9 18:6 | 53:24 55:19 | 100:20,21 |
| 151:22,25 | online 44:10 | 27:14 41:8 | 69:7 96:10 | 101:1 |
| 152:4,10,12,22 | oOo-- 4:13 7:1 | 59:9 66:5 96:8 | particular 11:16 | perceive 17:19 |
| 152:25 153:4 | 7:10 177:6 | 96:17 99:16,21 | 35:18,25 38:25 | perceived 17:14 |
| 153:15 154:5 | opening 106:5 | 99:24 100:19 | 39:23 52:25 | performance |
| 154:13 155:14 | operate 115:16 | 120:10 165:18 | 53:13 54:14 | 17:9,11 |
| 156:17 157:5 | operator 49:1 | outstanding | 56:11 66:14,17 | period 16:16 |
| 157:15 158:3 | 61:9,10 72:19 | 96:3,6 | 67:7 91:21 | 29:9 32:15,22 |
| 158:19 159:4 | 89:18 91:11 | overbroad | 126:20 | 41:2 67:7,17 |
| 159:16,19 | 135:15 | 83:21 146:16 | particulars | 115:23 |
| 160:9,15 | opinion 100:6,8 | overcome 36:21 | 84:16 | person 10:6 |
| 161:21 162:12 | opportunity | owner 141:11 | parties 18:10 | 22:22 54:23 |
| 163:8,14 164:1 | 69:14 110:25 | owners 49:9 | 178:17,20 | 56:11 64:11,12 |
| 165:6,11,21 | 126:5 | ownership | Partin 8:12 | 71:23 72:5,12 |
| | | | 15:24 | |

KEVIN WALSH  2/9/2017

74:3 84:12,21
85:3,8,17 86:9
87:25 88:7,15
90:15,21 91:9
91:13 92:7
94:3,8,17 96:9
96:13 97:1
100:23 102:11
103:5,20
105:18,19,24
106:13,15,17
111:9,13,25
112:4,6,15
113:1 124:4,25
127:3 128:21
129:8 130:3,10
140:13 142:18
142:21 161:3
170:24
**personal** 28:1
**personalities**
36:21
**personally**
15:17
**persons** 105:19
146:3
**perspective**
75:23
**phase** 29:16,21
29:22,23,23,24
30:14 32:3
**phases** 29:17,18
30:8,9,15,16
**phone** 41:7
54:20 72:6,25
73:17 74:15
92:24 121:19
121:22,25
122:20 123:19
123:22 124:5
124:11,12,13
124:14,18
125:1 127:9,18
130:7 152:3,8
152:15 164:8
**phrased** 67:16
124:2

**phrasing** 28:5
**physical** 25:1
26:16 41:22
42:12 129:23
129:25 130:3
167:4 169:12
**physically** 32:8
**pick** 72:25
**picked** 28:20
91:24 92:2
103:8,21 104:7
121:25 122:13
124:15 136:14
143:3
**pickup** 104:10
**place** 41:5 50:7
58:21 71:21
119:11
**placed** 58:19,24
70:9 72:10
87:13 121:3
122:11 123:9
133:3 155:7
**placing** 72:23
123:12,15
**Plaintiff** 1:6 4:8
**plaintiffs** 4:16
5:5 7:3 8:9 9:6
20:4,12
**plastic** 121:7
**platoon** 35:14
**platoons** 35:15
**play** 74:9
**please** 8:1,16
9:11 11:7
51:11 54:25
65:5 68:3
81:20 85:23
96:25 99:18
104:3 111:7
112:22 128:9
131:21 133:12
137:13
**PO** 138:18
**point** 10:21 11:6
21:21 24:6
25:17,19 27:2

36:9 37:7
71:12 121:14
121:15 122:16
122:22 132:14
144:1
**points** 23:13
**police** 2:24
14:16 16:4
17:13 18:7
21:10,22 24:9
24:13,17 25:4
25:14,20 26:2
27:4,5,7,12,14
27:15,17 32:25
33:10,12,17
35:8 36:3,6,12
36:22 39:11
41:16,19 43:5
43:23 45:20
46:5,13,16
49:10,11,12,15
50:8,15 63:23
65:6,7 69:21
70:23 72:2
84:9,11 93:10
96:15 97:19
99:24 100:5
101:5 102:4
107:5,11
114:18 115:14
126:12 144:5
149:19 165:11
167:25 169:22
170:22
**policies** 98:19
**policy** 47:14
86:22 101:23
139:20 142:12
142:13 165:11
165:18
**polygraph** 25:2
**poorly** 67:16
**portion** 137:1
155:6
**position** 23:23
27:3
**possession**

124:17
**possible** 9:25
22:24 37:8
54:16,19 74:21
85:12,16 86:16
94:19
**possibly** 10:20
**Post** 98:8
**potentially**
54:18 58:13
61:20 72:1
85:14 105:19
105:24 151:6
**PowerPoints**
45:5
**powers** 131:9
134:9
**practical** 35:19
35:24
**practice** 56:23
57:1 112:19
123:17,20
127:2,17,22
133:24 148:2
**practices** 98:4
98:19
**preceded** 83:15
146:13
**precinct** 32:11
32:12 34:3
39:1 90:25
92:21 102:15
116:18,20
117:13 136:13
140:19 161:3
**preparation**
13:11 170:8
**prepare** 13:2
**presence** 173:11
176:1
**present** 8:1
126:1 134:2
**presentations**
41:21
**presented**
105:22 132:21
133:17

**pressing** 121:12
**presumably**
24:20 72:11
164:18
**pretty** 10:3
27:13 28:8
30:24 31:6
34:4,7 61:15
98:7 163:11
**previous** 67:2
87:21
**previously** 67:4
113:4 123:7
**primarily** 23:8
**print** 178:13
**prior** 63:24
64:11 67:13
69:11 141:25
**priority** 94:23
95:2,5
**prisoner** 91:2
103:9
**probable** 45:17
45:22 48:23,24
49:3,12,19
51:3,18 64:10
64:17,22,24
65:3,8 66:14
66:17 67:5,10
69:16 70:8
72:9,13 74:11
79:25 83:2
85:6,10 86:8
92:11 105:17
106:13 109:13
109:25 111:9
111:25 113:10
122:12 125:4
126:22 129:2,6
129:9,18 131:3
131:4 134:12
162:13 169:1
**probably** 18:19
35:16 41:1
121:8 122:13
124:2 133:1
**probation** 16:16

