# Exhibit 12

CINDY JENNINGS  3/30/2017

Page 1

```
1              UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION
3                        --oOo--
4        DWAYNE FURLOW, et al.,      )
                                     )
5              Plaintiffs,           )
                                     )
6              vs.          )Case No. 4:16-CV-00254-CEJ
                                     )
7        JON BELMAR, et al.,         )
                                     )
8              Defendants.           )
         _____    )
9
10            VIDEO-RECORDED DEPOSITION OF
11                   CINDY JENNINGS
         _____
12                  March 30, 2017
13
14
15            (Beginning at 9:28 a.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
1                         INDEX
2                                         PAGE
3
4     EXAMINATION BY MR. HOLLAND ...................8
5     EXAMINATION BY MR. HUGHES ...................134
6                       EXHIBITS
7     Exhibit 1  List of topics              11
8     Exhibit Gomez 3  Previously marked exhibit   50
9     Exhibit Gomez 16 Previously marked exhibit   60
10    Exhibit Gomez 17 Previously marked exhibit   60
11    Exhibit Gomez 18 Previously marked exhibit   60
12    Exhibit 2   Document entitled "LEPAC       96
13          Agenda Item" dated May 7, 2015
14    Exhibit 3   Document entitled "LEPAC Agenda  96
15          Item" dated August 6, 2015
16    Exhibit 4   Document entitled "Law        96
17          Enforcement Policy Advisory
18          Committee Meeting Minutes" dated
19          August 6, 2015
20    Exhibit 5   Document entitled "Law        96
21          Enforcement Policy Advisory
22          Committee Meeting Minutes" dated
23          May 7, 2015
24    Exhibit Gomez 24 Previously marked exhibit   99
25    Exhibit Meschke 2 Previously marked exhibit  104
```

Page 3

```
1     Exhibit 6   Document entitled "LEPAC Agenda   116
2          Item" dated November 1, 2012
3     Exhibit 7   Document entitled            120
4          "Locate/Detainer, When on earth
5          do I use them?"
6                      )
7     (The original exhibits were retained by the court
8     reporter and will be copied and attached to copies
9     of the transcript.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION
3                        --oOo--
4        DWAYNE FURLOW, et al.,      )
                                     )
5              Plaintiffs,           )
                                     )
6              vs.          )Case No. 4:16-CV-00254-CEJ
                                     )
7        JON BELMAR, et al.,         )
                                     )
8              Defendants.           )
         _____    )
9
10                       --oOo--
11            VIDEO-RECORDED DEPOSITION OF CINDY
12    JENNINGS, produced, sworn, and examined on Thursday,
13    March 30, 2017, taken on behalf of the Plaintiffs,
14    at the offices of Midwest Litigation Services, 711
15    North 11th Street, in the City of St. Louis, State
16    of Missouri, before RENÉE COMBS QUINBY, a Certified
17    Court Reporter (MO), Certified Shorthand Reporter
18    (CA), Registered Merit Reporter, Certified Realtime
19    Reporter, and a Notary Public within and for the
20    State of Missouri.
21
22
23
24
25
```

1 (Pages 1 to 4)

CINDY JENNINGS  3/30/2017

Page 5

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4       Nathaniel R. Carroll, Esq.
         ArchCity Defenders, Inc.
 5       1210 Locust Street
         St. Louis, MO 63103
 6       (855)724-2489
         ncarroll@archcitydefenders.org
 7
 8       Timothy J. Holland, Esq.
         Paul, Weiss, Rifkind, Wharton & Garrison LLP
 9       1285 Avenue of the Americas
         New York, NY  10019-6064
10       (212)373-3373
         tholland@paulweiss.com
11
12       Angelo Guisado, Esq.
         Britney Wilson, Esq.
13       Center For Constitutional Rights
         666 Broadway, 7th Floor
14       New York, NY  10012
         (212)614-6464
15       aguisado@ccrjustice.org
         bwilson@ccrjustice.org
16
17
18   FOR THE WITNESS:
19       Raymond B. Flojo, Esq.
         City of St. Louis Law Department
20       1915 Olive Street, Suite 773
         St. Louis, MO 63103
21       (314)444-5609
         rflojo@slmpd.org
22
23
24
25
```

Page 6

```
 1   FOR THE DEFENDANTS:
 2       Michael E. Hughes, Esq.
         St. Louis County Counselor's Office
 3       41 S. Central Avenue, 9th Floor
         Clayton, MO  63105
 4       (314)615-7042
         mhughes2@stlouisco.com
 5
 6   THE VIDEOGRAPHER:
 7       David Doell
         Midwest Litigation Services
 8       711 North 11th Street
         St. Louis, MO  63101
 9       (314)644-2191
10
11   COURT REPORTER:
12       RENÉE COMBS QUINBY, RMR, CRR
         CSR (CA) #11867
13       CCR (MO) #1291
         Midwest Litigation Services
14       711 North 11th Street
         St. Louis, MO  63101
15       (314)644-2191
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1              --oOo--
 2           IT IS HEREBY STIPULATED AND AGREED by and
 3   between counsel for the Plaintiffs and counsel for
 4   the Defendants, that this deposition may be taken in
 5   machine shorthand by RENÉE COMBS QUINBY, a Certified
 6   Court Reporter and Notary Public, and afterwards
 7   transcribed into typewriting, and the signature
 8   waived by agreement of Counsel and consent of the
 9   Witness.
10              --oOo--
11        P R O C E E D I N G S   9:29 a.m.
12              --oOo--
13           THE VIDEOGRAPHER:  We are now on the
14   record.  Today's date is March the 30th, 2017.  The
15   time is approximately 9:29 a.m.  This is the
16   video-recorded deposition of Cindy Jennings in the
17   matter of Furlow, et al., versus Belmar, et al.,
18   Case Number 4:16-CV-00245-CEJ in the United States
19   District Court for the Eastern District of Missouri.
20           This deposition is being held at
21   Midwest Litigation Center in St. Louis, Missouri.
22   The reporter's name is Renée Quinby.  My name is
23   David Doell, and I'm the legal videographer.  We're
24   here with Midwest Litigation Services.
25           Will the attorneys present please
```

Page 8

```
 1   introduce yourselves.
 2           MR. HOLLAND:  My name is Timothy
 3   Holland.  I'm here from Paul Weiss on behalf of
 4   plaintiffs, and I have co-counsel who will introduce
 5   themselves.
 6           MR. CARROLL:  Nathaniel Carroll from
 7   ArchCity Defenders also here on behalf of the
 8   plaintiffs.
 9           MS. WILSON:  I'm Britney Wilson, also
10   here on behalf of the plaintiffs, from the Center
11   for Constitutional Rights.
12           MR. GUISADO:  Angelo Guisado, Center
13   for Constitutional Rights, on behalf of plaintiffs.
14           MR. HUGHES:  I am Michael Hughes.  I
15   represent Jon Belmar, St. Louis County, Christopher
16   Partin, and Laura Clements and Kevin Walsh.
17           MR. FLOJO:  Ray Flojo from the City
18   Counselor's Office here for the REJIS Commission.
19        (Discussion off the record.)
20           EXAMINATION
21   BY MR. HOLLAND:
22        Q.  Good morning, Ms. Jennings.
23        A.  Good morning.
24        Q.  My name is Tim Holland, and I'll be
25   asking you some questions today.  Can you just state
```

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

## CINDY JENNINGS  3/30/2017

Page 9

1    your name and spell your name again for the record.
2        A.   Cindy, C-i-n-d-y; Jennings,
3    J-e-n-n-i-n-g-s.
4        Q.   Thank you.  So as I'm asking you
5    questions today, if you don't understand something,
6    if something comes across to you as vague, unclear,
7    confusing, just let me know so I can try to ask a
8    better question, okay?
9        A.   Yes.
10       Q.   Is there anything that might keep you
11   from answering truthfully and accurately or fully
12   today such as a medical condition or substance of
13   any kind?
14       A.   No.
15       Q.   And if that changes during the course
16   of today you'll let me know?
17       A.   Yes.
18       Q.   Okay.  For the sake of efficiency
19   hopefully to get you out of here as soon as we can,
20   let's just go over some ground rules.
21            As you can see we only have one court
22   reporter here, and there's two of us talking, so she
23   can only take down one of our words at once.  So
24   let's just try our best not to talk over each other.
25            If you're talking, I'll do my best to

Page 10

1    wait until you're done answering; and if I'm
2    answering a question, I know you might want to jump
3    on where I'm going, but just let me finish for her
4    sake and then we can have this go more efficiently
5    today.
6        A.   Sure.
7        Q.   Your attorney, Mr. Flojo, as well as
8    Mr. Hughes, who's here for the defendants, may at
9    times object to a question I ask.  Unless Mr. Flojo
10   instructs you not to answer, you can go ahead and
11   keep answering my question though.  The objection is
12   purely for the record.  Does that make sense?
13       A.   Yes.
14       Q.   Okay.  Have you ever been deposed
15   before?
16       A.   Yes.
17       Q.   How many times?
18       A.   Three.
19       Q.   All three in your capacity at REJIS?
20       A.   Yes.
21       Q.   When did those depositions take place?
22       A.   I don't recall the years.
23       Q.   Within the past five years?
24       A.   Once, yes.
25       Q.   And the others earlier than that?

Page 11

1        A.   Yes.
2        Q.   When did you find out that you'll be
3    testifying today?
4        A.   About three weeks ago.
5        Q.   Who did you find out from?
6        A.   A man that showed up at work -- at
7    REJIS.
8            MR. HOLLAND:  And I'll show you what
9    I'll mark as Jennings Exhibit 1.
10           (Exhibit 1 was marked for
11           identification.)
12           MR. HOLLAND:  A copy for each of you.
13       Q.   Did that man give you this document?
14       A.   Yes.
15       Q.   Now, in the -- in the center of this
16   document or on the first page, it says that you will
17   be testifying regarding the following matters, and
18   it lists training and any other matters related to
19   the St. Louis County Police Department in connection
20   with your employment at REJIS; do you see that?
21       A.   Yes.
22       Q.   And are you prepared today to testify
23   on those topics?
24       A.   Yes.
25       Q.   Okay.  Great.  You can set that aside.

Page 12

1            What did you -- so in the past three
2    weeks when -- since you found out you were going to
3    be testifying, what have you done to prepare for
4    today?
5        A.   Nothing.
6        Q.   Did you meet with anybody to prepare?
7        A.   I spoke to Mr. Flojo yesterday -- well,
8    actually I emailed him to say that I
9    couldn't make --
10       Q.   Let's stop there.  There's -- you might
11   know just from being deposed before there's
12   privileged communications.  So I don't need to know
13   the contents of your communications with Mr. Flojo.
14   But just all I'm wondering is, you know, how many
15   times did you speak with him, about how long were
16   those communications?  I don't need to know the
17   contents.
18       A.   Spoke with him once about 30 minutes.
19       Q.   Great.  And may have emailed him
20   questions you may have had or something like that?
21       A.   Correct.
22       Q.   Okay.  So aside from those 30 minutes
23   or so, did you do anything else to prepare such as
24   look as documents or anything like that?
25       A.   No.

3 (Pages 9 to 12)

CINDY JENNINGS  3/30/2017

Page 13

1    Q.  So I'm going to be showing you some
2    documents at various points today, maybe all of them
3    hopefully -- hopefully not all of them that are
4    sitting here next to me.
5        But when we're done, I'll probably ask
6    you again -- I'll probably ask you whether aside
7    from the documents we looked at today, are you aware
8    of any other documents that might be relevant to
9    what we've discussed, what the topics listed in
10   this -- this subpoena I showed you are.  And at that
11   point I'd appreciate it if you'll tell me if they
12   exist; is that fair?
13       A.  Yes.
14       Q.  Let's walk through some of your
15   background starting with your education.  So after
16   high school can you walk me through what other
17   education you've received.
18       A.  Some college and I graduated from
19   Hickey Business School.
20       Q.  Where did you attend college?
21       A.  Florissant Valley.
22       Q.  Where is that located?
23       A.  Florissant, Missouri.
24       Q.  And you said "some college."  About how
25   long did you attend college for?

Page 14

1        A.  I took about eight credit hours.
2        Q.  And then you went -- and then after
3    that you went where?
4        A.  Nowhere.
5        Q.  Nowhere.
6        A.  I graduated from Hickey College first
7    after high school.
8        Q.  Hickey College, and you said that was a
9    business degree?
10       A.  Yes, secretarial program.
11       Q.  Secretarial program.  And do you have
12   any training in law enforcement?
13       A.  No, I do not.
14       Q.  Do you have any formal legal training?
15       A.  No, I do not.
16       Q.  After you graduated from Hickey College
17   and then attended for about eight credits at
18   Florissant, did you then start at REJIS?
19       A.  I started at REJIS when I graduated
20   from Hickey.
21       Q.  And what year was that?
22       A.  '78.
23       Q.  And you've worked at REJIS continuously
24   since 1978?
25       A.  That's correct.

Page 15

1        Q.  We don't have to walk through every
2    year, but if you can give me just what your
3    positions were since you've worked at REJIS.
4        A.  I started as a secretary.  I worked on
5    the help desk.  I was a trainer, client
6    representative, and training supervisor.
7        Q.  About how long before you became a
8    trainer were you employed at REJIS?
9        A.  Three years.
10       Q.  So in the early '80s you became a
11   trainer?
12       A.  That is correct.
13       Q.  And then about when did you become a
14   training supervisor?
15       A.  Ten years ago.
16       Q.  Who hired you into that position as a
17   training supervisor?
18       A.  The director of client services.
19       Q.  What was his or her name?
20       A.  Larry White.
21       Q.  Who have your supervisors been since
22   you've been a training supervisor?
23       A.  Larry White, John Earls, David
24   Pudloswki, Marc Meschke.
25       Q.  Is Marc Meschke your current

Page 16

1    supervisor?
2        A.  Yes, he is.
3        Q.  Do you have anybody that reports in to
4    you?
5        A.  Yes, I do.
6        Q.  How many people?
7        A.  Four.
8        Q.  Are they trainers?
9        A.  They are.
10       Q.  Which makes you their training
11   supervisor?
12       A.  Correct.
13       Q.  That makes sense.
14        Can you give me an idea of your
15   day-to-day responsibilities since you've been a
16   training supervisor?
17       A.  I conduct the law enforcement training
18   classes, basically all of our training classes.  I
19   supervise those individuals that conduct the
20   classes.  We prepare the documentation, calendar.
21   I'm responsible for help desk, phone calls.  I'm
22   also responsible for working with the applications
23   development team to develop our applications.
24       Q.  You said you're responsible for the law
25   enforcement training courses.  Can you tell me a

CINDY JENNINGS  3/30/2017

Page 17

1   little bit more about that?  Who do you -- who on
2   the law enforcement do you train?
3        A.   We train anyone that has access to the
4   law enforcement files or the criminal justice files,
5   whether they be in the St. Louis area or the Kansas
6   City area.  And that's Kansas City, Missouri, and
7   Kansas City, Kansas, both.  And then we also have
8   clients in Illinois.
9        Q.   And does that include both police
10  officers as well as clerks?
11       A.   It does.
12       Q.   Do you train them after or before they
13  gain access to the record systems?
14       A.   Both.
15       Q.   Now, you have four people you said
16  underneath you.  Do you have -- have you trained
17  them since they have started as trainers?
18       A.   Yes, all of them.
19       Q.   What does that training involve?
20       A.   They will attend the classes that we
21  instruct and then they will also sit in or go to the
22  agencies to observe the agencies and how they work.
23  They go on ride-alongs with them, some of the
24  departments.  They'll go to the courts, sit in on
25  the court classes, court proceedings.

Page 18

1             We also put them on the help desk so
2   that they're answering some of the phone calls or
3   listening to the phone calls that come into the
4   clients.  Also work with our applications group.
5   Kind of onboarding program that they'll work with
6   each unit within REJIS.
7        Q.   So you kind of make sure they're
8   familiar with all the various end points where
9   they're going to have to be providing training?
10       A.   That's correct.
11       Q.   And you mentioned earlier you have them
12  visit all of the agencies.  Can you just be a little
13  bit more specific?
14       A.   What we do is we have client
15  representatives that are assigned to individual
16  departments, and then the trainer would work with
17  that client representative to go to some of those
18  departments to see the operations if they're not
19  familiar.
20       Q.   I guess my question is who are the
21  clients?
22       A.   Clients would be -- well, law
23  enforcement would be the police agencies.  We have
24  the courts.  We have corrections agencies.  We have
25  prosecutors.  We have private access agencies are

Page 19

1   all clients.
2        Q.   Thank you.  So aside from law
3   enforcement and the trainers who you train, who else
4   do you train?
5        A.   Courts, court clerks, court
6   administrators, judges, prosecutors, attorneys,
7   paralegals -- I'm going to call them security
8   personnel that use our PS Net program, and that's
9   it.
10       Q.   So anyone who accesses the systems that
11  you maintain?
12       A.   Correct.
13       Q.   Or by "you" I mean REJIS.
14       A.   Correct.
15       Q.   Now, do you use -- are these oral
16  trainings or do you use, you know, materials to
17  assist your trainings for all these courses?
18       A.   Both.
19       Q.   About how many trainings do you
20  yourself conduct in any given year?
21       A.   Separate classes or --
22       Q.   That's a good question.  Let me
23  clarify.
24            So your clarifying question is asking
25  whether -- how many courses because you could -- you

Page 20

1   could obviously teach the same course many times.
2        A.   Correct.
3        Q.   So let's -- how many courses do you
4   teach in any given year?  I'm not going to hold you
5   to the number.
6        A.   I'm going to say probably 75.
7        Q.   And about how many of those are of law
8   enforcement, police officers or clerks?
9        A.   73, 74.
10       Q.   Depending on the audience does the
11  course change or do all of these various people or
12  groups that you told us about already today, do they
13  take the same course?
14       A.   The different people, the different
15  areas take different courses.  So the private access
16  people would not take the same course as a police
17  officer would take, if I understand you correctly.
18       Q.   How would the police officer's training
19  differ from the private access folks?
20       A.   They have different access levels so
21  they would have different views, different security
22  clearances than the private access people would
23  have.
24       Q.   What are the various types of access
25  levels to REJIS?

5 (Pages 17 to 20)

**CINDY JENNINGS  3/30/2017**

Page 21

1     A.   We have about 60 different levels of
2   certification, so we customize the certification
3   based on the individual's role.
4     Q.   Can you give me some examples of the
5   types of access and certification that a police
6   officer might have?
7     A.   Yes.  Many of the police officers would
8   have what we call a level 27 which allows them to
9   access hot file and driver vehicle registration
10  records.
11        We have some officers that are at a
12  different level.  They would have access to do entry
13  of arrest records in addition to their inquiry
14  access.
15        We have officers that would have full
16  access, meaning they could do all entries and all
17  inquiries, and they would be a level 2.
18    Q.   So the most common level is just being
19  able to go into the system and access information
20  that was already input, is that fair to say, among
21  officers?  Level 27, I think you said.
22    A.   Yes.
23    Q.   What would give an officer level 2, all
24  entry, all access?
25    A.   I don't understand your question.

Page 22

1     Q.   You said some officers have level 2
2   access which gives them all entry, all viewing.
3   What would give an officer -- what qualifications
4   would an officer have to have in order to get that
5   level of access or that role?
6     A.   The level or access role would be
7   assigned by their department, so they complete an
8   identification -- what we call an operator
9   identification form which identifies what access
10  that department wants them to give them.  REJIS
11  doesn't make that determination.
12    Q.   Okay.  Now, among all these trainings
13  do you train trainers from other agencies who then
14  go back and train their employees?
15    A.   I guess I would need a little more
16  clarification.  Meaning do I certify them as a
17  trainer?
18    Q.   No.  Let me -- let me clarify.
19    A.   Okay.
20    Q.   So as an example, police officers go
21  through The Police Academy and they have in-service
22  training, so obviously there are trainers employed
23  by the police department for that purpose.  Do you
24  train them in any capacity that they then use what
25  they learn from you to train police officers?

Page 23

1     A.   Yes.
2     Q.   In what topics do you train them in?
3     A.   They would take the regular training
4   classes, and then if the agency chooses to make them
5   trainer, that's their choice.
6     Q.   So they take the same course as any
7   other police officer, and then it's just up to the
8   police department to say, okay, we're going to make
9   you a trainer in this area to train, you know,
10  incoming police officers; is that fair?
11    A.   Fair.
12    Q.   Let's just talk a little bit about the
13  REJIS database itself.  Your supervisor,
14  Mr. Meschke, previously was deposed in this case.
15  He discussed a lot of this, so hopefully that will
16  be able to spare you some of the nitty-gritty
17  details.  So just who created REJIS?
18    A.   REJIS was created out of the St. Louis
19  City Police Department.
20    Q.   And has it grown to cover other
21  departments in geographical areas?
22    A.   Yes, we cover -- yes.
23    Q.   What does it presently cover?
24    A.   St. Louis City, St. Louis County,
25  Jefferson County, Franklin County, St. Charles

Page 24

1   County, and you go out to the Kansas City side of
2   the state and you'll have the Kansas City counties,
3   Jackson.
4         And then we go over to the Kansas side,
5   and so you have Johnson County, Kansas area, and
6   then we also cover Illinois counties of Madison,
7   Monroe, and St. Clair.
8     Q.   And what is a wanted?
9     A.   Wanted?  A wanted is based on
10  questioning, based on a police report, wanted for
11  questioning.
12    Q.   Is that one of the -- that's one of
13  the -- one of the applications or entries that's
14  maintained within the REJIS database?
15    A.   Yes.
16    Q.   And how about a stop order?
17    A.   Stop order is also in the REJIS
18  database.
19    Q.   So staying on wanted, what is the
20  purpose of REJIS giving officers the option of
21  entering a wanted rather than having them obtain an
22  arrest warrant?
23    What is the purpose?
24    Q.   So REJIS provides the interface where
25  the officer can have a clerk enter information that

6 (Pages 21 to 24)

**CINDY JENNINGS  3/30/2017**

Page 25

1    sends out a wanted through REJIS.  Why does REJIS
2    provide that option as opposed to having them go get
3    a -- you know, an arrest warrant?
4        A.  I don't know.
5        Q.  Is it fair to say that arrests are
6    effectuated on the basis of the information
7    contained in the REJIS database?
8        A.  Can you repeat that?
9        Q.  So what I'm asking is:  REJIS -- the
10   REJIS database allows for the entry of a wanted.
11       A.  Correct.
12       Q.  Is it fair to say that the information
13   contained in that entry can lead to an arrest?
14       MR. FLOJO:  Let me show my objection on
15   speculation.
16       MR. HUGHES:  Object to the form of that
17   question.  Improper foundation.
18   BY MR. HOLLAND:
19       Q.  You can answer.
20       A.  Answer?
21       Q.  Yeah.
22       A.  Correct.
23       Q.  So it's important that that information
24   is accurate, correct?
25       A.  Correct.

Page 26

1        Q.  And part of your job is to ensure that
2    the users know how to create entries that are
3    complete and accurate; is that fair?
4        A.  Correct.
5        Q.  And it's also your job to make sure the
6    users of that information are able to interpret it
7    in a fair and reasonable way to know how to use it;
8    is that fair?
9        A.  Fair.
10       Q.  What happens when information in REJIS
11   is not accurate?
12       MR. HUGHES:  Just object to the form of
13   the question.  It's way overbroad.
14       MR. FLOJO:  I'll join.  Speculation
15   too.
16       BY MR. HOLLAND:
17       Q.  Have you ever been aware of a situation
18   where information within a wanted entry in REJIS is
19   inaccurate?
20       A.  No.
21       Q.  And you're not saying there's never
22   been an instance where there's been inaccurate
23   information; you're just saying you yourself aren't
24   aware?
25       A.  That is correct.

Page 27

1        MR. HUGHES:  Just object.
2    Argumentative.
3    BY MR. HOLLAND:
4        Q.  What information should be in a wanted
5    entry within REJIS to make it complete?
6        A.  What are required fields for entry?
7        Q.  Correct.
8        A.  Last name, first name, race, sex, date
9    of birth or age, height, weight, eye color, hair
10   color is the pedigree information, and then the
11   charge -- I've got to go down the screen.
12       The charge, the court ORI -- the
13   charge, not the court ORI, the date of offense, and
14   the extradition.
15       Q.  You mentioned court ORI.  What is that?
16       A.  Court ORI is the court, if it is a
17   warrant, the court that issued the warrant.
18       Q.  So that would be an added requirement
19   if it was a warrant entry?
20       A.  Correct.
21       Q.  And if the officer doesn't have all of
22   that information just listed, can the wanted still
23   be entered if he doesn't know his last name or
24   knows his first name or doesn't know his exact
25   height?  Do they guess or can the wanted be issued

Page 28

1    without some of that information?
2        A.  It's really two questions.  The first
3    question, you said was the name.
4        Q.  My main question is can it be -- can a
5    wanted really be issued with less than all of that
6    information?
7        A.  No.
8        Q.  And once a wanted is entered into the
9    system -- excuse me -- how long can it remain in the
10   system, in REJIS?
11       A.  That depends on the severity of the
12   offense.
13       Q.  Can you explain that?
14       A.  If it's a felony versus a misdemeanor
15   versus a warrant -- excuse me -- ordinance, the
16   length of stay in the system changes.
17       Q.  Can you tell me how long the length is
18   for each level of offense?  If you don't know, you
19   don't know.
20       A.  No.
21       Q.  That's fair.  I don't want you to guess
22   today.
23       A.  No.
24       Q.  That's fair.  But wanteds can remain --
25   withdrawn.

7 (Pages 25 to 28)

**CINDY JENNINGS  3/30/2017**

Page 29

1    **Are you familiar with temporary**
2    **wanteds?**
3    A.  No.
4    **Q.  Are you familiar with how long other**
5    **systems such as MULES or NCIC allow wanteds to be**
6    **kept in their systems?**
7    A.  Wanteds?
8    **Q.  Or stop orders.**
9    MR. HUGHES:  Yeah.  Just object.  It
10   assumes facts not in evidence that calls for
11   speculation and conjecture.
12   MR. HOLLAND:  I'm just asking her about
13   her knowledge of these other systems.
14   **Q.  Are you familiar with MULES?**
15   A.  Yes.
16   **Q.  Are you familiar with the fact that**
17   **MULES has entries comparable to wanteds?**
18   A.  Yes.
19   MR. HUGHES:  Same objection.
20   BY MR. HOLLAND:
21   **Q.  Are you familiar with how long an entry**
22   **like that can remain in MULES?**
23   A.  Yes.
24   **Q.  How long?**
25   A.  I can't recite them all to you off the

Page 30

1    top of my head going down from -- it varies between
2    warrant, wanted, stop order, temporary warrants.
3    That all changes based on the type of entry and the
4    severity of the charge.
5    **Q.  All right.  I'll come back to that**
6    **later and maybe we'll have a document that we can**
7    **have some more certainty on.  That will be helpful,**
8    **I think.**
9    **Do you train -- do you provide any**
10   **training on why to use REJIS instead of MULES or**
11   **NCIC in any particular situation?**
12   A.  I explain the differences between all
13   three systems and what one does versus another.
14   **Q.  And you do that training in the courses**
15   **taken by police officers?**
16   A.  Yes.
17   **Q.  Do you train them -- withdrawn.**
18   **So I assume you've been asked the**
19   **question, "Why should I use REJIS instead of using**
20   **MULES?"**
21   A.  Yes.
22   **Q.  What would be your answer to that**
23   **question?**
24   A.  REJIS provides the ability to enter
25   local information that does not qualify for the

Page 31

1    state or national files.
2    **Q.  What does it mean not to qualify for**
3    **the state or national files?**
4    A.  Meaning that when they enter
5    information into our system we have files that do
6    not meet the criteria nor exist in those other
7    systems.
8    **Q.  What type of files?**
9    A.  Arrest would be -- a local arrest
10   record would be only in REJIS.  That doesn't get
11   sent to the state.  Our arrest file stays locally.
12   **Q.  Why wouldn't the state -- if there's a**
13   **wanted, why wouldn't statewide be interested in**
14   **those local files, if you know?**
15   A.  Ask me one more time, please.
16   **Q.  Sure.  So if you enter -- if you're**
17   **using REJIS it has local files that if you're using**
18   **MULES you just can't access.  So if there's an**
19   **individual who's wanted, why wouldn't the statewide**
20   **jurisdictions, police departments be interested in**
21   **those -- access to those files, if you know?**
22   MR. HUGHES:  My objection, calls for
23   speculation and conjecture.
