# Exhibit 13

**PETER MORROW  4/5/2017**

Page 1

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF MISSOURI
 2                 EASTERN DIVISION
 3                    --oOo--
     DWAYNE FURLOW, et al.,      )
 4                               )
         Plaintiffs,             )
 5                               )
             vs.        )No. 4:16-CV-00254-CEJ
 6                               )
     JON BELMAR, et al.,         )
 7                               )
         Defendants.             )
 8   _____)
 9
        VIDEO-RECORDED 30(b)6 DEPOSITION OF PETER MORROW
10          FOR THE COUNTY OF ST. LOUIS
11   _____
12              April 5, 2017
13
14
15        (Beginning at 1:41 p.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF MISSOURI
 2                 EASTERN DIVISION
 3                    --oOo--
     DWAYNE FURLOW, et al.,      )
 4                               )
         Plaintiffs,             )
 5                               )
             vs.        )No. 4:16-CV-00254-CEJ
 6                               )
     JON BELMAR, et al.,         )
 7                               )
         Defendants.             )
 8   _____)
 9                    --oOo--
10        VIDEO-RECORDED DEPOSITION OF PETER MORROW,
11   produced, sworn, and examined on Thursday, March 30,
12   2017, taken on behalf of the Plaintiffs, at the
13   offices of Midwest Litigation Services, 711 North
14   11th Street, in the City of St. Louis, State of
15   Missouri, before RENÉE COMBS QUINBY, a Certified
16   Court Reporter (MO), Certified Shorthand Reporter
17   (CA), Registered Merit Reporter, Certified Realtime
18   Reporter, and a Notary Public within and for the
19   State of Missouri.
20
21
22
23
24
25
```

Page 2

```
 1               INDEX
 2                            PAGE
 3
 4   EXAMINATION BY MR. HOLLAND ....................8
 5
 6               EXHIBITS
 7   Exhibit 1   Notice of deposition          11
     Exhibit 2   Newsletter                    41
 8   Exhibit 3   Newsletter                    41
     Exhibit 7   Previously marked exhibit     51
 9   Exhibit 8   Previously marked exhibit     51
     Exhibit 9   Previously marked exhibit     51
10   Exhibit 14  Previously marked exhibit     94
     Exhibit 15  Previously marked exhibit     94
11   Exhibit 4   Document entitled "Field Training 102
                 and Evaluation Program"
12   Exhibit 5   Document entitled "Field Training 105
                 and Evaluation Program"
13   Exhibit 6   Document entitled "LEPAC Agenda 107
                 Item" dated August 6, 2015
14   Exhibit 16  Previously marked exhibit     109
15   Exhibit 17  Previously marked exhibit     109
     Exhibit 7   St. Louis County inmate short 122
16               profile for Ralph Torres
17
     (The original exhibits were retained by the court
18   reporter and will be copied and attached to copies
     of the transcript.)
19
20
21
22
23
24
25
```

Page 4

```
 1           A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4       Nathaniel R. Carroll, Esq.
 5       Christopher Peconga, Esq.
 6       ArchCity Defenders, Inc.
 7       1210 Locust Street
 8       St. Louis, MO  63103
 9       (855)724-2489
10       ncarroll@archcitydefenders.org
11
12       Timothy Holland, Esq.
13       Elizabeth Grossman, Esq.
14       Paul, Weiss, Rifkind, Wharton & Garrison LLP
15       1285 Avenue of the Americas
16       New York, NY  10019-6064
17       (212)373-3373
18       tholland@paulweiss.com
19       egrossman@paulweiss.com
20
21
22
23
24
25
```

**MIDWEST LITIGATION SERVICES**
www.midwestlitigation.com          Phone: 1.800.280.3376          Fax: 314.644.1334

PETER MORROW  4/5/2017

Page 5

1    FOR THE DEFENDANTS:
2       Michael E. Hughes, Esq.
3       St. Louis County Counselor's Office
4       41 S. Central Avenue, 9th Floor
5       Clayton, MO  63105
6       (314)615-7042
7       mhughes2@stlouisco.com
8
9    THE VIDEOGRAPHER:
10       David Doell
11       Midwest Litigation Services
12       711 North 11th Street
13       St. Louis, MO  63101
14       (314)644-2191
15
16   COURT REPORTER:
17       RENÉE COMBS QUINBY, RMR, CRR
18       CSR (CA) #11867
19       CCR (MO) #1291
20       Midwest Litigation Services
21       711 North 11th Street
22       St. Louis, MO  63101
23       (314)644-2191
24
25

Page 6

1                      --oOo--
2           IT IS HEREBY STIPULATED AND AGREED by and
3    between counsel for the Plaintiffs and counsel for
4    the Defendants, that this deposition may be taken in
5    machine shorthand by RENÉE COMBS QUINBY, a Certified
6    Court Reporter and Notary Public, and afterwards
7    transcribed into typewriting, and the signature
8    waived by agreement of Counsel and consent of the
9    Witness.
10                     --oOo--
11       P R O C E E D I N G S  1:41 p.m.
12                     --oOo--
13          THE VIDEOGRAPHER:  We are now on the
14   record.  Today's date is April the 5th, 2017.  The
15   time is approximately 1:43 p.m.
16          This is the video-recorded deposition
17   of Lieutenant Peter Morrow in the matter of Furlow,
18   et al., versus Belmar, et al., case number
19   4:16-CV-00254-CEJ in the United States District
20   Court for the Eastern District of Missouri.
21          This deposition is being held at
22   Midwest Litigation Center in St. Louis, Missouri.
23   The reporter's name is Renée Quinby.  My name is
24   David Doell, and I'm the legal videographer.  We're
25   here with Midwest Litigation Services.

Page 7

1          Would the attorneys present please
2    introduce yourselves.
3          MR. HOLLAND:  My name is Timothy
4    Holland.  I'm here with my colleague, Elizabeth
5    Grossman, from the firm Paul Weiss on behalf of
6    plaintiffs.  I have some co-counsel here who will
7    introduce themselves.
8          MR. CARROLL:  Nathaniel Carroll from
9    ArchCity Defenders on behalf of the plaintiffs, and
10   I'm joined by my colleague Chris Peconga,
11   P-e-c-o-n-g-a, also with ArchCity Defenders for the
12   plaintiffs.
13          MR. HUGHES:  And I'm Michael Hughes.  I
14   represent Chief Jon Belmar and St. Louis County and
15   Officer Kevin Walsh and Officer Christopher Partin
16   and Detective Laura Clements.
17          THE VIDEOGRAPHER:  Would the court
18   reporter please swear in the witness and we may
19   proceed.
20               PETER MORROW,
21   of lawful age, having been first duly sworn to
22   testify to the truth, the whole truth, and nothing
23   but the truth in the case aforesaid, deposes and
24   says in reply to oral interrogatories propounded as
25   follows, to-wit:

Page 8

1                      --oOo--
2              EXAMINATION
3    BY MR. HOLLAND:
4       Q.  Good afternoon, Lieutenant Morrow.
5       A.  Good afternoon.
6       Q.  My name is Tim Holland.  I'll be asking
7    you some questions today.  If throughout the
8    afternoon I ask a question that you don't
9    understand, might seem vague, confusing, please let
10   me know that so I can ask a better question, reask
11   it.  If you don't do so, I'll just assume that you
12   understand what I'm asking you.
13      A.  Uh-huh, okay.
14      Q.  Is there any reason such as a medical
15   condition or influence of a substance which might
16   impact your ability to testify truthfully and
17   accurately and completely today?
18      A.  No.
19      Q.  You'll let me know if that changes?
20      A.  (Nods head.)
21      Q.  In -- for the sake of efficiency, let's
22   just go over some ground rules.  The two of us are
23   going to be having a conversation.  She's trying to
24   get down all of our words.  She's only one person,
25   so let's do our best to try not to talk over each

PETER MORROW  4/5/2017

Page 9

1  other.
2      A.  Okay.
3      Q.  I will finish a question and then you
4  answer and I'll wait until you finish your answer
5  before I jump in again.
6      A.  Okay.
7      Q.  We both might know where each other are
8  going and want to jump in, but this will go smoother
9  and quicker if we just wait each other out.
10      Do you understand that I'm going to be
11  asking you questions today in connection with a
12  legal case?
13      A.  Yes.
14      Q.  What is your understanding of that
15  legal case?
16      A.  Well, I think there's multiple cases,
17  correct?  At least --
18      Q.  I'm talking --
19      A.  -- involved.
20      Q.  Good clarification.  Let me ask a
21  better question.
22      Do you understand that you're here
23  testifying in connection with a litigation that has
24  been filed in court?
25      A.  Yes.  Yes.

Page 10

1      Q.  That's the case.  I know there might be
2  individual cases in terms of the plaintiffs --
3      A.  Okay.
4      Q.  -- but the legal case, are you familiar
5  with the claims that are brought?
6      A.  Which plaintiff?  For the -- go ahead.
7      Q.  Have you read the complaint that's --
8      A.  Not fully, no.
9      Q.  What is your understanding of the --
10  the legal case that has been brought here?
11      A.  That the -- there is a misuse of or
12  perceived misuse of the 24-hour hold policy of our
13  police department.
14      Q.  Anything else?
15      A.  Not that I know of at the moment.
16      Q.  Have you ever been deposed before?
17      A.  Yes.
18      Q.  How many times?
19      A.  It's been a while.  It's been -- I was
20  discussing this.  It's probably been a good ten
21  years.  I spent nine years in our robbery homicide
22  unit and it happened, I'm going to say, at least 10
23  to 15 times during those years.
24      Q.  And each time in connection with your
25  position on the police force?

Page 11

1      A.  Yes, uh-huh.
2      Q.  Let me hand you what I'm going to mark
3  as Exhibit 1.
4          (Exhibit 1 was marked for
5          identification.)
6  BY MR. HOLLAND:
7      Q.  Here you go.  A copy for you.
8      Have you seen this document before?
9      A.  Yes.
10      Q.  Do you understand that you're here
11  today as a 30(b)(6) witness on behalf of St. Louis
12  County?
13      A.  I do.
14      Q.  Do you understand that that means that
15  you are testifying today on behalf of the County?
16      A.  Yes.
17      Q.  If you turn to page 3 -- which says 3
18  of 6 -- or excuse me -- pages -- pages 5 of 6,
19  leading on to 6 of 6, do you see where it says
20  "deposition topics"?
21      A.  Yes.
22      Q.  And you've reviewed this document?
23      A.  I did not fully.  I did see the first
24  part, number 1.  That's what I did discuss with
25  Mr. Hughes.

Page 12

1      Q.  So there are three topics here listed.
2      A.  Uh-huh.
3      Q.  Correct?
4      A.  Yes.
5      Q.  Do you understand that you're here
6  today to testify about those three topics?
7      A.  Yes.
8      Q.  Are you prepared to testify about those
9  three topics today?
10      A.  I believe so.
11      Q.  And what did you do to prepare to
12  testify today?
13      A.  I had -- when I was contacted by
14  Mr. Hughes, he talked about these particular
15  topics --
16      Q.  Well, let me stop you there.
17      MR. HUGHES:  I think he's asking you
18  what did you review.  Is that --
19      MR. HOLLAND:  Sure.
20      MR. HUGHES:  Is that correct?  Or if
21  not, I don't --
22      BY MR. HOLLAND:
23      Q.  I just want to make sure that you
24  understand before you delve into what your
25  discussions with Mr. Hughes were that those are

3 (Pages 9 to 12)

PETER MORROW  4/5/2017

Page 13

1  privileged during your prep.
2      A.  Yeah, I --
3      Q.  I don't need to know what you
4  discussed.
5      A.  Correct.  I'm leading -- I was going to
6  lead up to that.
7      Q.  But if you could tell me when you first
8  found out, about how many times you met or spoke
9  with Mr. Hughes, and then beyond that, what you
10  reviewed and any other prep you did for today.
11      A.  Okay.  I don't -- I'd have to defer to
12  Mr. Hughes about the first time he contacted me.
13  It's been at least a few weeks, but we had a phone
14  conversation where we talked about a few things, and
15  then we met yesterday specifically for today's
16  meeting.  And that's where he did show me this
17  Exhibit 1, and I focused on, of course, the first
18  topic.
19          And what I did was I looked for those
20  written directives with the county police department
21  that were -- what I thought were related to these
22  topics.  I then pulled those, looked at them,
23  reviewed them a little bit, and it didn't take -- I
24  didn't do a whole lot more aside from that prior to
25  today.  And that was mostly just yesterday and

Page 14

1  yesterday evening.
2      Q.  And yesterday was the first time that
3  you saw Exhibit 1 and the topics listed therein?
4      A.  I -- I think so.
5      Q.  Did you -- after -- after speaking with
6  Mr. Hughes you said more than a couple weeks ago
7  when you found out you were going to testify, did
8  you have any conversations with anyone else in
9  preparation for today?
10      A.  Well, I didn't know that I was going to
11  testify after our first conversation.  Okay?  That
12  may have happened.  I think we discussed it may -- I
13  might -- may be needed.
14      Q.  So a couple weeks ago or a few weeks
15  ago, Mr. Hughes contacted you to let you know you
16  might be a witness for this 30(b)(6) deposition?
17      A.  Correct.
18      Q.  And what -- did you talk to anybody
19  about that thereafter?
20      A.  Not about me testifying; but I did have
21  a conversation with, I think, Lieutenant Gomez whom
22  you've already spoken with --
23      Q.  Correct.
24      A.  -- regarding some of our processes that
25  he wasn't familiar with.

Page 15

1      Q.  What processes in particular are those?
2      A.  He wanted to know about, I guess you'd
3  call it, the work flow of our policy decision
4  process for the department.
5      Q.  Can you tell me a little bit more about
6  that.  What you mean by "work flow"?
7      A.  It's -- it's the creation of a new
8  document -- let me back up.  The creation of a new
9  written directive regarding any policy or the
10  revision of a written directive or any policy begins
11  with my office.
12          Once my unit, which is the planning and
13  analysis unit, once we direct -- create a draft, I
14  send it up my chain of command to my colonel.  My
15  colonel approves it.  It then goes to our executive
16  command staff which is our four colonels, our deputy
17  chief, and Chief Belmar.  They look at it, decide if
18  they like the content, and if they agree that it's
19  to move on, it goes to the FOP, which is relatively
20  new -- it's a new part of our process.
21      Q.  And what's the FOP?
22      A.  Fraternal Order Police in agreement
23  with the CDA that was signed with St. Louis County
24  government in, I think, December or January.  So
25  this is all relatively new to us, that part of the

Page 16

1  process.
2      Q.  December 2016 or January 2017?
3      A.  Yes, yes.
4      Q.  And this is the process that takes
5  place any time a written directive of the St. Louis
6  County Police Department is either issued or
7  updated?
8      A.  Yes, yes.  And then there's the final
9  step then is if the FOP has no issue with what
10  they're -- what they've read, then it goes to our
11  command staff, which is all of our captains and
12  above, and they meet once a week to go over any
13  number of different things up to and including
14  policy.  And if it gets approved there, then if it
15  qualifies for a police board signature, then the
16  police board handles it once a month.
17      Q.  And is another name for a written
18  directive a general order?
19      A.  Yes.
20      Q.  And this -- so you had this
21  conversation with Mr. -- excuse me, with Lieutenant
22  Gomez.  He had sought out your knowledge about this
23  process.  Is that accurate?
24      A.  Yes.  He had told me what he was going
25  to be doing and asked a few questions about how

4 (Pages 13 to 16)

PETER MORROW  4/5/2017

Page 17

1  we -- how we worked.
2      Q.   And by telling you what he was going to
3  be doing is that that he was going to be testifying?
4      A.   Yeah, that he was going to be deposed.
5      Q.   So if Lieutenant Gomez was deposed on
6  February 6th, this conversation that you had with
7  him occurred prior to that date.  Is that your
8  recollection?
9      A.   Yes.
10     Q.   And that conversation with Lieutenant
11  Gomez occurred after Mr. Hughes had contacted you
12  about potentially being a witness in this case; is
13  that accurate?
14     A.   It probably did then, yes.  If we're
15  going back -- if Lieutenant Gomez was February 6th,
16  then yes.
17     Q.   Did you talk to Lieutenant Gomez at all
18  after his deposition?
19     A.   He might have commented.
20     Q.   And let me -- let me rephrase.  You may
21  have passed him in the hall and had, you know --
22     A.   That's about it.
23     Q.   -- banter.  But did you speak to him at
24  all about this case since his deposition?
25     A.   I believe I asked him just how it went.

Page 18

1  And he said that, you know, certainly that, you
2  know, like any deposition, he's glad it was over.
3  But he said it was fine and he didn't have any
4  issues that -- to directly discuss with me.
5      Q.   And then you found out from Mr. Hughes
6  yesterday or met with Mr. Hughes to discuss the case
7  yesterday?
8      A.   Uh-huh.
9      Q.   Between the point of that brief
10  conversation with Lieutenant Gomez and yesterday,
11  did you speak to anyone about this case?
12     A.   No, not other than Mr. Hughes and --
13  only in passing I'm sure, so ...
14     Q.   Let's talk a little bit about your
15  personal background starting with your education.
16  Can you give me an idea of post high school what
17  your education is or has been?
18     A.   Yep.  I have a bachelor's in political
19  science from Benedictine University, I'm sorry,
20  College back then, in Atchison, Kansas.
21     Q.   Say that again.
22     A.   Atchison, Kansas.  It is a pretty small
23  school and I graduated in May of '92 and then I have
24  no postgraduate work after that.
25     Q.   What did you do in May of '92?  Where

Page 19

1  did you go after college?
2      A.   I moved back home and I applied with
3  multiple police departments, and I actually did try
4  and get in a few graduate programs and did not
5  succeed.  So that took care of that.
6          But I moved back home and it took
7  about -- about a year and a half to get -- finally
8  get into the Police Academy.
9      Q.   The St. Louis County Police Academy?
10     A.   St. Louis County Police Academy.
11     Q.   So give or take late '93, early '94 is
12  when you started at the Police Academy?
13     A.   April of '94.
14     Q.   April '94.
15          What positions have you held since
16  joining the Police Academy?
17     A.   Let's see.  I graduated -- I was
18  offered employment with St. Louis County PD the day
19  after I graduated, so I started within that week
20  with them and I was assigned a division of patrol
21  where everybody starts, uniformed patrol.
22     Q.   This is in the fall of '94?
23     A.   This is August.
24     Q.   August '94?
25     A.   Late summer, right.

Page 20

1      Q.   Because the academy is was about six
2  months?
3      A.   At the time it was five, yeah, it was
4  five.  So early August I started on the street in
5  the division of patrol.  A little less than three
6  years there.  And I was transferred to -- it was our
7  division of crimes against persons, but it was a
8  juvenile unit.  And I spent about 13 months working
9  for the family court.  And then I was transferred
10  from the family court to robbery homicide where I
11  did almost nine years to the day.  And I was
12  promoted to sergeant.
13     Q.   When were you promoted?
14     A.   I'm sorry?
15     Q.   When were you promoted?
16     A.   It was April of '07.
17          Let's see, I went back -- I went right
18  back to patrol as a supervisor and I spent about
19  four years on the street.  And then I was -- I got
20  pulled into planning and analysis at that time as a
21  sergeant doing the same thing that I think you
22  may -- we might have talked about this already, but
23  dealing with planning and analysis at the time, had
24  two officers and three civilians.  And we handled
25  crime stats, policy, our accreditation, and any

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com       Phone: 1.800.280.3376       Fax: 314.644.1334

PETER MORROW  4/5/2017

Page 21

1  other project that came down -- came our way, so --
2      Q.  Let me just stop you there and see if
3  I'm understanding.  So in about 2007, you said you
4  were promoted to sergeant?
5      A.  Uh-huh.
6      Q.  And at that time, you went back to
7  patrol on the street --
8      A.  Uh-huh.
9      Q.  -- for about --
10     A.  About four.
11     Q.  -- four years?
12     A.  It was August of '11 that I went into
13  planning.
14     Q.  And what group -- what department were
15  you in when you became sergeant and went on patrol?
16     A.  I was a detective in robbery homicide
17  when I got promoted --
18     Q.  So you were still in robbery homicide
19  at that time?
20     A.  Yeah, uh-huh.
21     Q.  And then in 2011, you moved from
22  robbery homicide over to planning and analysis?
23     A.  No.  After in robbery homicide in
24  May -- about April of '07, I made sergeant.  Right
25  out of there, right back to the street.

Page 22

1      Q.  Uh-huh.
2      A.  Okay.  So from May of '07 until August
3  of '11, I was a street sergeant, patrol sergeant.
4      Q.  In robbery homicide?
5      A.  No.  Patrol meaning uniform, answering
6  calls on the street.
7      Q.  Understood.
8      A.  That's -- when I say "patrol," that's
9  the function of patrol.  It's answering calls, you
10  know, working the road so to speak.
11         The robbery homicide unit is in another
12  division altogether.  It's the division of criminal
13  investigation.
14     Q.  Okay.  DCI?
15     A.  Yes, sir.
16     Q.  I'm learning a lot about the police
17  department over the past couple months.
18         And then August '11 is planning or --
19     A.  Uh-huh.
20     Q.  -- planning and analysis?
21     A.  Uh-huh.
22     Q.  And have you held -- I guess you at
23  some point promoted to lieutenant?
24     A.  Uh-huh.
25     Q.  When did that happen?

Page 23

1      A.  Let's see.  I did about two and a half
2  years in planning and I got promoted in May of '14
3  to lieutenant.  And I went back to patrol.  I was on
4  the midnight shift in our central county precinct.
5  And then in August, the civil unrest hit.
6      Q.  Say that again.
7      A.  In August of '14, the civil unrest
8  began.
9      Q.  Oh, right.  Right.
10     A.  And that kind of changed everything as
11  far as my -- about -- so I still maintained my
12  assignment of patrol at that time, but I was
13  assigned with three detectives to handle
14  unrest-related criminal cases that needed some more
15  attention.  And I did -- so I kind of did both.  I
16  worked with these group of detectives and I still
17  was on the midnight watch.
18         And then -- so that lasted for about
19  four months.  I got into planning and analysis this
20  time as a lieutenant.  They reclassified the
21  position and just made it a lieutenant spot, and
22  I've been there ever since.
23     Q.  And you mentioned that you served in a
24  supervisory role at some point in that window?
25     A.  Yeah.  Yes.  As a sergeant and

Page 24

1  certainly as a lieutenant, you're management, you
2  manage subordinates.
3      Q.  How many people have you managed, I
4  guess, since you became a sergeant?
5      A.  Let's see.  I think my biggest platoon
6  was probably 17 people, in that neighborhood, maybe
7  more.
8      Q.  And these are all officers?
9      A.  Uh-huh.
10     Q.  And who do you report in to?
11     A.  As a sergeant you report to a
12  lieutenant.  The lieutenant then reports to the
13  precinct captain.
14     Q.  And who was your direct -- who did you
15  directly report into as a sergeant?
16     A.  Let's see.  Well, of the three
17  assignments I had on the road, two of them I
18  reported directly to a lieutenant and one of them --
19  one of the assignments was a contract city, a little
20  smaller contract.  We didn't have a lieutenant, so I
21  reported directly to the captain.
22     Q.  What was the name of the lieutenant who
23  you reported in to?
24     A.  Let's see.  In my first assignment, it
25  was Bill Ostendorf.  He's retired.  Next assignment

6 (Pages 21 to 24)

PETER MORROW  4/5/2017

Page 25

1  as a sergeant was Tim Cunningham.  He's currently a
2  captain now.  Then I was assigned in the City of
3  Fenton where we had no -- I'm sorry, the captain at
4  that point was Jack Webb.
5        I spent a cup of coffee, about five
6  weeks, in the central county precinct where I
7  reported to Kurt Frisz before I went into planning
8  as a sergeant.  And it was there that I reported to
9  Captain Mary Barton.
10       Q.  At planning and analysis?
11       A.  In planning the first time.
12       Q.  So the first time, the only person you
13  reported in to at planning was Mary Barton?
14       A.  Yeah, captain -- she was --
15       Q.  Captain Barton?
16       A.  Yeah, there was no lieutenant between
17  us at that point, right.
18       Q.  And then how about the second time?
19       A.  Okay.  This time now I -- I report to
20  Captain Norm Mann.
21       Q.  And has that been the case since you've
22  been back at planning?
23       A.  Uh-huh.  Since February of '15.
24  Uh-huh.
25       Q.  What training have you received for --

Page 26

1  for your various positions?
2       A.  Well --
3       Q.  We don't have to go all the way back to
4  '94 academy, but have you received any updated
5  training?
6       A.  Well, again, there's -- there's quite a
7  few positions along the way.  Each one has a
8  specific -- most of them have a specific set of
9  training classes that you can attend.
10       I guess -- I guess I can just stick
11  with planning.  When I first got into planning as a
12  sergeant, in August of '11, I -- I didn't know much
13  about it.  Okay?  And the executive director at the
14  time knew that, but he said:  Come on in, you can --
15  I'll teach you.  And there was a lot of OGT [sic], a
16  lot of on-the-job training.  Okay.  And --
17       Q.  What was the name of the director at
18  the time?
19       A.  Bill Howe.  He was a civilian executive
20  director over my division.  So, and he, I guess,
21  made things a little easier for him because he -- he
22  basically made planning what it was.  He spent about
23  17 years in there running planning and analysis
24  before he got promoted and then promoted again.  And
25  so he basically took me under his wing.  Anything I

Page 27

1  needed, I go down have conversations with him and
2  that's how I learned, so --
3       Q.  So you said he made planning
4  analysis -- planning and analysis what it is.  What
5  does the planning and analysis group do?
6       A.  Well, I guess the flyover version is
7  for the last 30 years, it's been -- it's been
8  policy, grants, UCR, crime reporting.
9       Q.  What is UCR?
10       A.  Uniform crime reporting.  Everybody
11  month we have to send a report to the highway patrol
12  for our monthly stats before the end of the month,
13  and then they send it to the FBI.
14       Q.  And that's the Missouri State Highway
15  Patrol?
16       A.  Yes, uh-huh.  And they -- they're
17  mandated by the feds to send everything to the FBI.
18       Q.  What's in that report?
19       A.  Class one crimes or part one crimes for
20  the previous month.
21       Q.  What is a part one crime?
22       A.  Your more serious crimes:  Murder,
23  rape, robbery, aggravated assaults, stolen autos,
24  burglaries.  I think there's about seven of them,
25  so ...

Page 28

1       Q.  What else does the planning group do?
2       A.  Well, we handle our accreditation for
3  CALEA.  That's the Commission on Accreditation for
4  Law Enforcement Agencies.  We've been accredited
5  since '98 and that's been planning's baby the whole
6  time.  And that takes a lot of our time.  But the
7  accreditation, crime reports, policy.  Policy
8  that -- I -- policy.  We do a ton of policy.
9       Q.  What do you guys do on policy?
10       A.  Well, I think I mentioned before
11  whether something's created or revised, it starts
12  with us.  And that's policy that's department --
13  that has department-wide applicability.  Okay?
14       Q.  When you say "starts with us," does it
15  mean you guys have a pen or you guys are the ones
16  making the decisions on how to frame the policy?
17       A.  Well, that can happen a couple
18  different ways.  If I back up a little bit, CALEA
19  requires policy, all policy, to be reviewed every
20  three years.  And that alone keeps us on our toes.
21  Okay?
22       And when I say "review," the review can
23  be, you know, I'm going to pick this one up and I'm
24  going to either do it myself or assign it to
25  somebody.  I'm going to go through it, check it out.

7 (Pages 25 to 28)

PETER MORROW  4/5/2017

| Page 29 | Page 31 |
|---|---|

**Page 29**

1  What we're looking for is:  Is anything outdated?
2  Is there any legal changes that have occurred in the
3  district court, local, state, federal, local,
4  whatever that we need to be aware of?  Does it
5  even -- does the policy even need to be anymore?  I
6  mean, we'll give it that kind of -- you know, we'll
7  go over it like in that regard.  Now -- so we have
8  that -- we have CALEA telling us to do that already.
9       But anybody above my rank can tell, you
10  know, can submit a suggestion that:  Hey, I think
11  you guys need to look at this.  Really, honestly it
12  can come from anybody if the department, but
13  generally it will be somebody -- it will be from the
14  chief's office.
15       Q.  Chief Belmar?
16       A.  Yeah, chief's office, deputy chief, or
17  maybe one of the four colonels will discover
18  something, you know.  And certainly that gets the
19  attention of it at that point.
20       Q.  How often does that happen?  And by
21  "that" I mean somebody recommending a change to you
22  as opposed to you guys organically doing it through
23  your CALEA duties.
24       A.  Let's just say that I'll guess I'll get
25  two are three times a month that I get a suggestion

**Page 30**

1  or somebody will say:  Hey, you think you need to
2  start looking at this.
3       Q.  Can you give us an example?
4       A.  Yeah.  Let's see.  We did -- we changed
5  about 25 general orders in 2015, so let me think if
6  I can get an example for you.  Well, I recall about
7  a year -- maybe a couple years ago, I had a --
8  department armor came to me and said:  Hey, I think
9  the -- the parameters on the assault rifle -- the
10  twist in the barrel should be this instead of that
11  and this is why.  And I say oh, okay.  You know,
12  you're the subject matter expert.  Thank you.
