## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DWAYNE FURLOW et al.,                   )
                                        )
    Plaintiffs,                        )
                                        )
       v.                          )          Case No. 4:16CV254 HEA
                                        )
JOHN BELMAR et al.,                     )
                                        )
    Defendants.                        )

## <u>OPINION, MEMORANDUM AND ORDER</u>

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. No. 77], Plaintiffs' Motion to Certify Class [Doc. No. 80], and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 84]. The parties oppose the respective motions. A hearing on the motions was held before Judge John A. Ross on February 28, 2018, and each party submitted a memorandum of law after the hearing. On March 9, 2018 Judge Ross recused himself and this case was reassigned to the undersigned.

With respect to the claims of Howard Liner ("Liner") against Defendant Officers John Doe 1-2, Plaintiffs have neither substituted named defendants for the Doe Defendants, nor effectuated service on the Doe Defendants. Liner's claims are stayed in accordance with the Order to substitute and serve the Doe Defendants

dated September 30, 2018, and Liner's claims are neither considered nor disposed of in this Opinion, Memorandum, and Order.

For the reasons set forth below, Defendants' motion is granted as to Defendants Belmar, St. Louis County, Partin, Walsh, and Clements.  Plaintiffs' motion for partial summary judgment is denied except as to Liner's claims.  A ruling on Liner's motion for summary judgment is stayed pending the outcome of the aforementioned Order.  Plaintiffs' motion to certify class is dismissed without prejudice.

## Facts and Background

### "Wanteds"

Under Missouri State Law, a law enforcement officer "may arrest on view, and without a warrant, any person the officer sees violating or who such officer has reasonable grounds to believe has violated any ordinance or law of this state, including a misdemeanor or infraction, over which such officer has jurisdiction." 544.216 RSMo.  A "wanted" is entered into a computer system by law enforcement, and identifies a person who is wanted for a crime, but for whom no warrant has been issued.  Wanteds differ from warrants in that no judicial determination of probable cause is required to enter a wanted.

The St. Louis County Police Department ("SLCPD") has utilized "wanteds" for over 20 years.  SLCPD's policies for entering wanteds are contained in a

general order ("G.O.").  Before 2015, nothing was written in the G.O. about

probable cause being a prerequisite to the entry of a wanted.  However, each

officer who provided deposition testimony in this cause testified that SLCPD

policy has always been that probable cause is required to enter a wanted.  In 2015,

express language about the probable cause requirement was added to the G.O.  In

2016, additional language was added to the G.O. requiring supervisory review and

approval of wanted requests before their entry into the computer system.

When an individual's name is run in the computer system and there is a

wanted issued for that person, the computer will return the wanted to the officer

running the search.  The information viewable to the searching officer includes the

name of the officer who issued the wanted and the crime for which the person is

wanted.  The wanted does not describe the probable cause on which it is based.  If

an SLCPD officer encounters a person with a wanted issued against him or her, the

officer is authorized by SLCPD policy to take that person into custody.

### Plaintiff Dwayne Furlow and Defendant Christopher Partin: Facts Not In Dispute

At 8:58 a.m. on November 11, 2015, Defendant St. Louis County Police

Officer Christopher Partin, along with field training Officer Slusser, received a

dispatch to the home of Janet Virgin  based on a 911 call that had been placed at

8:57 a.m..  The officers arrived on the scene at 9:00 a.m.  Dwayne Furlow

("Furlow"), who lived next door to Ms. Virgin, was not on the scene when the

officers arrived.  Ofc. Partin spoke to Virgin, who told him that her family was

having ongoing issues with Furlow's family.  She said Furlow's son had started a

fight with her sons that morning, so she started video recording the incident on her

cell phone for evidence.  Virgin told Partin that Furlow then approached her and

took her phone with some force, including a strike to her head.

Partin also conducted a canvas of the neighborhood in search of witnesses.

Partin spoke to a 16-year-old neighbor who said he observed an altercation

between Furlow and Virgin, and saw Furlow take a phone from Virgin.  This

witness also said he did not see whether Furlow or Virgin initiated the altercation.

