**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

Michael E. Gans
*Clerk of Court*

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

November 01, 2022

Mr. Eric Alan Stone
PAUL & WEISS
1285 Avenue of the Americas
New York, NY  10019-6064

RE:  21-2640  Dwayne Furlow, et al v. Jon Belmar, et al

Dear Counsel:

The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion.

Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

Michael E. Gans
Clerk of Court

CNL

Enclosure(s)

cc:    Ms. Ameya Sita Ananth
       Mr. Nathaniel R. Carroll
       Mr. Jay Cohen
       Mr. Omar Ahmed Farah
       Mr. Angelo R. Guisado
       Ms. Maureen Hanlon
       Mr. Thomas B. Harvey
       Mr. Gregory J. Linhares
       Ms. Laura M. Robb
       Mr. Blake A. Strode

District Court/Agency Case Number(s):   4:16-cv-00254-HEA

**United States Court of Appeals**
*For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
**St. Louis, Missouri 63102**

**Michael E. Gans**
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

November 01, 2022

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

RE:  21-2640  Dwayne Furlow, et al v. Jon Belmar, et al

Dear Sir or Madam:

A published opinion was filed today in the above case.

Counsel who presented argument on behalf of the appellants and appeared on the appellants' brief was Eric Alan Stone, of New York, NY. The following attorneys appeared on the appellant brief; Nathaniel R. Carroll, of Saint Louis, MO., Blake A. Strode, of Saint Louis, MO., Maureen Hanlon, of Saint Louis, MO., Ameya Sita Ananth, of New York, NY., Angelo R. Guisado, of New York, NY., Omar Ahmed Farah, of New York, NY., and Baher Azmy, of New York, NY.

Counsel who presented argument on behalf of the appellees and appeared on the appellees' brief was Frank James Smith, Jr., of Saint Charles, MO., formerly of Clayton, MO.

The judge who heard the case in the district court was Honorable Henry Edward Autrey. The judgment of the district court was entered on June 23, 2021.

If you have any questions concerning this case, please call this office.

Michael E. Gans
Clerk of Court

CNL

Enclosure(s)

cc:  MO Lawyers Weekly

District Court/Agency Case Number(s):  4:16-cv-00254-HEA

# United States Court of Appeals

## For the Eighth Circuit

_____

No. 21-2640

_____

Dwayne Furlow, individually and on behalf of all others similarly situated; Ralph Torres

*Plaintiffs - Appellants*

Michael Gunn, Personal Representative of the Estate of Howard Liner, Deceased

*Plaintiff*

v.

Jon Belmar; County of St. Louis, Missouri; Kevin Walsh, St. Louis County Police Officer, Badge #4068; Christopher Partin; Laura Clements, Detective, St. Louis County Police Department

*Defendants - Appellees*

Ed Schlueter, St. Louis County Police Department; John Does, 1-20, St. Louis County Police Department

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 13, 2022
Filed: November 1, 2022

_____

Before SHEPHERD, ERICKSON, and STRAS, Circuit Judges.

_____

ERICKSON, Circuit Judge.

The St. Louis County Police Department ("SLCPD") in Missouri utilizes what it calls a "Wanteds System."  This system allows officers to issue electronic notices ("Wanteds") authorizing any other officer to seize a person and take him into custody for questioning without any review by a neutral magistrate before issuance.  The Wanteds may pend for days, months, or, in some cases, indefinitely.  Because of the problems created by these Wanteds, we reverse in part, affirm in part, and remand for further proceedings.

## I.     BACKGROUND

### 1.     The Wanteds System

While Wanteds have the practical impact of authorizing the seizure, arrest, and custodial interrogation of a person at a remote location, they are not arrest warrants.  According to documents from the St. Louis County Police Department ("SLCPD"), a Wanted is a law enforcement officer's system-wide notice that the subject is wanted for questioning by an officer, although no warrant is associated with the subject's record.  The SLCPD defines a "warrant" as a judicially signed "official Court Order requesting the person be presented in court."

To issue a Wanted, an SLCPD officer, without any judicial oversight, concludes that probable cause exists to believe that the subject "has committed a crime."[1]  Armed with this independent conclusion, the officer notifies a computer clerk (known as a "CARE operator"), who enters the Wanted in the Regional Justice

---

[1]In 2010, the SLCPD's written policies for issuing a Wanted did not explicitly require officers to make a finding of probable cause prior to issuing a Wanted.  See St. Louis County Police Department, Office of the Chief of Police, Departmental General Order 10-37 (Dec. 22, 2010).

-2-

Information System ("REJIS") database.  To have the Wanted entered into the system, the SLCPD officer need only identify the target's name, physical descriptors, personal data, address, charges being investigated, and the issuing officer's name and contact information.  If all is in order, the Wanted is entered into the REJIS database.  The CARE operator is wholly without information to assess the existence of probable cause to issue the Wanted.

On September 14, 2016, while this lawsuit was pending, the SLCPD added a new requirement that a supervising SLCPD officer must approve the Wanted before it may be entered into the system.  The policy states that the supervising officer or his designee must review the facts supporting the initial officer's determination of probable cause.  The Wanted displayed to and reviewed by the arresting officer does not include an affidavit or a statement setting forth the issuing officer's observations, inferences, and conclusions that supported his independent probable cause determination.  Once the Wanted is entered into the REJIS database, it is available to most law enforcement agencies in St. Louis County and the surrounding counties in Missouri and Illinois.  If the identified charge is a felony, the Wanted may also be available nationally through the National Crime Information Center ("NCIC") database as a "Temporary Wanted."  Temporary Wanteds entered into the NCIC system or Missouri's Uniform Law Enforcement System automatically expire after 48 hours.

A Wanted in the REJIS database may be active anywhere from six months to indefinitely.  Wanteds for misdemeanants remain active for a year, although the Wanted will be removed if (1) the suspect is arrested; (2) the statute of limitations is less than one year; or (3) the Wanted is cancelled.  Suspects of non-Class A felonies may have an active Wanted outstanding for up to three years unless (1) the target is arrested; (2) the statute of limitations runs; or (3) the Wanted is cancelled.  Wanteds for Class A suspected felons remain active in the REJIS database until they are removed by the agency or the suspect is arrested.  Under the existing system, no process exists to quash or challenge a Wanted even though Wanteds may remain active for years.