KEVIN WALSH  2/9/2017

22:1,20 23:1
24:4,11 25:6
27:17 120:20
120:22 154:2,4
154:7 157:13
**probationary**
16:25 24:11
27:5,6,12 29:3
29:9,13 30:12
30:13,16 32:15
32:22 41:2
115:23 116:4
116:10
**problem** 55:16
**procedure**
125:12
**procedures**
101:5 164:24
165:3 169:2
**proceed** 8:17
11:18
**process** 24:20,23
25:6 29:12
37:15,19 38:1
38:3 62:24
70:18 72:18
74:9 75:11,15
75:21 84:4
126:18,23
135:14
**processing**
106:16 112:6
**produced** 4:15
**professional**
20:24 40:20
41:7
**profusely**
152:21
**promoted** 38:5
**properly** 48:16
**properties** 19:18
**property** 141:11
141:12
**propounded**
8:22
**prosecute**
159:17 164:4

**prosecuted**
161:7
**prosecuting**
51:22 52:3,3,8
52:12,14 53:13
53:25 55:20
56:10,12 57:9
59:6 82:7
125:14 161:8
**prosecution**
80:10
**prosecutor**
132:4 134:3
**prosecutor's**
139:10
**prosecutors**
58:17
**protect** 167:22
**protection**
120:21 142:15
155:4 156:9,14
157:1 166:19
167:4
**protections**
27:14
**protective** 120:9
120:16 153:8
153:10,13
**protocol** 89:8
113:16 126:21
**proved** 40:24
**provide** 10:18
15:10 62:7
**provided** 43:14
129:5 135:23
**provider** 73:1,1
135:23
**providing** 84:17
**Public** 4:22 7:6
178:7
**publication**
65:23 66:1
**published** 93:10
**pull** 144:23
**punish** 166:8
**purchase** 157:13
157:16 158:5

158:11,21
**purchased**
120:21 157:7
157:12
**purpose** 55:25
56:5 57:6
69:13,22,24
83:11 86:22
87:1 125:18
142:12
**purposes** 11:20
62:6 75:19
**pursuant** 95:12
**pursue** 51:5,15
52:16,24 53:17
54:1 55:1,21
**pursued** 57:21
**pursuing** 51:10
**put** 62:15 68:20
86:9 92:15
98:8 107:14,19
113:10 169:13
173:15 174:20
**puts** 16:19 34:7
**putting** 154:19

_____
### Q
**qualifications**
37:24
**quarterly** 47:4
50:2
**question** 9:10,13
11:8,9,10,19
46:21 53:8,10
55:13 65:20
67:22 68:2,20
75:3,5 78:15
78:17 83:20
84:7 94:7
95:22 103:23
109:17 111:15
123:24 127:13
128:3,6 131:18
133:12 134:5
144:4 146:11
146:15 147:13
165:2

**questioning**
10:22 11:17
63:24 64:8
111:13,16,17
140:1 169:11
**questions** 9:5,9
11:23 108:24
108:24 146:12
172:19,23
173:7 176:7,8
**quick** 124:16
**quickly** 9:25
10:3 77:10
142:11
**Quinby** 4:19
6:15 7:5,23
178:3,25
**quite** 53:3,7
150:21
**quizzes** 41:21
44:5

_____
### R
**R** 5:3 7:11
**R-o-e-d-i-g-e-r**
39:19
**radio** 33:16
72:25 73:18
90:24 168:3,10
**Ralph** 9:8 19:22
20:12
**random** 16:18
**rang** 121:19
**rank** 33:6 77:22
77:24
**ranking** 25:3
**rape** 33:19
**re-** 13:22
**reach** 28:23
**reached** 49:19
**reaction** 19:25
20:16
**read** 12:6,9 13:3
47:13,21 63:21
64:2,4,5,13
97:23 98:6
101:20 103:2

103:13 106:10
106:18 107:11
107:16,21
111:5,6,7
112:9 137:20
143:24 144:2
164:16 170:9
170:17 176:9
**reading** 47:17
47:19 52:1
107:14 113:15
113:23 136:25
**reads** 63:23
103:1 105:5,15
137:3
**ready** 72:15
**real** 124:16
142:21 167:8,8
**realize** 10:23
144:10 155:15
**realized** 24:12
**really** 49:21
172:23 174:7
**Realtime** 4:21
178:4,6
**reason** 9:10,15
45:24 96:23,25
105:18 108:1
124:4,20 128:3
128:12 153:16
154:16,18
166:8
**reasonable**
45:24
**reasons** 58:7
59:5 166:13
171:17
**recall** 17:25
44:22 45:7
46:10 48:3,14
48:20 50:20,23
51:1 56:13
66:5 87:7 98:9
98:16,18,23
99:4 106:20
116:24 127:16
135:1 136:7

KEVIN WALSH  2/9/2017

recant 140:11
160:23 161:23
recanted 140:24
160:17,22
recanting
140:16 161:11
162:9
receive 38:22
46:12,15 53:12
61:5,8 70:22
70:23 80:23
81:17,23
111:12 112:3
112:14 113:1
113:24
received 19:8
21:8,13 34:25
37:1 40:11
41:6,16 43:11
52:7 59:6 60:3
92:17 99:5
116:21 118:9
140:10 149:15
168:3
receiving 44:22
136:7
Recess 59:21
114:11
recognize
101:17 115:9
recognized
124:13
recollection
44:14,25 45:18
68:5 106:23
116:14 135:6
138:7
recommend
176:21
record 7:14
10:17 11:20
59:20,23 63:18
63:22 64:9
84:19 89:1
90:5,7 114:7
114:10,13
172:25 173:1,3