24   MR. FLOJO:  I'll join.
25   BY MR. HOLLAND:

Page 32

1    **Q.  You can answer.**
2    A.  They got me -- lost your question.
3    **Q.  That's okay.  I'm just trying to wrap**
4    **my head around you have these three systems that**
5    **kind of overlap in ways.  Officers use one in**
6    **certain scenarios, one in another scenario.  I'm --**
7    **you train them on this issue.**
8    **So I'm just trying to learn from you**
9    **why would they use one system over the other and why**
10   **would users of one system, MULES, not want or need**
11   **access to the same files that a user of REJIS would**
12   **have.**
13   MR. FLOJO:  Same objection.
14   THE WITNESS:  The local -- if the
15   person is wanted on a local offense, the state does
16   not want those records in their system.  The
17   severity level.  So you have local ordinances,
18   misdemeanors, and felonies.  So if I'm wanted on a
19   local offense, that department would choose not to
20   go outside a particular area, so that would mean the
21   record would be in REJIS only.
22   BY MR. HOLLAND:
23   **Q.  Is another benefit of using REJIS**
24   **over -- "benefit" was the wrong word.**
25   **Is another reason that an officer might**

8 (Pages 29 to 32)

CINDY JENNINGS  3/30/2017

Page 33

1  use REJIS over MULES because their wanted can remain
2  in the system longer?
3       A.  I can't answer that for them.
4       Q.  Okay.  Let's talk a little bit more
5  about your training role as the training supervisor.
6  You've already said you lead trainings.  The other
7  four that are underneath you, is it just you five
8  who lead the trainings that you've discussed today?
9       A.  Yes.
10      Q.  What qualifications does one need to
11  become a REJIS trainer?
12      A.  A degree or comparable experience, high
13  school diploma.  That's it.
14      Q.  You said "a degree or comparable
15  experience."  What does that mean?  A degree in
16  what?
17      A.  In -- basically a degree.
18      Q.  Such as your degree in business
19  secretarial -- is that what your degree is?
20      A.  Yes.  Mine is comparable service.
21      Q.  Understood.  What do you do to prepare
22  for any training?
23      A.  Before I go into the classroom, I
24  review all my materials, make sure that I have my
25  attendance sheets, et cetera, ready to go.

Page 34

1       Q.  Are the materials the same as you may
2  have used for a prior training, or do you work -- do
3  you develop the materials that are then used in that
4  training?
5       A.  If it's a new system, then they're
6  developed.  If it's the previous classes we've been
7  teaching all along, I just check to make sure all my
8  material is updated.
9       Q.  If it's a new training, about how much
10  time do you spend reviewing the materials before
11  going in and teaching the course?
12      A.  Oh, a new class?  Months.
13      Q.  Yourself, months on a day-to-day basis
14  learning the material?
15      A.  Yeah, testing the system, walking
16  through it, yes.
17      Q.  How long -- or excuse me.  Withdrawn.
18      How is it determined who might lead any
19  training?  Is there a rotation?
20      A.  Yes, we have three people that are
21  assigned to law enforcement and two people that are
22  assigned to court, so they would normally -- they
23  are participating in the law enforcement courses and
24  the development of those courses and then the others
25  would be in the court area.

Page 35

1       Q.  Who are the three who are on the law
2  enforcement team?
3       A.  Myself, Karen Karl, and Brian Willman.
4       Q.  And among you three, is there any
5  specialization or do you just have a rotation of who
6  teaches which courses?
7       A.  We rotate.
8       Q.  Are these trainings recorded on video
9  or audio?
10      A.  We do not record them.
11      Q.  Can you tell me what these trainings
12  are like?  Where do they take place?  About how
13  long?
14      A.  The courses are all -- on the St. Louis
15  side would be from 9:00 to 4:00, and then on the
16  Kansas City side, 8:30 to 3:30.  Depending on the
17  course itself, it can go from one day to two days.
18      Q.  I assume you don't train the entire
19  police department at once, so how is it determined
20  who takes, from the other side -- about how many
21  officers at once are in the course?
22      A.  Our classroom holds 18.  But if we're
23  using like the county academy or the city academy,
24  then they have more seats available, so you would do
25  25.  Kansas City is 38 seats.

Page 36

1       Q.  Now, do those 18 to 38 take the course
2  and then you go back and train those others who
3  weren't able to attend, or do they just -- you train
4  them in installments?
5       A.  Both.
6       Q.  Does it depend on which course?
7       A.  No.
8       Q.  So then can you explain how both would
9  apply to the answer to my question?
10      A.  The agency can do their own training or
11  they can send them to class.  So if they choose --
12  you have to have -- once you receive your ID, you
13  have six months to become certified.  Certification
14  would occur through training or on-job service and
15  testing.
16      Q.  And what does it take to become a
17  certified REJIS user?
18      A.  That would depend on your level that
19  you are -- your security is set to.
20      Q.  Let's focus on the level 27.
21      A.  Level 27 would be two-day course.
22      Q.  Just take the course and then you're
23  certified?
24      A.  The course and then the test.
25      Q.  Can you tell me a little bit about the

9 (Pages 33 to 36)

**CINDY JENNINGS  3/30/2017**

Page 37

1  test?
2  A.  Online test, varying degree of number
3  of questions based on the course.
4  Q.  All right.  We'll talk about that in a
5  minute, but why don't we just focus on the two-day
6  course itself.  What topics are covered?
7  A.  Which two-day course?
8  Q.  So the two-day course that would then
9  lead to a level 27 certification.
10  A.  Okay.  That would be a basic REJIS
11  introduction.  That would be followed by the hot
12  file and then Department of Revenue and inlets
13  driver history and vehicle registrations.
14  Q.  Anything else?
15  A.  No.
16  Q.  And then the exam would be on a
17  separate day?
18  A.  Same day at the end -- end of day two.
19  Q.  About how many questions are on that
20  test?
21  A.  I believe 30.
22  Q.  Mr. Meschke told us that your staff is
23  responsible for drafting the questions of that exam;
24  is that right?
25  A.  That is correct.

Page 38

1  Q.  How do you come up with the questions?
2  A.  Looking at the material, determining
3  what are the most important points that we want them
4  to realize going out of that course.
5  Q.  Has the exam changed at all since
6  you've been the training supervisor the last ten
7  years?
8  A.  Yes.
9  Q.  About how many times has it changed?
10  A.  Well, we went from paper to automated
11  and then it's a bank of questions and always
12  changing the questions.
13  Q.  So each year, or maybe after each
14  course, you do, you know, a review, maybe the manual
15  has been updated and maybe you look at the answers
16  of the officers and you kind of focus in on, you
17  know, what other questions might be, you know,
18  necessary; is that fair?
19  A.  Correct, that's fair.
20  Q.  Do you keep copies of each of these
21  tests?
22  A.  Yes.
23  Q.  Is that something we would be able to
24  look at?
25  A.  They're automated online.  They're

Page 39

1  stored for two years.
2  MR. HOLLAND:  Ray, I would ask if we
3  could, you know, see a copy of the exams that have
4  been provided over the last couple of years.
5  MR. FLOJO:  I'll discuss that with my
6  witness and REJIS.
7  BY MR. HOLLAND:
8  Q.  So just so I understand the
9  certification process, the officers take this
10  two-day course and if they pass the test they then
11  have level 27 access to REJIS; is that fair?
12  A.  Once they have the user ID, yes.
13  Q.  What if there are updates to REJIS
14  thereafter, do they have to recertify after any
15  period of time to, you know, take another test to
16  see -- to see if they're still qualified?
17  A.  Every two years.
18  Q.  Each REJIS user every two years has to
19  take the exam -- a new exam and recertify; is that
20  correct?
21  A.  That is correct.
22  Q.  What percentage, if any, of the
23  officers do not pass the -- the exam on their first
24  try?
25  A.  I don't know the number.

Page 40

1  Q.  Would you say that more pass the test
2  than fail?
3  A.  Yes.
4  Q.  Do you know if there's a test to access
5  MULES or NCIC?
6  A.  Repeat that, please.
7  Q.  Do you know if there's a similar or --
8  I don't want to say "similar."  I don't want to
9  characterize it.  Do you know if there is a test
10  that officers must take in order to access MULES or
11  NCIC?
12  MR. HUGHES:  Objection.  Calls for
13  speculation and conjecture.
14  THE WITNESS:  MULES, yes.
15  BY MR. HOLLAND:
16  Q.  Have you seen that test?
17  A.  Yes.
18  Q.  Did it in any way inform how -- the
19  questions you drafted for the REJIS test?
20  A.  No.
21  Q.  Would you say it's comparable to the
22  tests that you drafted for REJIS users?
23  A.  Yes.
24  Q.  Same amount of questions?
25  A.  I don't remember.

10 (Pages 37 to 40)

**CINDY JENNINGS  3/30/2017**

Page 41

1      Q.  So during this two-day test, about how
2  much time is spent on wanteds?
3      A.  Two-day class.
4      Q.  Sorry, I misspoke.  Withdrawn.
5          During this two-day course, about how
6  much time is spent on wanteds?
7      A.  Could you be more specific what you
8  mean by that?
9      Q.  So we've talked a little bit this
10  morning about the entries you can use within the
11  REJIS system, correct?
12      A.  Correct.
13      Q.  One of those entries is wanteds?
14      A.  Correct.
15      Q.  How much of the training course to
16  police officers to gain level 27 access is spent on
17  wanteds?
18      A.  I don't know the time but we go through
19  every single file that they would get as a response
20  and what each of those files, the information being
21  returned means.
22      Q.  So is this training -- as it relates to
23  wanteds, is it more of technical in terms of the
24  logistics and how to enter information, what
25  information is needed to get that wanted sent out?

Page 42

1      A.  Not at all.
2      Q.  So then can you explain to me --
3  explain to me what you teach these officers about
4  wanteds.
5      A.  You teach them how to read the records.
6  What data you input, what is being returned, and
7  what is being returned you go through field by field
8  explaining to them what those fields are and how to
9  read those records.
10      Q.  Do you train them on what information
11  will be needed when they're calling into a clerk or
12  REJIS operator about what they want added to the
13  wanted entry?
14      A.  Not in that course.
15      Q.  Is there another course where that
16  comes up?
17      A.  It would be in the entry course as to
18  what's required.
19      Q.  Is the entry course part of that
20  two-day course that we've been discussing or is that
21  separate?
22      A.  Separate.
23      Q.  When does that happen?  As it relates
24  to that two-day course, does it happen before or
25  does it happen then after they've gained access and

Page 43

1  been certified?
2      A.  It happens after, and it would again be
3  based on their certification level.  What has their
4  agency given them with regard to their security.
5      Q.  So let me just see if I'm understanding
6  you.  There's a -- to gain level 27 access, officers
7  take a two-day course followed by an exam.  During
8  that two-day course some amount of time is spent on
9  wanteds but more about how to understand the
10  information they're reading in each of the entries
11  that are a part of that wanted; is that correct?
12      A.  Part of the response.
13      Q.  Part of the response.
14      A.  Responses.
15      Q.  Responses.  The information in the
16  wanted?
17      A.  Is one of them.
18      Q.  And then they pass the exam, they're
19  certified, they're given a user ID, and then they
20  have access to REJIS and at that point there's a
21  separate course; is that right?
22      A.  No.
23      Q.  An intro course you said?
24      A.  No.
25      Q.  Well, then I'm confused, so please

Page 44

1  explain it to me.
2      A.  Once -- once -- if they are assigned --
3  if I am given -- my agency fills out an operator
4  identification form.  I'm a new officer, level 27.
5  They complete the form.  We create their user ID.
6  If it is a new course, a recruit class that I'm
7  teaching, I will go to the academy, one of the three
8  academies, and I will teach the two-day course.
9          At that point in time they are done,
10  they are certified.  I might see them again in two
11  years or I might never see them again because
12  they'll just test online.
13      Q.  You mentioned this separate
14  introductory course.  That's what I'm wondering what
15  that is.
16      A.  That's -- the REJIS introduction is a
17  one-day course that is added to that level 27.  It's
18  part of their course or it's taught separately.
19  That's going to depend on what other courses you're
20  taking.
21          So if I'm, for example, a level 2
22  operator, I'm going to take seven different courses,
23  one of which is the REJIS introduction, one might be
24  an inquiry, one would be an entry, et cetera.
25      Q.  Okay.  And within that introductory

11 (Pages 41 to 44)

**CINDY JENNINGS  3/30/2017**

Page 45

1 course, there's a section about the information
2 needed to have a wanted entered; is that correct?
3     A.   We explain each of the law enforcement
4 files, what information is contained in that file,
5 and, yes, they may ask me what is -- what fields you
6 have, but I don't specifically say, "If you're going
7 to create a wanted record, put these fields in."
8     Q.   Do you train officers on when it is
9 appropriate to seek a wanted?
10     A.   No, I do not.
11     Q.   If REJIS does not train officers on
12 when it is appropriate to seek a wanted, how does
13 REJIS know what fields are appropriate for a wanted
14 entry?
15     A.   That's in the database design.
16     Q.   Who designed the database?
17     A.   Our programming staff.
18     Q.   Where would they learn which fields are
19 appropriate to include?
20     A.   That would be from the agencies because
21 we have committees or user groups that we work with.
22     Q.   So the police department tells REJIS
23 what fields it needs for its wanted entries, your
24 programmers create that, and then the officers come
25 back and -- from The Police Academy training would

Page 46

1 know what information to provide to complete the
2 fields that then result in a wanted; is that fair?
3           MR. HUGHES:  My only objection to the
4 question is you said police department singular, and
5 she just said agencies plural.
6           BY MR. HOLLAND:
7     Q.   Yes, I was speaking each police
8 department tells you which -- that's fair.  Police
9 departments tell you which -- withdrawn.
10           So police departments tell REJIS which
11 fields are needed for a wanted entry, REJIS program
12 development creates that database, and then officers
13 come back and know which information to provide in
14 order to complete a wanted entry; is that fair?
15     A.   They do not tell us put this field and
16 this field on every screen that we create for them.
17 So we have what we call user groups that participate
18 that we discuss if we're going to create a new
19 application what elements do they want in that
20 application.
21     Q.   Who is -- who's on these user groups?
22     A.   It varies based on the application that
23 we're designing.
24     Q.   Representatives from each of the
25 agencies would be on these user groups?

Page 47

1     A.   Not every single agency that uses
2 REJIS, no.
3     Q.   Representatives from the St. Louis
4 County Police Department?
5     A.   Depending on the application, yes.
6     Q.   Which application would they be on a
7 user group for?
8     A.   I don't know specific ones they were
9 on.  I know that they participated in like our hot
10 files.
11     Q.   Can you just give me an explanation of
12 hot files?
13     A.   Hot files are what we consider
14 information that the officer is going to get when
15 they pull over a vehicle.  Is the person wanted?  Is
16 the vehicle stolen?  Is the person missing?  Is the
17 vehicle wanted or stolen?  It's ...
18     Q.   Can you give me an idea of have you
19 attended these user groups?
20     A.   Yes.
21     Q.   Can you give me an idea of typical
22 discussion within a user group relating to the
23 wanted application?
24     A.   No, I can't.
25     Q.   How often do those user group meetings

Page 48

1 happen?
2     A.   Depends on the application.  I mean, we
3 have a quarterly TAC meeting which is all our
4 Terminal Agency Coordinators where we talk about new
5 changes that are coming up, so all of our agencies
6 are invited to those.
7           We also have specific focus groups
8 where we bring people in that are knowledgeable in
9 that area.  If I'm making a change to my gang file,
10 I want gang officers to be a part of that
11 discussion.
12     Q.   You mentioned TAC, which I was going to
13 ask you about.  Terminal Agency Coordinator meetings
14 occur; is that correct?
15     A.   Correct.
16     Q.   Who attends -- a representative from
17 each agency attends those meetings?
18     A.   Not every meeting but they're required
19 to attend at least two meetings.
20     Q.   Can you tell me who the representative
21 from St. Louis County's Police Department --
22 withdrawn.
23           Can you tell me who the representative
24 on TAC was over the past five years from the
25 St. Louis County Police Department?

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**CINDY JENNINGS  3/30/2017**

Page 49

1        A.   Lieutenant Jeff Burk.
2        Q.   **What was the purpose of these meetings?**
3        A.   Our TAC meetings are to inform our
4    clients of system changes, new systems that we're
5    going to introduce, covering things that have
6    changed -- system changes since the last meeting,
7    and anything outside of the REJIS area, for example,
8    what's changed in MULES and NCIC that would also
9    affect them.
10       Q.   **How do you learn about the changes from**
11   **MULES and NCIC so that you're able to inform your**
12   **clients?**
13       A.   MULES would post it on their website,
14   their next test launch pad.  We also are in
15   communications with the MULES trainers.  And then
16   NCIC sends out a technical and operational update
17   and we get those.
18       Q.   **Is it someone's job at REJIS to monitor**
19   **these websites and postings?**
20       A.   All of the trainers' responsibilities.
21       Q.   **You said you coordinate with trainers**
22   **at MULES.  What does that entail?  Do you meet with**
23   **them on a regular basis?**
24       A.   Regular, we attend their TAC meetings.
25   They also have a TAC meeting and we attend -- they

Page 50

1    have those twice a year, and we attend those.  And
2    then anytime something is changing in their system,
3    they will usually email us and say, "We are making a
4    change to our system, wanted to make you aware of
5    it," and then we talk to them about that change.
6        Q.   **And at the MULES TAC meetings, do**
7    **representatives from agencies attend as well?**
8        A.   Yes.
9        Q.   **Was Lieutenant Burk the representative**
10   **from St. Louis County for those meetings as well?**
11       A.   Yes.
12       Q.   **You said those occurred twice a year.**
13   **How often were the REJIS TAC meetings?  Did you say**
14   **quarterly?**
15       A.   Quarterly.
16       Q.   **Are you familiar with St. Louis County**
17   **Police Department's general orders or policies on**
18   **wanteds and other teletypes?**
19       A.   No, I'm not.
20       Q.   **Do you -- strike that.**
21            **Let's take a look at some materials**
22   **that I understand REJIS created.  This has**
23   **previously been marked as Gomez Exhibit 3.**
24            **(Previously marked Exhibit**
25            **Gomez 3 was shown to the**

Page 51

1            witness.)
2    BY MR. HOLLAND:
3        Q.   **Are you familiar with this document?**
4        A.   I am.
5        Q.   **How so?**
6        A.   My unit created it.
7        Q.   **Do you know when you created it?**
8        A.   I do not.
9        Q.   **You said your unit.  Were you**
10   **personally involved in drafting this document?**
11       A.   My senior trainer actually developed
12   the document.
13       Q.   **Who is that?**
14       A.   Karen Karl.
15       Q.   **And you said you don't know when it was**
16   **drafted?**
17       A.   There's no date on this.  I don't know.
18       Q.   **That's why I asked.  Do you know if**
19   **it's been updated since -- well, strike that.**
20            **Has this been in existence for the past**
21   **five years?**
22       A.   Yes.
23       Q.   **Ten years?**
24       A.   No.  This document you're having me
25   look at?

Page 52

1        Q.   **Correct.**
2        A.   No, it has not.
3        Q.   **So this was created sometime in the**
4    **period after you became the training supervisor?**
5        A.   Correct.
6        Q.   **Do you know if it's been updated in**
7    **that time?**
8        A.   Yes.
9        Q.   **About how many times, if you know?**
10       A.   I don't know.
11       Q.   **How does your unit use this document?**
12       A.   This is part of what we give out in our
13   wanted entry class.  And it's published on our
14   extranet site.
15       Q.   **You just said "wanted entry class."**
16       A.   Uh-huh.
17       Q.   **Is that different than what we've**
18   **discussed -- the classes we've discussed already?**
19       A.   Different from the level 27?
20       Q.   **Correct.**
21       A.   Yes.
22       Q.   **Can you tell me about the wanted entry**
23   **class.**
24       A.   Wanted entry class is a single-day
25   class where we cover the entry of wanted and missing

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com        Phone: 1.800.280.3376        Fax: 314.644.1334

**CINDY JENNINGS  3/30/2017**

Page 53

1    persons.
2        **Q.  Who takes that course?**
3        A.  Anyone that has access to wanted or
4    missing entries.
5        **Q.  What level access would they have?**
6        A.  That varies.
7        **Q.  Level 27?**
8        A.  No.
9        **Q.  So level 27 access you would not take a**
10   **course where this is discussed?**
11       **Q.  This document?**
12       **Q.  Gomez Exhibit 3.**
13       A.  No.
14       **Q.  Level 2 access you would?**
15       A.  Yes.
16       **Q.  Now, the CARE operators, are they**
17   **level 2?**
18       A.  CARE operators are level 55.
19       **Q.  What is level 55 access?**
20       A.  55 is they do not do arrest entry.  So
21   it's all inquiries and entries except arrests.
22       **Q.  So it would be all of these entries?**
23       A.  That is correct.
24       **Q.  And by "these," I'm talking about**
25   **warrant records, temporary wanted records, wanted**

Page 54

1    **records, person of interest records, contact and**
2    **advise records?**
3        A.  Correct.
4        **Q.  Was this document discussed at any of**
5    **the TAC meetings that you attended?**
6        A.  Yes.
7        **Q.  How so?**
8        A.  This was presented at the TAC meeting
9    when changes were made from going from stop orders
10   to persons of interest to adding a contact and
11   advise.
12       **Q.  Who was involved in making those**
13   **decisions?**
14       A.  Making the decisions about?
15       **Q.  Sorry, I spoke over you.  You've been**
16   **great today.  You haven't done it once.  Go ahead,**
17   **I'm sorry.**
18       A.  Making the decisions about?
19       **Q.  The changes you just mentioned, going**
20   **from stop order to person of interest, for example.**
21       A.  Who made those changes?
22       **Q.  Correct.  Who made those decisions?**
23       A.  To change the document?
24       **Q.  Correct.**
25       A.  I did.

Page 55

1        **Q.  I guess the document is changed because**
2    **a decision has been made to change the designation;**
3    **is that fair?**
4        A.  That's fair.
5        **Q.  So I guess I'm more interested in who**
6    **made that decision, if you know.**
7        A.  To change from adding like contact and
8    advise?
9        **Q.  Correct.**
10       A.  That contact and advise was based on a
11   decision by our Law Enforcement Policy Advisory
12   Committee that we were going to add a contact and
13   advise category.  So once that change comes down,
14   our programming staff makes the change, I update the
15   documentation or Karen updates the documentation to
16   correspond with that change.
17       **Q.  You said, "Law Enforcement Policy**
18   **Advisory Committee."  Is that also referred to as**
19   **LEPAC?**
20       A.  Correct.
21       **Q.  I'll ask you some questions about that**
22   **a little later.**
23           At the TAC meeting, what would the
24   changes -- would this document and any changes
25   thereto be discussed after LEPAC has made certain

Page 56

1    recommendations?  I'm just trying to understand
2    what's discussed at these TAC meetings -- strike
3    that.  I'll move on.
4            Do you then use this document during
5    your trainings?
6        A.  Yes.
7        **Q.  During the wanted entry class, what do**
8    **you -- what do you -- how do you use this during**
9    **those trainings?**
10       A.  This is a document to support -- to
11   help the client understand what's required, what's
12   the differences between them.  It's a little
13   complicated, so it helps them kind of -- another
14   tool that we use to help them clarify what's the
15   difference between each one, where does it go, how
16   does it affect them.
17       **Q.  Is it fair to say this is a tool for**
18   **the officers to know which interface to use in**
19   **certain -- in various circumstances they encounter?**
20       A.  A tool for the officers?
21       **Q.  Yes, or is it fair to -- strike that.**
22           **Is it fair to say that this document is**
23   **a tool for users of REJIS to know which interface to**
24   **use in a certain situation?**
25       A.  Yes, it could help them.

14 (Pages 53 to 56)

**CINDY JENNINGS 3/30/2017**

Page 57

1      Q.  Is it fair to say that the -- that
2   REJIS is the only interface that you can use in each
3   of these five scenarios?
4      A.  No.
5      Q.  If we look at the document, so you
6   have -- I have five scenarios.  I'm saying warrant
7   record, temporary wanted, wanted, person of
8   interest, contact and advise.
9          Am I correct that REJIS is the only
10  interface listed in the far-right column for each of
11  those entries?
12     A.  No, REJIS is not the only interface.
13     Q.  For all five.
14     A.  For all five, yes.
15     Q.  Would you agree that the only
16  difference between a warrant record and a wanted is
17  that a warrant record is court issued and a wanted
18  is police issued?
19     A.  Yes.
20     Q.  So is it fair to say that NCIC and
21  MULES allow for a temporary wanted that does not
22  have court authority but views anything beyond
23  temporary as unnecessary because of the warrant
24  requirement?
25     A.  That's incorrect.

Page 58

1      Q.  How so?
2      A.  Persons of interest.
3      Q.  I'm focusing on wanteds, so let's leave
4   person of interest and contact and advise out.  So
5   you have -- the top three are warrant, temporary
6   wanted, and wanted.
7      A.  Okay.
8      Q.  The first two MULES and NCIC allow
9   those entries, but the third, a straight wanted,
10  only REJIS allows; is that correct?
11     A.  Correct, using the term or file name
12  "wanted," yes.
13     Q.  Correct.  So MULES and NCIC allow a
14  file named "temporary wanted," "wanted," for only 48
15  hours; is that correct?
16     A.  NCIC only.  That's not correct for
17  MULES.
18     Q.  How so?
19     A.  MULES is a year -- they don't have --
20  let me back up, please.
21         MULES does not have a temporary wanted
22  file.  That is an NCIC file.  The record would be
23  created, based on the client, would it be a
24  REJIS-created record or would a MULES agency create
25  the record?

Page 59

1          If a REJIS agency created the temporary
2   wanted, it would go to MULES and NCIC based on the
3   charge and checking the flag.  I cannot speak on how
4   a MULES agency creates the record, but it's not
5   stored in the MULES system.  They're stored -- I
6   should say passed through to NCIC.
7      Q.  So what's the difference between a
8   temporary wanted record and a wanted record then?
9      A.  A temporary wanted is going to be based
10  on the severity of the charge and the extradition
11  that the agency chooses to use.
12     Q.  If the only difference between a wanted
13  and a warrant record is court issued versus police
14  issued, what's -- what's -- again, what's the
15  purpose of a wanted?  Why wouldn't you just -- why
16  wouldn't the officer go get a warrant?
17         MR. HUGHES:  Objection.  Calls for
18  speculation and conjecture.  Improper foundation.
19  Argumentative.
20         BY MR. HOLLAND:
21     Q.  I'll withdraw the question.
22         What is REJIS's purpose for providing a
23  wanted option if there's also the warrant option?
24     A.  Our purpose is to allow the agencies to
25  create records based on their policy or procedures.

Page 60

1      Q.  So from REJIS's perspective there's a
2   wanted and a warrant record option because the
3   police agencies ask you to have those options
4   available?
5      A.  Correct.
6      Q.  Have you ever heard that wanteds enable
7   officers to circumvent the warrant requirement?
8      A.  No.
9      Q.  Do you agree with that statement?
10         MR. HUGHES:  Objection.  Argumentative.
11         MR. HOLLAND:  If you know.
12         THE WITNESS:  I don't.
13         BY MR. HOLLAND:
14     Q.  You can put that aside.
15         Let's take a look at a few other
16  documents that I think you'll be familiar with.  I'm
17  handing you what have previously been marked Gomez
18  Exhibit 16, 17, and 18.
19         (Previously marked Exhibits
20         Gomez 16-18 were shown to the
21         witness.)
22         BY MR. HOLLAND:
23     Q.  There you go.
24     A.  Thank you.
25     Q.  Are you familiar with these documents?

15 (Pages 57 to 60)

CINDY JENNINGS  3/30/2017

Page 61

1    A.  I am.
2        Q.  **More familiar than you'd like to be?**
3    **How are you familiar with these documents?**
4        A.  These are the documents that we use to
5    train wanted entry -- wanted missing person entries.