13       And then we'll -- we have a weapons
14  system committee in this case.  And I'll say:  Did
15  you talk to them?  Yeah, we talked to them.  We need
16  to change it.  So then I'll whip up a draft, send it
17  up my chain of command, and my colonel has to okay
18  it, and then we start the sequence that I explained
19  earlier.
20       Q.  That's helpful.  So, you know, you guys
21  are obviously monitoring under your CALEA
22  obligations what might be updated; but if somebody
23  is actually out in the field or has some expertise,
24  they might come to you and say:  Look, you might
25  want to look at this or there's been this update or

**Page 31**

1  for whatever reason they may come to you and suggest
2  something.  And once they suggest something to you,
3  what's the -- what's the process from going from,
4  okay, we've got a recommendation to, yes, let's
5  update our policy?  How does that decision get made?
6       A.  Well, a lot -- there are a number --
7  there are -- there's a number of things that I'll be
8  able to catch just by the nature of my position.
9  And the longer I'm there, the more I know.  Okay?
10  When I first got in there, you know, I was way
11  behind the curve.
12       So now I can look at something and
13  say -- you know, somebody might recommend:  Hey, I
14  think we need -- I want to do away with this annual
15  review of whatever in my unit.  And I say:  No, you
16  can't do that.  CALEA requires that.  We need this
17  annual review, you know, this, that, and the other.
18       But if I know that this is something
19  that's probably, you know, we need to take a look
20  at -- and there really isn't much that I'm not going
21  to look at.  You know, just about anything is going
22  to get -- get reviewed if it's brought to my
23  attention.  Then --
24       Q.  Is it fair to say that if you receive a
25  recommendation and it doesn't go against CALEA

**Page 32**

1  requirements, you're likely to implement it because
2  whoever recommended it will help their day-to-day
3  job or they think it's the right thing to do?
4       A.  Right.  Right.
5       Q.  You mentioned that there are 25 pop
6  general orders revised in 2015.  Is that a lot for a
7  year?
8       A.  That was more than normal, uh-huh.
9       Q.  Is there a reason that that occurred in
10  2015?
11       A.  I had a workhorse in there, an officer
12  who really hustled throughout the year.
13       Q.  Who was that?
14       A.  His name is Bob Morley, and now he's
15  currently an instructor in the academy.  And I made
16  it very clear to my superiors that he -- the work --
17  that work was done because of his effort.  And
18  that's just the way it goes sometimes, you know.
19  Some people --
20       Q.  What was he doing that made -- made it
21  so necessary to update these orders?
22       A.  Well, okay.  Well, that's part of my
23  argument for getting more people in there to begin
24  with, but that's -- you know, with my superiors.
25       Q.  Is it fair to say the orders that he

PETER MORROW  4/5/2017

Page 33

1  was updating, in your opinion, should have been
2  updated earlier?
3       A.  They could have been, but I will tell
4  you that a lot of the orders that -- that Officer
5  Morley dealt with some of them were directly as a
6  result of litigation from the civil unrest.  Okay?
7  You know, we had a media policy, okay, and another
8  policy related to media, but we had -- it was part
9  of a -- some litigation that we had to revise those
10 and include certain elements that weren't there
11 before and we learned.
12      Q.  So there was a lot of civil unrest,
13 there was some litigation.  In essence attention was
14 brought to the police department and therefore you
15 updated your policies in response?
16      A.  Yes.  And, again, that's just -- I'm
17 sorry.  That's one way that it happens.
18      Q.  Understood.
19          Why were you hired into the police --
20 excuse me.  Withdrawn.
21          Why were you hired into the planning
22 group?
23      A.  I was transferred in there in August of
24 '11, like I said, by the executive director Bill
25 Howe.  And I don't know why.  I suspect that -- and

Page 34

1  I -- I don't know if I should even do this, but I
2  could only surmise that I have a poly sci bachelor's
3  and the previous sergeant had a poly sci bachelor's
4  from Mizzou.  So maybe he thought we were inclined
5  to sit down and look at things.  I don't know.  I
6  don't know.  And there was no qualification to get
7  in there.  There was no criteria.
8       Q.  Who preceded you in the position?
9       A.  Jeff Burk, a retired lieutenant about
10 three or four months ago, Mike?  Yeah.  So ...
11      Q.  You replaced him or you came in and
12 worked alongside him?
13      A.  I replaced him.
14      Q.  Where did he move in --
15      A.  He went -- he got promoted from
16 sergeant to lieutenant and then was assigned the
17 division of patrol up north in our North County
18 precinct.
19      Q.  Did you ever work alongside him?
20      A.  No.
21      Q.  What is a wanted?
22      A.  What is a wanted?  A wanted is -- how
23 can I be brief?  A wanted is a -- an entry into
24 our -- our computer system, REJIS system, indicating
25 that a person is wanted -- is wanted for a crime and

Page 35

1  that they've not yet been arrested for it yet.
2  How's that?
3       Q.  What are the requirements that must
4  exist for a wanted entry to be issued?
5       A.  If I'm -- if I'm investigating a case
6  and I put somebody out as wanted, I need to have
7  probable cause -- probable cause has to exist that
8  they committed a crime before I'm going to put them
9  in as wanted or enter them into REJIS as wanted.
10      Q.  So you described a wanted as an entry
11 for a person who is wanted who has not yet been
12 arrested -- wanted for committed a crime who has not
13 yet been arrested.  So why -- how is that different
14 than an arrest warrant?
15      A.  By definition I would say that an
16 arrest warrant, of course, is reviewed by our
17 prosecuting attorney and then signed by a judge.  A
18 wanted is -- is probable cause developed by an
19 investigating officer at the time that they receive
20 a complaint and develop the probable cause over
21 a period of time by their victim witnesses,
22 et cetera.  So ...
23      Q.  So why would an officer issue a wanted
24 instead of getting an arrest warrant?
25      A.  Well, there's -- I know that, you know,

Page 36

1  these -- I had these very same questions 22 years
2  ago.  You know, you can be taught X number of things
3  and then when you get out in the field and you start
4  really, you know, doing the practical side of it,
5  you know, you want to know when the right time is to
6  do this and not do that.
7           The -- repeat that last question.  Or
8  I'm sorry, repeat that again.
9       Q.  Sure.  No problem.
10          Why would an officer issue a wanted
11 instead of going and getting an arrest warrant?
12      A.  Okay.  Generally -- and even -- I
13 shouldn't say generally.  Our Prosecuting Attorney's
14 Office requires an attempt at an interview with your
15 suspect before they will entertain a warrant
16 application for whatever reasons that is, okay?
17          So, you know, if I investigate a case,
18 I determine you've done it, and I don't know where
19 you're at -- you know, if I know where at, I'm going
20 to go pick you up, okay.  And we'll do it right
21 there.  But otherwise I'll make attempts find you
22 and if I can't, then I'll putting out wanted.
23      Q.  And what if you speak to me and I tell
24 you that I'm not talking to you or I don't want to
25 talk to you or, you know --

9 (Pages 33 to 36)

Page 37

1    MR. HUGHES:  Can I just object to the
2  form of the question as being vague and calls for
3  speculation.  Are you -- do you mean speaking in
4  person and saying I don't want to talk to you or do
5  you mean or what?  I mean, he's just --
6    BY MR. HOLLAND:
7    **Q.   You said when you're -- the Prosecuting**
8  **Attorney's Office requires an attempt at an**
9  **interview or attempt at questioning before they'll**
10  **issue an arrest warrant.  What if you're talking to**
11  **me on the phone and I tell you I'm not going to --**
12  **I'm not going to speak with you or, you know, speak**
13  **to my attorney, what happens then?  Is there any --**
14  **is there still a need for the wanted?**
15    A.  Well, I -- personally, you know, if I'm
16  on -- if I'm talking to you on the phone, I don't
17  know who I'm talking to.  You can tell me all day
18  long who you are, but if I don't know -- I don't see
19  you.  So I have -- I can't take the chance, you
20  know.  I want -- I want to sit down with you and
21  know that it's your -- you know, it's the same
22  reason we fingerprint people.  We know that we had
23  you, back in the day, you know, when I actually did
24  that.
25    But, no, phone interviews are fine, but

Page 38

1  for me I still -- I still need to physically see you
2  so that I'm certain that there's no -- there's no
3  problem with the fact that I could have been talking
4  to your twin brother or your cousin or somebody
5  else.  Just a matter of investigative preference, I
6  guess.
7    **Q.   Is there any policy that say you need**
8  **to see a person in person rather than hearing their**
9  **voice?**
10    A.  No, I don't believe so.
11    **Q.   How did you learn that the Prosecuting**
12  **Attorney's Office requires this attempt at an**
13  **interview before issuing a warrant?**
14    A.  Probably I would suspect it was during
15  my training period once I got out of the Police
16  Academy.  And we had 12 weeks -- a 12-week training
17  period back then with two different field training
18  instructors.  And it was during the course of those
19  conversations that I'm almost positive.
20    **Q.   Do you recall being told that or you're**
21  **just assuming?**
22    A.  At this point I'm going to assume.  It
23  was too long ago.
24    **Q.   But since then nobody has told you**
25  **that, you know, if you have probable cause, that's**

Page 39

1  **not good enough for a warrant, you need to attempt**
2  **at an interview?**
3    A.  I don't believe it's in writing
4  anywhere.
5    **Q.   How about a stop order?  What's that?**
6    A.  Well, I'm not as familiar with stop
7  orders.  But a stop order, if I recall correctly, is
8  specific to -- our local system is REJIS and then we
9  have MULES, which is the Missouri system, and then
10  we have NCIC, which of course is nationwide.  Okay?
11    The stop order, I believe, is specific
12  to MULES.  And I think they can -- stop orders are
13  similar to a wanted, it's just called stop order and
14  it's for a different computer system.  And I believe
15  that it's limited to maybe a one charge, I think.
16  And then it's good for a year in the State's -- in
17  the MULES system.
18    **Q.   What do you mean it's good for a year?**
19    A.  I'm sorry.  It will stay as long -- and
20  I don't know what their verification process is,
21  meaning, "they" meaning MULES.  But it's -- it can
22  be -- it can be maintained in their system for 12
23  months.  I don't -- clearly if it's a felony, then I
24  don't know what the -- you know, that -- you know,
25  extends to three years or more.  I don't know how

Page 40

1  they continue to verify on that.
2    **Q.   I don't want you to guess.**
3    A.  Yeah.
4    **Q.   It sounds like you're much more**
5  **familiar with REJIS than MULES; is that fair?**
6    A.  Yes.
7    **Q.   And you just use MULES -- I mean,**
8  **excuse me.  Strike that.**
9    **You just use REJIS when -- when it**
10  **comes to be that you would need to enter something?**
11    A.  Well, it depends -- back -- it depended
12  on the type of the case, you know.  When I'm
13  entering a wanted, you know, one of my, you know,
14  what's the charge and what kind of extradition am I
15  looking at?  You know, I'm not going to do statewide
16  for a, you know, littering charge something to that
17  effect.
18    **Q.   So you're -- your use of the systems**
19  **depends on how far you want the message to go out;**
20  **is that fair?**
21    A.  Based on the severity of the crime.  I
22  would say, yeah, yes.  Again, it's been some time
23  since I've done this, so ...
24    **Q.   May a wanted be issued for the purposes**
25  **of detaining somebody for questioning?**

10 (Pages 37 to 40)

PETER MORROW  4/5/2017

<table>
<tr><td>

Page 41

1      A.  I mean, not without probable cause.
2      Q.  Right.  So probable cause and then you
3   can issue a wanted for the purpose of having an
4   individual detained for questioning.
5      A.  Yes.
6      Q.  I'm just going to show you a couple of
7   documents.  Mark these as Morrow 2 and 3.
8          (Exhibits 2 and 3 were marked
9           for identification.)
10  BY MR. HOLLAND:
11     Q.  These are two newsletters that we found
12  on the police department's website.
13         MR. HUGHES:  Which one is 2 and which
14  one is 3?  One says 1601 --
15         MR. HOLLAND:  15 is 2.  16 -- right.
16  So they're both titled the CJIS newsletter, which is
17  Criminal Justice Information Services.  Exhibit 2 is
18  dated -- is -- has a 15-01 on it.  Exhibit 3 has
19  just 16-01 on it.
20     Q.  So let's start with the -- would you
21  agree that 15-01 suggests that this is 2015?
22     A.  Sure.
23     Q.  Are you familiar with this document at
24  all?
25     A.  Huh-huh.  No, sir.

</td><td>

Page 43

1      A.  Yeah, I see what you're saying, but
2   you're unable to obtain a warrant until.  It's the
3   word "until," I guess, that's the question here.
4          You know, if you -- if you've got
5   probable cause as an investigator, regardless of
6   your -- you know, your assignment, your experience,
7   you know, if you've got probable cause, however it
8   is that you came to get that probable cause, in your
9   mind you believe that you've got enough for a
10  warrant, at least that, you know --
11     Q.  And that's my understanding, so I'm
12  just wondering what this --
13     A.  Well --
14     Q.  -- further information that, you
15  know --
16     A.  Well, I think the further information,
17  you know, certainly -- certainly if you've got -- if
18  you bring somebody in and they confess to the crime,
19  then that's an additional piece.
20         If, you know, the additional probable
21  cause might be:  Well, hey, you know what, I pitched
22  the gun in a sewer over here and you can find it.
23  You know, I burned the car and I put it in the
24  Mississippi.  I mean, that's additional information
25  to what you know they already did, just different,

</td></tr>
<tr><td>

Page 42

1      Q.  I just want to direct you to page 15.
2   So stop orders -- the second paragraph reads:  "A
3   Stop Order should be issued when the investigating
4   officer has probable cause to believe a person has
5   been involved in a crime, but is unable to obtain a
6   warrant until further information can be derived
7   from the said individual."
8          What information beyond probable cause
9   would be required there?
10         MR. HUGHES:  My objection is you're
11  asking him to comment on Missouri Highway Patrol
12  newsletter that he just said he's not familiar with.
13  So you're asking him to speculate --
14         MR. HOLLAND:  We found these on the
15  St. Louis County Police Department's website, so
16  that's -- that's why I was asking about it.
17         MR. HUGHES:  Still, you know, it does
18  say Missouri State Highway Patrol.
19         MR. HOLLAND:  I see.
20         MR. HUGHES:  And he said he's not
21  familiar with it, so ...
22  BY MR. HOLLAND:
23     Q.  So what information -- what further
24  information as this reads here would be required to
25  obtain a warrant in addition to probable cause?

</td><td>

Page 44

1   you know, pieces of evidence that you weren't maybe
2   aware of.  And those are the things that can be
3   determined from an interview?  Maybe that's what --
4   again, I don't -- I don't know what they're looking
5   for here.
6      Q.  Wouldn't you able to get a warrant
7   without that information if you have the probable
8   cause?
9      A.  You --
10         MR. HUGHES:  Well, objection.  Calls
11  for speculation and conjecture as to whether or not
12  prosecuting attorney would issue a warrant without
13  that information.
14  BY MR. HOLLAND:
15     Q.  Do officers receive any training on
16  when they will and will not be able to obtain a
17  warrant?
18     A.  Aside from -- okay.  I'm sorry.  When
19  they will or will not be able to obtain a warrant?
20  Is that what you're asking?
21     Q.  Correct.
22     A.  I don't know outside of what they're
23  taught in the academy, in the Police Academy, and
24  really and/or subsequent classes that they might
25  take as electives on their own at the academy.  The

</td></tr>
</table>

11 (Pages 41 to 44)

PETER MORROW  4/5/2017

Page 45

1  type of -- you know, with this as a subject matter,
2  you know, there might be a subject matter expert
3  teaching the class who might be able to, you know,
4  expand on what they learned initially and talk
5  about, I guess, the nuances of warrant application,
6  but I don't know if there's anything specific aside
7  from Police Academy.
8      Q.  And are you -- do you recall classes on
9  this topic in the Police Academy or you're just
10  guessing that would have been -- they could have
11  been covered in the academy?
12      A.  I'm guessing.  I wouldn't -- I don't
13  know off -- I don't know off the top of my head if
14  there are specific classes about warrant
15  application.
16      Q.  But I'm just trying to understand, you
17  know, as an officer you try to come to a
18  determination that there's probable cause.  But
19  you've mentioned that the Prosecuting Attorney's
20  Office requires an attempted interview.  This
21  document suggests that there's a need for further
22  information.  I'm just wondering how the police
23  officer knows okay, now I can go get a warrant.  You
24  know.
25      A.  Well, yeah.  As far as being

Page 46

1  instructed, so I don't know the answer to that.
2      Q.  Okay.  So if we look at the fourth
3  paragraph on page 15, it says:  "Agencies should
4  know that there are no guidelines in place as to how
5  another agency must handle a Stop Order hit
6  received.  It is encouraged that if the agency is
7  within the extradition limits of a Stop Order, a hit
8  confirmation" --
9          (Court reporter
10          clarification.)
11  BY MR. HOLLAND:
12      Q.  I'll -- withdrawn.
13          Page 15, paragraph 4 reads:  "Agencies
14  should know that there are no guidelines in place as
15  to how another agency must handle a Stop Order hit
16  received."  The last sentence of that paragraph
17  reads:  "There are no requirements in place stating
18  that an agency must hold or detain on a Stop Order
19  and each agency can establish their own policy on
20  these matters."
21          What is the St. Louis County Police
22  Department's policy on these matters?
23      A.  If we -- if we arrest another agency's
24  wanted or stop order, we take the person into
25  custody and we transport them to whatever the local

Page 47

1  booking facility -- the closest booking -- usually
2  it's the precinct they're in or assigned to or it
3  will be the county jail down in Clayton, the
4  general intake.  But they -- they have to have our
5  record room send a locate, a hit that they're
6  speaking of, to that -- you know, jurisdiction or
7  whatever agency it is to verify.
8      Q.  Does that happen after the individual
9  is taken into custody?
10      A.  Well, that's where I'm -- actually I
11  think -- I think a lot of officers try and do it on
12  scene as a courtesy, okay, to make sure that they've
13  got what they've got.  I mean, if -- if it's -- what
14  we have -- we have to rely on good faith as an
15  officer on the road.  If I pull someone over in a
16  wanted pops up, do you know what, as a safety
17  precaution I'm probably going to put you in cuffs
18  pretty quick.
19      Q.  You're relying on the issuing officer's
20  determination of probable cause --
21      A.  Correct.
22      Q.  -- that everything is accurately
23  inputted?
24      A.  Yeah.
25      Q.  Understood.

Page 48

1      A.  So if they can determine at the scene
2  that it's still valid, then all the better.  If
3  not they -- they will obviously release him right
4  there.
5      Q.  Did there come a time where stop orders
6  became known as person of interest entries?
7      A.  I think -- I think that that is
8  something that the Highway Patrol discussed, but I'm
9  not familiar with.  But I believe that it did -- at
10  some point did morph into that -- that phrase.
11      Q.  But you're not familiar with --
12      A.  No, no.
13      Q.  Understood.
14          How do officers make a probable cause
15  determination?
16      A.  Assess the facts at the scene or assess
17  the facts that are presented to them during their
18  investigation.
19      Q.  Is there training on how do that?
20      A.  Yes.  Yes.  When we -- when you --
21  you're taught statutory law in the state of
22  Missouri -- Missouri statutory law at the Police
23  Academy, you go over every element of the crime, of
24  as many as they can cover in a month or whatever
25  they're doing, whatever time they allot.  And it's

PETER MORROW  4/5/2017

Page 49

1 at that time that they go over -- they'll -- they'll
2 use examples of crimes based on what they just
3 learned and talk about at some point -- you know,
4 throughout that lesson plan they talk about, you
5 know, this happened, this happened, this happened,
6 what do you think?  And it's -- it's like -- it's a
7 give and take at that point.  And I think they
8 follow up with some testing.  I don't know.  But
9 that would be -- that would be the time, in my
10 opinion, that that's first discussed.
11     Q.  Are they taught whether there's, you
12 know, a barometer of, okay, now you've tripped the
13 line of probable cause?  You know, how much -- how
14 confident do you have to be to make that
15 determination and issue the wanted?
16     A.  The -- based on my training days,
17 generally probable cause you were about -- if you
18 were to assign a percentage to it, you knew you were
19 75 to 80 to 100 percent there that -- that this
20 person committed the crime, probably higher --
21 probably 80 percent or up depending -- I forget who
22 the instructor was back in the day that went through
23 that with us, but you knew.  You knew.  There wasn't
24 a lot of space left for this person that they might
25 not have committed the crime, but it was generally

Page 50

1 something along those lines.
2     Q.  Why don't you -- what does it need to
3 be based on?  I know you mentioned assessment of the
4 facts, but -- I mean, do you need a certain number
5 of witnesses?
6     A.  No, there's no -- there's no hard and
7 fast rules that I'm aware of.  But, you know, one
8 witness if might be all it takes.  But there --
9 there really -- it's just a totality of the
10 circumstances as the phrase goes.
11     Q.  The gut feeling?
12     A.  I don't like that.  It could be for
13 some, but I -- the totality of the -- facts and
14 circumstances.  How's that?
15     Q.  That's fine.
16     A.  That's my preference, yeah.
17     Q.  Understood.
18     You mentioned instructors.  Who teaches
19 the officers how to make this determination?
20     A.  One of the academy instructors.  I
21 think the officer that handles constitutional law
22 and state law.
23     Q.  Is that officer legally trained or just
24 a police officer?
25     A.  Police officer.

Page 51

1     Q.  And probable cause has always been
2 required in order for a wanted to be issued?
3     A.  Yeah, yes.
4     Q.  I'll show you what has been marked
5 previously Gomez Exhibits 7, 8, and 9.
6     (Previously marked Exhibits 7
7     through 9 were shown to the
8     witness.)
9 BY MR. HOLLAND:
10     Q.  Are you familiar with these documents?
11     A.  Yes.
12     Q.  What are they?
13     A.  These are department general orders.
14 It's one general order, three versions.
15     Q.  So is it accurate to say that Gomez 7
16 was in place from September 13th, 2011, until it was
17 replaced by Gomez 8 on July 15th, 2015?
18     A.  Yes.
19     Q.  And Gomez 8 was in effect from July 15,
20 2015, until it was replaced by Gomez 9 on
21 September 14, 2016?
22     A.  Yes.
23     Q.  In Gomez 8 if we look -- is the bolded
24 language new language?  Is that what that --
25     A.  Yeah, it indicates a revision, yes,

Page 52

1 or -- or new information.
2     Q.  And were you involved in updating these
3 documents?
4     A.  Let's see.  July of '15, I was.
5     Q.  What do you recall about these -- the
6 updates that were made -- well -- strike that.
7     Let's look at page 2 of 5 in Gomez 8,
8 which is the 2015 version.  Do you see paragraph B1
9 little A?
10     A.  Yes.
11     Q.  That's in bold, correct?
12     A.  Yes.
13     Q.  It reads:  "Once the case officer has
14 determined probable cause exists that a person has
15 committed a crime, only the case officer shall
16 request wanted person entries.  The case officer
17 will contact CARE or DCI word processing and
18 requesting a wanted entry on the person."
19     Other than the grammatical error that
20 should probably be request instead of requesting,
21 did I read that correctly?
22     A.  Yes.
23     Q.  What do you -- what can you tell me
24 about the addition of this language to this general
25 order?

13 (Pages 49 to 52)

PETER MORROW  4/5/2017

Page 53

1          A.   You caught a grammatical error.
2    Thanks.  That's my -- I missed that one.
3          Q.   I won't --
4          A.   But thank you though.
5               Let's see.  This was -- this was a --
6    this particular change was brought to my attention
7    specifically via the chief's office from Colonel
8    Corvington who has a police commissioner on our
9    board -- our police board.  Okay?  Civilian -- on
10   our civilian police board.
11         Q.   What's the civilian police board?
12         A.   It's a five-member board that appoints
13   the chief of police, hears appeals for terminations,
14   reviews policy, signs off on every policy.  Most
15   general orders.  I'm sorry, all general orders, but
16   not all -- like, they don't sign off on a specific
17   unit procedure for planning.  They don't -- you
18   know, they only handle signing and reviewing the
19   directives that are -- have department-wide
20   applicability.  And they -- they have some other
21   duties that aren't coming to me at the moment.
22         Q.   Who sits on the -- who are the five
23   members?
24         A.   Huh.  Well, let's see, Colonel
25   Corvington is the commissioner and Laurie Westfall

Page 54

1    is on the board.  She's secretary I think.  And then
2    there's a couple that are escaping me.  There's two
3    new members, but there's five total.
4          Q.   What qualifications do they have to sit
5    on the board?
6          A.   They are -- obviously they're civilian.
7    And I don't know -- I think they're looking more for
8    a -- "they" being -- they're appointed by the county
9    executive, first of all.  Okay?  In St. Louis County
10   it's like the mayor.  Same deal.
11         Q.   Uh-huh.
12         A.   And they are looking for a
13   cross-section of people from the community to not
14   necessarily serve as oversight, but they're
15   oversight.  If that makes sense.
16         Q.   So if we look at Gomez 7, which is the
17   2011 version of the general order, in the same area
18   Section B1 little A, there's no mention of, you
19   know, the need for probable cause, right?
20         A.   Right.
21         Q.   So that language was added in 2015.  Do
22   you know why?
23         A.   What was explained to me was that
24   Colonel Corvington reviewed our order after there
25   were issues brought to attention by the DOJ

Page 55

1    from other --
2          Q.   What issues --
3          A.   -- departments.
4          Q.   -- were those?
5          A.   That it was specific to the 109-page
6    police report or I'm sorry, the DOJ report regarding
7    the City of Ferguson's police department.  One of
8    the sections in that review was concerning the use
9    of wanteds.  And they had some -- they had some
10   other interviews, some of the interviews done by the
11   DOJ revealed that certain officers on that
12   department weren't very clear on the use of wanteds.
13              That prompted -- and I'm -- I hate to
14   speak for my colonel, Colonel Corvington, but he
15   reviewed our policy and discovered the phrase
16   "reasonable grounds" I think is what was brought to
17   my attention.
18         Q.   If we look at Gomez 7, I think you're
19   right.
20         A.   Yeah, he discovered that and wanted to
21   know why it wasn't probable cause, which is what,
22   obviously, we were taught from the start in our
23   careers.
24              I didn't know at the time why that was.
25   This order was approved right after I got into

Page 56

1    planning in '11 and I had -- I didn't have anything
2    to do with it at the time.  I was still learning --
3    learning the job.
4          Q.   Did you learn who was responsible for
5    drafting the 2011 version?
6          A.   Well, it looks like it's George --
7    Officer Randy Vaughn.  Right here next to Tim -- the
8    TF for Tim Fitch, it says GV, which is George
9    Vaughn, his real -- he goes by Randy.
10         Q.   Where do you see that?
11         A.   Down -- on the signature page.
12         Q.   404?  On the last page --
13         A.   Okay.
14         Q.   -- I see Colonel Timothy Fitch.
15         A.   We see the TV right here in small
16   print?  Off to the left?
17         Q.   I see GV, yes.
18         A.   And the TF is right next to it.  I'm
19   sorry, I said TV.
20         Q.   TF signed, but GV was involved in
21   drafting.
22         A.   Yeah.
23         Q.   That's how you understand that to mean?
24         A.   That's exactly what that means.  Now --
25   now, what Officer Vaughn, he was my -- he was my

14 (Pages 53 to 56)

Page 57

1  policy person at the time.  He may have worked on
2  this.  Whatever the changes were made for this
3  particular version, he could have worked on this for
4  months leading up to it.  I just came in in August,
5  so I caught the tail end of it.
6        But that's -- you know, if I started
7  looking at this, I probably remember a little more.
8  Now, as I look at this, yeah, this is -- this --
9  some of the changes that were made regarding stolen
10  autos.  And we had -- I think there was a -- more
11  clarity needed on what officers were expected to do
12  when they recovered a stolen auto.  I think that's
13  what that was, so ...
14        Q.  If you had been in the planning role
15  that you began in August 2011 earlier, you would
16  have been involved in drafting a document like this
17  or overseeing the drafting of a document like this?
18        A.  Yes.
19        Q.  So do you understand that Lieutenant
20  Burk would have been involved in the drafting of a
21  document like this?
22        A.  Yeah.  Yes, he would have.
23        Q.  So 2015 Colonel Corvington -- did I say
24  that right?
25        A.  Corvington.

Page 58

1        Q.  Corvington.
2        A.  Yep.
3        Q.  Did he have this conversation with you
4  about this needed change or somebody else?
5        A.  I don't think I spoke with him.
6        Q.  Do you know who you spoke with to learn
7  of this change?
8        A.  It could -- I don't remember if it was
9  Chief Belmar or if it was his aide, sergeant -- I
10  don't know who his aide was at the -- at that point.