At some point, one of the Furlow children handed a cell phone to Partin so

that Partin could speak to Furlow.  Partin asked Furlow to return home to answer

some questions about the alleged assault and theft.  Furlow informed Partin that he

would not return home.  Partin told Furlow that he would issue a Wanted for

Furlow if Furlow did not return home.  Partin issued a Wanted for Furlow that day.

On December 12, 2015, Furlow, accompanied by counsel, appeared in

person at the St. Louis County Justice Center in Clayton, Missouri.  There,

Furlow's counsel indicated that Furlow would not answer any questions.  After

Furlow's fifth amendment right was invoked, Partin issued a summons to Furlow

relating to charges of assault and larceny, gave the summons to Furlow's attorney,

and stated that he would cancel the Wanted.  Partin then cancelled the Wanted

shortly after the meeting with Furlow and his attorney, as he was leaving the Justice Center.

### Plaintiff Dwayne Furlow and Defendant Kevin Walsh

During the noon hour on January 25, 2016, St. Louis County Police Officer Kevin Walsh responded to a 911 call concerning an alleged domestic assault. Walsh arrived to find Latoya Furlow ("Latoya"), who claimed that her husband, Plaintiff Dwayne Furlow, had assaulted her.  Walsh's investigative report includes a summary of Latoya's statements that day.  Latoya told Ofc. Walsh that Furlow had just assaulted her.  Latoya claimed that Furlow had come home and immediately started screaming, saying he had heard that Latoya was cheating on him.  Latoya said Furlow kept screaming "B****, get the f*** out of my house." She claimed he then smacked her in the cheek with his right hand, knocking her to the ground.  Latoya told Walsh that Furlow then stood over her, stomped on her legs several times, grabbed her by her hair, and began dragging her toward the door.  Latoya said that when Furlow let go of her hair to open the door, she ran out of the house and to the neighbors, where she called the police.  Latoya told Walsh that she saw Furlow get into his car and drive away.  Latoya then told Walsh that she wanted to press charges.

In his report, Walsh observed that Latoya was "angry, crying, fearful, afraid, [and] nervous." Walsh observed no bruising, swelling, or lacerations on Latoya, and wrote that she refused medical attention on the scene.

Walsh reported that he conducted an interior sweep of Latoya's residence while looking for Furlow. Walsh saw a fully loaded AR-15 firearm in plain view in the Furlows' basement. Latoya told Walsh that she purchased the firearm for her and her husband's protection, and that she had purchased the firearm in her name because Furlow was on probation. Walsh ran a record check for Dwayne Furlow and found that he was indeed on active probation for burglary in the second degree.

Walsh noted that while he was on the scene, Latoya's cell phone rang multiple times. Latoya told Walsh that it was Furlow calling, so Walsh answered the phone and identified himself as a St. Louis County Police Officer. Walsh reported that the subject on the phone identified himself as Dwayne Furlow. Walsh informed Furlow of his investigation, to which Furlow reportedly replied that he had spoken to his lawyer and would not turn himself in, because he would get locked up. Furlow reportedly said that Latoya "f***ed around" with another man and was mad because Furlow now wanted a divorce. Walsh advised Furlow that he would be "put out as wanted" for domestic assault in the third degree and

domestic peace disturbance.  The phone conversation ended, and Walsh entered the wanted.

The next day, Walsh received a phone call from a subject who identified herself as Latoya Furlow.  Latoya told Walsh that she wanted to recant her statement from the previous day.  When Walsh asked if anyone was coercing her into recanting, Latoya said no.  It is undisputed that Walsh asked Latoya to come to the precinct and give a written statement, although neither party makes reference to an in-person retraction actually occurring.

 On January 28, 2016, Furlow was driving a car with no rear tags and was stopped the police.[1]  It is undisputed that after he was stopped, Furlow admitted that he had a suspended license and that he believed a wanted or warrant had been issued against him.  A computer search returned the wanted that Walsh had issued on January 25.  Furlow was arrested and taken into custody at the Jennings, Missouri police station.[2]  An officer there informed Walsh that Furlow was in custody.  Walsh asked the officer to conduct an interview with Furlow.   The officer read Furlow his *Miranda* rights; Furlow invoked his right to remain silent.