-3-

The genesis of the Wanteds System appears to lie in the St. Louis County Prosecuting Attorney's Office (the "PAO"), which "requires a complete investigation" prior to submitting an arrest warrant application to a judge. This "complete investigation," according to the PAO, requires an SLCPD officer to interview all suspects involved in the alleged crime before submitting the warrant application. The Wanted is a tool to help officers comply with the PAO's interview requirement. The SLCPD admits that Wanteds authorize any officer to arrest a suspect. This system has been in place for over 20 years, even though the U.S. Department of Justice recommended in 2015 that the Ferguson Police Department discontinue its use of a similar "wanteds" system.

From February 2011 until December 2016, the SLCPD issued approximately 15,000 Wanteds but only made about 2,500 formal arrests (i.e., roughly 17% of Wanteds resulted in arrests). The record does not reflect how many of those Wanteds resulted in arrest warrants or criminal convictions. Nor does it allow us to determine how many people were "informally" arrested or detained pursuant to Wanteds.

## 2. The Individual Plaintiffs[2]

### A. *Dwayne Furlow*

Dwayne Furlow had two Wanteds issued for his arrest. On November 11, 2015, SLCPD Officer Christopher Partin and another officer were dispatched to the home of Furlow's neighbor. Furlow was not present when the officers arrived. The neighbor reported that Furlow forcefully took her phone and struck her in the head after she tried to record a fight between their sons. Officer Partin canvassed the neighborhood for witnesses, eventually speaking to a 16-year-old neighbor who said he observed the altercation involving Furlow. The 16-year-old told Officer Partin that he did not see who started the fight, but he did see Furlow take the phone from

---

[2]A third plaintiff, Howard Liner, passed away before trial and his estate settled his claims. His claims are not before us.

-4-

the neighbor.  While Officer Partin was conducting his investigation at the scene, one of Furlow's children handed a cell phone to him.  Furlow was on the phone. Officer Partin asked Furlow to return home for questioning, but Furlow refused. Officer Partin told Furlow that refusal to return for questioning would result in the issuance of a Wanted.  Later that day, Officer Partin issued the Wanted.  The Wanted was cancelled about a month later, on December 12, 2015, when Furlow and his counsel appeared at the St. Louis County Justice Center in Clayton, Missouri, and Officer Partin issued a summons to Furlow for the alleged assault and larceny.

The following month, on January 25, 2016, SLCPD Officer Kevin Walsh responded to a 911 call at Furlow's home for a suspected domestic assault.  Furlow was not present when Officer Walsh arrived.  Officer Walsh found Latoya Furlow (Furlow's wife), who claimed she had been assaulted by Furlow.  Officer Walsh's report included Latoya's claims that Furlow knocked her to the ground, dragged her by the hair, and then drove away as she was calling the police.  Officer Walsh perceived Latoya to be angry, nervous, and fearful, but did not note in his report any bruising or evidence of other physical harm on Latoya.

Meanwhile, Officer Partin searched the residence for Furlow.  While in the residence, he observed a fully-loaded AR-15 in plain view.  Latoya claimed she owned the rifle, explaining that she had purchased it because Furlow was on probation.  When Officer Walsh spoke to Furlow on the phone and told him about the investigation, Furlow reportedly informed Officer Walsh that he would not turn himself in for fear of being incarcerated.  Officer Walsh advised Furlow that he would issue a Wanted for domestic assault in the third degree and domestic peace disturbance.  Officer Walsh then entered the Wanted.  The next day, Latoya called Officer Walsh and recanted her statements.  Officer Walsh asked her to come to the precinct to give a written statement, but she never showed up to retract her statement.

On January 28, 2016, Furlow was stopped for a traffic violation and was ultimately arrested on the outstanding Wanted.  Furlow was held for 24 hours and

-5-

28 minutes despite SLCPD's policy of holding suspects of domestic violence for no more than 24 hours.  No warrant was ever issued.

### B.    Ralph Torres

On December 16, 2014, Detective Laura Clements of the SLCPD Child Abuse Unit began an investigation into Ralph Torres.  Torres' ex-wife had previously filed a report with the Department of Social Services-Children's Division ("DSS") reporting that Torres had sexually abused his minor daughter.  While DSS was continuing its investigation of Torres, Detective Clements conducted a parallel investigation unsuccessfully attempting to speak with Torres who directed Detective Clements to talk to his attorney.  When efforts to contact Torres' attorney proved unsuccessful, Detective Clements issued a Wanted for Torres on February 23, 2015, more than two months after the first complaint.  On March 30, 2015, DSS completed its investigation, which was closed based on a finding of insufficient evidence.  A state court later found that the allegations were fabricated by the child's mother.  Detective Clements was unaware that the investigation had concluded, so Torres' Wanted remained active.

On April 1, 2015, SLCPD Officer Scott Leible was on patrol in the vicinity of Torres' house and discovered Torres' outstanding Wanted.  Officer Leible arrested Torres at his house.  There is no evidence that Torres was involved in criminal activity at the time of arrest or that Officer Leible had any evidence that would support a finding of probable cause.  Torres was detained and held for questioning.  When Detective Clements came on duty later that afternoon he attempted to speak with Torres, but Torres invoked his Fifth Amendment rights to remain silent and to obtain counsel.  The next morning, Detective Clements asked the PAO for approval to file a warrant application.  The PAO denied the request.  Torres was released after being held in custody between 24 and 25 hours.  At no time during Torres' detention did Detective Clements contact DSS.  No warrant was ever issued authorizing Torres' arrest or detention.

-6-

### 3.    Procedural Posture

On February 24, 2016, Furlow commenced this putative class action under 42 U.S.C. § 1983 on behalf of himself and all others similarly situated.  Furlow's First Amended Class Action Complaint added Torres and Howard Liner as individual plaintiffs and putative class representatives.  The operative complaint alleges that SLCPD Chief of Police Jon Belmar, in his official capacity, the County of St. Louis, Missouri, and Officer Christopher Partin, Officer Kevin Walsh, and Detective Laura Clements, in their individual capacities, violated the plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights.  The defendants (collectively, the "Officers") moved for summary judgment and Furlow and Torres cross-moved for partial summary judgment.  The district court granted the Officers' motion, denied the plaintiffs' motions, and denied the plaintiffs' motion for class certification.  Furlow and Torres appeal.

## II.    DISCUSSION

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party.  Leftwich ex rel. Leftwich v. Cnty. of Dakota, 9 F.4th 966, 972 (8th Cir. 2021); see MacKintrush v. Pulaski Cnty. Sheriff's Dep't, 987 F.3d 767, 769 (8th Cir. 2021) (applying the same standard of review to the denial of summary judgment when officers assert the defense of qualified immunity).  We will affirm the district court if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

While Furlow and Torres raise several issues on appeal, this case primarily turns on a single question: does the SLCPD's Wanteds System violate the Constitution?  We conclude it depends on the circumstances.  Because circumstances may exist under which the Wanteds System does not run afoul of the Constitution, the plaintiffs' facial challenge to the system fails.  See United States v. Salerno, 481

U.S. 739, 745 (1987) (noting that a party bringing a facial challenge "must establish that no set of circumstances exists under which the [a]ct would be valid").