176:19 177:1
recorded 17:22
records 15:7
63:25 88:18
90:2,16 120:25
134:24
recounted 120:2
129:24
reduced 178:13
refer 12:18
reference 134:9
referenced
130:7
referred 15:14
referring 67:6
110:6
refused 128:21
regarding
164:13
regional 60:15
145:11
Registered 4:21
178:3
rejected 58:5
REJIS 2:11,14
60:12,14,18
61:6 63:25
64:12 69:1
76:8 101:23
145:10,14,18
relate 61:19
related 15:5
99:17,25
178:16
relating 50:21
relations 100:13
100:15
relationship
30:21 60:17
relative 178:19
release 89:22
96:22 143:25
146:25
released 82:9,14
86:10 94:9
95:13 96:9
98:11 139:17

140:10,22
169:23
reluctant 34:9
remain 95:18
remainder
95:19
remained 38:11
remember
25:24 43:10
44:17 53:5
109:2 115:20
117:23
remind 41:23
rendered 121:3
159:15
rendering
120:24
Renée 4:19 6:15
7:5,23 178:3
178:25
repeat 55:13
81:20 99:18
repetitive 65:18
rephrase 9:11
51:11 59:2
65:5 68:1,3
76:15 85:23
99:18 104:2
107:2,3 123:25
133:11
replaces 110:15
reply 8:22
report 2:24 14:9
15:8 26:18
35:9,17 36:4
39:5,8,21
66:22 67:9,20
67:20 68:8,12
72:20 74:10,12
76:11,13 77:3
77:5 92:9,10
97:23 98:6,11
98:20 99:2,5
100:1 112:8
115:14 117:19
126:12 128:16
135:20 165:8

167:25 168:16
reported 39:11
reporter 3:5
4:20,20,21,22
6:14 7:6 8:16
10:5,17 176:11
178:1,4,4,5,5
reporter's 7:23
reporting 39:16
71:2,8 88:8
128:11 168:4
reports 13:3
14:2 28:3 66:1
represent 8:11
8:11
represented
11:13
representing 9:6
reprimand
40:12
request 11:8,10
57:10 102:11
102:20 106:15
112:6,25
requested
172:20
requesting
106:17 111:14
111:17 112:4
112:14
require 34:23,24
required 41:20
46:7 66:15,18
66:18,20 67:5
67:6,15,19
68:15 80:19
86:18
requirement
52:22 54:7
65:8 110:1
requirements
22:6,11,11
28:11,16 52:8
57:7 66:6,9
77:14 103:16
131:3
reserved 103:16

residence 14:11
19:7,9,18
71:21 120:17
121:16 123:3
140:22 141:7,9
141:12,16
150:25 171:20
171:22
respond 34:16
92:20 93:5
103:10 118:22
122:4,10 161:2
responded
34:15 117:3
119:8 123:4
140:18,22
170:22,23
responders
18:14
responding
38:23 46:24
173:9
responsibilities
24:3 38:13
104:12
responsibility
92:8 102:14
104:9 138:18
138:21
responsible
27:24 39:24
103:8,20 104:6
104:9
responsive
38:15,16
restate 131:22
restroom 11:6
result 126:8,9
132:12 133:1
139:3
resulted 66:1
results 71:17,19
132:13
retained 3:4
return 127:14
132:7 171:20
171:21

**KEVIN WALSH  2/9/2017**

returned 32:2
returning
  127:23
reverse 21:5,5
review 13:20,25
  29:12 74:10
  77:10 111:10
  112:1 134:24
  168:23
reviewed 15:8
  15:15 170:7,15
reviewing 75:22
revisit 70:21
rhyme 107:25
Rifkind 5:12
rifle 155:8 156:6
  156:10 157:1,7
  158:7 159:8
  173:22 175:2
  176:2
rifles 157:23
right 9:13 10:14
  11:2,11 12:18
  20:4 23:10
  28:13 31:13
  32:20 41:3
  42:22 63:22
  72:13 88:14
  96:24 111:22
  116:1,5 118:10
  118:22 120:15
  122:15 129:24
  133:5,8,10
  136:17,22
  137:8 138:25
  140:25 142:4
  146:21 150:6
  151:11 173:16
  174:2 176:9,12
  176:16
right-hand
  136:5
rights 99:11
  137:20
ring 161:14
ripped 141:14
rise 114:19

RMR 6:15
  178:25
road 38:24 39:2
  151:13
roadmap 60:6
Rob 40:8
robberies 33:19
Roediger 39:17
rogue 165:14
role 74:8
Ron 43:15
room 11:5
Rose 135:2
roughly 13:9
  19:10 23:15
  25:16 42:10
  118:19
round 155:12
rounds 155:13
route 151:17
row 132:17
ruffled 130:1
rules 10:1
run 10:3 88:7
  90:13

_____
**S**
S 5:3 6:4 7:11
safe 99:13,13
  121:3 150:7
  159:15 166:25
  173:15
safety 174:5
sake 9:23 115:1
saved 124:14
saw 119:15
  153:23 162:14
  164:2,2,2
saying 54:24
  67:9 116:8
  117:7 136:16
  137:18 141:12
  156:15 157:21
  164:4 168:8
says 8:22 63:2
  63:18 81:11
  97:1 104:5

106:12 108:3
109:3,5 111:8
112:13 118:7,9
134:21,24
138:16,17
149:2 151:12
164:22 168:2,4
168:22 169:11
scenario 87:20
  113:6,9
scenarios 113:6
scene 49:5,7,22
  54:17 70:11,24
  71:1,5,7,16
  72:24 102:14
  113:4 117:19
  119:4,7,15
  122:4,11 127:3
  127:10,23
  128:22 146:21
  150:6 151:17
  153:2 175:24
schedule 108:2
school 21:6,9,16
  28:8,20
scratching
  63:14
screaming
  137:17
screen 109:1
scroll 107:18
se 130:4
Search 3:2
sec 175:20
second 10:16
  29:23 36:11,12
  51:25 75:5
  102:7 114:3
  116:3 128:18
  137:3
seconds 65:18
section 64:5
  102:7 104:4
  105:12 110:25
  111:2
secure 123:4
  151:17,19