6        Q.  **So these are the materials used during**
7    **that wanted entry class that you just mentioned?**
8        A.  Correct.
9        Q.  **Did you draft these documents?**
10       A.  I did not.
11       Q.  **Do you know who did?**
12       A.  I do.
13       Q.  **Who is that?**
14       A.  Karen Karl.
15       Q.  **That's your senior trainer?**
16       A.  That is.
17       Q.  **Is she responsible for initially**
18   **drafting these and any updates thereafter?**
19       A.  She's responsible for drafting those
20   documents.
21       Q.  **Have there been updates since she**
22   **drafted them?**
23       A.  Yes.
24       Q.  **When did Karen first draft these**
25   **documents?**

Page 62

1        A.  I don't know the specific date.
2        Q.  **Since you've become training**
3    **supervisor?**
4        A.  Oh, yes.
5        Q.  **Within the past five years?**
6        A.  Yes.
7        Q.  **So the three documents I handed you**
8    **have three separate dates.  If you look -- I don't**
9    **think it's on the cover, but if you turn the page in**
10   **the legend on the bottom, I believe Gomez Exhibit 17**
11   **updated 7/2014; do you see that?**
12       A.  I do.
13       Q.  **Gomez Exhibit 16, updated January 2016;**
14   **do you see that?**
15       A.  I do.
16       Q.  **And Gomez Exhibit 18, updated**
17   **January 2017, so earlier this year; do you see that?**
18       A.  Yes, I do.
19       Q.  **Other than these three versions are you**
20   **aware of any others?**
21       A.  There could be.
22       Q.  **Do you say that because the Gomez 17**
23   **updated 7/2014 suggests that a previous version**
24   **existed?**
25       A.  Yes.

Page 63

1        Q.  **Do you know when the previous version**
2    **would have been drafted?**
3        A.  Not off the top of my head, I don't.
4        Q.  **If it exists do you think you still**
5    **have it?**
6        A.  I don't know.
7        Q.  **Okay.**
8        A.  I can't guarantee that.
9        Q.  **That's fair.**
10           Let's take a look at -- well, strike
11   that.
12           Why don't you tell me how you use these
13   documents during your trainings during the wanted
14   entry class.  Do you walk through page by page or do
15   you just kind of hand the document out and give them
16   an overview?
17       A.  The document gets handed out.  When I
18   teach it, I do not teach page by page.  I teach from
19   my experience in going through -- I use this as a
20   reference guide, point out to the students where
21   they need to go to make their notes, et cetera, but,
22   no, I don't read line by line, page by page.
23       Q.  **And just to reclarify, the officers who**
24   **would have level 27 access do not take these**
25   **courses?**

Page 64

1        A.  Correct.  This course.
2        Q.  **This course.  Excuse me.  But the CARE**
3    **operators who are entering the information, they**
4    **would take this course?**
5        A.  They could take the course.
6        Q.  **Could.  Okay.**
7            Who -- who's required to take the
8    wanted entry class, if anyone?
9        A.  No one is required to.
10       Q.  **Who makes the decision on whether they**
11   **take the course or not?**
12       A.  Their agency.
13       Q.  **Is it fair to say that these manuals**
14   **are used for training people on how to use a system**
15   **that has legal ramifications such as inputting**
16   **information that could in and of itself lead to an**
17   **arrest?**
18       A.  Just repeat it one more time, please.
19       Q.  **Is it fair to say that these manuals**
20   **are used to train people on how to use a system that**
21   **has legal ramifications such as inputting**
22   **information that could itself lead to a person's**
23   **arrest?**
24       A.  That's correct.
25       Q.  **With that in mind, do you know if any**

16 (Pages 61 to 64)

**CINDY JENNINGS  3/30/2017**

Page 65

1  lawyers were involved in drafting these materials?
2      A.  They were not.
3      Q.  Did you --
4      A.  In our training material?
5      Q.  Correct.
6          Did you or Karen or any of your
7  other -- or anyone else at REJIS, were you advised
8  by any counsel about the ramifications of a wanted?
9      A.  No, we were not.
10     Q.  Do any of the -- let me strike that.
11         Does the wanted entry course include
12  any training on probable cause?
13     A.  I don't know what you mean by "training
14  on probable cause."
15     Q.  Training on, you know, what amounts to
16  probable cause?
17     A.  No.
18     Q.  Is there reference -- your question
19  sparked something in me.  Is there references in
20  other ways to probable cause other than what it is?
21     A.  We would say -- if they're training,
22  someone would say a wanted is based on probable
23  cause or questioning.  Could be a statement that you
24  would make in that course.
25     Q.  So it's mentioned in the course as a

Page 66

1  factor of a wanted, requirement of a wanted, but not
2  what it is; is that fair?
3      A.  Fair.
4      Q.  And that's because you as trainers
5  don't have any legal background, so you're not
6  qualified to make that determination or teach on it;
7  is that fair?
8      A.  I have no legal background, correct.
9      Q.  Let's take a look at page 4 of each of
10  these documents.  Let's start with Gomez Exhibit 16.
11         So this is the updated January 2016
12  version, page 4.  At the top there it says "Wanted
13  vs. Warrant - What's the difference?"  Do you see
14  that?
15     A.  Yes.
16     Q.  Is that something you cover in this
17  wanted entry class?
18     A.  Yes.
19     Q.  And then the first record type listed
20  there is wanted.  And it says, "Subject is wanted
21  for questioning.  There is no warrant associated
22  with the record.  The law enforcement officer
23  entering the wanted information must have probable
24  cause to believe that the person committed the crime
25  prior to entering a REJIS wanted on that person."

Page 67

1          Did I read that correctly?
2      A.  You did.
3      Q.  And if we turn to Gomez Exhibit 18
4  which is the January 2017 version, and that's the
5  current version, correct?  You're not aware of
6  anything updating within the past two months?
7      A.  Yes, I mean, this document has had one
8  listed multiple times, and I don't think this is --
9      Q.  Correct.
10     A.  No, this is not a good --
11     Q.  Are you looking at Gomez Exhibit 18?
12     A.  I am, sir.
13     Q.  So on the bottom there we've added --
14  so this was a document that Mr. Flojo provided us,
15  and on the bottom we've added Bates stamps DEF-SUPP;
16  do you see that?
17     A.  Yes, I do.
18     Q.  So those are just identifiers so we can
19  all be on the same page in case pagination is either
20  missing or confusing.  So if you go to the bottom of
21  where it says -- ends in 91 on the bottom right, I
22  think it's the next page.  And you said that this is
23  the current version?
24     A.  I said it was not because if I'm
25  looking at this, our page number goes 567911, so

Page 68

1  this is not -- I would say this is not the current
2  document.  It's page 1 multiple times.
3      Q.  Yes, mine goes 56789 and then 11 as
4  well.
5      A.  So ...
6      Q.  This is part of the reason why we added
7  these identifiers on the bottom right.
8      A.  So I wouldn't -- I would not guarantee
9  that this is the current document.
10     Q.  Well, I'll just ask you to coordinate
11  with Ray and try to see if you can find the current
12  document.
13     A.  Oh, I can find it.
14     Q.  Thank you.
15         But just looking at page 4 of this
16  document, and understanding that it may not be the
17  current version, just in that same area we looked at
18  in the 2016 version, it reads the same paragraph,
19  correct, where the wanted record teletype or record
20  type is described?
21     A.  Correct.
22     Q.  And then if we go to Gomez 17, page 4,
23  are you there?
24     A.  I am.
25     Q.  In the same area it's a little bit

17 (Pages 65 to 68)

**CINDY JENNINGS  3/30/2017**

Page 69

1  different. It says, "Record type: Wanted. The
2  police are interested in questioning a subject prior
3  to asking for a judge's order. Wanted records are
4  maintained in REJIS but not MULES and NCIC."
5      So my first question is the language
6  regarding probable cause is -- is not in this 2014
7  version; is that right?
8      A.  That is correct.
9      Q.  And my second question is, "Wanted
10 records are maintained in REJIS but not MULES or
11 NCIC"; what does that mean?
12     A.  That's not a correct statement. That
13 would be wrong.
14     Q.  Wrong now or wrong even in July 2014?
15     A.  Wrong in July of 2014.
16     Q.  How so?
17     A.  In that MULES -- MULES and NCIC both
18 accepted wanted records for felony offenses with
19 state or partial extradition.
20     Q.  Do you think the discrepancy here is
21 between wanteds and temporary wanteds or you just
22 think this is wrong?
23     A.  This is wrong.
24     Q.  Do you know why the probable cause
25 language was added to the 2016 version?

Page 70

1      A.  Why it was added?
2      Q.  So sometime between July 2014 and
3  January 2016 a decision was made to add the probable
4  cause language to the description of a wanted within
5  this wanted entry manual. Do you know why that
6  decision was made?
7      A.  LEPAC asked that it be placed in our
8  documentation and on our entry screen.
9      Q.  Do you know who at LEPAC asked you to
10 do that?
11     A.  LEPAC is a committee. Specifically
12 who, I'm not involved in those meetings.
13     Q.  Who told you that the change had been
14 made -- strike that.
15     Who told you that the decision had been
16 made to add probable cause language to the wanted
17 entry manual?
18     A.  Our programming staff went through a
19 change control.
20     Q.  Who specifically on the programming
21 staff?
22     A.  I don't know that.
23     Q.  Did Marc Meschke tell you that that
24 change had been made?
25     A.  He was not my director at that time.

Page 71

1      Q.  Do you remember exactly when this
2  happened?
3      A.  Not the exact date, no.
4      Q.  So after this change was made, was
5  there a training that focused on this new language?
6      A.  It would be incorporated into the
7  training and the screen change would have been
8  discussed at our TAC meetings and possibly --
9  probably a service announcement would have been sent
10 that that change has been made.
11     Q.  What do you recall about the discussion
12 at the TAC meeting?
13     A.  I don't recall.
14     Q.  Officers who were trained prior to this
15 change being made, did they have to come back in for
16 new training after the language was added to the
17 manual?
18     A.  Officers, no. I mean, no one is
19 required to come back in to train.
20     Q.  Strike that.
21     Because this was not a required course
22 to begin with?
23     A.  For an officer with level 21 -- 27
24 access, you're correct.
25     Q.  You said it wasn't required for anyone.

Page 72

1      A.  That's correct.
2      Q.  And you also mentioned an announcement
3  might be sent out. Can you tell me more about that?
4      A.  With all of our system changes, we send
5  out a service announcement where there's going to be
6  changes that the people are going to see like a
7  screen change or those kind of things. We send out
8  our post send-out and post a service announcement.
9      Q.  Who receives that announcement?
10     A.  The REJIS TACs and agency heads.
11     Q.  So anybody who's a representative on
12 TAC or an agency head receives that announcement?
13     A.  It's emailed to all of them.
14     Q.  So someone like Lieutenant Jeff Burk
15 would have received that announcement?
16     A.  Should have.
17     Q.  Let's take a look at Gomez 17, page 24.
18 Excuse me, I misspoke.
19     Let's start with Gomez 16, page 24.
20 And I didn't say it earlier, but you're free to take
21 a break at any point if you need the bathroom. I'd
22 just ask, you know, if a question is pending we wait
23 until you answer the question.
24     A.  Sure.
25     Q.  So we're on Gomez 16, page 24. This is

18 (Pages 69 to 72)

CINDY JENNINGS  3/30/2017

Page 73

1   a 2016 version, and I think in our discussion a
2   moment ago you talked about a screen change --
3       A.  Correct.
4       Q.  -- following this update to the manual.
5   Is the screen change seen on this page?
6       A.  Yes.
7       Q.  Where is it?
8       A.  About the middle of the page in the
9   kind of light gray area between "suppressed
10   indictment" and "wanted message."
11       Q.  So the one that says, "Wanted entry.
12   Subject is wanted for questioning. There's no
13   warrant associated with the record. The law
14   enforcement officer entering the wanted information
15   must have probable cause to believe that the person
16   committed the crime prior to entering a REJIS wanted
17   on that person."
18       A.  Correct.
19       Q.  And that was added new in January 2016,
20   correct?
21       A.  The --
22       Q.  Or excuse me. It's in the January 2016
23   version, correct?
24       A.  Correct.
25       Q.  And if we look at Gomez 17, same page.

Page 74

1   This is the July 2014 version, page 24. Would you
2   agree with me that that message is not on that page?
3       A.  That is correct.
4       Q.  So would you agree that it was added in
5   the January 2016 version?
6       A.  It was present in the January 2016
7   version.
8       Q.  Was it in any version prior to the
9   January 2016 version that you know of?
10       A.  I don't know.
11       Q.  Do you recall this being something
12   discussed as -- at one of your TAC meetings as being
13   added to the manual?
14       A.  Not added to the manual, but it would
15   have been a system change, so we would have showed
16   them a screen shot and what the change was. We
17   would not have issued them a new manual at that
18   meeting.
19       Q.  But it was in addition to the screen
20   that users who are entering a wanted would see?
21       A.  Correct.
22       Q.  Do you recall who told you that it
23   would be added to the screen?
24       A.  No. It goes through what we call a
25   change control process. So the programmer makes the

Page 75

1   change. That goes through three iterations of
2   change control meetings so that we're all aware of
3   what's being changed.
4       And then our responsibility is then to
5   update the clients the day the change takes place,
6   notify them prior to, if necessary, and update our
7   documentation.
8       Q.  So you're telling me hopefully on one
9   end what's happening, but presumably before the
10   programmer knows to make chose changes and run the
11   test, a decision has been made by someone to add
12   that screen; is that fair?
13       A.  That's fair.
14       Q.  Do you know who was involved on that
15   end making that decision to add the screen?
16       A.  To this change, LEPAC requested the
17   change.
18       Q.  Do you know if there's a record of
19   LEPAC's request of the change?
20       A.  I do not know that.
21       Q.  Mr. Meschke had told us that the reason
22   for this change came from MULES. Do you -- is that
23   your understanding as well?
24       A.  I was not at that meeting. I'm not
25   sure.

Page 76

1       Q.  So let's just focus in on this new
2   screen. And who would be seeing this -- this
3   screen?
4       A.  Anyone that has the capability to enter
5   a wanted record.
6       Q.  So no officer with level 27 access
7   would see this screen; is that fair?
8       A.  That's fair.
9       Q.  The person who determined whether
10   there's probable cause would not be seeing this
11   screen; is that fair?
12       A.  Person who -- that's fair.
13       Q.  So the person who's entering
14   information would just be seeing a pop-up box
15   warning them that in order for this wanted to be
16   entered, the officer must have probable cause,
17   correct?
18       A.  It's not a pop-up box. It's a one-page
19   entry screen and --
20       Q.  That's fair, sorry for the
21   characterization.
22       So the person who's seeing this screen
23   and having to click "Submit" for one of these four
24   options is -- is not in a position to determine
25   whether there's probable cause, correct?

19 (Pages 73 to 76)

CINDY JENNINGS  3/30/2017

## Page 77

1    A.  With based on their level of access?

2    Q.  Let's say it's a CARE coordinator who's

3 entering the information to complete a wanted entry,

4 and they see this screen and they have to click

5 "Submit," "Reset," "Cancel," or "Help."  They're not

6 qualified themselves to make a probable cause

7 determination, correct?

8    A.  I don't know if they are or aren't.

9    Q.  Did you -- do you think this

10 represented a change in requirements for wanteds?

11    MR. HUGHES:  Objection.  Calls for

12 speculation and conjecture on her part.

13    MR. FLOJO:  Join.

14    THE WITNESS:  I don't understand the

15 question.

16    BY MR. HOLLAND:

17    Q.  I'm just trying to understand what

18 purpose adding this screen served.

19    A.  Adding this wording to the screen?

20    Q.  So this screen as we looked in the 2014

21 didn't include this message about wanteds requiring

22 probable cause, and in 2016 it did.  Do you know

23 what the purpose for including it was?

24    A.  No, I do not know the background on

25 that.

## Page 78

1    Q.  Can you think of any good reason why it

2 was added?

3    MR. HUGHES:  Objection.  It's

4 overbroad.

5    THE WITNESS:  Again, as I said before,

6 it was at the request of LEPAC.

7    BY MR. HOLLAND:

8    Q.  Did this new screen impact how you

9 trained CARE coordinators?

10    A.  Impact how I trained CARE coordinators?

11    Q.  I'll strike the question.

12    Did this new screen impact the way you

13 took -- that you trained CARE coordinators who took

14 your wanted entry class?

15    A.  Not them specifically. I would explain

16 it to all of the students who would take the class

17 when that was placed down there and it's bold red

18 and why it's there.

19    MR. HOLLAND:  Why don't we take a quick

20 break and give the court reporter a chance to rest

21 her fingers.

22    THE WITNESS:  Thank you.

23    THE VIDEOGRAPHER:  The time is 10:55.

24 We are off the record.

25    (Recess taken.)

## Page 79

1    THE VIDEOGRAPHER:  The time is 11:09.

2 We're back on the record.

3    BY MR. HOLLAND:

4    Q.  Ms. Jennings, before we took a break

5 this morning we were talking about one issue that I

6 would like to try to clarify.

7    I asked you earlier about how entries

8 came to be within the -- focusing specifically on

9 wanteds, how they came to be, and I had asked you

10 whether REJIS created them or -- I believe you

11 said the agencies tell you which options or

12 entry fields to include and then the programmers go

13 about adding those fields and that's how it appears

14 in REJIS.

15    Is that an accurate description?

16    A.  Yes.

17    Q.  So the agencies at their own -- at

18 their own place come up with what fields they want

19 to have included when their officers go and tell a

20 coordinator, whoever it might be, to enter a wanted.

21 REJIS programmers take that information, develop the

22 database, the screen, and run it through tests, and

23 then that's how it appears; is that correct?

24    A.  One way, yes.

25    Q.  One way.  Can you tell me each way that

## Page 80

1 it could happen?

2    A.  Other ways could be it would be a

3 change that is mandated by NCIC that comes to us

4 through the technical operational update.  They

5 would notify -- the Highway Patrol would be

6 notified.  They would notify us.  So those kind of

7 changes.  Legislative changes would come in through

8 that same process.

9    Q.  So rather than speaking in

10 hypotheticals, let's talk about the current wanted

11 screen, the fields that you listed earlier as being

12 requirements.  Those fields were told by the

13 agencies to REJIS that those are the ones that they

14 wanted included; is that fair?

15    A.  Wanteds was before my time, the actual

16 system creation, so I wouldn't swear to that.

17    Q.  Your understanding?

18    A.  Yes.

19    Q.  Who supervises the programmers at

20 REJIS?

21    A.  The director would be Eric Gorham.

22    Q.  You mentioned earlier that when LEPAC

23 makes a recommendation or a decision is made at that

24 level, programmers are notified, whether it be the

25 wanted message addition, adding the probable cause

20 (Pages 77 to 80)

**CINDY JENNINGS  3/30/2017**

Page 81

1  language, they run it through tests and eventually
2  it comes to your team that these changes have been
3  made.
4       Is that a fair description of the
5  process?
6       A.  One of the descriptions, yes.
7       Q.  So would Eric Gorham be somebody who
8  would have learned from LEPAC that a decision had
9  been made and then he tells his programmers what to
10  do?
11       A.  For that situation?
12       Q.  (Nods head.)
13       A.  I don't know that.
14       Q.  I'm just trying to understand how a
15  decision at LEPAC is coming to be known by REJIS, if
16  you know.
17       A.  In LEPAC, you would have the general
18  manager would be present -- could be present at the
19  meeting, the director of client services could be
20  present at the meeting, and the director of IT.
21       So whichever meeting, I mean, there
22  could be all three of them or one of those three.
23  Someone from REJIS is in attendance at the LEPAC
24  meeting because it's at our facility.
25       Q.  Who are those three individuals that

Page 82

1  you just referred to by title?
2       A.  Today?
3       Q.  The general manager.
4       A.  The general manager today is Daniel
5  Isom.
6       Q.  How long has he been the general
7  manager?
8       A.  Six weeks.
9       Q.  Who preceded him in that role?
10       A.  William Powell.
11       Q.  And how long was he the general
12  manager?
13       A.  Eight years.
14       Q.  And the IT supervisor, is that another
15  person you mentioned as attending the meetings?
16       A.  IT director.
17       Q.  IT director?
18       A.  Is Eric Gorham.
19       Q.  And how long has he held that role?
20       A.  At least ten years.
21       Q.  And the third role, who attends?
22       A.  Client services director which is
23  currently Marc Meschke.
24       Q.  How long has he held that position?
25       A.  Since January 1st.

Page 83

1       Q.  And who preceded him in that role?
2       A.  David Pudloswki.
3       Q.  How long had David Pudloswki been in
4  that role?
5       A.  Ten years, I think.
6       Q.  So the individuals you just mentioned
7  are the representatives from REJIS who would have
8  been attending LEPAC meetings at any given meeting?
9       A.  Correct.
10       Q.  And they would have learned the
11  decisions made by LEPAC and taken those -- taken
12  those decisions back to REJIS and directed whoever
13  needed to know what needed to happen?
14       A.  Correct.  They would probably have
15  created an issue in our incident system and then
16  that issue would be assigned to the -- whatever team
17  it is -- in this case the law enforcement team --
18  and then they would work on that change.
19       Q.  Are those issues maintained by REJIS?
20       A.  The issues in our system?
21       Q.  Yes.
22       A.  Correct.
23       Q.  And that's something that we would be
24  able to ask you to produce?  It's still present
25  within --

Page 84

1       A.  We have a new incident-tracking system,
2  so that would be a change prior to the new system.
3       Q.  But changes made in the old system
4  still exist somewhere at REJIS?
5       A.  I don't know that.
6       Q.  Issues sent out by Powell or whoever
7  else might have sent them out following a LEPAC
8  decision?
9       A.  I don't know that.
10       Q.  Okay.  You mentioned earlier TAC
11  meetings.  Are any records of those meetings kept,
12  minutes?
13       A.  The agenda and the attendees but not
14  minutes for the TAC meeting.
15       Q.  How about materials that are used
16  during those meetings?
17       A.  The material is the agenda with its
18  corresponding documentation, and then if anything
19  else is presented at the meeting, that's sent out as
20  an email.
21       Q.  And where are those materials
22  maintained?
23       A.  In our office.
24       Q.  You -- are those stored somewhere that
25  we would be able to view them?

21 (Pages 81 to 84)

CINDY JENNINGS  3/30/2017

Page 85

1       A.   Yes.
2       Q.   Would anybody else aside from you
3   attend the MULES TAC meetings?
4       A.   Yes.
5       Q.   Who else?
6       A.   From REJIS?
7       Q.   From REJIS.
8       A.   Myself or one of the other trainers or
9   all of us.  Just depends on who's available to
10  attend.
11      Q.   So just the training staff would attend
12  the MULES TAC meetings?
13      A.   Could or have?
14      Q.   Would anybody aside from training at
15  REJIS attend the MULES TAC meetings?
16      A.   They could, yes.  That allows you, if
17  you attend their TAC meetings, that qualifies you to
18  be -- to -- to be certified.  So if I need my
19  certification -- my certification with the MULES
20  system is up -- I can attend that TAC meeting.
21          So, yes, others from our staff could
22  attend that meeting and have.
23      Q.   Who else has?
24      A.   Lou Briggs -- the programming staff?
25  Their names?

Page 86

1       Q.   How many people are there?
2       A.   I don't know everybody that's been, but
3   I know that of the ones I've been, I believe Lou
4   Briggs and John Brown have attended.
5       Q.   And they're programmers?
6       A.   Yes.
7       Q.   You mentioned earlier that the
8   trainings that you conduct are -- you do not record
9   them by video or audio.
10      A.   Correct.
11      Q.   Does anyone record them by video or
12  audio?
13      A.   Audio, we have had people that will sit
14  in class and record, yes.
15      Q.   Just students?
16      A.   Yes.
17      Q.   Do you know -- do you know anybody
18  specifically who did that?
19      A.   I don't recall their name.  Not
20  something regular that happens.
21      Q.   You mentioned that -- when preparing
22  for class you make sure you have your attendance
23  sheet.  Do you take attendance at every course?
24      A.   Yes.
25      Q.   Do you keep the attendance sheets?

Page 87

1       A.   Yes.  For the two years.
2       Q.   Do you mark down on these attendance
3   sheets who is recording the class by audio?
4       A.   No.
5       Q.   Nobody videotapes these courses that
6   you're aware of?
7       A.   No.
8       Q.   Aside from the manuals we've looked at
9   today, are there any other materials that you hand
10  out or PowerPoints that you use for these courses?
11      A.   Each instructor could have their own
12  PowerPoint, yes.  Or shared.  It's on a common
13  drive.
14      Q.   And you maintain these materials after
15  the courses are done?
16      A.   Yes.
17      Q.   For how long?
18      A.   Until they're updated or changed or no
19  longer valid.
20      Q.   Do you keep a list of the levels of
21  access that we talked about earlier?
22      A.   Yes.
23      Q.   Is that something we would be able to
24  get?
25      A.   Yes.

Page 88

1       Q.   And does it have a description of the
2   type of access provided?
3       A.   Yes.
4       Q.   How about a name -- a list with a name
5   and access level for each employee of the St. Louis
6   County Police Department?  Is that something that
7   you keep?
8       A.   Ask one more time.
9       Q.   So each -- each employee of the
10  St. Louis County Police Department who has access to
11  REJIS and is certified has a specific access level?
12      A.   Correct.
13      Q.   Do you keep a list with their name and
14  corresponding access level?
15      A.   Yes.
16      Q.   Is that something we would be able to
17  receive?
18      A.   Yes.
19          MR. FLOJO:  We'll discuss.  You're
20  really asking is it out there and is it available?
21          MR. HOLLAND:  Is it something that
22  exists, correct.
23          MR. FLOJO:  Right.
24          MR. HOLLAND:  We would want to see
25  that.

**CINDY JENNINGS  3/30/2017**

Page 89

1    Q.  One more thing I wanted to clarify was
2  that you -- I was asking you earlier about whether
3  you refer to or include probable cause with any of
4  your courses, and you said you might mention that,
5  to your students, that probable cause -- that
6  wanteds require probable cause or questioning.
7          So is that an accurate statement?
8    A.  Yes.
9    Q.  Did you include mentions of probable
10  cause in your courses prior to the changes we
11  discussed, the language that was added to the manual
12  and the screen that was added to the -- or, excuse
13  me -- the message that was added to the screen?
14    A.  Did I personally?
15    Q.  Yeah.
16    A.  Yes.  I could have said that in my
17  courses.
18    Q.  So as long as you've been teaching
19  you've always mentioned that a wanted requires
20  probable cause or questioning?
21    A.  Correct.  Not every single class.
22    Q.  Something you could have said?
23    A.  Correct.
24    Q.  How did you know to mention that that
25  was a requirement?

Page 90

1    A.  Part of that is in the MULES
2  messaging -- message that they send out, one of the
3  documents that they had.  It indicates probable
4  cause or wanted for questioning, so we would include
5  that -- on the documents that I've read would
6  include that information, or if somebody
7  specifically asked if that's what it means.
8    Q.  So you would have learned that from
9  MULES, you're saying?  From a MULES document?
10    A.  There is one MULES document that does
11  have that, yes.
12    Q.  Are you thinking of a specific document
13  that you have?
14    A.  I do have one, yes.
15        MR. HOLLAND:  We'd want to take a look
16  at that as well.
17    Q.  When you say a wanted requires probable
18  cause or questioning, what do you mean by "or
19  questioning"?
20    A.  You say they're wanted for questioning
21  or the officer has probable cause to believe that
22  they have committed an offense.
23    Q.  So we've talked a lot about LEPAC
24  today -- not a lot, but we've certainly mentioned
25  it.  And I want to get an understanding of your

Page 91

1  awareness of what it is and any potential
2  involvement.
3          So what is LEPAC?
4    A.  Law Enforcement Policy Advisory
5  Committee.
6    Q.  Who sits on the committee?
7    A.  Members of the law enforcement
8  community from the police agencies, different
9  jurisdictions.
10    Q.  Does REJIS have a member on the
11  committee?