11  It might have been Sergeant Schaffer.  But there's a
12  lot of messages that I get regarding decisions that
13  are made by the chief and/or deputy chief, that's
14  Sergeant Schaffer, who's -- the aide comes down and
15  say, "Hey, here's what they want.  Do it."
16        Q.  How do you get these messages?
17        A.  Sometimes it's a conversation, a direct
18  conversation.  Sometimes it's an email.  A lot of
19  times I ask for email so I can track it later.  But
20  it was in this case that he wanted probable cause
21  put in there, okay?  The Colonel Corvington and
22  certainly the Chief Belmar.  Of course that makes
23  sense.
24        Q.  Is there any discussion about why it
25  hasn't been in there previously?

Page 59

1        A.  No.  Well, we didn't know why it
2  wasn't.  How's that?  So there were discussions.  I
3  probably -- I seem to remember talking to -- I don't
4  remember if it was the chief or Colonel Corvington,
5  but it -- you know, saying, "I don't understand why
6  this isn't here."  You know, it's easy to blame the
7  last group, you know.
8        But that -- that particular section I
9  don't remember -- I'd have to look at the historical
10  document of -- the history of this document to go
11  back and see when that was put in.  And honestly --
12  you know, not until Mr. Hughes and I spoke yesterday
13  did I realize that it's from, you know, 544216 or
14  whatever the state statute is.  It says reasonable
15  grounds in that statute.
16        So I'm surmising, but I'm guessing
17  whoever wrote this back in the day, used that
18  verbiage, which we do often.  We'll take it directly
19  from statute, an ordinance, anything, and put it in
20  our orders.  So that's -- I can only assume that
21  that's why they had that verbiage in there.
22        Q.  When the change was made, was there a
23  memorandum or notice sent out either among
24  lieutenants or precinct-wide?
25        A.  I don't know.  We don't generally -- we

Page 60

1  don't generally send out memoranda to make changes.
2  Sometimes -- and when I say that, it's -- we call it
3  a to/from.  To the department personnel, from Chief
4  Belmar, okay?  And we can -- it would be via email.
5  We could send it out saying:  Hey, we discovered
6  this.  Cease and desist or continue to do or
7  whatever the message might be, okay?
8        But I think this one -- this one was
9  changed just like all of them.  We made the change.
10  I sent it up my chain of command.  It got approved.
11  It went down the line.  And then made its ways to
12  command staff, got approved, we put it out.
13        Q.  And you mentioned looking at the
14  history of these documents.  How do you go about
15  doing that?
16        A.  We're required to keep everything.  Our
17  retention schedule for -- sorry.  Our retention
18  schedule for my unit, if I recall correctly, our
19  general orders we keep them forever, the signed doc.
20  And eventually I'll PDF them and then we'll save
21  them that way.  And then I'll send -- I'll keep the
22  PDF for us and then I'll send the hard doc off-site.
23        Q.  So it will let you know how often a
24  document was worked on updated and what prior
25  versions were --

PETER MORROW  4/5/2017

Page 61

1      A.  Uh-huh.
2      **Q.  -- who worked on it.**
3      A.  Uh-huh.
4      **Q.  You say -- do you say drafts as well of**
5  **those documents?**
6      A.  Huh-huh.
7      **Q.  So --**
8      A.  No, I don't.
9      **Q.  Only the final versions --**
10      A.  I wish.  But no, because historically
11  speaking, as someone sitting in my seat, you know, I
12  want to know why these things were made because --
13  and in fact, since I got in there, actually my
14  second tour, I mandated my -- anybody that works on
15  policy in my office, I want you to put in there a
16  paragraph why.
17          I mean, there's an ATS, administrative
18  transmittal sheet, that accompanies everything that
19  goes up our chain of command.  And in that we'll
20  have a brief explanation about:  Hey, this came out
21  because the colonel said to or this, that, and the
22  other.
23          Or actually, we're in the process of
24  changing our use of force regarding a fourth
25  district Taser -- not far from, I guess it was

Page 62

1  Virginia or something.  Anyway long story short,
2  we're moving our use of Taser in our use of force
3  continuum.  It hasn't been approved yet, but that's
4  the thing of thing.  You know, hey, decision X
5  versus Y, this is why we did it.
6          And that's the kind of thing we're
7  trying to do now, so that those that replace us down
8  line, when they sit here, they can say why.  Well,
9  Morrow did this so --
10      **Q.  That makes a lot of sense to me.**
11      A.  Yeah, we're getting better at it,
12  but --
13      **Q.  This 2015 version, it would have come**
14  **with a transmittal sheet showing information as to**
15  **why --**
16      A.  They all do.
17      **Q.  -- alternate?  Where is that stored?**
18      A.  I've got it.  It's in the file.
19      **Q.  Is that something we could get from**
20  **you?**
21      A.  Sure.  Sure.
22      **Q.  You don't have to --**
23      A.  And on that you don't -- okay.
24      **Q.  You don't have to write it down.**
25  **Mr. Hughes we'll coordinate with you on getting that**

Page 63

1  down for us.
2      A.  They're very -- I'm sorry.  They're
3  very basic explanations.  The subject -- usually a
4  paragraph.  If it's something more significant,
5  we'll attach a memo with a full-page explanation,
6  but it just depends.  More often than not, it's
7  three or four lines.  But, yeah, you can -- and in
8  that --
9      **Q.  So these -- updates to these documents**
10  **will definitely be, should be in either the**
11  **transmittal or if there's an accompanying memo, that**
12  **goes with it.  And you mentioned that you get**
13  **messages.  You prefer to get messages by email.**
14      A.  Uh-huh.
15      **Q.  Do you save those emails as well?**
16      A.  I don't save them, but I can -- we
17  use -- we utilize Barracuda and I can get them.  I
18  can get them.  And it just depends.  Sometimes I
19  will save it into my desktop if I know I'm going to
20  need it in a few months, but then I'll discard or
21  delete it.
22          MR. HOLLAND:  Why don't we take a short
23  break.  Use the bathroom.  Give her a break.  Does
24  that sound okay?
25          THE VIDEOGRAPHER:  The time is 2:51.

Page 64

1  We're off the record.
2          (Recess taken.)
3          THE VIDEOGRAPHER:  The time is
4  3:00 o'clock.  We are back on the record.
5  BY MR. HOLLAND:
6      **Q.  Lieutenant Morrow, before we took a**
7  **break, we were talking about Gomez Exhibits 7 and 8,**
8  **the updates in 2015 that added the language**
9  **"probable cause."  How did that change impact**
10  **day-to-day police work?**
11      A.  Well, I don't believe that it did.
12      **Q.  So why was the change made?**
13      A.  We were already doing it.  We already
14  required probable cause for a wanted.  The change
15  was made at the direction of my -- my chief.
16      **Q.  So you don't know the reason why it --**
17      A.  I don't.
18      **Q.  -- was -- do you know if there was any**
19  **additional training on the update of this policy?**
20      A.  I don't know if we covered it in -- in
21  our yearly training.  I don't know.
22      **Q.  Let me ask you this:  At the -- how**
23  **would a new police officer get trained on Gomez 7,**
24  **the 2011 policy?  So a police officer who started**
25  **2011 through -- through 2014 would have been trained**

16 (Pages 61 to 64)

PETER MORROW  4/5/2017

Page 65

1   on this general order; is that accurate?
2       A.  Yes.
3       Q.  What would that training have looked
4   like?
5       A.  We at that time had a system called
6   PASS, P-A-S-S.  It's Policy Acknowledgment System.
7   And that was our electronic records management of --
8   of our written directives, okay?
9       So I get hired September 1st of 2011.
10  No, that's a bad example.  October 1st.  This is
11  already in play of 2011.  In our system when I go
12  and sit and get trained by my field training
13  instructor in the car, it's my responsibility -- I
14  believe at the time we gave new employees 30 days to
15  go through our general orders review and
16  acknowledge.
17      Q.  How would they acknowledge?
18      A.  It's an electronic signature through
19  the PASS system.
20      Q.  So that officer who starts October 1st,
21  2011, and any other officer until Gomez 8, the
22  updated policy, they would have read this document
23  and acknowledged they understood it and clicked the
24  button in PASS?  Is that accurate?
25      A.  Yes, they would -- they would enter

Page 66

1   their -- what they called our DSN, it's our
2   department serial number, everybody has their own,
3   and then a password.
4       Q.  And this document serves as telling
5   them how or when a wanted can be entered?  Is that
6   accurate?
7       A.  Yeah, regarding the REJIS system, yes.
8       Q.  And until -- until July 15th, 2015,
9   this policy did not contain the probable cause
10  language?
11      A.  Not in that paragraph.  I thought that
12  it did elsewhere.  I could -- I'm sorry.  I think
13  I'm wrong.  Yeah, I think --
14      Q.  But even just in that paragraph, didn't
15  contain --
16      A.  Correct.
17      Q.  -- the probable cause language that the
18  officer would read while learning this policy.  Is
19  that accurate?
20      A.  Correct.
21      Q.  How would they then know that probable
22  cause was needed for a wanted?
23      MR. HUGHES:  My only objection it's
24  been answered a couple times, more than a couple
25  times already, so it's been asked and answered.

Page 67

1       I just make objections and then you
2   can -- he can rephrase the question or ask a
3   different question or ask you to answer it anyway.
4   So that's --
5       BY MR. HOLLAND:
6       Q.  Lieutenant Morrow, what I'm saying here
7   is I asked you how new officers are trained on these
8   documents.  And you said that they -- within 30 days
9   they have to read them and in the PASS system click
10  that they understand them, acknowledge that they've
11  read and understand them.  Is that accurate?
12      A.  Yes.
13      Q.  And new officers prior to July '15,
14  2015, would have been reading a document instructing
15  them when and how to enter wanteds that did not
16  contain "probable cause" in that paragraph, correct?
17      A.  Correct.
18      Q.  So how -- they otherwise know that
19  probable cause is required?
20      MR. HUGHES:  And my --
21      MR. HOLLAND:  Mike, your objection is
22  preserved.
23      MR. HUGHES:  My objection to the form
24  is asked and answered, repetitive.  Okay.
25      THE WITNESS:  Their academy training

Page 68

1   when they are taught that probable cause is required
2   to make an arrest and further to enter a wanted.
3       BY MR. HOLLAND:
4       Q.  So there's a specific class that tells
5   them that probable cause is needed to enter a
6   wanted?
7       A.  I believe there is in our -- it's
8   either in constitutional law or statutory law.
9       Q.  And what's your basis for that belief?
10      A.  History, experience.
11      Q.  What experience?
12      A.  Possibly discussions with -- with
13  instructors over the years or since I've been in
14  planning.
15      Q.  Do you remember any specific
16  discussions?
17      A.  No.
18      Q.  Specific people you've spoken to?
19      A.  No.  I would call the academy
20  instructors from time to time on a variety of
21  subjects.
22      Q.  So you don't have a specific
23  recollection of anyone telling officers that -- in a
24  training course, that probable cause is required for
25  a wanted?

17 (Pages 65 to 68)

PETER MORROW  4/5/2017

Page 69

1      A.  Not that discussion, no.
2      Q.  Are you aware or -- strike that.
3          Let's take a look -- you mentioned
4   earlier that you are -- strike that.
5          I want to show you one thing with
6   Gomez -- Gomez 9, which is the 2016 version; is that
7   right?  Dated September 14, 2016.  Do you see that?
8      A.  I do.
9      Q.  Audible.
10     A.  No, I was waiting until you finished.
11  Yes, I see it and that's it.
12     Q.  And this replaced general order 1526?
13     A.  Yes.
14     Q.  Is this the current version of this
15  policy?
16     A.  It is.
17     Q.  Let's look at page 2 again in Section B
18  which is about wanted, warrants, stop orders; do you
19  see that?
20     A.  Yes.
21     Q.  Do you have an understanding of why
22  warrants are grouped together with wanteds and stop
23  orders?
24     A.  I don't.
25     Q.  Is it a fair characterization -- strike

Page 70

1   that.
2          Do you agree that that suggests that
3   they're comparable -- comparable entries since
4   they're all grouped together?
5          MR. HUGHES:  Just object to the form of
6   the question.  Calls for speculation and conjecture.
7          BY MR. HOLLAND:
8      Q.  Just asking for your opinion.
9      A.  Because it's in the same section, I
10  could see that.
11     Q.  If we look at the same paragraph as the
12  previous orders, Section B1 little A.  Some bolded
13  language which suggests that it's new; is that
14  right?
15     A.  Correct.
16     Q.  So it reads:  "Once the case officer
17  has determined probable cause exists that a person
18  has committed a crime, they must have a review of
19  the facts supporting the case by their immediate
20  supervisor or his or her designee and receive
21  approval before requesting wanted person entries."
22  Did I read that right?
23     A.  Yes.
24     Q.  What can you tell me about that change?
25     A.  There was a discussion in our executive

Page 71

1   command staff, which is, again, it's the four
2   colonels, deputy chief, and chief, at some point
3   before September of '16 where they determined that
4   they wanted in our general order another layer of
5   review for -- but prior to entering a wanted.  I
6   don't know why this came about.
7      Q.  Do you know who -- one of those six
8   people raised this as an issue?
9      A.  I don't know.
10     Q.  You just know it came from their --
11     A.  Yes.
12     Q.  -- meetings?
13         Do you remember who told you about it?
14     A.  I thought it was the deputy chief.
15     Q.  You had mentioned that in your opinion,
16  the change to the 2015 policy adding the probable
17  cause language was not a change in day-to-day police
18  practice or did not lead to a day-to-day -- change
19  in day-to-day police practice.  Did this update here
20  lead to a change in day-to-day police practice?
21     A.  Yes, because it was now an additional
22  step, so that would -- it would change in that
23  regard.
24     Q.  So now before entering a wanted, a
25  police officer had to review the facts with their

Page 72

1   immediate supervisor?
2      A.  Yes.
3      Q.  But you don't know why that was
4   implemented?
5      A.  Correct.
6      Q.  Do you know who would know why?
7      A.  A member of the executive command
8   staff.
9      Q.  Do you think Lieutenant Burk would know
10  why?
11     A.  I don't know that.  I don't know if he
12  would know why.
13     Q.  What position did he hold in September
14  of 2016?
15     A.  He was the bureau -- commander of
16  bureau of records -- current position that
17  Lieutenant Gomez has.
18     Q.  Let's take a look at the DOJ report
19  that you mentioned earlier.  I think you mentioned
20  earlier it's 109 pages, so -- off the top of your
21  head, so I assume that you're familiar with the
22  report?
23     A.  Something like that, yeah.  Or was it
24  109 recommendations?  I lost track.
25     Q.  102 pages.  So you were close.  This

18 (Pages 69 to 72)

PETER MORROW  4/5/2017

Page 73

1    was previously marked Schlueter 3.
2        Have you read this report?
3        A.  Yes.
4        Q.  Let's flip to pages -- or strike that.
5        When did you read the report?
6        A.  Probably I would suspect it was over a
7    period of time.  I'm guessing it was no later than a
8    year later that I actually finished it.
9        Q.  So it's dated March 4th, 2015.  Within
10   the subsequent year --
11       A.  Uh-huh.
12       Q.  -- you read the report?
13       A.  Yes, yes.
14       Q.  Was it a requirement for you to read
15   the report or did you do it optionally?
16       A.  I did it on my own.  I did it on my
17   own.
18       Q.  Why?
19       A.  I thought that it was pertinent.
20   Having spent enough time up there, I wanted to see
21   what they -- what they -- how they -- the Department
22   of Justice evaluated what had gone on.
23       Q.  What do you recall within the St. Louis
24   County Police Department being discussed following
25   this report?

Page 74

1        MR. HUGHES:  Just object it's -- it's
2    way overbroad and it calls for hearsay.
3        MR. HOLLAND:  I'll withdraw that
4    question.
5        Q.  Do you recall any discussions about
6    this report following the DOJ's issuance of it?
7        A.  Well, I will tell you that after it
8    came out, there were probably multiple
9    conversations, not necessarily all involving me.
10       Q.  How about the ones that you were
11   involved in?  Who did you talk to about this report?
12       A.  Multiple people gathering opinions.  I
13   did -- I recall talking to Captain Lawson from our
14   Internal Affairs Bureau of Professional
15   Responsibility.
16       Q.  What did you talk to that captain
17   about?
18       A.  Just his input.  He's on the same floor
19   as I am.  Just getting his reaction, opinions,
20   things like that.
21       Q.  Let me focus just a little bit.  Maybe
22   that will help.  Did you talk to anybody about the
23   part of the report that relates to wanteds?
24       A.  Those -- I had discussions.  I can't
25   say with who, but yes.

Page 75

1        Q.  Do you remember what those discussions
2    involved?
3        A.  It -- I recall wondering where we stood
4    as a police department with 20 times the amount of
5    people that Ferguson had, officers -- sworn
6    officers, you know, their 30 or 40 to our 800, 850.
7    I'm wondering where we might stand on a review like
8    this, especially regarding wanteds.
9        Q.  What do you mean "might stand"?
10       A.  How are we performing with our use?
11   Does a two-month officer know the same thing as a
12   20-year officer.
13       Q.  That's fair.  Let's take a look at some
14   language and maybe that will bring back some
15   recollection of those conversations you had.
16       Let's take a look at page -- let's take
17   a look at page 19.  Do you see where it says -- bear
18   with me.  On your page 19, is there a section that
19   says in bold:  "One, FPD engages in a pattern of
20   unconstitutional stops and arrests in violation of
21   the Fourth Amendment"?
22       MR. HUGHES:  I don't see it on mine.
23       BY MR. HOLLAND:
24       Q.  Okay.  I just wanted to make sure.
25   Let's try page 16.  Sorry about that.  Do you see

Page 76

1    that there?
2        A.  Yes.
3        Q.  In that first paragraph below that
4    section heading, second to last sentence it says:
5    "FPD," which is Ferguson Police Department, "also
6    relies on a system of officer generated arrest
7    orders called wanteds that circumvents the warrant
8    system and poses a significant risk of abuse."  Did
9    I read that correctly?
10       A.  Yes.
11       Q.  Do you agree with the characterization
12   that wanteds circumvent the warrant system?
13       MR. HUGHES:  Well, just object to form
14   of the question because, you know, this is
15   pertaining to FPD and there's a lot of factors
16   involved in that I'm sure, so ...
17       MR. HOLLAND:  I did not ask him
18   anything specific to FPD.  I asked him if he agrees
19   with the characterization that wanteds circumvent
20   the warrant system.
21       You can answer.
22       MR. HUGHES:  Just object to the form of
23   the question.  It calls for speculation and -- on
24   his part.
25       BY MR. HOLLAND:

19 (Pages 73 to 76)

PETER MORROW  4/5/2017

Page 77

1    Q.  You can answer.
2    A.  Try it again.  I'm sorry, sir.
3    Q.  Sure.  I'll reask the question.
4        Mike, your objection is preserved.
5        Do you agree with the characterization
6    that wanteds circumvent the warrant system?
7    A.  Well, I would say no.
8    Q.  Why?
9    A.  Since the time I started in '94, this
10   has -- this has been the practice and I've been
11   taught that -- I was taught that I had the ability
12   to determine probable cause.  Why I didn't have to
13   bring it in front of a judge or a magistrate prior
14   to that, that wasn't explained to me.  So I had --
15   because for 22 years I've been allowed to do this,
16   it -- I don't believe that it's circumvented.
17   Q.  So because you've been told this is the
18   way you should do it, therefore, you think it's the
19   right way to do it?
20       MR. HUGHES:  Object to the form of the
21   question.  It misstates his testimony.
22       BY MR. HOLLAND:
23   Q.  You can answer.
24   A.  I've been told -- and this is an
25   accepted practice all the way through our

Page 78

1    Prosecuting Attorney's Office.  If we couldn't do
2    it, they certainly wouldn't let us.  Is that fair
3    enough?
4    Q.  That's fair.
5        Why -- why do you think there is the
6    requirement that a judge sign off on an arrest
7    warrant?
8        MR. HUGHES:  Objection.  Calls for
9    speculation and conjecture.
10       BY MR. HOLLAND:
11   Q.  You can answer.
12   A.  Why the -- why is there a requirement
13   that a judge has to sign off --
14       MR. HUGHES:  And -- and he's -- he's
15   being produced --
16       MR. HOLLAND:  Mike, he's testifying
17   today.
18       MR. HUGHES:  He's being produced to
19   talk about facts not opinions.
20       MR. HOLLAND:  He's being produced as a
21   30(b)(6) witness on behalf of the County.
22       MR. HUGHES:  Yes.  Well, you're
23   asking --
24       MR. HOLLAND:  The County has its
25   policies and practices.

Page 79

1        MR. HUGHES:  -- opinions.  You're
2    asking him opinions.  You're not, you know, he's
3    being produced to give factual statements, not
4    opinions, so it's beyond the notice.
5        BY MR. HOLLAND:
6    Q.  What is St. Louis County's position on
7    why the -- what is the St. Louis County Police
8    Department's position on why the warrant requirement
9    needs the sign-off of a judge or judicial officer?
10       MR. HUGHES:  Same -- same objections as
11   before.  Calling for speculation, conjecture, and
12   opinion.
13       THE WITNESS:  I don't know the answer
14   to that.  I'm not certain.
15       BY MR. HOLLAND:
16   Q.  And that's St. Louis County's official
17   answer?
18   A.  Yes.
19   Q.  So the paragraph we looked at, the
20   sentence that I read from page 16 of the report,
21   also says that wanteds pose a significant risk of
22   abuse.  Do you recall discussing that with anyone
23   after this report?
24       MR. HUGHES:  Well, objection to the
25   form of the question.  It -- again, this is focused

Page 80

1    on Ferguson Police Department, some abuses that --
2        MR. HOLLAND:  Mike, he testified that
3    he read this report and discussed it with some of
4    his colleagues.  I'm asking him whether he discussed
5    that -- that -- that part of this paragraph with
6    anyone.  I'm not asking him to talk about Ferguson.
7    I'm asking him whether he discussed that sentence,
8    that comment by the DOJ with anyone.
9    Q.  I'll reask the question.  You mentioned
10   earlier that you discussed this report with some of
11   your colleagues following its issuance.  The report
12   reads:  "Wanteds pose a significant risk of abuse."
13   Did you -- do you recall discussing that part of the
14   report with anyone?
15   A.  I don't recall.
16   Q.  Does St. Louis County have a position
17   on whether wanteds pose a significant risk of abuse?
18       MR. HUGHES:  Again, he's here --
19       MR. HOLLAND:  Mike, he's testifying --
20       MR. HUGHES:  He's here to answer facts.
21   He's not here to provide opinions.
22       MR. HOLLAND:  I'm not asking for his
23   opinion.
24       MR. HUGHES:  Sure it is.  Sure you are.
25       BY MR. HOLLAND:

20 (Pages 77 to 80)

PETER MORROW  4/5/2017

Page 81

1    Q.  You mentioned that St. Louis County
2  has, I think you said, 800 or so officers?
3    A.  Yes.
4    Q.  And Ferguson Police Department has
5  around 40 you said?
6    A.  Yeah, roughly.
7    Q.  Wouldn't that mean that St. Louis
8  County -- in St. Louis County, given the number of
9  officers, there's a greater risk of abuse in terms
10  of wanteds than Ferguson Police County -- Police
11  Department?
12    MR. HUGHES:  Objection.  Calls for
13  speculation and conjecture.  I guess you can ask
14  him if he's aware that there's ever been any --
15    MR. HOLLAND:  Mike, are you going to
16  let him testify?
17    MR. HUGHES:  Rather than are any
18  greater -- again, you're asking him for his
19  conjecture, his opinions --
20    MR. HOLLAND:  Mike, let him testify.
21    MR. HUGHES:  You're not asking for
22  facts.  Ask him if he's aware of even one instance
23  of abuse.
24    BY MR. HOLLAND:
25    Q.  You can answer the question.

Page 82

1    A.  Okay.  I see what you're -- okay.  The
2  last question was whether you thought -- or you
3  asked me what my opinion was regarding abuse based
4  on what was that -- do it again.
5    Q.  I'll just reask the question.
6    A.  Thank you.
7    Q.  You mentioned earlier that the
8  St. Louis County Police Department is much larger
9  than the Ferguson Police Department.  Did that --
10  did St. Louis County -- do you recall any
11  discussions among your colleagues at St. Louis
12  County about how that could mean that there are --
13  there's greater risk of abuse within your
14  department?
15    A.  No.
16    Q.  Were you aware of any specific risks --
17  any abuses of the wanted system?
18    A.  No.
19    Q.  Have you ever heard of LEPAC?
20    A.  Yes.
21    Q.  The Law Enforcement Police Advisory
22  Committee; is that right?
23    A.  I believe that that's what it is.
24    Q.  How are you familiar with it?
25    A.  Probably previous discussions with

Page 83

1  Lieutenant Burk a year or so ago just in passing.  I
2  really -- I don't know a whole lot about LEPAC.  I
3  just know that it was something that he was familiar
4  with regarding his position and records.
5    Q.  Do you think you're prepared to testify
6  about LEPAC today?
7    A.  I can certainly give it an effort here,
8  but I don't know that I can offer you much.
9    Q.  Have you ever personally attended a
10  meeting?
11    A.  No, no.
12    Q.  Have you ever reviewed any of the
13  minutes --
14    A.  No.
15    Q.  -- of the meeting?
16    A.  No, no.
17    Q.  Have you ever talked to anyone about
18  specific discussions at any LEPAC meetings?
19    A.  No, not ...
20    Q.  Do you know who sits on LEPAC?
21    A.  I don't.
22    Q.  Let's take a look back at Exhibit 1.
23  If you'll turn to page -- the last page, so that's
24  the -- so topic three that you were -- that we
25  noticed in your deposition reads:  "Whether and how

Page 84

1  the Defendant County of St. Louis changes its
2  policies, procedures, practices, standards,
3  guidelines, training, or instruction related to..."
4  And then option B is:  "Arrests and detentions made
5  pursuant to wanteds or Stop Orders following United
6  States Justice Department's March 4th report on the
7  Ferguson Police Department and/or consent decree of
8  the United States Justice Department and the City of
9  Ferguson entered into March 17th of 2016, including,
10  but not limited to, the involvement of LEPAC."
11    So you're just not prepared to testify
12  today about the involvement LEPAC in any of the
13  changes --
14    MR. HUGHES:  Well, if you want to ask
15  him if LEPAC made recommendations to planning to
16  make changes in their policies.
17    MR. HOLLAND:  I was hoping to ask him a
18  lot about LEPAC and show him documents, but he just
19  told me --
20    MR. HUGHES:  But he's here.  You know,
21  he's St. Louis County representative, and if LEPAC
22  makes recommendations to St. Louis County, he can
23  answer that, you know, to planning.  But -- but, you
24  know, I mean, you know, LEPAC is not even a County
25  agency, so -- but if -- you know, he's here to

21 (Pages 81 to 84)

PETER MORROW  4/5/2017

Page 85

1    answer questions --
2         MR. HOLLAND:  Mike --
3         MR. HUGHES:  -- regarding whether LEPAC
4    make recommendations to -- to St. Louis County to
5    planning.  You know, so the answer is yes or the
6    answer is no.
7    BY MR. HOLLAND:
8         Q.  Do you have any knowledge of
9    recommendations St. Louis County has made to LEPAC?
10        MR. HUGHES:  St. Louis County has made
11   to LEPAC.
12        THE WITNESS:  A member of my department
13   that sits on LEPAC?
14   BY MR. HOLLAND:
15        Q.  So --
16        A.  More specifically or --
17        Q.  Are you -- strike that.
18            What purpose does LEPAC serve, if you
19   know?
20        A.  Well, I don't know.
21        Q.  And why did you talk to Lieutenant Burk
22   about LEPAC?
23        A.  He may have -- what I said before, he
24   may -- there are times when we'd have conversations
25   when he was in the record room about -- he might

Page 86

1    have brought up something about REJIS or things that
2    I don't have any training or knowledge about, and we
3    would just -- I would -- he explain it and I would
4    move on.
5         Q.  Was he on LEPAC?  A member of LEPAC?
6         A.  I don't know.  I don't know who the
7    members were.
8         Q.  If I wanted to find out about
9    recommendations that LEPAC made to St. Louis County
10   or something like that, would you be the right
11   person to talk to?
12        A.  No.
13        MR. HUGHES:  Well --
14        MR. HOLLAND:  Mike, he answered the
15   question.  He's obviously not familiar with LEPAC.
16   He can't answer my questions today.
17        Q.  Does anybody at St. Louis County within
18   the police department know about LEPAC?
19        A.  I would suspect that Jeff Burk
20   obviously had the most knowledge about it.
21        Q.  Who --
22            Mike --
23        MR. HUGHES:  Well, I can say this.  I
24   did supply you with documents from LEPAC that show
25   that they make recommendations to REJIS.

Page 87

1         MR. HOLLAND:  I agree, Mike, that you
2    showed -- you prepared --
3         MR. HUGHES:  And the documents also
4    show that multiple jurisdictions are on the LEPAC
5    committee and, you know, I gave them to you and they
6    make recommendations to REJIS.
7         MR. HOLLAND:  Mike, if documents were
8    sufficient, why would we ever have depositions?