While in custody, Furlow contacted his attorney.  During Furlow's detention, his attorney told multiple police officers that Furlow was being held

---

[1] The exact details of the stop and Furlow's arrest are unclear, as the stop apparently occurred in St. Louis City and Furlow ended up at the City of Jennings precinct in St. Louis County.  It is unclear, therefore, which agency actually arrested Furlow and at what time that arrest occurred. However, the Court finds that those facts are ultimately immaterial.

[2] See Note 1, *supra*.

illegally for lack of probable cause and requested that Furlow be released.  Furlow was not released as a result of those requests.

It is the policy of the St. Louis County Police Department to hold individuals accused of domestic violence for 24 hours.  Furlow was to be held for 24 hours pursuant to this policy, and was transferred from the Jennings station to the St. Louis County Justice Center during his detention.  Justice Center documents show an arrest time of 17:40 on January 28 and a release time of 18:08 on January 29, meaning Furlow was detained for 24 hours and 28 minutes.

It is undisputed that Ofc. Walsh believes that he followed department procedure with respect to this incident.

**Plaintiff Ralph Torres and Defendant Laura Clements**

On December 16, 2014, Detective Laura Clements of the St. Louis County Police Department Child Abuse Unit was directed to begin an investigation into allegations that Ralph Torres ("Torres") had sexually abused his minor daughter ("Daughter").  On November 13, 2014 Torres' ex-wife, who is also Daughter's mother ("Mother"), had contacted the office of the Department of Social Services – Children's Division ("DSS") in St. Charles, Missouri alleging the abuse, which triggered an "emergency investigation" by DSS.  A forensic interview of Daughter was conducted by a DSS employee on November 26.  While Det. Clements would normally attend a forensic interview, on the day of Daughter's interview, all police

officers, including Clements, were working mandatory 12-hour shifts due to civil unrest in St. Louis County.   Clements instead received a video copy of the forensic interview from her sergeant.

Before viewing the video, Clements called Mother, who told Clements that one day in November, Daughter began rubbing her own buttocks and asked Mother to "touch her bottom."  Mother told Clements that she said "No, I don't do that," to which Daughter replied "Well, my dad does."  Mother told Clements that on one prior occasion, Daughter had grabbed the genital area of Mother's 14-year-old son. Mother also said that Daughter would often return from a visit with Torres and scream and beg not to go with him again.  Finally, Mother told Clements that Torres had not contacted her or Daughter since she reported Daughter's claims to DSS.

Clements then viewed the video of the forensic interview.  Her investigative report contains a summary of Daughter's statement in the video.  Daughter reported that she was 5 years old, that her parents were divorced, and that she lived mostly with her mother and siblings.  The interviewer asked Daughter if she knew why she was there, and Daughter replied "Because I have to tell you something… My dad begs me to touch his private parts, and I don't want to."  Daughter said that he sometimes made her touch his "front" and sometimes made her touch his "back."  The interviewer had Daughter identify male and female genital anatomy

on diagrams.  The interviewer asked about the last time she touched her father's penis and she said it had happened when she was four years old and that her father "begs" her to let him touch her privates.  Daughter said that her father made her touch his penis with a tissue,  that she had to "clean down there," and that she had to touch his buttocks with a washcloth.  When asked, Daughter reported that her father only touched her privates when he was cleaning her.  At this point, the interviewer took a break and left the room. While she was gone, Daughter drew pictures.  She later told the interviewer that the pictures were of her father's penis with pee coming out, her fathers "butt," her mother's "pee-pee" [vagina], and her mother's "butt."  When asked, Daughter said that her father says "yes" when she touches his penis "because he likes it."  Daughter reported that this happens in the living room and that her father makes her "clean it when he pees."  Finally, Daughter said that her father told her not to tell her mother.

Clements did not arrest Torres then.  Rather, Clements called Torres and left voicemails.  When Torres returned her call, Clements asked him to come to the police department to answer questions about the child abuse allegations.  Torres replied that Clements would have to go through his attorney.  Clements and the attorney exchanged "several missed calls."  On February 23, 2015, Clements entered a wanted for Torres with a charge of statutory sodomy.