### 1.     The Wanteds System Does Not Always Lack the Reasonableness Required by the Fourth Amendment

The Fourth Amendment to the United States Constitution provides in relevant part: "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons . . . to be seized."  U.S. Const. amend. IV.  "[T]he ultimate touchstone of the Fourth Amendment is reasonableness."  Lange v. California, 594 U.S. ____, 141 S. Ct. 2011, 2017 (2021) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). Being taken into custody for questioning or formally arrested is a "seizure" under the Fourth Amendment.  See Torres v. Madrid, 592 U.S. ____, 141 S. Ct. 989, 995 (2021) ("The seizure of a person can take the form of physical force or a show of authority that in some way restrains the liberty of the person.") (cleaned up); United States v. Ferguson, 970 F.3d 895, 901 (8th Cir. 2020) (discussing factors indicating there has been a restriction on a person's freedom rendering him in custody—a *de facto* arrest—and subject to Miranda protections).  Subject to narrow exceptions, seizures are generally "'reasonable' only if based on probable cause to believe that the individual has committed a crime.  Bailey v. United States, 568 U.S. 186, 192 (2013) (quoting Dunaway v. New York, 442 U.S. 200, 213 (1979)).

Wanteds are more than a mere investigative tool because they authorize arrests, as is apparent by the facts in this case.  See United States v. Sandell, 27 F.4th 625, 628–29 (8th Cir. 2022) (recognizing *de facto* arrests).  While this Court has previously described Wanteds, see United States v. Smith, 648 F.3d 654, 656 n.2 (8th Cir. 2011); United States v. Kalter, 5 F.3d 1166, 1170 (8th Cir. 1993), we have yet to decide whether the SLCPD Wanteds policy comports with the Fourth Amendment.  The Supreme Court has interpreted the Constitution to permit reasonable seizures of persons under two general circumstances: (1) when the arrest

-8-

is effectuated pursuant to a judicially authorized arrest warrant supported by probable cause, see Gerstein v. Pugh, 420 U.S. 103, 112 (1975), or (2) a warrantless arrest based on the officer's determination of probable cause, such as a suspect who commits a crime in the officer's presence, see District of Columbia v. Wesby, 583 U.S. ____, 138 S. Ct. 577, 586 (2018). Warrants are the default rule to effect a reasonable arrest because they:

> [A]llow a neutral judicial officer to assess whether the police have probable cause to make an arrest . . . . [T]he placement of this checkpoint between the Government and the citizen implicitly acknowledges that an "officer engaged in the often competitive enterprise of ferreting out crime," may lack sufficient objectivity to weigh correctly the strength of the evidence supporting the contemplated action against the individual's interests in protecting his own liberty . . . .

Steagald v. United States, 451 U.S. 204, 212 (1981) (citation omitted); accord United States v. Jeffers, 342 U.S. 48, 51 (1951) (explaining the Fourth Amendment "merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended"). The Officers acknowledge that Wanteds are not warrants or supported by judicial process. As such, Wanteds must fall within an exception to the warrant requirement in order to survive scrutiny under the Constitution.

The Officers contend that because Wanteds are only entered when the issuing officer determines that probable cause to arrest exists, they are constitutionally reasonable. The Officers assert that one officer's determination of probable cause is all that is necessary to make a warrantless arrest by any law enforcement officer consistent with the Constitution. While an officer may arrest a suspect if he determines there is probable cause to arrest under some circumstances, such as the commission of a crime in the officer's presence or under the collective knowledge doctrine, the collective knowledge doctrine is not as elastic as the Officers contend. The collective knowledge doctrine imputes other officers' finding of probable cause to the arresting officer "[w]hen multiple officers are involved in an investigation"

-9-

and "as long as there is some degree of communication" among the officers. United States v. Robinson, 664 F.3d 701, 703 (8th Cir. 2011) (quoting United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011)). We have held that the officers need to be "functioning as a 'search team'" for the doctrine to apply. Id. at 704 (quoting United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir. 2001)).

The evidence here belies any claim that the Officers were acting as part of a team involved in an investigation. Rather, the Wanteds rested on a single officer's probable cause determination and authorized any officer to arrest the suspect. The evidence establishes that seizures pursuant to Wanteds occur following routine traffic stops conducted by officers who, by chance, search the Wanteds database (as demonstrated by Furlow) and when an officer happens to check for Wanteds in the area (as seems to be the case in Torres' seizure). Because the Wanteds System routinely imputes a single officer's finding of probable cause to officers potentially anywhere in the country—without any showing of a joint investigation—this Wanteds System cannot be saved under the collective knowledge doctrine.

We are unpersuaded by several other reasons offered by the Officers as to why a warrant is unnecessary and Wanteds are reasonable. The SLCPD's expression of doubt that a neutral magistrate will issue an arrest warrant unless officers speak with the suspect prior to making the warrant application defies logic. The only requirements for issuance of an arrest warrant are: (1) probable cause to believe a crime has been or is being committed, and (2) probable cause to believe the person to be arrested is the person who committed the crime. It necessarily follows that if a neutral magistrate declines to issue a warrant, then the officer's determination of probable cause is unsupported.

The Officers also suggest that seeking a warrant in every case in which a Wanted is issued would be inconvenient and unduly burdensome. The Officers offer no explanation as to why the vast majority of police agencies in the country function without resort to a "wanteds system" like the SLCPD's system. The claim that seeking a warrant is unduly burdensome is overstated. To enter a Wanted, the

-10-

issuing officer needs to know the suspect's name, physical description, some personal data, address, and alleged legal violation(s).  The officer is also required to make a probable cause determination.  The only apparent obstacles between an SLCPD officer issuing a Wanted and seeking a warrant are the additional requirements that the officer (1) write down his or her grounds for determining the existence of probable cause to arrest, and (2) present that information to a neutral judicial officer in the form of an application.  Absent some exigency or urgency threatening public safety, these steps are not unduly burdensome.  The Supreme Court has not enumerated an exception to the Fourth Amendment's warrant requirement based on the inconvenience of obtaining a warrant before proceeding with an arrest.  See United States v. Morgan, 743 F.2d 1158, 1162 (6th Cir. 1984); United States v. Gooch, 6 F.3d 673, 679 n.3 (9th Cir. 1993).