secured 155:5
securing 123:2
see 10:4 37:7
  63:2,5,14,15
  63:19 90:4
  100:11,20
  102:7,8 105:2
  105:5,12,13
  114:6 116:8
  128:24 134:14
  135:16 140:23
  140:24 143:17
  151:1 152:12
  171:21
seek 83:9,10
  142:15,16
  166:22
seeking 83:4
  130:11
select 40:2
self-initiated
  33:20,24 34:5
  34:9 38:20
senior 27:24,24
  28:16 46:23
  117:15
seniority 28:24
  77:20
sense 23:12,14
  33:13 60:10
  89:19 102:24
sentence 137:3
separate 47:7,8
  94:7,21
sequence 90:17
sergeant 35:13
  39:9,14,16,17
  39:20 77:25
  78:1 135:2,10
  164:19,22
sergeants 35:10
  35:18,21,25
  36:2 39:10
serve 28:12 36:7
  36:9 56:4 78:1
served 65:6
  75:18

service 14:4,10
  19:7,9,17
  33:18 34:10,15
  141:6 148:12
services 4:17
  6:10,16 7:22
  7:25 19:20
  33:18
serving 25:6
  77:14
set 28:2 49:17
  72:1
sets 27:17
Shakes 12:14
share 100:8
shared 69:22
shed 141:13
shift 116:16
  118:13
shingles 141:14
shoes 92:15
shootings 34:23
shoplifting 86:6
shopliftings
  33:19
short 59:12 98:8
shorthand 4:20
  7:5 178:5
shortly 118:12
shouted 122:20
shouting 124:15
  136:17
show 40:21
  61:21 77:5
  80:9 101:8
  104:19 107:21
  155:1
showed 120:25
  121:22
showing 107:16
shows 14:10
  18:17
side 54:15 62:16
  62:16 68:21
  118:6 126:3,6
  127:4 133:25
  134:1

KEVIN WALSH  2/9/2017

| | | | | |
|---|---|---|---|---|
| **sign** 128:25 129:1 | 34:20,25 43:10 44:3 46:20 | **specifics** 98:22 **specified** 54:3 | **standard** 27:9 123:17,20 | 129:7 150:13 150:17 153:25 |
| **signature** 7:7 46:7 176:21,22 177:3 | 52:14 73:17 77:9 87:16 89:12 94:23 | **speculate** 109:17 **speculation** | 127:17,22 133:24 134:12 **standards** 28:1 | **station** 72:2 169:22 **status** 154:4,7 |
| **signed** 45:15 | 98:24 100:1 | 103:24 109:18 | 40:20 41:7 | **statute** 43:12 |
| **significant** 24:2 49:8 | 107:7 109:1,2 116:14 118:6 | **spell** 31:9,13 39:18 43:17 | **start** 21:6 25:18 30:13,14 93:1 | 59:9 147:15 **statutes** 43:21 |
| **signs** 129:23 | 119:6 121:6 | **spent** 26:22 45:8 | 111:23 115:19 | 160:2 |
| **simple** 61:15 71:4 | 122:16 126:18 128:13,24 | 45:10 **spoke** 119:18 | 118:5 **started** 26:1 | **statutory** 44:4 **stayed** 139:8 |
| **sir** 30:5 88:3 | 129:19,22,23 | 160:16 163:10 | 70:19 93:2 | 155:5 |
| **sit** 47:13 58:14 | 132:10 137:1 | 164:7,18,20 | 116:16 127:13 | **stenographic** |
| **sitting** 73:2,3 | 138:3,6 143:8 | **spoken** 16:9,11 | 166:15 | 178:12 |
| **situation** 150:5 153:18 174:7 | 144:11,12 152:18 155:18 | 66:8 95:17 126:8 | **starting** 20:24 23:20 33:12 | **step** 71:23 72:8 84:11 87:22,22 |
| **six** 19:10 23:24 | 165:14 166:12 | **spot** 72:2 | **starts** 137:2 | **steps** 48:17,20 |
| 25:16 26:6,14 | **sought** 80:6 | **spouse** 158:5,8 | **state** 4:18,23 | 48:20 49:2 |
| 26:22 35:16 | **sound** 129:14 | **St** 3:1 4:18 5:7 | 21:4,17 22:2 | 51:10 80:14 |
| 42:1,2,4,13 | **sounded** 143:22 | 6:3,11,17 7:22 | 43:12 103:11 | 88:16 123:1 |
| **smacked** 119:22 | **sounds** 95:10 | 8:13 16:18 | 105:20 129:11 | 124:3 174:11 |
| **small** 141:17 | 137:6 | 18:6 21:10 | 129:20 151:23 | 174:17 175:19 |
| **Snaps** 74:6 | **space** 62:15 | 23:5,18 24:8 | 152:1 153:24 | **Steve** 149:2 |
| **somebody** 82:4 | **Spanish** 149:21 | 24:17 25:3,18 | 157:21 161:5 | 168:17 |
| 82:14,20 83:8 | **speak** 16:9 | 26:1 27:3 28:2 | 178:7 | **stick** 63:14,17 |
| 83:9 84:15 | 74:19 89:5 | 33:17 40:1 | **state/emotions** | **STIPULATED** |
| 85:13 86:1,7 | 93:23,23 95:3 | 47:5 50:8,14 | 169:12 | 7:2 |
| 86:15,24 87:2 | 113:11 121:16 | 60:19 65:7 | **stated** 121:1 | **stolen** 121:1 |
| 87:18 90:12 | 125:2,19 127:9 | 66:22 69:20 | 160:23 | **stomped** 119:23 |
| 95:17 123:21 | 137:9 146:21 | 70:6,13 88:17 | **statement** 52:6 | **stop** 100:21 |
| 124:21 125:20 | 163:9 174:23 | 88:22 93:10 | 71:9 126:10 | 105:16,16,23 |
| 127:9,18 143:3 | **speakers** 41:20 | 95:1,1,4,5 98:7 | 140:11,13,17 | 105:25 146:3 |
| **someplace** | **speaking** 55:4 | 98:19 99:1,24 | 140:25 143:23 | 171:12 |
| 151:19 | 124:5,21 125:1 | 100:12 101:5 | 145:17 146:22 | **stops** 33:21 |
| **somewhat** | 127:20 129:19 | 114:17 115:13 | 146:23 147:2 | **store** 49:9 |
| 115:22 | 170:6 | 117:5 121:5 | 147:11 160:24 | **story** 54:15 |
| **son** 141:14 | **speaks** 123:18 | 144:4,5,11,15 | 161:1,3,7,17 | 126:3 127:4 |
| **soon** 97:15 | 123:22 | 144:17,20,25 | 162:10,19 | 133:25 |
| **sorry** 8:11 22:15 | **specialty** 39:23 | 145:2,14,22 | 164:23 168:11 | **straight** 139:25 |
| 28:4 54:17 | **specific** 43:12 | 155:15,16,19 | 169:1 | **straw** 158:11,21 |
| 55:11 81:4,21 | 48:5 56:14 | **stage** 150:6,8 | **statements** | **street** 4:18 5:7 |
| 116:2 118:17 | 107:15 109:4,6 | 151:19 | 10:10 129:4,10 | 6:11,17 100:22 |
| 118:17 123:25 | 126:24 128:17 | **stamped** 2:13,16 | 147:6 | **stretch** 59:17 |
| 125:10 128:6 | **specifically** 48:7 | 2:19,21,24 | **states** 1:1 4:1 | **strike** 16:10 |
| **sort** 16:24 17:20 | 57:10 86:20 | 77:6 | 7:19 102:10 | 18:20 25:18 |
| 26:13 28:25 | 117:24 159:16 | **stand** 14:5 | **stating** 30:1 | 35:20 46:11 |
| 29:7,8 32:17 | 173:22 | 145:22 | 53:18,21 67:8 | 56:7 65:24 |