12    A.  We're the person of the committee.  We
13  don't vote but we host the committee.  I mean, it's
14  our, REJIS's, committee.
15    Q.  Do you remember when it was created?
16    A.  Prior to me.  When I was the secretary
17  I was the secretary for that committee, so it
18  existed before I got there in '78.
19    Q.  Do you know if the Missouri Highway
20  Patrol has a seat on the committee?
21    A.  They attend the meetings, yes.
22    Q.  St. Louis County Police Department?
23    A.  Yes, they're on the committee
24  currently.
25    Q.  Do you know who their -- who their

Page 92

1  representative on the committee is?
2    A.  I do not.
3    Q.  Do you know who it has been in the
4  past?
5    A.  It's the chief of police.
6    Q.  Jon Belmar?
7    A.  Yes.  He's the current chief.
8    Q.  Do you know if they have more than one
9  representative on the committee or if they ever
10  have?
11    A.  Not multiple representatives.  Voting
12  representatives?
13    Q.  Members.
14    A.  Or people that attend?
15    Q.  Members that attend.
16    A.  No, just one member that attends.
17    Q.  Have you ever personally attended a
18  LEPAC meeting?
19    A.  I have.
20    Q.  When was that?
21    A.  In the '78 -- '79, '80, '81 when I was
22  the secretary for them.
23    Q.  And your responsibility was to take
24  minutes at these meetings?
25    A.  Yes, it was.

23 (Pages 89 to 92)

CINDY JENNINGS  3/30/2017

Page 93

1      Q.  Do any lawyers sit on LEPAC?
2      A.  I don't know what their -- the outside
3   qualifications are.  I mean, if the chief has also a
4   law degree, I don't know that.
5      Q.  But your understanding is that it's
6   representatives from the various law enforcement
7   agencies around the -- is it just St. Louis area?
8      A.  Kansas City also.
9      Q.  So law enforcement agencies have
10  representatives from the area that uses REJIS that
11  sits on a committee?
12     A.  There are REJIS customers only, yes.
13     Q.  Have you attended any meetings since
14  you've stopped being the secretary of LEPAC?
15     A.  I do not believe I have.
16     Q.  Are you aware of the DOJ's
17  investigation into the Ferguson Police Department?
18     A.  Only through media.
19     Q.  Are you aware that they issued a report
20  of their findings in March of 2015?
21     A.  Not the date, no.
22     Q.  Are you aware that they issued a report
23  on their findings?
24     A.  Yes, I've heard.
25     Q.  Have you reviewed the report?

Page 94

1      A.  No, I have not.
2      Q.  Did you receive any summary or
3   description of the report from anyone?
4      A.  No, I have not.
5      Q.  Did you receive any guidance on how
6   trainings or policies or procedures at REJIS might
7   change as a result of the report?
8      A.  No, I have not.
9      Q.  Did you -- do you understand or have
10  you understood that the report included a section on
11  wanteds?
12     A.  No, I did not.
13     Q.  I assume your answers to those
14  questions would be the same if I was talking about
15  the consent decree between the DOJ and Ferguson as
16  well?
17     A.  I don't know what that is.
18     Q.  I'll put the bulky documents aside.
19     A.  Oh, okay.
20     Q.  So I'm going to show you a couple
21  documents.  I'm just going to ask you some
22  questions, and I understand you may not have seen
23  them before, but I just want to use them for
24  informational purposes, contextual purposes.
25        MR. HUGHES:  You're going to ask her

Page 95

1   questions on things she has not seen before?  Would
2   that be outside the scope of the notice?
3         MR. HOLLAND:  I'm just -- the topic is
4   within the scope.  I'm just going to ask her.  If
5   she can't answer the questions, she can't answer the
6   questions.
7      Q.  Have you ever seen LEPAC minutes of any
8   recent meetings?
9      A.  Yes.
10     Q.  So the meeting occurs and you -- the
11  minutes of the meeting are distributed among REJIS
12  employees?
13     A.  No, they are not.
14     Q.  How did you see REJIS -- or excuse
15  me -- LEPAC meeting minutes?
16     A.  Summaries are posted on the REJIS
17  extranet.
18     Q.  And one of your responsibilities as a
19  REJIS trainer is to stay up-to-date on -- by
20  reviewing those minutes?
21     A.  I do that as part of my awareness of my
22  job.
23        MR. HOLLAND:  I'm going to show you
24  what I'll mark as -- I think it is just 2, right?
25  Jennings 2 and 3.

Page 96

1         (Exhibits 2-3 were marked for
2         identification.)
3   BY MR. HOLLAND:
4      Q.  Do you recall seeing these documents
5   previously?
6      A.  I have not seen the document.
7         MR. HOLLAND:  And I'll just mark these
8   4.
9         (Exhibit 4 was marked for
10        identification.)
11        MR. HOLLAND:  And 5.
12        (Exhibit 5 was marked for
13        identification.)
14  BY MR. HOLLAND:
15     Q.  These are the minutes that correspond
16  with the LEPAC agenda items I handed you as 2 and 3.
17  Have you seen the minutes that I just handed you
18  from these two meetings?
19     A.  The minutes are before the agenda,
20  though.  Wait a minute, May 5th.
21     Q.  So you should have --
22     A.  This is August 6th, May 5th, okay.
23  I'm -- hold on a minute.  I'm confused.
24     Q.  I'll take that one back.
25     A.  Which one?

24 (Pages 93 to 96)

CINDY JENNINGS  3/30/2017

Page 97

1    Q.  May 5th.
2    A.  May 5th?
3    Q.  This is the one you should have.  Here
4  you go.
5    A.  No, this is the same -- I'm sorry, this
6  is the same -- I have two of the same copy now.
7    Q.  So you're missing August 6th?
8    A.  Yes, sir.
9    Q.  There it is.  That's the confusion.
10   A.  Okay.  So you want 4 back or 5?
11   Q.  I'll take 4 back.  Sorry about that.
12      MR. HUGHES:  What exhibit is this?
13      MR. FLOJO:  Is this 4?
14      MR. HOLLAND:  It's 4.
15   Q.  So you now have the agenda item and
16  minutes for the May 7th, 2015, meeting and the
17  agenda item and minutes for the August 6th, 2015,
18  meeting of LEPAC; is that correct?
19   A.  Correct.
20   Q.  Have you seen the minutes for these two
21  meetings previously?
22   A.  No, I have not.
23   Q.  I'd just ask you one question about the
24  August 6th, 2015, agenda item.
25   A.  Okay.

Page 98

1    Q.  It says, "Lieutenant Jeff Burk
2  subsequently recommended that REJIS add comments to
3  the REJIS 'Wanteds' training manual that would state
4  that the initiating officer/agency must have
5  probable cause that the person committed the crime
6  prior to entering a REJIS Wanted entry."
7       Had you ever heard that Lieutenant Jeff
8  Burk was the individual who made that
9  recommendation?
10   A.  I did not.
11   Q.  Do you remember at all receiving any
12  documents or summaries explaining the differences
13  between a wanted and a person of interest at the end
14  of last year, end of 2016?
15   A.  A document?
16   Q.  So did you ever see a summary
17  circulated or posted on a LEPAC database explaining
18  the differences between a wanted and a person of
19  interest?
20   A.  No.
21   Q.  So all of the minutes of LEPAC's
22  meeting are available on a publicly -- publicly
23  available database, or do you have to have certain
24  rights to access it?
25   A.  It's our intranet and it's a summary of

Page 99

1  the minutes.  It's not the meeting minutes.  It's a
2  summary of the minutes that's posted.
3    Q.  So if you didn't see this document,
4  perhaps you saw a summary of these two meetings?
5    A.  Could have been a summary of the
6  meetings, yes.  That's what's on the extranet.
7    Q.  Since we don't have those summaries I'm
8  going to ask you to bear with me and I'm going to
9  ask you some questions from the minutes possibly,
10  and you can let me know if you can answer those
11  questions; is that fair?
12   A.  Yes.
13      MR. HOLLAND:  I'll move along.  You can
14  put those aside.  I'm going to hand you what has
15  previously been marked Gomez Exhibit 24.
16         (Previously marked Exhibit
17         Gomez 24 was shown to the
18         witness.)
19      BY MR. HOLLAND:
20   Q.  Are you familiar with this document?
21   A.  I am not.
22   Q.  I understand this to be a
23  REJIS-generated report.  Does this look like
24  something that could be generated out of the REJIS
25  database?

Page 100

1    A.  I don't know that.
2    Q.  Does REJIS maintain data on wanteds
3  that are issued?
4    A.  Maintain data on wanteds?  What do you
5  mean by "maintain data"?
6    Q.  So if we look at this document, in the
7  upper left corner it says, "Wanted/Stop Orders
8  Issued," and then the second column is "Year," and
9  then the third column is "Month," and the fourth
10  column is "Number of Charges," and you see
11  "Records."
12      Does REJIS maintain the number of
13  wanteds that are issued in any given month within a
14  year, the number of charges maintained or included
15  within each wanted?  Is that something that REJIS
16  maintains, that type of data?
17   A.  We'd have the number of records by
18  month.  I'm not aware that we keep track of the
19  number of charges on that record.
20   Q.  In your capacity as training
21  supervisor, are you familiar with the type of data
22  that REJIS maintains relating to specific wanteds?
23   A.  We keep the whole entire record but we
24  don't just go out and say, "Here's how many" -- we
25  don't send something out that says, "Here's how many

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com     Phone: 1.800.280.3376     Fax: 314.644.1334

**CINDY JENNINGS  3/30/2017**

Page 101

1  charges you have in the system."
2      Q.  I'm not saying it's being sent out;
3  it's just stored within REJIS.  So if you wanted
4  to -- you know, oh, I wonder how many, you know,
5  females have been issued wanteds, you know, in
6  January of 2011, you can type it into REJIS and it
7  pops up, oh, there it is.  There's the number.
8      A.  No, you can't do that.  It would be a
9  report that would have to be requested.
10     Q.  But if you requested that report,
11 that's something that could be generated?
12     A.  Possibly, yes.  If it's a field that's
13 captured on the record in the database then, yeah,
14 you can pull it back out.
15     Q.  And I understand that you're a training
16 supervisor, so maybe you're not well schooled in
17 the -- all the IT and all that kind of stuff; is
18 that fair?
19     A.  Fair.
20     Q.  Who would be the right person if I
21 wanted to -- if I wanted a report that listed how
22 many wanteds in each year, how many of those wanteds
23 resulted in arrests, how many of those arrests or
24 how long the person was held while arrested, and
25 then whether any warrants or criminal charges were

Page 102

1  brought.
2          If that's a report that I thought might
3  exist, who would be the right person at REJIS to
4  ask, A, does that exist; and, B, can you do it for
5  me?
6      A.  The call -- the procedures we follow is
7  that the person would call the REJIS help desk.
8  They would create an issue and they would assign
9  that to level 2, because they couldn't answer --
10 they couldn't pull that report out.
11         So that would come to level 2 which
12 would be my division or training unit.  I would look
13 at that ticket and say, "This is not something that
14 I do," and I would assign it to the applications
15 team.
16     Q.  Who at the applications team would you
17 ask to do it?
18     A.  I don't ask them.  I assign it to a
19 queue.
20     Q.  Who is on the applications team?
21     A.  All of our developers.
22     Q.  Who are your developers?
23     A.  Everybody's name?
24     Q.  I'm just -- you can see where I'm
25 going.  I'm asking -- if, say, I want this report to

Page 103

1  be generated by REJIS that shows how many wanteds,
2  how many led to arrests, how long that person was
3  held while arrested, how many of those wanteds --
4  how many of any wanteds led to an actual warrant
5  being issued and/or criminal charges being brought,
6  if I wanted that report, who do I call?
7      A.  The REJIS help desk.
8      Q.  Who do I ask Ray to get that report
9  from?
10         MR. HUGHES:  You know, if I can object.
11 You know, Marc Meschke was already produced and he
12 was questioned already.  And then there was one or
13 two questions where he said it would be training, it
14 would be Cindy Jennings.
15         MR. HOLLAND:  Mike, the actual record
16 of Marc Meschke shows that he said this is a report
17 that he could probably produce in two to three
18 hours, and we haven't received it.  We received
19 this, so I was trying to talk to her about this.
20         I'm fully aware of what Mr. Meschke
21 testified to.  It's now been almost two months since
22 his deposition and we don't have anything, so I'm
23 trying to figure out what we need to do to get it;
24 is that fair?
25     Q.  And maybe Mr. Meschke is the right

Page 104

1  person, but would you say that you're not the right
2  person?
3      A.  I'm not the right person.
4      Q.  Then we can move on.
5          MR. FLOJO:  For the record, I haven't
6  received a subpoena for that particular type of
7  report or anything like that.  Deposition happened,
8  yes, it was talked about, but then I haven't
9  received any requests or anything further from that
10 deposition.
11         MR. HOLLAND:  We'll make the request
12 now on the record.  We can discuss if we need to
13 issue a subpoena, then we'll do that.
14     Q.  Let's walk through one wanted entry
15 relevant to this case and see what I can learn from
16 you about it.
17     A.  We're done with this page?
18     Q.  We're done with that one, yes.
19     A.  Okay.
20         MR. HOLLAND:  Let me show you what has
21 been marked Plaintiffs' 2 from the Meschke
22 deposition.
23         (Previously marked Exhibit
24          Meschke 2 was shown to the
25          witness.)

26 (Pages 101 to 104)

**CINDY JENNINGS  3/30/2017**

Page 105

1    BY MR. HOLLAND:
2        Q.  I'm only going to ask you about --
3    let's see.  The -- the last page on the back.  Can
4    you tell me what this document is?
5        A.  This is the full display of a wanted
6    person stop order from the REJIS system.
7        Q.  So this is a stop order and it's from
8    the REJIS system, but down on the bottom it says,
9    "MULES only."  What does that mean?  If you see
10   there three lines up from the bottom, "Case cleared
11   MULES only."  What does that mean?
12       A.  "Case cleared MULES only" is because
13   the record was not in NCIC, it was strictly in REJIS
14   and MULES.  And when the record was canceled, we
15   send the cancellation to MULES and it says it's
16   cleared out of MULES only; it was never in NCIC.
17       Q.  Was it cleared out of REJIS?
18       A.  Yes.  If you look at the line above
19   that you'll see the field that is labeled -- you see
20   what I'm talking about?  It starts with "LC" right
21   above the line you read, 4052 line.
22       Q.  I do.
23       A.  To the right of that you'll see the
24   letter "CN."
25       Q.  What does that stand for?

Page 106

1        A.  "CN" stands for canceled.  That would
2    be the date, the time, and the user ID of the person
3    that canceled the record, which is stamped by the
4    system, not the user.
5        Q.  What is "LC"?  Is that locate?
6        A.  "LC" stands for locate.
7        Q.  So this is a screen that an officer
8    with level 27 access would view if they're out in
9    their car and they punch in --
10       A.  No, sir, they would not.
11       Q.  Okay.
12       A.  Because this record is canceled.
13       Q.  Understood.
14       A.  You don't see a canceled as -- on that
15   level of access that they have.
16       Q.  Is it canceled -- so as soon as a stop
17   order is canceled, does it immediately disappear
18   from the system?
19       A.  It does not disappear.  Depending on
20   the format that you are using and your level of
21   access, you can still see canceled records.
22       Q.  What level of access would you have to
23   have to still see canceled records?
24       A.  Many different levels.
25       Q.  We'll figure that out once we see the

Page 107

1    list.
2        A.  You'll see the -- yes.
3        Q.  Why is this referred -- if this is a
4    REJIS document, why is it referred to as a stop
5    order?
6        A.  When the agency created the record
7    through the REJIS system they chose the button
8    labeled "Stop Order," and that creates this entry.
9        Q.  Does anywhere on here show you who
10   created this entry?
11       A.  Yes, it does.
12       Q.  Where is that?
13       A.  If you'd go above the line we
14   previously talked about, that "LC" line.
15       Q.  Uh-huh.
16       A.  Directly above that you see the letters
17   "EN."  "EN" tells you the date, time, and who
18   entered the record into the system.
19       Q.  Is that person the officer or the CARE
20   coordinator?
21       A.  Sir, I don't know who that is.
22       Q.  So whoever created this record chose
23   stop order instead of wanted or any of the other
24   teletypes that are available?
25       A.  Correct.

Page 108

1        Q.  Can you give me any reasons why they
2    would do that?  Why not just put wanted?
3        A.  The -- as I look at the record, I see
4    that the charge is a felony and they're asking to go
5    partial which means that they wanted it outside of
6    the REJIS system, so they would have chosen a stop
7    order.
8        Q.  Where are you seeing partial?
9        A.  If you go -- if you look at the line
10   where it says "Social Security Number" with the
11   blackout.
12       Q.  I see that.
13       A.  Go to the line underneath of that.  It
14   says "Charges."
15       Q.  Yep.
16       A.  Okay.  "Felony wanted.  Statutory
17   sodomy, first, under 14 years of age.  EXT," and
18   right underneath that is the letter "P."
19       Q.  Yes.
20       A.  That's the extradition and how far they
21   will extradite.
22       Q.  "P" is partial?
23       A.  Yes, sir.
24       Q.  What levels of extradition exist?
25       A.  There are ten different levels

27 (Pages 105 to 108)

**CINDY JENNINGS  3/30/2017**

Page 109

1  depending on the severity of the charge that you can
2  choose.
3      Q.  What does "partial" mean?
4      A.  Partial means that you must indicate
5  how many miles or counties you will go to apprehend
6  that person.
7      Q.  Is that on here somewhere?
8      A.  If you go to the next line underneath
9  the "Charge" line you'll see it says "RMK."
10     Q.  What does that mean?
11     A.  Remarks.  And in the charge remarks
12 they would put the miles or counties that they would
13 extradite.  In this case adjacent counties.
14     Q.  So any counties adjacent to St. Louis
15 County --
16     A.  Yes.
17     Q.  -- would be able to see this when --
18 before it was canceled?
19     A.  I answered too prematurely.  That would
20 be any agency in the State of Missouri could have
21 seen this record because it is MULES qualified.
22 They would only act on the record if they were in
23 any county that surrounded St. Louis.
24     Q.  Understood.  Thank you for that.
25         So down at the last line it talks about

Page 110

1  a purge date.  What is that?
2      A.  Once a record is canceled from the
3  REJIS system, it is then purged, meaning it's
4  removed, and there are only two special transactions
5  that you can do to pull this record back.
6      Q.  So prior to being canceled, the stop
7  order here would be viewable by, you know, somebody
8  with level 27 access?
9      A.  Yes.
10     Q.  After canceled it's not viewable by
11 somebody with level 27 access but it is still
12 viewable by somebody with a certain level of access
13 that, you know, there might be too many now to
14 talk -- to list them all?
15     A.  Correct.
16     Q.  And then after that 30-day canceled
17 period, there's a -- it's purged and only a very
18 special level of access allows you to pull that back
19 and view it?
20     A.  I wouldn't call it special, but there
21 are levels of access that allow you to view purged
22 records.
23     Q.  What's the purpose of, you know,
24 keeping it for 30 days after it's canceled and then
25 even keeping it somewhere after it's purged?

Page 111

1      A.  The purpose?
2      Q.  Why not just purge it completely?  It's
3  been canceled.
4      A.  The record -- so that the agency has a
5  way to validate the reasons why that record was
6  taken out of existence is why we keep them longer so
7  that they know why the record is gone.  It did not
8  meet its end of life.
9      Q.  Maybe I just don't understand it, but
10 can an officer enter a wanted into REJIS while also
11 parallel entering a stop order into MULES for the
12 same suspect, same charges?
13     A.  Well, are you asking a REJIS customer?
14     Q.  Somebody is a REJIS customer and a
15 MULES customer.  They enter a wanted into REJIS
16 while also entering a stop order into MULES.  Is
17 that something that's possible?
18     A.  No, if you're a REJIS customer, you're
19 a REGIS customer; if you're a MULES customer, you're
20 a MULES customer.
21     Q.  I see.
22     A.  If you're dual, then you can only enter
23 into one of those.  So we have agencies that are
24 dual that are in fact REJIS and MULES clients but
25 they're going to either enter into MULES and only

Page 112

1  into MULES or they're going to enter into REJIS and
2  only into REJIS and then we pass the data along.
3      Q.  Do you know if the St. Louis County
4  Police Department is a dual member?
5      A.  They were a dual agency, yes.
6      Q.  But at any one time an officer who
7  wants to enter one of these teletype records has to
8  choose between the two?
9      A.  That's not correct.  They're only dual
10 agency in that they enter their order protections
11 directly through the MULES system.  That's the only
12 thing that they do direct MULES.
13     Q.  So if you're a dual member you have to
14 use REJIS for your wanteds?
15     A.  No, you can choose to be one or the
16 other.
17     Q.  But once you choose that's the one you
18 use?
19     A.  Yes.
20     Q.  And is the choice made at a department
21 level or at an officer level?
22     A.  Oh, no, department level.
23     Q.  So the St. Louis County Police
24 Department if they're a dual member if they choose
25 REJIS, then their officers must use REJIS; is that

28 (Pages 109 to 112)

**CINDY JENNINGS  3/30/2017**

Page 113

```
1   correct?
2        A.  Correct.
3        Q.  Do you know how many members are dual
4   members?
5        A.  Not a specific number.
6        Q.  Would you say of the dual members more
7   choose REJIS or more choose MULES?
8        A.  Of the dual agencies, do they choose to
9   enter into REJIS?  I guess I need a little --
10       Q.  You told me that if you're a dual
11  member, you have the choice of which one you want to
12  use, MULES or REJIS.  But once you choose, that's
13  the one you have to use, correct?
14       A.  To do your entries.
15       Q.  To do your entries.  That's what I'm
16  talking about.  Correct?
17       A.  Yes, correct.
18       Q.  So of the dual members do you know if
19  more choose REJIS for their entries or MULES for
20  their entries?
21       A.  More choose REJIS.
22       Q.  Do you know a percentage of the
23  breakdown?
24       A.  No.
25       Q.  Ballpark?
```

Page 114

```
1        A.  No.
2        Q.  Can you tell me a little bit about the
3   validation process relating to wanteds?
4        A.  Yes.
5        Q.  Who -- who -- just give me a
6   description of the -- of what the validation process
7   entails.
8        A.  Validation, we send the agency -- I
9   guess depending on the time frame you're talking
10  about, it is now done electronically.  The agency is
11  notified via email that they have a report on the
12  extranet.  They go out to the extranet and it will
13  give them a listing of all the records that are
14  required to be validated that month.
15           Their process for validation is that
16  they must confirm that the record is complete,
17  accurate, and still outstanding.  They mark the
18  record as being validated, and then they don't see
19  that record again for another year as long as it's
20  active.
21       Q.  How can they tell if it's active?
22       A.  How can they tell?
23       Q.  That's the purpose of the wanted,
24  right, for the officer to confirm whether it's
25  active or not?  How do they inform REJIS that it is
```

Page 115

```
1   or isn't active?  Is there a button they click?  Do
2   they tell them over the phone?
3        A.  When you're validating?
4        Q.  Right.
5        A.  The officer is not validating the
6   record.
7        Q.  Who is validating the record?
8        A.  That's normally just the person
9   with the access to validate that record.  The agency
10  is to back up as part of their validation to say
11  that it's complete, accurate, and still outstanding.
12           The process would be if it was a
13  warrant, you'd contact the prosecutor and the court;
14  if it's a wanted, you would contact the officer to
15  verify that that wanted is -- still should be in
16  existence.
17       Q.  And that's the validation --
18       A.  That's part of the validation process.
19       Q.  So you contact the officer by phone
20  or --
21       A.  We don't.  The agency validates their
22  own records.  We present them the records to be
23  validated.
24       Q.  And are wanteds, have they always been
25  routinely validated?
```

Page 116

```
1        A.  Yes.
2        Q.  What would be routine?  Every 90 days?
3        A.  No.  Records are validated the first
4   time when they are between 60 and 90 days' old and
5   then annually thereafter as long as it's active.
6           MR. HOLLAND:  I'm going to show you
7   what I'll mark as Jennings Exhibit 6.
8           (Exhibit 6 was marked for
9            identification.)
10          BY MR. HOLLAND:
11       Q.  And these LEPAC agenda items and
12  meeting minutes that I'm showing you were produced
13  to us recently by defendants in this action.
14          MR. HUGHES:  This is, I'm sorry,
15  exhibit what?
16          MR. HOLLAND:  Six.
17          MR. HUGHES:  CJ6.
18          MR. FLOJO:  Jennings 6.
19          MR. HUGHES:  Jennings 6.  Cindy
20  Jennings 6.
21          MR. FLOJO:  I think it's actually just
22  Jennings 6, but that's ...
23          BY MR. HOLLAND:
24       Q.  Have you ever seen this document
25  before?
```

29 (Pages 113 to 116)

**CINDY JENNINGS  3/30/2017**

Page 117

1     A.  No, sir.
2         Q.  If you look at the bottom paragraph on
3     the first page, understanding that you haven't seen
4     this document, it's just an issue that I wanted to
5     ask you about given your familiarity with
6     validation.
7             It reads, "At the time wanted records
8     were also being presented for validation.  Since
9     then the online validation process has been
10    implemented and only MULES qualified warrants and
11    Stop Order records are routinely presented for
12    validation."
13        A.  Uh-huh.
14        Q.  Does that mean that wanteds were not
15    routinely presented for validation?
16        A.  After this date?
17        Q.  After the online validation process was
18    implemented.
19        A.  This is pre- --
20        Q.  This is dated November 2012.  At some
21    time around that period online validation process
22    had been implemented and it suggests that MULES --
23    only MULES-qualified warrants and stop order records
24    are routinely presented for validation.
25            So I'm just wondering does that suggest

Page 118

1     to you that other -- other entries, teletypes of
2     that sort were not routinely presented for
3     validation?
4         A.  I'm not sure where you see it says
5     "online."
6         Q.  It's on the bottom paragraph of the
7     first page.
8         A.  Since then (reading ...) okay.  And I'm
9     sorry, could you repeat your question to me?
10        Q.  That suggests to me that aside from
11    MULES-qualified warrants and stop order records, the
12    others are not routinely presented for validation.
13        A.  Unless the agency chooses to have us
14    send them to them.  That's the agency makes that
15    decision if they want their wanted records sent out
16    as part of their validation process.
17        Q.  So I guess my follow-up question may be
18    the same answer.  Do you have the May 7th, 2015,
19    LEPAC agenda item?  I'm guessing it might be
20    Jennings 2 or 3.  That's it there in front of you,
21    the Jennings 2.
22        A.  Yes, sir.
23        Q.  There's a paragraph that starts in bold
24    "Current Situation."
25        A.  Okay.

Page 119

1         Q.  Do you see the last line says, "REJIS
2     does not require local only wanteds be validated"?
3         A.  Yes, I do.
4         Q.  Why was that?
5         A.  Why did we not require them to be
6     validated?  I don't know that.
7         Q.  Basically you were leaving it up to the
8     agency to decide whether they wanted to validate
9     their wanteds or not?
10        A.  Their local only records, correct.
11        Q.  So for records that REJIS did not
12    require to be validated, how would that validation
13    process be initiated?
14        A.  I don't know.
15        Q.  Do you know if that's still true today
16    that REJIS does not require local only wanteds to be
17    validated?
18        A.  That is correct.
19        Q.  Are wanteds ever automatically removed
20    from REJIS?
21        A.  When they meet their purge criteria,
22    depending on the severity of the charge.
23        Q.  Based on the time period?
24        A.  Correct.
25        Q.  So whether they're active or not,

Page 120

1     they'll be removed at some point depending on the
2     severity of the charge and the time period?
3         A.  Correct.
4         Q.  What is a locate or detainer?
5         A.  They're two different things.  A locate
6     is when an agency other than the agency that entered
7     the record, if we'll talk about a person, stops that
8     person, they confirm the record with the originating
9     agency.  Their next step is to place a locate on it.
10            And it's really a reconfirmation of
11    what you discussed in the hit confirmation.  Yes,
12    the record is valid.  What are you going -- what do
13    you want us to do with that, in this case, an
14    individual?  What would be next step?
15        Q.  Did you provide training on that?
16        A.  On the locates, that's part of the
17    wanted entry class, vehicle entry class, missing
18    person.