9         MR. HUGHES:  So -- so you had the
10   opportunity to talk to REJIS people to ask what
11   recommendations LEPAC made to them.
12        MR. HOLLAND:  Does that mean that we
13   don't also have the opportunity to ask St. Louis
14   County what their views and participation on
15   LEPAC --
16            (Simultaneous speech.)
17        THE REPORTER:  One at a time, please.
18        MR. HUGHES:  You can ask him has LEPAC
19   made recommendations to St. Louis County.
20        MR. HOLLAND:  I'm not going to ask him
21   questions about something he has no idea what it is.
22   I need a basis and some context before I can ask him
23   what their decisions are and they made decisions.
24   It's -- it's a waste of his time to sit here and ask
25   him questions he has no idea what -- what anything

Page 88

1    has do with.
2         MR. HUGHES:  Well, if LEPAC made
3    recommendations to planning, he would know.  But --
4         MR. HOLLAND:  You're inside his brain?
5    Let's just move on.  He's not the right witness.
6         MR. HUGHES:  All right.
7         MR. HOLLAND:  So we've now failed twice
8    in trying to get somebody who knows about LEPAC.
9    We'll try again.
10        Q.  I apologize, Lieutenant Morrow.
11            Are you familiar with the consent
12   decree that the DOJ entered into with Ferguson, the
13   City of Ferguson, after its report?
14        A.  I know that they did enter into a
15   consent decree, yeah.  I'm not familiar with the
16   decree though.
17        Q.  Did you read it?
18        A.  No, no.
19        Q.  Are you aware of whether St. Louis
20   County changed -- made any changes as a result of
21   the consent decree?
22        A.  No, sir, I'm not aware.
23        Q.  Do you know if the update to the 2016
24   general order that we looked at, Gomez 9, the
25   addition of the supervisory review, do you know if

22 (Pages 85 to 88)

PETER MORROW  4/5/2017

Page 89

1  that was a result of anything in the DOJ report or
2  the consent decree?
3       A.  I do not.
4       Q.  What familiarity, aside from your own
5  training in 1994, do you have with the St. Louis
6  County Police Department's training of its officers?
7       A.  What type of training are you talking
8  about?
9       Q.  Let's focus on training on wanteds and
10  probable cause.  What familiarity do you have with
11  the training that's been conducted in the last five
12  years on those two topics?
13       A.  Well, I would have to see a -- I am not
14  familiar with what the Police Academy with their
15  training regarding stops and -- stop orders or
16  wanteds, and I don't know what else I could offer on
17  that end for you.
18       Q.  Who runs the county and municipal
19  Police Academy?
20       A.  It's Lieutenant Steve Hampton from my
21  police department.
22       Q.  Is his sole job to run the Police
23  Academy?
24       A.  Yes.
25       Q.  How long has he held that position for?

Page 90

1       A.  I'm going to say about a year.
2       Q.  Who preceded him in that position?
3       A.  Lieutenant Matt O'Neill.
4       Q.  And their job would be to come up with
5  the schedule and curriculum for the training as
6  police officers?
7       A.  Well, I think that there's a commission
8  or a board that oversees the academy and I believe
9  that they're part of that -- that decision-making
10  process.  I'm almost positive.  But it's our command
11  staff, St. Louis County Police's command staff, that
12  is in charge of the curriculum for our employees at
13  the academy.
14       Q.  So there's a commission who -- why
15  don't you tell me what does the commission do?
16       A.  I think it's just a board of sorts.
17       Q.  What does the board do?
18       A.  I don't know specifically, but I
19  believe that they have -- as far as overseeing and I
20  hate to -- I don't want to say the wrong thing
21  because I don't know what they do specifically, but
22  I would suspect that they have some input on the
23  curriculum on the law enforcement side of the
24  academy because we split it, of course, with the
25  firefighters, so --

Page 91

1       Q.  Do you know who sits on the board?
2       A.  No.
3       Q.  And then you said each command staff
4  has some input as to the training.  Do you mean kind
5  of that would be specific to their department?
6       A.  Yes, our command staff -- yeah, and I
7  don't suspect that that really helps you on that end
8  because we get people more than their employees that
9  attend the Police Academy.  Various police
10  departments send people through.  But our command
11  staff is responsible for the curriculum on that end.
12       Q.  And when you say "our command staff" --
13       A.  St. Louis County.
14       Q.  And within St. Louis County's police
15  departments does each subdepartment provide input on
16  what officers should be trained in?  So does the
17  planning group say, you know, they should have
18  training on this?  Does the robbery and homicide
19  group say it's -- you know, they need training on
20  this?
21       A.  No.
22       Q.  What kind of input does the command
23  center provide specifically?
24       A.  Well, I believe that the -- that
25  Lieutenant Hampton and I don't know that -- he's not

Page 92

1  done it since I've been present at a command staff,
2  but these are the type of issues that would be
3  discussed during command staff when needed.
4       I think the curriculum itself, I think
5  for the most part -- and, again, I -- okay, I've not
6  been assigned there, but it carries over from year
7  to year what the instructor is doing, the research
8  and verifying that it's still applicable, things of
9  that nature.  And everything does essentially go
10  through Lieutenant Hampton.
11       And I don't know -- I don't know for
12  a -- I don't know what the mode or the work flow is
13  for Lieutenant Hampton to the command staff and what
14  things he needs to come there for to request a
15  discussion.
16       Q.  So you're now talking about command
17  staff has a -- is it a committee?
18       A.  Command staff is our -- it meets
19  weekly.  And we discuss crime stats, policy, and
20  other issues that might come up.  And it's captains
21  on up.  Captains, colonels, deputy chief, chief, and
22  occasionally some lieutenants are present.
23       Q.  So occasionally you'll attend one of
24  these meetings?
25       A.  If I have to present policy, I'm there.

23 (Pages 89 to 92)

PETER MORROW  4/5/2017

Page 93

1      Q.   What does -- what does the training
2  look like?  Where does it happen?  Who's -- are
3  materials given out?
4      A.   Yes.  The -- we have police academy
5  basic classroom setups.
6      Q.   Where?
7      A.   I'm sorry.
8      Q.   Where?
9      A.   It's in the city of Wellston which is
10  right on the St. Louis City limits in the center of
11  the county, St. Louis County.
12      Q.   And which police departments attend at
13  the same time?
14      A.   Whoever it is that wants to put a
15  recruit through.  We have --
16      Q.   Within the county?
17      A.   We have -- it can be from out of
18  county, out of -- anywhere in the state of Missouri
19  ultimately.  Although I don't know that there are
20  many people beyond a couple counties away.
21      Q.   And are -- are wanteds covered during a
22  day of this training?
23      A.   I believe so.
24      Q.   How much -- how much time is spent on
25  wanteds?

Page 94

1      A.   I don't know.
2      Q.   Is it one course?  One part of a
3  course?
4      A.   That would be an instructor question as
5  to how much time they dedicate to it.
6      Q.   Do you specifically know what that
7  portion of the course looks like or do you --
8      A.   I do not.
9      Q.   Do you remember that part of the course
10  from your Police Academy?
11      A.   No, sir.
12      Q.   I'm going to show you what has
13  previously been marked Gomez 14 and 15.
14          (Previously marked Exhibits 14
15          and 15 were shown to the
16          witness.)
17  BY MR. HOLLAND:
18      Q.   Do you recognize these documents?
19      A.   No.
20      Q.   These documents were produced by
21  defendants in this action.  I believe they are
22  Police Academy calendars.  Does that sound right to
23  you?
24      A.   Well, based on what's contained in
25  them, yes.

Page 95

1      Q.   The first one or, excuse me, Gomez 14
2  is from January 2011 and it says class 175; do you
3  see that?
4      A.   Yes.
5      Q.   And then Gomez 15 is from more recent,
6  October 2016, class 190; do you see that?
7      A.   Yes.  Can I ask you, I have two 15s.
8  Is there a reason for that --
9      Q.   You should have one 14.
10      A.   I have a 14 -- I have 14 -- I'm sorry,
11  14 and 15 and I got -- okay.  Very good.
12      Q.   I'll take the additional one back.
13  Thank you.
14          Other than that duplication, did I
15  describe these documents correctly?
16      A.   Yes.
17      Q.   So looking through these we -- I didn't
18  see anything that says wanteds.  So which course --
19  and understanding that you haven't seen these
20  documents before, would you be able to tell me which
21  course wanteds would have been covered in?
22      A.   Well, I would say it's -- it would
23  either be Missouri State law or constitutional law,
24  and it looks like Officer Emerson is the instructor.
25      Q.   Are you looking at Gomez 15 right

Page 96

1  now --
2      A.   I'm at 15 and I flipped it over to the
3  second -- the page number 2 and I'm looking at the
4  top.  Missouri State law, constitutional law,
5  Emerson.
6      Q.   Do you know who Emerson?
7      A.   I do.
8      Q.   Who is Officer Emerson?
9      A.   He's a Maryland -- Maryland Heights
10  Police Department officer assigned to our academy.
11      Q.   What would qualify Officer Emerson to
12  teach constitutional law?
13      A.   I'm not sure what they use at the
14  academy to make their instructor choices.
15      Q.   So St. Louis County's official answer
16  is you don't know what qualifies Officer Emerson to
17  teach the officers constitutional law?
18      A.   Correct.
19      Q.   Does Officer Emerson have a first name?
20      A.   I believe it's Keith.
21      Q.   Keith?
22      A.   Yes.
23      Q.   Does Officer Emerson have any
24  qualifications to teach Missouri statutory law?
25      A.   Again, I'm not sure what they use to

24 (Pages 93 to 96)

PETER MORROW  4/5/2017

Page 97

1  make the choice when they brought him in.
2     Q.  And that's St. Louis County's --
3     A.  St. Louis County Academy, yes.  Yes,
4  sir.
5     Q.  Looking back in the 2011 version, which
6  is Gomez 14, I don't see a class on Missouri
7  statutory law.  Do you?  I guess the better question
8  is do you know if Missouri statutory law was added
9  as a course more recently than 2011?
10    A.  No, it's been -- it was there when I
11  was there.
12    Q.  Okay.  So actually, excuse me.  I do
13  see it.  If you turn to page 6, it's -- it's just
14  called statutory law.
15    A.  Probably yes.  Yeah.  That's what I
16  would say.
17    Q.  Do you know who -- sorry.  Talking over
18  him again.
19       Do you know who Crowley is?
20    A.  I don't.
21    Q.  And in then turning back to the first
22  page of that document, it looks like constitutional
23  law was taught by Grames, G-r-a-m-e-s; do you see
24  that?
25    A.  Yes, I do.

Page 98

1     Q.  Do you know who Grames is?
2     A.  Yes, he's a retired -- they called him
3  an instructional technologist.  Ron Grames was his
4  name.
5     Q.  What is an institutional technologist?
6     A.  I don't know the definition.  That was
7  his title.
8     Q.  Do you know what his background was?
9     A.  I don't.
10    Q.  Do you know if he had any
11  qualifications to teach constitutional law?
12    A.  I don't.
13    Q.  And that's St. Louis County's official
14  answer?
15    A.  Yes.
16    Q.  Do you know whether aside from a
17  calendar like this the Police Academy keeps any
18  schedule of courses?
19    A.  They keep on our -- I believe it's our
20  intranet, the County police intranet, they keep a
21  schedule of upcoming courses.  So if you chose to
22  take an elective -- an elective course, you could
23  sign up.
24    Q.  Is there any continuing training
25  following the academy?

Page 99

1     A.  Yes, we have continuing education.
2     Q.  What does that involve?
3     A.  Well, the -- in Missouri we have the
4  POST -- actually it might be a national thing, but
5  I'm not -- I'm not certain, but it's Police Officer
6  Standards and Trainings, POST.  And there's a
7  certain minimum requirement of continuing education
8  once you get out of the Police Academy.  Used to be
9  48 hours in three years.  It's since gone up.  And I
10  don't know what the numbers are currently.  There
11  are more hours required is what I mean by that.
12    Q.  Annual hours required?
13    A.  Correct.
14    Q.  And you take that each year?
15    A.  Correct.
16    Q.  Have you taken any continuing education
17  training on wanteds?
18    A.  I don't believe so.
19    Q.  Do you know if any continuing training
20  on wanteds is offered by the St. Louis County Police
21  Department?
22    A.  I don't know.
23    Q.  Is there any training on what a
24  temporary wanted is?
25    A.  I'm not certain.

Page 100

1     Q.  Do you know what a temporary wanted is?
2     A.  I'm not certain what that is.
3     Q.  Do you know if attendance is taken at
4  academy training?
5     A.  Yes, it is.
6     Q.  And is that something that's kept?
7     A.  Yes, it is.
8     Q.  Is it attendance taken at continuing
9  education training?
10    A.  Yes, it is.
11    Q.  And the attendance lists are also kept
12  for that?
13    A.  Yes.
14    Q.  Are any of the -- are these trainings
15  recorded by video?
16    A.  I don't think so.
17    Q.  Audio?
18    A.  I don't think so.
19    Q.  As a supervisor did you, other than the
20  normal training you received as a police officer,
21  did you receive any training to be a supervisor?
22    A.  After promotion when I was promoted to
23  2007 to sergeant, there was a mandatory 40-hour
24  basic front line supervision class that I took.
25    Q.  Did any of that involve training on how

PETER MORROW  4/5/2017

Page 101

1  to -- how to review a wanted entry to determine that
2  it had -- is sufficient -- strike that.
3          Did any of your 40-hour training course
4  to become a supervisor involve any training on how
5  to review a wanted entry to determine whether it had
6  sufficient probable cause?
7      A.  I don't recall.
8      Q.  Were you ever a field trainer?
9      A.  No, sir.
10     Q.  Do you know if field trainers -- field
11  training instructors receive any specialized
12  training?
13     A.  I don't.  I don't believe that they do.
14  I take that back.  I think there is a class at the
15  academy specifically for field training instructors
16  and I don't know how many hours.  I think --
17     Q.  Sorry.  Go ahead.
18     A.  Yeah, I believe that there is, yeah.
19     Q.  Do you know what that course involves?
20     A.  I do not.  Can you -- can I have five
21  minutes?
22     Q.  Of course.  Let's take a break.
23     A.  It's time.
24     Q.  Let's take a break.
25     A.  Please.  Thank you.

Page 102

1          THE VIDEOGRAPHER:  The time is 3:47.
2  We're off the record.
3          (Recess taken.)
4          THE VIDEOGRAPHER:  The time is 3:54.
5  We are back on the record.
6          BY MR. HOLLAND:
7      Q.  Lieutenant Morrow, before we took a
8  break, we were talking about field trainers.  I'm
9  going to hand you what I've marked Morrow Exhibit 4.
10  This was produced by defendants this morning.
11          (Exhibit 4 was marked for
12          identification.)
13          BY MR. HOLLAND:
14     Q.  Again if --
15          MR. HUGHES:  I'm sorry, what number?
16          MR. HOLLAND:  Four.
17     Q.  Do you recognize this document?
18     A.  Yes, I do, yeah.
19     Q.  How do you recognize it?  Or how are
20  you familiar about it?
21     A.  It's just one of our manuals.
22     Q.  Who is -- if you turn to page Roman
23  numeral -- little Roman numeral ii, which is -- do
24  you see the goals and objectives at the top?
25     A.  Yes.

Page 103

1      Q.  At the bottom again we see Colonel
2  Timothy Fitch and we see a TF and then an EM.
3  Earlier you said GV was Vaughn if I remember
4  correctly.
5      A.  Uh-huh.
6      Q.  Who is EM?
7      A.  EM is officer Ed Menzenwerth.
8      Q.  Is that -- does this suggest to you
9  that Ed Menzenwerth was involved in drafting this
10  document?
11     A.  Correct.  He was assigned to planning
12  at that time and worked on -- this was obviously one
13  of his assignments.
14     Q.  So if you could turn to page 1 of 18.
15  It says there's a Section B called field training
16  instructor.  Do you see that?
17     A.  Yes.
18     Q.  And you would agree that the bolded
19  language in this document is -- represents the
20  updates or the new information added to this
21  document --
22     A.  Yes, sir.
23     Q.  -- from a prior version?
24     A.  Yes, sir.
25     Q.  Do you know the date of this document?

Page 104

1  I'm just asking.  September 25th, 2013.
2      A.  Okay.
3      Q.  So turning back to 1 of 18, in that
4  field training instructor section, in the first
5  section called selection, do you agree that that --
6  that refers to the selection of field training
7  instructors?
8      A.  Yes.
9      Q.  Do you know what qualifications an
10  officer has to have to be selected as a field
11  training instructor?
12     A.  Well, yes.  As it states here in
13  subsections 1, 2, and 3, it outlines it.
14     Q.  Subsection 3 was -- was added:  "Must
15  attend a department approved basic field training
16  instructor seminar before training a probationary
17  officer."  Do you see that?
18     A.  Yes.
19     Q.  So prior to this version of the manual
20  which is September 2013, was there -- strike that.
21          Prior to the version of this manual
22  here, September 2013, was there a basic field
23  training instructor seminar?
24     A.  I would say yes.
25     Q.  Was it just not a requirement to be a

26 (Pages 101 to 104)

PETER MORROW  4/5/2017

Page 105

1    field training instructor then?
2         A.   Without -- without looking at the prior
3    version, it may have been in there already.  Do you
4    by chance have the --
5         Q.   We found one from I believe it's -- let
6    me -- let me not guess.  I'll just produce it to you
7    so we can look at it together.
8         A.   Okay.
9         MR. HOLLAND:  Morrow Exhibit 5.
10        (Exhibit 5 was marked for
11        identification.)
12   BY MR. HOLLAND:
13        Q.   And based on the date, it says December
14   of 2007, so about six years earlier.  Do you have
15   any -- do you have any way to tell whether there was
16   a version in between this one and the September 2013
17   version?
18        A.   Not without looking in the historical
19   file.
20        Q.   Okay.  Yeah, but the only version that
21   was produced to us by defendants is the 2013
22   version.  We found this 2007 version on the website
23   of the police department.  But if you look in that
24   same area, which is page 1 of 8 in this 2007
25   version, you'll again see field training instructor

Page 106

1    and a selection section.  And do you agree that the
2    reference to the basic field instructor training
3    seminar is not in this version?
4         A.   I agree.
5         Q.   Do you know -- do you recall anything
6    about that seminar being added at the police
7    department?
8         A.   I don't.
9         Q.   Do you know why it was added?
10        A.   Well, if -- we're looking at the '07
11   version now.  I mean, under the training and
12   certification section, it refers to an F -- an FTI
13   seminar.  I'm going to assume that that's what that
14   is, that that's the training for the -- for the
15   field training instructors.  So --
16        Q.   Are you --
17        A.   -- they changed -- I'm sorry.
18        Q.   No, no.  Go ahead.  You weren't done.
19        A.   It looks like in the '13 version -- the
20   2013 version that the FTI seminar became basic field
21   training instructor seminar and then further moved
22   up into the selection process section.
23        Q.   So in 2007 it was a part of the
24   training, but in 2013 it became a criterion for
25   being selected as a field training instructor?

Page 107

1         A.   That's what it looks like to me.
2         Q.   And your -- your basis for this
3    testimony is just on review of the documents?  You
4    don't have an independent recollection of these
5    decisions being made; is that right?
6         A.   Correct.
7         Q.   Okay.  You can put those aside.
8              We were talking about LEPAC a little
9    bit earlier, and fully understanding that you said
10   you don't have, you know, much knowledge when it
11   comes to LEPAC, I'm just going to show you some
12   documents just to help you jog your recollection.
13        A.   Okay.  Okay.
14        MR. HOLLAND:  I'm going to mark these
15   Morrow Exhibit 6 and 7.
16        (Exhibit 6 was marked for
17        identification.)
18   BY MR. HOLLAND:
19        Q.   Here's 6.  While my colleague is
20   looking for the next document, I'll ask you about
21   this one.  Are you at all familiar with this
22   August 6th, 2015, LEPAC agenda item?
23        A.   No.
24        Q.   So it says in the background part, it
25   refers to:  Lieutenant Jeff Burk recommending that

Page 108

1    REJIS add comments to the REJIS "Wanteds" training
2    manual that would state that the initiating
3    officer/agency must have probable cause that the
4    person committed the crime prior to entering a REJIS
5    Wanted entry."  Did I read that correctly?
6         A.   Yes.
7         Q.   Do you recall any discussions around
8    Jeff Burk or Lieutenant Burk making that
9    recommendation?
10        A.   I don't recall.
11        Q.   Do you know what training manual the
12   REJIS wanteds training manual, are you familiar with
13   that?
14        A.   I've seen it.
15        Q.   And then in the next paragraph it says:
16   "The training manual does not include such language
17   as a prerequisite to the 'Wanted' entry.  Lieutenant
18   Burk believes that such language would offer a
19   higher level of assurance to officers that take
20   action on the 'wanted' that a lawful arrest is
21   appropriate."  Did I read that correctly?
22        A.   Yes.
23        Q.   Do you recall any discussions about
24   Lieutenant Burk believing -- adding such language to
25   the wanted entry would offer a higher level of

27 (Pages 105 to 108)

PETER MORROW  4/5/2017

|  | Page 109 |
|---|---|
| 1 | assurance to officers that action taken on a wanted |
| 2 | that a -- that a lawful arrest was appropriate? |
| 3 | A.  I don't recall. |
| 4 | Q.  Let's take a look at another document. |
| 5 | This is previously marked Gomez 16 and 17. |
| 6 | (Previously marked Exhibits 16 |
| 7 | and 17 were shown to the |
| 8 | witness.) |
| 9 | BY MR. HOLLAND: |
| 10 | Q.  Do you recognize Gomez 16? |
| 11 | A.  Yes, I've seen it before. |
| 12 | Q.  How have you seen it. |
| 13 | A.  It's possible that I -- I want to say I |
| 14 | was exposed to this. |
| 15 | Q.  In what capacity? |
| 16 | A.  It might have been during an audit. |
| 17 | And I apologize, but it might have been during an |
| 18 | audit that I sat in on, but that might have been the |
| 19 | wrong audit -- that might have been the wrong audit |
| 20 | that I sat in on.  That might have been for another |
| 21 | issue.  But I have seen this before.  But I don't |
| 22 | know that it was in regards to training |
| 23 | specifically.  It could have just been in my |
| 24 | interactions with -- with Lieutenant Burk or whoever |
| 25 | else might have been in the record room as the |

|  | Page 110 |
|---|---|
| 1 | commander at the time. |
| 2 | Q.  Do you know what this document is used |
| 3 | for? |
| 4 | A.  It appears as though it's for training |
| 5 | specifically -- |
| 6 | Q.  And I don't want you to guess.  Do you |
| 7 | have an understanding? |
| 8 | A.  No. |
| 9 | Q.  How about Gomez 17, same answers? |
| 10 | A.  Yes. |
| 11 | Q.  So if we look on page 2 of each |
| 12 | document, just so we're -- we have an idea of dates |
| 13 | we're working with, Gomez 16 says updated |
| 14 | January 2016 and Gomez 17 says updated 7/2014; do |
| 15 | you see that? |
| 16 | A.  Okay. |
| 17 | Q.  So Gomez 17 was -- came into effect in |
| 18 | January of -- excuse me, July of 2014 and Gomez 16 |
| 19 | came into effect in January of 2016. |
| 20 | A.  Okay. |
| 21 | Q.  Just so we're on the same page. |
| 22 | I'll direct you to page 24 of Gomez 16. |
| 23 | And are you familiar with the updates that were made |
| 24 | in this January 2016 version? |
| 25 | MR. HUGHES:  Wait.  Page 24 of Gomez |

|  | Page 111 |
|---|---|
| 1 | 16? |
| 2 | MR. HOLLAND:  Correct. |
| 3 | MR. HUGHES:  What you just handed me |
| 4 | doesn't have a page 24, so can I see what you have? |
| 5 | It only goes up to -- |
| 6 | MR. HOLLAND:  I see it. |
| 7 | MR. HUGHES:  -- page 12. |
| 8 | MR. HOLLAND:  Here.  You can look at |
| 9 | mine. |
| 10 | Q.  So Gomez 16 on page 24, do you see a |
| 11 | screen that -- |
| 12 | A.  Okay.  I do. |
| 13 | Q.  Do you have a recollection of that |
| 14 | being an addition? |
| 15 | A.  I don't. |
| 16 | Q.  If we look at Gomez 17, page 24, the |
| 17 | July 2014 version.  And why don't you keep both of |
| 18 | them open, 24 of each page.  Might be easiest. |
| 19 | Do you see that that screen where it |
| 20 | has probable cause language? |
| 21 | A.  I do. |
| 22 | Q.  Is in the 2016 version, but not in the |
| 23 | 2014 version? |
| 24 | A.  I see. |
| 25 | Q.  Do you recall anything about that being |

|  | Page 112 |
|---|---|
| 1 | added? |
| 2 | A.  I don't. |
| 3 | Q.  If we look back at the August 6th, |
| 4 | 2015, agenda item, which is Morrow 6.  Right there. |
| 5 | Do you see that when I read:  Burk subsequently |
| 6 | recommended that REJIS add comments to the -- |
| 7 | (Court reporter |
| 8 | clarification.) |
| 9 | BY MR. HOLLAND: |
| 10 | Q.  -- to the REJIS wanteds training manual |
| 11 | that would state that the initiating officer or |
| 12 | agency must have probable cause.  Do you see that? |
| 13 | A.  I do. |
| 14 | Q.  Do you have any awareness that |
| 15 | whether -- whether that recommendation led to the |
| 16 | change that we just looked at in the REJIS manual? |
| 17 | A.  I don't. |
| 18 | Q.  So looking at that screen on the REJIS |
| 19 | wanteds -- REJIS wanted entry manual, what would |
| 20 | provide an arresting officer with a higher level of |
| 21 | assurance -- or strike that. |
| 22 | How would that screen offer a higher |
| 23 | level of assurance to officers that take action on a |
| 24 | wanted that a lawful arrest is appropriate? |
| 25 | MR. HUGHES:  Same objection I made |

28 (Pages 109 to 112)

PETER MORROW  4/5/2017

| Page 113 |
|---|

1  earlier.  You're asking him -- you know, not asking
2  him facts, but you're asking for opinion,
3  speculation, and conjecture.
4  　　　　MR. HOLLAND:  I'll withdraw the
5  question and reask it.
6  　　　　Q.  This Morrow Exhibit 6, the LEPAC agenda
7  item, states Lieutenant Jeff Burk, who was employed
8  by the St. Louis County Police Department at the
9  time, correct?
10  A.  Yes, sir.
11  　　　　Q.  States that he believes that such
12  language would offer a higher level of assurance to
13  officers that action -- that take action on a wanted
14  that a lawful arrest is appropriate.  I'm asking
15  you, the representative of St. Louis County, how
16  adding that language would offer a higher level of
17  assurance?
18  　　　　MR. HUGHES:  Again, you're asking him
19  for his opinion.  You're asking him to speculate and
20  conjecture, so ...
21  　　　　THE WITNESS:  (Nods head.)
22  　　　　BY MR. HOLLAND:
23  　　　　Q.  Can you answer the question?
24  A.  Yes.  I would say that that's -- that's
25  one more location that an investigating officer or

| Page 114 |
|---|

1  somebody entering a wanted could see what's
2  required.  So I would suspect, then, that would be
3  the assurance that it's one more location that that
4  information is -- is available.
5  　　　　Q.  Looking at Gomez 16, which is the 2016
6  version, on page 24, that screen, do you have any --
7  do you know if the arresting officer sees that
8  screen?
9  A.  I believe that the arresting officer
10  can see that on their -- on their screen -- on
11  their mobile data terminal, the MDT in their car.
12  If they're using REJIS to run a record check, they
13  would see that.  I'm sorry.  If they're using it to
14  enter a wanted, they would see that.
15  　　　　Q.  How about if they're using it to search
16  a person's name to see if they have a wanted on
17  them?
18  A.  I don't know that they would see that
19  at that point.  They would see just the wanted.  I
20  don't know that they would see that information.
21  　　　　Q.  Would you agree that that screen with
22  the submit option is for the person entering the
23  wanted?
24  A.  Correct.  I would agree.
25  　　　　Q.  Would you say that that is almost all

| Page 115 |
|---|

1  of the time the care operator?
2  A.  Almost all the time, correct.
3  　　　　Q.  So the arresting officer would not see
4  that -- would not see that language; do you agree?
5  A.  I see -- correct.  I agree.
6  　　　　Q.  So do you see my confusion as to how it
7  might -- how it would provide a higher level
8  assurance to an arresting officer?
9  A.  I could see that.
10  　　　　Q.  And it sounds like it's just a better
11  question for Lieutenant Burk as to what he was
12  thinking when he made that recommendation; do you
13  agree with that?
14  　　　　MR. HUGHES:  Well, again, that's
15  calling for his opinion and speculation and
16  conjecture.
17  　　　　MR. HOLLAND:  I think the answer speaks
18  for itself.  Okay.  The question speaks for itself.