On April 1, 2015, St. Louis County Police Officer Scott Leible ran a computer check which revealed a wanted for Torres and provided his address. Leible went to the address at 11:00 a.m., found Torres with his son in the garage fixing a bicycle, notified Torres of the outstanding wanted, and arrested Torres.[3] Clements, who was not on duty at the time, was notified that Torres was in custody around 11:30 a.m.  Clements was scheduled to begin her duty at 4:30 p.m.  At 4:30 p.m., she would not have had time to apply for a warrant with the Prosecuting Attorney's office that day.

Torres, who had initially been taken to the Affton precinct, was booked into the County Justice Center at 4:54 p.m.  Clements attempted to interview Torres that night, at 8:45 p.m.  Torres invoked his right to silence and right to counsel. Torres was held overnight at the Justice Center.

At 10:00 a.m. the next morning, Clements went to the St. Louis County Prosecuting Attorney's Office to present her case against Torres.  Because Torres was being held, Clements was "bumped up" to speak to the prosecutor  sooner. Around 11:00 a.m., the Prosecutor denied Clement's request for a warrant application.  Torres was released from custody at around 11:55 or noon on April 2, 2015.  In total, Torres was in custody between 24 and 25 hours.

---

[3] Defendants argue that Torres was arrested after his son's mother had come to pick the son up and after Leible contacted Clements.  This dispute is ultimately immaterial.

The parties agree that Clements did not have a grudge against, malice toward, or any emotional connection regarding Torres.

## Discussion

Plaintiffs claim that Defendants violated their Fourth, Fifth, and Fourteenth Amendment rights.  In addition to Plaintiffs' claims against individual officers, Plaintiffs also claim that St. Louis County and Police Chief Jon Belmar, in his official capacity, are liable for the alleged violations.  Plaintiffs' First Amended Complaint ("FAC") contains three counts.  Plaintiffs seek class certification.

Count I alleges that Furlow's and Torres' Fourth Amendment rights were violated when Officers Walsh and Clements, respectively, issued wanteds for their arrest without probable cause, and without seeking a judicial determination of probable cause.  Count I further alleges that Plaintiffs' Fourth Amendment rights were violated when they were arrested pursuant to wanteds by officers who were without warrants and who had no knowledge of the probable cause on which the issuing officers based the wanteds.  Further, Plaintiffs allege a Fourth Amendment violation when Defendants detained them without seeking a judicial determination of probable cause.

Count II alleges that Defendants (excluding Officer Partin) retaliated against Plaintiffs based on Plaintiffs' invocation of their rights to silence and rights to have

counsel during questioning as guaranteed by the Fifth Amendment.  Plaintiffs
claim that the retaliation was in the form of prolonged detention.

Count III alleges that Defendants deprived them of the liberty interests of
freedom of movement and freedom to conduct their daily lives without fear, as
well as their interest in not being classified stigmatically as a person who is subject
to summary arrest and detention.  Defendants allege that they were deprived of
these interests without due process or procedure with which to challenge the
wanteds issued against them, thereby violating the Fourteenth Amendment right to
due process.

Plaintiffs moved for partial summary judgment as to Count I only.
Defendants moved for summary judgment on all Counts.   The Court addresses the
wholly[4] dispositive motion first.

**Summary Judgment Standard**

The Court may grant a motion for summary judgment if the movant shows
that there is no genuine dispute as to any material fact and that the moving party is
entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v.*
*Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The
substantive law determines which facts are critical and which are irrelevant.  Only
disputes over facts that might affect the outcome will properly preclude summary

---

[4] Defendants' motion for summary judgment is dispositive of all claims, excepting of course
those concerning Plaintiff Harold Liner and Defendants John Doe 1-2.

judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.*

A moving party always bears the burden of informing the Court of the basis of its motion.  *Celotex,* 477 U.S. at 323.  Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the mere existence of some alleged factual dispute.  *Anderson,* 477 U.S. at 247.  The nonmoving party may not rest upon mere allegations or denials of its pleadings.  *Anderson,* 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor.  *Anderson,* 477 U.S. at 255.  The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Id.* at 249.

In order to survive a motion for summary judgment, "the nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'"  *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (*quoting Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003)) (internal quotation omitted).