An argument has also been advanced that Wanteds are like a wanted poster or flyer.  In United States v. Hensley, 469 U.S. 221 (1985), a police department issued a "wanted flyer" for an alleged armed robber (Hensley) on the day it learned of his possible involvement in a felony aggravated robbery offense.  The flyer was sent to a neighboring police department and sought a stop for investigation only, not the arrest, of Hensley.  Id. at 223–24.  Six days had passed when an officer in the neighboring jurisdiction stopped Hensley based on the flyer and arrested him.  Id. at 223–25.  The Supreme Court found the traffic stop was constitutional because the officer who published the flyer had a "reasonable suspicion" of Hensley's criminal activity and the officer who stopped Hensley reasonably relied on the flyer to make the stop.  Id. at 233–35.  In other words, the flyer was sufficient to effectuate a Terry stop.  Id.  Hensley's arrest was permissible because the arresting officer discovered "additional weapons in Hensley's car during the course of a lawful search" that provided "probable cause to arrest Hensley . . . for possession of firearms."  Id. at 236.  In reaching this conclusion, the Supreme Court noted that if the arresting officer lacked independent probable cause to effectuate the arrest but still detained Hensley so that officers from the original jurisdiction could come and question him, then that detention "might well be so lengthy or intrusive as to exceed the permissible limits of a Terry stop."  Id. at 235.  The Supreme Court also suggested

-11-

that if Hensley's arrest had been based solely on the flyer, it likely would have violated the Fourth Amendment.  Id. at 235–36 (refusing to "endorse St. Bernard's request in its flyer for actions that could foreseeably violate the Fourth Amendment" and justifying the arrest on the basis of the weapons found in Hensley's car).  Hensley demonstrates that while a wanted flyer is sufficient to justify a Terry stop allowing an officer "to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information," id. at 232, it is insufficient to support an arrest or a *de facto* arrest unless there is a showing of probable cause, see id. at 233, 236.

Here, Wanteds are neither supported by a warrant nor do they relate any facts that provide the arresting officer with sufficient information to make a probable cause determination.  At most, the Wanted is like the flyer in Hensley and authorizes only a brief investigatory stop.  See id. at 232.  But even in the investigatory stop context, a Terry stop based on a Wanted is not always lawful.  See Davis v. Dawson, 33 F.4th 993, 998–99 (8th Cir. 2022) (noting "even a 45-minute detention can be too long" to be a "minimally-intrusive Terry stop" under certain circumstances).  Like the flyer in Hensley, Wanteds cannot provide a sufficient basis to justify the arrest and prolonged detention of a suspect under the Constitution.

That said, regardless of the reasons for the creation of SLCPD's Wanteds System or its continued purpose, arrests may be effectuated under this system that do not violate the Constitution.  Exceptions to the warrant requirement have been created to account for "the practical demands of effective criminal investigation and law enforcement."  Beck v. Ohio, 379 U.S. 89, 92 (1964) (citation omitted).  At their most basic level, these exceptions recognize that officers should not be forced to lose a suspect because of the time required to seek an arrest warrant.  See Virginia v. Moore, 553 U.S. 164, 171 (2008) (stating a warrantless arrest may be justified even if the suspect committed "a minor crime in [the officer's] presence"); Watson, 423 U.S. at 418 (discussing the common law rule of warrantless arrests, including where the suspect committed a misdemeanor or felony in the officer's presence); Carroll v. United States, 267 U.S. 132, 156 (1925) (noting an "officer may arrest without

-12-

warrant one believed by the officer upon reasonable cause to have been guilty of a felony").

The Wanteds System is broad enough to encompasses situations that do not violate the Constitution, including those involving an arrest immediately after an officer has entered a wanted, United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004) (exigent circumstances); circumstances involving evanescent evidence, see, e.g., Cupp v. Murphy, 412 U.S. 291, 296 (1973); and incidents involving a fleeing felon, see, e.g., Tennessee v. Garner, 471 U.S. 1, 12 (1985). Because of the existence of these constitutional applications, the plaintiffs' facial challenge to the Wanteds System fails. See Salerno, 481 U.S. at 745.

## 2. Qualified Immunity

Even if the Wanteds System provided a means for an officer to make an unconstitutional arrest, Officers Partin and Walsh may be shielded from civil liability under the doctrine of qualified immunity. See Morgan v. Robinson, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (stating "[q]ualified immunity shields officials from civil liability in § 1983 actions"). Qualified immunity provides "breathing room" for government officials "to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Cent. Specialties, Inc. v. Large, 18 F.4th 989, 997 (8th Cir. 2021) (quoting Morgan, 920 F.3d at 524), petition for cert. filed, (U.S. June 10, 2022) (No. 21-1552). The availability of qualified immunity depends on a two-step analysis: "First, did [the Officers'] actions violate a constitutional right? Second, was the right clearly established?" N.S. ex rel. Lee v. Kansas City Bd. of Police Comm'rs, 35 F.4th 1111, 1114 (8th Cir. 2022). "If the answer to either question is no," then the Officers are entitled to qualified immunity. Id.; see Just v. City of St. Louis, 7 F.4th 761, 766 (8th Cir. 2021) (noting a court "may begin [its] analysis at—and resolve [its] analysis on—either prong").

-13-

We turn our inquiry to the clearly established prong of the analysis.  A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Morgan, 920 F.3d at 523 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate," Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011), and that precedent needs to be "'particularized' to the facts of the case," Morgan, 920 F.3d at 524 (quoting White v. Pauly, 580 U.S. 73, 137 S. Ct. 548, 552 (2017)).  To be clearly established, there needs to be "prior cases [that] would have put a reasonable officer on notice." Williams v. City of Burlington, 27 F.4th 1346, 1352 (8th Cir. 2022) (quoting Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005)).

The old west-style "wanted" posters and reward notices may have once permitted warrantless arrests of suspects pursuant to notices like Wanteds, see Rachel Hall, Wanted: The Outlaw in American Visual Culture 2–3 (2009), but that practice lost its vitality in the twentieth century.  Since at least the 1970s, case law has established that a warrantless arrest prompted by a notice from one officer to another is unconstitutional unless: (1) the arresting officer is able to make an independent finding of probable cause, see Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568–69 (1971) (noting the arrest warrant lacked probable cause and the "arresting officer was not himself possessed of any factual data" to have probable cause to arrest), or (2) the arresting officer has been working closely with the officer who made the initial and valid probable cause determination (encompassing both hot pursuit/fleeing suspect cases and collective knowledge doctrine cases), see, e.g., United States v. Stratton, 453 F.2d 36, 37 (8th Cir. 1972); United States v. Heisman, 503 F.2d 1284, 1286–87, 1289–90 (8th Cir. 1974).