KEVIN WALSH  2/9/2017

66:7 67:3
78:20 82:11
97:15 98:17
123:19 126:22
163:19
**Strode** 5:6 8:8,8
**struck** 164:8
**subject** 37:23
    45:17,25 48:24
    49:14 51:17,19
    51:20 52:25
    54:2,4,7,8,8,12
    63:24 64:7
    93:22 121:25
    122:2,5
**subjects** 42:17
    48:25
**subsection**
    102:10 103:1
    106:3,7 111:2
**substance** 9:16
**successful** 27:20
    131:15
**sudden** 147:22
**sued** 20:21
**sufficient** 129:9
    130:19 131:5,5
    131:9
**suggest** 151:18
    158:24
**suitable** 22:22
**summary**
    148:15
**summons** 86:11
    147:1 169:24
**supervising**
    67:19 76:21,24
    78:9 79:1
    80:23 81:2,8
    81:11,18,24
    112:21 113:7
    113:12,24
**supervisor**
    36:22 48:25
    66:13,16 67:1
    67:4,9 74:9,16
    74:22 75:1,18

76:2,13,18
77:5,10,15
78:21 79:7
91:5 105:21,21
111:12 112:2,7
134:24 135:17
136:11,13
168:23
**supervisor's**
    67:14 68:6,7
    68:11 75:22
    80:19
**supervisors**
    17:15 28:21
    38:25 66:20
    76:7 82:8
**supplement**
    92:10 136:23
**supporting**
    111:11 112:2
**supports** 18:14
**suppose** 76:9
    78:6 88:1
**supposed**
    157:22
**sure** 15:13 22:16
    31:2 51:12
    53:3 58:23
    68:4 76:16
    80:6 81:6,22
    87:11 89:2,11
    89:24 95:21,23
    96:24 98:21
    99:19 112:23
    120:10,13
    123:3,24 124:1
    124:14 128:10
    132:17,18
    133:13 137:12
    139:5 140:25
    163:11 167:24
    171:17,19
    174:17
**surveillance**
    80:8
**suspect** 51:23
    52:4 55:22

56:2 60:8
69:15,15 70:9
70:10 71:16
84:15 91:21
103:5,8,11,20
104:6,10
123:21 126:2
134:15 142:16
142:19,21
**suspect's** 72:20
**suspects** 143:9
**sustained** 40:22
**swear** 8:16
**sweep** 120:10,16
    153:9,10,13
**swelling** 128:20
**switched** 35:15
**sworn** 4:15 8:19
    178:9
**system** 12:5 14:3
    15:10 60:15,16
    60:19,21 61:11
    73:21,25 77:5
    84:17 107:13
    115:16 134:17
    145:11,19,19
    146:2
**systems** 60:23
    60:25 145:7
    178:6

—————————
**T**
**tactics** 99:12
**take** 10:5 11:4
    23:12 25:13
    37:12 39:2
    42:11 48:21
    49:2 50:7 51:9
    59:12 62:25
    73:13 75:15
    77:17 80:15
    84:14,21 85:5
    85:9 86:18
    88:9,16 90:21
    91:2,6 108:8
    109:6 120:9
    123:1 124:3,9

134:23 137:1
137:21 174:11
174:16 175:19
**taken** 4:16 7:4
    48:17,21 51:20
    54:8 58:9,9,11
    59:1,21 114:11
    119:11 126:12
    161:7 178:11
    178:18
**takes** 26:23
**talk** 10:12 18:6
    26:12 37:9
    41:13,23 48:19
    49:17,25 51:25
    58:3 60:7 79:6
    82:22 113:7
    116:24 119:6
    121:24 127:10
    144:3
**talked** 54:13
    68:23,23,24,25
    86:13 101:4
    113:4 124:18
    153:8 174:13
    174:14
**talking** 10:8
    30:1,2 49:22
    60:2,3 72:1
    96:15 114:16
    124:10 125:25
    141:21,23
    161:21
**taught** 51:9
**team** 172:22
**technical** 61:13
    73:24 107:17
**telephone** 71:21
    71:23 160:16
    161:22 163:9
**teletype** 76:8
    101:23 136:22
    137:10
**teletypes** 130:9
**televised** 176:12
**tell** 9:11,20
    21:13,13 22:3