19            MR. HOLLAND:  I'll show you what I'll
20    mark Jennings Exhibit 7.
21            (Exhibit 7 was marked for
22            identification.)
23    BY MR. HOLLAND:
24        Q.  Do you recognize this document?
25        A.  I do.

30 (Pages 117 to 120)

**CINDY JENNINGS  3/30/2017**

Page 121

1      Q.  Is this part of the same course
2   material that would be used with the manuals we saw
3   earlier, the wanted entry class?
4      A.  Yes, it is.
5      Q.  So that class would -- you'd hand out
6   the wanted entry manual and this locate/detainer
7   document?
8      A.  Yes.
9      Q.  If you turn to page 2.
10     A.  Mine are all page 6.
11     Q.  Sorry, physical number 2.  So if we go
12   past the cover page the bottom right says "05/2010,"
13   so May 2010; do you see that?
14     A.  Yes, I do.
15     Q.  If I recall correctly, all the other
16   manuals we went through were January 2014 -- or
17   excuse me -- July 2014, January 2016, and
18   January 2017, the wanted entry manuals we looked at
19   earlier; does that sound right?
20     A.  Sounds right.
21     Q.  So would this suggest to you that there
22   is a corresponding wanted entry manual for May 2010
23   that should exist?
24     A.  Not necessarily May.  I mean, it would
25   be a document -- we create documents based on the

Page 122

1   need, so if we had a change in procedures and change
2   of how locates worked or detainers would be
3   introduced or we were teaching it and felt like the
4   students needed further instructions, we would
5   create another document to go along with that.
6         And that could be the case here.  I
7   don't know.  I'd have to go back and look and see do
8   I have a May 2010, and it doesn't make a
9   one-to-one --
10     Q.  That's fair.
11        Sometime, give or take around this time
12   period, do you think you did a wanted entry manual
13   course?
14     A.  Course?
15     Q.  You'd have to check?
16     A.  Taught a course?
17     Q.  Yeah.
18     A.  I'd have to look.
19     Q.  That's fair.
20        Going back to the cover page, it says,
21   "Locate/Detainer.  When on earth do I use them?"
22        It seems like kind of a curious
23   subtitle for a training document in a government
24   agency.
25        MR. HUGHES:  Object as argumentative.

Page 123

1      MR. FLOJO:  Join.
2   BY MR. HOLLAND:
3      Q.  Is it -- did you ever -- was it
4   confusing for users?
5      A.  Locates and detainers?
6      Q.  Right.
7      A.  Very confusing.
8      Q.  How so?
9      A.  Well, detainer, especially because when
10   a detainer is -- you have the wanted entry.  A
11   wanted record.  The person could be apprehended by
12   another agency and they place a locate on that
13   record.
14        Once a record is located, how long it
15   lives after it's been located varies on what happens
16   to that record next.  And one of the procedures that
17   was introduced is that if you place a detainer on
18   the record, that would allow record that's in locate
19   status to live in the system longer.
20        The confusing part for many of the
21   clients is that the detainer is not put on the
22   record by the agency that located the body but the
23   agency that owns the record.
24     Q.  So can you walk me through the process?
25   So one agency, let's say the St. Louis County Police

Page 124

1   Department, issues a wanted.
2      A.  Correct.
3      Q.  The locate is made by the St. Charles
4   County Police Department.
5      A.  The procedure would be St. Charles
6   County would -- let's say the officer would run that
7   person.  They would come back with a hit.  That
8   officer would then be required, either their
9   dispatch or themself, to send a hit confirmation to
10   St. Louis County as the originator of the record.
11     Q.  How would -- let me stop you there.
12   How would they send that hit confirmation?
13     A.  A button on the screen.  A button on
14   the screen --
15     Q.  This is all within REJIS?
16     A.  Within REJIS.
17     Q.  In their car possibly?
18     A.  Possibly.  But let me back up because
19   you used the agency as St. Charles County, and
20   St. Charles County Sheriff is not a REJIS customer.
21     Q.  Poor choice by me.
22     A.  So let's say that it was St. Louis
23   County and Bridgeton.
24     Q.  Sure.
25     A.  Okay?  So St. Louis County has the

31 (Pages 121 to 124)

**CINDY JENNINGS  3/30/2017**

Page 125

1  person that is wanted.  The Bridgeton officer either
2  calls into dispatch or runs it from their vehicle.
3  They receive the hit that that person is wanted.
4  Before they take any action, they're required to
5  send a confirmation to the agency, so Bridgeton
6  would send the confirmation.
7         They press a button on the screen.  The
8  button fills out the hit confirmation saying it's
9  sending it to St. Louis County.  Here's the
10  description of the individual, and then St. Louis
11  County would receive that hit confirmation.
12         They would then do a hit confirmation
13  response back letting Bridgeton know, yes, that
14  person is still wanted; no, they're not.  Yes,
15  there's a warrant; no, there's not.  Whatever it is.
16         And then the next step that Bridgeton
17  would take is they would place a locate on the
18  St. Louis County record.  The locate would tell them
19  are you going to extradite them?  Are you not going
20  to extradite them?  Are you detaining them on your
21  own charges?
22         Once that locate is placed, depending
23  on what they decide, then the next step would be to
24  place a detainer on that record.  So if they said --
25  Bridgeton said, "I'm going to detain them on my

Page 126

1  charges and once I am done with them I will turn
2  them over to St. Louis County," then St. Louis
3  County would put a detainer on their wanted record
4  showing that they were being detained at Bridgeton.
5         Q.  What if they were -- what if the
6  Bridgeton officer didn't have any charges to detain
7  the person?  Would they still -- would they still
8  take that person into custody?
9         A.  Based on whatever St. Louis County told
10  them to do.  If they're going to come to pick them
11  up, then they would have said "Extradite" on the
12  record.
13         Q.  What if they're unable to get in touch
14  with St. Louis County?
15         A.  On the hit confirmation?  The hit
16  confirmation, depending -- there are two choices on
17  a hit confirmation.  There's an urgent, a routine.
18  With an urgent, there is a ten-minute rule that goes
19  with it, so within ten minutes, that agency has to
20  reply to that confirmation.
21         If they don't, then the rules are you
22  send a second confirmation.  When a second
23  confirmation is sent, not only is the originating
24  agency notified, but also the state system.
25         If you don't respond within that ten

Page 127

1  minutes, ten additional minutes, and that agency
2  chooses to send a third request, that is also sent
3  to St. Louis County, the state system, and NCIC.  At
4  that point it's that agency who stopped them, in
5  this case Bridgeton's decision whether to let that
6  person go or not.
7         Q.  And if they haven't heard from
8  St. Louis County they -- are they unable to confirm
9  whether it's active or not?  So then after 30
10  minutes it's up to them whether to take the person
11  into custody?
12         A.  They wouldn't take them into custody
13  after that 30 minutes because they have not
14  confirmed that that is a valid record.  A computer
15  entry is taught it is lead information only.  You
16  don't take action on that entry until you confirm
17  the status with the originating agency.
18         Q.  Understood.  And you mentioned at one
19  point "the rules."  What rules are you referring to?
20         A.  System rules, meaning --
21         Q.  REJIS rules?
22         A.  REJIS, MULES, NCIC.  That's rules or
23  policy.
24         Q.  Are those documented anywhere?
25         A.  Uh-huh, yes.

Page 128

1         Q.  And are officers taught about those
2  rules?
3         A.  Yes.
4         Q.  During what course are they taught?
5         A.  Everybody is taught in all our courses
6  on hit confirmation process.
7         Q.  It's called hit confirmation process?
8         A.  Uh-huh.
9         Q.  That's separate from the wanted entry
10  class?
11         A.  Separate from the --
12         Q.  So is it taught during the REJIS
13  introductory course?
14         A.  Yes.
15         MR. HOLLAND:  I think we'll want to see
16  the materials used for that course.
17         Q.  So earlier we talked -- this is just
18  one question, I'm not going back to LEPAC, but you
19  mentioned that the LEPAC, the summaries of the
20  meetings are available to you on an intranet or
21  extranet?
22         A.  We call it our REJIS extranet.
23         Q.  Is that available to individuals who
24  are not REJIS employees?
25         A.  Yes.

32 (Pages 125 to 128)

**CINDY JENNINGS  3/30/2017**

Page 129

1      Q.   Who is it available to?
2      A.   All of our clients that are criminal
3  justice clients, not our private access clients.
4      Q.   It's not publicly available?
5      A.   That's correct.
6      Q.   Who manages the process of information
7  sharing between REJIS, MULES, and NCIC?  Or does it
8  just happen naturally?
9      A.   Can you ask me -- I mean, be more
10 specific.  I'm not sure what you mean by that.
11     Q.   So REJIS, MULES, NCIC share
12 information.  Is that just each agency knows to put
13 something on a posting or their website and the
14 other agencies know that that's where they should go
15 to check, or is there more of a communication on a
16 lower level?
17     A.   Information like -- like what kind --
18 you mean records or are you meaning --
19     Q.   Trainings, records, changes to
20 policies, those sorts of things.
21     A.   It happens all different ways.  They
22 would have posted on their next test website or we
23 would get it via emails or it would come out as the
24 technical operational update from NCIC.  It comes in
25 a variety of ways.

Page 130

1      Q.   Do you guys try to do your best to
2  align in terms of policies and procedures?
3      A.   With who?
4      Q.   With MULES.
5      A.   Yes.
6      Q.   Do you have regular communications with
7  anyone at the St. Louis County Police Department?
8      A.   Yes.
9      Q.   Who?
10     A.   All the individual names?
11     Q.   I'm talking about on a regular basis.
12     A.   Well, on a regular basis I probably
13 talk to a lot of them because they would call in
14 help desk tickets, and I'm responsible for answering
15 those tickets.  So I would talk to Lieutenant Burk.
16 I would talk to Lieutenant Gomez, Sharon Pezold,
17 Mary Wicking -- it just depends on what unit of the
18 PD you're talking about and ...
19     Q.   Do you -- have you ever heard any
20 feedback from the St. Louis County Police Department
21 about the trainings you provide?
22     A.   No.
23     Q.   Do they inform the materials that are
24 used at all?
25     A.   Do they what?

Page 131

1      Q.   Inform or help draft the materials that
2  are used during trainings at all?
3      A.   No, they do not.
4      Q.   Do they make requests for what should
5  be covered during trainings?
6      A.   Well, they -- I guess I would say yes.
7  Like for their recruit class they tell us what they
8  want taught in that recruit class and how many
9  hours.
10     Q.   Are you familiar at all with the
11 training that The Police Academy does itself for its
12 officers?
13     A.   No, I'm not.
14     Q.   Any of the trainers that they use,
15 other than anybody who would have gone through your
16 courses?
17     A.   Am I familiar with the trainers they
18 use?
19     Q.   (Nods head.)
20     A.   Well, I would -- yes they have trainers
21 that teach the academy course and they're the ones
22 that set up the training with us.
23     Q.   Who is that?
24     A.   Who it is today?
25     Q.   Yeah.

Page 132

1      A.   I don't know his name.  I haven't done
2  that --
3      Q.   What do you mean by set up the
4  trainings with you?
5      A.   Well, they would contact myself or a
6  member of my staff to say, "We have a recruit class.
7  Recruit class 602 is going to be ready for REJIS
8  training in the next three months."
9      Q.   Logistically they help you set it up?
10     A.   Right.
11     Q.   Understood.
12          Did you speak with Lieutenant Gomez in
13 connection with this case?
14     A.   Directly with Lieutenant Gomez?  No.
15     Q.   Prior to his deposition in this case,
16 did you speak with him?
17     A.   No.
18     Q.   Do you speak with him on a regular
19 basis?
20     A.   No.
21     Q.   When was the last time you would have
22 spoken to Lieutenant Gomez?
23     A.   Probably about two months ago.
24     Q.   Do you remember what capacity that
25 conversation occurred?

33 (Pages 129 to 132)

**CINDY JENNINGS  3/30/2017**

Page 133

1    A.  He was on the conference phone call
2  with Sharon Pezold.
3    Q.  Who's Sharon Pezold?
4    A.  She's the CARE coordinator.
5    Q.  What was the purpose of that conference
6  call?
7    A.  Questions about a wanted document.
8    Q.  Do you remember which one?
9    A.  Which document?  No.
10   Q.  Have you spoken to anyone besides the
11 30 minutes with Mr. Flojo about this case?
12   A.  No.
13   Q.  Or about your --
14   A.  Oh.  Yes.
15   Q.  You're allowed to correct yourself.
16   A.  Sorry.
17   Q.  No need to apologize.
18   A.  I forgot my director, Marc Meschke.
19   Q.  When did you speak to Mr. Meschke?
20   A.  When he got his subpoena.
21   Q.  Sometime in January, give or take?  His
22 deposition was on February 3rd, if that helps.
23   A.  Yes, I know I talked to him in January.
24   Q.  What did you guys talk about?
25   A.  He told me to get these -- create these

Page 134

1  records, pull these records based on information
2  requested from someone.  I don't know who at that
3  point.
4    Q.  So he had received a subpoena.  He
5  needed help gathering materials --
6    A.  The documents.
7    Q.  -- that were potentially relevant and
8  he asked you to help him?
9    A.  That's correct.
10   Q.  Did you guys talk about anything else
11 related to his deposition or this case?
12   A.  No.
13      MR. HOLLAND:  That's all I have for you
14 today.  Depending on what Mr. Hughes might have, I
15 may have some follow-up, but for now, that's it.
16      EXAMINATION
17 BY MR. HUGHES:
18   Q.  I'm going to be very short, don't
19 worry.
20   A.  Okay.
21   Q.  Very early in your deposition you
22 talked about training law enforcement agencies in
23 the St. Louis area, Kansas City, and some counties
24 in Illinois; is that correct?
25   A.  That's correct.

Page 135

1    Q.  And you were also asked some questions
2  about stop orders and wanteds.  In the Kansas City
3  area, do they have what they call stop orders?
4    A.  Yes.
5    Q.  Okay.  And -- and in St. Louis here,
6  they have what's called wanteds; is that correct?
7    A.  Yes.
8    Q.  And now, you -- you were involved in
9  training and you're a supervisor of trainers; is
10 that correct?
11   A.  Correct.
12   Q.  And it's my understanding that when you
13 train agencies, courts, court officials, judges,
14 clerks, whatever, you train them on how to make
15 entries properly into the REJIS system; is that
16 correct?
17   A.  Correct.
18   Q.  You don't train on when it's
19 permissible -- you don't train on Constitutional
20 law, for example; is that correct?
21   A.  Correct.
22   Q.  So you don't train when it's
23 permissible to issue a wanted; is that correct?
24   A.  Correct.
25   Q.  From a Constitutional standpoint, but

Page 136

1  you train how to do it accurately; is that correct?
2    A.  Correct.
3    Q.  Okay.  And you mentioned something
4  about not all agencies require validation but
5  St. Louis County does require validation.  They want
6  you to contact them in 60 days, 60 to 90 days to do
7  the validation process; is that correct?
8    A.  I can't speak for sure the St. Louis
9  County --
10   Q.  Well ...
11   A.  -- does that.  I mean, they can request
12 that.  I don't know off the top of my head every
13 single agency says, oh, yeah, give us all our
14 records and every agency that doesn't.
15   Q.  Okay.  Well, if Lieutenant Gomez
16 testified that within 90 days we'd get the
17 validation reminders on a monthly basis and then
18 annually thereafter from REJIS, you would have no
19 reason to dispute that; is that correct?
20   A.  That's correct.
21      MR. HUGHES:  All right.  I told you I'd
22 be short.  Thank you very much, Ms. Jennings.
23      THE WITNESS:  You're welcome.
24      MR. HOLLAND:  I have nothing further.
25 Thank you very much for coming in today.

34 (Pages 133 to 136)

**CINDY JENNINGS  3/30/2017**

Page 137

| | |
|---|---|
| 1 | THE WITNESS:  Thank you. |
| 2 | MR. FLOJO:  Cindy, I think we talked |
| 3 | about there's going to be a transcript created of |
| 4 | this deposition and you have the right to review |
| 5 | that and go page by page, line by line to make any |
| 6 | corrections, or you can trust that our court |
| 7 | reporter has taken down everything accurately. |
| 8 | Would you like to read your deposition |
| 9 | or would you like to waive your signature? |
| 10 | THE WITNESS:  I can waive my signature. |
| 11 | MR. FLOJO:  Okay. |
| 12 | THE VIDEOGRAPHER:  The time is 12:21. |
| 13 | We are off the record.  This concludes our |
| 14 | deposition of Cindy Jennings. |
| 15 | THE REPORTER:  Same thing? |
| 16 | MR. FLOJO:  We don't need a copy. |
| 17 | (Whereupon, signature was |
| 18 | waived and the witness was |
| 19 | excused at 12:20 p.m.) |
| 20 | --oOo-- |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 138

| | |
|---|---|
| 1 | CERTIFICATE OF REPORTER |
| 2 | |
| 3 | I, RENÉE COMBS QUINBY, a Registered Merit |
| 4 | Reporter, Certified Realtime Reporter, Certified |
| 5 | Shorthand Reporter (CA), Certified Court Reporter |
| 6 | (MO), Realtime Systems Administrator, and Notary |
| 7 | Public within and for the State of Missouri, do |
| 8 | hereby certify that the witness whose testimony |
| 9 | appears in the foregoing deposition was duly sworn |
| 10 | by me to testify to the truth and nothing but the |
| 11 | truth; that the testimony of said witness was taken |
| 12 | by stenographic means by me to the best of my |
| 13 | ability and thereafter reduced to print under my |
| 14 | direction. |
| 15 | I further certify that I am neither |
| 16 | attorney nor counsel nor related nor employed by any |
| 17 | of the parties to the action in which this |
| 18 | deposition was taken; further, that I am not a |
| 19 | relative or employee of any attorney or counsel |
| 20 | employed by the parties hereto or financially |
| 21 | interested in this action. |
| 22 | My Commission expires April 9, 2017 |
| 23 | |
| 24 | -------------------------------------- |
| 25 | Renée Combs Quinby, RMR, CRR, CCR #1291 |

35 (Pages 137 to 138)

CINDY JENNINGS  3/30/2017

**A**

ability 30:24
  138:13
able 21:19 23:16
  26:6 36:3
  38:23 49:11
  83:24 84:25
  87:23 88:16
  109:17
academies 44:8
academy 22:21
  35:23,23 44:7
  45:25 131:11
  131:21
accepted 69:18
access 17:3,13
  18:25 20:15,19
  20:20,22,24
  21:5,9,12,14
  21:16,19,24
  22:2,5,6,9
  31:18,21 32:11
  39:11 40:4,10
  41:16 42:25
  43:6,20 53:3,5
  53:9,14,19
  63:24 71:24
  76:6 77:1
  87:21 88:2,5
  88:10,11,14
  98:24 106:8,15
  106:21,22
  110:8,11,12,18
  110:21 115:9
  129:3
accesses 19:10
accurate 25:24
  26:3,11 79:15
  89:7 114:17
  115:11
accurately 9:11
  136:1 137:7
act 109:22
action 116:13
  125:4 127:16
  138:17,21

active 114:20,21
  114:25 115:1
  116:5 119:25
  127:9
actual 80:15
  103:4,15
add 55:12 70:3
  70:16 75:11,15
  98:2
added 27:18
  42:12 44:17
  67:13,15 68:6
  69:25 70:1
  71:16 73:19
  74:4,13,14,23
  78:2 89:11,12
  89:13
adding 54:10
  55:7 77:18,19
  79:13 80:25
addition 21:13
  74:19 80:25
additional 127:1
adjacent 109:13
  109:14
Administrator
  138:6
administrators
  19:6
advise 54:2,11
  55:8,10,13
  57:8 58:4
advised 65:7
Advisory 2:17
  2:21 55:11,18
  91:4
affect 49:9 56:16
age 27:9 108:17
agencies 17:22
  17:22 18:12,23
  18:24,25 22:13
  45:20 46:5,25
  48:5 50:7
  59:24 60:3
  79:11,17 80:13
  91:8 93:7,9

111:23 113:8
  129:14 134:22
  135:13 136:4
agency 23:4
  36:10 43:4
  44:3 47:1 48:4
  48:13,17 58:24
  59:1,4,11
  64:12 72:10,12
  107:6 109:20
  111:4 112:5,10
  114:8,10 115:9
  115:21 118:13
  118:14 119:8
  120:6,6,9
  122:24 123:12
  123:22,23,25
  124:19 125:5
  126:19,24
  127:1,4,17
  129:12 136:13
  136:14
agenda 2:13,14
  3:1 84:13,17
  96:16,19 97:15
  97:17,24
  116:11 118:19
ago 11:4 15:15
  73:2 132:23
agree 57:15 60:9
  74:2,4
AGREED 7:2
agreement 7:8
aguisado@ccr...
  5:15
ahead 10:10
  54:16
al 1:4,7 4:4,7
  7:17,17
align 130:2
allow 29:5 57:21
  58:8,13 59:24
  110:21 123:18
allowed 133:15
allows 21:8
  25:10 58:10

85:16 110:18
Americas 5:9
amount 40:24
  43:8
amounts 65:15
and/or 103:5
Angelo 5:12
  8:12
announcement
  71:9 72:2,5,8,9
  72:12,15
annually 116:5
  136:18
answer 10:10
  25:19,20 30:22
  32:1 33:3 36:9
  72:23 95:5,5
  99:10 102:9
  118:18
answered
  109:19
answering 9:11
  10:1,2,11 18:2
  130:14
answers 38:15
  94:13
anybody 12:6
  16:3 72:11
  85:2,14 86:17
  131:15
anytime 50:2
apologize
  133:17
appears 79:13
  79:23 138:9
application
  46:19,20,22
  47:5,6,23 48:2
applications
  16:22,23 18:4
  24:13 102:14
  102:16,20
apply 36:9
appreciate
  13:11
apprehend

109:5
apprehended
  123:11
appropriate
  45:9,12,13,19
approximately
  7:15
April 138:22
ArchCity 5:4
  8:7
area 17:5,6 23:9
  24:5 32:20
  34:25 48:9
  49:7 68:17,25
  73:9 93:7,10
  134:23 135:3
areas 20:15
  23:21
argumentative
  27:2 59:19
  60:10 122:25
arrest 21:13
  24:22 25:3,13
  31:9,9,11
  53:20 64:17,23
arrested 101:24
  103:3
arrests 25:5
  53:21 101:23
  101:23 103:2
aside 11:25
  12:22 13:6
  19:2 60:14
  85:2,14 87:8
  94:18 99:14
  118:10
asked 30:18
  51:18 70:7,9
  79:7,9 90:7
  134:8 135:1
asking 8:25 9:4
  19:24 25:9
  29:12 69:3
  88:20 89:2
  102:25 108:4
  111:13

CINDY JENNINGS  3/30/2017

assign 102:8,14
102:18
assigned 18:15
22:7 34:21,22
44:2 83:16
assist 19:17
associated 66:21
73:13
assume 30:18
35:18 94:13
assumes 29:10
attached 3:8
attend 13:20,25
17:20 36:3
48:19 49:24,25
50:1,7 85:3,10
85:11,15,17,20
85:22 91:21
92:14,15
attendance
33:25 81:23
86:22,23,25
87:2
attended 14:17
47:19 54:5
86:4 92:17
93:13
attendees 84:13
attending 82:15
83:8
attends 48:16,17
82:21 92:16
attorney 10:7
138:16,19
attorneys 7:25
19:6
audience 20:10
audio 35:9 86:9
86:12,13 87:3
August 2:15,19
96:22 97:7,17
97:24
authority 57:22
automated
38:10,25
automatically

119:19
available 35:24
60:4 85:9
88:20 98:22,23
107:24 128:20
128:23 129:1,4
Avenue 5:9 6:3
aware 13:7
26:17,24 50:4
62:20 67:5
75:2 87:6
93:16,19,22
100:18 103:20
awareness 91:1
95:21
a.m 1:15 7:11,15

**B**

B 5:19 102:4
back 22:14 30:5
36:2 45:25
46:13 58:20
71:15,19 79:2
83:12 96:24
97:10,11
101:14 105:3
110:5,18
115:10 122:7
122:20 124:7
124:18 125:13
128:18
background
13:15 66:5,8
77:24
Ballpark 113:25
bank 38:11
based 21:3 24:9
24:10 30:3
37:3 43:3
46:22 55:10
58:23 59:2,9
59:25 65:22
77:1 119:23
121:25 126:9
134:1
basic 37:10

basically 16:18
33:17 119:7
basis 25:6 34:13
49:23 130:11
130:12 132:19
136:17
Bates 67:15
bathroom 72:21
bear 99:8
Beginning 1:15
behalf 4:13 8:3
8:7,10,13
believe 37:21
62:10 66:24
73:15 79:10
86:3 90:21
93:15
Belmar 1:7 4:7
7:17 8:15 92:6
benefit 32:23,24
best 9:24,25
130:1 138:12
better 9:8
beyond 57:22
birth 27:9
bit 17:1 18:13
23:12 33:4
36:25 41:9
68:25 114:2
blackout 108:11
body 123:22
bold 78:17
118:23
bottom 62:10
67:13,15,20,21
68:7 105:8,10
117:2 118:6
121:12
box 76:14,18
break 72:21
78:20 79:4
breakdown
113:23
Brian 35:3
Bridgeton
124:23 125:1,5

125:13,16,25
126:4,6
Bridgeton's
127:5
Briggs 85:24
86:4
bring 48:8
Britney 5:12 8:9
Broadway 5:13
brought 102:1
103:5
Brown 86:4
bulky 94:18
Burk 49:1 50:9
72:14 98:1,8
130:15
business 13:19
14:9 33:18
button 107:7
115:1 124:13
124:13 125:7,8
bwilson@ccrj...
5:15

**C**

C 5:1 7:11
CA 4:18 6:12
138:5
calendar 16:20
call 19:7 21:8
22:8 46:17
74:24 102:6,7
103:6 110:20
128:22 130:13
133:1,6 135:3
called 128:7
135:6
calling 42:11
calls 16:21 18:2
18:3 29:10
31:22 40:12
59:17 77:11
125:2
Cancel 77:5
canceled 105:14
106:1,3,12,14

106:16,17,21
106:23 109:18
110:2,6,10,16
110:24 111:3
cancellation
105:15
capability 76:4
capacity 10:19
22:24 100:20
132:24
captured 101:13
car 106:9 124:17
CARE 53:16,18
64:2 77:2 78:9
78:10,13
107:19 133:4
Carroll 5:4 8:6,6
case 1:6 4:6 7:18
23:14 67:19
83:17 104:15
105:10,12
109:13 120:13
122:6 127:5
132:13,15
133:11 134:11
category 55:13
cause 65:12,14
65:16,20,23
66:24 69:6,24
70:4,16 73:15
76:10,16,25
77:6,22 80:25
89:3,5,6,10,20
90:4,18,21
98:5
CCR 6:13
138:25
center 5:13 7:21
8:10,12 11:15
Central 6:3
certain 32:6
55:25 56:19,24
98:23 110:12
certainly 90:24
certainty 30:7
CERTIFICA...