19  Excuse me.
20  　　　　MR. HUGHES:  And it's argumentative.
21  　　　　BY MR. HOLLAND:
22  　　　　Q.  Bear with me a second.  Do you know
23  who -- sorry.  Do you know who a person named
24  Lieutenant Colonel Steve Meinberg?
25  A.  I don't.

| Page 116 |
|---|

1  　　　　Q.  How about Chief Charles Adams?
2  A.  I don't.
3  　　　　Q.  Chief Jeff Beaton?
4  A.  I know Chief Beaton.
5  　　　　Q.  Who is Chief Beaton?
6  A.  He's the chief of the Shrewsbury Police
7  Department here in St. Louis County.
8  　　　　Q.  How about Major Greg Volker --
9  A.  Oh, I'm sorry.  He's the chief of
10  Glendale Police Department.  My apologies.
11  　　　　Q.  That's Chief Jeff Beaton?
12  A.  Beaton, yeah, he's the chief of
13  Glendale PD.  Okay.
14  　　　　Q.  And Glendale is within St. Louis
15  County?
16  A.  Municipality within St. Louis County.
17  　　　　Q.  How about Major Greg Volker?
18  A.  Sounds familiar, but I don't know.
19  　　　　Q.  Lieutenant Colonel Jeff Bader?
20  A.  It's my colonel.
21  　　　　Q.  Do you know whether he sits on LEPAC?
22  A.  I am not aware.
23  　　　　Q.  That's your -- that's your direct
24  report?
25  A.  He's --

29 (Pages 113 to 116)

PETER MORROW  4/5/2017

Page 117

1    Q.   Your supervisor?
2    A.   Correct.  He's the commander of my
3  division.
4    Q.   The planning and analysis division?
5    A.   The division of operational support of
6  which planning is one small unit.
7    Q.   How about Mark Reichert?
8    A.   I don't know.
9    Q.   Captain Mary Edwards?
10   A.   Not familiar.
11   Q.   Herb Bernsen?
12   A.   Mr. Bernsen is the director of the
13  jail, St. Louis County jail.
14   Q.   How about Sergeant Scott Ruddle?
15   A.   Not familiar.
16   Q.   Dr. William Powell?
17   A.   Not familiar.
18   Q.   Eric Gorham?
19   A.   Not familiar.
20   Q.   Paula Girtman?
21   A.   Not familiar.
22   Q.   Chief Joseph Edwards?
23   A.   He might -- I believe he's the chief of
24  Columbia Illinois PD, but I can't be certain.
25   Q.   Chief Roy Joachim- -- Joachimstaler?

Page 118

1    A.   Joachimstaler?  Yes, sir, I'm familiar
2  with him.
3    Q.   Who is he?
4    A.   He's the chief of the O'Fallon,
5  Missouri, police department.
6    Q.   Chief Tim Schwartzkopf?
7    A.   Not familiar.
8    MR. HOLLAND:  I'll help you with these
9  spellings later.
10   Q.   Mr. Bill Howe?
11   A.   That's my former commander.
12   Q.   You mentioned him.
13   A.   Correct.
14   Q.   Were you aware that he sat on LEPAC?
15   A.   I was not aware.
16   Q.   Scott Anders?
17   A.   Not familiar.
18   Q.   Patrick Woods?
19   A.   Not familiar.
20   Q.   LaVerta Barnes?
21   A.   Not familiar.
22   Q.   John Meyer?
23   A.   Not familiar.
24   Q.   Do you know why NCIC and MULES only
25  allow wanteds to remain in their system for 48

Page 119

1  hours?
2    A.   I don't know why.
3    Q.   Do you know who Cindy Jennings is?
4    A.   I believe she's on the cover of the
5  REJIS manual I just looked at.  I don't know her
6  title.
7    Q.   Do you know her otherwise -- other than
8  seeing her name on the manual?
9    A.   No.
10   Q.   Are you aware that police departments
11  can choose to be either REJIS or MULES members or
12  have a dual membership?
13   A.   I did not know.
14   Q.   Do you know who would know that
15  information at the St. Louis County Police
16  Department?
17   A.   Well, I would suspect it would be
18  our -- the commander of our record room.
19   Q.   What's -- what's that person's name?
20   A.   Well, that would be -- if he wasn't new
21  it would be Francis Gomez, but Jeff Burk certainly
22  would know that answer had he still -- if he was
23  still there.
24   Q.   Are you aware of any department-wide
25  reviews of the wanteds in St. Louis County Police

Page 120

1  Department?
2    A.   Yeah, we do have reviews.  I don't
3  know -- I want to say it's anywhere from three to
4  six months.  I don't recall.
5    Back in my bureau days when I was a
6  detective, I would get notifications about a wanted,
7  you know, still active and I would have to verify.
8  And then if it was, then certainly, you know, they
9  would keep it in the system unless statute of
10  limitations ran out and/or if I determined that it
11  was, you know, incorrectly in the system I would
12  take it out then.  But that was something that we
13  would get notified through our supervisor with if I
14  recall, right.
15   Q.   Are you describing to me the validation
16  process?
17   A.   Yes, yes.
18   Again, that was ten years ago that the
19  last time I probably dealt with that.  I don't know
20  how they do it now.
21   Q.   So the last time you were involved with
22  a wanted entry was when you were on robbery and
23  homicide?
24   A.   Yes, sir.
25   Q.   Have you reviewed any wanted entries

MIDWEST LITIGATION SERVICES
www.midwestlitigation.com    Phone: 1.800.280.3376    Fax: 314.644.1334

Page 121

1  since then?
2      A.  I don't -- I don't think I have.
3      Q.  To your knowledge have there been
4  instances in which St. Louis County police officers
5  have misused or improperly filed a wanted?
6      A.  I'm not familiar with any at the
7  moment.
8      Q.  Do you know if there's a penalty for
9  the misusing or inappropriately entering a wanted?
10     A.  I believe -- yes.  In -- misuse of our
11 teletype or REJIS system, I believe the general
12 order covers it and I'd have to refer to our conduct
13 and discipline manual to see where it falls, which
14 article it falls under.
15     Q.  Are you familiar with the 24-hour rule?
16     A.  Yes.
17     Q.  What is it?
18     A.  In the state of Missouri there's a
19 statute that allows peace officers to hold a suspect
20 without a warrant for 24 hours.  That's the gist of
21 it.
22     Q.  To your knowledge have police officers
23 deliberately detained individuals pursuant to a
24 wanted in excess of 24 hours?
25     A.  Not to my knowledge.

Page 122

1      Q.  Let's just take a look at one example
2  of a wanted entry.
3          I'll mark this Morrow -- are we up to
4  8?
5      A.  I've got 6.  Probably 7.
6      Q.  Yeah, I think it is 7.  I think I was
7  planning to use 7, but didn't have it.  Morrow 7.
8          (Exhibit 7 marked for
9          identification.)
10 BY MR. HOLLAND:
11     Q.  Have you seen this document before?
12     A.  No, sir.
13     Q.  Have you seen a document like this
14 before if it -- you know, not relating to
15 Mr. Torres?
16     A.  I probably have.  It's been a while.  I
17 would say yes, I have.
18     Q.  Can you tell me what it is?
19     A.  I can't.
20     Q.  Did you say you can't?
21     A.  I cannot.
22     Q.  And just so -- for your information on
23 the first page, bottom right corner there's a Bates
24 stamp.  It says JC underscore several zeros and then
25 a six; do you see that?

Page 123

1      A.  I see that.
2      Q.  This document was produced to us on
3  behalf of the Justice Center.
4      A.  Okay.
5      Q.  So that just is an indicator that this
6  is page 6 of their production.  I just want to ask
7  you some questions if you can give me the answers,
8  great.  If the answer is "I don't know" or "I can't
9  answer," I don't want you to guess.
10     A.  Okay.
11     Q.  Just, you know, as a civilian, looking
12 at this, I don't know how to read it, but hoping you
13 as a seasoned police officer can provide some
14 insight.
15         So turning to the back page -- the
16 back, if says at the top it looks like it was
17 stamped hold 24 hours.  Do you know what that means?
18     A.  If this is a county intake or jail
19 document that would be stamped on there by them --
20 by their -- by their own employees indicating that
21 this person is to be held 24 hours.
22     Q.  When an individual is arrested on a
23 wanted, are there any rules as to when they should
24 be released other than the 24-hour window?
25     A.  Other than what the statute says, when

Page 124

1  they -- as far as anything in writing, no.  That I
2  know of.
3      Q.  So let me ask it this way:  Earlier
4  today we -- you talked about the purpose of a wanted
5  being to -- in one sense locate an individual who
6  the officer has probable cause to believe committed
7  a crime and to attempt to interview, you know --
8      A.  Right.
9      Q.  -- find out the further information
10 that would then lead, you know, to the determination
11 of whether they can go get a warrant; is that fair?
12     A.  Correct.
13     Q.  So my question is:  Okay.  We have this
14 24-hour period, but is there a point in time where
15 that purpose ends and you should either go get a
16 warrant or release the individual?
17     A.  Yes.
18     Q.  When is that?
19     A.  Once you've gone to the prosecuting
20 attorney, to the warrant office and applied for the
21 warrant, if they refuse it or take it under
22 advisement -- well, there's three things they can
23 do.  Of course they can issue a warrant, refuse it,
24 or take it under advisement.  If they take it under
25 advisement or refuse it, then unless they order you

31 (Pages 121 to 124)

PETER MORROW  4/5/2017

Page 125

1  to conduct some additional investigation, then that
2  person should be released for that charge, the
3  charges applied on.
4       Q.  So let's take it from not the
5  Prosecuting Attorney's Office perspective, but the
6  investigating officer.  They're -- let's say
7  Mr. Torres is arrested on the investigating
8  officer's wanted and taken into custody.  The
9  officer is notified and goes and attempts to talk to
10  Mr. Torres.  Mr. Torres doesn't want to talk to the
11  office.  The attempt at the interview is over.
12       You're saying that the person should
13  still be held in custody until a determination is
14  made by the Prosecuting Attorney's Office?
15       A.  Correct.
16       Q.  What if there's no attempt to go to the
17  Prosecuting Attorney's Office's?  Should the person
18  or -- withdrawn.
19       Should the person be released if the
20  investigating officer has come to the determination
21  that there's no need to go to the Prosecuting
22  Attorney's Office?
23       A.  Yes.
24       Q.  Immediately?  Or as soon as
25  practicable?

Page 126

1       A.  Yes.
2       Q.  So if we look at the same page, the
3  back here, it looks like there's another stamping
4  hard to read in the middle of the page, does it
5  say -- does it say being interviewed?  Do you see
6  that?
7       A.  It looks like being interviewed,
8  correct.
9       Q.  Officer and then it says Clements?
10       A.  Uh-huh.  And then her DSN is next to
11  it, the 3571.
12       Q.  Arrived 8:45 p.m., departed 8:55 p.m.
13  So about a ten-minute interview?
14       A.  That tells me that he didn't speak.
15       Q.  And then what is -- what is the
16  disposition line for?
17       A.  I'm not certain how -- what intake uses
18  that line for.
19       Q.  Here it says hold, right?
20       A.  Correct.
21       Q.  What is your understanding of what that
22  means?
23       A.  Well, if --
24       MR. HUGHES:  Just --
25       THE WITNESS:  I don't know.

Page 127

1       MR. HUGHES:  Just --
2       MR. HOLLAND:  That's fair.
3       THE WITNESS:  I'm sorry.
4  BY MR. HOLLAND:
5       Q.  If you don't know.
6       A.  I'm trying --
7       Q.  I didn't know if -- I didn't know if,
8  you know, hold is a common, you know, usage here
9  that you might have some insight into what it means.
10  But if you don't know, you don't know.
11       A.  This last one I'm not certain, so ...
12       Q.  And then turning to the front page and
13  just one more question on that hold.  I know you
14  said you don't know what it means here, but are you
15  aware of any St. Louis County police officers
16  informing the Justice Center to hold arrestees for
17  the full 24 hours even, you know, if that's not
18  necessary?
19       A.  I'm not aware of that.
20       Q.  So just turning to the first page,
21  under the inmate wants and warrants check
22  information, which is the bottom section of that
23  page; do you see that?
24       A.  Correction.  Which page?
25       Q.  Yeah, you're on the same page as me?

Page 128

1       A.  Got it.  Got it.
2       Q.  It says:  Type, results, user ID, check
3  DTTM; do you see that?
4       A.  I do.
5       Q.  So the first line ADMT, is that
6  admit?
7       A.  I'm going to assume, yes.
8       Q.  So this person, Mr. Torres, was
9  admitted on April 12th, 2015 at 1655 according to
10  this document.  Is that your understanding as
11  well?
12       MR. HUGHES:  Well, again, you just
13  asked him to read from someone else's document, so
14  anything that he -- speculation --
15       MR. HOLLAND:  I can ask a better
16  question.
17       MR. HUGHES:  All right.
18       MR. HOLLAND:  We don't have to refer to
19  this.
20       Q.  When does -- we were talking about the
21  24-hour rule.  When does the clock start?
22       A.  My understanding has always been it
23  starts at the time of arrest.
24       Q.  Okay.  And -- withdrawn.  Let me change
25  that to Exhibit 8.

PETER MORROW  4/5/2017

Page 129

1    Are you aware of police officers ever
2 using wantedos to profile or target individuals of a
3 particular race or ethnic origin?
4    A.  I am not.
5    Q.  Is Lieutenant Burk still employed by
6 the St. Louis County Police Department?
7    A.  No.
8    Q.  Do you know if he was recently hired to
9 teach a training course?
10    A.  I don't know that.
11    MR. HOLLAND:  I don't presently have
12 any more questions for you.  I may have some
13 follow-up if Mr. Hughes asks you questions.
14    THE WITNESS:  Okay.
15    MR. HUGHES:  I have no questions.
16 We'll waive signature.
17    THE VIDEOGRAPHER:  The time is 4:32.
18 We are off the record.  This concludes our
19 deposition of Lieutenant Peter Morrow.
20    (Discussion off the record.)
21    THE VIDEOGRAPHER:  The time is 4:33.
22 We're back on the record.
23    MR. HUGHES:  No, we're not.
24    MR. HOLLAND:  What was that?
25    MR. HUGHES:  No, we're not.  I'm

Page 130

1 waiting for my -- you were --
2    MR. HOLLAND:  Can we go off the record,
3 please.
4    THE VIDEOGRAPHER:  The time is 4:32.
5 We're off the record.
6    (Discussion off the record.)
7    THE VIDEOGRAPHER:  The time is 4:34.
8 We're back on the record.
9    BY MR. HOLLAND:
10    Q.  Lieutenant Morrow, sorry.  My
11 colleague reminded me of a question that we wanted
12 to ask you.
13    A.  Okay.
14    Q.  Are your email -- you mentioned you
15 receive emails, it's your preference, earlier.  Are
16 your email archives searchable?
17    A.  Yes.
18    Q.  If we were to give you a list of search
19 terms, would you be able to search your archives for
20 those emails?
21    A.  That does allow for that, yes.
22    MR. HOLLAND:  I have no further
23 questions.
24    MR. HUGHES:  No questions.
25    THE VIDEOGRAPHER:  The time is 4:35.

Page 131

1    We are off the record.  This concludes the
2 deposition of Lieutenant Peter Morrow.
3    (Whereupon, signature and
4    signature was
5    waived and the witness was
6    excused at 4:35 p.m.)
7    --oOo--

Page 132

1    CERTIFICATE OF REPORTER
2
3    I, RENÉE COMBS QUINBY, a Registered Merit
4 Reporter, Certified Realtime Reporter, Certified
5 Shorthand Reporter (CA), Certified Court Reporter
6 (MO), Realtime Systems Administrator, and Notary
7 Public within and for the State of Missouri, do
8 hereby certify that the witness whose testimony
9 appears in the foregoing deposition was duly sworn
10 by me to testify to the truth and nothing but the
11 truth; that the testimony of said witness was taken
12 by stenographic means by me to the best of my
13 ability and thereafter reduced to print under my
14 direction.
15    I further certify that I am neither
16 attorney nor counsel nor related nor employed by any
17 of the parties to the action in which this
18 deposition was taken; further, that I am not a
19 relative or employee of any attorney or counsel
20 employed by the parties hereto or financially
21 interested in this action.
22
23
24 --------------------------------------
25    Renée Combs Quinby, RMR, CRR, CCR #1291

33 (Pages 129 to 132)

PETER MORROW  4/5/2017

| A | | | | |
|---|---|---|---|---|

**A**

**ability** 8:16
  77:11 132:13
**able** 31:8 44:6
  44:16,19 45:3
  95:20 130:19
**abuse** 76:8
  79:22 80:12,17
  81:9,23 82:3
  82:13
**abuses** 80:1
  82:17
**academy** 19:8,9
  19:10,12,16
  20:1 26:4
  32:15 38:16
  44:23,23,25
  45:7,9,11
  48:23 50:20
  67:25 68:19
  89:14,19,23
  90:8,13,24
  91:9 93:4
  94:10,22 96:10
  96:14 97:3
  98:17,25 99:8
  100:4 101:15
**accepted** 77:25
**accompanies**
  61:18
**accompanying**
  63:11
**accreditation**
  20:25 28:2,3,7
**accredited** 28:4
**accurate** 16:23
  17:13 51:15
  65:1,24 66:6
  66:19 67:11
**accurately** 8:17
  47:22
**acknowledge**
  65:16,17 67:10
**acknowledged**
  65:23
**Acknowledgm...**

**65:6**
**action** 94:21
  108:20 109:1
  112:23 113:13
  113:13 132:17
  132:21
**active** 120:7
**Adams** 116:1
**add** 108:1 112:6
**added** 54:21
  64:8 97:8
  103:20 104:14
  106:6,9 112:1
**adding** 71:16
  108:24 113:16
**addition** 42:25
  52:24 88:25
  111:14
**additional** 43:19
  43:20,24 64:19
  71:21 95:12
  125:1
**administrative**
  61:17
**Administrator**
  132:6
**admit** 128:6
**admitted** 128:9
**ADMT** 128:5
**advisement**
  124:22,24,25
**Advisory** 82:21
**Affairs** 74:14
**aforesaid** 7:23
**afternoon** 8:4,5
  8:8
**age** 7:21
**Agencies** 28:4
  46:3,13
**agency** 46:5,6,15
  46:18,19 47:7
  84:25 112:12
**agency's** 46:23
**agenda** 2:13
  107:22 112:4
  113:6

**aggravated**
  27:23
**ago** 14:6,14,15
  30:7 34:10
  36:2 38:23
  83:1 120:18
**agree** 15:18
  41:21 70:2
  76:11 77:5
  87:1 103:18
  104:5 106:1,4
  114:21,24
  115:4,5,13
**AGREED** 6:2
**agreement** 6:8
  15:22
**agrees** 76:18
**ahead** 10:6
  101:17 106:18
**aide** 58:9,10,14
**al** 1:3,6 3:3,6
  6:18,18
**allot** 48:25
**allow** 118:25
  130:21
**allowed** 77:15
**allows** 121:19
**alongside** 34:12
  34:19
**alternate** 62:17
**altogether** 22:12
**Amendment**
  75:21
**Americas** 4:15
**amount** 75:4
**analysis** 15:13
  20:20,23 21:22
  22:20 23:19
  25:10 26:23
  27:4,4,5 117:4
**Anders** 118:16
**and/or** 44:24
  58:13 84:7
  120:10
**annual** 31:14,17
  99:12

**answer** 9:4,4
  46:1 67:3
  76:21 77:1,23
  78:11 79:13,17
  80:20 81:25
  84:23 85:1,5,6
  86:16 96:15
  98:14 113:23
  115:17 119:22
  123:8,9
**answered** 66:24
  66:25 67:24
  86:14
**answering** 22:5
  22:9
**answers** 110:9
  123:7
**anybody** 14:18
  29:9,12 61:14
  74:22 86:17
**anymore** 29:5
**anyway** 62:1
  67:3
**apologies** 116:10
**apologize** 88:10
  109:17
**appeals** 53:13
**appears** 110:4
  132:9
**applicability**
  28:13 53:20
**applicable** 92:8
**application**
  36:16 45:5,15
**applied** 19:2
  124:20 125:3
**appointed** 54:8
**appoints** 53:12
**appropriate**
  108:21 109:2
  112:24 113:14
**approval** 70:21
**approved** 16:14
  55:25 60:10,12
  62:3 104:15
**approves** 15:15

**approximately**
  6:15
**April** 1:12 6:14
  19:13,14 20:16
  21:24 128:9
**ArchCity** 4:6
  7:9,11
**archives** 130:16
  130:19
**area** 54:17
  105:24
**argument** 32:23
**argumentative**
  115:20
**armor** 30:8
**arrest** 35:14,16
  35:24 36:11
  37:10 46:23
  68:2 76:6 78:6
  108:20 109:2
  112:24 113:14
  128:23
**arrested** 35:1,12
  35:13 123:22
  125:7
**arrestees** 127:16
**arresting** 112:20
  114:7,9 115:3
  115:8
**arrests** 75:20
  84:4
**Arrived** 126:12
**article** 121:14
**aside** 13:24
  44:18 45:6
  89:4 98:16
  107:7
**asked** 16:25
  17:25 66:25
  67:7,24 76:18
  82:3 128:13
**asking** 8:6,12
  9:11 12:17
  42:11,13,16
  44:20 70:8
  78:23 79:2

PETER MORROW  4/5/2017

80:4,6,7,22
81:18,21 104:1
113:1,1,2,14
113:18,19
asks 129:13
assault 30:9
assaults 27:23
assess 48:16,16
assessment 50:3
assign 28:24
49:18
assigned 19:20
23:13 25:2
34:16 47:2
92:6 96:10
103:11
assignment
23:12 24:24,25
43:6
assignments
24:17,19
103:13
assume 8:11
38:22 59:20
72:21 106:13
128:7
assuming 38:21
assurance
108:19 109:1
112:21,23
113:12,17
114:3 115:8
Atchison 18:20
18:22
ATS 61:17
attach 63:5
attached 2:18
attempt 36:14
37:8,9 38:12
39:1 124:7
125:11,16
attempted 45:20
attempts 36:21
125:9
attend 26:9 91:9
92:23 93:12

104:15
attendance
100:3,8,11
attended 83:9
attention 23:15
29:19 31:23
33:13 53:6
54:25 55:17
attorney 35:17
37:13 44:12
124:20 132:16
132:19
attorneys 7:1
Attorney's
36:13 37:8
38:12 45:19
78:1 125:5,14
125:17,22
Audible 69:9
Audio 100:17
audit 109:16,18
109:19,19
August 2:13
19:23,24 20:4
21:12 22:2,18
23:5,7 26:12
33:23 57:4,15
107:22 112:3
auto 57:12
autos 27:23
57:10
available 114:4
Avenue 4:15 5:4
aware 29:4 44:2
50:7 69:2
81:14,22 82:16
88:19,22
116:22 118:14
118:15 119:10
119:24 127:15
127:19 129:1
awareness
112:14

———— B ————
B 69:17 84:4

103:15
baby 28:5
bachelor's 18:18
34:2,3
back 15:8 17:15
18:20 19:2,6
20:17,18 21:6
21:25 23:3
25:22 26:3
28:18 37:23
38:17 40:11
49:22 59:11,17
64:4 75:14
83:22 95:12
97:5,21 101:14
102:5 104:3
112:3 120:5
123:15,16
126:3 129:22
130:8
background
18:15 98:8
107:24
bad 65:10
Bader 116:19
banter 17:23
Barnes 118:20
barometer
49:12
Barracuda
63:17
barrel 30:10
Barton 25:9,13
25:15
based 40:21
49:2,16 50:3
82:3 94:24
105:13
basic 63:3 93:5
100:24 104:15
104:22 106:2
106:20
basically 26:22
26:25
basis 68:9 87:22
107:2

Bates 122:23
bathroom 63:23
bear 75:17
115:22
Beaton 116:3,4
116:5,11,12
began 23:8
57:15
Beginning 1:15
begins 15:10
behalf 3:12 7:5
7:9 11:11,15
78:21 123:3
belief 68:9
believe 12:10
17:25 38:10
39:3,11,14
42:4 43:9 48:9
64:11 65:14
68:7 77:16
82:23 90:8,19
91:24 93:23
94:21 96:20
98:19 99:18
101:13,18
105:5 114:9
117:23 119:4
121:10,11
124:6
believes 108:18
113:11
believing 108:24
Belmar 1:6 3:6
6:18 7:14
15:17 29:15
58:9,22 60:4
Benedictine
18:19
Bernsen 117:11
117:12
best 8:25 132:12
better 8:10 9:21
48:2 62:11
97:7 115:10
128:15
beyond 13:9

42:8 79:4
93:20
biggest 24:5
Bill 24:25 26:19
33:24 118:10
bit 13:23 15:5
18:14 28:18
74:21 107:9
blame 59:6
board 16:15,16
53:9,9,10,11
53:12 54:1,5
90:8,16,17
91:1
Bob 32:14
bold 52:11 75:19
bolded 51:23
70:12 103:18
booking 47:1,1
bottom 103:1
122:23 127:22
brain 88:4
break 63:23,23
64:7 101:22,24
102:8
brief 18:9 34:23
61:20
bring 43:18
75:14 77:13
brother 38:4
brought 10:5,10
31:22 33:14
53:6 54:25
55:16 86:1
97:1
bureau 72:15,16
74:14 120:5
burglaries 27:24
Burk 34:9 57:20
72:9 83:1
85:21 86:19
107:25 108:8,8
108:18,24
109:24 112:5
113:7 115:11
119:21 129:5

PETER MORROW  4/5/2017

burned 43:23
button 65:24
B1 52:8 54:18
  70:12

**C**

C 4:1 6:11
CA 3:17 5:18
  132:5
CALEA 28:3,18
  29:8,23 30:21
  31:16,25
calendar 98:17
calendars 94:22
call 15:3 60:2
  68:19
called 39:13
  65:5 66:1 76:7
  97:14 98:2
  103:15 104:5
calling 79:11
  115:15
calls 22:6,9 37:2
  44:10 70:6
  74:2 76:23
  78:8 81:12
capacity 109:15
captain 24:13,21
  25:2,3,9,14,15
  25:20 74:13,16
  117:9
captains 16:11
  92:20,21
car 43:23 65:13
  114:11
care 19:5 52:17
  115:1
careers 55:23
carries 92:6
Carroll 4:4 7:8,8
case 6:18 7:23
  9:12,15 10:1,4
  10:10 17:12,24
  18:6,11 25:21
  30:14 35:5
  36:17 40:12

52:13,15,16
58:20 70:16,19
cases 9:16 10:2
  23:14
catch 31:8
certify 132:8,15
caught 53:1 57:5
cause 35:7,7,18
  35:20 38:25
  41:1,2 42:4,8
  42:25 43:5,7,8
  43:21 44:8
  45:18 47:20
  48:14 49:13,17
  51:1 52:14
  54:19 55:21
  58:20 64:9,14
  66:9,17,22
  67:16,19 68:1
  68:5,24 70:17
  71:17 77:12
  89:10 101:6
  108:3 111:20
  112:12 124:6
CCR 5:19
  132:25
CDA 15:23
Cease 60:6
center 6:22
  91:23 93:10
  123:3 127:16
central 5:4 23:4
  25:6
certain 33:10
  38:2 50:4
  55:11 79:14
  99:5,7,25
  100:2 117:24
  126:17 127:11
certainly 18:1
  24:1 29:18
  43:17,17 58:22
  78:2 83:7
  119:21 120:8
CERTIFICA...
  132:1
certification

106:12
Certified 3:15
  3:16,17 6:5
  132:4,4,5
cetera 35:22
chain 15:14
  30:17 60:10
  61:19
chance 37:19
  105:4
change 29:21
  30:16 53:6
  58:4,7 59:22
  60:9 64:9,12
  64:14 70:24
  71:16,17,18,20
  71:22 112:16
  128:24
changed 23:10
  30:4 60:9
  88:20 106:17
changes 8:19
  29:2 57:2,9
  60:1 84:1,13
  84:16 88:20
changing 61:24
characterizati...