**Qualified Immunity**

The threshold inquiry is whether the Defendants being sued in their

individual capacities, Walsh, Clements, and Partin, are immune from suit under the

doctrine of Qualified Immunity.

"The doctrine of qualified immunity protects government officials 'from

liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172

L.Ed.2d 565 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.

2727, 73 L.Ed.2d 396 (1982)).  "Qualified immunity gives government officials

breathing room to make reasonable but mistaken judgments, and protects all but

the plainly incompetent or those who knowingly violate the law." *Messerschmidt*

*v. Millender*, 565 U.S. 535, 546, 132 S. Ct. 1235, 1244, 182 L. Ed. 2d 47 (2012)

(*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S.Ct. 2074, 2085, 179

L.Ed.2d 1149 (2011)) (internal quotations omitted).  "The entitlement is an

*immunity from suit* rather than a mere defense to liability . . . it is effectively lost if

a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511,

526, 105 S. Ct. 2806 , 86 L. Ed. 2d 411 (1985) (emphasis in original).

**Municipal and Governmental Entity Liability**

A suit against a governmental actor in his official capacity is treated as a suit against the governmental entity itself.  *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007) (*quoting Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)).  Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise.  *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91 (1978); *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388–89 (1989).

A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Ware v. Jackson Cnty., Mo.,* 150 F.3d 873, 880 (8th Cir.1998) (internal quotation marks and citation omitted). "[I]n order to state a viable § 1983 claim . . . plaintiff is required to plead facts sufficient to show at least an inference that his constitutional rights were violated as a result of action taken pursuant to an official policy, or as a result of misconduct so pervasive among non-policymakers as to constitute a widespread custom and practice with the force of law." *Davis v. St. Louis County, Mo.,* 2015 WL 758218, at *12 (E.D.Mo. Feb. 23, 2015) (citation omitted).

**Analysis**

16

**Count I against Walsh and Clements: Probable Cause**

Each Plaintiff was subject to a warrantless arrest.  The question, therefore, is whether those arrests violated the Fourth Amendment.

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'"  *Gilmore v. City of Minneapolis*, 837 F.3d 827, 832 (8th Cir. 2016) (*quoting Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)) (internal citations omitted).  "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based on probable cause if the mistake is objectively reasonable." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 474 (8th Cir. 2010) (*quoting Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

"Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." *Duhe v. City of Little Rock*, 902 F.3d 858 (8th Cir. 2018) (*quoting Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir 1999).  "[P]robable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462

U.S. 213, 232 (1983). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 175 (1949) (internal quotation omitted). "Whether probable cause existed at the time of the arrest is a question of law for the court." *Duhe v. City of Little Rock*, 902 F.3d 858 (8th Cir. 2018) (*quoting Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010).

For its determination as to whether arguable probable cause existed, the Court relies heavily on record investigative reports. The SLCPD investigative reports from each incident, written contemporaneously by the Defendant officers, go to the heart of the probable cause issue: that is, what the Defendant officer knew at the time that he or she issued the wanted. Moreover, the contents of the investigative reports are undisputed as representative of what the Defendant officers heard, observed, and believed at the time they issued the wanted.

In issuing a wanted against Furlow for allegedly assaulting and stealing the phone of Janet Virgin, Partin relied on the statements of Virgin herself and a 16-year-old neighbor who said he witnessed the altercation between Furlow and Virgin. The 16-year-old witness said that he did not see who started the altercation, but he did say that he saw Furlow take a phone from Virgin. Partin also spoke on the phone with Furlow and noted that Furlow changed his account of the incident, first saying that he did not see anyone fighting, and then saying that

he saw a fight and tried to break it up.  These statements, taken together and with other circumstances, such as the fact that Furlow had left the scene within the three minutes it took for Partin to arrive on the scene provided enough for a finding of probable cause.

Plaintiffs argue that Partin should not have relied on the 16-year-old witness in finding probable cause because the witness was of unknown credibility and a minor.  This argument is not well taken and spurious in tenor.  It is wholly reasonable to believe that an average sixteen-year-old can provide accurate, competent information about an event he has just seen.