Despite those clear statements of law regarding warrantless arrests and notices of arrest, we are not free to ignore United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).  There, the St. Paul Police Department apparently had a department policy of

-14-

issuing "probable cause pickups" (i.e., warrantless arrest notices) for suspects.[3]  Id. at 1302–03.  An officer issued such a notice for Briley.  Id. at 1302.  The pickup notice was not supported by a warrant even though there was ample time to get a warrant and no exigent circumstances were present.  Id. at 1302–03.  All officers received the notice when they arrived for duty and two other officers later—who were not involved in issuing the pickup notice or part of a related investigation— arrested Briley.  Id. at 1303.  The Eighth Circuit upheld the arrest, concluding probable cause to arrest existed "based on the collective knowledge of all the officers involved."  Id. at 1305–06.  While many of the facts underlying Briley's arrest are unknown from the opinion, the facts as recited in Briley align closely with the circumstances here, leaving some doubt about whether the actions of Officers Partin and Walsh and Detective Clements violated clearly established law.  See Morgan, 920 F.3d at 523.  Given this doubt, we find Officers Partin and Walsh are entitled to qualified immunity under the clearly established prong.

Detective Clements' situation is different.  It is arguable that Detective Clements had probable cause to believe Torres committed a crime when she first issued the Wanted, but Torres' case later evolved.  By the time Torres was seized pursuant to the Wanted, Detective Clements should have known that probable cause had evaporated.  While the Wanted was pending, Detective Clements did not make herself aware of the investigation's development.  Although Detective Clements attempted to call Torres and his counsel prior to issuing the Wanted, she admitted that she never spoke to Torres about the allegations, she never interacted with a DSS employee after initiating the investigation, and she never attempted to visit Torres' home to discuss the case or execute the Wanted during the three-and-a-half months that the investigation was open.  Viewing the facts in a light most favorable to Torres, as we must at this stage of the proceedings, see Leftwich, 9 F.4th at 972, if Detective Clements had engaged in even "minimal further investigation," then she would have

---

[3]The Briley court noted there was insufficient evidence in the record to conclude that the police department was regularly making "warrantless in-the-home arrests," 726 F.2d at 1305, but it is apparent the department had at least an informal policy of issuing pickup notices for arrests outside the home, id. at 1302–03.

-15-

been aware that probable cause (or even arguable probable cause) had dissipated, leaving no continuing justification for the Wanted, Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (citation omitted).  Detective Clements is not entitled to qualified immunity under these circumstances.

Furlow and Torres also argue that Officers Partin and Walsh and Detective Clements are subject to liability for ordering their detentions.  We focus our analysis on Furlow's detention as a result of Officer Walsh's Wanted because Officer Partin's Wanted did not result in any detention.  We do not need to go into Torres' detention because his seizure was unlawful in the first instance.  See Manuel v. City of Joliet, 508 U.S. ____, 137 S. Ct. 911, 920 n.8 (2017) (noting that when "probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights").

Officer Walsh is entitled to qualified immunity because there was at least arguable probable cause to believe Furlow domestically assaulted Latoya and he was detained shortly after the alleged incident.  See Just, 7 F.4th at 767 (discussing arguable probable cause in the context of qualified immunity).  Officer Walsh noted that Latoya was fearful and anxious and that she described the alleged assault in detail.  Meanwhile, Furlow reportedly fled from the scene and said he did not want to be incarcerated.

### 3.    Municipal Liability

Furlow and Torres also contend the district court erred when it dismissed their claim that St. Louis County and Chief Belmar (acting in his official capacity) were liable for employing the SLCPD Wanteds System.  When a public employee is sued in his official capacity, the plaintiff is suing "only the public employer and therefore must establish the municipality's liability for the alleged conduct."  Kelly v. City of Omaha, 813 F.3d 1070, 1075 (8th Cir. 2016).  Municipal liability does not hinge on a municipal employee being held personally liable, rather, that employee simply needs to have committed an unconstitutional act.  See Webb v. City of Maplewood,

-16-

889 F.3d 483, 487 (8th Cir. 2018).  To make the governmental entity liable for the employee's wrongdoing under 42 U.S.C. § 1983, a plaintiff needs to prove his or her "constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a 'custom or usage' with the force of law."  Mitchell v. Kirchmeier, 28 F.4th 888, 899 (8th Cir. 2022) (quoting Ware v. Jackson Cnty., 150 F.3d 873, 880 (8th Cir. 1998)).  But see Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

The SLCPD Wanteds System, although fraught with the risk of violating the Constitution in certain circumstances and/or the danger of evidence being suppressed due to an invalid arrest, is not facially unconstitutional.  The burden is then on the plaintiffs to show a persistent pattern of unconstitutional misconduct. Mitchell v. Kirchmeier, 28 F.4th 888, 889 (8th Cir. 2022) (explaining a showing of "custom or usage" includes proof of "a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees") (quoting Ware v. Jackson Cnty., 150 F.3d 873, 990 (8th Cir. 1998)). The evidence in the record before us does not show a persistent pattern of unconstitutional arrests so pervasive that it can be said to constitute custom or usage with the force of law.  Nor do the proposed classes describe a group of individuals who demonstrate that such a custom or practice exists. The district court did not err in dismissing the plaintiffs' municipal liability claim.

### 4.   Summary Judgment on Count Three

Finally, Furlow and Torres claim the district court erred in granting summary judgment on Count Three (Deprivation of Liberty Interests without Due Process) because no party sought summary judgment on that particular count.  The Officers concede the district court *sua sponte* granted summary judgment on that count but

-17-

argue there was no error because Furlow and Torres' constitutional rights were not infringed upon by the Wanteds for their arrests.

A stigmatic claim like the one alleged in this case would fall under the rubric of substantive due process. The Supreme Court, however, has been clear that, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing th[o]se claims." Cnty. of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.)). Because the Fourth Amendment provides the "explicit textual source of constitutional protection," the district court did not err in dismissing Count Three. See id. (dismissing a substantive due process claim in favor of one under the Fourth Amendment).