33:9 43:9
79:24 80:2
116:13 134:1
136:10 153:20
155:8,11
159:16 160:19
161:16 162:1,5
**telling** 138:4
**ten** 57:16,23
    147:23
**tend** 100:8
**tended** 34:15
**term** 22:9 28:13
    165:15
**Terminal**
    101:23
**terminology**
    87:10
**terms** 15:15
    28:24 29:18
    61:13 94:24
    117:14
**terribly** 124:2
**test** 25:1,2 108:3
    108:7,16,22,23
    109:6
**testified** 163:8
**testify** 8:20 9:17
    12:24 178:10
**testimony** 10:19
    11:1 69:12
    70:7 131:18
    141:25 143:18
    143:20 145:9
    176:13 178:8
    178:11
**tests** 24:25,25
    41:20 44:5
    107:22,24
    108:13,19
**thank** 12:22
    20:10,10,15
    41:12 68:18,19
    87:15 101:2
    111:18,18
    112:11 114:15
    143:14 172:18

**KEVIN WALSH  2/9/2017**

173:6
**Thanks** 59:25
**thing** 41:22
  72:17 111:6
  146:4 160:9
**things** 16:21
  17:16 18:11
  33:23 34:23
  79:21 80:9
  107:18 138:7
  138:22 142:14
  143:1 148:15
  164:1 170:14
**think** 9:10 16:18
  55:6 58:24,25
  65:15 68:20
  70:5 75:2 77:1
  77:18 78:10
  95:14 102:20
  103:15 104:8
  109:12 111:15
  111:16,16,19
  111:20,21
  128:12 134:11
  145:9 146:10
  146:14 148:13
  154:16,18,21
  166:13
**thinking** 79:12
**third** 11:4 29:23
  159:20,22
**tholland@pau...**
  5:14
**thought** 20:2
  42:2 133:18
**thoughts** 160:19
**threat** 82:21
  132:21
**three** 10:8 13:9
  29:23,24,25
  30:1,3 31:5,7
  31:20,25 32:3
  32:6 35:14
  42:11 95:10
  96:1,4,8,17
  121:8 132:17
  152:5 172:5,7

**threshold** 49:17
**Thursday** 4:15
**Tim** 8:5
**time** 7:15 10:9
  10:21 13:16
  23:4 24:10
  26:4,24 30:13
  34:1,5,11 35:8
  36:3,6 38:4,4
  39:4 45:8
  51:21 56:16
  59:19,22 63:13
  67:7,17,17
  68:6 71:12
  74:14 85:25
  91:24 92:1
  102:4 114:6,9
  114:12 116:15
  116:19 118:16
  121:14 122:14
  122:16,22
  123:5 124:17
  126:2 128:1,5
  130:20,23
  132:14 143:7
  149:15,20
  152:10 166:18
  166:21,25
  170:17 172:24
  173:2 176:25
**timeline** 84:1
  115:22
**times** 11:16 13:7
  19:8 34:6
  42:11 119:23
  121:19 132:19
  162:9 171:6
  172:3,7
**Timothy** 5:10
**tinted** 151:4,8
**title** 27:3 32:24
  33:1,2,4
  101:21 105:15
**titled** 102:8
**to-wit** 8:23
**today** 9:5,9,18
  10:5 11:14,23

33:2,4 39:21
  159:25 160:3
  160:10
**today's** 7:14
  13:2 15:15
**told** 10:16 58:4
  80:3 120:19
  121:4 122:5
  127:24 131:12
  137:17,25
  161:5
**top** 22:13 59:10
  101:21,24
  105:2,5 118:7
  128:19 138:17
**topic** 48:4 50:24
  51:2 69:2
  70:21
**topics** 51:2
  99:17
**Torres** 9:8 19:22
  20:12
**touch** 130:10
**trade** 28:9
**traffic** 23:21
  33:21
**trained** 147:17
**trainer** 28:22
  48:13
**trainers** 30:25
  31:4,6,7
**training** 26:13
  27:21,22,23
  28:17,20 31:21
  36:17,19 41:14
  41:16 42:15,15
  42:18 43:8
  44:15,17 46:11
  46:12,15,17,18
  46:21,22 50:2
  50:3,7,10,19
  50:24 51:8,13
  61:5,8,10
  68:23,24,25,25
  69:1 80:22
  89:12 99:5
**trainings** 50:13

50:16,21 51:2
  60:2,6 61:18
  66:6 69:8
  98:23,24 99:8
**transcribed** 7:7
**transcript** 3:6
  52:1
**travel** 151:11
**treat** 153:21
**treatment** 22:23
**tried** 119:23
**true** 78:19
  161:14 165:2
  166:24 169:17
  169:23
**truly** 154:23
**truth** 8:20,20,21
  178:10,11
**truthful** 10:19
  128:14 162:11
**truthfully** 9:18
**try** 71:24 72:1
  93:14,23 126:1
  133:24 140:22
  155:1 175:19
**trying** 10:5 28:4
  54:25 74:13
  121:7 133:15
  133:21
**tubs** 121:7,7
**turn** 62:23 63:12
  105:11 110:24
  119:12 122:8
  122:19 127:24
  163:16 170:2
  172:8
**turned** 169:19
**two** 17:12 23:13
  34:23,24 40:6
  41:1 42:11
  65:16,23 66:1
  94:8 96:2,20
  113:5 115:25
  116:1 118:19
  119:13 121:8
  171:6 172:23
**type** 16:23 17:5

18:15 35:22
  41:16 46:15
  57:4 61:8
  70:25 80:18
  82:24 106:1,2
  127:8
**types** 16:20,23
  18:22 63:18,22
  82:11,13 86:25
  87:1 101:1
**typewriting** 7:7
**typical** 33:14,15
**typically** 14:23
  73:13 77:24

———————
**U**

**Uh-huh** 31:24
  32:9 36:23
  40:6 43:20
  47:20 61:2
  94:4 102:16
  109:8 116:6
  118:3,11
  120:23 121:10
  139:2 140:14
  140:20 142:17
  142:23 143:2,5
  147:3
**ultimately** 25:2
  76:25 133:19
  133:20 136:6
  161:8
**unable** 72:11
**unaware** 17:24
  146:8
**unclear** 104:2
**underlying** 14:2
**underneath**
  63:18,22
**understand**
  11:20,22,25
  50:3 55:25
  59:13 68:2
  95:22 112:24
  128:23 168:7
**understanding**
  12:3 46:4