CINDY JENNINGS  3/30/2017

138:1
**certification**
21:2,2,5 36:13
37:9 39:9 43:3
85:19,19
**certified** 4:16,17
4:18 7:5 36:13
36:17,23 43:1
43:19 44:10
85:18 88:11
138:4,4,5
**certify** 22:16
138:8,15
**cetera** 33:25
44:24 63:21
**chance** 78:20
**change** 20:11
48:9 50:4,5
54:23 55:2,7
55:13,14,16
70:13,19,24
71:4,7,10,15
72:7 73:2,5
74:15,16,25
75:1,2,5,16,17
75:19,22 77:10
80:3 83:18
84:2 94:7
122:1,1
**changed** 38:5,9
49:6,8 55:1
75:3 87:18
**changes** 9:15
28:16 30:3
48:5 49:4,6,10
54:9,19,21
55:24,24 72:4
72:6 75:10
80:7,7 81:2
84:3 89:10
129:19
**changing** 38:12
50:2
**characterizati...**
76:21
**characterize**

40:9
**charge** 27:11,12
27:13 30:4
59:3,10 108:4
109:1,9,11
119:22 120:2
**charges** 100:10
100:14,19
101:1,25 103:5
108:14 111:12
125:21 126:1,6
**Charles** 23:25
124:3,5,19,20
**check** 34:7
122:15 129:15
**checking** 59:3
**chief** 92:5,7 93:3
**choice** 23:5
112:20 113:11
124:21
**choices** 126:16
**choose** 32:19
36:11 109:2
112:8,15,17,24
113:7,7,8,12
113:19,21
**chooses** 23:4
59:11 118:13
127:2
**chose** 75:10
107:7,22
**chosen** 108:6
**Christopher**
8:15
**Cindy** 1:11 4:11
7:16 9:2
103:14 116:19
137:2,14
**circulated** 98:17
**circumstances**
56:19
**circumvent** 60:7
**city** 4:15 5:19
8:17 17:6,6,7
23:19,24 24:1
24:2 35:16,23

35:25 93:8
134:23 135:2
**CJ6** 116:17
**Clair** 24:7
**clarification**
22:16
**clarify** 19:23
22:18 56:14
79:6 89:1
**clarifying** 19:24
**class** 34:12
36:11 41:3
44:6 52:13,15
52:23,24,25
56:7 61:7
63:14 64:8
66:17 78:14,16
86:14,22 87:3
89:21 120:17
120:17 121:3,5
128:10 131:7,8
132:6,7
**classes** 16:18,18
16:20 17:20,25
19:21 23:4
34:6 52:18
**classroom** 33:23
35:22
**Clayton** 6:3
**clearances** 20:22
**cleared** 105:10
105:12,16,17
**Clements** 8:16
**clerk** 24:25
42:11
**clerks** 17:10
19:5 20:8
135:14
**click** 76:23 77:4
115:1
**client** 15:5,18
18:14,17 56:11
58:23 81:19
82:22
**clients** 17:8 18:4
18:21,22 19:1

49:4,12 75:5
111:24 123:21
129:2,3,3
**CN** 105:24
106:1
**college** 13:18,20
13:24,25 14:6
14:8,16
**color** 27:9,10
**column** 57:10
100:8,9,10
**Combs** 4:16
6:12 7:5 138:3
138:25
**come** 18:3 30:5
38:1 45:24
46:13 71:15,19
79:18 80:7
102:11 124:7
126:10 129:23
**comes** 9:6 42:16
55:13 80:3
81:2 129:24
**coming** 48:5
81:15 136:25
**comments** 98:2
**Commission**
8:18 138:22
**committed**
66:24 73:16
90:22 98:5
**committee** 2:18
2:22 55:12,18
70:11 91:5,6
91:11,12,13,14
91:17,20,23
92:1,9 93:11
**committees**
45:21
**common** 21:18
87:12
**communication**
129:15
**communicatio...**
12:12,13,16
49:15 130:6

**community** 91:8
**comparable**
29:17 33:12,14
33:20 40:21
**complete** 22:7
26:3 27:5 44:5
46:1,14 77:3
114:16 115:11
**completely**
111:2
**complicated**
56:13
**computer**
127:14
**concludes**
137:13
**condition** 9:12
**conduct** 16:17
16:19 19:20
86:8
**conference**
133:1,5
**confirm** 114:16
114:24 120:8
127:8,16
**confirmation**
120:11 124:9
124:12 125:5,6
125:8,11,12
126:15,16,17
126:20,22,23
128:6,7
**confirmed**
127:14
**confused** 43:25
96:23
**confusing** 9:7
67:20 123:4,7
123:20
**confusion** 97:9
**conjecture**
29:11 31:23
40:13 59:18
77:12
**connection**
11:19 132:13

CINDY JENNINGS  3/30/2017

94:15
consider 47:13
Constitutional
5:13 8:11,13
135:19,25
contact 54:1,10
55:7,10,12
57:8 58:4
115:13,14,19
132:5 136:6
contained 25:7
25:13 45:4
contents 12:13
12:17
contextual 94:24
continuously
14:23
control 70:19
74:25 75:2
conversation
132:25
coordinate
49:21 68:10
coordinator
48:13 77:2
79:20 107:20
133:4
coordinators
48:4 78:9,10
78:13
copied 3:8
copies 3:8 38:20
copy 11:12 39:3
97:6 137:16
corner 100:7
correct 12:21
14:25 15:12
16:12 18:10
19:12,14 20:2
25:11,22,24,25
26:4,25 27:7
27:20 37:25
38:19 39:20,21
41:11,12,14
43:11 45:2
48:14,15 52:1

52:5,20 53:23
54:3,22,24
55:9,20 57:9
58:10,11,13,15
58:16 60:5
61:8 64:1,24
65:5 66:8 67:5
67:9 68:19,21
69:8,12 71:24
72:1 73:3,18
73:20,23,24
74:3,21 76:17
76:25 77:7
79:23 83:9,14
83:22 86:10
88:12,22 89:21
89:23 97:18,19
107:25 110:15
112:9 113:1,2
113:13,16,17
119:10,18,24
120:3 124:2
129:5 133:15
134:9,24,25
135:6,10,11,16
135:17,20,21
135:23,24
136:1,2,7,19
136:20
corrections
18:24 137:6
correctly 20:17
67:1 121:15
correspond
55:16 96:15
corresponding
84:18 88:14
121:22
counsel 7:3,3,8
65:8 138:16,19
Counselor's 6:2
8:18
counties 24:2,6
109:5,12,13,14
134:23
county 6:2 8:15

11:19 23:24,25
23:25 24:1,5
35:23 47:4
48:25 50:10,16
88:6,10 91:22
109:15,23
112:3,23
123:25 124:4,6
124:10,19,20
124:23,25
125:9,11,18
126:2,3,9,14
127:3,8 130:7
130:20 136:5,9
County's 48:21
couple 39:4
94:20
course 9:15 20:1
20:11,13,16
23:6 34:11
35:17,21 36:1
36:6,21,22,24
37:3,6,7,8 38:4
38:14 39:10
41:5,15 42:14
42:15,17,19,20
42:24 43:7,8
43:21,23 44:6
44:8,14,17,18
45:1 53:2,10
64:1,2,4,5,11
65:11,24,25
71:21 86:23
121:1 122:13
122:14,16
128:4,13,16
131:21
courses 16:25
19:17,25 20:3
20:15 30:14
34:23,24 35:6
35:14 44:19,22
63:25 87:5,10
87:15 89:4,10
89:17 128:5
131:16

court 1:1 3:7 4:1
4:17 6:11 7:6
7:19 9:21
17:25,25 19:5
19:5 27:12,13
27:15,16,16,17
34:22,25 57:17
57:22 59:13
78:20 115:13
135:13 137:6
138:5
courts 17:24
18:24 19:5
135:13
cover 23:20,22
23:23 24:6
52:25 62:9
66:16 121:12
122:20
covered 37:6
131:5
covering 49:5
co-counsel 8:4
create 26:2 44:5
45:7,24 46:16
46:18 58:24
59:25 102:8
121:25 122:5
133:25
created 23:17,18
50:22 51:6,7
52:3 58:23
59:1 79:10
83:15 91:15
107:6,10,22
137:3
creates 46:12
59:4 107:8
creation 80:16
credit 14:1
credits 14:17
crime 66:24
73:16 98:5
criminal 17:4
101:25 103:5
129:2

criteria 31:6
119:21
CRR 6:12
138:25
CSR 6:12
curious 122:22
current 15:25
67:5,23 68:1,9
68:11,17 80:10
92:7 118:24
currently 82:23
91:24
custody 126:8
127:11,12
customer 111:13
111:14,15,18
111:19,20,20
124:20
customers 93:12
customize 21:2
C-i-n-d-y 9:2

**D**

D 7:11
Daniel 82:4
data 42:6 100:2
100:4,5,16,21
112:2
database 23:13
24:14,18 25:7
25:10 45:15,16
46:12 79:22
98:17,23 99:25
101:13
date 7:14 27:8
27:13 51:17
62:1 71:3
93:21 106:2
107:17 110:1
117:16
dated 2:13,15,18
2:22 3:2
117:20
dates 62:8
David 6:7 7:23
15:23 83:2,3

CINDY JENNINGS  3/30/2017

**day** 35:17 37:17
  37:18,18 75:5
**days** 35:17
  110:24 116:2,4
  136:6,6,16
**day-to-day**
  16:15 34:13
**decide** 119:8
  125:23
**decision** 55:2,6
  55:11 64:10
  70:3,6,15
  75:11,15 80:23
  81:8,15 84:8
  118:15 127:5
**decisions** 54:13
  54:14,18,22
  83:11,12
**decree** 94:15
**defendants** 1:8
  4:8 6:1 7:4
  10:8 116:13
**Defenders** 5:4
  8:7
**DEF-SUPP**
  67:15
**degree** 14:9
  33:12,14,15,17
  33:18,19 37:2
  93:4
**department**
  5:19 11:19
  22:7,10,23
  23:8,19 32:19
  35:19 37:12
  45:22 46:4,8
  47:4 48:21,25
  88:6,10 91:22
  93:17 112:4,20
  112:22,24
  124:1,4 130:7
  130:20
**departments**
  17:24 18:16,18
  23:21 31:20
  46:9,10

**Department's**
  50:17
**depend** 36:6,18
  44:19
**depending**
  20:10 35:16
  47:5 106:19
  109:1 114:9
  119:22 120:1
  125:22 126:16
  134:14
**depends** 28:11
  48:2 85:9
  130:17
**deposed** 10:14
  12:11 23:14
**deposition** 1:10
  4:11 7:4,16,20
  103:22 104:7
  104:10,22
  132:15 133:22
  134:11,21
  137:4,8,14
  138:9,18
**depositions**
  10:21
**described** 68:20
**description** 70:4
  79:15 81:4
  88:1 94:3
  114:6 125:10
**descriptions**
  81:6
**design** 45:15
**designation** 55:2
**designed** 45:16
**designing** 46:23
**desk** 15:5 16:21
  18:1 102:7
  103:7 130:14
**details** 23:17
**detain** 125:25
  126:6
**detained** 126:4
**detainer** 120:4
  123:9,10,17,21

125:24 126:3
**detainers** 122:2
  123:5
**detaining**
  125:20
**determination**
  22:11 66:6
  77:7
**determine** 76:24
**determined**
  34:18 35:19
  76:9
**determining**
  38:2
**develop** 16:23
  34:3 79:21
**developed** 34:6
  51:11
**developers**
  102:21,22
**development**
  16:23 34:24
  46:12
**differ** 20:19
**difference** 56:15
  57:16 59:7,12
  66:13
**differences**
  30:12 56:12
  98:12,18
**different** 20:14
  20:14,15,20,21
  20:21 21:1,12
  44:22 52:17,19
  69:1 91:8
  106:24 108:25
  120:5 129:21
**diploma** 33:13
**direct** 112:12
**directed** 83:12
**direction** 138:14
**directly** 107:16
  112:11 132:14
**director** 15:18
  70:25 80:21
  81:19,20 82:16

82:17,22
  133:18
**disappear**
  106:17,19
**discrepancy**
  69:20
**discuss** 39:5
  46:18 88:19
  104:12
**discussed** 13:9
  23:15 33:8
  52:18,18 53:10
  54:4 55:25
  56:2 71:8
  74:12 89:11
  120:11
**discussing** 42:20
**discussion** 8:19
  47:22 48:11
  71:11 73:1
**dispatch** 124:9
  125:2
**display** 105:5
**dispute** 136:19
**distributed**
  95:11
**District** 1:1,2
  4:1,2 7:19,19
  **division** 1:2 4:2
  102:12
**document** 2:12
  2:14,16,20 3:1
  3:3 11:13,16
  30:6 51:3,10
  51:12,24 52:11
  53:11 54:4,23
  55:1,24 56:4
  56:10,22 57:5
  63:15,17 67:7
  67:14 68:2,9
  68:12,16 90:9
  90:10,12 96:6
  98:15 99:3,20
  100:6 105:4
  107:4 116:24
  117:4 120:24

121:7,25 122:5
  122:23 133:7,9
**documentation**
  16:20 55:15,15
  70:8 75:7
  84:18
**documented**
  127:24
**documents**
  12:24 13:2,7,8
  60:16,25 61:3
  61:4,9,20,25
  62:7 63:13
  66:10 90:3,5
  94:18,21 96:4
  98:12 121:25
  134:6
**Doell** 6:7 7:23
**DOJ** 94:15
**DOJ's** 93:16
**draft** 61:9,24
  131:1
**drafted** 40:19,22
  51:16 61:22
  63:2
**drafting** 37:23
  51:10 61:18,19
  65:1
**drive** 87:13
**driver** 21:9
  37:13
**dual** 111:22,24
  112:4,5,9,13
  112:24 113:3,6
  113:8,10,18
**duly** 138:9
**DWAYNE** 1:4
  4:4

---
**E**
**E** 5:1,1 6:2 7:11
  7:11
**earlier** 10:25
  18:11 62:17
  72:20 79:7
  80:11,22 84:10

**CINDY JENNINGS  3/30/2017**

86:7 87:21
89:2 121:3,19
128:17
**Earls** 15:23
**early** 15:10
134:21
**earth** 3:4 122:21
**Eastern** 1:2,2
4:2,2 7:19
**education** 13:15
13:17
**effectuated** 25:6
**efficiency** 9:18
**efficiently** 10:4
**eight** 14:1,17
82:13
**either** 67:19
111:25 124:8
125:1
**electronically**
114:10
**elements** 46:19
**email** 50:3 84:20
114:11
**emailed** 12:8,19
72:13
**emails** 129:23
**employed** 15:8
22:22 138:16
138:20
**employee** 88:5,9
138:19
**employees** 22:14
95:12 128:24
**employment**
11:20
**EN** 107:17,17
**enable** 60:6
**encounter** 56:19
**ends** 67:21
**enforcement**
2:17,21 14:12
16:17,25 17:2
17:4 18:23
19:3 20:8
34:21,23 35:2

45:3 55:11,17
66:22 73:14
83:17 91:4,7
93:6,9 134:22
**ensure** 26:1
**entail** 49:22
**entails** 114:7
**enter** 24:25
30:24 31:4,16
41:24 76:4
79:20 111:10
111:15,22,25
112:1,7,10
113:9
**entered** 27:23
28:8 45:2
76:16 107:18
120:6
**entering** 24:21
64:3 66:23,25
73:14,16 74:20
76:13 77:3
98:6 111:11,16
**entire** 35:18
100:23
**entitled** 2:12,14
2:16,20 3:1,3
**entries** 21:16
24:13 26:2
29:17 41:10,13
43:10 45:23
53:4,21,22
57:11 58:9
61:5 79:7
113:14,15,19
113:20 118:1
135:15
**entry** 21:12,24
22:2 25:10,13
26:18 27:5,6
27:19 29:21
30:3 42:13,17
42:19 44:24
45:14 46:11,14
52:13,15,22,24
52:25 53:20

56:7 61:5,7
63:14 64:8
65:11 66:17
70:5,8,17
73:11 76:19
77:3 78:14
79:12 98:6
104:14 107:8
107:10 120:17
120:17 121:3,6
121:18,22
122:12 123:10
127:15,16
128:9
**Eric** 80:21 81:7
82:18
**especially** 123:9
**Esq** 5:4,8,12,12
5:19 6:2
**et** 1:4,7 4:4,7
7:17,17 33:25
44:24 63:21
**eventually** 81:1
**everybody** 86:2
128:5
**Everybody's**
102:23
**evidence** 29:10
**exact** 27:24 71:3
**exactly** 71:1
**exam** 37:16,23
38:5 39:19,19
39:23 43:7,18
**EXAMINATI...**
2:4,5 8:20
134:16
**examined** 4:12
**example** 22:20
44:21 49:7
54:20 135:20
**examples** 21:4
**exams** 39:3
**excuse** 28:9,15
34:17 64:2
72:18 73:22
89:12 95:14

121:17
**excused** 137:19
**exhibit** 2:7,8,8,9
2:9,10,10,11
2:11,12,14,16
2:20,24,24,25
2:25 3:1,3 11:9
11:10 50:23,24
53:12 60:18
62:10,13,16
66:10 67:3,11
96:9,12 97:12
99:15,16
104:23 116:7,8
116:15 120:20
120:21
**exhibits** 2:6 3:7
60:19 96:1
**exist** 13:12 31:6
84:4 102:3,4
108:24 121:23
**existed** 62:24
91:18
**existence** 51:20
111:6 115:16
**exists** 63:4 88:22
**experience**
33:12,15 63:19
**expires** 138:22
**explain** 28:13
30:12 36:8
42:2,3 44:1
45:3 78:15
**explaining** 42:8
98:12,17
**explanation**
47:11
**EXT** 108:17
**extradite** 108:21
109:13 125:19
125:20 126:11
**extradition**
27:14 59:10
69:19 108:20
108:24
**extranet** 52:14

95:17 99:6
114:12,12
128:21,22
**eye** 27:9

---
**F**
**facility** 81:24
**fact** 29:16
111:24
**factor** 66:1
**facts** 29:10
**fail** 40:2
**fair** 13:12 21:20
23:10,11 25:5
25:12 26:3,7,8
26:9 28:21,24
38:18,19 39:11
46:2,8,14 55:3
55:4 56:17,21
56:22 57:1,20
63:9 64:13,19
66:2,3,7 75:12
75:13 76:7,8
76:11,12,20
80:14 81:4
99:11 101:18
101:19 103:24
122:10,19
**familiar** 18:8,19
29:1,4,14,16
29:21 50:16
51:3 60:16,25
61:2,3 99:20
100:21 131:10
131:17
**familiarity**
117:5
**far** 108:20
**far-right** 57:10
**February**
133:22
**feedback** 130:20
**felonies** 32:18
**felony** 28:14
69:18 108:4,16
**felt** 122:3

CINDY JENNINGS  3/30/2017

females 101:5
Ferguson 93:17
  94:15
field 42:7,7
  46:15,16
  101:12 105:19
fields 27:6 42:8
  45:5,7,13,18
  45:23 46:2,11
  79:12,13,18
  80:11,12
figure 103:23
  106:25
file 21:9 31:11
  37:12 41:19
  45:4 48:9
  58:11,14,22,22
files 17:4,4 31:1
  31:3,5,8,14,17
  31:21 32:11
  41:20 45:4
  47:10,12,13
fills 44:3 125:8
financially
  138:20
find 11:2,5
  68:11,13
findings 93:20
  93:23
fingers 78:21
finish 10:3
first 11:16 14:6
  27:8,24 28:2
  39:23 58:8
  61:24 66:19
  69:5 108:17
  116:3 117:3
  118:7
five 10:23 33:7
  48:24 51:21
  57:3,6,13,14
  62:5
flag 59:3
Flojo 5:19 8:17
  8:17 10:7,9
  12:7,13 25:14

26:14 31:24
32:13 39:5
67:14 77:13
88:19,23 97:13
104:5 116:18
116:21 123:1
133:11 137:2
137:11,16
Floor 5:13 6:3
Florissant 13:21
  13:23 14:18
focus 36:20 37:5
  38:16 48:7
  76:1
focused 71:5
focusing 58:3
  79:8
folks 20:19
follow 102:6
followed 37:11
  43:7
following 11:17
  73:4 84:7
follow-up
  118:17 134:15
foregoing 138:9
forgot 133:18
form 22:9 25:16
  26:12 44:4,5
formal 14:14
format 106:20
found 12:2
foundation
  25:17 59:18
four 16:7 17:15
  33:7 76:23
fourth 100:9
frame 114:9
Franklin 23:25
free 72:20
front 118:20
full 21:15 105:5
fully 9:11
  103:20
Furlow 1:4 4:4
  7:17

further 104:9
  122:4 136:24
  138:15,18

_____

### G

G 7:11
gain 17:13 41:16
  43:6
gained 42:25
gang 48:9,10
Garrison 5:8
gathering 134:5
general 50:17
  81:17 82:3,4,6
  82:11
generated 99:24
  101:11 103:1
geographical
  23:21
give 11:13 15:2
  16:14 21:4,23
  22:3,10 47:11
  47:18,21 52:12
  63:15 78:20
  108:1 114:5,13
  122:11 133:21
  136:13
given 19:20 20:4
  43:4,19 44:3
  83:8 100:13
  117:5
gives 22:2
giving 24:20
go 9:20 10:4,10
  17:21,23,24
  18:17 21:19
  22:14,20 24:1
  24:4 25:2
  27:11 32:20
  33:23,25 35:17
  36:2 41:18
  42:7 44:7
  54:16 56:15
  59:2,16 60:23
  63:21 67:20
  68:22 79:12,19

97:4 100:24
107:13 108:4,9
108:13 109:5,8
114:12 121:11
122:5,7 127:6
129:14 137:5
goes 67:25 68:3
  74:24 75:1
  126:18
going 10:3 12:2
  13:1 18:9 19:7
  20:4,6 23:8
  30:1 34:11
  38:4 44:19,22
  45:6 46:18
  47:14 48:12
  49:5 54:9,19
  55:12 59:9
  63:19 72:5,6
  94:20,21,25
  95:4,23 99:8,8
  99:14 102:25
  105:2 111:25
  112:1 115:8
  116:6 120:12
  122:20 125:19
  125:19,25
  126:10 128:18
  132:7 134:18
  137:3
Gomez 2:8,9,10
  2:11,24 50:23
  50:25 53:12
  60:17,20 62:10
  62:13,16,22
  66:10 67:3,11
  68:22 72:17,19
  72:25 73:25
  99:15,17
  130:16 132:12
  132:14,22
  136:15
good 8:22,23
  19:22 67:10
  78:1
Gorham 80:21

81:7 82:18
government
  122:23
graduated 13:18
  14:6,16,19
gray 73:9
great 11:25
  12:19 54:16
ground 9:20
group 18:4 47:7
  47:22,25
groups 20:12
  45:21 46:17,21
  46:25 47:19
  48:7
grown 23:20
guarantee 63:8
  68:8
guess 18:20
  22:15 27:25
  28:21 55:1,5
  113:9 114:9
  118:17 131:6
guessing 118:19
guidance 94:5
guide 63:20
Guisado 5:12
  8:12,12
guys 130:1
  133:24 134:10

_____

### H

hair 27:9
hand 63:15 87:9
  99:14 121:5
handed 62:7
  63:17 96:16,17
handing 60:17
happen 42:23,24
  42:25 48:1
  80:1 83:13
  129:8
happened 71:2
  104:7
happening 75:9
happens 26:10

**CINDY JENNINGS  3/30/2017**

43:2 86:20
123:15 129:21
**head** 30:1 32:4
63:3 72:12
81:12 131:19
136:12
**heads** 72:10
**heard** 60:6
93:24 98:7
127:7 130:19
**height** 27:9,25
**held** 7:20 82:19
82:24 101:24
103:3
**help** 15:5 16:21
18:1 56:11,14
56:25 77:5
102:7 103:7
130:14 131:1
132:9 134:5,8
**helpful** 30:7
**helps** 56:13
133:22
**hereto** 138:20
**Hickey** 13:19
14:6,8,16,20
**high** 13:16 14:7
33:12
**Highway** 80:5
91:19
**hired** 15:16
**history** 37:13
**hit** 120:11 124:7
124:9,12 125:3
125:8,11,12
126:15,15,17
128:6,7
**hold** 20:4 96:23
**holds** 35:22
**Holland** 2:4 5:8
8:2,3,21,24
11:8,12 25:18
26:16 27:3
29:12,20 31:25
32:22 39:2,7
40:15 46:6

51:2 59:20
60:11,13,22
77:16 78:7,19
79:3 88:21,24
90:15 95:3,23
96:3,7,11,14
97:14 99:13,19
103:15 104:11
104:20 105:1
116:6,10,16,23
120:19,23
123:2 128:15
134:13 136:24
**hopefully** 9:19
13:3,3 23:15
75:8
**host** 91:13
**hot** 21:9 37:11
47:9,12,13
**hours** 14:1
58:15 103:18
131:9
**Hughes** 2:5 6:2
8:14,14 10:8
25:16 26:12
27:1 29:9,19
31:22 40:12
46:3 59:17
60:10 77:11
78:3 94:25
97:12 103:10
116:14,17,19
122:25 134:14
134:16 136:21
**hypotheticals**
80:10

———— I ————
**ID** 36:12 39:12
43:19 44:5
106:2
**idea** 16:14 47:18
47:21
**identification**
11:11 22:8,9
44:4 96:2,10

96:13 116:9
120:22
**identifiers** 67:18
68:7
**identifies** 22:9
**Illinois** 17:8
24:6 134:24
**immediately**
106:17
**impact** 78:8,10
78:12
**implemented**
117:10,18,22
**important** 25:23
38:3
**Improper** 25:17
59:18
**inaccurate**
26:19,22
**incident** 83:15
**incident-track...**
84:1
**include** 17:9
45:19 65:11
77:21 79:12
89:3,9 90:4,6
**included** 79:19
80:14 94:10
100:14
**including** 77:23
**incoming** 23:10
**incorporated**
71:6
**incorrect** 57:25
**INDEX** 2:1
**indicate** 109:4
**indicates** 90:3
**indictment**
73:10
**individual** 18:15
31:19 98:8
120:14 125:10
130:10
**individuals**
16:19 81:25
83:6 128:23

**individual's**
21:3
**inform** 40:18
49:3,11 114:25
130:23 131:1
**information**
21:19 24:25
25:6,12,23
26:6,10,18,23
27:4,10,22
28:1,6 30:25
31:5 41:20,24
41:25 42:10
43:10,15 45:1
45:4 46:1,13
47:14 64:3,16
64:22 66:23
73:14 76:14
77:3 79:21
90:6 127:15
129:6,12,17
134:1
**informational**
94:24
**initially** 61:17
**initiated** 119:13
**initiating** 98:4
**inlets** 37:12
**input** 21:20 42:6
**inputting** 64:15
64:21
**inquiries** 21:17
53:21
**inquiry** 21:13
44:24
**installments**
36:4
**instance** 26:22
**instruct** 17:21
**instructions**
122:4
**instructor** 87:11
**instructs** 10:10
**interest** 54:1,10
54:20 57:8
58:2,4 98:13

98:19
**interested** 31:13
31:20 55:5
69:2 138:21
**interface** 24:24
56:18,23 57:2
57:10,12
**interpret** 26:6
**intranet** 98:25
128:20
**intro** 43:23
**introduce** 8:1,4
49:5
**introduced**
122:3 123:17
**introduction**
37:11 44:16,23
**introductory**
44:14,25
128:13
**investigation**
93:17
**invited** 48:6
**involve** 17:19
**involved** 51:10
54:12 65:1
70:12 75:14
135:8
**involvement**
91:2
**in-service** 22:21
**Isom** 82:5
**issue** 32:7 79:5
83:15,16 102:8
104:13 117:4
135:23
**issued** 27:17,25
28:5 57:17,18
59:13,14 74:17
93:19,22 100:3
100:8,13 101:5
103:5
**issues** 83:19,20
84:6 124:1
**item** 2:13,15 3:2
97:15,17,24

CINDY JENNINGS  3/30/2017

118:19
**items** 96:16
116:11
**iterations** 75:1

**J**

**J** 5:8
**Jackson** 24:3
**January** 62:13
62:17 66:11
67:4 70:3
73:19,22 74:5
74:6,9 82:25
101:6 121:16
121:17,18
133:21,23
**Jeff** 49:1 72:14
98:1,7
**Jefferson** 23:25
**Jennings** 1:11
4:12 7:16 8:22
9:2 11:9 79:4
95:25 103:14
116:7,18,19,20
116:22 118:20
118:21 120:20
136:22 137:14
**job** 26:1,5 49:18
95:22