  69:25 76:11,19
  77:5
charge 39:15
  40:14,16 90:12
  125:2
charges 125:3
Charles 116:1
check 28:25
  114:12 127:21
  128:2
chief 7:14 15:17
  15:17 29:15,16
  53:13 58:9,13
  58:13,22 59:4
  60:3 64:15
  71:2,2,14
  92:21,21 116:1
  116:3,4,5,6,9

116:11,12
117:22,23,25
118:4,6
chief's 29:14,16
  53:7
choice 97:1
choices 96:14
choose 119:11
chose 98:21
Chris 7:10
Christopher 4:5
  7:15
Cindy 119:3
circumstances
  50:10,14
circumvent
  76:12,19 77:6
circumvented
  77:16
circumvents
  76:7
city 3:14 24:19
  25:2 55:7 84:8
  88:13 93:9,10
civil 23:5,7 33:6
  33:12
civilian 26:19
  53:9,10,11
  54:6 123:11
civilians 20:24
CJIS 41:16
claims 10:5
clarification
  9:20 46:10
  112:8
clarity 57:11
class 27:19 45:3
  68:4 95:2,6
  97:6 100:24
  101:14
classes 26:9
  44:24 45:8,14
classroom 93:5
Clayton 5:5 47:3
clear 32:16
  55:12

clearly 39:23
Clements 7:16
  126:9
click 67:9
clicked 65:23
clock 128:21
close 72:25
closest 47:1
coffee 25:5
colleague 7:4,10
  107:19 130:11
colleagues 80:4
  80:11 82:11
college 18:20
  19:1
colonel 15:14,15
  30:17 53:7,24
  54:24 55:14,14
  56:14 57:23
  58:21 59:4
  61:21 103:1
  115:24 116:19
  116:20
colonels 15:16
  29:17 71:2
  92:21
Columbia
  117:24
Combs 3:15
  5:17 6:5 132:3
  132:25
come 26:14
  29:12 30:24
  31:1 45:17
  48:5 62:13
  90:4 92:14,20
  125:20
comes 40:10
  58:14 107:11
coming 53:21
command 15:14
  15:16 16:11
  30:17 60:10,12
  61:19 71:1
  72:7 90:10,11
  91:3,6,10,12

PETER MORROW  4/5/2017

91:22 92:1,3
92:13,16,18
**commander**
72:15 110:1
117:2 118:11
119:18
**comment** 42:11
80:8
**commented**
17:19
**comments** 108:1
112:6
**commission**
28:3 90:7,14
90:15
**commissioner**
53:8,25
**committed** 35:8
35:12 49:20,25
52:15 70:18
108:4 124:6
**committee** 30:14
82:22 87:5
92:17
**common** 127:8
**community**
54:13
**comparable**
70:3,3
**complaint** 10:7
35:20
**completely** 8:17
**computer** 34:24
39:14
**concerning** 55:8
**concludes**
129:18 131:1
**condition** 8:15
**conduct** 121:12
125:1
**conducted** 89:11
**confess** 43:18
**confident** 49:14
**confirmation**
46:8
**confusing** 8:9

**confusion** 115:6
**conjecture**
44:11 70:6
78:9 79:11
81:13,19 113:3
113:20 115:16
**connection** 9:11
9:23 10:24
**consent** 6:8 84:7
88:11,15,21
89:2
**constitutional**
50:21 68:8
95:23 96:4,12
96:17 97:22
98:11
**contact** 52:17
**contacted** 12:13
13:12 14:15
17:11
**contain** 66:9,15
67:16
**contained** 94:24
**content** 15:18
**context** 87:22
**continue** 40:1
60:6
**continuing**
98:24 99:1,7
99:16,19 100:8
**continuum** 62:3
**contract** 24:19
24:20
**conversation**
8:23 13:14
14:11,21 16:21
17:6,10 18:10
58:3,17,18
**conversations**
14:8 27:1
38:19 74:9
75:15 85:24
**coordinate**
62:25
**copied** 2:18
**copies** 2:18

**copy** 11:7
**corner** 122:23
**correct** 9:17
12:3,20 13:5
14:17,23 44:21
47:21 52:11
66:16,20 67:16
67:17 70:15
72:5 96:18
99:13,15
103:11 107:6
111:2 113:9
114:24 115:2,5
117:2 118:13
124:12 125:15
126:8,20
**Correction**
127:24
**correctly** 39:7
52:21 60:18
76:9 95:15
103:4 108:5,21
**Corvington** 53:8
53:25 54:24
55:14 57:23,25
58:1,21 59:4
**counsel** 6:3,3,8
132:16,19
**Counselor's** 5:3
**counties** 93:20
**county** 1:10 2:15
5:3 7:14 11:12
11:15 13:20
15:23 16:6
19:9,10,18
23:4 25:6
34:17 42:15
46:21 47:3
54:8,9 73:24
78:21,24 79:7
80:16 81:1,8,8
81:10 82:8,10
82:12 84:1,21
84:22,24 85:4
85:9,10 86:9
86:17 87:14,19

88:20 89:6,18
90:11 91:13
93:11,11,16,18
97:3 98:20
99:20 113:8,15
116:7,15,16
117:13 119:15
119:25 121:4
123:18 127:15
129:6
**County's** 79:6
79:16 91:14
96:15 97:2
98:13
**couple** 14:6,14
22:17 28:17
30:7 41:6 54:2
66:24,24 93:20
**course** 13:17
35:16 38:18
39:10 58:22
68:24 90:24
94:2,3,7,9
95:18,21 97:9
98:22 101:3,19
101:22 124:23
129:9
**courses** 98:18,21
**court** 1:1 2:17
3:1,16 5:16 6:6
6:20 7:17 9:24
20:9,10 29:3
46:9 112:7
132:5
**courtesy** 47:12
**cousin** 38:4
**cover** 48:24
119:4
**covered** 45:11
64:20 93:21
95:21
**covers** 121:12
**co-counsel** 7:6
**create** 15:13
**created** 28:11
**creation** 15:7,8

**crime** 20:25 27:8
27:10,21 28:7
34:25 35:8,12
40:21 42:5
43:18 48:23
49:20,25 52:15
70:18 92:19
108:4 124:7
**crimes** 20:7
27:19,19,22
49:2
**criminal** 22:12
23:14 41:17
**criteria** 34:7
**criterion** 106:24
**cross-section**
54:13
**Crowley** 97:19
**CRR** 5:17
132:25
**CSR** 5:18
**cuffs** 47:17
**Cunningham**
25:1
**cup** 25:5
**current** 69:14
72:16
**currently** 25:1
32:15 99:10
**curriculum** 90:5
90:12,23 91:11
92:4
**curve** 31:11
**custody** 46:25
47:9 125:8,13

---

**D**

**D** 6:11
**data** 114:11
**date** 6:14 17:7
103:25 105:13
**dated** 2:13 41:18
69:7 73:9
**dates** 110:12
**David** 5:10 6:24
**day** 19:18 20:11

PETER MORROW  4/5/2017

| | | | |
|---|---|---|---|
| 37:17,23 49:22 59:17 93:22 | 21:14 22:17 28:12 29:12 | 71:2,14 92:21 **derived** 42:6 | 24:15,18,21 33:5 59:18 | 59:10,10 60:24 65:22 66:4 |

37:17,23 49:22
59:17 93:22
**days** 49:16
  65:14 67:8
  120:5
**day-to-day** 32:2
  64:10 71:17,18
  71:19,20
**DCI** 22:14 52:17
**deal** 54:10
**dealing** 20:23
**dealt** 33:5
  120:19
**December** 15:24
  16:2 105:13
**decide** 15:17
**decision** 15:3
  31:5 62:4
**decisions** 28:16
  58:12 87:23,23
  107:5
**decision-maki...**
  90:9
**decree** 84:7
  88:12,15,16,21
  89:2
**dedicate** 94:5
**Defendant** 84:1
**defendants** 1:7
  3:7 5:1 6:4
  94:21 102:10
  105:21
**Defenders** 4:6
  7:9,11
**defer** 13:11
**definitely** 63:10
**definition** 35:15
  98:6
**delete** 63:21
**deliberately**
  121:23
**delve** 12:24
**departed** 126:12
**department**
  10:13 13:20
  15:4 16:6

21:14 22:17
28:12 29:12
30:8 33:14
51:13 55:7,12
60:3 66:2
73:21,24 75:4
76:5 80:1 81:4
81:11 82:8,9
82:14 84:7,8
85:12 86:18
89:21 91:5
96:10 99:21
104:15 105:23
106:7 113:8
116:7,10 118:5
119:16 120:1
129:6
**departments**
  19:3 55:3
  91:10,15 93:12
  119:10
**department's**
  41:12 42:15
  46:22 79:8
  84:6 89:6
**department-w...**
  28:13 53:19
  119:24
**depended** 40:11
**depending**
  49:21
**depends** 40:11
  40:19 63:6,18
**deposed** 10:16
  17:4,5
**deposes** 7:23
**deposition** 1:9
  2:7 3:10 6:4,16
  6:21 11:20
  14:16 17:18,24
  18:2 83:25
  129:19 131:2
  132:9,18
**depositions** 87:8
**deputy** 15:16
  29:16 58:13

71:2,14 92:21
**derived** 42:6
**describe** 95:15
**described** 35:10
  117:12
**describing**
  120:15
**designee** 70:20
**desist** 60:6
**desktop** 63:19
**detain** 46:18
**detained** 41:4
  121:23
**detaining** 40:25
**detective** 7:16
  21:16 120:6
**detectives** 23:13
  23:16
**detentions** 84:4
**determination**
  45:18 47:20
  48:15 49:15
  50:19 124:10
  125:13,20
**determine** 36:18
  48:1 77:12
  101:1,5
**determined** 44:3
  52:14 70:17
  71:3 120:10
**develop** 35:20
**developed** 35:18
**different** 16:13
  28:18 35:13
  38:17 39:14
  43:25 67:3
**direct** 15:13
  24:14 42:1
  58:17 110:22
  116:23
**direction** 64:15
  132:14
**directive** 15:9
  15:10 16:5,18
**directives** 13:20
  53:19 65:8
**directly** 18:4

24:15,18,21
33:5 59:18
**director** 26:13
  26:17,20 33:24
  117:12
**discard** 63:20
**discipline**
  121:13
**discover** 29:17
**discovered**
  55:15,20 60:5
**discuss** 11:24
  18:4,6 92:19
**discussed** 13:4
  14:12 48:8
  49:10 73:24
  80:3,4,7,10
  92:3
**discussing** 10:20
  79:22 80:13
**discussion** 58:24
  69:1 70:25
  92:15 129:20
  130:6
**discussions**
  12:25 59:2
  68:12,16 74:5
  74:24 75:1
  82:11,25 83:18
  108:7,23
**disposition**
  126:16
**district** 1:1,1 3:1
  3:1 6:19,20
  29:3 61:25
**division** 1:2 3:2
  19:20 20:5,7
  22:12,12 26:20
  34:17 117:3,4
  117:5
**doc** 60:19,22
**document** 2:11
  2:12,13 11:8
  11:22 15:8
  41:23 45:21
  57:16,17,21

59:10,10 60:24
65:22 66:4
67:14 97:22
102:17 103:10
103:19,21,25
107:20 109:4
110:2,12
122:11,13
123:2,19
128:10,13
**documents** 41:7
  51:10 52:3
  60:14 61:5
  63:9 67:8
  84:18 86:24
  87:3,7 94:18
  94:20 95:15,20
  107:3,12
**Doell** 5:10 6:24
**doing** 16:25 17:3
  20:21 29:22
  32:20 36:4
  48:25 60:15
  64:13 92:7
**DOJ** 54:25 55:6
  55:11 72:18
  80:8 88:12
  89:1
**DOJ's** 74:6
**Dr** 117:16
**draft** 15:13
  30:16
**drafting** 56:5,21
  57:16,17,20
  103:9
**drafts** 61:4
**DSN** 66:1
  126:10
**DTTM** 128:3
**dual** 119:12
**duly** 7:21 132:9
**duplication**
  95:14
**duties** 29:23
  53:21
**DWAYNE** 1:3

PETER MORROW  4/5/2017

3:3

**E**

**E** 4:1,1 5:2 6:11
  6:11
**earlier** 30:19
  33:2 57:15
  69:4 72:19,20
  80:10 82:7
  103:3 105:14
  107:9 113:1
  124:3 130:15
**early** 19:11 20:4
**easier** 26:21
**easiest** 111:18
**Eastern** 1:1,2
  3:1,2 6:20
**easy** 59:6
**Ed** 103:7,9
**education** 18:15
  18:17 99:1,7
  99:16 100:9
**Edwards** 117:9
  117:22
**effect** 40:17
  51:19 110:17
  110:19
**efficiency** 8:21
**effort** 32:17 83:7
**egrossman@p...**
  4:19
**either** 16:6
  28:24 59:23
  63:10 68:8
  95:23 119:11
  124:15
**elective** 98:22,22
**electives** 44:25
**electronic** 65:7
  65:18
**element** 48:23
**elements** 33:10
**Elizabeth** 4:13
  7:4
**else's** 128:13
**EM** 103:2,6,7

**email** 58:18,19
  60:4 63:13
  130:14,16
**emails** 63:15
  130:15,20
**Emerson** 95:24
  96:5,6,8,11,16
  96:19,23
**employed** 113:7
  129:5 132:16
  132:20
**employee**
  132:19
**employees** 65:14
  90:12 91:8
  123:20
**employment**
  19:18
**encouraged** 46:6
**ends** 124:15
**enforcement**
  28:4 82:21
  90:23
**engages** 75:19
**enter** 35:9 40:10
  65:25 67:15
  68:2,5 88:14
  114:14
**entered** 66:5
  84:9 88:12
**entering** 40:13
  71:5,24 108:4
  114:1,22 121:9
**entertain** 36:15
**entitled** 2:11,12
  2:13
**entries** 48:6
  52:16 70:3,21
  120:25
**entry** 34:23 35:4
  35:10 52:18
  101:1,5 108:5
  108:17,25
  112:19 120:22
  122:2
**Eric** 117:18

**error** 52:19 53:1
**escaping** 54:2
**especially** 75:8
**Esq** 4:4,5,12,13
  5:2
**essence** 33:13
**essentially** 92:9
**establish** 46:19
**et** 1:3,6 3:3,6
  6:18,18 35:22
**ethnic** 129:3
**evaluated** 73:22
**Evaluation** 2:11
  2:12
**evening** 14:1
**eventually** 60:20
**everybody** 19:21
  27:10 66:2
**evidence** 44:1
**exactly** 56:24
**EXAMINATI...**
  2:4 8:2
**examined** 3:11
**example** 30:3,6
  65:10 122:1
**examples** 49:2
**excess** 121:24
**excuse** 11:18
  16:21 33:20
  40:8 95:1
  97:12 110:18
  115:19
**excused** 131:5
**executive** 15:15
  26:13,19 33:24
  54:9 70:25
  72:7
**exhibit** 2:7,7,8,8
  2:8,9,9,9,9,10
  2:10,10,10,11
  2:12,13,14,14
  2:15,15,15
  11:3,4 13:17
  14:3 41:17,18
  83:22 102:9,11
  105:9,10

107:15,16
  113:6 122:8
  128:25
**exhibits** 2:6,17
  41:8 51:5,6
  64:7 94:14
  109:6
**exist** 35:4,7
**exists** 52:14
  70:17
**expand** 45:4
**expected** 57:11
**experience** 43:6
  68:10,11
**expert** 30:12
  45:2
**expertise** 30:23
**explain** 86:3
**explained** 30:18
  54:23 77:14
**explanation**
  61:20 63:5
**explanations**
  63:3
**exposed** 109:14
**extends** 39:25
**extradition**
  40:14 46:7

**F**

**F** 106:12
**facility** 47:1
**fact** 38:3 61:13
**factors** 76:15
**facts** 48:16,17
  50:4,13 70:19
  71:25 78:19
  80:20 81:22
  113:2
**factual** 79:3
**failed** 88:7
**fair** 31:24 32:25
  40:5,20 69:25
  75:13 78:2,4
  124:11 127:2
**faith** 47:14

**fall** 19:22
**falls** 121:13,14
**familiar** 10:4
  14:25 39:6
  40:5 41:23
  42:12,21 48:9
  48:11 51:10
  72:21 82:24
  83:3 86:15
  88:11,15 89:14
  102:20 107:21
  108:12 110:23
  116:18 117:10
  117:15,17,19
  117:21 118:1,7
  118:17,19,21
  118:23 121:6
  121:15
**familiarity** 89:4
  89:10
**family** 20:9,10
**far** 23:11 40:19
  45:25 61:25
  90:19 124:1
**fast** 50:7
**FBI** 27:13,17
**February** 17:6
  17:15 25:23
**federal** 29:3
**feds** 27:17
**feeling** 50:11
**felony** 39:23
**Fenton** 25:3
**Ferguson** 75:5
  76:5 80:1,6
  81:4,10 82:9
  84:7,9 88:12
  88:13
**Ferguson's** 55:7
**field** 2:11,12
  30:23 36:3
  38:17 65:12
  101:8,10,10,15
  102:8 103:15
  104:4,6,10,15
  104:22 105:1

PETER MORROW  4/5/2017

105:25 106:2
106:15,20,25
**file** 62:18 105:19
**filed** 9:24 121:5
**final** 16:8 61:9
**finally** 19:7
**financially**
132:20
**find** 36:21 43:22
86:8 124:9
**fine** 18:3 37:25
50:15
**fingerprint**
37:22
**finish** 9:3,4
**finished** 69:10
73:8
**firefighters**
90:25
**firm** 7:5
**first** 7:21 11:23
13:7,12,17
14:2,11 24:24
25:11,12 26:11
31:10 49:10
54:9 76:3 95:1
96:19 97:21
104:4 122:23
127:20 128:5
**Fitch** 56:8,14
103:2
**five** 20:3,4 25:5
53:22 54:3
89:11 101:20
**five-member**
53:12
**flip** 73:4
**flipped** 96:2
**floor** 5:4 74:18
**flow** 15:3,6
92:12
**flyover** 27:6
**focus** 74:21 89:9
**focused** 13:17
79:25
**follow** 49:8

**following** 73:24
74:6 80:11
84:5 98:25
**follows** 7:25
**follow-up**
129:13
**FOP** 15:19,21
16:9
**force** 10:25
61:24 62:2
**foregoing** 132:9
**forever** 60:19
**forget** 49:21
**form** 37:2 67:23
70:5 76:13,22
77:20 79:25
**former** 118:11
**found** 13:8 14:7
18:5 41:11
42:14 105:5,22
**four** 15:16 20:19
21:10,11 23:19
29:17 34:10
63:7 71:1
102:16
**fourth** 46:2
61:24 75:21
**FPD** 75:19 76:5
76:15,18
**frame** 28:16
**Francis** 119:21
**Fraternal** 15:22
**Frisz** 25:7
**front** 77:13
100:24 127:12
**FTI** 106:12,20
**full** 127:17
**fully** 10:8 11:23
107:9
**full-page** 63:5
**function** 22:9
**Furlow** 1:3 3:3
6:17
**further** 42:6,23
43:14,16 45:21
68:2 106:21

124:9 130:22
132:15,18

_____
**G**
**G** 6:11
**Garrison** 4:14
**gathering** 74:12
**general** 16:18
30:5 32:6 47:4
51:13,14 52:24
53:15,15 54:17
60:19 65:1,15
69:12 71:4
88:24 121:11
**generally** 29:13
36:12,13 49:17
49:25 59:25
60:1
**generated** 76:6
**George** 56:6,8
**getting** 32:23
35:24 36:11
62:11,25 74:19
**Girtman** 117:20
**gist** 121:20
**give** 18:16 19:11
29:6 30:3 49:7
63:23 79:3
83:7 123:7
130:18
**given** 81:8 93:3
**glad** 18:2
**Glendale** 116:10
116:13,14
**go** 8:22 9:8 10:6
11:7 16:12
19:1 26:3 27:1
28:25 29:7
31:25 36:20
40:19 45:23
48:23 49:1
59:10 60:14
65:11,15 92:9
101:17 106:18
124:11,15
125:16,21

130:2
**goals** 102:24
**goes** 15:15,19
16:10 32:18
50:10 56:9
61:19 63:12
111:5 125:9
**going** 8:23 9:8
9:10 10:22
11:2 13:5 14:7
14:10 16:24
17:2,3,4,15
28:23,24,25
31:3,20,21
35:8 36:11,19
37:11,12 38:22
40:15 41:6
47:17 63:19
81:15 87:20
90:1 94:12
102:9 106:13
107:11,14
128:7
**Gomez** 14:21
16:22 17:5,11
17:15,17 18:10
51:5,15,17,19
51:20,23 52:7
54:16 55:18
64:7,23 65:21
69:6,6 72:17
88:24 94:13
95:1,5,25 97:6
109:5,10 110:9
110:13,14,17
110:18,22,25
111:10,16
114:5 119:21
**good** 8:4,5 9:20
10:20 39:1,16
39:18 47:14
95:11
**Gorham** 117:18
**government**
15:24
**graduate** 19:4

**graduated** 18:23
19:17,19
**Grames** 97:23
98:1,3
**grammatical**
52:19 53:1
**grants** 27:8
**great** 123:8
**greater** 81:9,18
82:13
**Greg** 116:8,17
**Grossman** 4:13
7:5
**ground** 8:22
**grounds** 55:16
59:15
**group** 21:14
23:16 27:5
28:1 33:22
59:7 91:17,19
**grouped** 69:22
70:4
**guess** 15:2 22:22
24:4 26:10,10
26:20 27:6
29:24 38:6
40:2 43:3 45:5
61:25 81:13
97:7 105:6
110:6 123:9
**guessing** 45:10
45:12 59:16
73:7
**guidelines** 46:4
46:14 84:3
**gun** 43:22
**gut** 50:11
**guys** 28:9,15,15
29:11,22 30:20
**GV** 56:8,17,20
103:3
**G-r-a-m-e-s**
97:23

_____
**H**
**half** 19:7 23:1

**PETER MORROW  4/5/2017**

**hall** 17:21
**Hampton** 89:20
  91:25 92:10,13
**hand** 11:2 102:9
**handed** 111:3
**handle** 23:13
  28:2 46:5,15
  53:18
**handled** 20:24
**handles** 16:16
  50:21
**happen** 22:25
  28:17 29:20
  47:8 93:2
**happened** 10:22
  14:12 49:5,5,5
**happens** 33:17
  37:13
**hard** 50:6 60:22
  126:4
**hate** 55:13 90:20
**head** 8:20 45:13
  72:21 113:21
**heading** 76:4
**heard** 82:19
**hearing** 38:8
**hears** 53:13
**hearsay** 74:2
**Heights** 96:9
**held** 6:21 19:15
  22:22 89:25
  123:21 125:13
**help** 32:2 74:22
  107:12 118:8
**helpful** 30:20
**helps** 91:7
**Herb** 117:11
**hereto** 132:20
**hey** 29:10 30:1,8
  31:13 43:21
  58:15 60:5
  61:20 62:4
**high** 18:16
**higher** 49:20
  108:19,25
  112:20,22

113:12,16
  115:7
**highway** 27:11
  27:14 42:11,18
  48:8
**hired** 33:19,21
  65:9 129:8
**historical** 59:9
  105:18
**historically**
  61:10
**history** 59:10
  60:14 68:10
**hit** 23:5 46:5,7
  46:15 47:5
**hold** 10:12 46:18
  72:13 121:19
  123:17 126:19
  127:8,13,16
**Holland** 2:4
  4:12 7:3,4 8:3
  8:6 11:6 12:19
  12:22 37:6
  41:10,15 42:14
  42:19,22 44:14
  46:11 51:9
  63:22 64:5
  67:5,21 68:3
  70:7 74:3
  75:23 76:17,25
  77:22 78:10,16
  78:20,24 79:5
  79:15 80:2,19
  80:22,25 81:15
  81:20,24 84:17
  85:2,7,14
  86:14 87:1,7
  87:12,20 88:4
  88:7 94:17
  102:6,13,16
  105:9,12
  107:14,18
  109:9 111:2,6
  111:8 112:9
  113:4,22
  115:17,21

118:8 122:10
  127:2,4 128:15
  128:18 129:11
  129:24 130:2,9
  130:22
**home** 19:2,6
**homicide** 10:21
  20:10 21:16,18
  21:22,23 22:4
  22:11 91:18
  120:23
**honestly** 29:11
  59:11
**hoping** 84:17
  123:12
**hours** 99:9,11,12
  101:16 119:1
  121:20,24
  123:17,21
  127:17
**Howe** 26:19
  33:25 118:10
**How's** 35:2
  50:14 59:2
**Hughes** 5:2 7:13
  7:13 11:25
  12:14,17,20,25
  13:9,12 14:6
  14:15 17:11
  18:5,6,12 37:1
  41:13 42:10,17
  42:20 44:10
  59:12 62:25
  66:23 67:20,23
  70:5 74:1
  75:22 76:13,22
  77:20 78:8,14
  78:18,22 79:1
  79:10,24 80:18
  80:20,24 81:12
  81:17,21 84:14
  84:20 85:3,10
  86:13,23 87:3
  87:9,18 88:2,6
  102:15 110:25
  111:3,7 112:25

113:18 115:14
  115:20 126:24
  127:1 128:12
  128:17 129:13
  129:15,23,25
  130:24
**Huh** 53:24
**Huh-huh** 41:25
  61:6
**hustled** 32:12

_____

**I**

**ID** 128:2
**idea** 18:16 87:21
  87:25 110:12
**identification**
  11:5 41:9
  102:12 105:11
  107:17 122:9
**ii** 102:23
**Illinois** 117:24
**immediate**
  70:19 72:1
**Immediately**
  125:24
**impact** 8:16
  64:9
**implement** 32:1
**implemented**
  72:4
**improperly**
  121:5
**inappropriately**
  121:9
**inclined** 34:4
**include** 33:10
  108:16
**including** 16:13
  84:9
**incorrectly**
  120:11
**independent**
  107:4
**INDEX** 2:1
**indicates** 51:25
**indicating** 34:24

123:20
**indicator** 123:5
**individual** 10:2
  41:4 42:7 47:8
  123:22 124:5
  124:16
**individuals**
  121:23 129:2
**influence** 8:15
**information**
  41:17 42:6,8
  42:23,24 43:14
  43:16,24 44:7
  44:13 45:22
  52:1 62:14
  103:20 114:4
  114:20 119:15
  122:22 124:9
  127:22
**informing**
  127:16
**initially** 45:4
**initiating** 108:2
  112:11
**inmate** 2:15
  127:21
**input** 74:18
  90:22 91:4,15
  91:22
**inputted** 47:23
**inside** 88:4
**insight** 123:14
  127:9
**instance** 81:22
**instances** 121:4
**institutional**
  98:5
**instructed** 46:1
**instructing**
  67:14
**instruction** 84:3
**instructional**
  98:3
**instructor** 32:15
  49:22 65:13
  92:7 94:4

PETER MORROW  4/5/2017

95:24 96:14
103:16 104:4
104:11,16,23
105:1,25 106:2
106:21,25
**instructors**
38:18 50:18,20
68:13,20
101:11,15
104:7 106:15
**intake** 47:4
123:18 126:17
**interactions**
109:24
**interest** 48:6
**interested**
132:21
**Internal** 74:14
**interrogatories**
7:24
**interview** 36:14
37:9 38:13
39:2 44:3
45:20 124:7
125:11 126:13
**interviewed**
126:5,7
**interviews** 37:25
55:10,10
**intranet** 98:20
98:20
**introduce** 7:2,7
**investigate**
36:17
**investigating**
35:5,19 42:3
113:25 125:6,7
125:20
**investigation**
22:13 48:18
125:1
**investigative**
38:5
**investigator**
43:5
**involve** 99:2

100:25 101:4
**involved** 9:19
42:5 52:2
56:20 57:16,20
74:11 75:2
76:16 103:9
120:21
**involvement**
84:10,12
**involves** 101:19
**involving** 74:9
**issuance** 74:6
80:11
**issue** 16:9 35:23
36:10 37:10
41:3 44:12
49:15 71:8
109:21 124:23
**issued** 16:6 35:4
40:24 42:3
51:2
**issues** 18:4
54:25 55:2
92:2,20
**issuing** 38:13
47:19
**item** 2:13 107:22
112:4 113:7

_____

**J**

**Jack** 25:4
**jail** 47:3 117:13
117:13 123:18
**January** 15:24
16:2 95:2
110:14,18,19
110:24
**JC** 122:24
**Jeff** 34:9 86:19
107:25 108:8
113:7 116:3,11
116:19 119:21
**Jennings** 119:3
**Joachim** 117:25
**Joachimstaler**
117:25 118:1

**job** 32:3 56:3
89:22 90:4
**jog** 107:12
**John** 118:22
**joined** 7:10
**joining** 19:16
**Jon** 1:6 3:6 7:14
**Joseph** 117:22
**judge** 35:17
77:13 78:6,13
79:9
**judicial** 79:9
**July** 51:17,19
52:4 66:8
67:13 110:18
111:17
**jump** 9:5,8
**jurisdiction** 47:6
**jurisdictions**
87:4
**Justice** 41:17
73:22 84:6,8
123:3 127:16
**juvenile** 20:8

_____

**K**

**Kansas** 18:20,22
**keep** 60:16,19
60:21 98:19,20
111:17 120:9
**keeps** 28:20
98:17
**Keith** 96:20,21
**kept** 100:6,11
**Kevin** 7:15
**kind** 23:10,15
29:6 40:14
62:6 91:4,22
**knew** 26:14
49:18,23,23
**know** 8:10,19
9:7 10:1,15
13:3 14:10,15
15:2 17:21
18:1,2 22:10
26:12 28:23

29:6,10,18
30:11,20 31:9
31:10,13,17,18
31:19,21 32:18
32:24 33:7,25
34:1,5,6 35:25
35:25 36:2,4,5
36:5,17,18,19
36:19,25 37:12
37:15,17,18,20
37:21,21,22,23
38:25 39:20,24
39:24,24,25
40:12,13,13,15
40:16 42:17
43:4,6,7,10,15
43:17,20,21,23
43:25 44:1,4
44:22 45:1,2,3
45:6,13,13,17
45:24 46:1,4
46:14 47:6,16
49:3,5,8,12,13
50:3,7 53:18
54:7,19,22
55:21,24 57:6
58:6,10 59:1,5
59:6,7,12,13
59:25 60:23
61:11,12 62:4
63:19 64:16,18
64:20,21 66:21
67:18 71:6,7,9
71:10 72:3,6,6
72:9,11,11,12
75:6,11 76:14
79:2,13 83:2,3
83:8,20 84:20
84:23,24,24,25
85:5,19,20
86:6,6,18 87:5
88:3,14,23,25
89:16 90:18,21
91:1,17,19,25
92:11,11,12
93:19 94:1,6

96:6,16 97:8
97:17,19 98:1
98:6,8,10,16
99:10,19,22
100:1,3 101:10
101:16,19
103:25 104:9
106:5,9 107:10
108:11 109:22
110:2 113:1
114:7,18,20
115:22,23
116:4,18,21
117:8 118:24
119:2,3,5,7,13
119:14,14,22
120:3,7,8,11
120:19 121:8
122:14 123:8
123:11,12,17
124:2,7,10
126:25 127:5,7
127:7,8,8,10
127:10,13,14
127:17 129:8
129:10
**knowledge**
16:22 85:8
86:2,20 107:10
121:3,22,25
**known** 48:6
**knows** 45:23
88:8
**Kurt** 25:7

_____

**L**

**language** 51:24
51:24 52:24
54:21 64:8
66:10,17 70:13
71:17 75:14
103:19 108:16
108:18,24
111:20 113:12
113:16 115:4
**larger** 82:8

PETER MORROW  4/5/2017

**lasted** 23:18
**late** 19:11,25
**Laura** 7:16
**Laurie** 53:25
**LaVerta** 118:20
**law** 28:4 48:21
 48:22 50:21,22
 68:8,8 82:21
 90:23 95:23,23
 96:4,4,12,17
 96:24 97:7,8
 97:14,23 98:11
**lawful** 7:21
 108:20 109:2
 112:24 113:14
**Lawson** 74:13
**layer** 71:4
**lead** 13:6 71:18
 71:20 124:10
**leading** 11:19
 13:5 57:4
**learn** 38:11 56:4
 58:6
**learned** 27:2
 33:11 45:4
 49:3
**learning** 22:16
 56:2,3 66:18
**led** 112:15
**left** 49:24 56:16
**legal** 6:24 9:12
 9:15 10:4,10
 29:2
**legally** 50:23
**LEPAC** 2:13
 82:19 83:2,6
 83:18,20 84:10
 84:12,15,18,21
 84:24 85:3,9
 85:11,13,18,22
 86:5,5,9,15,18
 86:24 87:4,11
 87:15,18 88:2
 88:8 107:8,11
 107:22 113:6
 116:21 118:14

**lesson** 49:4
**let's** 8:21,25
 18:14 19:17
 20:17 23:1
 24:5,16,24
 29:24 30:4
 31:4 41:20
 52:4,7 53:5,24
 69:3,17 72:18
 73:4 75:13,16
 75:16,25 83:22
 88:5 89:9
 101:22,24
 109:4 122:1
 125:4,6
**level** 108:19,25
 112:20,23
 113:12,16
 115:7
**lieutenant** 6:17
 8:4 14:21
 16:21 17:5,10
 17:15,17 18:10
 22:23 23:3,20
 23:21 24:1,12
 24:12,18,20,22
 25:16 34:9,16
 57:19 64:6
 67:6 72:9,17
 83:1 85:21
 88:10 89:20
 90:3 91:25
 92:10,13 102:7
 107:25 108:8
 108:17,24
 109:24 113:7
 115:11,24
 116:19 129:5
 129:19 130:10
 131:2
**lieutenants**
 59:24 92:22
**limitations**
 120:10
**limited** 39:15
 84:10

**limits** 46:7 93:10
**line** 49:13 60:11
 62:8 100:24
 126:16,18
 128:5
**lines** 50:1 63:7
**list** 130:18
**listed** 12:1 14:3
**lists** 100:11
**litigation** 3:13
 5:11,20 6:22
 6:25 9:23 33:6
 33:9,13
**littering** 40:16
**little** 13:23 15:5
 18:14 20:5
 24:19 26:21
 28:18 52:9
 54:18 57:7
 70:12 74:21
 102:23 107:8
**LLP** 4:14
**local** 29:3,3 39:8
 46:25
**locate** 47:5
 124:5
**location** 113:25
 114:3
**Locust** 4:7
**long** 37:18 38:23
 39:19 62:1
 89:25
**longer** 31:9
**look** 15:17 29:11
 30:24,25 31:12
 31:19,21 34:5
 46:2 51:23
 52:7 54:16
 55:18 57:8
 59:9 69:3,17
 70:11 72:18
 75:13,16,17
 83:22 93:2
 105:7,23 109:4
 110:11 111:8
 111:16 112:3

 122:1 126:2
**looked** 13:19,22
 65:3 79:19
 88:24 112:16
 119:5
**looking** 29:1
 30:2 40:15
 44:4 54:7,12
 57:7 60:13
 95:17,25 96:3
 97:5 105:2,18
 106:10 107:20
 112:18 114:5
 123:11
**looks** 56:6 94:7
 95:24 97:22
 106:19 107:1
 123:16 126:3,7
**lost** 72:24
**lot** 13:24 22:16
 26:15,16 28:6
 31:6 32:6 33:4
 33:12 47:11
 49:24 58:12,18
 62:10 76:15
 83:2 84:18
**Louis** 1:10 2:15
 3:14 4:8 5:3,13
 5:22 6:22 7:14
 11:11 15:23
 16:5 19:9,10
 19:18 42:15
 46:21 54:9
 73:23 79:6,7
 79:16 80:16
 81:1,7,8 82:8
 82:10,11 84:1
 84:21,22 85:4
 85:9,10 86:9
 86:17 87:13,19
 88:19 89:5
 90:11 91:13,14
 93:10,11 96:15
 97:2,3 98:13
 99:20 113:8,15
 116:7,14,16

 117:13 119:15
 119:25 121:4
 127:15 129:6

---

### M

**machine** 6:5
**magistrate**
 77:13
**maintained**
 23:11 39:22
**Major** 116:8,17
**making** 28:16
 108:8
**manage** 24:2
**managed** 24:3
**management**
 24:1 65:7
**mandated** 27:17
 61:14
**mandatory**
 100:23
**Mann** 25:20
**manual** 104:19
 104:21 108:2
 108:11,12,16
 112:10,16,19
 119:5,8 121:13
**manuals** 102:21
**March** 3:11 73:9
 84:6,9
**mark** 11:2 41:7
 107:14 117:7
 122:3
**marked** 2:8,9,9
 2:10,10,14,15
 11:4 41:8 51:4
 51:6 73:1
 94:13,14 102:9
 102:11 105:10
 107:16 109:5,6
 122:8
**Mary** 25:9,13
 117:9
**Maryland** 96:9
 96:9
**materials** 93:3

PETER MORROW  4/5/2017

Matt 90:3
matter 6:17
  30:12 38:5
  45:1,2
matters 46:20
  46:22
mayor 54:10
MDT 114:11
mean 15:6 28:15
  29:6,21 37:3,5
  37:5 39:18
  40:7 41:1
  43:24 47:13
  50:4 56:23
  61:17 75:9
  81:7 82:12
  84:24 87:12
  91:4 99:11
  106:11
meaning 22:5
  39:21,21
means 11:14
  56:24 123:11
  126:22 127:9
  127:14 132:12
media 33:7,8
medical 8:14
meet 16:12
meeting 13:16
  83:10,15
meetings 71:12
  83:18 92:24
meets 92:18
Meinberg
  115:24
member 72:7
  85:12 86:5
members 53:23
  54:3 86:7
  119:11
membership
  119:12
memo 63:5,11
memoranda
  60:1
memorandum

59:23
mention 54:18
mentioned
  23:23 28:10
  32:5 45:19
  50:3,18 60:13
  63:12 69:3
  71:15 72:19,19
  80:9 81:1 82:7
  118:12 130:14
Menzenwerth
  103:7,9
Merit 3:17
  132:3
message 40:19
  60:7
messages 58:12
  58:16 63:13,13
met 13:8,15 18:6
Meyer 118:22
mhughes2@st...