Plaintiffs also claim that Partin should have but did not interview a taxi driver at the scene.  "[L]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as 'law enforcement would not be unduly hampered...if the agents...wait to obtain more facts before seeking to arrest.'"  *Kuehl v. Burtis*, 173 F.3d 646, 651 (8th Cir.1999) (quoting *United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir.1987)).  A police officer "need not conduct a 'mini-trial before making an arrest, but probable cause does not exist when a minimal further investigation would have exonerated the suspect."  *Id*. (quotation marks and citation omitted).

In his deposition, Partin claimed that he had trouble understanding the driver, while Furlow claims that the driver was always understandable.  This argument does not preclude a finding of summary judgment in favor of Partin. There is no indication or allegation that the driver's statement would have exonerated Furlow.  In fact, Furlow testified that he told his son to stay inside until the cab taking him to school arrived, and then left home.  It does not follow that the taxi driver, who arrived after Furlow left home, could have witnessed the incident between Furlow and Virgin.  Partin had probable cause to believe Furlow assaulted Virgin and took her phone.

In issuing a wanted against Furlow for allegedly assaulting his wife, Latoya, Walsh relied on Latoya's statements, her emotional state, and the presence of a loaded gun in the Furlow home.  Latoya told Walsh that, while screaming and cursing at her, Furlow smacked her, knocked her to the ground, stomped on her legs, and dragged her by her hair.  Partin observed that Latoya was "angry, crying, fearful, afraid and nervous."  In a domestic violence situation such as this, where Partin has no reason to believe Latoya was lying or being coerced, her specific, credible statements and heightened emotional state are enough to warrant a finding of arguable probable cause.

Partin also found a fully loaded firearm in the home.  Plaintiff's claim that the firearm and the fact that Latoya bought the firearm in her name because Furlow

was on probation are immaterial facts.  The Court disagrees.  Probable cause is

based on the totality of the circumstances.  While the gun may not be a direct

indication of domestic violence, the circumstances of its purchase and the presence

of a loaded, deadly weapon in the home could reasonably lead Partin to at least

believe that Latoya was not fabricating her allegations, and was actually in fear of

her husband.

Latoya did recant her statement the next day, over the phone, and claimed

she was not being coerced to do so.  Walsh did not cancel the wanted.  Walsh

testified that based on her statement and demeanor the previous day, Latoya's

recantation seemed "odd" to Walsh.  Walsh also testified that Latoya was speaking

at a fast pace and she seemed anxious and agitated.  Plaintiffs claim that Walsh's

interpretation are not facts and are unsupported by documentary evidence.  While

that may be true, the issue here is probable cause, the existence of which relies on

the reasonable conclusions officers make based on their reasonable beliefs and the

totality of the circumstances.  Here, Walsh concluded, based on Latoya's demeanor

on the phone, that her recantation was not genuine.  Arguable probable cause did

not cease to exist based on Latoya's recantation.

In issuing a wanted against Torres for allegedly abusing his minor daughter,

Clements relied on the statement of Mother and the video of the DSS interview of

Daughter.  Plaintiffs do not seem to argue that the Mother's statements and the

video interview do not support a probable cause finding.  Rather, Plaintiffs argue that because Clements did not meet Mother to assess her credibility in person or communicate with DSS staff while investigating the allegations, probable cause did not exist.  Indeed, unbeknownst to Clements, DSS had closed its investigation two days prior to Torres' arrest, and Mother would later be found to have fabricated allegations about Torres.[5]

In determining whether a Fourth Amendment violation occurred, "Courts must not judge officers with the 20/20 vision of hindsight." *City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1777, 191 L. Ed. 2d 856 (2015). Unlike most cases in which Clements would be involved from the beginning and attend the initial DSS interview of an alleged child victim, in this case, Clements could not attend the interview because SLCPD officers were working 12 hour shifts in response to civil unrest.  Rather, Clements called Mother and viewed the video of the interview well after the initial allegations to DSS.  It is not alleged what, if anything, about an in-person interview with Mother would have led Clements to believe she was not credible.  Clements noted nothing incredible about Mother's statements over the phone.  When Clements issued the wanted, DSS had not yet closed the case against Torres.  While Clements testified that she typically communicates with DSS staff concerning allegations, she did not in this case, and