## 5. Class Certification

Furlow brought a motion to certify two classes: (1) All persons, who since February 24, 2011, have been arrested pursuant to a Wanted issued by Defendants without a judicial determination of probable cause either prior to or promptly after their arrest, including those persons who were arrested without probable cause; and (2) All persons who, since February 24, 2011, have been the subject of a Wanted issued by Defendant St. Louis County and have been denied procedural remedies to quash the Wanted. Because of its disposition on the summary judgment motions, the district court denied the motion for class certification without addressing the merits and without prejudice. While the proposed classes appear quite broad, the district court is in the best position to consider in the first instance whether class certification is appropriate in light of our decision. See Kelley as Trustee of PCI Liquidating Trust v. Safe Harbor Managed Account 101, Ltd., 31 F.4th 1058, 1068 (8th Cir. 2022) (remanding to the district court for consideration of the issue when fact-intensive analysis is necessary, and it would be beneficial for us to have the district court resolve in the first instance).

-18-

## III.   CONCLUSION

For the foregoing reasons, we affirm the district court's grant of qualified immunity as to Officers Partin and Walsh and its dismissal of the municipal liability claim and Count Three.  We reverse the district court's grant of qualified immunity to Detective Clements.  We remand the case for further proceedings consistent with this opinion.

SHEPHERD, Circuit Judge, concurring in part and dissenting in part.

I join the Court's opinion in full, except for Part II.3 regarding plaintiffs' Monell[4] claim.  I hold no opinion as to whether the plaintiffs have established a Monell claim; however, I believe that the disposition of the claim is better left to the district court to decide in the first instance.  The district court found that the individual officers were entitled to qualified immunity.  Accordingly, because it found that there was no underlying unconstitutional act to support plaintiffs' Monell claim, it dismissed the claim without addressing whether the record reflected an official policy or custom of St. Louis County that gave rise to the alleged violations of plaintiffs' constitutional rights.

Having reversed the district court's grant of qualified immunity as to Detective Clements, the Court goes on to find that neither the record nor the description of the proposed classes demonstrates "a persistent pattern of unconstitutional arrests so pervasive that it can be said to constitute custom or usage with the force of law."  "Although we *may* affirm the district court's judgment on any basis supported by the record, we are not required to do so."  Loftness Specialized Farm Equip., Inc. v. Twiestmeyer, 742 F.3d 845, 851 (8th Cir. 2014). Instead, we generally remand to the district court when it would be beneficial for it to consider arguments in the first instance.  Id.; see also Kelley as Trustee of PCI Liquidating Trust v. Safe Harbor Managed Acct. 101, Ltd., 31 F.4th 1058, 1068 (8th

---

[4] Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

Cir. 2022).   This is especially true when, as here, "the parties did not comprehensively brief or argue" the alternative basis for affirmance, <u>Tweistmeyer</u>, 742 F.3d at 851, and the alternative basis requires us to engage in a "fact-intensive analysis," <u>Kelley</u>, 31 F.4th at 1068 (citation omitted).

Moreover, the Court does not explain why remand is appropriate on the issue of class certification but not on plaintiffs' <u>Monell</u> claim.   Arguably, the Court's treatment of the <u>Monell</u> claim renders remand of the class certification a forgone conclusion.  If we are to give the district court any autonomy as to the determination of class certification, then the district court should be afforded the opportunity to address the issues in tandem.

For the foregoing reasons, I respectfully dissent from the Court's disposition of plaintiffs' <u>Monell</u> claim.   I would reverse the district court's dismissal of plaintiffs' <u>Monell</u> claim and remand to give the district court, and the parties, the opportunity to pass upon the matter in the first instance.

STRAS, Circuit Judge, concurring in part and concurring in the judgment.

Think of the iconic wanted posters of the old west.  They contained just a few basic pieces of information: the name of the outlaw, his image, a reward for his capture, and the crime he committed.  *See, e.g.*, Barbara Fifer & Martin Kidston, *Wanted!: Wanted Posters of the Old West* (2003); Leanna S. Schooley & Tom Kellam, *Wanted in America* (2019).  The posters for Jesse James and John Wilkes Booth followed this formula.  *See* Photographs of John Wilkes Booth and Jesse James Wanted Posters, *in* Sophie Tanno, *$5,000 for Jesse James 'Dead or Alive' and $100,000 for Lincoln's three killers: The fascinating wanted posters for America's biggest 19th century criminals*, DailyMail (July 24, 2019, 9:25 AM), https://bit.ly/3SVNPng.  And sometimes, like during the manhunt for Jesse James, the poster would contain three words no outlaw would want to see: "DEAD OR ALIVE."  *See id.*

-20-

Although the old west is a bygone era, wanted posters still exist today.  Except now officers send out electronic messages and place the information in a computer database.  The question is whether these "wanteds," as St. Louis County calls them, violate the Fourth Amendment.  Based on the long common-law tradition of warrantless felony arrests supported by probable cause, I would conclude that the answer is no.

I.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Every arrest is a seizure, *see Torres v. Madrid*, 141 S. Ct. 989, 996 (2021), the reasonableness of which depends on "the common-law understanding of an officer's authority," *Payton v. New York*, 445 U.S. 573, 591 (1980).  The existence of a warrant generally makes an arrest reasonable, but not every reasonable arrest requires one.  *See United States v. Watson*, 423 U.S. 411, 423–24 (1976) ("Law enforcement officers may find it wise to seek arrest warrants where practicable to do so, and their judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate.").

The unfortunate history behind general warrants is one reason why.  During the pre-revolutionary period, these types of warrants gave officers a "blank check" to investigate crimes however they saw fit.  *Davis v. Dawson*, 33 F.4th 993, 1002 (8th Cir. 2022) (Stras, J., concurring).  Their features included "indiscriminate searches of people and property, and in certain cases, conscript[ion of] individuals to aid[] and assist[] the Sheriff." *Id.* (quotation marks omitted) (quoting M.H. Smith, *The Writs of Assistance Case* 95 n.1 (1978)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (explaining how general warrants allowed "general, exploratory rummaging in a person's belongings").  And importantly for this case, general warrants typically just left "the name of the person to be arrested . . . blank." *Henry v. United States*, 361 U.S. 98, 100 (1959).

-21-

Revolutionaries had good reason, based on their experience, to view "the warrant . . . as an enemy."   Telford Taylor, *Two Studies in Constitutional Interpretation* 41 (1969).  As one leading article explained, it was the "loose warrant, not the warrantless intrusion," that was "labeled unreasonable" in early drafts of the Bill of Rights.  Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 775 (1994) (quotation marks omitted) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 1027 (1971)).