**KEVIN WALSH  2/9/2017**

55:17 56:11,18
56:21 69:21
79:20 80:11
89:17 91:14
97:15 109:24
113:14 130:13
134:10 138:7
139:16
**understood** 9:12
143:18
**undisclosed**
72:3
**unfaithful**
119:21
**unfolding** 80:9
**unincorporated**
73:4
**unit** 40:5,7
103:9
**United** 1:1 4:1
7:19
**universe** 69:5
97:12
**University**
21:18
**unloading**
159:15
**unwritten** 57:5
**update** 68:17
**updated** 63:2,6
63:10
**updates** 50:18
**upset** 117:10
**use** 11:6 14:23
33:20 61:1
67:12 70:3
98:14 130:10
134:11 145:6
145:19
**user** 107:15
**usually** 162:8,11
**utilize** 60:20

_____
**V**
_____
**vague** 9:10
78:17 103:23
**various** 56:16

114:17 166:13
**vehicle** 47:17
121:4 123:3
151:24 153:3,6
155:5,7 159:11
**verbal** 24:25
32:7 35:2 45:2
52:10,11 99:12
**verification**
88:21
**verify** 71:25
84:19 88:18
**version** 98:8
**versus** 7:18
34:21 38:15
45:15 51:10
61:17 63:18
**victim** 58:10
59:8 117:9
119:9,18 129:8
142:14,25
162:10 166:18
166:21,25
167:3,22
**victim's** 169:8
**victimless** 161:6
**victims** 79:17
**video** 80:7
**video-recorded**
1:11 4:14 7:16
**videographer**
6:9 7:13,24
8:15 59:19,22
114:9,12
172:24 173:2
176:25
**violated** 158:21
**violations** 22:25
**violence** 87:13
96:2,6 97:8,9
117:6 120:19
125:5 126:20
126:24 139:22
139:24 141:22
142:8,9,13
143:9 147:19
154:6 160:2

164:14 165:7
166:14 170:18
171:7
**violent** 86:19
150:4
**voice** 161:23
**voluntarily**
170:5
**volunteer**
156:24
**vs** 1:7 4:9

_____
**W**
_____
**W-o** 31:12
**W-o-j-c-h-i-u-h**
31:13
**Wainwright**
23:9
**wait** 95:21,21
148:2
**waiting** 120:14
**waive** 176:16,21
176:22
**waived** 7:8
177:4
**walk** 20:23
70:18 78:7
114:20 115:18
**walked** 119:10
**walking** 83:17
83:17 118:5
**Wall** 5:11 8:5
**Walsh** 1:12 4:14
7:17 8:11,18
9:2 12:17,19
14:13 19:3
20:16 21:1
59:25 61:24
62:9,17,20
64:15 101:11
101:17 104:22
110:8,12 115:7
115:9 137:4
138:18 164:23
168:1,5 172:19
173:6 177:2
**Walsh's** 141:25

**want** 18:23
26:19,21 30:24
52:19 53:1,21
55:21 60:6,7
83:25 92:15
96:23 101:3
102:6 134:14
136:22 142:11
146:16 165:8
169:16,22
172:21 173:8
174:14 176:18
**wanted** 2:12,15
10:24 12:5
21:22 24:12
44:20,21 45:16
45:19 46:6
48:17,18,22
51:10,15 52:24
55:8 56:1,4
57:6,11 62:21
63:18,22,23,25
64:7,7,10,12
64:17,21 65:4
65:9,16 66:2
66:21 67:10,20
68:8 69:13,22
70:9,19 71:13
72:10,16,18
73:7,19 74:3,9
74:16,17,23
75:1,11,15,19
75:22 76:1,3
76:19 77:10,15
78:2,9,11,23
79:5,8,9,21
80:13,14,24
81:9,13,14,15
83:6,10,11,12
83:15 84:1,2,6
84:10,12,20
85:4,17 86:1,5
86:9,23 87:19
88:8,16,19,23
88:25 89:3,13
89:25 90:15,17
91:10,11,12,14

91:18 92:16
93:5,6,15,22
94:19,24,25
95:2,4,8,12
96:11 102:8,11
102:20 103:5,7
105:15 106:1
106:15,17
110:1 111:13
112:4,6,15,20
112:25 113:5,8
113:25 114:21
122:11,23,24
123:9,9 124:25
125:18,21,24
130:16 131:3,5
133:3,23
136:14 138:9
143:3 144:24
146:13,17
147:8 161:4,22
162:1 171:12
172:13,14
**wanted's** 134:17
**wanteds** 44:15
44:18 45:1,10
45:13 46:2
48:4,10 50:21
50:24 57:13
60:3,8 61:19
66:7,9 67:2
69:2,8,10 70:3
70:5 77:19
78:5 89:4,10
98:14 144:3,6
144:20 145:7
145:19 146:2
**wants** 53:25
100:5 132:4
134:1 136:16
137:18,18,20
137:21 138:5
155:17,17
164:4
**warning** 99:12
**warrant** 44:20
44:21 45:15

KEVIN WALSH  2/9/2017

46:6,7 51:6,10
51:16,24 52:5
52:9,16 53:1
53:16,17 54:1
55:2,7,8,10,21
57:7,21 58:4
58:19 63:19
64:8 79:3 81:3
81:12,19,25
82:6,10,15
83:1,3,6,9,15
86:11 94:18,24
95:5 96:5,7,22
97:3 103:12
125:8,20
130:20,22
131:2,6,15
132:2 133:1,6
133:21 137:22
138:22,24
139:1,4 141:20
142:3 146:13
147:7,8 175:15
175:20
**warrants** 45:1
45:14 46:2
57:20 58:3
59:7 60:4
61:19 69:2,8
82:24 94:2,16
96:3,21 97:7
102:8 105:15
**wasn't** 120:13
164:21 169:10
**watch** 90:23
**way** 35:22 47:25
48:10 123:6
126:15,20
130:14 146:11
166:15 169:16
**ways** 117:4,23
**we'll** 37:9 61:23
170:2
**we're** 7:24 11:9
34:4 47:12
62:9 73:23
104:21 108:3