**John** 15:23 86:4
**Johnson** 24:5
**join** 26:14 31:24
77:13 123:1
**Jon** 1:7 4:7 8:15
92:6
**judges** 19:6
135:13
**judge's** 69:3
**July** 69:14,15
70:2 74:1
121:17
**jump** 10:2
**jurisdictions**
31:20 91:9
**justice** 17:4
129:3

**J-e-n-n-i-n-g-s**
9:3

**K**

**Kansas** 17:5,6,7
17:7 24:1,2,4,5
35:16,25 93:8
134:23 135:2
**Karen** 35:3
51:14 55:15
61:14,24 65:6
**Karl** 35:3 51:14
61:14
**keep** 9:10 10:11
38:20 86:25
87:20 88:7,13
100:18,23
111:6
**keeping** 110:24
110:25
**kept** 29:6 84:11
**Kevin** 8:16
**kind** 9:13 18:5,7
32:5 38:16
56:13 63:15
72:7 73:9 80:6
101:17 122:22
129:17
**know** 9:7,16
10:2 12:11,12
12:14,16 19:16
23:9 25:3,4
26:2,7 27:23
27:24 28:18,19
31:14,21 38:14
38:17,17 39:3
39:15,25 40:4
40:7,9 41:18
45:13 46:1,13
47:8,9 51:7,15
51:17,18 52:6
52:9,10 55:6
56:18,23 60:11
61:11 62:1
63:1,6 64:25
65:13,15 69:24

70:5,9,22
72:22 74:9,10
75:14,18,20
77:8,22,24
81:13,16 83:13
84:5,9 86:2,3
86:17,17 89:24
91:19,25 92:3
92:8 93:2,4
94:17 99:10
100:1 101:4,4
101:5 103:10
103:11 107:21
110:7,13,23
111:7 112:3
113:3,18,22
119:6,14,15
122:7 125:13
129:14 132:1
133:23 134:2
136:12
**knowledge**
29:13
**knowledgeable**
48:8
**known** 81:15
**knows** 27:24
75:10 129:12

**L**

**labeled** 105:19
107:8
**language** 69:5
69:25 70:4,16
71:5,16 81:1
89:11
**Larry** 15:20,23
**launch** 49:14
**Laura** 8:16
**law** 2:16,20 5:19
14:12 16:17,24
17:2,4 18:22
19:2 20:7
34:21,23 35:1
45:3 55:11,17
66:22 73:13

83:17 91:4,7
93:4,6,9
134:22 135:20
**lawyers** 65:1
93:1
**LC** 105:20 106:5
106:6 107:14
**lead** 25:13 33:6
33:8 34:18
37:9 64:16,22
127:15
**learn** 22:25 32:8
45:18 49:10
104:15
**learned** 81:8
83:10 90:8
**learning** 34:14
**leave** 58:3
**leaving** 119:7
**led** 103:2,4
**left** 100:7
**legal** 7:23 14:14
64:15,21 66:5
66:8
**legend** 62:10
**Legislative** 80:7
**length** 28:16,17
**LEPAC** 2:12,14
3:1 55:19,25
70:7,9,11
75:16 78:6
80:22 81:8,15
81:17,23 83:8
83:11 84:7
90:23 91:3
92:18 93:1,14
95:7,15 96:16
97:18 98:17
116:11 118:19
128:18,19
**LEPAC's** 75:19
98:21
**letter** 105:24
108:18
**letters** 107:16
**letting** 125:13

**let's** 9:20,24
12:10 13:14
20:3 23:12
33:4 36:20
50:21 58:3
60:15 63:10
66:9,10 72:17
72:19 76:1
77:2 80:10
104:14 105:3
123:25 124:6
124:22
**level** 21:8,12,17
21:18,21,23
22:1,5,6 28:18
32:17 36:18,20
36:21 37:9
39:11 41:16
43:3,6 44:4,17
44:21 52:19
53:5,7,9,14,17
53:18,19 63:24
71:23 76:6
77:1 80:24
88:5,11,14
102:9,11 106:8
106:15,20,22
110:8,11,12,18
112:21,21,22
129:16
**levels** 20:20,25
21:1 87:20
106:24 108:24
108:25 110:21
**Lieutenant** 49:1
50:9 72:14
98:1,7 130:15
130:16 132:12
132:14,22
136:15
**life** 111:8
**light** 73:9
**line** 63:22,22
105:18,21,21
107:13,14
108:9,13 109:8

CINDY JENNINGS  3/30/2017

109:9,25 119:1
137:5,5
**lines** 105:10
**list** 2:7 87:20
88:4,13 107:1
110:14
**listed** 13:9 27:22
57:10 66:19
67:8 80:11
101:21
**listening** 18:3
**listing** 114:13
**lists** 11:18
**Litigation** 4:14
6:7,13 7:21,24
**little** 17:1 18:12
22:15 23:12
33:4 36:25
41:9 55:22
56:12 68:25
113:9 114:2
**live** 123:19
**lives** 123:15
**LLP** 5:8
**local** 30:25 31:9
31:14,17 32:14
32:15,17,19
119:2,10,16
**locally** 31:11
**locate** 106:5,6
120:4,5,9
123:12,18
124:3 125:17
125:18,22
**located** 13:22
123:14,15,22
**locates** 120:16
122:2 123:5
**locate/detainer**
3:4 121:6
122:21
**Locust** 5:5
**Logistically**
132:9
**logistics** 41:24
**long** 12:15 13:25

15:7 28:9,17
29:4,21,24
34:17 35:13
82:6,11,19,24
83:3 87:17
89:18 101:24
103:2 114:19
116:5 123:14
**longer** 33:2
87:19 111:6
123:19
**look** 12:24 38:15
38:24 50:21
51:25 57:5
60:15 62:8
63:10 66:9
72:17 73:25
90:15 99:23
100:6 102:12
105:18 108:3,9
117:2 122:7,18
**looked** 13:7
68:17 77:20
87:8 121:18
**looking** 38:2
67:11,25 68:15
**lost** 32:2
**lot** 23:15 90:23
90:24 130:13
**Lou** 85:24 86:3
**Louis** 4:15 5:5
5:19,20 6:2,8
6:14 7:21 8:15
11:19 17:5
23:18,24,24
35:14 47:3
48:21,25 50:10
50:16 88:5,10
91:22 93:7
109:14,23
112:3,23
123:25 124:10
124:22,25
125:9,10,18
126:2,2,9,14
127:3,8 130:7

130:20 134:23
135:5 136:5,8
**lower** 129:16

———————

**M**

**machine** 7:5
**Madison** 24:6
**main** 28:4
**maintain** 19:11
87:14 100:2,4
100:5,12
**maintained**
24:14 69:4,10
83:19 84:22
100:14
**maintains**
100:16,22
**making** 48:9
50:3 54:12,14
54:18 75:15
**man** 11:6,13
**manager** 81:18
82:3,4,7,12
**manages** 129:6
**mandated** 80:3
**manual** 38:14
70:5,17 71:17
73:4 74:13,14
74:17 89:11
98:3 121:6,22
122:12
**manuals** 64:13
64:19 87:8
121:2,16,18
**Marc** 15:24,25
70:23 82:23
103:11,16
133:18
**March** 1:12 4:13
7:14 93:20
**mark** 11:9 87:2
95:24 96:7
114:17 116:7
120:20
**marked** 2:8,9,10
2:11,24,25

11:10 50:23,24
60:17,19 96:1
96:9,12 99:15
99:16 104:21
104:23 116:8
120:21
**Mary** 130:17
**material** 34:8,14
38:2 65:4
84:17 121:2
**materials** 19:16
33:24 34:1,3
34:10 50:21
61:6 65:1
84:15,21 87:9
87:14 128:16
130:23 131:1
134:5
**matter** 7:17
**matters** 11:17
11:18
**mean** 19:13 31:2
32:20 33:15
41:8 48:2
65:13 67:7
69:11 71:18
81:21 90:18
91:13 93:3
100:5 105:9,11
109:3,10
117:14 121:24
129:9,10,18
132:3 136:11
**meaning** 21:16
22:16 31:4
110:3 127:20
129:18
**means** 41:21
90:7 108:5
109:4 138:12
**media** 93:18
**medical** 9:12
**meet** 12:6 31:6
49:22 111:8
119:21
**meeting** 2:18,22

48:3,18 49:6
49:25 54:8
55:23 71:12
74:18 75:24
81:19,20,21,24
83:8 84:14,19
85:20,22 92:18
95:10,11,15
97:16,18 98:22
99:1 116:12
**meetings** 47:25
48:13,17,19
49:2,3,24 50:6
50:10,13 54:5
56:2 70:12
71:8 74:12
75:2 82:15
83:8 84:11,11
84:16 85:3,12
85:15,17 91:21
92:24 93:13
95:8 96:18
97:21 99:4,6
128:20
**member** 91:10
92:16 112:4,13
112:24 113:11
132:6
**members** 91:7
92:13,15 113:3
113:4,6,18
**mention** 89:4,24
**mentioned**
18:11 27:15
44:13 48:12
54:19 61:7
65:25 72:2
80:22 82:15
83:6 84:10
86:7,21 89:19
90:24 127:18
128:19 136:3
**mentions** 89:9
**Merit** 4:18
138:3
**Meschke** 2:25

CINDY JENNINGS  3/30/2017

15:24,25 23:14
37:22 70:23
75:21 82:23
103:11,16,20
103:25 104:21
104:24 133:18
133:19
**message** 73:10
74:2 77:21
80:25 89:13
90:2
**messaging** 90:2
**mhughes2@st...**
6:4
**Michael** 6:2
8:14
**middle** 73:8
**Midwest** 4:14
6:7,13 7:21,24
**Mike** 103:15
**miles** 109:5,12
**mind** 64:25
**mine** 33:20 68:3
121:10
**minute** 37:5
96:20,23
**minutes** 2:18,22
12:18,22 84:12
84:14 92:24
95:7,11,15,20
96:15,17,19
97:16,17,20
98:21 99:1,1,2
99:9 116:12
126:19 127:1,1
127:10,13
133:11
**misdemeanor**
28:14
**misdemeanors**
32:18
**missing** 47:16
52:25 53:4
61:5 67:20
97:7 120:17
**Missouri** 1:2 4:2

4:16,20 7:19
7:21 13:23
17:6 91:19
109:20 138:7
**misspoke** 41:4
72:18
**MO** 4:17 5:5,20
6:3,8,13,14
138:6
**moment** 73:2
**monitor** 49:18
**Monroe** 24:7
**month** 100:9,13
100:18 114:14
**monthly** 136:17
**months** 34:12,13
36:13 67:6
103:21 132:8
132:23
**morning** 8:22,23
41:10 79:5
**move** 56:3 99:13
104:4
**MULES** 29:5,14
29:17,22 30:10
30:20 31:18
32:10 33:1
40:5,10,14
49:8,11,13,15
49:22 50:6
57:21 58:8,13
58:17,19,21,24
59:2,4,5 69:4
69:10,17,17
75:22 85:3,12
85:15,19 90:1
90:9,9,10
105:9,11,12,14
105:15,16
109:21 111:11
111:15,16,19
111:20,24,25
112:1,11,12
113:7,12,19
117:10,22
127:22 129:7

129:11 130:4
**MULES-quali...**
117:23 118:11
**multiple** 67:8
68:2 92:11

___

**N**

**N** 5:1 7:11
**name** 7:22,22
8:2,24 9:1,1
15:19 27:8,8
27:23,24 28:3
58:11 86:19
88:4,4,13
102:23 132:1
**named** 58:14
**names** 85:25
130:10
**Nathaniel** 5:4
8:6
**national** 31:1,3
**naturally** 129:8
**ncarroll@arc...**
5:6
**NCIC** 29:5
30:11 40:5,11
49:8,11,16
57:20 58:8,13
58:16,22 59:2
59:6 69:4,11
69:17 80:3
105:13,16
127:3,22 129:7
129:11,24
**necessarily**
121:24
**necessary** 38:18
75:6
**need** 12:12,16
22:15 32:10
33:10 63:21
72:21 85:18
103:23 104:12
113:9 122:1
133:17 137:16
**needed** 41:25

42:11 45:2
46:11 83:13,13
122:4 134:5
**needs** 45:23
**neither** 138:15
**Net** 19:8
**never** 26:21
44:11 105:16
**new** 5:9,14 34:5
34:9,12 39:19
44:4,6 46:18
48:4 49:4 71:5
71:16 73:19
74:17 76:1
78:8,12 84:1,2
**nitty-gritty**
23:16
**Nods** 81:12
131:19
**normally** 34:22
115:8
**North** 4:15 6:8
6:14
**Notary** 4:19 7:6
138:6
**notes** 63:21
**notice** 95:2
**notified** 80:6,24
114:11 126:24
**notify** 75:6 80:5
80:6
**November** 3:2
117:20
**number** 7:18
20:5 37:2
39:25 67:25
100:10,12,14
100:17,19
101:7 108:10
113:5 121:11
**NY** 5:9,14

___

**O**

**O** 7:11
**object** 10:9
25:16 26:12

27:1 29:9
103:10 122:25
**objection** 10:11
25:14 29:19
31:22 32:13
40:12 46:3
59:17 60:10
77:11 78:3
**observe** 17:22
**obtain** 24:21
**obviously** 20:1
22:22
**occur** 36:14
48:14
**occurred** 50:12
132:25
**occurs** 95:10
**offense** 27:13
28:12,18 32:15
32:19 90:22
**offenses** 69:18
**office** 6:2 8:18
84:23
**officer** 20:17
21:6,23 22:3,4
23:7 24:25
27:21 32:25
44:4 47:14
59:16 66:22
71:23 73:14
76:6,16 90:21
106:7 107:19
111:10 112:6
112:21 114:24
115:5,14,19
124:6,8 125:1
126:6
**officers** 17:10
20:8 21:7,11
21:15,21 22:1
22:20,25 23:10
24:20 30:15
32:5 35:21
38:16 39:9,23
40:10 41:16
42:3 43:6 45:8

**CINDY JENNINGS  3/30/2017**

45:11,24 46:12
48:10 56:18,20
60:7 63:23
71:14,18 79:19
112:25 128:1
131:12
**officer's** 20:18
**officer/agency**
98:4
**offices** 4:14
**officials** 135:13
**oh** 34:12 62:4
68:13 94:19
101:4,7 112:22
133:14 136:13
**okay** 9:8,18
10:14 11:25
12:22 22:12,19
23:8 32:3 33:4
37:10 44:25
58:7 63:7 64:6
84:10 94:19
96:22 97:10,25
104:19 106:11
108:16 118:8
118:25 124:25
134:20 135:5
136:3,15
137:11
**old** 84:3 116:4
**Olive** 5:20
**onboarding**
18:5
**once** 9:23 10:24
12:18 28:8
35:19,21 36:12
39:12 44:2,2
54:16 55:13
106:25 110:2
112:17 113:12
123:14 125:22
126:1
**ones** 47:8 80:13
86:3 131:21
**one-day** 44:17
**one-page** 76:18

**one-to-one**
122:9
**online** 37:2
38:25 44:12
117:9,17,21
118:5
**on-job** 36:14
**oOo** 4:10 7:1,10
137:20
**operational**
49:16 80:4
129:24
**operations**
18:18
**operator** 22:8
42:12 44:3,22
**operators** 53:16
53:18 64:3
**opposed** 25:2
**option** 24:20
25:2 59:23,23
60:2
**options** 60:3
76:24 79:11
**oral** 19:15
**order** 22:4 24:16
24:17 30:2
40:10 46:14
54:20 69:3
76:15 105:6,7
106:17 107:5,8
107:23 108:7
110:7 111:11
111:16 112:10
117:11,23
118:11
**orders** 29:8
50:17 54:9
100:7 135:2,3
**ordinance** 28:15
**ordinances**
32:17
**ORI** 27:12,13,15
27:16
**original** 3:7
**originating**

120:8 126:23
127:17
**originator**
124:10
**outside** 32:20
49:7 93:2 95:2
108:5
**outstanding**
114:17 115:11
**overbroad** 26:13
78:4
**overlap** 32:5
**overview** 63:16
**owns** 123:23
**o0o** 1:3 4:3 7:12

---

**P**

**P** 5:1,1 7:11
108:18,22
**pad** 49:14
**page** 2:2 11:16
62:9 63:14,14
63:18,18,22,22
66:9,12 67:19
67:22,25 68:2
68:15,22 72:17
72:19,25 73:5
73:8,25 74:1,2
104:17 105:3
117:3 118:7
121:9,10,12
122:20 137:5,5
**pagination**
67:19
**paper** 38:10
**paragraph**
68:18 117:2
118:6,23
**paralegals** 19:7
**parallel** 111:11
**part** 26:1 42:19
43:11,12,13
44:18 48:10
52:12 68:6
77:12 90:1
95:21 115:10

115:18 118:16
120:16 121:1
123:20
**partial** 69:19
108:5,8,22
109:3,4
**participate**
46:17
**participated**
47:9
**participating**
34:23
**particular** 30:11
32:20 104:6
**parties** 138:17
138:20
**Partin** 8:16
**pass** 39:10,23
40:1 43:18
112:2
**passed** 59:6
**Patrol** 80:5
91:20
**Paul** 5:8 8:3
**PD** 130:18
**pedigree** 27:10
**pending** 72:22
**people** 16:6
17:15 20:11,14
20:16,22 34:20
34:21 48:8
64:14,20 72:6
86:1,13 92:14
**percentage**
39:22 113:22
**period** 39:15
52:4 110:17
117:21 119:23
120:2 122:12
**permissible**
135:19,23
**person** 32:15
47:15,16 54:1
54:20 57:7
58:4 61:5
66:24,25 73:15

73:17 76:9,12
76:13,22 82:15
91:12 98:5,13
98:18 101:20
101:24 102:3,7
103:2 104:1,2
104:3 105:6
106:2 107:19
109:6 115:8
120:7,8,18
123:11 124:7
125:1,3,14
126:7,8 127:6
127:10
**personally** 51:10
89:14 92:17
**personnel** 19:8
**persons** 53:1
54:10 58:2
**person's** 64:22
**perspective** 60:1
**Pezold** 130:16
133:2,3
**phone** 16:21
18:2,3 115:2
115:19 133:1
**physical** 121:11
**pick** 126:10
**place** 10:21
35:12 75:5
79:18 120:9
123:12,17
125:17,24
**placed** 70:7
78:17 125:22
**plaintiffs** 1:5 4:5
4:13 5:3 7:3
8:4,8,10,13
104:21
**please** 7:25
31:15 40:6
43:25 58:20
64:18
**plural** 46:5
**point** 13:11
43:20 44:9

63:20 72:21 120:1 127:4,19 134:3
**points** 13:2 18:8 38:3
**police** 11:19 17:9 18:23 20:8,16,18 21:5,7 22:20 22:21,23,25 23:7,8,10,19 24:10 30:15 31:20 35:19 41:16 45:22,25 46:4,7,8,10 47:4 48:21,25 50:17 57:18 59:13 60:3 69:2 88:6,10 91:8,22 92:5 93:17 112:4,23 123:25 124:4 130:7,20 131:11
**policies** 50:17 94:6 129:20 130:2
**policy** 2:17,21 55:11,17 59:25 91:4 127:23
**Poor** 124:21
**pops** 101:7
**pop-up** 76:14,18
**position** 15:16 76:24 82:24
**positions** 15:3
**possible** 111:17
**possibly** 71:8 99:9 101:12 124:17,18
**post** 49:13 72:8 72:8
**posted** 95:16 98:17 99:2 129:22
**posting** 129:13

**postings** 49:19
**potential** 91:1
**potentially** 134:7
**Powell** 82:10 84:6
**PowerPoint** 87:12
**PowerPoints** 87:10
**pre** 117:19
**preceded** 82:9 83:1
**prematurely** 109:19
**prepare** 12:3,6 12:23 16:20 33:2
**prepared** 11:22
**preparing** 86:21
**present** 7:25 74:6 81:18,18 81:20 83:24 115:22
**presented** 54:8 84:19 117:8,11 117:15,24 118:2,12
**presently** 23:23
**press** 125:7
**presumably** 75:9
**previous** 34:6 62:23 63:1
**previously** 2:8,9 2:10,11,24,25 23:14 50:23,24 60:17,19 96:5 97:21 99:15,16 104:23 107:14
**print** 138:13
**prior** 34:2 66:25 69:2 71:14 73:16 74:8 75:6 84:2 89:10 91:16

98:6 110:6 132:15
**private** 18:25 20:15,19,22 129:3
**privileged** 12:12
**probable** 65:12 65:14,16,20,22 66:23 69:6,24 70:3,16 73:15 76:10,16,25 77:6,22 80:25 89:3,5,6,9,20 90:3,17,21 98:5
**probably** 13:5,6 20:6 71:9 83:14 103:17 130:12 132:23
**procedure** 124:5
**procedures** 59:25 94:6 102:6 122:1 123:16 130:2
**proceedings** 17:25
**process** 39:9 74:25 80:8 81:5 114:3,6 114:15 115:12 115:18 117:9 117:17,21 118:16 119:13 123:24 128:6,7 129:6 136:7
**produce** 83:24 103:17
**produced** 4:12 103:11 116:12
**program** 14:10 14:11 18:5 19:8 46:11
**programmer** 74:25 75:10
**programmers** 45:24 79:12,21

80:19,24 81:9 86:5
**programming** 45:17 55:14 70:18,20 85:24
**properly** 135:15
**prosecutor** 115:13
**prosecutors** 18:25 19:6
**protections** 112:10
**provide** 25:2 30:9 46:1,13 120:15 130:21
**provided** 39:4 67:14 88:2
**provides** 24:24 30:24
**providing** 18:9 59:22
**PS** 19:8
**Public** 4:19 7:6 138:7
**publicly** 98:22 98:22 129:4
**published** 52:13
**Pudloswki** 15:24 83:2,3
**pull** 47:15 101:14 102:10 110:5,18 134:1
**punch** 106:9
**purely** 10:12
**purge** 110:1 111:2 119:21
**purged** 110:3,17 110:21,25
**purpose** 22:23 24:20,23 49:2 59:15,22,24 77:18,23 110:23 111:1 114:23 133:5
**purposes** 94:24 94:24

**put** 18:1 45:7 46:15 60:14 94:18 99:14 108:2 109:12 123:21 126:3 129:12
**p.m** 137:19

**Q**

**qualifications** 22:3 33:10 93:3
**qualified** 39:16 66:6 77:6 109:21 117:10
**qualifies** 85:17
**qualify** 30:25 31:2
**quarterly** 48:3 50:14,15
**question** 9:8 10:2,9,11 18:20 19:22,24 21:25 25:17 26:13 28:3,4 30:19,23 32:2 36:9 46:4 59:21 65:18 69:5,9 72:22 72:23 77:15 78:11 97:23 118:9,17 128:18
**questioned** 103:12
**questioning** 24:10,11 65:23 66:21 69:2 73:12 89:6,20 90:4,18,19,20
**questions** 8:25 9:5 12:20 28:2 37:3,19,23 38:1,11,12,17 40:19,24 55:21 94:14,22 95:1

CINDY JENNINGS  3/30/2017

95:5,6 99:9,11
103:13 133:7
135:1
**queue** 102:19
**quick** 78:19
**Quinby** 4:16
6:12 7:5,22
138:3,25

**R**

**R** 5:1,4 7:11
**race** 27:8
**ramifications**
64:15,21 65:8
**Ray** 8:17 39:2
68:11 103:8
**Raymond** 5:19
**read** 42:5,9
63:22 67:1
90:5 105:21
137:8
**reading** 43:10
118:8
**reads** 68:18
117:7
**ready** 33:25
132:7
**realize** 38:4
**really** 28:2,5
88:20 120:10
**Realtime** 4:18
138:4,6
**reason** 32:25
68:6 75:21
78:1 136:19
**reasonable** 26:7
**reasons** 108:1
111:5
**recall** 10:22
71:11,13 74:11
74:22 86:19
96:4 121:15
**receive** 36:12
88:17 94:2,5
125:3,11
**received** 13:17

72:15 103:18
103:18 104:6,9
134:4
**receives** 72:9,12
**receiving** 98:11
**recertify** 39:14
39:19
**Recess** 78:25
**recite** 29:25
**reclarify** 63:23
**recognize**
120:24
**recommendati...**
80:23 98:9
**recommendati...**
56:1
**recommended**
98:2
**reconfirmation**
120:10
**record** 7:14 8:19
9:1 10:12
17:13 31:10
32:21 35:10
45:7 57:7,16
57:17 58:22,24
58:25 59:4,8,8
59:13 60:2
66:19,22 68:19
68:19 69:1
73:13 75:18
76:5 78:24
79:2 86:8,11
86:14 100:19
100:23 101:13
103:15 104:5
104:12 105:13
105:14 106:3
106:12 107:6
107:18,22
108:3 109:21
109:22 110:2,5
111:4,5,7
114:16,18,19
115:6,7,9
120:7,8,12

123:11,13,14
123:16,18,18
123:22,23
124:10 125:18
125:24 126:3
126:12 127:14
137:13
**recorded** 35:8
**recording** 87:3
**records** 21:10
21:13 32:16
42:5,9 53:25
53:25 54:1,1,2
59:25 69:3,10
69:18 84:11
100:11,17
106:21,23
110:22 112:7
114:13 115:22
115:22 116:3
117:7,11,23
118:11,15
119:10,11
129:18,19
134:1,1 136:14
**recruit** 44:6
131:7,8 132:6
132:7
**red** 78:17
**reduced** 138:13
**refer** 89:3
**reference** 63:20
65:18
**references** 65:19
**referred** 55:18
82:1 107:3,4
**referring** 127:19
**regard** 43:4
**regarding** 11:17
69:6
**REGIS** 111:19
**Registered** 4:18
138:3
**registration**
21:9
**registrations**

37:13
**regular** 23:3
49:23,24 86:20
130:6,11,12
132:18
**REJIS** 8:18
10:19 11:7,20
14:18,19,23
15:3,8 18:6
19:13 20:25
22:10 23:13,17
23:18 24:14,17
24:20,24 25:1
25:1,7,9,10
26:10,18 27:5
28:10 30:10,19
30:24 31:10,17
32:11,21,23
33:1,11 36:17
37:10 39:6,11
39:13,18 40:19
40:22 41:11
42:12 43:20
44:16,23 45:11
45:13,22 46:10
46:11 47:2
49:7,18 50:13
50:22 56:23
57:2,9,12
58:10 59:1
65:7 66:25
69:4,10 72:10
73:16 79:10,14
79:21 80:13,20
81:15,23 83:7
83:12,19 84:4
85:6,7,15
88:11 91:10
93:10,12 94:6
95:11,14,16,19
98:2,3,6 99:24
100:2,12,15,22
101:3,6 102:3
102:7 103:1,7
105:6,8,13,17
107:4,7 108:6

110:3 111:10
111:13,14,15
111:18,24
112:1,2,14,25
112:25 113:7,9
113:12,19,21
114:25 119:1
119:11,16,20
124:15,16,20
127:21,22
128:12,22,24
129:7,11 132:7
135:15 136:18
**REJIS's** 59:22
60:1 91:14
**REJIS-created**
58:24
**REJIS-genera...**
99:23
**related** 11:18
134:11 138:16
**relates** 41:22
42:23
**relating** 47:22
100:22 114:3
**relative** 138:19
**relevant** 13:8
104:15 134:7
**remain** 28:9,24
29:22 33:1
**remarks** 109:11
109:11
**remember** 40:25
71:1 91:15
98:11 132:24
133:8
**reminders**
136:17
**removed** 110:4
119:19 120:1
**Renée** 7:22
138:25
**RENÉE** 4:16
6:12 7:5 138:3
**repeat** 25:8 40:6
64:18 118:9

**CINDY JENNINGS  3/30/2017**

reply 126:20
report 24:10
93:19,22,25
94:3,7,10
99:23 101:9,10
101:21 102:2
102:10,25
103:6,8,16
104:7 114:11
reporter 3:8
4:17,17,18,19
6:11 7:6 9:22
78:20 137:7,15
138:1,4,4,5,5
reporter's 7:22
reports 16:3
represent 8:15
representative
15:6 18:17
48:16,20,23
50:9 72:11
92:1,9
representatives
18:15 46:24
47:3 50:7 83:7
92:11,12 93:6
93:10
represented
77:10
request 75:19
78:6 104:11
127:2 136:11
requested 75:16
101:9,10 134:2
requests 104:9
131:4
require 89:6
119:2,5,12,16
136:4,5
required 27:6
42:18 48:18
56:11 64:7,9
71:19,21,25
114:14 124:8
125:4
requirement

27:18 57:24
60:7 66:1
89:25
requirements
77:10 80:12
requires 89:19
90:17
requiring 77:21
Reset 77:5
respond 126:25
response 41:19
43:12,13
125:13
Responses 43:14
43:15
responsibilities
16:15 49:20
95:18
responsibility
75:4 92:23
responsible
16:21,22,24
37:23 61:17,19
130:14
rest 78:20
result 46:2 94:7
resulted 101:23
retained 3:7
returned 41:21
42:6,7
Revenue 37:12
review 33:24
38:14 137:4
reviewed 93:25
reviewing 34:10
95:20
rflojo@slmpd...