  5:7
Michael 5:2
  7:13
middle 126:4
midnight 23:4
  23:17
Midwest 3:13
  5:11,20 6:22
  6:25
Mike 34:10
  67:21 77:4
  78:16 80:2,19
  81:15,20 85:2
  86:14,22 87:1
  87:7
mind 43:9
mine 75:22
  111:9
minimum 99:7
minutes 83:13
  101:21
missed 53:2
Mississippi
  43:24
Missouri 1:1 3:1

3:15,19 6:20
  6:22 27:14
  39:9 42:11,18
  48:22,22 93:18
  95:23 96:4,24
  97:6,8 99:3
  118:5 121:18
  132:7
misstates 77:21
misuse 10:11,12
  121:10
misused 121:5
misusing 121:9
Mizzou 34:4
MO 3:16 4:8 5:5
  5:13,19,22
  132:6
mobile 114:11
mode 92:12
moment 10:15
  53:21 121:7
monitoring
  30:21
month 16:16
  27:11,12,20
  29:25 48:24
monthly 27:12
months 20:2,8
  22:17 23:19
  34:10 39:23
  57:4 63:20
  120:4
Morley 32:14
  33:5
morning 102:10
morph 48:10
Morrow 1:9
  3:10 6:17 7:20
  8:4 41:7 62:9
  64:6 67:6
  88:10 102:7,9
  105:9 107:15
  112:4 113:6
  122:3,7 129:19
  130:10 131:2
move 15:19

34:14 86:4
  88:5
moved 19:2,6
  21:21 106:21
moving 62:2
MULES 39:9,12
  39:17,21 40:5
  40:7 118:24
  119:11
multiple 9:16
  19:3 74:8,12
  87:4
municipal 89:18
Municipality
  116:16
Murder 27:22
_____
          N
N 4:1 6:11
name 6:23,23
  7:3 8:6 16:17
  24:22 26:17
  32:14 96:19
  98:4 114:16
  119:8,19
named 115:23
Nathaniel 4:4
  7:8
national 99:4
nationwide
  39:10
nature 31:8 92:9
ncarroll@arc...
  4:10
NCIC 39:10
  118:24
necessarily
  54:14 74:9
necessary 32:21
  127:18
need 13:3 29:4,5
  29:11 30:1,15
  31:14,16,19
  35:6 37:14
  38:1,7 39:1
  40:10 45:21

50:2,4 54:19
  63:20 87:22
  91:19 125:21
needed 14:13
  23:14 27:1
  57:11 58:4
  66:22 68:5
  92:3
needs 79:9 92:14
neighborhood
  24:6
neither 132:15
new 4:16 15:7,8
  15:20,20,25
  51:24 52:1
  54:3 64:23
  65:14 67:7,13
  70:13 103:20
  119:20
newsletter 2:7,8
  41:16 42:12
newsletters
  41:11
nine 10:21 20:11
Nods 8:20
  113:21
Norm 25:20
normal 32:8
  100:20
north 3:13 5:12
  5:21 34:17,17
Notary 3:18 6:6
  132:6
notice 2:7 59:23
  79:4
noticed 83:25
notifications
  120:6
notified 120:13
  125:9
nuances 45:5
number 6:18
  11:24 16:13
  31:6,7 36:2
  50:4 66:2 81:8
  96:3 102:15

PETER MORROW  4/5/2017

numbers 99:10
numeral 102:23
102:23
NY 4:16

**O**

O 6:11
object 37:1 70:5
74:1 76:13,22
77:20
objection 42:10
44:10 66:23
67:21,23 77:4
78:8 79:24
81:12 112:25
objections 67:1
79:10
objectives
102:24
obligations
30:22
obtain 42:5,25
43:2 44:16,19
obviously 30:21
48:3 54:6
55:22 86:15,20
103:12
occasionally
92:22,23
occurred 17:7
17:11 29:2
32:9
October 65:10
65:20 95:6
offer 83:8 89:16
108:18,25
112:22 113:12
113:16
offered 19:18
99:20
office 5:3 15:11
29:14,16 36:14
37:8 38:12
45:20 53:7
61:15 78:1
124:20 125:5

125:11,14,22
officer 7:15,15
32:11 33:4
35:19,23 36:10
42:4 45:17,23
47:15 50:21,23
50:24,25 52:13
52:15,16 56:7
56:25 64:23,24
65:20,21 66:18
70:16 71:25
75:11,12 76:6
79:9 95:24
96:8,10,11,16
96:19,23 99:5
100:20 103:7
104:10,17
112:11,20
113:25 114:7,9
115:3,8 123:13
124:6 125:6,9
125:20 126:9
officers 20:24
24:8 44:15
47:11 48:14
50:19 55:11
57:11 67:7,13
68:23 75:5,6
81:2,9 89:6
90:6 91:16
96:17 108:19
109:1 112:23
113:13 121:4
121:19,22
127:15 129:1
officer's 47:19
125:8
officer/agency
108:3
offices 3:13
Office's 125:17
official 79:16
96:15 98:13
off-site 60:22
OGT 26:15
oh 23:9 30:11

116:9
okay 8:13 9:2,6
10:3 13:11
14:11 22:2,14
25:19 26:13,16
28:13,21 30:11
30:17 31:4,9
32:22 33:6,7
36:12,16,20
39:10 44:18
45:23 46:2
47:12 49:12
53:9 54:9
56:13 58:21
60:4,7 62:23
63:24 65:8
67:24 75:24
82:1,1 92:5
95:11 97:12
104:2 105:8,20
107:7,13,13
110:16,20
111:12 115:18
116:13 123:4
123:10 124:13
128:24 129:14
130:13
once 15:12,13
16:12,16 31:2
38:15 52:13
70:16 99:8
124:19
ones 28:15 74:10
on-the-job 26:16
oOo 3:9 6:1,10
131:6
open 111:18
operational
117:5
operator 115:1
opinion 33:1
49:10 70:8
71:15 79:12
80:23 82:3
113:2,19
115:15

opinions 74:12
74:19 78:19
79:1,2,4 80:21
81:19
opportunity
87:10,13
opposed 29:22
option 84:4
114:22
optionally 73:15
oral 7:24
order 15:22
16:18 39:5,7
39:11,13 42:3
46:5,7,15,18
46:24 51:2,14
52:25 54:17,24
55:25 65:1
69:12 71:4
88:24 121:12
124:25
orders 30:5 32:6
32:21,25 33:4
39:7,12 42:2
48:5 51:13
53:15,15 59:20
60:19 65:15
69:18,23 70:12
76:7 84:5
89:15
ordinance 59:19
organically
29:22
origin 129:3
original 2:17
Ostendorf 24:25
outdated 29:1
outlines 104:13
outside 44:22
overbroad 74:2
overseeing
57:17 90:19
oversees 90:8
oversight 54:14
54:15
o'clock 64:4

O'Fallon 118:4
O'Neill 90:3
oOo 1:3 3:3 6:12
8:1

**P**

P 4:1,1 6:11
page 2:2 11:17
42:1 46:3,13
52:7 56:11,12
69:17 75:16,17
75:18,25 79:20
83:23,25 96:3
97:13,22
102:22 103:14
105:24 110:11
110:21,22,25
111:4,7,10,16
111:18 114:6
122:23 123:6
123:15 126:2,4
127:12,20,23
127:24,25
pages 11:18,18
72:20,25 73:4
paragraph 42:2
46:3,13,16
52:8 61:16
63:4 66:11,14
67:16 70:11
76:3 79:19
80:5 108:15
parameters 30:9
part 11:24 15:20
15:25 27:19,21
32:22 33:8
74:23 76:24
80:5,13 90:9
92:5 94:2,9
106:23 107:24
participation
87:14
particular 12:14
15:1 53:6 57:3
59:8 129:3
parties 132:17

PETER MORROW  4/5/2017

132:20
**Partin** 7:15
**PASS** 65:6,19,24
  67:9
**passed** 17:21
**passing** 18:13
  83:1
**password** 66:3
**Patrick** 118:18
**patrol** 19:20,21
  20:5,18 21:7
  21:15 22:3,5,8
  22:9 23:3,12
  27:11,15 34:17
  42:11,18 48:8
**pattern** 75:19
**Paul** 4:14 7:5
**Paula** 117:20
**PD** 19:18 116:13
  117:24
**PDF** 60:20,22
**peace** 121:19
**Peconga** 4:5
  7:10
**pen** 28:15
**penalty** 121:8
**people** 24:3,6
  32:19,23 37:22
  54:13 68:18
  71:8 74:12
  75:5 87:10
  91:8,10 93:20
**perceived** 10:12
**percent** 49:19
  49:21
**percentage**
  49:18
**performing**
  75:10
**period** 35:21
  38:15,17 73:7
  124:14
**person** 8:24
  25:12 34:25
  35:11 37:4
  38:8,8 42:4

46:24 48:6
  49:20,24 52:14
  52:16,18 57:1
  70:17,21 86:11
  108:4 114:22
  115:23 123:21
  125:2,12,17,19
  128:8
**personal** 18:15
**personally** 37:15
  83:9
**personnel** 60:3
**persons** 20:7
**person's** 114:16
  119:19
**perspective**
  125:5
**pertaining** 76:15
**pertinent** 73:19
**Peter** 1:9 3:10
  6:17 7:20
  129:19 131:2
**phone** 13:13
  37:11,16,25
**phrase** 48:10
  50:10 55:15
**physically** 38:1
**pick** 28:23 36:20
**piece** 43:19
**pieces** 44:1
**pitched** 43:21
**place** 16:5 46:4
  46:14,17 51:16
**plaintiff** 10:6
**plaintiffs** 1:4 3:4
  3:12 4:3 6:3
  7:6,9,12 10:2
**plan** 49:4
**planning** 15:12
  20:20,23 21:13
  21:22 22:18,20
  23:2,19 25:7
  25:10,11,13,22
  26:11,11,22,23
  27:3,4,5 28:1
  33:21 53:17

56:1 57:14
  68:14 84:15,23
  85:5 88:3
  91:17 103:11
  117:4,6 122:7
**planning's** 28:5
**platoon** 24:5
**play** 65:11
**please** 7:1,18 8:9
  87:17 101:25
  130:3
**point** 18:9 22:23
  23:24 25:4,17
  29:19 38:22
  48:10 49:3,7
  58:10 71:2
  114:19 124:14
**police** 10:13,25
  13:20 15:22
  16:6,15,16
  19:3,8,9,10,12
  19:16 22:16
  33:14,19 38:15
  41:12 42:15
  44:23 45:7,9
  45:22 46:21
  48:22 50:24,25
  53:8,9,10,11
  53:13 55:6,7
  64:10,23,24
  71:17,19,20,25
  73:24 75:4
  76:5 79:7 80:1
  81:4,10,10
  82:8,9,21 84:7
  86:18 89:6,14
  89:19,21,22
  90:6 91:9,9,14
  93:4,12 94:10
  94:22 96:10
  98:17,20 99:5
  99:8,20 100:20
  105:23 106:6
  113:8 116:6,10
  118:5 119:10
  119:15,25

121:4,22
  123:13 127:15
  129:1,6
**Police's** 90:11
**policies** 33:15
  78:25 84:2,16
**policy** 10:12
  15:3,9,10
  16:14 20:25
  27:8 28:7,7,8,8
  28:9,12,16,19
  28:19 29:5
  31:5 33:7,8
  38:7 46:19,22
  53:14,14 55:15
  57:1 61:15
  64:19,24 65:6
  65:22 66:9,18
  69:15 71:16
  92:19,25
**political** 18:18
**poly** 34:2,3
**pop** 32:5
**pops** 47:16
**portion** 94:7
**pose** 79:21 80:12
  80:17
**poses** 76:8
**position** 10:25
  23:21 31:8
  34:8 72:13,16
  79:6,8 80:16
  83:4 89:25
  90:2
**positions** 19:15
  26:1,7
**positive** 38:19
  90:10
**possible** 109:13
**Possibly** 68:12
**post** 18:16 99:4
  99:6
**postgraduate**
  18:24
**potentially**
  17:12

**Powell** 117:16
**practicable**
  125:25
**practical** 36:4
**practice** 71:18
  71:19,20 77:10
  77:25
**practices** 78:25
  84:2
**precaution**
  47:17
**preceded** 34:8
  90:2
**precinct** 23:4
  24:13 25:6
  34:18 47:2
**precinct-wide**
  59:24
**prefer** 63:13
**preference** 38:5
  50:16 130:15
**prep** 13:1,10
**preparation**
  14:9
**prepare** 12:11
**prepared** 12:8
  83:5 84:11
  87:2
**prerequisite**
  108:17
**present** 7:1 92:1
  92:22,25
**presented** 48:17
**presently** 129:11
**preserved** 67:22
  77:4
**pretty** 18:22
  47:18
**previous** 27:20
  34:3 70:12
  82:25
**previously** 2:8,9
  2:9,10,10,14
  2:15 51:5,6
  58:25 73:1
  94:13,14 109:5

**PETER MORROW  4/5/2017**

109:6
**print** 56:16
132:13
**prior** 13:24 17:7
60:24 67:13
71:5 77:13
103:23 104:19
104:21 105:2
108:4
**privileged** 13:1
**probable** 35:7,7
35:18,20 38:25
41:1,2 42:4,8
42:25 43:5,7,8
43:20 44:7
45:18 47:20
48:14 49:13,17
51:1 52:14
54:19 55:21
58:20 64:9,14
66:9,17,21
67:16,19 68:1
68:5,24 70:17
71:16 77:12
89:10 101:6
108:3 111:20
112:12 124:6
**probably** 10:20
17:14 24:6
31:19 38:14
47:17 49:20,21
52:20 57:7
59:3 73:6 74:8
82:25 97:15
120:19 122:5
122:16
**probationary**
104:16
**problem** 36:9
38:3
**procedure** 53:17
**procedures** 84:2
**proceed** 7:19
**process** 15:4,20
16:1,4,23 31:3
39:20 61:23

90:10 106:22
120:16
**processes** 14:24
15:1
**processing**
52:17
**produce** 105:6
**produced** 3:11
78:15,18,20
79:3 94:20
102:10 105:21
123:2
**production**
123:6
**Professional**
74:14
**profile** 2:16
129:2
**Program** 2:11
2:12
**programs** 19:4
**project** 21:1
**promoted** 20:12
20:13,15 21:4
21:17 22:23
23:2 26:24,24
34:15 100:22
**promotion**
100:22
**prompted** 55:13
**propounded**
7:24
**prosecuting**
35:17 36:13
37:7 38:11
44:12 45:19
78:1 124:19
125:5,14,17,21
**provide** 80:21
91:15,23
112:20 115:7
123:13
**Public** 3:18 6:6
132:7
**pull** 47:15
**pulled** 13:22

20:20
**purpose** 41:3
85:18 124:4,15
**purposes** 40:24
**pursuant** 84:5
121:23
**put** 35:6,8 43:23
47:17 58:21
59:11,19 60:12
61:15 93:14
107:7
**putting** 36:22
**P-A-S-S** 65:6
**P-e-c-o-n-g-a**
7:11
**p.m** 1:15 6:11,15
126:12,12
131:5

**Q**

**qualification**
34:6
**qualifications**
54:4 96:24
98:11 104:9
**qualifies** 16:15
96:16
**qualify** 96:11
**question** 8:8,10
9:3,21 36:7
37:2 43:3 67:2
67:3 70:6 74:4
76:14,23 77:3
77:21 79:25
80:9 81:25
82:2,5 86:15
94:4 97:7
113:5,23
115:11,18
124:13 127:13
128:16 130:11
**questioning**
37:9 40:25
41:4
**questions** 8:7
9:11 16:25

36:1 85:1
86:16 87:21,25
123:7 129:12
129:13,15
130:23,24
**quick** 47:18
**quicker** 9:9
**Quinby** 3:15
5:17 6:5,23
132:3,25
**quite** 26:6

**R**

**R** 4:1,4 6:11
**race** 129:3
**raised** 71:8
**Ralph** 2:16
**ran** 120:10
**Randy** 56:7,9
**rank** 29:9
**rape** 27:23
**reaction** 74:19
**read** 10:7 16:10
52:21 65:22
66:18 67:9,11
70:22 73:2,5
73:12,14 76:9
79:20 80:3
88:17 108:5,21
112:5 123:12
126:4 128:13
**reading** 67:14
**reads** 42:2,24
46:13,17 52:13
70:16 80:12
83:25
**real** 56:9
**realize** 59:13
**really** 29:11
31:20 32:12
36:4 44:24
50:9 83:2 91:7
**Realtime** 3:17
132:4,6
**reask** 8:10 77:3
80:9 82:5

113:5
**reason** 8:14 31:1
32:9 37:22
64:16 95:8
**reasonable**
55:16 59:14
**reasons** 36:16
**recall** 30:6 38:20
39:7 45:8 52:5
60:18 73:23
74:5,13 75:3
79:22 80:13,15
82:10 101:7
106:5 108:7,10
108:23 109:3
111:25 120:4
120:14
**receive** 31:24
35:19 44:15
70:20 100:21
101:11 130:15
**received** 25:25
26:4 46:6,16
100:20
**Recess** 64:2
102:3
**reclassified**
23:20
**recognize** 94:18
102:17,19
109:10
**recollection** 17:8
68:23 75:15
107:4,12
111:13
**recommend**
31:13
**recommendati...**
31:4,25 108:9
112:15 115:12
**recommendati...**
72:24 84:15,22
85:4,9 86:9,25
87:6,11,19
88:3
**recommended**

PETER MORROW  4/5/2017

32:2 112:6
**recommending**
29:21 107:25
**record** 6:14 47:5
64:1,4 85:25
102:2,5 109:25
114:12 119:18
129:18,20,22
130:2,5,6,8
131:1
**recorded** 100:15
**records** 65:7
72:16 83:4
**recovered** 57:12
**recruit** 93:15
**reduced** 132:13
**refer** 121:12
128:18
**reference** 106:2
**refers** 104:6
106:12 107:25
**refuse** 124:21,23
124:25
**regard** 29:7
71:23
**regarding** 14:24
15:9 55:6 57:9
58:12 61:24
66:7 75:8 82:3
83:4 85:3
89:15
**regardless** 43:5
**regards** 109:22
**Registered** 3:17
132:3
**Reichert** 117:7
**REJIS** 34:24
35:9 39:8 40:5
40:9 66:7 86:1
86:25 87:6,10
108:1,1,4,12
112:6,10,16,18
112:19 114:12
119:5,11
121:11
**related** 13:21

33:8 84:3
132:16
**relates** 74:23
**relating** 122:14
**relative** 132:19
**relatively** 15:19
15:25
**release** 48:3
124:16
**released** 123:24
125:2,19
**relies** 76:6
**rely** 47:14
**relying** 47:19
**remain** 118:25
**remember** 57:7
58:8 59:3,4,9
68:15 71:13
75:1 94:9
103:3
**reminded**
130:11
**Renée** 6:23
132:25
**RENÉE** 3:15
5:17 6:5 132:3
**repeat** 36:7,8
**repetitive** 67:24
**rephrase** 17:20
67:2
**replace** 62:7
**replaced** 34:11
34:13 51:17,20
69:12
**reply** 7:24
**report** 24:10,11
24:15 25:19
27:11,18 55:6
55:6 72:18,22
73:2,5,12,15
73:25 74:6,11
74:23 79:20,23
80:3,10,11,14
84:6 88:13
89:1 116:24
**reported** 24:18

24:21,23 25:7
25:8,13
**reporter** 2:18
3:16,16,17,18
5:16 6:6 7:18
46:9 87:17
112:7 132:1,4
132:4,5,5
**reporter's** 6:23
**reporting** 27:8
27:10
**reports** 24:12
28:7
**represent** 7:14
**representative**
84:21 113:15
**represents**
103:19
**request** 52:16,20
92:14
**requesting**
52:18,20 70:21
**required** 42:9
42:24 51:2
60:16 64:14
67:19 68:1,24
99:11,12 114:2
**requirement**
73:14 78:6,12
79:8 99:7
104:25
**requirements**
32:1 35:3
46:17
**requires** 28:19
31:16 36:14
37:8 38:12
45:20
**research** 92:7
**response** 33:15
**responsibility**
65:13 74:15
**responsible** 56:4
91:11
**result** 33:6
88:20 89:1

**results** 128:2
**retained** 2:17
**retention** 60:17
60:17
**retired** 24:25
34:9 98:2
**revealed** 55:11
**review** 12:18
28:22,22 31:15
31:17 55:8
65:15 70:18
71:5,25 75:7
88:25 101:1,5
107:3
**reviewed** 11:22
13:10,23 28:19
31:22 35:16
54:24 55:15
83:12 120:25
**reviewing** 53:18
**reviews** 53:14
119:25 120:2
**revise** 33:9
**revised** 28:11
32:6
**revision** 15:10
51:25
**Rifkind** 4:14
**rifle** 30:9
**right** 19:25
20:17 21:24,25
23:9,9 25:17
32:3,4,4 36:5
36:20 41:2,15
48:3 54:19,20
55:19,25 56:7
56:15,18 57:24
69:7 70:14,22
77:19 82:22
86:10 88:5,6
93:10 94:22
95:25 107:5
112:4 120:14
122:23 124:8
126:19 128:17
**risk** 76:8 79:21

80:12,17 81:9
82:13
**risks** 82:16
**RMR** 5:17
132:25
**road** 22:10
24:17 47:15
**robbery** 10:21
20:10 21:16,18
21:22,23 22:4
22:11 27:23
91:18 120:22
**role** 23:24 57:14
**Roman** 102:22
102:23
**Ron** 98:3
**room** 47:5 85:25
109:25 119:18
**roughly** 81:6
**Roy** 117:25
**Ruddle** 117:14
**rule** 121:15
128:21
**rules** 8:22 50:7
123:23
**run** 89:22
114:12
**running** 26:23
**runs** 89:18

**S**

**S** 4:1 5:4 6:11
**safety** 47:16
**sake** 8:21
**sat** 109:18,20
118:14
**save** 60:20 63:15
63:16,19
**saw** 14:3
**saying** 37:4 43:1
59:5 60:5 67:6
125:12
**says** 7:24 11:17
11:19 41:14
46:3 56:8
59:14 75:17,19

**PETER MORROW  4/5/2017**

95:2,18 103:15
105:13 107:24
108:15 110:13
110:14 122:24
123:16,25
126:9,19 128:2
**scene** 47:12 48:1
48:16
**Schaffer** 58:11
58:14
**schedule** 60:17
60:18 90:5
98:18,21
**Schlueter** 73:1
**school** 18:16,23
**Schwartzkopf**
118:6
**sci** 34:2,3
**science** 18:19
**Scott** 117:14
118:16
**screen** 111:11
111:19 112:18
112:22 114:6,8
114:10,21
**search** 114:15
130:18,19
**searchable**
130:16
**seasoned** 123:13
**seat** 61:11
**second** 25:18
42:2 61:14
76:4 96:3
115:22
**secretary** 54:1
**section** 54:18
59:8 69:17
70:9,12 75:18
76:4 103:15
104:4,5 106:1
106:12,22
127:22
**sections** 55:8
**see** 11:19,23
19:17 20:17

21:2 23:1 24:5
24:16,24 30:4
37:18 38:1,8
42:19 43:1
52:4,8 53:5,24
56:10,14,15,17
59:11 69:7,11
69:19 70:10
73:20 75:17,22
75:25 82:1
89:13 95:3,6
95:18 97:6,13
97:23 102:24
103:1,2,16
104:17 105:25
110:15 111:4,6
111:10,19,24
112:5,12 114:1
114:10,13,14
114:16,18,19
114:20 115:3,4
115:5,6,9
121:13 122:25
123:1 126:5
127:23 128:3
**seeing** 119:8
**seen** 11:8 95:19
108:14 109:11
109:12,21
122:11,13
**sees** 114:7
**selected** 104:10
106:25
**selection** 104:5,6
106:1,22
**seminar** 104:16
104:23 106:3,6
106:13,20,21
**send** 15:14
27:11,13,17
30:16 47:5
60:1,5,21,22
91:10
**sense** 54:15
58:23 62:10
124:5

**sent** 59:23 60:10
**sentence** 46:16
76:4 79:20
80:7
**September**
51:16,21 65:9
69:7 71:3
72:13 104:1,20
104:22 105:16
**sequence** 30:18
**sergeant** 20:12
20:21 21:4,15
21:24 22:3,3
23:25 24:4,11
24:15 25:1,8
26:12 34:3,16
58:9,11,14
100:23 117:14
**serial** 66:2
**serious** 27:22
**serve** 54:14
85:18
**served** 23:23
**serves** 66:4
**Services** 3:13
5:11,20 6:25
41:17
**set** 26:8
**setups** 93:5
**seven** 27:24
**severity** 40:21
**sewer** 43:22
**sheet** 61:18
62:14
**shift** 23:4
**short** 2:15 62:1
63:22
**shorthand** 3:16
6:5 132:5