---

[5] So found by Judge Thomas J. Frawley of the Circuit Court of the City of St. Louis.

had no knowledge of the disposition of Torres' case at DSS.  It is very unfortunate that Torres was subjected to arrest and detention for horrific, but false, allegations. Still, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 565 U.S. at 546.  Clements' missteps do not rise to those levels.  Clements had probable cause, attempted to get Torres' side of the story, and issued a wanted when she could not.  Neither Clements nor Torres or his attorney attempted to resolve the matter between the day the wanted was issued and the day he was arrested, over a month later.  This is not plain incompetence.  There is no evidence that Clements intended to leave Torres' arrest warrant out for two days after DSS closed the case, so as to pick him up despite a lack of probable cause.  Clements is entitled to qualified immunity.

Plaintiffs also argue that in general, warrantless arrests pursuant to a wanted are illegal when effectuated by an officer who does not have any knowledge of the grounds on which the issuing officer found probable cause.

In *United States v. Hensley*, 469 U.S. 221, 232 (1985) , the Supreme Court addressed the legality of an investigatory *Terry* stop when the police officer is relying upon a "wanted flyer," or notice from another police department, that a person is wanted in connection with the investigation of a crime.  "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a  reasonable suspicion that the wanted person has committed an offense, then reliance on that

flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information." *Hensley*, 469 U.S. at 232 (internal citations omitted), *accord United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011).

A flyer based on reasonable suspicion is sufficient to justify a *Terry* stop even if the flyer omits the specific articulable facts supporting that reasonable suspicion. It follows that a wanted based on probable cause that a subject committed some offense is sufficient to support a warrantless arrest for that offense, even though the wanted lacks a description of the circumstances and facts supporting probable cause. *See United States v. Holloman*, 2018 WL 1166557, at *2 (E.D. Mo. Mar. 6, 2018) ("The 'wanted' could only justify their detaining Holloman for the purpose for which it was issued—allowing the sex crimes Detective to interview him."). Here, there is no Fourth Amendment violation because the wanteds in question were based on probable cause.

It is also noted that in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, they claim summary judgment is not appropriate because Defendants have not shown that Torres was arrested outside the curtilage of his home and "Officer Leible violated Mr. Torres' right to be free from warrantless arrest within his home." This alleged violation is not pled in the FAC. Officer Leible is not a party to this action. Therefore, an individual claim

24

for this alleged violation does not exist in this case.  Moreover, Plaintiffs do not argue that there is a question of fact as to whether there is a policy, practice or custom of arresting subjects in the curtilage of their homes, so there is no claim against SLCPD or Chief Belmar.  *See Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690–91 (1978).  Summary judgment is not barred by the purported issue of Torres' arrest "within his home."

Defendants Walsh and Clements are entitled to summary judgment as to Count I of the FAC.

### Count II against Walsh and Clements: Fifth Amendment Claims

Furlow and Torres claim that Defendants violated their Fifth Amendment rights by issuing retaliatory wanteds, and detaining them pursuant to these wanteds, after they invoked their right to silence and right to have counsel present during questioning while on the phone with Defendant officers.  However, Plaintiffs fail to create a question of fact as to whether they actually invoked these rights.  Plaintiffs offer no law to support their contention that the Fifth Amendment may be invoked, sight unseen, on a telephone call with a law enforcement officer.  As argued by Defendants, an officer cannot be sure to whom he is speaking when on the phone, rendering a purported invocation of rights meaningless, and resulting in no constitutional violation.

Plaintiffs also allege retaliation for properly invoking their right to silence and right to have counsel present during questioning once they had been arrested and were in custody pursuant to the wanteds.  Furlow and Torres claim that as a result of these invocations, Defendants Walsh and Clements, respectively, held them in custody as retaliation with their times in detention exceeding the maximum 24 hours allowed by §544.170 RSMo.