Arrests supported by probable cause, by contrast, do not carry the same historical baggage.  *See Watson*, 423 U.S. at 421.  From the earliest days, the common law allowed "arrest without warrant [of any]one believed by the officer upon reasonable cause to have been guilty of a felony."  *Carroll v. United States*, 267 U.S. 132, 156 (1925); *see also* 2 Matthew Hale, *The History of the Pleas Of The Crown* 85 (1800) (noting that officers "may without any other warrant but from themselves arrest felons, and those that are probably suspected of felonies").  The no-warrant rule was so well-established,[5] in fact, that Blackstone said that "peace officer[s][] that [were] present when any felony [was] committed, [were] *bound* by the law to arrest the felon."  4 William Blackstone, Commentaries *289 (emphasis added).  The point is that probable cause has always been what makes a felony arrest reasonable, not the existence of a warrant.  *See California v. Acevedo*, 500 U.S. 565, 583–84 (1991) (Scalia, J., concurring); *cf. Robinson v. Richardson*, 79 Mass. (13 Gray) 454, 457 (1859) (explaining how the Massachusetts Constitution did not "vary, extend[, or] enlarge the purposes for and occasions on which [warrants] might be used").

---

[5]At common law, the rules were simple.  Officers could arrest suspects without a warrant if they had "probable and reasonable grounds for believing [a] party guilty of a felony."  *Rohan v. Sawin*, 59 Mass. (5 Cush.) 281, 283–84 (1850).  For most misdemeanors, an officer could only make a warrantless arrest if the suspect "committed [the offense] in [his] presence."  *Carroll*, 267 U.S. at 157.  And "the weight of authority" was that a "warrant was required" for arrests of all kinds within the home.  *Payton*, 445 U.S. at 596.

-22-

Consider an early Massachusetts case involving a constable who arrested someone suspected of committing the felony offense of "receiving and secreting stolen goods." *See Rohan*, 59 Mass. at 283–84. In rejecting a false-imprisonment claim brought against the constable, the Massachusetts Supreme Judicial Court relied on the common-law rule that he could "arrest without a warrant, in cases of felony," as long as someone—either an innocent bystander or a fellow police officer—"acquaint[ed] the constable that [the suspect] did it." *Id*. at 284. Not even Massachusetts's Founding-era warrant clause altered the common-law rule. Although it restrained the use of "general warrants," it did not mandate the use of particularized ones.[6] *Id.* at 285.

The Fourth Amendment rule is the same. *See Henry*, 361 U.S. at 100; *see also United States v. Jones*, 565 U.S. 400 (2012). As the Supreme Court has put it, "officers and agents [may] make felony arrests without a warrant" when "they have reasonable grounds to believe that the [suspect] . . . has committed or is committing a felony."[7] *Henry*, 361 U.S. at 100 (quotation marks omitted); *see also Watson*, 423

---

[6]Similar statements abound. *See, e.g.*, *Mayo v. Wilson*, 1 N.H. 53, 60 (1817) (observing that New Hampshire's counterpart to the Fourth Amendment did "not seem intended to restrain the legislature from authorizing arrests without warrant, but to guard against the abuse of warrants issued by magistrates"); *Wakely v. Hart*, 6 Binn. 316, 318 (Pa. 1814) ("[I]t is no where said, that there shall be no arrest without warrant. To have said so would have endangered the safety of society."); *State v. Brown*, 5 Del. (5 Harr.) 505, 507 (Ct. Gen. Sess. 1853); *Johnson v. State*, 30 Ga. 426, 430–31 (1860); *Baltimore & O.R. Co. v. Cain*, 31 A. 801, 803–05 (Md. 1895); *Reuck v. McGregor*, 32 N.J.L. 70, 74 (Sup. Ct. 1866); *Holley v. Mix*, 3 Wend. 350, 353 (N.Y. Sup. Ct. 1829); *Wade v. Chaffee*, 8 R.I. 224, 225 (1865).

[7]The Second Congress, for example, understood that warrantless felony arrests posed no constitutional problem. In 1792, it passed a law "invest[ing] United States marshals and their deputies with 'the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states.'" *Watson*, 423 U.S. at 420 (quoting Act of May 2, 1792, ch. 28, § 9, 1 Stat. 265). This grant of power, in effect for over two centuries, allowed marshals to have "the same power as local peace officers to arrest for a felony without a warrant." *Id.* The point is

-23-

U.S. at 417 (stating that the "necessary inquiry" is "not whether there was a warrant . . . but whether there was probable cause for the arrest").  Indeed, the Supreme Court "has *never* invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant." *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975) (emphasis added); *but see ante*, at 9 (claiming that "[w]arrants are the default rule to effect a reasonable arrest").

## II.

One reason why is that wanteds in some form have been a staple of American life since the Founding.  In the 1780s, officials issued proclamations announcing the identity of fugitives and a reward for their capture.  During Shays' Rebellion, for example, a proclamation from Massachusetts Governor James Bowdoin declared a reward for the capture of the rebels and "enjoined and required" all "judges, justices, sheriffs, and constables" to "use their utmost endeavours [sic] to apprehend and secure" them.  Photograph of a 1787 Proclamation Offering a Reward for the Apprehension of Daniel Shays and Others, *in* America's Historical Imprints, at 1 Early American Imprints, No. 20623; *see also* Leonard L. Richards, *Shays's Rebellion: The American Revolution's Final Battle* 19 (2002); Thomas Chittenden, *A Proclamation*, *in Public Papers of Governor Thomas Chittenden* 679–81 (John A. Williams ed., 1969) (reproducing a proclamation by the Governor of Vermont to assist in the capture of the rebels).  And later, in the old west, sheriffs "spread[] the news of wanted fugitives to their known haunts and along likely paths of escape" through mail, telegraphs, and posters.  Fifer & Kidston, *supra*, at 5.  The person making the arrest often did not have personal knowledge of the crime the outlaw committed.  *See id.* at 6 (explaining that local law-enforcement agencies used wanted posters to ask surrounding jurisdictions for "help in capturing and holding fugitives until one of their [own] officers could arrive").  Even so, no one really questioned the constitutionality of the practice.

---

that, historically speaking, no one "saw [any] inconsistency between the Fourth Amendment" and warrantless arrests.  *Id.* at 420–21.

-24-

According to an early Massachusetts case, the common law may have provided the reason. In *Commonwealth v. Carey*, a case decided just three years after *Rohan*, the Massachusetts Supreme Judicial Court declared that

> if a constable or other peace-officer arrest[s] a person without a warrant . . . [and] suspects [a felony] on his own knowledge of facts, or *on facts communicated to him by others*, and thereupon he has reasonable ground to believe that the accused has been guilty of [a] felony, the arrest is not unlawful.