144:16
**we've** 13:20
59:11,13 60:2
60:2 83:25
101:4 114:5,5
133:16 167:25
**week** 13:18
29:25 42:11
**weekly** 44:5
**weeks** 29:22
30:3,4,10,15
30:23 31:20,21
31:22,25 32:1
32:5 38:7
143:4
**weird** 10:12
**Weiss** 5:12 8:4
**went** 34:14
99:11 171:13
171:17,23
172:3,6
**West** 73:5,5
**Wharton** 5:12
**whereabouts**
175:1
**whichever** 92:20
**wife** 163:20
**windows** 151:4
151:8
**wished** 51:23
52:4 160:23
**wishes** 39:3
**wishing** 140:11
**witness** 7:9 8:16
13:13 40:23
75:7 109:22
118:19 138:13
142:4 143:13
157:3,18,25
158:10 159:2
160:5,13
162:25 163:6
164:11 167:16
168:13,19
170:3 171:3,9
172:17 176:23
177:4 178:8,11

**witnesses** 71:10
79:16
**Wojchiuh** 31:12
32:1,11
**word** 14:25 15:1
67:13 106:16
111:15 112:5
**wording** 113:19
113:20
**words** 64:17
163:15
**work** 16:5 28:8
32:12 33:24
35:24 37:17
38:19,22 71:21
100:21 115:17
**work-related**
14:12,23
**workday** 50:11
**worked** 16:6
23:25 32:11
44:21,21 53:19
**working** 136:12
**worries** 125:11
**worry** 154:3,6,7
**wouldn't** 22:14
86:16 89:15
94:1,8 95:12
104:13 125:7
127:21 130:25
**wrap** 74:13
**write** 26:17
37:21 92:9
**writing** 144:2
**written** 24:24,25
28:3 35:2,3,4
56:19 69:25
87:5,7,8
128:19 140:13
161:3
**wrong** 20:2,6
54:25 77:2
96:25 112:13
131:2,21
145:25

_____
**X**
_____

_____
**Y**
_____
**yeah** 28:6,10
37:18 55:13
85:22,24 99:15
99:15 101:24
128:10,11
133:14 136:19
137:12 138:13
144:22
**year** 16:17 23:25
24:16 25:22
27:8 33:11
35:12,15 36:11
36:12 77:20
115:25 116:9
160:1
**years** 28:24 41:1
98:22 115:25
116:1 117:14
**yelling** 137:18
137:24 138:5
**yesterday**
169:18
**York** 5:13
**you-all** 45:10
114:4
**young** 36:22

_____
**Z**
_____
**Ziegler** 117:3,11
**ZIP** 23:9

_____
**0**
_____

_____
**1**
_____
**1** 2:11 61:25
62:1 63:6 64:4
64:21
**1/25** 118:14
**1:24** 172:24
**1:26** 134:22
**1:27** 173:2
**1:30** 177:5
**10:30** 116:17
**10:37** 59:19
**10:45** 59:22
**10019-6064** 5:13

**101** 2:18
**104** 2:20
**11-26** 2:18 102:1
109:15
**11:59** 114:9
**110** 2:22
**115** 2:24
**11867** 6:15
**11th** 4:18 6:11
6:17
**12:09** 114:12
**12:25** 118:10
149:16 152:5
**12:26** 150:9
**12:27** 150:21
**12:28** 151:23
152:1
**12:36** 152:11
**12:38** 151:14
**1210** 5:7
■ 118:23
119:9 149:10
**1230** 150:23,25
**1285** 5:12
**1291** 6:16
178:25
**13** 101:7
**143** 2:6
**148** 3:1
**15** 69:12
**15-26** 2:20 108:4
109:14 110:17
**1526** 105:6
**16** 33:8 36:14
147:23
**16-26** 2:22
110:13
**17** 30:10,15,22
31:19,21 32:4
**173** 2:7
**180** 43:3
**19** 42:24

_____
**2**
_____
**2** 2:14 62:10,11
63:9,21 64:16
65:1

**KEVIN WALSH  2/9/2017**

**2:31** 176:25
**20** 23:15,18
  69:12 95:7
**2005** 21:15
**2010** 21:17
**2012** 24:18
**2013** 25:23 26:1
  26:23 116:3
**2014** 63:10 65:1
  65:4,7 66:9
  116:4
**2015** 32:21,21
  33:12 116:4
**2016** 19:13
  33:13 63:6
  114:22 115:20
  116:8
**2017** 1:13 4:16
  7:14 178:22
**212)373-3373**
  5:13
**23** 148:2,2
**24** 92:3 93:8,14
  93:18 95:19,20
  135:1 139:18
  139:19,25
  147:12,20
  165:9 167:5
**24-hour** 87:12
  95:8 142:12
  143:8 147:14
  164:13 165:6
  166:14
**25th** 115:20
  134:18
**29** 155:13
**29th** 136:2,3

**3**

**3** 2:18 63:1
  101:11,12
  105:8 106:5,8
**30** 23:19
**314)615-7042**
  6:6
**314)644-2191**
  6:12,18

**4**

**4** 2:20 104:22,23
  106:7 110:16
  164:17
**4:16-cv-00254...**
  1:7 4:9
**4:16CV00245...**
  7:18
**41** 6:4

**5**

**5** 2:22 110:8,9
  136:4
**50** 57:18,25
  108:24

**6**

**6** 2:24 115:3,4,7
  168:1,1
**60** 65:18
**62** 2:11,14
**63101** 6:11,17
**63103** 5:7
**63105** 6:5
**63147** 23:9

**7**

**7** 136:4
**711** 4:17 6:11,17
**76** 151:16

**8**

**8** 2:5
**855)724-2489**
  5:8

**9**

**9** 1:13 4:16
  178:22
**9:31** 1:16 7:11
**9:32** 7:15
**9th** 6:4 7:14