5:21
ride-alongs
17:23
Rifkind 5:8
right 30:5 37:4
37:24 43:21
67:21 68:7
69:7 88:23
95:24 101:20

102:3 103:25
104:1,3 105:20
105:23 108:18
114:24 115:4
121:12,19,20
123:6 132:10
136:21 137:4
rights 5:13 8:11
8:13 98:24
RMK 109:9
RMR 6:12
138:25
role 21:3 22:5,6
33:5 82:9,19
82:21 83:1,4
rotate 35:7
rotation 34:19
35:5
routine 116:2
126:17
routinely 115:25
117:11,15,24
118:2,12
rule 126:18
rules 9:20
126:21 127:19
127:19,20,21
127:22 128:2
run 75:10 79:22
81:1 124:6
runs 125:2

_____
**S**
S 5:1 6:3 7:11
sake 9:18 10:4
saw 99:4 121:2
saying 26:21,23
57:6 90:9
101:2 125:8
says 11:16 66:12
66:20 67:21
69:1 73:11
98:1 100:7,25
105:8,15
108:10,14
109:9 118:4

119:1 121:12
122:20 136:13
scenario 32:6
scenarios 32:6
57:3,6
school 13:16,19
14:7 33:13
schooled 101:16
scope 95:2,4
screen 27:11
46:16 70:8
71:7 72:7 73:2
73:5 74:16,19
74:23 75:12,15
76:2,3,7,11,19
76:22 77:4,18
77:19,20 78:8
78:12 79:22
80:11 89:12,13
106:7 124:13
124:14 125:7
seat 91:20
seats 35:24,25
second 69:9
100:8 126:22
126:22
secretarial
14:10,11 33:19
secretary 15:4
91:16,17 92:22
93:14
section 45:1
94:10
security 19:7
20:21 36:19
43:4 108:10
see 9:21 11:20
18:18 39:3,16
39:16 43:5
44:10,11 62:11
62:14,17 66:13
67:16 68:11
72:6 74:20
76:7 77:4
88:24 95:14
98:16 99:3

100:10 102:24
104:15 105:3,9
105:19,19,23
106:14,21,23
106:25 107:2
107:16 108:3
108:12 109:9
109:17 111:21
114:18 118:4
119:1 121:13
122:7 128:15
seeing 76:2,10
76:14,22 96:4
108:8
seek 45:9,12
seen 40:16 73:5
94:22 95:1,7
96:6,17 97:20
109:21 116:24
117:3
send 36:11 72:4
72:7 90:2
100:25 105:15
114:8 118:14
124:9,12 125:5
125:6 126:22
127:2
sending 125:9
sends 25:1 49:16
send-out 72:8
senior 51:11
61:15
sense 10:12
16:13
sent 31:11 41:25
71:9 72:3 84:6
84:7,19 101:2
118:15 126:23
127:2
separate 19:21
37:17 42:21,22
43:21 44:13
62:8 128:9,11
separately 44:18
served 77:18
service 33:20

**CINDY JENNINGS  3/30/2017**

36:14 71:9
72:5,8
**services** 4:14 6:7
6:13 7:24
15:18 81:19
82:22
**set** 11:25 36:19
131:22 132:3,9
**seven** 44:22
**severity** 28:11
30:4 32:17
59:10 109:1
119:22 120:2
**sex** 27:8
**share** 129:11
**shared** 87:12
**sharing** 129:7
**Sharon** 130:16
133:2,3
**sheet** 86:23
**sheets** 33:25
86:25 87:3
**Sheriff** 124:20
**short** 134:18
136:22
**shorthand** 4:17
7:5 138:5
**shot** 74:16
**show** 11:8 25:14
94:20 95:23
104:20 107:9
116:6 120:19
**showed** 11:6
13:10 74:15
**showing** 13:1
116:12 126:4
**shown** 50:25
60:20 99:17
104:24
**shows** 103:1,16
**side** 24:1,4 35:15
35:16,20
**signature** 7:7
137:9,10,17
**similar** 40:7,8
**single** 41:19

47:1 89:21
136:13
**single-day** 52:24
**singular** 46:4
**sir** 67:12 97:8
106:10 107:21
108:23 117:1
118:22
**sit** 17:21,24
86:13 93:1
**site** 52:14
**sits** 91:6 93:11
**sitting** 13:4
**situation** 26:17
30:11 56:24
81:11 118:24
**six** 36:13 82:8
116:16
**Social** 108:10
**sodomy** 108:17
**somebody** 81:7
90:6 110:7,11
110:12 111:14
**someone's** 49:18
**soon** 9:19
106:16
**sorry** 41:4 54:15
54:17 76:20
97:5,11 116:14
118:9 121:11
133:16
**sort** 118:2
**sorts** 129:20
**sound** 121:19
**Sounds** 121:20
**spare** 23:16
**sparked** 65:19
**speak** 12:15
59:3 132:12,16
132:18 133:19
136:8
**speaking** 46:7
80:9
**special** 110:4,18
110:20
**specialization**

35:5
**specific** 18:13
41:7 47:8 48:7
62:1 88:11
90:12 100:22
113:5 129:10
**specifically** 45:6
70:11,20 78:15
79:8 86:18
90:7
**speculation**
25:15 26:14
29:11 31:23
40:13 59:18
77:12
**spell** 9:1
**spend** 34:10
**spent** 41:2,6,16
43:8
**spoke** 12:7,18
54:15
**spoken** 132:22
133:10
**St** 4:15 5:5,19,20
6:2,8,14 7:21
8:15 11:19
17:5 23:18,24
23:24,25 24:7
35:14 47:3
48:21,25 50:10
50:16 88:5,10
91:22 93:7
109:14,23
112:3,23
123:25 124:3,5
124:10,19,20
124:22,25
125:9,10,18
126:2,2,9,14
127:3,8 130:7
130:20 134:23
135:5 136:5,8
**staff** 37:22 45:17
55:14 70:18,21
85:11,21,24
132:6

**stamped** 106:3
**stamps** 67:15
**stand** 105:25
**standpoint**
135:25
**stands** 106:1,6
**start** 14:18
66:10 72:19
**started** 14:19
15:4 17:17
**starting** 13:15
**starts** 105:20
118:23
**state** 4:15,20
8:25 24:2 31:1
31:3,11,12
32:15 69:19
98:3 109:20
126:24 127:3
138:7
**statement** 60:9
65:23 69:12
89:7
**States** 1:1 4:1
7:18
**statewide** 31:13
31:19
**status** 123:19
127:17
**Statutory**
108:16
**stay** 28:16 95:19
**staying** 24:19
**stays** 31:11
**stenographic**
138:12
**step** 120:9,14
125:16,23
**STIPULATED**
7:2
**stolen** 47:16,17
**stop** 12:10 24:16
24:17 29:8
30:2 54:9,20
105:6,7 106:16
107:4,8,23

108:6 110:6
111:11,16
117:11,23
118:11 124:11
135:2,3
**stopped** 93:14
127:4
**stops** 120:7
**stored** 31:1 59:5
59:5 84:24
101:3
**straight** 58:9
**Street** 4:15 5:5
5:20 6:8,14
**strictly** 105:13
**strike** 50:20
51:19 56:2,21
63:10 65:10
70:14 71:20
78:11
**students** 63:20
78:16 86:15
89:5 122:4
**stuff** 101:17
**subject** 66:20
69:2 73:12
**Submit** 76:23
77:5
**subpoena** 13:10
104:6,13
133:20 134:4
**subsequently**
98:2
**substance** 9:12
**subtitle** 122:23
**suggest** 117:25
121:21
**suggests** 62:23
117:22 118:10
**Suite** 5:20
**summaries**
95:16 98:12
99:7 128:19
**summary** 94:2
98:16,25 99:2
99:4,5

**CINDY JENNINGS  3/30/2017**

supervise 16:19
supervises 80:19
supervisor 15:6
    15:14,17,22
    16:1,11,16
    23:13 33:5
    38:6 52:4 62:3
    82:14 100:21
    101:16 135:9
supervisors
    15:21
support 56:10
suppressed 73:9
sure 10:6 18:7
    26:5 31:16
    33:24 34:7
    72:24 75:25
    86:22 118:4
    124:24 129:10
    136:8
surrounded
    109:23
suspect 111:12
swear 80:16
sworn 4:12
    138:9
system 21:19
    28:9,10,16
    31:5 32:9,10
    32:16 33:2
    34:5,15 41:11
    49:4,6 50:2,4
    59:5 64:14,20
    72:4 74:15
    80:16 83:15,20
    84:1,2,3 85:20
    101:1 105:6,8
    106:4,18 107:7
    107:18 108:6
    110:3 112:11
    123:19 126:24
    127:3,20
    135:15
systems 17:13
    19:10 29:5,6
    29:13 30:13

31:7 32:4 49:4
138:6

**T**

TAC 48:3,12,24
    49:3,24,25
    50:6,13 54:5,8
    55:23 56:2
    71:8,12 72:12
    74:12 84:10,14
    85:3,12,15,17
    85:20
TACs 72:10
take 9:23 10:21
    20:13,15,16,17
    23:3,6 35:12
    36:1,16,22
    39:9,15,19
    40:10 43:7
    44:22 50:21
    53:9 60:15
    63:10,24 64:4
    64:5,7,11 66:9
    72:17,20 78:16
    78:19 79:21
    86:23 90:15
    92:23 96:24
    97:11 122:11
    125:4,17 126:8
    127:10,12,16
    133:21
taken 4:13 7:4
    30:15 78:25
    83:11,11 111:6
    137:7 138:11
    138:18
takes 35:20 53:2
    75:5
talk 9:24 23:12
    33:4 37:4 48:4
    50:5 80:10
    103:19 110:14
    120:7 130:13
    130:15,16
    133:24 134:10
talked 41:9 73:2

87:21 90:23
    104:8 107:14
    128:17 133:23
    134:22 137:2
talking 9:22,25
    53:24 79:5
    94:14 105:20
    113:16 114:9
    130:11,18
talks 109:25
taught 44:18
    122:16 127:15
    128:1,4,5,12
    131:8
teach 20:1,4
    42:3,5 44:8
    63:18,18,18
    66:6 131:21
teaches 35:6
teaching 34:7,11
    44:7 89:18
    122:3
team 16:23 35:2
    81:2 83:16,17
    102:15,16,20
technical 41:23
    49:16 80:4
    129:24
teletype 68:19
    112:7
teletypes 50:18
    107:24 118:1
tell 13:11 16:25
    28:17 35:11
    36:25 46:9,10
    46:15 48:20,23
    52:22 63:12
    70:23 72:3
    79:11,19,25
    105:4 114:2,21
    114:22 115:2
    125:18 131:7
telling 75:8
tells 45:22 46:8
    81:9 107:17
temporary 29:1

30:2 53:25
    57:7,21,23
    58:5,14,21
    59:1,8,9 69:21
    ten 15:15 38:6
    51:23 82:20
    83:5 108:25
    126:19,25
    127:1
ten-minute
    126:18
term 58:11
Terminal 48:4
    48:13
terms 41:23
    130:2
test 36:24 37:1,2
    37:20 39:10,15
    40:1,4,9,16,19
    41:1 44:12
    49:14 75:11
    129:22
testified 103:21
    136:16
testify 11:22
    138:10
testifying 11:3
    11:17 12:3
testimony 138:8
    138:11
testing 34:15
    36:15
tests 38:21 40:22
    79:22 81:1
Thank 9:4 19:2
    60:24 68:14
    78:22 109:24
    136:22,25
    137:1
themself 124:9
thereto 55:25
thing 89:1
    112:12 137:15
things 49:5 72:7
    95:1 120:5
    129:20

think 21:21 30:8
    60:16 62:9
    63:4 67:8,22
    69:20,22 73:1
    77:9 78:1 83:5
    95:24 116:21
    122:12 128:15
    137:2
thinking 90:12
third 58:9 82:21
    100:9 127:2
tholland@pau...
    5:10
thought 102:2
three 10:18,19
    11:4 12:1 15:9
    30:13 32:4
    34:20 35:1,4
    44:7 58:5 62:7
    62:8,19 75:1
    81:22,22,25
    103:17 105:10
    132:8
Thursday 4:12
ticket 102:13
tickets 130:14
    130:15
Tim 8:24
time 7:15 31:15
    34:10 39:15
    41:2,6,18 43:8
    44:9 52:7
    64:18 70:25
    78:23 79:1
    80:15 88:8
    106:2 107:17
    112:6 114:9
    116:4 117:7,21
    119:23 120:2
    122:11 132:21
    137:12
times 10:9,17
    12:15 20:1
    38:9 52:9 67:8
    68:2
Timothy 5:8 8:2

CINDY JENNINGS  3/30/2017

**title** 82:1
**today** 8:25 9:5
  9:12,16 10:5
  11:3,22 12:4
  13:2,7 20:12
  28:22 33:8
  54:16 82:2,4
  87:9 90:24
  119:15 131:24
  134:14 136:25
**Today's** 7:14
**told** 20:12 37:22
  70:13,15 74:22
  75:21 80:12
  113:10 126:9
  133:25 136:21
**tool** 56:14,17,20
  56:23
**top** 30:1 58:5
  63:3 66:12
  136:12
**topic** 95:3
**topics** 2:7 11:23
  13:9 23:2 37:6
**touch** 126:13
**track** 100:18
**train** 17:2,3,12
  19:3,4 22:13
  22:14,24,25
  23:2,9 30:9,17
  32:7 35:18
  36:2,3 42:10
  45:8,11 61:5
  64:20 71:19
  135:13,14,18
  135:19,22
  136:1
**trained** 17:16
  71:14 78:9,10
  78:13
**trainer** 15:5,8
  15:11 18:16
  22:17 23:5,9
  33:11 51:11
  61:15 95:19
**trainers** 16:8

17:17 19:3
  22:13,22 49:15
  49:20,21 66:4
  85:8 131:14,17
  131:20 135:9
**training** 11:18
  14:12,14 15:6
  15:14,17,22
  16:10,16,17,18
  16:25 17:19
  18:9 20:18
  22:22 23:3
  30:10,14 33:5
  33:5,22 34:2,4
  34:9,19 36:10
  36:14 38:6
  41:15,22 45:25
  52:4 62:2
  64:14 65:4,12
  65:13,15,21
  71:5,7,16
  85:11,14 98:3
  100:20 101:15
  102:12 103:13
  120:15 122:23
  131:11,22
  132:8 134:22
  135:9
**trainings** 19:16
  19:17,19 22:12
  33:6,8 35:8,11
  56:5,9 63:13
  86:8 94:6
  129:19 130:21
  131:2,5 132:4
**transactions**
  110:4
**transcribed** 7:7
**transcript** 3:9
  137:3
**true** 119:15
**trust** 137:6
**truth** 138:10,11
**truthfully** 9:11
**try** 9:7,24 39:24
  68:11 79:6

130:1
**trying** 32:3,8
  56:1 77:17
  81:14 103:19
  103:23
**turn** 62:9 67:3
  121:9 126:1
**twice** 50:1,12
**two** 9:22 28:2
  34:21 35:17
  37:18 39:1,17
  39:18 44:10
  48:19 58:8
  67:6 87:1
  96:18 97:6,20
  99:4 103:13,17
  103:21 110:4
  112:8 120:5
  126:16 132:23
**two-day** 36:21
  37:5,7,8 39:10
  41:1,3,5 42:20
  42:24 43:7,8
  44:8
**type** 30:3 31:8
  66:19 68:20
  69:1 88:2
  100:16,21
  101:6 104:6
**types** 20:24 21:5
**typewriting** 7:7
**typical** 47:21

─── **U** ───

**Uh-huh** 52:16
  107:15 117:13
  127:25 128:8
**unable** 126:13
  127:8
**unclear** 9:6
**underneath**
  17:16 33:7
  108:13,18
  109:8
**understand** 9:5
  20:17 21:25

39:8 43:9
  50:22 56:1,11
  77:14,17 81:14
  94:9,22 99:22
  101:15 111:9
**understanding**
  43:5 68:16
  75:23 80:17
  90:25 93:5
  117:3 135:12
**understood**
  33:21 94:10
  106:13 109:24
  127:18 132:11
**unit** 18:6 51:6,9
  52:11 102:12
  130:17
**United** 1:1 4:1
  7:18
**unnecessary**
  57:23
**update** 49:16
  55:14 73:4
  75:5,6 80:4
  129:24
**updated** 34:8
  38:15 51:19
  52:6 62:11,13
  62:16,23 66:11
  87:18
**updates** 39:13
  55:15 61:18,21
**updating** 67:6
**upper** 100:7
**up-to-date** 95:19
**urgent** 126:17
  126:18
**use** 3:5 19:8,15
  19:16 22:24
  26:7 30:10,19
  32:5,9 33:1
  41:10 52:11
  56:4,8,14,18
  56:24 57:2
  59:11 61:4
  63:12,19 64:14

64:20 87:10
  94:23 112:14
  112:18,25
  113:12,13
  122:21 131:14
  131:18
**user** 32:11 36:17
  39:12,18 43:19
  44:5 45:21
  46:17,21,25
  47:7,19,22,25
  106:2,4
**users** 26:2,6
  32:10 40:22
  56:23 74:20
  123:4
**uses** 47:1 93:10
**usually** 50:3

─── **V** ───

**vague** 9:6
**valid** 87:19
  120:12 127:14
**validate** 111:5
  115:9 119:8
**validated** 114:14
  114:18 115:23
  115:25 116:3
  119:2,6,12,17
**validates** 115:21
**validating** 115:3
  115:5,7
**validation** 114:3
  114:6,8,15
  115:10,17,18
  117:6,8,9,12
  117:15,17,21
  117:24 118:3
  118:12,16
  119:12 136:4,5
  136:7,17
**Valley** 13:21
**varies** 30:1
  46:22 53:6
  123:15
**variety** 129:25

**CINDY JENNINGS  3/30/2017**

**various** 13:2
  18:8 20:11,24
  56:19 93:6
**varying** 37:2
**vehicle** 21:9
  37:13 47:15,16
  47:17 120:17
  125:2
**verify** 115:15
**version** 62:23
  63:1 66:12
  67:4,5,23
  68:17,18 69:7
  69:25 73:1,23
  74:1,5,7,8,9
**versions** 62:19
**versus** 7:17
  28:14,15 30:13
  59:13
**video** 35:8 86:9
  86:11
**videographer**
  6:6 7:13,23
  78:23 79:1
  137:12
**videotapes** 87:5
**video-recorded**
  1:10 4:11 7:16
**view** 84:25
  106:8 110:19
  110:21
**viewable** 110:7
  110:10,12
**viewing** 22:2
**views** 20:21
  57:22
**visit** 18:12
**vote** 91:13
**Voting** 92:11
**vs** 1:6 4:6 66:13
———————
**W**
**wait** 10:1 72:22
  96:20
**waive** 137:9,10
**waived** 7:8

137:18
**walk** 13:14,16
  15:1 63:14
  104:14 123:24
**walking** 34:15
**Walsh** 8:16
**want** 10:2 28:21
  32:10,16 38:3
  40:8,8 42:12
  46:19 48:10
  79:18 88:24
  90:15,25 94:23
  97:10 102:25
  113:11 118:15
  120:13 128:15
  131:8 136:5
**wanted** 24:8,9,9
  24:10,19,21
  25:1,10 26:18
  27:4,22,25
  28:5,8 30:2
  31:13,19 32:15
  32:18 33:1
  41:25 42:13
  43:11,16 45:2
  45:7,9,12,13
  45:23 46:2,11
  46:14 47:15,17
  47:23 50:4
  52:13,15,22,24
  52:25 53:3,25
  53:25 56:7
  57:7,7,16,17
  57:21 58:6,6,9
  58:12,14,14,21
  59:2,8,8,9,12
  59:15,23 60:2
  61:5,5,7 63:13
  64:8 65:8,11
  65:22 66:1,1
  66:12,17,20,20
  66:23,25 68:19
  69:1,3,9,18
  70:4,5,16
  73:10,11,12,14
  73:16 74:20

76:5,15 77:3
  78:14 79:20
  80:10,14,25
  89:1,19 90:4
  90:17,20 98:6
  98:13,18
  100:15 101:3
  101:21,21
  103:6 104:14
  105:5 107:23
  108:2,5,16
  111:10,15
  114:23 115:14
  115:15 117:4,7
  118:15 119:8
  120:17 121:3,6
  121:18,22
  122:12 123:10
  123:11 124:1
  125:1,3,14
  126:3 128:9
  133:7 135:23
**wanteds** 28:24
  29:2,5,7,17
  41:2,6,13,17
  41:23 42:4
  43:9 50:18
  58:3 60:6
  69:21,21 77:10
  77:21 79:9
  80:15 89:6
  94:11 98:3
  100:2,4,13,22
  101:5,22,22
  103:1,3,4
  112:14 114:3
  115:24 117:14
  119:2,9,16,19
  135:2,6
**Wanted/Stop**
  100:7
**wants** 22:10
  112:7
**warning** 76:15
**warrant** 24:22
  25:3 27:17,17

27:19 28:15
  30:2 53:25
  57:6,16,17,23
  58:5 59:13,16
  59:23 60:2,7
  66:13,21 73:13
  103:4 115:13
  125:15
**warrants** 30:2
  101:25 117:10
  117:23 118:11
**wasn't** 71:25
**way** 26:7,13
  40:18 78:12
  79:24,25,25
  111:5
**ways** 32:5 65:20
  80:2 129:21,25
**website** 49:13
  129:13,22
**websites** 49:19
**weeks** 11:4 12:2
  82:8
**weight** 27:9
**Weiss** 5:8 8:3
**welcome** 136:23
**went** 14:2,3
  38:10 70:18
  121:16
**weren't** 36:3
**we'll** 30:6 37:4
  88:19 104:11
  104:13 106:25
  120:7 128:15
**we're** 7:23 13:5
  23:8 35:22
  46:18,23 49:4
  72:25 75:2
  79:2 91:12
  104:17,18
**we've** 13:9 34:6
  41:9 42:20
  52:17,18 67:13
  67:15 87:8
  90:23,24
**Wharton** 5:8

**whichever** 81:21
**White** 15:20,23
**Wicking** 130:17
**William** 82:10
**Willman** 35:3
**Wilson** 5:12 8:9
  8:9
**withdraw** 59:21
**withdrawn**
  28:25 30:17
  34:17 41:4
  46:9 48:22
**witness** 5:18 7:9
  32:14 39:6
  40:14 51:1
  60:12,21 77:14
  78:5,22 99:18
  104:25 136:23
  137:1,10,18
  138:8,11
**wonder** 101:4
**wondering**
  12:14 44:14
  117:25
**word** 32:24
**wording** 77:19
**words** 9:23
**work** 11:6 17:22
  18:4,5,16 34:2
  45:21 83:18
**worked** 14:23
  15:3,4 122:2
**working** 16:22
**worry** 134:19
**wouldn't** 31:12
  31:13,19 59:15
  59:16 68:8
  80:16 110:20
  127:12
**wrap** 32:3
**wrong** 32:24
  69:13,14,14,15
  69:22,23
———————
**Y**
**yeah** 25:21 29:9

CINDY JENNINGS  3/30/2017

| | | | | |
|---|---|---|---|---|
| 34:15 89:15 | **16** 2:9 60:18 | **212)373-3373** | 1:6 4:6 | **8** 2:4 |
| 101:13 122:17 | 62:13 66:10 | 5:10 | **4052** 105:21 | **8:30** 35:16 |
| 131:25 136:13 | 72:19,25 | **212)614-6464** | **41** 6:3 | **80** 92:21 |
| **year** 14:21 15:2 | **16-18** 60:20 | 5:14 | **48** 58:14 | **80s** 15:10 |
| 19:20 20:4 | **17** 2:10 60:18 | **24** 2:24 72:17,19 | | **81** 92:21 |
| 38:13 50:1,12 | 62:10,22 68:22 | 72:25 74:1 | **5** | **855)724-2489** |
| 58:19 62:17 | 72:17 73:25 | 99:15,17 | **5** 2:20 96:11,12 | 5:6 |
| 98:14 100:8,14 | **18** 2:11 35:22 | **25** 35:25 | 97:10 | |
| 101:22 114:19 | 36:1 60:18 | **27** 21:8,21 36:20 | **5th** 96:20,22 | **9** |
| **years** 10:22,23 | 62:16 67:3,11 | 36:21 37:9 | 97:1,2 | **9** 138:22 |
| 15:9,15 38:7 | **1915** 5:20 | 39:11 41:16 | **50** 2:8 | **9th** 6:3 |
| 39:1,4,17,18 | **1978** 14:24 | 43:6 44:4,17 | **55** 53:18,19,20 | **9:00** 35:15 |
| 44:11 48:24 | | 52:19 53:7,9 | **56789** 68:3 | **9:28** 1:15 |
| 51:21,23 62:5 | **2** | 63:24 71:23 | **567911** 67:25 | **9:29** 7:11,15 |
| 82:13,20 83:5 | **2** 2:12,25 21:17 | 76:6 106:8 | | **90** 116:2,4 136:6 |
| 87:1 108:17 | 21:23 22:1 | 110:8,11 | **6** | 136:16 |
| **Yep** 108:15 | 44:21 53:14,17 | | **6** 2:15,19 3:1 | **91** 67:21 |
| **yesterday** 12:7 | 95:24,25 96:16 | **3** | 116:7,8,18,19 | **96** 2:12,14,16,20 |
| **York** 5:9,14 | 102:9,11 | **3** 2:8,14 50:23 | 116:20,22 | **99** 2:24 |
| | 104:21,24 | 50:25 53:12 | 121:10 | |
| **#** | 118:20,21 | 95:25 96:16 | **6th** 96:22 97:7 | |
| **#11867** 6:12 | 121:9,11 | 118:20 | 97:17,24 | |
| **#1291** 6:13 | **2-3** 96:1 | **3rd** 133:22 | **60** 2:9,10,11 | |
| 138:25 | **2010** 121:13,22 | **3:30** 35:16 | 21:1 116:4 | |
| | 122:8 | **30** 1:12 4:13 | 136:6,6 | |
| **0** | **2011** 101:6 | 12:18,22 37:21 | **602** 132:7 | |
| **05/2010** 121:12 | **2012** 3:2 117:20 | 110:24 127:9 | **63101** 6:8,14 | |
| | **2014** 69:6,14,15 | 127:13 133:11 | **63103** 5:5,20 | |
| **1** | 70:2 74:1 | **30th** 7:14 | **63105** 6:3 | |
| **1** 2:7 3:2 11:9,10 | 77:20 121:16 | **30-day** 110:16 | **666** 5:13 | |
| 68:2 | 121:17 | **314)444-5609** | | |
| **1st** 82:25 | **2015** 2:13,15,19 | 5:21 | **7** | |
| **10:55** 78:23 | 2:23 93:20 | **314)615-7042** | **7** 2:13,23 3:3 | |
| **10012** 5:14 | 97:16,17,24 | 6:4 | 120:20,21 | |
| **10019-6064** 5:9 | 118:18 | **314)644-2191** | **7th** 5:13 97:16 | |
| **104** 2:25 | **2016** 62:13 | 6:9,15 | 118:18 | |
| **11** 2:7 68:3 | 66:11 68:18 | **38** 35:25 36:1 | **7/2014** 62:11,23 | |
| **11th** 4:15 6:8,14 | 69:25 70:3 | | **711** 4:14 6:8,14 | |
| **11:09** 79:1 | 73:1,19,22 | **4** | **73** 20:9 | |
| **116** 3:1 | 74:5,6,9 77:22 | **4** 2:16 66:9,12 | **74** 20:9 | |
| **12:20** 137:19 | 98:14 121:17 | 68:15,22 96:8 | **75** 20:6 | |
| **12:21** 137:12 | **2017** 1:12 4:13 | 96:9 97:10,11 | **773** 5:20 | |
| **120** 3:3 | 7:14 62:17 | 97:13,14 | **78** 14:22 91:18 | |
| **1210** 5:5 | 67:4 121:18 | **4:00** 35:15 | 92:21 | |
| **1285** 5:9 | 138:22 | **4:16-CV-0024...** | **79** 92:21 | |
| **134** 2:5 | **21** 71:23 | 7:18 | | |
| **14** 108:17 | | **4:16-CV-0025...** | **8** | |