**show** 13:16 41:6
51:4 69:5
84:18 86:24
87:4 94:12
107:11
**showed** 87:2
**showing** 62:14

**shown** 51:7
94:15 109:7
**Shrewsbury**
116:6
**sic** 26:15
**side** 36:4 90:23
**sign** 53:16 78:6
78:13 98:23
**signature** 6:7
16:15 56:11
65:18 129:16
131:3
**signed** 15:23
35:17 56:20
60:19
**significant** 63:4
76:8 79:21
80:12,17
**signing** 53:18
**signs** 53:14
**sign-off** 79:9
**similar** 39:13
**Simultaneous**
87:16
**sir** 22:15 41:25
77:2 88:22
94:11 97:4
101:9 103:22
103:24 113:10
118:1 120:24
122:12
**sit** 34:5 37:20
54:4 62:8
65:12 87:24
**sits** 53:22 83:20
85:13 91:1
116:21
**sitting** 61:11
**six** 20:1 71:7
105:14 120:4
122:25
**small** 18:22
56:15 117:6
**smaller** 24:20
**smoother** 9:8
**sole** 89:22

**somebody** 28:25
29:13,21 30:1
30:22 31:13
35:6 38:4
40:25 43:18
58:4 88:8
114:1
**something's**
28:11
**soon** 125:24
**sorry** 18:19
20:14 25:3
33:17 36:8
39:19 44:18
53:15 55:6
56:19 60:17
63:2 66:12
75:25 77:2
93:7 95:10
97:17 101:17
102:15 106:17
114:13 115:23
116:9 127:3
130:10
**sorts** 90:16
**sought** 16:22
**sound** 63:24
94:22
**sounds** 40:4
115:10 116:18
**space** 49:24
**speak** 17:23
18:11 22:10
36:23 37:12,12
55:14 126:14
**speaking** 14:5
37:3 47:6
61:11
**speaks** 115:17
115:18
**specialized**
101:11
**specific** 26:8,8
39:8,11 45:6
45:14 53:16
55:5 68:4,15

**PETER MORROW  4/5/2017**

68:18,22 76:18
82:16 83:18
91:5
**specifically**
13:15 53:7
85:16 90:18,21
91:23 94:6
101:15 109:23
110:5
**speculate** 42:13
113:19
**speculation** 37:3
44:11 70:6
76:23 78:9
79:11 81:13
113:3 115:15
128:14
**speech** 87:16
**spellings** 118:9
**spent** 10:21 20:8
20:18 25:5
26:22 73:20
93:24
**split** 90:24
**spoke** 13:8 58:5
58:6 59:12
**spoken** 14:22
68:18
**spot** 23:21
**St** 1:10 2:15 3:14
4:8 5:3,13,22
6:22 7:14
11:11 15:23
16:5 19:9,10
19:18 42:15
46:21 54:9
73:23 79:6,7
79:16 80:16
81:1,7,8 82:8
82:10,11 84:1
84:21,22 85:4
85:9,10 86:9
86:17 87:13,19
88:19 89:5
90:11 91:13,14
93:10,11 96:15

97:2,3 98:13
99:20 113:8,15
116:7,14,16
117:13 119:15
119:25 121:4
127:15 129:6
**staff** 15:16 16:11
60:12 71:1
72:8 90:11,11
91:3,6,11,12
92:1,3,13,17
92:18
**stamp** 122:24
**stamped** 123:17
123:19
**stamping** 126:3
**stand** 75:7,9
**standards** 84:2
99:6
**start** 30:2,18
36:3 41:20
55:22 128:21
**started** 19:12,19
20:4 57:6
64:24 77:9
**starting** 18:15
**starts** 19:21
28:11,14 65:20
128:23
**state** 3:14,19
27:14 29:3
42:18 48:21
50:22 59:14
93:18 95:23
96:4 108:2
112:11 121:18
132:7
**statements** 79:3
**states** 1:1 3:1
6:19 84:6,8
104:12 113:7
113:11
**statewide** 40:15
**State's** 39:16
**stating** 46:17
**stats** 20:25

27:12 92:19
**statute** 59:14,15
59:19 120:9
121:19 123:25
**statutory** 48:21
48:22 68:8
96:24 97:7,8
97:14
**stay** 39:19
**stenographic**
132:12
**step** 16:9 71:22
**Steve** 89:20
115:24
**stick** 26:10
**STIPULATED**
6:2
**stolen** 27:23
57:9,12
**stood** 75:3
**stop** 12:16 21:2
39:5,6,7,11,12
39:13 42:2,3
46:5,7,15,18
46:24 48:5
69:18,22 84:5
89:15
**stops** 75:20
89:15
**stored** 62:17
**story** 62:1
**street** 3:14 4:7
5:12,21 20:4
20:19 21:7,25
22:3,6
**strike** 40:8 52:6
69:2,4,25 73:4
85:17 101:2
104:20 112:21
**subdepartment**
91:15
**subject** 30:12
45:1,2 63:3
**subjects** 68:21
**submit** 29:10
114:22

**subordinates**
24:2
**Subsection**
104:14
**subsections**
104:13
**subsequent**
44:24 73:10
**subsequently**
112:5
**substance** 8:15
**succeed** 19:5
**sufficient** 87:8
101:2,6
**suggest** 31:1,2
103:8
**suggestion** 29:10
29:25
**suggests** 41:21
45:21 70:2,13
**summer** 19:25
**superiors** 32:16
32:24
**supervision**
100:24
**supervisor**
20:18 70:20
72:1 100:19,21
101:4 117:1
120:13
**supervisory**
23:24 88:25
**supply** 86:24
**support** 117:5
**supporting**
70:19
**sure** 12:19,23
18:13 36:9
41:22 47:12
62:21,21 75:24
76:16 77:3
80:24,24 96:13
96:25
**surmise** 34:2
**surmising** 59:16
**suspect** 33:25

36:15 38:14
73:6 86:19
90:22 91:7
114:2 119:17
121:19
**swear** 7:18
**sworn** 3:11 7:21
75:5 132:9
**system** 30:14
34:24,24 39:8
39:9,14,17,22
65:5,6,11,19
66:7 67:9 76:6
76:8,12,20
77:6 82:17
118:25 120:9
120:11 121:11
**systems** 40:18
132:6

———————
**T**
**tail** 57:5
**take** 13:23 19:11
31:19 37:19
44:25 46:24
49:7 59:18
63:22 69:3
72:18 75:13,16
75:16 83:22
95:12 98:22
99:14 101:14
101:22,24
108:19 109:4
112:23 113:13
120:12 122:1
124:21,24,24
125:4
**taken** 3:12 6:4
47:9 64:2
99:16 100:3,8
102:3 109:1
125:8 132:11
132:18
**takes** 16:4 28:6
50:8
**talk** 8:25 14:18

PETER MORROW  4/5/2017

17:17 18:14
30:15 36:25
37:4 45:4 49:3
49:4 74:11,16
74:22 78:19
80:6 85:21
86:11 87:10
125:9,10
**talked** 12:14
13:14 20:22
30:15 83:17
124:4
**talking** 9:18
36:24 37:10,16
37:17 38:3
59:3 64:7
74:13 89:7
92:16 97:17
102:8 107:8
128:20
**target** 129:2
**Taser** 61:25
62:2
**taught** 36:2
44:23 48:21
49:11 55:22
68:1 77:11,11
97:23
**teach** 26:15
96:12,17,24
98:11 129:9
**teaches** 50:18
**teaching** 45:3
**technologist**
98:3,5
**teletype** 121:11
**tell** 13:7 15:5
29:9 33:3
36:23 37:11,17
52:23 70:24
74:7 90:15
95:20 105:15
122:18
**telling** 17:2 29:8
66:4 68:23
**tells** 68:4 126:14

**temporary**
99:24 100:1
**ten** 10:20 120:18
**ten-minute**
126:13
**terminal** 114:11
**terminations**
53:13
**terms** 10:2 81:9
130:19
**testified** 80:2
**testify** 7:22 8:16
12:6,8,12 14:7
14:11 81:16,20
83:5 84:11
132:10
**testifying** 9:23
11:15 14:20
17:3 78:16
80:19
**testimony** 77:21
107:3 132:8,11
**testing** 49:8
**TF** 56:8,18,20
103:2
**thank** 30:12
53:4 82:6
95:13 101:25
**Thanks** 53:2
**thing** 20:21 32:3
62:4,4,6 69:5
75:11 90:20
99:4
**things** 13:14
16:13 26:21
31:7 34:5 36:2
44:2 61:12
74:20 86:1
92:8,14 124:22
**think** 9:16 12:17
14:4,12,21
15:24 20:21
24:5 27:24
28:10 29:10
30:1,5,8 31:14
32:3 39:12,15

43:16 47:11,11
48:7,7 49:6,7
50:21 54:1,7
55:16,18 57:10
57:12 58:5
60:8 66:12,13
72:9,19 77:18
78:5 81:2 83:5
90:7,16 92:4,4
100:16,18
101:14,16
115:17 121:2
122:6,6
**thinking** 115:12
**tholland@pau...**
4:18
**thought** 13:21
34:4 66:11
71:14 73:19
82:2
**three** 12:1,6,9
20:5,24 23:13
24:16 28:20
29:25 34:10
39:25 51:14
63:7 83:24
99:9 120:3
124:22
**Thursday** 3:11
**Tim** 8:6 25:1
56:7,8 118:6
**time** 6:15 10:24
13:12 14:2
16:5 20:3,20
20:23 21:6,19
23:12,20 25:11
25:12,18,19
26:14,18 28:6
28:6 35:19,21
36:5 40:22
48:5,25 49:1,9
55:24 56:2
57:1 63:25
64:3 65:5,14
68:20,20 73:7
73:20 77:9

87:17,24 93:13
93:24 94:5
101:23 102:1,4
103:12 110:1
113:9 115:1,2
120:19,21
124:14 128:23
129:17,21
130:4,7,25
**times** 10:18,23
13:8 29:25
58:19 66:24,25
75:4 85:24
**Timothy** 4:12
7:3 56:14
103:2
**title** 98:7 119:6
**titled** 41:16
**today** 8:7,17
9:11 11:11,15
12:6,9,12
13:10,25 14:9
78:17 83:6
84:12 86:16
124:4
**today's** 6:14
13:15
**toes** 28:20
**told** 16:24 38:20
38:24 71:13
77:17,24 84:19
**ton** 28:8
**top** 45:13 72:20
96:4 102:24
123:16
**topic** 13:18 45:9
83:24
**topics** 11:20
12:1,6,9,15
13:22 14:3
89:12
**Torres** 2:16
122:15 125:7
125:10,10
128:8
**total** 54:3

**totality** 50:9,13
**tour** 61:14
**to-wit** 7:25
**to/from** 60:3
**track** 58:19
72:24
**trained** 50:23
64:23,25 65:12
67:7 91:16
**trainer** 101:8
**trainers** 101:10
102:8
**training** 2:11,12
25:25 26:5,9
26:16 38:15,16
38:17 44:15
48:19 49:16
64:19,21 65:3
65:12 67:25
68:24 84:3
86:2 89:5,6,7,9
89:11,15 90:5
91:4,18,19
93:1,22 98:24
99:17,19,23
100:4,9,20,21
100:25 101:3,4
101:11,12,15
103:15 104:4,6
104:11,15,16
104:23 105:1
105:25 106:2
106:11,14,15
106:21,24,25
108:1,11,12,16
109:22 110:4
112:10 129:9
**trainings** 99:6
100:14
**transcribed** 6:7
**transcript** 2:18
**transferred** 20:6
20:9 33:23
**transmittal**
61:18 62:14
63:11

PETER MORROW  4/5/2017

transport 46:25
tripped 49:12
truth 7:22,22,23
    132:10,11
truthfully 8:16
try 8:25 19:3
    45:17 47:11
    75:25 77:2
    88:9
trying 8:23
    45:16 62:7
    88:8 127:6
turn 11:17 83:23
    97:13 102:22
    103:14
turning 97:21
    104:3 123:15
    127:12,20
TV 56:15,19
twice 88:7
twin 38:4
twist 30:10
two 8:22 20:24
    23:1 24:17
    29:25 38:17
    41:11 54:2
    89:12 95:7
two-month
    75:11
type 40:12 45:1
    89:7 92:2
    128:2
typewriting 6:7

_____
**U**

UCR 27:8,9
uh-huh 8:13
    11:1 12:2 18:8
    21:5,8,20 22:1
    22:19,21,24
    24:9 25:23,24
    27:16 32:8
    54:11 61:1,3
    63:14 73:11
    103:5 126:10
ultimately 93:19

unable 42:5 43:2
unconstitutio...
    75:20
underscore
    122:24
understand 8:9
    8:12 9:10,22
    11:10,14 12:5
    12:24 45:16
    56:23 57:19
    59:5 67:10,11
understanding
    9:14 10:9 21:3
    43:11 69:21
    95:19 107:9
    110:7 126:21
    128:10,22
understood 22:7
    33:18 47:25
    48:13 50:17
    65:23
uniform 22:5
    27:10
uniformed
    19:21
unit 10:22 15:12
    15:13 20:8
    22:11 31:15
    53:17 60:18
    117:6
United 1:1 3:1
    6:19 84:5,8
University 18:19
unrest 23:5,7
    33:6,12
unrest-related
    23:14
upcoming 98:21
update 30:25
    31:5 32:21
    64:19 71:19
    88:23
updated 16:7
    26:4 30:22
    33:2,15 60:24
    65:22 110:13

110:14
updates 52:6
    63:9 64:8
    103:20 110:23
updating 33:1
    52:2
usage 127:8
use 40:7,9,18
    49:2 55:8,12
    61:24 62:2,2
    63:17,23 75:10
    96:13,25 122:7
user 128:2
uses 126:17
usually 47:1
    63:3
utilize 63:17

_____
**V**

vague 8:9 37:2
valid 48:2
validation
    120:15
variety 68:20
various 26:1
    91:9
Vaughn 56:7,9
    56:25 103:3
verbiage 59:18
    59:21
verification
    39:20
verify 40:1 47:7
    120:7
verifying 92:8
version 27:6
    52:8 54:17
    56:5 57:3
    62:13 69:6,14
    97:5 103:23
    104:19,21
    105:3,16,17,20
    105:22,22,25
    106:3,11,19,20
    110:24 111:17
    111:22,23

114:6
versions 51:14
    60:25 61:9
versus 6:18 62:5
victim 35:21
video 100:15
videographer
    5:9 6:13,24
    7:17 63:25
    64:3 102:1,4
    129:17,21
    130:4,7,25
video-recorded
    1:9 3:10 6:16
views 87:14
violation 75:20
Virginia 62:1
voice 38:9
Volker 116:8,17
vs 1:5 3:5

_____
**W**

wait 9:4,9
    110:25
waiting 69:10
    130:1
waive 129:16
waived 6:8
    131:4
Walsh 7:15
want 9:8 12:23
    30:25 31:14
    36:5,24 37:4
    37:20,20 40:2
    40:19 42:1
    58:15 61:12,15
    69:5 84:14
    90:20 109:13
    110:6 120:3
    123:6,9 125:10
wanted 15:2
    34:21,22,22,23
    34:25,25 35:4
    35:6,9,9,10,11
    35:12,18,23
    36:10,22 37:14

39:13 40:13,24
    41:3 46:24
    47:16 49:15
    51:2 52:16,18
    55:20 58:20
    64:14 66:5,22
    68:2,6,25
    69:18 70:21
    71:4,5,24
    73:20 75:24
    82:17 86:8
    99:24 100:1
    101:1,5 108:5
    108:17,20,25
    109:1 112:19
    112:24 113:13
    114:1,14,16,19
    114:23 120:6
    120:22,25
    121:5,9,24
    122:2 123:23
    124:4 125:8
    130:11
wanteds 55:9,12
    67:15 69:22
    74:23 75:8
    76:7,12,19
    77:6 79:21
    80:12,17 81:10
    84:5 89:9,16
    93:21,25 95:18
    95:21 99:17,20
    108:1,12
    112:10,19
    118:25 119:25
    129:2
wants 93:14
    127:21
warrant 35:14
    35:16,24 36:11
    36:15 37:10
    38:13 39:1
    42:6,25 43:2
    43:10 44:6,12
    44:17,19 45:5
    45:14,23 76:7

PETER MORROW  4/5/2017

76:12,20 77:6
78:7 79:8
121:20 124:11
124:16,20,21
124:23
**warrants** 69:18
69:22 127:21
**wasn't** 14:25
49:23 55:21
59:2 77:14
119:20
**waste** 87:24
**watch** 23:17
**way** 21:1 26:3,7
31:10 32:18
33:17 60:21
74:2 77:18,19
77:25 105:15
124:3
**ways** 28:18
60:11
**weapons** 30:13
**Webb** 25:4
**website** 41:12
42:15 105:22
**week** 16:12
19:19
**weekly** 92:19
**weeks** 13:13
14:6,14,14
25:6 38:16
**Weiss** 4:14 7:5
**Wellston** 93:9
**went** 17:25
20:17,17 21:6
21:12,15 23:3
25:7 34:15
49:22 60:11
**weren't** 33:10
44:1 55:12
106:18
**Westfall** 53:25
**we'll** 29:6,6
30:13 36:20
59:18 60:20
61:19 62:25

63:5 88:9
129:16
**we're** 6:24 17:14
29:1 60:16
61:23 62:2,6
62:11 64:1
102:2 106:10
110:12,13,21
129:22,23,25
130:5,8
**we've** 28:4 31:4
88:7
**Wharton** 4:14
**whip** 30:16
**William** 117:16
**window** 23:24
123:24
**wing** 26:25
**wish** 61:10
**withdraw** 74:3
113:4
**withdrawn**
33:20 46:12
125:18 128:24
**witness** 6:9 7:18
11:11 14:16
17:12 50:8
51:8 67:25
78:21 79:13
85:12 88:5
94:16 109:8
113:21 126:25
127:3 129:14
131:4 132:8,11
**witnesses** 35:21
50:5
**wondering**
43:12 45:22
75:3,7
**Woods** 118:18
**word** 43:3 52:17
**words** 8:24
**work** 15:3,6
18:24 32:16,17
34:19 64:10
92:12

**worked** 17:1
23:16 34:12
57:1,3 60:24
61:2 103:12
**workhorse**
32:11
**working** 20:8
22:10 110:13
**works** 61:14
**wouldn't** 44:6
45:12 78:2
81:7
**write** 62:24
**writing** 39:3
124:1
**written** 13:20
15:9,10 16:5
16:17 65:8
**wrong** 66:13
90:20 109:19
109:19
**wrote** 59:17

---
**X**
---
**X** 36:2 62:4

---
**Y**
---
**Y** 62:5
**yeah** 13:2 17:4
20:3 21:20
23:25 25:14,16
29:16 30:4,15
34:10 40:3,22
43:1 45:25
47:24 50:16
51:3,25 55:20
56:22 57:8,22
62:11 63:7
66:7,13 72:23
81:6 88:15
91:6 97:15
101:18,18
102:18 105:20
116:12 120:2
122:6 127:25
**year** 19:7 30:7
32:7,12 39:16

39:18 73:8,10
83:1 90:1 92:6
92:7 99:14
**yearly** 64:21
**years** 10:21,21
10:23 20:6,11
20:19 21:11
23:2 26:23
27:7 28:20
30:7 36:1
39:25 68:13
77:15 89:12
99:9 105:14
120:18
**Yep** 18:18 58:2
**yesterday** 13:15
13:25 14:1,2
18:6,7,10
59:12
**York** 4:16

---
**Z**
---
**zeros** 122:24

---
**#**
---
**#11867** 5:18
**#1291** 5:19
132:25

---
**0**
---
**07** 20:16 21:24
22:2 106:10

---
**1**
---
**1** 2:7 11:3,4,24
13:17 14:3
83:22 103:14
104:3,13
105:24
**1st** 65:9,10,20
**1:41** 1:15 6:11
**1:43** 6:15
**10** 10:22
**100** 49:19
**10019-6064** 4:16
**102** 2:11 72:25
**105** 2:12

**107** 2:13
**109** 2:14,15
72:20,24
**109-page** 55:5
**11** 2:7 21:12
22:3,18 26:12
33:24 56:1
**11th** 3:14 5:12
5:21
**12** 38:16 39:22
111:7
**12th** 128:9
**12-week** 38:16
**1210** 4:7
**122** 2:15
**1285** 4:15
**13** 20:8 106:19
**13th** 51:16
**14** 2:10 23:2,7
51:21 69:7
94:13,14 95:1
95:9,10,10,11
97:6
**15** 2:10 10:23
25:23 41:15
42:1 46:3,13
51:19 52:4
67:13 94:13,15
95:5,11,25
96:2
**15s** 95:7
**15th** 51:17 66:8
**15-01** 41:18,21
**1526** 69:12
**16** 2:14 41:15
71:3 75:25
79:20 109:5,6
109:10 110:13
110:18,22
111:1,10 114:5
**16-01** 41:19
**1601** 41:14
**1655** 128:9
**17** 2:15 24:6
26:23 109:5,7
110:9,14,17

PETER MORROW  4/5/2017

| | | | |
|---|---|---|---|
| 111:16 | 110:24 111:22 | **4:35** 130:25 | **8:55** 126:12 |
| **17th** 84:9 | 114:5 | 131:5 | **80** 49:19,21 |
| **175** 95:2 | **2017** 1:12 3:12 | **40** 75:6 81:5 | **800** 75:6 81:2 |
| **18** 103:14 104:3 | 6:14 16:2 | **40-hour** 100:23 | **850** 75:6 |
| **19** 75:17,18 | **212)373-3373** | 101:3 | **855)724-2489** |
| **190** 95:6 | 4:17 | **404** 56:12 | 4:9 |
| **1994** 89:5 | **22** 36:1 77:15 | **41** 2:7,8 5:4 | |
| | **24** 110:22,25 | **48** 99:9 118:25 | _____ |
| _____ | 111:4,10,16,18 | | **9** |
| **2** | 114:6 121:20 | _____ | **9** 2:9 51:5,7,20 |
| **2** 2:7 41:7,8,13 | 121:24 123:17 | **5** | 69:6 88:24 |
| 41:15,17 52:7 | 123:21 127:17 | **5** 1:12 2:12 | **9th** 5:4 |
| 69:17 96:3 | **24-hour** 10:12 | 11:18 52:7 | **92** 18:23,25 |
| 104:13 110:11 | 121:15 123:24 | 105:9,10 | **93** 19:11 |
| **2:51** 63:25 | 124:14 128:21 | **5th** 6:14 | **94** 2:10,10 19:11 |
| **20** 75:4 | **25** 30:5 32:5 | **51** 2:8,9,9 | 19:13,14,22,24 |
| **20-year** 75:12 | **25th** 104:1 | **544216** 59:13 | 26:4 77:9 |
| **2007** 21:3 | | | **98** 28:5 |
| 100:23 105:14 | _____ | _____ | |
| 105:22,24 | **3** | **6** | |
| 106:23 | **3** 2:8 11:17,17 | **6** 2:13,13 11:18 | |
| **2011** 21:21 | 41:7,8,14,18 | 11:18,19,19 | |
| 51:16 54:17 | 73:1 104:13,14 | 97:13 107:15 | |
| 56:5 57:15 | **3:00** 64:4 | 107:16,19 | |
| 64:24,25 65:9 | **3:47** 102:1 | 112:4 113:6 | |
| 65:11,21 95:2 | **3:54** 102:4 | 122:5 123:6 | |
| 97:5,9 | **30** 3:11 27:7 | **6th** 17:6,15 | |
| **2013** 104:1,20 | 65:14 67:8 | 107:22 112:3 | |
| 104:22 105:16 | 75:6 | **63101** 5:13,22 | |
| 105:21 106:20 | **30(b)(6)** 11:11 | **63103** 4:8 | |
| 106:24 | 14:16 78:21 | **63105** 5:5 | |
| **2014** 64:25 | **30(b)6** 1:9 | | |
| 110:18 111:17 | **314)615-7042** | _____ | |
| 111:23 | 5:6 | **7** | |
| **2015** 2:13 30:5 | **314)644-2191** | **7** 2:8,15 51:5,6 | |
| 32:6,10 41:21 | 5:14,23 | 51:15 54:16 | |
| 51:17,20 52:8 | **3571** 126:11 | 55:18 64:7,23 | |
| 54:21 57:23 | | 107:15 122:5,6 | |
| 62:13 64:8 | _____ | 122:7,7,8 | |
| 66:8 67:14 | **4** | **7/2014** 110:14 | |
| 71:16 73:9 | **4** 2:11 46:13 | **711** 3:13 5:12,21 | |
| 107:22 112:4 | 102:9,11 | **75** 49:19 | |
| 128:9 | **4th** 73:9 84:6 | | |
| **2016** 16:2 51:21 | **4:16-CV-0025...** | _____ | |
| 69:6,7 72:14 | 1:5 3:5 6:19 | **8** | |
| 84:9 88:23 | **4:32** 129:17 | **8** 2:4,9 51:5,17 | |
| 95:6 110:14,19 | 130:4 | 51:19,23 52:7 | |
| | **4:33** 129:21 | 64:7 65:21 | |
| | **4:34** 130:7 | 105:24 122:4 | |
| | | 128:25 | |
| | | **8:45** 126:12 | |