Contrary to Plaintiffs' retaliation claims, Defendants say that Furlow was held in custody pursuant to an SLCPD policy that requires those accused of domestic violence to be held for 24 hours.  The parties agree that the SLCPD has such policy, though it seems to be unwritten.  The parties also agree that Walsh believes he followed all policies in his dealings with Furlow.  The issue of mandatory or minimum holds of people accused of domestic violence has not yet been addressed by the Supreme Court or the Eighth Circuit.  The purported right to be free from a domestic violence hold is not clearly established.  It would certainly not be clear to a reasonable officer who by all accounts was acting in accordance with SLCPD policy.  Walsh is entitled to qualified immunity on this claim.  As to the fact that Furlow was held for 24 hours and 28 minutes, Walsh is not alleged to have had control over Furlow's detention outside of the general directive to hold Furlow for 24 hours.  Walsh is not liable for the 28 minute statutory overage.

Contrary to Plaintiffs' retaliation claims, Defendants say that Torres was held overnight only because it was too late to go to the prosecuting attorney's office to apply for a warrant at the time that Clements came on duty.  Clements applied for a warrant the next morning, before she was scheduled to work.  The warrant request was denied, and Torres was released soon after, though more than 24 hours after his arrest.

In *County of Riverside v. McLaughlin*, the Supreme Court set forth boundaries on detention pending a probable cause determination:

> This is not to say that the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

500 U.S. 44, 56–57, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49 (1991).  Here, every delay in seeking a probable cause determination for Torres was based on reasonable, unavoidable delays.  Plaintiffs agree that Clements harbored no ill-will against Torres.  There is no allegation that Clements delayed Torres' detention by

seeking additional information to justify Torres' arrest.  Like Walsh, there is no evidence that Clements instructed the Justice Center officers and employees to hold Torres longer than 24 hours.  Walsh is entitled to qualified immunity on Torres' Fifth Amendment retaliation claim.

Defendants Walsh and Clements are entitled to summary judgment as to Count II of the FAC.

### Count III against Partin, Walsh , and Clements: Due Process

Plaintiffs also claim that Defendants, by issuing wanteds for their arrests, deprived Plaintiffs of liberty interests including freedom of movement and freedom to conduct their daily lives without fear.  Plaintiffs also claim that being the subject of wanteds subjected them to classification and stigma as a person who is subject to summary arrest and detention.  This claim is not well-founded.  Plaintiffs present no evidence of an actual harm.  Additionally, Plaintiffs could not fear a deprivation of liberty where no liberty existed, i.e. they were not free from the threat of arrest because there was probable cause to arrest them.  To the extent that there was a likely lack of probable cause to arrest Torres for the two days prior to his arrest, Clements is entitled to qualified immunity.  Individual Defendants Walsh, Partin, and Clements are entitled to summary judgment as to Count III of the FAC.

### All Counts, as to Defendants Belmar and St. Louis County

Plaintiffs name Defendants St. Louis County and SLCPD Chief Belmar, in his official capacity, in all three counts of the FAC.  Because Plaintiffs have failed to overcome summary judgment on their claims against the individual SLCPD defendants, Plaintiffs cannot satisfy their burden of establishing municipal liability or liability of the governmental entity.  *Brockinton v. City of Sherwood, Ark*, 503 F.3d 667, 674 (8th Cir. 2007).  Delmar and the County are entitled to summary judgment as to the claims of Furlow and Torres.

**Plaintiffs' Motions**

As none of Furlow's or Torres' claims survive this motion for summary judgment, Plaintiffs' motion for class certification is denied without prejudice at this time, pending the outcome of Liner's claims.

Similarly, Plaintiffs motion for partial summary judgment is denied without prejudice at this time, pending the outcome of Liner's claims.

## Conclusion

The record before the Court establishes that the individual Defendants are entitled qualified immunity from suit.  Plaintiffs have failed to establish that immunity does not apply.  As such, the Chief Belmar and St. Louis County Defendants are also entitled to summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment, [Doc. No. 77], is **GRANTED**.

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, [Doc. No. 84], is **DENIED** except as to Liner.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Certify Class, [Doc. No. 80], is **DENIED** at this time.

A separate judgment will be entered upon the disposition of the remaining issues herein.

Dated this 30th  day of September, 2018.


_____

HENRY EDWARD AUTREY

UNITED STATES DISTRICT JUDGE