66 Mass. (12 Cush.) 246, 251 (1853) (emphasis added). That basic rule, combined with the fact that the constable or peace officer "ha[d] a right to summon others to assist him in making the arrest," gave us all the ingredients for what eventually became the collective-knowledge doctrine. *See Commonwealth v. Phelps*, 209 Mass. 396, 410 (1911). The Supreme Court agreed a few years later when it declared that probable cause could come from either an officer's "own knowledge of facts, or on facts communicated to him by others." *Carroll*, 267 U.S. at 161 (relying on both Massachusetts cases).

Nearly half a century later, the Supreme Court explained how one officer could pass probable cause on to another. In *Whiteley v. Warden*, one Wyoming police department secured an arrest warrant and sent out a radio bulletin to another department, which then communicated it to a third. 401 U.S. 560, 563–64 (1971). Despite what became a game of telephone,[8] the Court matter-of-factly said that

---

[8] Although the Court did not mention it, communications like this one were routine under the common law's hue-and-cry rule. *See* Joseph Chitty, *A Practical Treatise on the Criminal Law* *26–30. When an individual had been seriously wounded by a suspect who was still at large, officers had a common-law duty to "give immediate notice to the next constable, and he to the next" until the suspect was caught. *Id.* at *26–27. Blackstone dates this practice back to 1285, although adherence to it ebbed and flowed until 1735, when an English statute made constables personally liable for failing to raise a hue or cry. 4 William Blackstone, Commentaries *290–91 (first citing Statute of Westminster 1285, 13 Edw. I c. 1, 4; and then citing 8 Geo. 2, c. 16 (1735)).

-25-

"[w]e do not, of course, question that the [third police department was] entitled to act on the strength of the radio bulletin." *Id.* at 568. The arresting officers were "entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause," even if they did not personally possess "any factual data tending to corroborate . . . the tip." *Id.*

In *United States v. Hensley*, the Supreme Court extended *Whiteley* to situations in which there was no arrest warrant. 469 U.S. 221, 229–30 (1985). There, "officers of one police department" stopped a suspect "in reliance on a flyer issued by another department indicating that the person [was] wanted for investigation of a felony." *Id.* at 229. No problem, the Court said. The flyer had "been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person ha[d] committed an offense." *Id.* at 232, 234. It did not matter whether the officers who performed the stop "were themselves aware of the specific facts" leading to the issuance of the flyer. *Id.* at 231–32 (discussing *Whiteley*, 401 U.S. at 569).

It is true, as Furlow and Torres argue, that their cases are different because they were arrested, not just stopped. But the Supreme Court has already decided that this distinction does not matter. After all, *Hensley* said that officers of one department could have properly arrested the suspect if "the officer[] who *issued* the flyer possessed probable cause to make the arrest." *Id.* at 231–32 (discussing *Whiteley*, 401 U.S. at 568). *Hensley*, in other words, synthesized the reasoning of those early Massachusetts cases into what we now know as the collective-knowledge doctrine, which allows a "stop, search, or arrest [of] a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010); *United States v. Chavez*, 534 F.3d 1338, 1345–47 (10th Cir. 2008) (examining the collective-knowledge rationale of *Hensley*).

-26-

III.

At this point, two principles are clear.  First, the longstanding common-law rule is that officers can arrest suspected felons if they have probable cause, regardless of whether they have a warrant.  *See Watson*, 423 U.S. at 419; *see also Rohan*, 59 Mass. at 284.  And second, an officer can rely on a wanted poster, bulletin, or flyer if another officer had probable cause to issue it.  *See Hensley*, 469 U.S. at 230–31; *see also Whiteley*, 401 U.S. at 568.  It is now time to apply those principles to this case.

A.

Furlow's circumstances are straightforward.  When Officer Walsh first encountered Latoya, Furlow's wife, she was "angry, . . . fearful, afraid, [and] nervous."  By her own account, Furlow had just "smacked her in the cheek," "knock[ed] her to the ground," "stomped on her legs," and "grabbed her by her hair." Even though she recanted her statement the next day, Officer Walsh still had probable cause to believe that Furlow committed domestic assault the day before. And under the collective-knowledge doctrine, so did the officers who later arrested him.  *See Hensley*, 469 U.S. at 232; *see also Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005).

B.

Torres's situation is a different story.  Although Detective Clements initially had probable cause to believe that he had sexually assaulted his daughter, it had gone away by the time another officer arrested him.  *See ante*, at 15.  A parallel investigation had failed to uncover evidence supporting the sex-abuse allegation. And once probable cause was gone for Detective Clements, who had personal knowledge of the investigation, it was gone for the officer who eventually arrested Torres too.  *See Hensley*, 469 U.S. at 232; *see also* 4 William Blackstone,

-27-

Commentaries *291 ("But if a man wantonly or maliciously raises a hue and cry, without cause, he shall be severely punished as a disturber of the public peace.").

IV.

One last comment.  The court departs from the common-law rule by making arrest "[w]arrants . . . the default rule."  *Ante*, at 9.  The concern seems to be that most officers will just bypass warrants in favor of a quicker and easier solution: wanteds.  *See id.* at 9–10.  Even aside from the fact that warrantless felony arrests have been a regular part of police practice for hundreds of years, the court's slippery-slope concern is unlikely to be a serious problem for two reasons.

First, as Torres's circumstances show, officers can face lawsuits when they are wrong about probable cause.  With arrest warrants, money damages are typically unavailable.  *See Carroll*, 267 U.S. at 156; *Kiesling v. Holladay*, 859 F.3d 529, 533 (8th Cir. 2017) (observing that "a warrant generally confers a shield of immunity [on] officers" (quotation marks omitted) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012)).  But without one, officers can face substantial civil liability.  *See Thurairajah v. City of Fort Smith*, 925 F.3d 979, 983 (8th Cir. 2019) (explaining that, after a warrantless arrest, an officer only gets qualified immunity if there was arguable probable cause); *see also Hensley*, 469 U.S. at 232 (stating that "officers making the stop" in reliance on a flyer "*may* have a good-faith defense to any civil suit" (emphasis added)).

Second, an absence of probable cause generally requires the suppression of any evidence found during a search incident to the arrest.  *See Wong Sun v. United States*, 371 U.S. 471, 483–85 (1963) (applying the fruit-of-the-poisonous-tree doctrine to a search incident to a warrantless arrest).  But if the officers have an arrest warrant, the evidence may still be admissible under the good-faith exception.  *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011) (quoting *United States v. Leon*, 468 U.S. 897, 900 (1984)).

-28-

The point is that officers still have every incentive to get an arrest warrant, especially when probable cause is a close call.  But in the ordinary case, nothing—not the common law nor the Fourth Amendment—prevents them from making a warrantless arrest.

_____

-29-